# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

FRANK NOONAN, RANDY FEATHERS,
RICHARDS A. SHEETZ, JR., E. MARC
COSTANZO and FRANK FINA
        Appellants

v.

KATHLEEN KANE and MICHAEL MILETTO
        Appellees

---

## **BRIEF OF APPELLANTS**

---

## **Nos. 16-3311 & 16-3312**

---

*Appeal from the Order of the Honorable Harvey J. Bartle, III, Entered on July 19, 2016 in the United States District Court for The Eastern District of Pennsylvania No. 15-cv-06082*

---

MARK W. TANNER, ESQUIRE
Feldman Shepherd Wohlgelernter Tanner
Weinstock & Dodig, LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
Attorneys for Appellants, Frank Noonan,
Randy Feathers, Richard A. Sheetz, Jr., and
Frank Fina

FORTUNATO N. PERRI, JR., ESQUIRE
McMonagle Perri McHugh & Mischak
145 Walnut Street, 19th Floor
Philadelphia, PA 19103

Attorney for Appellant, E. Marc Costanzo

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

STATEMENT OF SUBJECT MATTER AND ..................................................... 1
APPELLATE JURISDICTION

STATEMENT OF THE ISSUES........................................................................... 2

STATEMENT OF RELATED CASES AND
PROCEEDINGS CONSISTENT WITH LRAP 28.1(A)(2) ................................... 4

CONCISE STATEMENTOF THE CASE ........................................................... 5

    A.    Relevant Facts .................................................................................. 5
    B.    Procedural History.......................................................................... 13
    C.    Rulings Presented for Review ........................................................ 14

STANDARD OF REVIEW ................................................................................ 15

SUMMARY OF ARGUMENT .......................................................................... 16

ARGUMENT ..................................................................................................... 20

I.    PLAINTIFFS/APPELLANTS' FIRST AMENDED COMPLAINT
    ADEQUATELY STATES A CLAIM FOR RELIEF ARISING FROM THE
    DEFENDANT/APPELLEES' GOVERNMENTAL ACTION IN
    RETALIATION FOR THE EXERCISE OF APPELLANTS' PROTECTED
    FIRST AMENDMENT RIGHT OF FREE SPEECH ............................... 20

    A.    The First Amended Complaint sets forth viable claims
        for retaliation by a governmental official against a person who
        exercises a First Amendment Right as actionable under
        42 U.S.C. §1983 ........................................................................... 21

    B.    The lower court misapplied the holdings of *Koren* and *Saurez*
        insofar as the court failed to acknowledge the clear facts
        alleged in the First Amended Complaint ........................................ 26

C.     The issue of whether the acts of retaliation "would deter a person of ordinary firmness from exercising his or her First Amendment right" is a question of fact that is not ripe for decision on a Rule 12(b)(6) Motion .......................... 33

D.     Defendant Kane's defamatory speech is not separately protected by the First Amendment when it is retaliatory in nature ......................................................................... 35

E.     Plaintiffs have sufficiently pled a nexus between their constitutionally protected speech and Kane's retaliation ................ 38

II.     THE LOWER COURT ABUSED ITS DISCRETION IN FAILING TO GRANT PLAINTIFFS/APPELLANTS MOTION UNDER RULE 60(b) AND PERMIT PLAINTIFFS TO CURE ANY PERCEIVED DEFICIENCIES IN THEIR PLEADING USING EVIDENCE THAT BECAME UNSEALED AND AVAILABLE AFTER THE GRANT OF APPELLEES' RULE 12(b)(6) MOTION .................................................. 39

III.     CONCLUSION .......................................................................... 44

CERTIFICATE OF COMPLIANCE .................................................... 45

CERTIFICATE OF SERVICE ........................................................... 46

APPENDIX VOLUME I

# TABLE OF AUTHORITIES

Page No.

**Cases**

*Allah v. Seiverling*, 229 F.3d 220, 224–25 (3d Cir.2000)................................. 42, 44

*Anderson v. Davila*, 125 F.3d 148, 160 (3d Cir. 1997) ............................. 24, 25, 26

*Ashcroft v. Iqbal*, 556 U.S. 662, 678................................................................. 21, 22

*Barrett v. Harrington*, 130 F.3d 246 (6th Cir.1997), cert. denied, 523 U.S. 1075, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998)................................................................43

*Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982).............................................39

*Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007)21

*Bloch v. Ribar*, 156 F.3d 673, 681–82 (6th Cir.1998) ............................... 42, 43, 44

*Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003) ...........................................30

*Citizens for a Better Lawnside, Inc. v. Bryant*, 2007 WL 1557479............ 37, 39, 40

*Colson v. Grohman*, 174 F.3d 498, 514 (5th Cir. 1999)...........................................31

*Commonwealth of Pennsylvania v. Kathleen Granahan Kane,* Montgomery County Court of Common Pleas Docket Nos. CP-46-CR-0006239-2015 and CP-46-CR-0008423-2015 ........................................................................................................4

*Compass Technology, Inc. v. Tseng Laboratories, Inc.*, 71 F.3d 1125, 1130 (3d Cir. 1995) ........................................................................................................................50

*Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 n2 (3d Cir. 2015)...................15

*Constantine v. Rectors and Victors of George Mason University*, 411 F.3d 474, 500 (4th Cir. 2005)................................................................................................40

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) ....................................................................................22

*DeLoach*, 922 F.2d at 620............................................................................... 42, 44

*Doe v. Deli*, 257 F.3d 309, 315 (3d Cir. 2001) ......................................................32

*Eichenlaub v. Twp of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004)..........................26

*Feibush v. Johnson*____ F. Supp.3d____ (E.D. of PA 2016), 2016 WL 4478775 *7..............................................................................................................................40

*Gill v. Pidlypchak*, 389 F.3d 379, 381 (2nd Cir. 2004)..........................................41

*Great W. Mining and Mineral Co. v. Fox Rothschild, LLP*, 615 F.3d 159, 163 (3d Cir. 2010) ...............................................................................................................15

*Harbin-Bey v. Rutter*, 420 F.3d 571, 579 (6th Cir. 2005)......................................41

*Hartman v. Moore*, 547 U.S. 250, 256 (2006)................................................. 23, 24

*Herndon v. Lowry*, 301 U.S. 242 (1937)...............................................................24

*Hesling v. CSX Transp., Inc.,* 396 F.3d 632, 642 (5th Cir.2005) ...........................50

*In Re Asbestos Product Liability Litigation* (*No. VI*), 822 F.3d 125, 131 (3d Cir. 2016) ......................................................................................................................15

*In re Blood Reagents Antitrust Litig.,* 756 F.Supp.2d 623, 630–31 (E.D.Pa.2010) 22

*In re: Processed Egg Products Antitrust Litigation*, 902 F.Supp. 2d 704, 710 (E.D. of PA 2012) ................................................................................................23

*Koren v. Noonan*, 586 F.App'x 885 (3d Cir. 2014)........................ 2, 29, 30, 32, 34

*Lauren W., ex rel. Jean W. v. Deflaninis*, 480 F.3d 259, 267 (3d Cir. 2007)..........45

*Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir.1984).................................... 42, 44

*Mezibov*, 411 F.3d at 722 .................................................................................43

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) ......... 24, 26

*NAACP v. Button*, 371 U.S. 415, 429 (1963)...........................................................23

*Neuberger v. Gordon*, 567 F. Supp., 2d 622 (D. Del. 2008) ........................... 32, 33

*Nicholas v. Pa. State Univ.*, 227 F.3d 133, 144 (3d Cir. 2000) .............................26

*O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006)............... 30, 37, 38

*Ollman v. Evans*, 750 F.2d 970, 1002 (D.C. Cir. 1984) .......................................31

*Parks v. City of Horseshoe Bend*, 480 F.3d 837, 840 (8th Cir. 2007).....................30

*Pennsylvania Office of Attorney General v. Brad Bumsted,* 134 A.3d 1204 (Pa Cmwlth 2016) .............................................................................................11

*Pennsylvania Office of Attorney General v. Supervising Judge of the 35th Statewide Investigating Grand Jury*, Supreme Court of Pennsylvania, No. 171 MM 2014, (December 12, 2014, unsealed August 26, 2015)...................................8

*Penthouse International Limited v. Meese*, 939 F.2d 1011, 1015 (D.C. Cir. 1991)35

*Perry v. Sinderman*, 408 U.S. 593, 597 (1972) ...................................................25

*Smith v. Mosley*, 532 F.3d 1270, 1277-78 (11th Cir. 2008)....................................40

*Springer v. Henry*, 435 F.3d 268, 275 (3d Cir. 2006)............................................26

*Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000) 2, 29, 30, 34, 35, 36

*Suppan v. DaDonna*, 203 F.3d 228, 234-35 (3d Cir. 2000) ............................ 38, 39

*Thaddeus–X v. Blatter*, 175 F.3d 378, 398 (6th Cir.1999) .............................. 42, 44

*Thomas v. Collins*, 323 U.S. 516, 537 (1945)........................................................23

*Thomas v. Independence Township,* 463 F. 3d 285 (3d Cir. 2006)............ 38, 39, 45

*Virgin Islands National Bank v. Tyson*, 506 F.2d 802, 804 (3d Cir. 1974).............16

*Whalen v. Roe*, 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) ...............32

*X-Men Sec. Inc. v. Pataki*, 196 F.3d 56 (2d Cir. 1999).............................................35

## Statutes

28 U.S.C. §1291 .................................................................................................1

28 U.S.C. §1331 .................................................................................................1

28 U.S.C. §1367 .................................................................................................1

42 U.S.C. §1983 .................................................................................................1

## Rules

FED. R. CIV. P. 60(b)(6) .....................................................................................51

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

Plaintiffs/Appellants' First Amended Complaint asserted claims for violation of Plaintiffs' First Amendment rights under the United States Constitution, as actionable pursuant to 42 U.S.C. §1983.[1] The District Court exercised jurisdiction pursuant to 28 U.S.C. §1331.

The District Court entered a final Order dismissing this case in its entirety on July 19, 2016, and Plaintiffs/Appellants filed timely Notices of Appeal on August 4, 2016. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. §1291, as the appeal is from a final Order or judgment that disposed of all of the parties' claims.

---

[1] The District Court had supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. §1367; however, those state law claims as asserted against the Philadelphia Daily News, Christopher Brennan, Philadelphia Media Network, LLC, and Philadelphia Media Network (Digital) LLC, have been resolved and are no longer before the Court. A Stipulation of Dismissal was entered in this Court on February 3, 2017.

## **STATEMENT OF THE ISSUES**

1.     Does the Plaintiffs' First Amended Complaint state any claim upon which relief can be granted such that the lower court erred in granting the Defendants' Motion to Dismiss filed under Rule 12(b)(6)?

*Suggested Answer: Yes.*

2.     In reviewing the Plaintiffs' First Amended Complaint, and applying the analysis reflected in the unpublished opinion of this Court in *Koren v. Noonan*, 586 F.App'x 885 (3d Cir. 2014) and the 4th Circuit's reasoning from *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000), did the lower court fail to accept the Amended Complaint's plausible factual allegations as true, and further fail to draw all inferences in the light most favorable to the Plaintiff?

*Suggested Answer  Yes.*

3.     In determining that the allegations of retaliation set forth in Plaintiffs' First Amended Complaint describe conduct that "would not dissuade a person of ordinary firmness" from exercising their First Amendment right to free speech, did the trial disregard existing precedent and make a factual determination that was not ripe for decision on a Rule 12(b)(6) Motion?

*Suggested Answer: Yes.*

4.     In denying Plaintiffs/Appellants Motion to Amend their Complaint filed pursuant to Rule 60(b), did the trial court abuse its discretion by refusing to

give Plaintiffs/Appellants the opportunity to cure any perceived deficiencies in their pleading based upon subsequently unsealed Grand Jury and trial testimony that confirmed the claims of Plaintiffs/Appellants and resulted in the criminal conviction of the Defendant Kane?

*Suggested Answer: Yes.*

## STATEMENT OF RELATED CASES AND
## PROCEEDINGS CONSISTENT WITH LRAP 28.1(A)(2)

This case has not previously been before this Court, and Appellants are not aware of any other case or proceeding that is in any way related, completed, pending or about to be presented before this Court. The facts giving rise to the Plaintiffs/Appellants causes of action are related to those that were the subject of

*Commonwealth of Pennsylvania v. Kathleen Granahan Kane,* Montgomery County Court of Common Pleas Docket Nos. CP-46-CR-0006239-2015 and CP-46-CR-0008423-2015 in which the Appellee was tried and convicted of Perjury, False Swearing, Obstruction of the Administration of Law Enforcement, and Conspiracy and Official Oppression to Deny Rights.

## CONCISE STATEMENT OF THE CASE

### A.     Relevant Facts

Plaintiffs/Appellants consist of three former Prosecutors (Sheetz, Costanzo and Fina), an Investigator (Feathers), and a former Commissioner of the State Police (Noonan). [A000143-144, A000145-149, ¶¶ [2]26-30, 35-61]. These men spent many years in the service of the Office of Attorney General, under multiple acting Attorney Generals, and their backgrounds were exemplary. Each of these individuals resigned their positions effective on or before Kathleen Kane took office as the Attorney General for the Commonwealth of Pennsylvania – a tenure which was terminated by her criminal convictions.[3]

It was apparent, both prior to Kane's tenure and in the immediate weeks that followed her inauguration, that Plaintiffs/Appellants would be unable to work with Kane, given the unwarranted, and factually unfounded, attacks which Kane had made on their work during Kane's political campaign. [A000137, A000149-153, ¶¶5-6, 62-82]. Moreover, Kane was actually aware that these individuals possessed first-hand knowledge which could expose the falsity of some of her campaign claims, and Kane knew they were also aware of her true motive in

---

[2] All paragraph references are to paragraphs in Plaintiffs' First Amended Complaint.

[3] On August 15, 2016, Kane's criminal trial concluded with a guilty verdict on the charges that Kane unlawfully disclosed grand jury materials and committed perjury before the grand jury. [A000711].

quashing an ongoing criminal investigation in which one of the individuals being investigated was her own campaign worker. [A000138-140, A000151-156, ¶¶8-14, 17, 72-82, 83-99]. Further, Kane knew some of the Plaintiffs/Appellants were expected to testify before a Grand Jury, and they had evidence that actions Kane had taken were both unethical and potentially illegal.[A000170-172, ¶¶ 128-138].

Given these circumstances, Kane was overwhelmingly concerned that the information held by these individuals could potentially prove explosive and lead to her public humiliation if not criminal conviction. [A000139, A000156-158, A000170, A000175, ¶ ¶13, 100-102, 130, 151]. In fact, her desire to destroy these individuals became both the focus of her brief career and its Achilles' heel, as her actions described in the First Amended Complaint resulted in the suspension of her law license and her subsequent felony convictions. *Id.*

As part of her retaliatory misconduct, Kane sent emissaries to provide direct warning to Plaintiffs/Appellants of potential retaliation if they continued to exercise their First Amendment rights and voice any criticism of Kane or her activities. In essence, she attempted to extort their silence. As described in detail in the First Amended Complaint, Kane sent her Chief Operating Officer, David Tyler, to send a message to Plaintiff/Appellant Frank Fina and others through one of Fina's colleagues, conveying that Fina and his colleagues would be "hurt" if "Fina does not back off" from his criticisms and comments exposing Kane's

conduct.  [A000175, A000177, ¶¶151, 155-156]. At the time, Fina and others were being openly critical of Kane's mishandling of the Tyrone Ali investigation (in which her own campaign manager was implicated), and further were actively exposing Kane's outright fabrications in connection with her attempts to criticize the Jerry Sandusky investigation, which was one of the most successful child predator prosecutions in history. [A000150-152, A000156, A000173-174, ¶¶66, 75-81, 98, 141-142, 146].

Kane delivered a second threat via the Chief Deputy Attorney General for Appeals and Legal Services, James Barker, who likewise conveyed a message to a close colleague of Mr. Fina, stating that if Fina did not stop criticizing Kane, Kane would retaliate by selectively releasing embarrassing private emails of Fina and his colleagues, the Plaintiffs/Appellants.  [A000175, A000177, ¶¶151,157-158].

In addition to the verbal threats which were issued by Kane via her staff, co-defendant Michael Miletto, at Kane's direction, attempted a more confrontational and physical effort at intimidation, confronting Fina and Costanzo physically in an elevator as they were heading to the courtroom to provide Grand Jury testimony which was relevant to Kathleen Kane's ultimate criminal conviction. [A000170-172, ¶¶128-138].

These threats and others were reported and corroborated via a Special Prosecutor, and the Honorable William Carpenter, who was presiding over a Grand

Jury Investigation pertaining to some of these events, concluded ". . .There were attempts, direct and indirect by agents of the OAG to sway Mr. Fina's and Mr. Costanzo's testimony before the Grand Jury. It was the substance of the threats combined with the timing of those threats, i.e. when the OAG became aware that both men were subpoenaed to testify, that created an atmosphere of intimidation."[4]

As Plaintiffs/Appellants continued to exercise their First Amendment rights, and as Plaintiffs/Appellants gave testimony and/or spoke publicly in ways that portrayed Kane in an adverse light and foreshadowed her ultimate demise [A000183-184, ¶¶170-171], Kane used the power of her office to unleash a torrent of retaliation, attempting to destroy these men by any means available. [A000186-190, A000192-193, A000195, ¶¶180, 184-187, 189, 196, 203, 210, 216, 223]. In an email to one of her co-conspirators, she described her efforts stating: "this is war." [A000139, ¶13].

First, Kane falsely and very publicly claimed that she was shutting down the investigation of multiple state officials that had been spearheaded by Fina (the Ali Investigation), claiming that it was racially motivated and unsound. Although these allegations were untrue, and Kane was actually shutting this investigation

_____

[4] Opinion of the Honorable William R. Carpenter in *Pennsylvania Office of Attorney General v. Supervising Judge of the 35th Statewide Investigating Grand Jury*, Supreme Court of Pennsylvania, No. 171 MM 2014, (December 12, 2014, unsealed August 26, 2015) [A000651-669, A000175 at ¶152].

down because of her own staff's implication in the investigation, the remarks were designed to disparage the character of Mr. Fina and Mr. Costanzo, who were now employed as prosecutors with the Philadelphia District Attorney's office. [A000139, A000153-158, ¶¶13-14, 83-105].

Next, by way of further retaliation, Kane also convened a televised press conference in which she claimed that foot-dragging and delay by the Plaintiffs/Appellants in the prosecution of child sex predator Jerry Sandusky permitted additional boys to be victimized as a consequence of this alleged delay. Obviously, the allegations that inadequate investigation or prosecution somehow allowed children to become victims of sexual assault proved devastating to the reputations of these longtime investigators and prosecutors, and in fact, Kane later admitted such allegations were not true. [A000173-174, ¶¶139-148].

Additionally, Kane had her co-conspirator Michael Miletto create a "statement," many years after a Grand Jury investigation involving J. Wyatt Mondesire had been closed, falsely suggesting that there was some improper termination of the investigation and/or that it was somehow motivated by politics as opposed to the facts. Kane then selectively collected contemporaneous documents from the sealed Grand Jury investigation involving J. Wyatt Mondesire, which Kane was required to keep confidential as a matter of law, and deliberately redacted portions of these materials to falsely depict the roles of Fina and

Costanzo. At Kane's direction, her campaign manager, Josh Morrow, then delivered these redacted documents to a reporter, Christopher Brennan, with directions that a story should be written which openly questioned the ethics and motives of Mr. Fina and Mr. Costanzo, in allegedly terminating this prosecution. [A000139, A000159-162, ¶¶15, 106-113, 129-134]. Articles about these events were published in the Daily News and other news networks in the area, wrongly calling into question the integrity of these two prosecutors.[5]*Id.*

Finally, in the course of Kane's retrospective review of the Sandusky prosecution, she became aware of a large number of emails that had been circulated over many years amongst scores of current and former OAG employees, and some outside individuals, and Kane discovered that many of these emails contained offensive material. None of the original content on these email strings was authored by any of the Plaintiffs/Appellants, and in fact, only a handful of the emails were ever forwarded by a few of Plaintiffs/Appellants with comments. There is no evidence that E. Marc Costanzo ever sent or forwarded any offensive email. The same holds true for Mr. Noonan. [A000174-175, ¶¶149-151].

Kane first sought legal opinions about whether she could release the names of any individuals connected in any fashion to these email strings. Towards that

---

[5] It was precisely these events that led directly to Kane's criminal conviction, as outlined in the Plaintiff/Appellants' Rule 60 Motion citing trial testimony from Kane's criminal trial. [A000270-650].

end, she received two legal opinions from counsel indicating that these emails could not lawfully and selectively be released to the public. [A000175, ¶152]. Nonetheless, Kane utilized her contacts in the media, and surreptitiously advised them to file Right to Know Requests for certain emails, targeting specific emails which she knew would prove disparaging to Plaintiffs/Appellants. [A000175-177, ¶¶151-155]. While she was providing this *sub-rosa* encouragement to the media, her office was taking the official position that the emails at issue were not subject to disclosure, and they were opposing the disclosure in an action by the media in the Commonwealth Court, which resulted in an Opinion[6] that the emails were not subject to public disclosure. *Id.*

After initially taking the public position that none of these emails would be produced, Kane then selectively redacted authors and recipients of some of the more offensive emails, leaving only the names of Plaintiff/Appellants visible in the string, and on multiple occasions released emails directly to members of the media, both on television and in news and print publications. She did so in a selective and misleading way, so as to paint a picture that Plaintiff/Appellants were at the core of these inappropriate emails, notwithstanding the fact that they played little, if any, role, and were never the authors of any of the original content. *Id.*

---

[6] See *Pennsylvania Office of Attorney General v. Brad Bumsted,* 134 A.3d 1204 (Pa Cmwlth 2016).

Most notably, Kane arranged for an interview on CNN, a national news program, and supplied photographs of Plaintiffs/Appellants, stating on CNN that these individuals were responsible for circulating emails of a pornographic and racially offensive nature, and which contained a number of offensive images, including "images of children." In this way, Kane attempted to paint these prosecutors and investigators as individuals who viewed and circulated child pornography, and she did so on national television. [A000178-182, ¶¶163-169]. In fact, there was absolutely no child pornography contained in any of the emails, and to the extent there were any harmless or comical images of children, the only email that Kane could identify with such images was one that had been distributed to most of her staff who still worked for her, including her co-defendant Miletto who was not identified to the media. *Id.*

Kane used the power of her office to unlawfully target Plaintiffs/Appellants whom she viewed as her critics and whom she knew she had to silence and discredit in order to stop the wheels of justice that were driving towards her conviction. Her motive was clear – to destroy Plaintiffs/Appellants, destroy their credibility, and shame them into silence. For this reason, Plaintiffs filed the First Amended Complaint seeking redress for this abuse of government power and this infringement on their First Amendment rights to speak and give testimony on matters of public importance.

## B. Procedural history

Plaintiffs filed their First Amended Complaint on February 26, 2016. On March 10, 2016, the defendant Kathleen Kane filed a Motion to Dismiss Counts I through VI of the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), alleging that the First Amended Complaint failed to state a claim upon which relief could be granted. Plaintiffs filed a Response in Opposition to this Motion on April 1, 2016, and Kane filed a Reply Brief on April 15, 2016.

On July 19, 2016, the Honorable Harvey J. Bartle, III, filed an Order and Memorandum Opinion granting Kane's Motion to Dismiss. Plaintiffs/Appellants filed their Notice of Appeal on August 8, 2016. During the pendency of the appeal, Plaintiffs/Appellants filed a Motion for Relief pursuant to Rule 60(b) requesting the trial court vacate the Order granting Kane's Motion to Dismiss, with Plaintiffs/Appellants seeking leave to file a Second Amended Complaint based upon Grand Jury testimony that recently became unsealed and trial testimony that was produced during the Montgomery County criminal trial in which defendant Kathleen Kane was convicted. Defendant Kane filed a Response in Opposition to this Motion on November 10, 2016, and on December 2, 2016, the Honorable Harvey J. Bartle filed an Order and Memorandum Opinion denying Plaintiffs/Appellants' Motion to Vacate.

On February 3, 2017, upon Motion of the parties, this Court entered a Stipulation dismissing the media defendants (Brennan, Philadelphia Daily News, Philadelphia Media Network, LLC and Philadelphia Media Network (Digital), LLC).

**C.     Rulings Presented for Review**

Plaintiffs/Appellants seek review of the Trial Court's Order dismissing Plaintiffs' First Amended Complaint, and of the Trial Court's refusal to grant Plaintiffs/Appellants Rule 60(b) Motion in which Plaintiffs/Appellants sought to amend their Complaint with information contained in previously sealed Grand Jury testimony and trial testimony that was produced following the Court's dismissal of Plaintiffs/Appellants' claims.

## STANDARD OF REVIEW

This Court's review of the District Court's dismissal of the Plaintiffs' First Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) is plenary. *In Re Asbestos Product Liability Litigation* (*No. VI*), 822 F.3d 125, 131 (3d Cir. 2016) citing *Great W. Mining and Mineral Co. v. Fox Rothschild, LLP*, 615 F.3d 159, 163 (3d Cir. 2010). In determining whether the Plaintiffs/Appellants' First Amended Complaint sets forth a viable claim, the Court must accept as true all plausible facts alleged in the First Amended Complaint and draw all reasonable inferences in favor of the Plaintiffs/Appellants. *Id.* citing *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 n2 (3d Cir. 2015).

Generally, the District Court's ruling on a Motion brought pursuant to Rule 60 is reviewable on appeal only for abuse of discretion. *Virgin Islands National Bank v. Tyson*, 506 F.2d 802, 804 (3d Cir. 1974).

# SUMMARY OF ARGUMENT

A citizen's right to be free from governmental retaliation for the exercise of free speech is protected by the First Amendment, and when elected officials take action against individuals in retribution for such speech, it gives rise to a well-recognized cause of action. This cause of action is an essential safeguard of our fundamental freedoms which allow for open criticism of public officers, and it has been repeatedly embraced by our Supreme Court.

Because even legitimate and otherwise lawful acts of government can violate the Constitution when undertaken for purposes of retaliation against one who exercises a First Amendment freedom, the motives of the government actors are relevant, and even dispositive, when determining the viability of such a claim.

Plaintiffs/Appellants' 241 paragraph First Amended Complaint describes, in detail, the words and actions of convicted felon Kathleen Kane, who while acting as Attorney General of this Commonwealth, was observed by many as being "hell-bent" in her endless quest for retribution against the Plaintiffs/Appellants. Her motive was clear: she wanted to punish, discredit and silence these men who provided Grand Jury testimony and who spoke publicly as a means of exposing her wrongdoing, much of which led to the suspension of her law license and her ultimate criminal conviction. Kane repeatedly threatened Plaintiffs/Appellants in an effort to coerce their silence, and as Plaintiffs/Appellants continued to exercise

their First Amendment right to speak out and expose Kane's lies and crimes, she utilized the power and pulpit of her office to unleash a torrent of retaliation.

In an effort to discredit and silence the Plaintiffs/Appellants, Kane illegally gathered, and selectively redacted, confidential documents from a closed Grand Jury investigation. She then illegally distributed them to the press in an effort to promote a story which misleadingly implied that two of the Plaintiffs/Appellants had wrongly terminated the investigation for political reasons rather than as a consequence of the evidence. She publicly and falsely accused Plaintiffs/Appellants of racially targeting legislators whom they had investigated (in an effort to divert attention from another subject of the same investigation – her own political consultant), and she also arranged for a televised interview on the national news program, CNN, in which she falsely and publicly accused Plaintiffs/Appellants of trafficking in child pornography as their pictures were broadcast nationally. Kane's retaliation, however, was not just slanderous. Kane sent her aide and co-Defendant Miletto to physically confront and intimidate two of the Plaintiffs/Appellants on the morning they were to appear before a Grand Jury investigating Kane's actions, and she also held a press conference in which she falsely claimed that two boys were sexually assaulted due to alleged delay by Plaintiffs/Appellants in investigating and prosecuting the notorious child predator Jerry Sandusky. Finally, Kane utilized the resources of her office to scour

government servers and gather private emails, from which she redacted the original authors, senders, and scores of recipients so as to only leave the names of Plaintiffs/Appellants visible, and in this way published these emails to the media and the public, falsely suggesting that Plaintiffs/Appellants were at the core of a mass of employees who had circulated offensive strings of emails. She selectively released this information notwithstanding two legal opinions which she had obtained advising her that such a release was illegal, and she did so solely to seek revenge against Plaintiffs/Appellants. Individually, let alone collectively, these actions were not *de minimis*.

Moreover, Kane's threats and efforts to extort silence from Plaintiffs/Appellants, combined with her retaliatory motives and the falsity of her statements, deprive her of any protection she might otherwise be afforded in connection with her own First Amendment right. Similarly, her actions cannot be fairly characterized as a "political dispute", given their criminal nature and the fact that none of the Plaintiffs/Appellants had ever run for any office – in fact, the political party affiliations of these men remain unknown.

In drawing the conclusion that Kane's conduct was "not 'sufficient to deter a person of ordinary fitness from exercising' his First Amendment freedoms" the lower court both failed to properly credit the plausible factual allegations of the First Amended Complaint, and also disregarded precedent of this Court holding

that such a determination is a question of fact that is not ripe for disposition on a Motion under Rule 12(b)(6).

Finally, the trial court also abused its discretion when, after concluding that the First Amended Complaint somehow lacked sufficient support for the claims asserted, the court denied the Rule 60(b) Motion of Plaintiffs/Appellants in which permission was requested to file a Second Amended Complaint based upon the detailed Grand Jury and trial testimony which was unsealed and released shortly following the court's decision. This testimony not only provided added detail and substance concerning Kane's retaliation against Plaintiffs/Appellants, it was obviously sufficient to convict her of such conduct beyond a reasonable doubt. This evidence would clearly have been adduced in discovery had the Plaintiffs/Appellants action not been prematurely terminated.

# ARGUMENT

## I. PLAINTIFFS/APPELLANTS' FIRST AMENDED COMPLAINT ADEQUATELY STATES A CLAIM FOR RELIEF ARISING FROM THE DEFENDANT/APPELLEES' GOVERNMENTAL ACTION IN RETALIATION FOR THE EXERCISE OF APPELLANTS' PROTECTED FIRST AMENDMENT RIGHT OF FREE SPEECH

In order to survive a Motion to Dismiss filed under Rule 12(b)(6), ". . . .a Complaint must contain sufficient factual matter accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007). As observed by the *Ashcroft* Court:

> A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. (Citation omitted). The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft*, 556 U.S. at 678.

Additionally, "when there are well pleaded factual allegations, a Court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The determination of whether the Complaint states a plausible claim for relief is a "context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

To the extent the First Amended Complaint contains allegations of a conspiracy,

> …a court should not "compartmentalize" the conspiracy. The "character and effect of [the] conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *see also In re Blood Reagents Antitrust Litig.,* 756 F.Supp.2d 623, 630–31 (E.D.Pa.2010) ("Defendants' briefing attempts to dismember plaintiffs' Complaint in order to show how each allegation, in isolation, fails to sufficiently aver plausibility.)
>
> However, ... the allegations in the Complaint must be viewed as a whole.... *Twombly* emphasized context." (citations omitted)).

*In re: Processed Egg Products Antitrust Litigation*, 902 F.Supp. 2d 704, 710 (E.D. of PA 2012).

Accordingly, all 241 paragraphs of Plaintiff/Appellants' First Amended Complaint need be considered as the context for determining whether the Complaint sets forth any viable claim for relief.

**A. The First Amended Complaint sets forth viable claims for retaliation by a governmental official against a person who exercises a First Amendment Right as actionable under 42 U.S.C. §1983.**

Appellants' right to be free of retaliation for the exercise of their First Amendment rights is well-recognized. In the Supreme Court's words, "[o]fficial

reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). For at least forty-five years, the Court has held that "the First Amendment ... protects vigorous advocacy, certainly of lawful ends, against governmental intrusion." *NAACP v. Button*, 371 U.S. 415, 429 (1963) citing *Thomas v. Collins*, 323 U.S. 516, 537 (1945); *Herndon v. Lowry*, 301 U.S. 242 (1937). As the Supreme Court has explained, ". . . it is clear that the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for speaking out." *Hartman*, 547 U.S. at 256.

"The Supreme Court has explicitly held that an individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment rights." *Anderson v. Davila*, 125 F.3d 148, 160 (3d Cir. 1997) citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). It has long been the law that "an otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech." *Id.* at 161. This is known as the "unconstitutional conditions" doctrine. *Id.* at n.12. *See, e.g. Perry v. Sinderman*, 408 U.S. 593, 597 (1972).

Accordingly, as far as it relates to the First Amendment, "motives of government officials are indeed relevant, **if not dispositive**, when an individual's exercise of speech precedes government action affecting that individual." *Id.* at 161 (emphasis supplied). In this regard, the First Amended Complaint details Kane's retaliatory motive repeatedly and at length [*e.g.* A000139, A000141-142, A000156-158, A000160-161, ¶¶ 13,18, 22,100,-102, 112-114], and even offers corroborating evidence, averring:

> 130. Kevin Wevodau, a former F.B.I agent who Kane had hired as a special agent in charge of the OAG's Bureau of Criminal Investigations confirmed that Kane's motive could only have been one of retaliation. He testified before the grand jury investigating Kane stating that "a review of the Mondesire investigation would have been solely done so that it may be or could have been used against Mr. Fina."

[A000170, ¶130]. This retaliatory motive was underscored by the testimony of Josh Morrow, Kane's confidant and campaign strategist, at Kane's criminal trial.[7] Morrow testified in elaborate detail about Kane's actions and motives that centered upon revenge and retaliation against Plaintiffs/Appellants, "I think she was just hell bent on getting back at Frank Fina. . ." [A000473]

---

[7] Plaintiffs/Appellants' Motion pursuant to Rule 60 sough to amend the Complaint to add these detailed allegations which were the subject of Grand Jury testimony that became unsealed after the trial court dismissed Plaintiffs/Appellants' claims.

Courts analyze First Amendment retaliation claims under a three part test. A plaintiff must allege: (1) that he engaged in constitutionally protected activity; (2) that the government responded with retaliation against him; and (3) that the protected activity caused the retaliation.[8] *Eichenlaub v. Twp of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004).

Upon review of the allegations, there can be no dispute that the First Amended Complaint details at length the protected activities of the Plaintiff/Appellants [*e.g.* A000183-184, ¶¶170-171] and as the lower court recognized, "Kane concedes that Fina and his fellow plaintiffs engaged in protected activity," satisfying the first element. [A000103]. Further, due to the detailed nature of the First Amended Complaint, Kane has never even contested the third element: that, if otherwise deemed to be retaliatory, her actions were caused by the protected activity of plaintiffs. See Trial Court Opinion at p16 ("… she does not appear to dispute the existence of a causal connection between this activity and the retaliatory action.") [A000103]. In fact, the sole focus of the lower

---

[8] The two part *Mt. Healthy* paradigm for proving causation applies to all types of First Amendment retaliation. *Anderson*, 125 F.3d at 163. Accordingly, following a determination that the speech is protected by the First Amendment, *Mt. Healthy* requires the plaintiff to demonstrate that his speech was a substantial or motivating factor in the adverse action. The burden of proof then shifts to the defendants to prove that they would have made the same decision anyway, even in the absence of the protected activity. *Mt. Healthy* 429 U.S. at 287; *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 144 (3d Cir. 2000); *Springer v. Henry*, 435 F.3d 268, 275 (3d Cir. 2006).

court centered upon Kane's contention that plaintiffs have failed to state a claim upon which a relief can be granted because the retaliatory action was not sufficient to deter a person of "ordinary firmness" from exercising his constitutional rights.

In this regard, the lower court's decision cannot be reconciled with the competing decision of the Middle District Court in *Carlson v. Beemer et al.,* 2016 WL 7404590 (M.D. of PA 12/21/2016), a virtually identical case in which Kane threatened the retaliatory release of embarrassing emails of two other OAG employees. As succinctly summarized by Chief Judge Conner:

> …plaintiffs aver that defendants denied them promotions and publicly exposed their private emails after both plaintiffs defied Kane's order not to testify [before a Grand Jury]. Defendants move to dismiss plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting that the First Amendment does not embrace plaintiffs' grand jury testimony. The court will deny the motions.

*Carlson v. Beemer et al.,* 2016 WL 7404590 (M.D. of PA 12/21/2016) *1.

Like the plaintiffs in *Carlson*, Kane threatened Plaintiffs/Appellants prior to their Grand Jury testimony, and then retaliated against them by publicly releasing the same emails as well as planting false news stories and engaging in interviews on national news where she falsely labeled them as traffickers in child pornography. [*e.g.* A000183, A000186, ¶170, 180]. Although none of the current Plaintiff/Appellants were Kane's employees at the time of the retaliation, they still suffered harsh consequences, including the loss of their existing jobs and

considerable damage to their reputations as Kane's efforts received national media attention.  [A000187, A000191-192, A000194-195, A000197, ¶184-187, 206, 212, 219, 226, 233].

### B. The lower court misapplied the holdings of *Koren* and *Saurez* insofar as the court failed to acknowledge the clear facts alleged in the First Amended Complaint.

With respect to the evaluation of the retaliatory action itself, and whether or not it was sufficient "to deter a person of ordinary firmness from exercising his constitutional rights," the lower court looked to *Koren v. Noonan*, 586 F.App'x 885 (3d Cir. 2014), and *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000).  *Koren* is an unpublished Third Circuit Opinion written by Chief Judge Vanaskie concerning the appeal of Judge Cynthia M. Rufe's dismissal[9] of a claim against Frank Noonan that had been filed by Edward Koren, who was a former state trooper running for political office.

In essence, Koren was running for District Attorney when it came to light that he was denied an honorable discharge by Commissioner Frank Noonan of the Pennsylvania State Police.  It was apparently intimated in Koren's Complaint that Noonan was a political appointee of Governor Tom Corbett, who was a fellow Republican and therefore the reader was asked to conclude that he was colluding with Koren's political opponent.

---

[9] Notably, Judge Rufe's Opinion was also an unpublished slip opinion.

When it came to an evaluation of whether the Plaintiff's First Amendment rights were in fact adversely affected by retaliatory conduct, the *Koren* court observed that this was a "fact intensive inquiry focusing on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts," which must "be more than *de minimis* or trivial." *Koren v. Noonan*, 586 F.App'x 885, 888 quoting *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003), quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000).

Additionally the *Koren* Court distinguished the case from those that arose in the employment context, as in that context the Court noted that when retaliatory action was taken by a public employer against an employee, the evaluation of the protected expression was given a threshold which was "very low." *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006). In contrast, the Court observed that employment cases are distinct from those that arise in the political arena, noting that courts "have consistently rejected first amendment retaliation claims based upon assertions of purportedly false reports or criticism" in the political arena. *Id.* at 888, citing *Parks v. City of Horseshoe Bend*, 480 F.3d 837, 840 (8th Cir. 2007) (Affirming grant of summary judgment where retaliation claim was predicated upon "a dispute fueled by the rough and tumble of local politics"); *Colson v. Grohman*, 174 F.3d 498, 514 (5th Cir. 1999) ("[T]he defendants allegedly

retaliatory crusade amounted to no more than the sort of steady stream of false accusations and vehement criticism than any politician must expect to endure."); and *Ollman v. Evans*, 750 F.2d 970, 1002 (D.C. Cir. 1984) (*en banc*) (Bork, J. concurring) ("Where politics and ideas about politics contend, there is a [F]irst [A]mendment arena. The individual who deliberately enters that arena must expect that the debate will sometimes be rough and personal.").

Notably, in the present case, none of the Plaintiffs/Appellants have ever campaigned for political office, nor were they political candidates at the time of the retaliatory action and false statements. With the exception of Noonan who served at the appointment of the Governor, Plaintiffs/Appellants were all former employees of the OAG who had worked under multiple Attorney Generals over a period of many years. They never ran for office, and in fact their political party affiliation, if any, has never even been publicly disclosed. Moreover, the actions alleged by Plaintiffs/Appellants cannot reasonably be characterized as "*de minimis* or trivial." Finally, and as will be discussed subsequently, to the extent a review under *Koren* is a "fact intensive inquiry", it is not ripe for disposition on a Rule 12(b)(6) Motion before any discovery can be conducted. Accordingly, *Koren* and the related cases are easily distinguishable.[10]

---

[10] Of interest to the allegations of retaliatory conduct concerning the release of emails, in another portion of the *Koren* Opinion, the Third Circuit noted that "the Supreme Court has recognized that the Constitution "protects" the individual

Given that none of the Plaintiffs were political candidates, Plaintiffs' claims are more comparable to those in *Neuberger v. Gordon*, 567 F. Supp., 2d 622 (D. Del. 2008). In *Neuberger*, plaintiff, a civil rights attorney, brought a First Amendment retaliation claim against numerous public figures who sought to discredit and defame him due to his advocacy and lawsuits which he brought on behalf of abuse victims against state entities and state actors. While the court dismissed plaintiff Neuberger's claim with respect to his legal representation of individuals, the court found that he had pleaded a sufficient First Amendment retaliation claim for actions taken against him as a result of his public advocacy and attempts to expose corruption and abuse by the government. The retaliation in the *Neuberger* case took two forms: (1) official release of medical information that government offices possessed concerning plaintiff's health; and (2) through the purchase of ads that accused plaintiff of unethical conduct and wrongdoing.

In *Neuberger*, the defendants made the identical argument presented here: i.e., that the defendant's actions would not have caused a person of reasonable firmness to discontinue speaking out against the objectionable government action. Even though there were no threats of physical coercion, prosecution, or other actions that could cause direct material harm in *Neuberger*, the court had no

---

interests in avoiding disclosure of personal matters." *Koren* at 889 citing *Doe v. Deli*, 257 F.3d 309, 315 (3d Cir. 2001) quoting *Whalen v. Roe*, 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977).

trouble finding that the plaintiff pleaded retaliatory action sufficient to show the chilling effect of the defamatory publications of government officials so as to overcome a motion to dismiss. In particular, the court rejected the defense suggestion that plaintiff would not likely be chilled by government actions given the fact that he was an outspoken civil rights advocate who would, presumably, be used to dealing with attacks and adversity from the parties.

In the present case, none of the plaintiffs chose to enter the political arena, but rather, they simply performed their professional duties or otherwise acted as concerned citizens. All of the Plaintiffs were either career prosecutors or career law enforcement investigators who themselves had never engaged in any political campaign or held elected office. Accordingly, they should not be held to the heightened standards of those who voluntarily take on the "rough and tumble" of political interaction. For these reasons, the unpublished *Koren* decision is of no service to the Court's evaluation of the Plaintiffs' claims, and the defendant's argument should be rejected.

The lower court also looked to the *Suarez* Opinion from the Fourth Circuit. *Suarez* was an action brought by a direct mail marketer and some of its customers against state officials alleging retaliation for the exercise of the marketer's First Amendment right to free speech. Interestingly, the *Suarez* decision actually seems to support Plaintiff/Appellants' claims when one considers the allegations in the

Amended Complaint; namely, **Kane repeatedly threatened Plaintiffs** [A000170, A000172, A000175, A000177, ¶¶128-138, 151, 155-158] and followed through on her threats. In this regard, the *Suarez* the Court observed:

> The nature of the alleged retaliatory acts has particular significance when the public official's acts are in the form of speech. Not only is there an interest in having public officials fulfill their duties, a public official's own First Amendment speech rights are implicated. Thus, where a public official's alleged retaliation is in the nature of speech, **in the absence of a threat, coercion or intimidation, intimating that punishment, sanction or adverse regulatory action will imminently follow,** such speech does not adversely affect a citizen's First Amendment rights, even if defamatory.

*Suarez Corp. Indus. v. MaGraw*, 202 F.3d 676, 687 (4th Cir. 2000) (emphasis supplied), citing *Penthouse International Limited v. Meese*, 939 F.2d 1011, 1015 (D.C. Cir. 1991). See also *X-Men Sec. Inc. v. Pataki*, 196 F.3d 56 (2d Cir. 1999) (holding that, in the absence of threats, intimidation or coercion, legislators' "disparaging accusatory or untrue statements . . . fail to state a claim for violation of . . . constitutional rights."). There is no question that Plaintiffs/Appellants' allegations of Kane's attempted threats and intimidation, designed to deter Plaintiffs/Appellants from revealing information to the media and/or through the Grand Jury process, would and should be sufficient to distinguish their situation from *Suarez*. [A000170-172, A000175, A000177, ¶¶128-138, 151, 155-158]. Moreover, Kane's retaliation was not confined to mere speech; rather, she engaged

in a pattern of criminal misconduct designed to manufacture "evidence" which she hoped would harm Plaintiffs/Appellants. [A000139, A000159-162, ¶¶ 15, 106-113, 129-134].

In this regard, the trial court ignored these detailed factual allegations, let alone the associated inferences, as the lower court mistakenly observed "Fina alleges no 'threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow.'"[A000108]. Frankly, such an observation cannot be reconciled with any fair reading of the detailed threats and intimidation described in the First Amended Complaint. [A000170-172, A000175, A000177, ¶¶128-138, 151, 155-158].

The *Suarez* case was further distinguished by Judge Kugler of the District Court of New Jersey when he declined to follow that reasoning in *Citizens for a Better Lawnside, Inc. v. Bryant*, 2007 WL 1557479. In that Opinion, the defendants sought reconsideration of Judge Kugler's Order denying summary judgment on the Plaintiff's First Amendment retaliation claims. The defendants argued that the alleged conduct constituted a "*de minimis* violation," relying heavily upon *Suarez*. Judge Kugler observed that "the Third Circuit has little binding precedent on the issue. However the Third Circuit used language in previous opinions which leads this Court to believe that the threshold to establish a First Amendment retaliation claim is low." *Citizens for a Better Lawnside, Inc.* at

*5.  Specifically, Judge Kugler cited to the Third Circuit Opinion of *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) for the observation that ". . . the threshold to establish a First Amendment retaliation claim is low."  In fact, as Judge Kugler observed, in the *O'Connor* Opinion, this Court stated:

> First Amendment retaliation claims are always individually actionable, even when relatively minor.  Even "an act of retaliation as trivial as failing to hold a birthday party for a public employee" if "intended to punish her for exercising her free speech rights" may be actionable if under the circumstances it would sufficient to "deter a person of ordinary firmness" from exercising his or her First Amendment rights.  A First Amendment retaliation claim will lie for any individual act which meets this "deterrence threshold," and that threshold is very low: . . . a cause of action is supplied by all but truly *de minimis* violations.

*O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) citing *Suppan v. DaDonna*, 203 F.3d 228, 234-35 (3d Cir. 2000).

**C.    The issue of whether the acts of retaliation "would deter a person of ordinary firmness from exercising his or her First Amendment right" is a question of fact that is not ripe for decision on a Rule 12(b)(6) Motion.**

Throughout its analysis of the First Amended Complaint, the lower court repeatedly concluded as a matter of law that the retaliatory conduct described "was not 'sufficient to deter a person of ordinary fitness from exercising' his First Amendment freedoms." [*e.g.* A000107].  In this regard, the lower court overreached.

In *Thomas v. Independence Township,* 463 F. 3d 285 (3d Cir. 2006) this

Court considered claims of unconstitutional retaliation and observed:

> Here, the complaint alleges that the individual
> Defendants have engaged in a campaign of harassment
> and intimidation in retaliation against plaintiffs for
> exercising their First Amendment rights. The complaint
> asserts that the retaliatory action has chilled plaintiffs'
> speech and discouraged them from seeking judicial
> redress. Although **"it is generally a question of fact
> whether a retaliatory campaign of harassment has
> reached the threshold of actionability under § 1983,"**
> *Suppan*, 203 F.3d at 233, construing the allegations in
> plaintiffs' favor, we conclude that plaintiffs have
> adequately pled First Amendment retaliation claims
> under the Free Speech and Petition Clauses.

*Id.* at 296 citing *Suppan v. Dadonna*, 203 F.3d 228 (3d Cir. 2000) (emphasis

supplied).

Notably, the *Suppan* decision, upon which the *Thomas* court relied, involved

the appellate review of a grant of summary judgment by the trial court.   In

reversing the grant of summary judgment, the Court borrowed from the 7th Circuit,

reasoning "that it is generally a question of fact whether a retaliatory campaign of

harassment has reached the threshold of actionability under § 1983," *Id.* citing *Bart*

*v. Telford*, 677 F.2d 622, 625 (7th Cir.1982).

Likewise, in the *Citizens for a Better Lawnside, Inc.* decision, *infra*,  Judge

Kugler observed that the inquiry of whether a defendant's conduct would deter a

person of "ordinary firmness from exercising his or her First Amendment rights" is

a "question of fact" which "is not an appropriate determination for this Court to make on a summary judgment motion," and obviously therefore would be inappropriate at the 12(b)(6) Motion to Dismiss stage. *Id.* at *6.

This same reasoning was reiterated just months ago in *Feibush v. Johnson*____ F. Supp.3d____ (E.D. of PA 2016), 2016 WL 4478775 *7 in which Judge Beetlestone reviewed a claim of unconstitutional retaliation and plainly concluded that "[w]hether the retaliatory conduct reaches the threshold of actionability is a question of fact for the jury." (citation omitted).

Finally, it is well established that the deterrence inquiry is an objective one and does not depend upon the actual effect which the retaliatory conduct may have had on the plaintiffs. *See Smith v. Mosley*, 532 F.3d 1270, 1277-78 (11th Cir. 2008); *Constantine v. Rectors and Victors of George Mason University*, 411 F.3d 474, 500 (4th Cir. 2005); and *Harbin-Bey v. Rutter*, 420 F.3d 571, 579 (6th Cir. 2005); and *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2nd Cir. 2004). Thus, it is immaterial to the analysis as to whether or not the plaintiffs were actually deterred from exercising their constitutional rights.

**D.    Defendant Kane's defamatory speech is not separately protected by the First Amendment when it is retaliatory in nature.**

First, it must be noted that Kane's retaliatory conduct consisted of far more than mere speech. Kane committed crimes by disseminating to a reporter secret grand jury information that attempted to depict misconduct on the part of

Plaintiffs/Appellants Fina and Costanzo by an alleged failure to pursue a public figure in a criminal investigation.[11]  Kane pursued her vendetta further by falsely alleging that plaintiffs abetted sexual child abuse by allowing a suspected child predator to remain at large during the course of a grand jury investigation.  Finally, defendant Kane also made statements falsely insinuating that the plaintiffs had engaged in the traffic of child pornography during a national interview with CNN.  All of these statements were intentionally made to punish the Plaintiffs/Appellants for their exercise of free speech.

Courts have found that an "act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *DeLoach*, 922 F.2d at 620 (quoting *Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir.1984)); and *Bloch v. Ribar*, 156 F.3d 673, 681–82 (6th Cir.1998) (same quotation); *see also Allah v. Seiverling*, 229 F.3d 220, 224–25 (3d Cir.2000)("Government actions which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right") quoting *Thaddeus–X v. Blatter*, 175 F.3d 378, 398 (6th Cir.1999)(en banc). Thus, assuming that defendant's motive was retaliatory, it is

---

[11] See Montgomery County Court of Common Pleas Criminal Docket Nos. CP-46-CR-0006239 and CP-46-CR-0008423-2015 [A000670, A000709].

irrelevant whether or not she may have had a right to respond under the First Amendment. Furthermore, Plaintiffs/Appellants also allege that defendant's statements were false and defamatory. Thus, the statements would not be protected under the First Amendment. See *Mezibov*, 411 F.3d at 722 (considering only those comments that could "reasonably be construed as defamatory, lest we trample on the First Amendment rights" of the government official).

Here, Kane expressly threatened Plaintiffs/Appellants with this embarrassment in an effort to coerce their silence. [A000175-178, ¶¶151-159]. When her blackmail attempts fell short, Kane, in an act of retaliation, released information that was highly embarrassing and impugned plaintiffs' professional and personal reputations. In *Bloch v. Ribar,* 156 F.3d 673, 678 (6th Cir.1998), the Court found that the retaliatory release of information concerning the criminal investigation of a rape victim could serve as a basis for retaliation suit and that "injury based on embarrassment, humiliation, and emotional distress" is sufficient to be actionable under § 1983. See also *Barrett v. Harrington,* 130 F.3d 246 (6th Cir.1997), cert. denied, 523 U.S. 1075, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998). Thus, while public disclosure of information could have a public purpose, when the release is done strictly for a retaliatory purpose, it turns the conduct into an unconstitutional act of retaliation.

For these reasons, Courts have found that actions taken in retaliation for the exercise of a constitutionally protected right are actionable under §1983 even if the act, when taken for a different reason, would have been proper. *DeLoach*, 922 F.2d at 620 *quoting Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir. 1984); *Bloch v. Ribar*, 156 F.3d 673, 681-82 (6th Cir. 1998); and *see also Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000) ("Government actions which standing alone do not violate the Constitution, may nevertheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.") *quoting Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (*en banc*). Thus, because defendant Kane's action was retaliatory in nature, it is irrelevant whether Kane may have otherwise had a right to respond under the First Amendment.

### E. Plaintiffs/Appellants have sufficiently pled a nexus between their constitutionally protected speech and Kane's retaliation.

The final element of a retaliation claim requires a causal link between the constitutionally protected conduct and retaliatory action which occurred. *See Thomas v. Independence T.P.*, 463 F.3d 285, 296 (3d Cir. 2006). Plaintiff/Appellants have provided a detailed timeline in their Amended Complaint which demonstrates that a causal link is easily established by the temporal proximity of the event, a past history of hostility and antagonism, and the evidence as a whole. *See Lauren W., ex rel. Jean W. v. Deflaninis*, 480 F.3d 259, 267 (3d

Cir. 2007) (holding that a plaintiff can establish the requisite connection by proving a "pattern of antagonism coupled with timing").

In short, the First Amended Complaint satisfies each of the essential elements and plainly states cognizable claims for retaliation under the First Amendment.

## II. THE LOWER COURT ABUSED ITS DISCRETION IN FAILING TO GRANT PLAINTIFFS/APPELLANTS' MOTION UNDER RULE 60(b)(2) AND PERMIT PLAINTIFFS TO CURE ANY PERCEIVED DEFICIENCIES IN THEIR PLEADING USING EVIDENCE THAT BECAME UNSEALED AND AVAILABLE AFTER THE GRANT OF APPELLEES' RULE 12(b)(6) MOTION.

The district court ruled on Appellee's 12(b)(6) motion, observing in part that "…plaintiffs have not adequately alleged the existence of a conspiracy," [A000117]. While Plaintiffs/Appellants contend that the First Amended Complaint provided detailed allegations of such a conspiracy that the lower court failed to properly credit [e.g. A000139-40, A000155, A000159, A000160-61, ¶¶ 15, 94, 106,112], Kane's criminal case went to trial and new evidence emerged by way of the testimony of Joshua Morrow that proved Appellants' assertion that Kane was at the center of conspiracy to retaliate against Appellants. Moreover, this testimony did so beyond any reasonable doubt. This new evidence had previously only been known to the Appellee, and the Grand Jury, as the Grand Jury testimony was unsealed after the lower court's ruling, and the criminal trial followed. Plaintiffs/Appellants could not have obtained the evidence, given that

they never had an opportunity to take discovery prior to the dismissal of their action, because the Grand Jury testimony remained under seal and Josh Morrow testified at the criminal trial later, upon a grant of immunity – something that was not in the power of the Plaintiffs/Appellants to confer.

In their Rule 60(b) motion, Plaintiffs/Appellants detailed this new evidence, focusing in detail on the relationship and conspiracy between Kane and Morrow.[12] At Kane's criminal trial, Morrow testified that he first met Kane in 2011 and began working for her on her campaign in February of 2012 as a media consultant and later as communication director. Following her election, which Morrow considered the crowning achievement of his career, he continued to work for Kane until her inauguration but then stayed in regular contact with her. [A000431-2]. He testified that he and Kane communicated on all manner of subjects, personal and professional. [A000434].

Morrow testified that from the very beginning of Kane's administration in 2013, she had a lot of animosity toward Fina. [A000442]. Morrow and Kane discussed their mutual negative feelings about Fina a lot. [A000458]. Morrow stated that Kane initiated the "conspiracy" to leak the grand jury documents when she called him in April of 2014 and explained that she had documents that she

---

[12] The criminal trial transcript was an Exhibit to the Rule 60 Motion and is appended hereto. [A000427-641].

wanted him to get to a reporter. [A000457]. They specifically discussed the contents of the documents. [A000458]. Morrow said this plan did not surprise him because of past conversations concerning Fina. [A000459]. Morrow knew that Kane had an interest in getting negative information out about Fina, [A000471], and testified further that Kane was "hell bent at getting back at Frank Fina." [A000473].

Morrow stated that Kane instructed him to give the documents to "a friendly reporter," plainly referring to someone who would be amenable to writing a piece hostile to Fina and Costanzo [A000433-34]. Morrow chose to offer them to Chris Brennan, a Daily News reporter, because he had known him for a number of years and he was somebody for whom Morrow had often served as a source of information. [A000433-35].

After Morrow received the documents, he redacted all of the names except for Fina and Costanzo because "it was clear that's what [Kane] wanted to get out, a negative story on Marc Costanzo and Frank Fina." [A000439-40]. The Kane prosecutor asked Morrow "And how did you know that? Had you discussed, you know, getting back at Frank Fina?" [A000439-40]. Morrow replied, "Yes." [A000440].

After Morrow delivered the documents to Brennan, he texted Kane: "What's the saying about revenge?" [A000436]. Kane responded, "Best served cold. Are

we eating out soon?" [A000436]. Morrow then responded "Yes." Morrow testified that he spoke with Brennan a lot about the article before it was published and updated Kane each time. [A000436-442]. Morrow testified that Brennan was updating him on the status of the story including responses to the people he had reached out to for comment, including Fina. [A000449-51]. Reflecting her own sense of ownership over the goal of the conspiracy, Kane texted Morrow "Where is my story? I'm dying here while you are drinking." [A000456-7]. (emphasis supplied). At one point, Brennan even previewed the article with Morrow before it was published. [A000462-3]. Finally, when Morrow found out that the article was about to be published, he sent a text to Kane that stated, "It's time for your friends to fight back." [A000455]. Kane responded by stating "I agree. I wish they would." [A000455]. Morrow then responded, "Happy to lead the charge." [A000455].

Unquestionably, these sworn admissions of a conspiracy to retaliate against Fina and Costanzo constitute compelling evidence in support of Plaintiffs/Appellants claims, and because the Grand Jury testimony was previously sealed, and Plaintiffs/Appellants were never able to take discovery in the matter, this evidence could not have reasonably been uncovered. To the extent the court identified any deficiency in the pleading arising from the difficulties inherently

associated with the pleading of a "conspiracy," those questions were clearly and unequivocally answered by this evidence.

Where a final judgment or order has been entered in a case, Rule 60(b) of the Federal Rules of Civil Procedure provides an avenue of relief based on one or more of the following reasons:

> (1)   mistake, inadvertence, surprise, or excusable neglect;
> (2)   newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> (3)   fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party,
> (4)   the judgment is void;
> (5)   the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> (6)   Any other reason that justifies relief.

Rule 60 has been characterized as "a grand reservoir of equitable power to do justice in a particular case." *Hesling v. CSX Transp., Inc.,* 396 F.3d 632, 642 (5th Cir.2005).   To satisfy Rule 60(b)(2), the movant bears the burden of establishing that the new evidence "(1) be material and not merely cumulative, (2) could not have been discovered before trial through the exercise of reasonable diligence, and (3) would probably have changed the outcome of the trial." *Compass Technology, Inc. v. Tseng Laboratories, Inc.*, 71 F.3d 1125, 1130 (3d Cir. 1995).   In the alternative, the Court may grant relief under Rule 60(b)(6) ,which

authorizes a court to grant relief from a judgment or order for "any other reason that justifies relief." FED. R. CIV. P. 60(b)(6).

In the present matter, after the trial court had dismissed the First Amended Complaint, the Appellee was criminally convicted for the conduct which gave rise to Plaintiffs/Appellants causes of action as detailed in the First Amended Complaint. Clearly, there was sufficient evidence available to support the civil causes of action for the victims of these crimes, and the trial court abused its discretion by refusing these victims their day in court.

## III.  <u>CONCLUSION</u>

For all of the foregoing reasons, this Honorable Court should conclude that the First Amended Complaint sets forth viable claims for retaliation that violate the First Amendment rights of Plaintiffs/Appellants. The decision of the trial court should be reversed, and this case should be remanded for further proceedings consistent with the findings of this Court.


 /s/ Mark W. Tanner_____        ___/s/ Fortunato N. Perri, Jr.___
MARK W. TANNER, ESQUIRE        FORTUNATO N. PERRI, JR., ESQUIRE
Feldman Shepherd Wohlgelernter Tanner    McMonagle Perri McHugh & Mischak
Weinstock & Dodig, LLP            145 Walnut Street, 19th Floor
1845 Walnut Street, 21st Floor        Philadelphia, PA 19103
Philadelphia, PA 19103
Attorneys for Appellants, Frank Noonan,    Attorney for Appellant, E. Marc Costanzo
Randy Feathers, Richard A. Sheetz, Jr., and
Frank Fina

Date: February 13, 2017

# CERTIFICATE OF COMPLIANCE

1.     The undersigned hereby certify that they are properly admitted to practice before the Bar of the Third Circuit Court of Appeals.

2.     This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because the brief contains less than 13,000 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

3.     This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using the Microsoft Word in Times New Roman 14 point font.

4.     The text of the printed and electronic versions of this brief are identical.

5.     A virus detection program has been run on the electronic version of this brief, and no viruses were detected.  Trend Micro, Program Version 19.0.3144, Engine Version 9.900.1008, Virus Pattern Version 13.217.00 was utilized for the scan.

/s/ Mark W. Tanner                              /s/ Fortunato N. Perri, Jr.
MARK W. TANNER, ESQUIRE                          FORTUNATO N. PERRI, JR., ESQUIRE
Feldman Shepherd Wohlgelernter Tanner            McMonagle Perri McHugh & Mischak
Weinstock & Dodig, LLP                           145 Walnut Street, 19th Floor
1845 Walnut Street, 21st Floor                   Philadelphia, PA 19103
Philadelphia, PA 19103
Attorneys for Appellants, Frank Noonan, Randy    Attorney for Appellant, E. Marc Costanzo
Feathers, Richard A. Sheetz, Jr., & Frank Fina

## CERTIFICATE OF SERVICE

This is to certify that in this case two (2) complete copies of all papers contained in the foregoing Brief of Appellants have been served via electronically by the Court and hand delivery upon the following:

Richard R. Harris, Esquire
Littler Mendelson, PC
1601 Cherry Street
Suite 1400
Philadelphia, PA 19102

/s/ Mark W. Tanner

MARK W. TANNER, ESQUIRE
Feldman Shepherd Wohlgelernter Tanner
Weinstock & Dodig, LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
Attorneys for Appellants, Frank Noonan,
Randy Feathers, Richard A. Sheetz, Jr., and
Frank Fina

/s/ Fortunato N. Perri, Jr.

FORTUNATO N. PERRI, JR., ESQUIRE
McMonagle Perri McHugh & Mischak
145 Walnut Street, 19th Floor
Philadelphia, PA 19103

Attorney for Appellant, E. Marc Costanzo

Date: February 13, 2017

**A000737**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

FRANK NOONAN, RANDY FEATHERS,
RICHARDS A. SHEETZ, JR., E. MARC
COSTANZO and FRANK FINA
**Appellants**

v.

KATHLEEN KANE and MICHAEL MILETTO

**Appellees**

---

## APPENDIX VOLUME I

### Pages A000001 – A000126

---

### Nos. 16-3311 & 16-3312

---

*Appeal from the Order of the Honorable Harvey J. Bartle, III, Entered on July 19,*
*2016 in the United States District Court for The Eastern District of Pennsylvania*
*No. 15-cv-06082*

---

MARK W. TANNER, ESQUIRE
Feldman Shepherd Wohlgelernter
Tanner
Weinstock & Dodig, LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
Attorneys for Plaintiffs, Frank Noonan,
Randy Feathers, Richard A. Sheetz, Jr.,
and Frank Fina

FORTUNATO N. PERRI, JR.,
ESQUIRE
McMonagle Perri McHugh & Mischak
145 Walnut Street, 19th Floor
Philadelphia, PA 19103

Attorney for Plaintiff, E. Marc Costanzo

# APPENDIX TABLE OF CONTENTS

## VOLUME I

Notice of Appeal, filed August 8, 2016 ........................................... A000001

Notice of Appeal of E. Marc Costanzo filed August 9, 2016............ A000043

Order of Judge Harvey Bartle, III, dated July 19, 2016 ................... A000086

Memorandum Opinion of Judge Harvey Bartle, III,
dated July 19, 2016 .......................................................................... A000088

Order of Judge Harvey Bartle, III, dated December 2, 2016............. A000122

Memorandum Opinion of Judge Harvey Bartle, III,
dated December 2, 2016.................................................................... A000123

## VOLUME II

Civil Docket for case no. 15-6082 ................................................... A000127

First Amended Complaint ................................................................ A000135

Response of Plaintiffs' to the Motion of Defendant
Kathleen G. Kane to Dismiss Counts I through VI of the
First Amended Complaint................................................................. A000218

Plaintiffs Motion Pursuant to Rule 60(b) to Vacate Order
Granting Defendant Kane's Motion to Dismiss Plaintiff's
Amended Complaint and Seeking Leave to File a
Second Amended Complaint ............................................................ A000270

Memorandum Opinion of Judge William R. Carpenter,
dated December 12, 2014.................................................................. A000651

Criminal Docket for case no. : CP-46-CR-0006239-2015 ................ A000670

Criminal Docket for case no.:  CP-46-CR-0008423-2015 ................ A000709

Certificate of Service ......................................................................... A000737

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| FRANK NOONAN, et al., | CIVIL ACTION: 15-cv-06082 |
| Plaintiff, |  |
| v. | JURY TRIAL DEMANDED |
| KATHLEEN KANE, ET AL., |  |
| Defendants. |  |

## **NOTICE OF APPEAL**

Notice is hereby given that Plaintiffs Frank Noonan, Randy Feathers, Richard A. Sheetz, Jr., and Frank Fina, hereby appeal to the United States Court of Appeals for the Third Circuit from the Court's Order dated July 19, 2016 dismissing this case pursuant to Defendants' Motions to Dismiss for failure to state a claim.

FELDMAN, SHEPHERD, WOHLGELERNTER,
TANNER, WEINSTOCK AND DODIG, LLP

/s/ Mark W. Tanner
Mark W. Tanner 58738
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
215-567-8300
Attorney for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

   I, Mark W. Tanner, Esquire hereby certify that on this date I caused to be served the within Notice of Appeal upon counsel via the Court's electronic filing system.


/s/ Mark W. Tanner         
Mark W. Tanner

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN, et al.          :          CIVIL ACTION
                              :
                              :
            v.                :
                              :
                              :
KATHLEEN KANE, et al.         :          NO. 15-6082

ORDER

AND NOW, this 19th day of July, 2016, for the reasons
set forth in the accompanying Memorandum, it is hereby ORDERED
that:

(1)  the motion of defendant Kathleen G. Kane to dismiss
Counts I through VI of the First Amended Complaint for failure to
state a claim (Doc. # 29) is GRANTED;

(2)  the motion of defendant Michael Miletto to dismiss
Count III of the First Amended Complaint for failure to state a
claim (Doc. # 30) is GRANTED;

(3)  the motion of defendant Christopher Brennan to
dismiss Count III of the First Amended Complaint for failure to
state a claim (Doc. # 36) is GRANTED;

(4)  pursuant to 28 U.S.C. § 1367(c)(3), Counts VII and
VIII of the First Amended Complaint are DISMISSED without
prejudice; and

(5)   the Clerk shall mark this case closed as no claims

remain.

BY THE COURT:


/s/ Harvey Bartle III
J.

-2-

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN, et al.           :           CIVIL ACTION
                               :
                               :
            v.                 :
                               :
                               :
KATHLEEN KANE, et al.          :           NO. 15-6082

MEMORANDUM

Bartle, J.                                      July 19, 2016

        Plaintiff are Frank Noonan ("Noonan"), Randy Feathers

("Feathers"), Richard A. Sheetz, Jr. ("Sheetz"), E. Marc Costanzo

("Costanzo"), and Frank Fina ("Fina"), four of whom are former high

level employees of the Office of the Attorney General of

Pennsylvania ("OAC") and one of whom is a retired Commissioner of

the Pennsylvania State Police.  They have filed this action

against:  Pennsylvania Attorney General Kathleen Kane ("Kane");

Michael Miletto ("Miletto"), an investigator for the Office of the

Attorney General; the Philadelphia Daily News; one of its

reporters, Christopher Brennan ("Brennan"); and Philadelphia Media

Network, LLC and Philadelphia Media Network (Digital) LLC, which

together own the Philadelphia Daily News.

        Noonan is the retired Commissioner of the Pennsylvania

State Police.  Feathers is a retired Regional Director of the

Bureau of Narcotics and Investigation and Control of the OAG.

Sheetz served as a former Executive Deputy Attorney General

Directing the Criminal Law Division of the OAG.  Costanzo is a
former Deputy Attorney General for the OAG.  Finally, Fina is a
former Chief Deputy Attorney General for the OAG.[1]  All five
plaintiffs are citizens of the Commonwealth of Pennsylvania.

Plaintiffs sue Kane under 42 U.S.C. § 1983.  They allege
that she retaliated against them for engaging in speech protected
by the First Amendment.  Costanzo and Fina also plead that Kane,
Miletto, and Brennan conspired to retaliate against them for the
same protected speech.  Finally, Costanzo and Fina assert
defamation and false light claims under Pennsylvania law against
Brennan, Philadelphia Media Network, LLC and Philadelphia Media
Network (Digital) LLC.  We have supplemental jurisdiction over
these state-law claims pursuant to 28 U.S.C. § 1367.

Before the court are three motions filed by Kane,
Miletto, and the Media Defendants (Brennan, the Philadelphia Daily
News, Philadelphia Media Network (Digital) LLC, and Philadelphia
Media Network LLC) to dismiss plaintiffs' First Amended Complaint
pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure
for failure to state a claim upon which relief can be granted.
Kane and Miletto also rely on the doctrine of qualified immunity.

---

1.  Although Feathers, Sheetz, Costanzo, and Fina no longer work
at the OAG, their pleading does not make clear precisely when
their employment with the OAG ended.  What is clear is that each
of these four plaintiffs left the OAG either before Kane took
office or shortly thereafter.

-2-

Kane further argues that the First Amended Complaint does not meet the pleading requirements under Rule 8(a).

                                    I.

        The facts set forth in the First Amended Complaint, taken in the light most favorable to plaintiffs, are as follows.

        In early 2012, Kane announced her candidacy to become Attorney General of Pennsylvania.  During her campaign, Kane criticized the OAG for its handling of the high-profile investigation and subsequent prosecution of Jerry Sandusky ("Sandusky"), a Penn State University football coach who was ultimately convicted in June 2012 of sexually abusing minors. Plaintiffs had all been involved in the Sandusky investigation during the time that Thomas Corbett was the Attorney General. While campaigning, Kane declared that the OAG had improperly delayed in charging Sandusky and had devoted inadequate resources to the investigation.  She promised to initiate an investigation into the handling of the Sandusky case by the OAG if elected.  In response, Feathers made public statements refuting Kane's claims and deriding her as uninformed.  Likewise, Costanzo "openly expressed criticism of Kane's campaign tactics regarding the Sandusky prosecution."  Kane won the election in November 2012 and assumed office in January 2013.

        Upon taking office, Kane also put a halt to a long-running bribery investigation in which plaintiffs had been

                                   -3-

involved.  In furtherance of that investigation, the OAG had been relying on an informant named Tyron Ali ("Ali").  Ali had entered into a cooperation agreement with the OAG pursuant to which he would identify Philadelphia elected officials who were prepared to accept bribes.  In exchange, the OAG would not pursue charges against Ali.

When Kane assumed office in early 2013, Fina informed her that he believed she could not oversee the Ali investigation because it had the potential to implicate Joshua Morrow ("Morrow"), a friend, supporter, and former campaign employee of Kane.  Kane disagreed and retained control of the investigation.

In September 2013, Kane made clear that she would not pursue the bribery investigation, nor would she honor Ali's cooperation agreement.  In response, Ali moved for Kane's recusal and for enforcement of the agreement.  Fina executed an affidavit in support of Ali's motion.  In it, Fina attested to his knowledge of the purported conflict of interest, the investigation, and the cooperation agreement.

Kane ultimately relented, dismissing all charges against Ali.  However, beginning in late 2013 and continuing into early 2014, she expressed publicly that the Ali bribery investigation had been racially motivated, that Ali was not credible, and that the investigation lacked "quality" and had inadequate resources.  She reported that federal law enforcement officials had characterized

–4–

the case as "flawed and not prosecutable" and stated that Ali and the lead case agent both believed the investigation to be focused on members of the General Assembly's Black Caucus. In addition, Kane implied that Fina was to blame for the public disclosure of the investigation. Plaintiffs allege that these statements were false. Fina responded to them in what plaintiffs characterize as a "letter of March 22, 2014 to the public." Meanwhile, Fina, Noonan, and Sheetz made public statements refuting Kane's accusations. Around the same time, Kane emailed a media strategist regarding reports of her role in the Ali investigation. In the email, Kane justified her accusations that the investigation was racially motived by stating: "This is war."

Ultimately, Philadelphia District Attorney Seth Williams ("Williams") took over the Ali bribery investigation. Williams reviewed the evidence and found no indication that the investigation was racially motivated. He brought charges against six elected officials, five of whom have pleaded guilty.

Meanwhile, Kane fulfilled her campaign promise to initiate an inquiry into the Sandusky investigation. Fina, who was contacted as part of the inquiry, openly questioned the legality of Kane's inquiry and Kane's authority to conduct it. Fina also directed "a variety [of] letters . . . and motions" to Geoffrey Moulton ("Moulton"), the attorney in the OAG directing the inquiry, and to the grand jury judge supervising it.

–5–

A report of the inquiry into the Sandusky investigation was completed by Moulton in May 2014. Pursuant to the protocol established by the grand jury judge who was supervising the inquiry, Noonan, Feathers, Sheetz, and Fina had the opportunity to respond to the Moulton report. They did so in June 2014. Plaintiffs criticized the inquiry as "ill-advised" and contended that it had been "born of political opportunism and posturing." They also called the claims that had given rise to the report "ill-informed and unfounded." The report, according to plaintiffs, was merely an "exercise in second guessing" undertaken "to sift for criticism." These responses were incorporated into a final version of the report.

On June 23, 2014, the day the final report was released, Kane convened a press conference. Speaking to reporters, she stated that the actions of Noonan, Feathers, Sheetz, and Fina had led to delays in the Sandusky investigation. As a result, Kane contended, Sandusky had been afforded the opportunity to molest two minors who would not have been victimized if the investigation had proceeded more quickly. According to plaintiffs, this statement was false. Indeed, Kane later acknowledged through a spokesperson that the statement was untrue.

In response, plaintiffs convened a press conference of their own. Fina told reporters that the inquiry into the Sandusky investigation "was a campaign promise [Kane] made. It was a trick

–6–

she used to get elected and Moulton didn't deliver for her.  What's she going to do?  She has to come up with something else sensational to detract that she [made] a series of falsehoods to the public during the campaign."

Plaintiffs plead that Kane retaliated against them for criticizing her.  As alleged in the First Amended Complaint, Kane "initiated a conspiracy" in 2014 to release grand jury information related to a 2009 criminal investigation which had been run by Fina.  That investigation involved the late J. Whyatt Mondesire ("Mondesire"), the former head of the Philadelphia Chapter of the N.A.A.C.P.  The OAG suspected that state grant money had improperly been used to make payments to Mondesire.  The investigation stalled, however, when key witnesses who were under indictment refused to testify before a grand jury.  The OAG concluded that Mondesire would not consent to appear before a grand jury and that subpoenaing him would be impracticable.  As a result, the investigation effectively became dormant.

Upon learning of the status of the Mondesire investigation, Kane gathered confidential grand jury documents related to that case and turned them over to her associate Morrow. She instructed Morrow to forward the materials to defendant Brennan, the reporter, with whom Morrow had a professional relationship.  Morrow redacted from the materials the names of all individuals other than Costanzo and Fina.  Upon receiving the

-7-

materials, Brennan wrote a story which suggested that Costanzo and Fina had impeded and improperly terminated the Mondesire investigation. The story was published by the <u>Philadelphia Daily News</u> in June 2014. Since that time, the <u>Philadelphia Daily News</u> has printed "numerous" articles critical of Fina and Costanzo.

According to plaintiffs, Kane thereafter "conspired with [defendant] Miletto," who was then employed by the OAG, by directing Miletto to state that he had uncovered evidence of Mondesire's wrongdoing and that Costanzo and Fina had removed him from the Mondesire investigation as a result. Plaintiffs allege that this claim was false.

When Costanzo and Fina became aware in May 2014 of the release of the grand jury information, they reported it to the Supervising Judge of the grand jury, who initiated an investigation into the alleged leak. Costanzo and Fina were subpoenaed to testify before the grand jury as part of that investigation. On August 26, 2014, the day they were to appear, they were confronted by defendant Miletto and several other OAG agents at the entrance to the building in which the grand jury convened. Plaintiffs maintain that Miletto "made intimidating, threatening and harassing statements toward Fina and Costanzo." Miletto and the agents then followed Costanzo and Fina into an elevator, where Miletto "attempted to physically intimidate, threaten and harass Fina." Costanzo and Fina reported this incident to the judge supervising

-8-

the grand jury, who later took evidence concerning the alleged intimidation and issued a protective order.

Since that time, Kane has been criminally charged for her role in the release of the grand jury materials and for lying to a grand jury about the disclosure. She has stated publicly and in "numerous . . . verified court filings" that Costanzo and Fina were part of a "conspiracy," "plot," or "scheme" to "corruptly" manufacture the grand jury investigation of her activities.

Meanwhile, the OAG, having concluded its inquiry into the Sandusky investigation, had come into possession of a large volume of emails that had been received and sent by OAG staff while the Sandusky investigation was taking place.[2] Among those emails, plaintiffs assert, were messages received and sent by plaintiffs containing pornographic images. Plaintiffs allege that Kane, embarrassed by the investigation into her role in the Mondesire grand jury leak and by the disclosure that her statements about Sandusky's victims had been untrue, "sought a way to utilize these emails to retaliate" against them. They contend, upon information and belief, that in summer 2014, Kane "instructed members of her staff to contact members of the media and suggest to them that e-mails existed for which they should make a Right to Know Law

---

2. Although plaintiffs repeatedly characterize these messages as their "private emails," they do not appear to dispute defendants' observation that the messages were received and sent using the "Pennsylvania OAG computer systems and email accounts."

-9-

request." Members of the press made such requests, and the OAG challenged them. The OAG contended that release of the emails was not mandated because they were not part of the public record.

While the debate over the release of the emails was ongoing, a colleague of Fina met with David Tyler ("Tyler"), the OAG's Chief Operating Officer. Tyler told Fina's colleague that many former members of the OAG legal staff would be hurt, apparently by their involvement in the email scandal, if "Fina does not back off." At around the same time, another of Fina's colleagues met with James Barker ("Barker"), Chief Deputy Attorney General for Appeals and Legal Services. Barker instructed Fina's colleague to tell Fina that if Fina continued to criticize Kane, Kane would release emails of former members of the OAG staff.

Ultimately, in September 2014 Kane released some but not all of the emails sought by the press. Plaintiffs allege that she did so selectively and in such a way as to paint them in a negative light. They claim that "[t]hose selected by Kane to have their emails released had either spoken out against Kane during her campaign or in connection with the Sandusky investigation, or were friends or professional associates of" plaintiffs.

The release of the emails garnered significant media attention. The Philadelphia Daily News published a profusion of articles and editorials regarding the participation of Costanzo and Fina in the email scandal. This reporting suggested that Costanzo

-10-

and Fina were the primary distributors of the offending emails and that they had engaged in workplace discrimination.  Plaintiffs insist that this was untrue.  In addition, the articles in the Philadelphia Daily News frequently failed to mention that Costanzo and Fina were only two of more than 100 recipients of the pornographic email chains.  According to plaintiffs, when the Media Defendants learned in June 2015 that this action was forthcoming, Costanzo and Fina were targeted "in articles and editorials with a focus and ferocity."  Plaintiffs claim that the Media Defendants "vastly overstate[d] the roles of Fina and Costanzo as the primary responsible persons."  The First Amended Complaint details multiple examples of the news stories with which plaintiffs take issue.

Kane, meanwhile, was scheduled to testify before a grand jury on November 17, 2014.  Allegedly in anticipation of the negative press coverage that would result, Kane approached CNN about a possible story regarding the email scandal.  The resulting segment was broadcast on November 18, 2014.  It included an interview with Kane in which she allegedly "knowingly, willfully and intentionally made false statements that were defamatory and cast Fina, Feathers and Noonan in a false light."

Plaintiffs contend that Kane stated in the CNN interview that the offending emails had included child pornography.  They also claim that she implied that Noonan, Feathers, Sheetz, and Fina had viewed such material.  They elaborate by including in their

-11-

First Amended Complaint a transcript of the CNN segment.  The
transcript reveals that a CNN correspondent declared during the
segment that Kane "claims that many of the officials who worked on
the Sandusky sex abuse case were at the exact same time breaking
the law by using their work computers to share hardcore porn."
Another correspondent then asserted that state officials "who
worked to bring down the infamous child molester Jerry Sandusky
have been caught exchanging crude pornographic emails written on
state email accounts, state computers and on state time, according
to the state's [A]ttorney [G]eneral . . . the porn being passed
around was not for the faint of heart."  Later in the segment, Kane
stated:  "When I saw [the images in the emails], they literally
took my breath away.  And they are deplorable.  Hardcore, graphic,
sometimes violent emails that had a string of videos and pictures
depicting sometimes children, old women, some of them involved
violent sexual acts against women."  A correspondent then reports
that "[t]hose involved in the scandal include some of the biggest
names in Pennsylvania's justice system, a state Supreme Court
Justice Seamus McCaffery, the State Police Commissioner Frank
Noonan and one of the main Sandusky investigators Randy Feathers."

The CNN segment also reported that Kane was unable to
investigate the distribution of the emails due to a gag order that
had been imposed as an indirect result of the

-12-

> public and very bitter feud between . . . Kane
> and the main prosecutor in the Sandusky case
> Frank Fina. . . . The two have been lobbying
> [sic] allegations against each other about
> whether several cases have been handled
> correctly.  As a result, Kane is now being
> investigated about whether she improperly leaked
> a memo about a case from 2009 that Fina handled.
> . . . [A] gag order in that case is keeping Kane
> from moving forward.

In addition, the commentator mentioned Noonan again, noting that while many involved in the scandal had lost their jobs, Noonan "still has his job because . . . the governor says there was no proof that he opened the emails."  At various points throughout the segment, photographs of Noonan, Feathers, and Fina were displayed.

After the CNN segment was aired, a spokesperson for Kane clarified that there was no child pornography in any of the emails at issue.

## II.

When ruling on a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and draw all inferences in the light most favorable to the plaintiff.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008); Umland v. Planco Fin. Servs., Inc., 542 F.3d 59, 64 (3d Cir. 2008).  We must then determine whether the pleading at issue "contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

-13-

(citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

In making our determination, we may also consider matters of public record as well as any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on that document." <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993).

In order to survive a Rule 12(b)(6) motion to dismiss, a claim must do more than raise a "mere possibility of misconduct." <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009) (quoting <u>Iqbal</u>, 556 U.S. at 679). Under this standard, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Iqbal</u>, 556 U.S. at 678. Instead, the complaint must contain factual matter sufficient to state a claim that is facially plausible, meaning that "the plaintiff [has] plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u> A complaint which "pleads facts that are 'merely consistent with' a defendant's

-14-

liability . . . 'stops short of the line between possibility and plausibility.'" Id. (citing Twombly, 550 U.S. at 557).

### III.

Kane has moved to dismiss Count One of the First Amended Complaint for failure to state a claim under § 1983.[3]  In Count One, Fina pleads that Kane's criticism of the OAG's handling of the Ali bribery investigation constituted unlawful retaliation for his exercise of his First Amendment rights.  Specifically, Fina alleges that Kane "fabricat[ed] and publish[ed] claims that the OAG possessed evidence that the [Ali investigation] was motivated by racism" in retaliation against Fina's protected speech. He appears to contend that his act of highlighting the termination of the Ali investigation and Kane's potential conflict of interest with

---

3.  Counts One through Six are all pleaded under 42 U.S.C. § 1983.  That section establishes in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 does not create substantive rights in and of itself, but instead provides a remedy for violations of constitutional or other federally established rights.  Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

-15-

respect to that matter motivated Kane unlawfully to retaliate against him.

It is well-established that "an individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment rights." Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist. v. Doyle, 429 U.S. 274 (1977)). In order properly to plead a First Amendment retaliation claim pursuant to § 1983, a plaintiff must allege "(1) that [the plaintiff] engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007); see also Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006).

Kane concedes that Fina and his fellow plaintiffs engaged in protected activity, and she does not appear to dispute the existence of a causal connection between this activity and her purported retaliation. See Lauren W., 480 F.3d at 267. Thus we must simply determine whether plaintiffs have adequately alleged that Kane's actions were "sufficient to deter a person of ordinary firmness from exercising his or her rights." See id. In making this determination, we "focus[] on the status of the speaker, the

-16-

status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*." Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2000) (quoting Suarez Corp. Indus. V. McGraw, 202 F.3d 676, 686 (4th Cir. 2000)); see also Koren v. Noonan, 586 F. App'x 885, 888 (3d Cir. 2014). When the alleged retaliator is a public employer, "courts have required the nature of the retaliatory acts . . . to be more than *de minimis* or trivial." Brennan, 350 F.3d at 419 (quoting Suarez, 202 F.3d at 686). "[C]riticism, false accusations, or verbal reprimands" are generally not considered sufficient to establish a claim. Id. (quoting Suarez, 202 F.3d at 686); see also Koren, 586 F. App'x at 888.

In analyzing First Amendment retaliation claims, our Court of Appeals has repeatedly cited with approval the well-reasoned decision of the Fourth Circuit in Suarez, 202 F.3d 676. See, e.g., Brennan, 350 F.3d at 419; Koren, 586 F. App'x at 888; see also McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006); McLaughlin v. Watson, 271 F.3d 566, 573 (3d Cir. 2001). In Suarez, the Court reviewed a district court ruling that a First Amendment retaliation claim raised by a direct mail marketing company against state officials was not barred by the doctrine of qualified immunity. 202 F.3d at 683-84. The Suarez court reversed. It concluded that the claim could not proceed because the alleged retaliatory conduct had not adversely affected the First Amendment

-17-

rights of the plaintiffs.  See id. at 690-91.  In so doing, the
court observed that when a First Amendment retaliation claim arises
in the public employment context, the relationship between the
speaker and the retaliator "creates competing interests between the
interests of the [public employee], as a citizen, in commenting
upon matters of public concern and the interest of the
[government], as an employer, in promoting the efficiency of the
public services it performs through its employees."  Id. at 686
(internal citation omitted).  It is because of these competing
interests that the retaliatory acts must be "more than *de minimis*
or trivial" to give rise to a viable claim.  Id.  Under this
standard, criticism and false accusations are insufficient.  See
id.

      According to the Suarez court, "[t]he nature of the
alleged retaliatory acts has particular significance where the
public official's acts are in the form of speech."  Id. at 687.
Under such circumstances, the "public official's own First
Amendment speech rights are implicated."  Id.  Consequently, "where
a public official's alleged retaliation is in the nature of speech,
in the absence of a threat, coercion, or intimidation intimating
that punishment, sanction, or adverse regulatory action will
immediately follow, such speech does not adversely affect a
citizen's First Amendment rights, even if defamatory."  Id.
(emphasis added) (citations omitted).

-18-

The Court of Appeals for the Third Circuit recently cited Suarez with approval in Koren, 586 F. App'x 885. There, a former Pennsylvania State Trooper brought a First Amendment retaliation action under § 1983 against two Pennsylvania State Police employees.[4] Id. at 886-87. He alleged that while he was running for political office they had implied in statements to the media that he had engaged in workplace misconduct. Id. at 887. The Court of Appeals affirmed the district court's dismissal of the claim. Id. at 890. It observed that "in the political arena, courts have consistently rejected First Amendment retaliation claims based upon assertions of purportedly false reports or criticism." Id. at 888. Because the defendants' allegedly retaliatory speech "involved no 'threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action [would] imminently follow,'" the court concluded that it "would not dissuade a person of ordinary firmness from" engaging in the type of protected activity undertaken by the plaintiff. Id. (quoting Suarez, 202 F.3d at 687).

Like the purported retaliation in Suarez and Koren, the criticism by Kane of the Ali bribery investigation is not actionable under § 1983. See generally 202 F.3d 676; 586 F. App'x 885. In reaching this conclusion, we consider the status

---

4. One of those two employees happened to be the same Frank Noonan who is a plaintiff in this action.

of Fina as the speaker, the status of Kane as the alleged retaliator, the relationship between them, and the nature of Kane's acts.  See Brennan, 350 F.3d at 419.  Fina, a Deputy Attorney General under Attorney General Corbett, was a high-level official in the OAG during the time the Ali investigation was ongoing.  Kane at the relevant time was the elected Attorney General.  It bears noting that in this capacity, Kane enjoys her own First Amendment rights.  See Suarez, 202 F.3d at 687.  Fina does not allege that there was an employment relationship between himself and Kane at the time of the alleged retaliation.  Even if there was such a relationship, the nature of Kane's alleged acts is different from that of the retaliation that occurred in the employment cases cited by plaintiffs.  Fina was not terminated, demoted, disciplined, or subjected to any other adverse employment action as a result of his criticism of Kane.  Instead, he merely bore the effects of a generalized critique of an investigation in which he took part under a former Attorney General.  In sum, the actions of Kane detailed in Count One would not "deter a person of ordinary firmness from exercising his constitutional rights."  See, e.g., Thomas, 463 F.3d at 296.

Plaintiffs urge us to distinguish Koren.  In their view, the retaliation alleged in Koren took place in the political arena, while this case arises in an employment context.  It is true that in Koren the Third Circuit acknowledged that when a public employer

-20-

takes action against an employee, the threshold for finding that action to be retaliatory is "very low." 586 F. App'x at 888 (quoting O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006)). But even under such circumstances, the court wrote, "a plaintiff must plead more than mere 'criticism, false accusations, or verbal reprimands.'" Id. (quoting Brennan, 350 F.3d at 419. Moreover, in support of their argument that this case takes place in the employment context, plaintiffs rely on cases which involve retaliatory adverse employment action such as demotion or termination. See, e.g., O'Connor, 440 F.3d at 126 n.1. No such adverse employment action was taken here.

Moreover, the retaliation described in Count One "is in the nature of speech," and Fina alleges no "threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow." See Suarez, 202 F.3d at 687. Rather, Kane's purportedly retaliatory acts are no more than "criticism, false accusations, or verbal reprimands." See Brennan, 350 F.3d at 419. Accordingly, even if that speech is defamatory, as Fina claims it is, it does not implicate his First Amendment rights. See Suarez, 202 F.3d at 687; Koren, 586 F. App'x at 888. We will therefore grant the motion of Kane to dismiss Count One.

IV.

Kane also seeks to dismiss Count Two of the First Amended Complaint.  Count Two, brought under § 1983, contains the allegations of Costanzo and Fina that Kane once again retaliated against them in violation of the First Amendment by "fabricating and publishing claims that Fina and Costanzo wrongfully impeded and terminated a valid criminal investigation against J. Whyatt Mondesire for improper and unethical purposes."  Costanzo and Fina also allege that Kane retaliated against them by unlawfully releasing grand jury materials related to the Mondesire investigation.  They argue that Kane did so in retaliation for their criticism of her handling of the Ali bribery investigation and "in an attempt to make it appear that [they] had abused their prosecutorial discretion by failing to pursue a case against Mondesire."

Once again, Kane does not appear to dispute that Costanzo and Fina engaged in protected activity or that there is a a causal connection between this activity and her purported retaliation.  Thus, our inquiry is again limited to whether Kane's actions would "deter a person of ordinary firmness from exercising his constitutional rights."  See, e.g., Thomas, 463 F.3d at 296.

To the extent that Count Two is based on speech by Kane, we reiterate that "where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or

-22-

intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory." Suarez, 202 F.3d at 687. As Kane correctly observes, she is entitled to make clear to the public that she, as the current Attorney General, "thinks that the OAG was either corrupt or inept before she took office and that Fina and Costanzo were part of the problem." Any statement made or initiated by Kane to the effect that the Mondesire investigation was improperly terminated was not "sufficient to deter a person of ordinary fitness from exercising" his First Amendment freedoms. See, e.g., Thomas, 463 F.3d at 296.

As to Costanzo and Fina's allegations that Kane retaliated against them through the unlawful release of materials from the Mondesire grand jury investigation, we likewise conclude that they have not made out a First Amendment retaliation claim. It is true that this alleged leak goes beyond mere speech and that Kane has been criminally charged in connection with it. To determine whether it amounts to retaliation, however, we must assess "the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*." Brennan, 350 F.3d at 419 (citation omitted). The First Amended Complaint does not allege that Kane released the grand jury materials selectively in such a

-23-

way as to misrepresent Costanzo and Fina's involvement in the
investigation.  Indeed, plaintiffs merely aver that Kane gathered
grand jury materials and gave them to her associate Morrow, who
passed them along to Brennan.  It was Morrow, and not Kane, who
"consciously redacted from these documents the names of all persons
other than Costanzo and Fina so that the reported story would only
be about them."  Morrow also "told Brennan that he and Kane were
looking to air a story critical of Fina and Costanzo."  Plaintiffs
do not allege that Morrow did so at Kane's direction.

    In summary, Fina and Costanzo have failed adequately to
allege that Kane unlawfully retaliated against them by criticizing
their handling of the Mondesire investigation or by releasing
confidential materials related to that investigation.  As a result,
we will grant the motion of Kane to dismiss Count Two.

V.

    In Count Three, which Kane, Miletto, and Brennan seek
to dismiss, Costanzo and Fina aver under § 1983 that Kane,
Miletto, and Brennan conspired to retaliate against them for
exercising their First Amendment freedoms by fabricating
assertions that they had improperly "impeded and terminated" the
Mondesire investigation.  This claim appears to be based on the
following allegations:  that Kane directed Miletto to state
falsely that Costanzo and Fina had removed him from the
Mondesire investigation after he uncovered evidence of

-24-

Mondesire's wrongdoing, and that Brennan reported this fabrication; and that Brennan received confidential grand jury materials from Morrow and, at Morrow's request, used them as the basis for a story.

For the reasons stated above, the criticism and allegedly false accusations levied by Kane, Miletto, Morrow, and Brennan against Costanzo and Fina are not enough to establish a First Amendment retaliation claim. These acts are mere speech and do not involve any "threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow." See Suarez, 202 F.3d at 687; Koren, 586 F. App'x at 888.[5] They are not enough to "deter a person of ordinary firmness from exercising his constitutional rights." See, e.g., Thomas, 463 F.3d at 296. Since they are not retaliatory, they cannot serve as the basis for a claim that defendants conspired to retaliate against them.

The same is true of the allegations that Kane, Miletto, and Brennan conspired to engage in retaliation by releasing confidential grand jury materials. We have already concluded that

---

5. Costanzo and Fina do allege that Miletto later threatened and intimidated them in connection with the grand jury investigation when he confronted them as they prepared to testify about the leak. This allegation does not appear to serve as the basis for the conspiracy claim in Count Three. Moreover, even if plaintiffs do base Count Three on this alleged intimidation, they have not alleged that Miletto conspired with Kane or Brennan to engage in this course of conduct.

-25-

any such leak does not amount to retaliation, and as such, it cannot support a retaliation conspiracy claim.

We also note that plaintiffs have not adequately alleged the existence of a conspiracy, at least with respect to defendant Brennan.  Nowhere in their First Amended Complaint do plaintiffs allege in anything more than conclusory terms that Brennan conspired with Kane or Miletto to engage in unlawful conduct.  See Iqbal, 556 U.S. at 678.  Plaintiffs aver that Brennan, at Morrow's direction, wrote a news story critical of Costanzo and Fina, but they do not allege any involvement by Kane or Miletto in this purported scheme.  As to Miletto, plaintiffs plead his involvement in a conspiracy only by asserting that Kane directed him to "falsely state that Fina and Costanzo had removed him from the Mondesire investigation when Miletto supposedly found evidence of Mondesire's wrongdoing which was ultimately reported by Brennan in the news story."  Again, this is not actionable retaliation, and cannot support a claim of a retaliatory conspiracy.

We will thus grant the motions of Kane, Miletto, and Brennan to dismiss Count Three.

## VI.

Kane further moves to dismiss Count Four.  Again, this count is predicated on § 1983.  There Noonan, Feathers, Sheetz, and Fina claim that Kane retaliated against them in violation of the First Amendment by making a statement "to the media that the

-26-

alleged delay in arresting Sandusky resulted in two minors being subjected to sexual abuse that would not have otherwise occurred." That assertion, as Kane's representative later acknowledged, was untrue.  Noonan, Feathers, Sheetz, and Fina aver that when Kane made the statement she was retaliating against them for their criticism of the inquiry she had initiated into the Sandusky investigation.

In Koren, our Court of Appeals opined that when a court is confronted with allegations that a defendant has "smeared [a plaintiff's] unblemished professional record . . . [t]he question . . . is not whether [the] remarks were defamatory – it is whether they would have deterred 'a person of ordinary firmness'" from exercising his constitutional rights. 586 F. App'x at 888 (quoting Thomas, 463 F.3d at 296).  While plaintiffs engaged in protected activity (as Kane concedes they did), and while Kane's contentions about the delays in the Sandusky investigation may have been false and damaging, those contentions "involved no 'threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow.'"  See id. (quoting Suarez, 202 F.3d at 687).  They were merely the remarks of an elected official about persons she considered to be her political opponents pertaining to an issue which had been at the core of her campaign for office.  They would not "dissuade a person of

-27-

ordinary firmness" from engaging in the type of protected speech at issue here, and as a result, they are not actionable under § 1983.  See id.  For this reason, we will grant the motion of Kane to dismiss Count Four.

## VII.

Kane moves to dismiss Count Five.  This count under § 1983 consists of the allegations of Noonan, Feathers, Sheetz, and Fina that Kane retaliated against them for engaging in First-Amendment-protected speech by "fabricating and publishing claims that implied that Fina, Sheetz, Feathers, and Noonan possessed and/or distributed child pornography."  Plaintiffs are referring to the statements made by Kane to a CNN correspondent, allegedly in retaliation for plaintiffs' criticism of her.  They were broadcast in a news segment which aired on November 18, 2014.  Once again, Kane concedes that plaintiffs' criticism of her was protected by the First Amendment, and she does not appear to dispute that there was a causal connection between this criticism and her statements.

We reiterate that under these circumstances, where Kane's purportedly retaliatory acts are "in the form of speech," her First Amendment rights are implicated as well.  See Suarez, 202 F.3d at 687.  The criticisms Kane articulated during the CNN segment, which appear to serve as the sole basis for Count Five, do not involve any "threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately

-28-

follow." See id. Again, Kane's comments were those of an elected official concerning the improper use of state computers and state email servers. Even if Kane had defamed Noonan, Feathers, Sheetz, and Fina by falsely asserting that they had viewed child pornography, this would not be actionable First Amendment retaliation under § 1983. See id.

In response to Kane's argument that her statements to CNN involved no threats or intimidation, Noonan, Feathers, Sheetz, and Fina contend that they were subjected to threats in connection with their involvement in the email scandal. Specifically, they plead that Tyler, an OAG official, threatened the release of the emails "if Fina does not back off." They further allege that Barker, another OAG official, directed Fina's colleague to instruct Fina that his criticism of Kane would result in the release of the emails. It is unclear which count (if any) in the First Amended Complaint relies on these allegations. Moreover, there is no indication in the First Amended Complaint that any defendant directed or played any role in the issuance of these alleged threats. Thus, they cannot serve as the basis for a claim in this action.

For the foregoing reasons we will grant the motion of Kane for dismissal of Count Five.

VIII.

This brings us to Count Six, which Kane asks us to dismiss as not stating a claim under § 1983.  In Count Six, all five plaintiffs plead that Kane again retaliated against their engagement in protected speech by "releasing the information about the private emails and/or releasing the emails of all plaintiffs." They take issue with the OAG's "selective" release of certain of their emails to the press following the filing of Right to Know Law requests concerning the communications.

Once again, in assessing whether the alleged retaliatory acts of Kane were "sufficient to determine a person of ordinary firmness from exercising" his constitutional rights, we "focus[] on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*." Thomas, 463 F.3d at 296; Brennan, 350 F.3d at 419.  Here, the speakers – in this case plaintiffs – are former high ranking public officials, and the retaliator Kane is an elected Attorney General who plays a major role in state law enforcement and who is tasked with directing the OAG.  The alleged retaliatory act at issue was the release to the media, pursuant to an official request and after significant litigation, of sexually explicit messages which plaintiffs do not dispute were exchanged on state email systems. In other words, the "nature of the retaliatory acts" was in this

-30-

case the disclosure by the state's Attorney General of official
misconduct within her office.  See id.  It would defy logic to
conclude that Kane violated the constitutional rights of plaintiffs
by bringing to light their use of state-owned computers and email
systems to exchange pornography.

In arguing otherwise, plaintiffs direct our attention to
the decision of the District of Delaware in Neuberger v. Gordon,
567 F. Supp. 2d 622 (D. Del. 2008).  In that case, a civil rights
attorney who had been critical of certain public figures brought a
First Amendment retaliation case against them after they disclosed
his private medical information to the media.  That disclosure, the
court concluded, was "sufficient to deter a civil rights
plaintiff's attorney of ordinary firmness from exercising
constitutional rights."  Id. at 638.  Plaintiffs contend that
Neuberger stands for the proposition that the disclosure of private
information about a plaintiff can support a First Amendment
retaliation claim.

Neuberger, however, is of no help to plaintiffs.  That
case involved the widespread dissemination of highly intimate
medical information about the plaintiff.  Here, in contrast, the
materials released were off-color and arguably pornographic
messages sent by state officials on state-owned email servers.  The
facts of Neuberger are easily distinguishable from those before us
in this matter.

-31-

In sum, when we consider "the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*," we have no trouble concluding that Kane's release of certain emails implicating plaintiffs was not "sufficient to determine a person of ordinary firmness from exercising" his right to free speech. See Thomas, 463 F.3d at 296; Brennan, 350 F.3d at 419.

To the extent that Count Six relies on allegations that plaintiffs were threatened with the release of their emails, we note once again that the First Amended Complaint contains no allegations that any defendant made or directed these threats. While plaintiffs may believe that Kane arranged for these purported threats to be made, they have not alleged this in their pleading.

Accordingly, we will grant the motion of Kane to dismiss Count Six.

IX.

In essence, the First Amended Complaint details a long-standing political battle between the Attorney General of Pennsylvania and former high-ranking state officials who served in the administrations of her adversaries. The battle has been hard fought and is not pretty. Each party, however, has exercised his or her rights under the First Amendment, and there has been alleged no illegal retaliation giving rise to claims under § 1983.

-32-

X.

As we have concluded that Rule 12(b)(6) requires dismissal of Counts One through Six, there are no remaining claims against Kane and Miletto. We need not reach their arguments that they are entitled to qualified immunity from all of the claims against them, nor must we address the argument of Kane that the First Amended Complaint should be dismissed on the ground that it runs afoul of the pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure.

XI.

Finally, we address Counts Seven and Eight, in which Costanzo and Fina state law claims of defamation and false light against the Media Defendants whose citizenship is not diverse from that of the plaintiffs. Our subject matter jurisdiction over these claims rests on 28 U.S.C. § 1367.[6]

---

6. Section 1367 provides in relevant part:

> (a) . . . in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.
>
> . . .
>
> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if —

-33-

All the federal claims are being dismissed.  Pursuant to 28 U.S.C. § 1367(c)(3), we decline to exercise supplemental jurisdiction over Counts Seven and Eight.  The action is in a very early stage.  Consequently, Counts Seven and Eight will be dismissed without prejudice to the right of plaintiffs to reassert these claims in the appropriate state court.

. . .

> (3) the district court has dismissed all claims over which it has original jurisdiction.

FRANK NOONAN; RANDY FEATHERS;
RICHARD A. SHEETZ, JR.;
E. MARC COSTANZO; FRANK FINA

v.

ATTORNEY GENERAL PENNSYLVANIA; MICHAEL MILETTO;
CHRISTOPHER BRENNAN; PHILADELPHIA DAILY NEWS;
PHILADELPHIA MEDIA NETWORK (DIGITAL) LLC;
PHILADELPHIA MEDIA NETWORK LLC

        Frank Noonan, Randy Feathers, Richard A. Sheetz, Jr., Frank Fina,
                Appellants

# STANDING ORDER REGARDING MOTIONS TO EXCEED THE PAGE LIMITATIONS OF THE FEDERAL RULES OF APPELLATE PROCEDURE

### Effective Immediately

**PRESENT**:  McKEE, **Chief Judge**, and SLOVITER, SCIRICA, RENDELL, AMBRO, FUENTES, SMITH, FISHER, CHAGARES, JORDAN, HARDIMAN, GREENAWAY, JR, VANASKIE, ALDISERT, WEIS, GARTH, STAPLETON, GREENBERG, COWEN, NYGAARD, ROTH, BARRY, and VAN ANTWERPEN, **Circuit Judges**

 

 

**AND NOW**, it being noted that motions to exceed the page/word limitations for briefs are filed in approximately twenty-five percent of cases on appeal, and that seventy-one percent of those motions seek to exceed the page/word limitations by more than twenty percent;

Notice is hereby given that motions to exceed the page or word limitations for briefs are strongly disfavored and will be granted only upon demonstration of extraordinary circumstances.  Such circumstances  may include multi-appellant consolidated appeals in which the appellee seeks to file a single responsive brief or complex/consolidated proceedings in which the parties are seeking to file jointly or the subject matter clearly requires expansion of the page or word limitations.

Accordingly, it is **ORDERED** that a three-judge Standing Motions Panel is hereby appointed to rule on all motions to exceed the page/word limitations for briefs since the page/word limitations, prescribed by Fed. R. App. P. 32(a)(7), should be sufficient to address all issues in an appeal.

It is further **ORDERED** that Counsel are advised to seek advance approval of requests to exceed the page/word limitations whenever possible or run the risk of rewriting and refiling a compliant brief.  Any request to exceed page/word limitations submitted in the absence of such an advance request shall include an explanation of why counsel could not have foreseen any difficulty in complying with the limitations in time to seek advance approval from the panel.

This order shall                                                        .

By the Court,

/s/ Theodore A. McKee
Chief Judge

Date: January 9

A True Copy:

*Marcia M. Waldron*

Marcia M. Waldron, Clerk

OFFICE OF THE CLERK

**MARCIA M. WALDRON**

**CLERK**



U NITED  S TATES  C OURT OF  A PPEALS
21400 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA  19106-1790
Website: www.ca3.uscourts.gov

TELEPHONE

215-597-2995

August 8, 2016

Mark W. Tanner, Esq.
Feldman Shepherd Wohlgelernter Tanner & Weinstock
1845 Walnut Street
21st Floor
Philadelphia, PA 19103

RE: Frank Noonan, et al v. Attorney General Pennsylvania, et al
Case Number: 16-3311
District Case Number: 2-15-cv-06082

**Effective December 15, 2008, the Court implemented the Electronic Case Files
System. Accordingly, attorneys are required to file all documents electronically.
See 3d Cir. L.A.R. 113 (2008) and the Court's CM/ECF website at
www.ca3.uscourts.gov/cmecf-case-managementelectronic-case-files.**

To All Parties:

Enclosed is case opening information regarding the above-captioned appeal filed by **Richard A.
Sheetz, Frank Noonan, Randy Feathers, Frank G. Fina**, docketed at No.**16-3311**. All
inquiries should be directed to your Case Manager in writing or by calling the Clerk's Office at
215-597-2995. This Court's rules, forms, and case information are available on our website at
http://www.ca3.uscourts.gov.

**On December 1, 2009, the Federal Rules of Appellate and Civil Procedure were amended
modifying deadlines and calculation of time. In particular those motions which will toll the
time for filing a notice of appeal under Fed.R.App.P. 4(a)(4), other than a motion for
attorney's fees under Fed.R.Civ.P. 54, will be considered timely if filed no later than 28
days after the entry of judgment. Should a party file one of the motions listed in
Fed.R.App.P 4(a)(4) after a notice of appeal has been filed, that party must immediately
inform the Clerk of the Court of Appeals in writing of the date and type of motion that was
filed. The case in the court of appeals will not be stayed absent such notification.**

**Counsel for Appellant**

As counsel for Appellant(s), you must file:
1. Application for Admission (if applicable)
2. Appearance Form
3. Civil Information Statement
4. Disclosure Statement (except governmental entities)
5. Concise Summary of the Case
6. Transcript Purchase Order Form.
These forms must be filed within **fourteen (14) days** of the date of this letter.

**Failure of Appellant(s) to comply with any of these requirements by the deadline will result in the DISMISSAL of the case without further notice. 3rd Circuit LAR Misc. 107.2.**

**Counsel for Appellee**

As counsel for Appellee(s), you must file:
1. Application for Admission (if applicable)
2. Appearance Form
3. Disclosure Statement (except governmental entities)
These forms must be filed within **fourteen (14) days** of the date of this letter.

Parties who do not intend to participate in the appeal must notify the Court in writing. This notice must be served on all parties.

Attached is a copy of the full caption in this matter as it is titled in the district court. Please review the caption carefully and promptly advise this office in writing of any discrepancies.

Very truly yours,

*Marcia M. Waldron*

Marcia M. Waldron,
Clerk

By: s/James
Case Manager
267-299-4958

cc:    All Counsel of Record

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

FRANK NOONAN, et al.,                    CIVIL ACTION: 15-cv-06082

      Plaintiff,

      v.                                JURY TRIAL DEMANDED

KATHLEEN KANE, ET AL.,

      Defendants.
_____

### **NOTICE OF APPEAL**

     Notice is hereby given that Plaintiff, E. Marc Costanzo, hereby appeals to the United

States Court of Appeals for the Third Circuit from the Court's Order dated July19, 2016

dismissing this case pursuant to Defendant's Motion to Dismiss for failure to state a claim.

                       MCMONAGLE, PERRI, MCHUGH, MISCHAK


                       /s/ FORTUNATO N. PERRI, JR.
                       FORTUNATO N. PERRI, JR. 52719
                       1845 Walnut Street, 19th Fl.
                       Philadelphia, PA 19103
                       215-981-0999

## CERTIFICATE OF SERVICE

I, Fortunato N. Perri, Jr., Esquire hereby certify that on this date I caused to be served the within Notice of Appeal upon counsel via Electronic Filing.

/s/ FORTUNATO N. PERRI, JR.
FORTUNATO N. PERRI, JR.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN, et al.            :            CIVIL ACTION
                                :
                                :
            v.                  :
                                :
                                :
KATHLEEN KANE, et al.           :            NO. 15-6082

ORDER

AND NOW, this 19th day of July, 2016, for the reasons
set forth in the accompanying Memorandum, it is hereby ORDERED
that:

(1)  the motion of defendant Kathleen G. Kane to dismiss
Counts I through VI of the First Amended Complaint for failure to
state a claim (Doc. # 29) is GRANTED;

(2)  the motion of defendant Michael Miletto to dismiss
Count III of the First Amended Complaint for failure to state a
claim (Doc. # 30) is GRANTED;

(3)  the motion of defendant Christopher Brennan to
dismiss Count III of the First Amended Complaint for failure to
state a claim (Doc. # 36) is GRANTED;

(4)  pursuant to 28 U.S.C. § 1367(c)(3), Counts VII and
VIII of the First Amended Complaint are DISMISSED without
prejudice; and

(5)   the Clerk shall mark this case closed as no claims

remain.

BY THE COURT:


/s/ Harvey Bartle III

J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN, et al.                :          CIVIL ACTION
                                    :
                                    :
            v.                      :
                                    :
                                    :
KATHLEEN KANE, et al.               :          NO. 15-6082

MEMORANDUM

Bartle, J.                                      July 19, 2016

            Plaintiff are Frank Noonan ("Noonan"), Randy Feathers

("Feathers"), Richard A. Sheetz, Jr. ("Sheetz"), E. Marc Costanzo

("Costanzo"), and Frank Fina ("Fina"), four of whom are former high

level employees of the Office of the Attorney General of

Pennsylvania ("OAC") and one of whom is a retired Commissioner of

the Pennsylvania State Police.  They have filed this action

against:  Pennsylvania Attorney General Kathleen Kane ("Kane");

Michael Miletto ("Miletto"), an investigator for the Office of the

Attorney General; the Philadelphia Daily News; one of its

reporters, Christopher Brennan ("Brennan"); and Philadelphia Media

Network, LLC and Philadelphia Media Network (Digital) LLC, which

together own the Philadelphia Daily News.

            Noonan is the retired Commissioner of the Pennsylvania

State Police.  Feathers is a retired Regional Director of the

Bureau of Narcotics and Investigation and Control of the OAG.

Sheetz served as a former Executive Deputy Attorney General

Directing the Criminal Law Division of the OAG. Costanzo is a former Deputy Attorney General for the OAG. Finally, Fina is a former Chief Deputy Attorney General for the OAG.[1] All five plaintiffs are citizens of the Commonwealth of Pennsylvania.

Plaintiffs sue Kane under 42 U.S.C. § 1983. They allege that she retaliated against them for engaging in speech protected by the First Amendment. Costanzo and Fina also plead that Kane, Miletto, and Brennan conspired to retaliate against them for the same protected speech. Finally, Costanzo and Fina assert defamation and false light claims under Pennsylvania law against Brennan, Philadelphia Media Network, LLC and Philadelphia Media Network (Digital) LLC. We have supplemental jurisdiction over these state-law claims pursuant to 28 U.S.C. § 1367.

Before the court are three motions filed by Kane, Miletto, and the Media Defendants (Brennan, the Philadelphia Daily News, Philadelphia Media Network (Digital) LLC, and Philadelphia Media Network LLC) to dismiss plaintiffs' First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. Kane and Miletto also rely on the doctrine of qualified immunity.

---

1. Although Feathers, Sheetz, Costanzo, and Fina no longer work at the OAG, their pleading does not make clear precisely when their employment with the OAG ended. What is clear is that each of these four plaintiffs left the OAG either before Kane took office or shortly thereafter.

-2-

Kane further argues that the First Amended Complaint does not meet
the pleading requirements under Rule 8(a).

I.

The facts set forth in the First Amended Complaint,
taken in the light most favorable to plaintiffs, are as follows.

In early 2012, Kane announced her candidacy to become
Attorney General of Pennsylvania.  During her campaign, Kane
criticized the OAG for its handling of the high-profile
investigation and subsequent prosecution of Jerry Sandusky
("Sandusky"), a Penn State University football coach who was
ultimately convicted in June 2012 of sexually abusing minors.
Plaintiffs had all been involved in the Sandusky investigation
during the time that Thomas Corbett was the Attorney General.
While campaigning, Kane declared that the OAG had improperly
delayed in charging Sandusky and had devoted inadequate resources
to the investigation.  She promised to initiate an investigation
into the handling of the Sandusky case by the OAG if elected.  In
response, Feathers made public statements refuting Kane's claims
and deriding her as uninformed.  Likewise, Costanzo "openly
expressed criticism of Kane's campaign tactics regarding the
Sandusky prosecution."  Kane won the election in November 2012 and
assumed office in January 2013.

Upon taking office, Kane also put a halt to a
long-running bribery investigation in which plaintiffs had been

-3-

involved.  In furtherance of that investigation, the OAG had been

relying on an informant named Tyron Ali ("Ali").  Ali had entered

into a cooperation agreement with the OAG pursuant to which he

would identify Philadelphia elected officials who were prepared to

accept bribes.  In exchange, the OAG would not pursue charges

against Ali.

When Kane assumed office in early 2013, Fina informed

her that he believed she could not oversee the Ali investigation

because it had the potential to implicate Joshua Morrow ("Morrow"),

a friend, supporter, and former campaign employee of Kane.  Kane

disagreed and retained control of the investigation.

In September 2013, Kane made clear that she would not

pursue the bribery investigation, nor would she honor Ali's

cooperation agreement.  In response, Ali moved for Kane's recusal

and for enforcement of the agreement.  Fina executed an affidavit

in support of Ali's motion.  In it, Fina attested to his knowledge

of the purported conflict of interest, the investigation, and the

cooperation agreement.

Kane ultimately relented, dismissing all charges against

Ali.  However, beginning in late 2013 and continuing into early

2014, she expressed publicly that the Ali bribery investigation had

been racially motivated, that Ali was not credible, and that the

investigation lacked "quality" and had inadequate resources.  She

reported that federal law enforcement officials had characterized

-4-

the case as "flawed and not prosecutable" and stated that Ali and
the lead case agent both believed the investigation to be focused
on members of the General Assembly's Black Caucus.  In addition,
Kane implied that Fina was to blame for the public disclosure of
the investigation.  Plaintiffs allege that these statements were
false.  Fina responded to them in what plaintiffs characterize as a
"letter of March 22, 2014 to the public."  Meanwhile, Fina, Noonan,
and Sheetz made public statements refuting Kane's accusations.
Around the same time, Kane emailed a media strategist regarding
reports of her role in the Ali investigation.  In the email, Kane
justified her accusations that the investigation was racially
motived by stating:  "This is war."

     Ultimately, Philadelphia District Attorney Seth Williams
("Williams") took over the Ali bribery investigation.  Williams
reviewed the evidence and found no indication that the
investigation was racially motivated.  He brought charges against
six elected officials, five of whom have pleaded guilty.

     Meanwhile, Kane fulfilled her campaign promise to
initiate an inquiry into the Sandusky investigation.  Fina, who was
contacted as part of the inquiry, openly questioned the legality of
Kane's inquiry and Kane's authority to conduct it.  Fina also
directed "a variety [of] letters . . . and motions" to Geoffrey
Moulton ("Moulton"), the attorney in the OAG directing the inquiry,
and to the grand jury judge supervising it.

-5-

A report of the inquiry into the Sandusky investigation
was completed by Moulton in May 2014.  Pursuant to the protocol
established by the grand jury judge who was supervising the
inquiry, Noonan, Feathers, Sheetz, and Fina had the opportunity to
respond to the Moulton report.  They did so in June 2014.
Plaintiffs criticized the inquiry as "ill-advised" and contended
that it had been "born of political opportunism and posturing."
They also called the claims that had given rise to the report
"ill-informed and unfounded."  The report, according to plaintiffs,
was merely an "exercise in second guessing" undertaken "to sift for
criticism."  These responses were incorporated into a final version
of the report.

On June 23, 2014, the day the final report was released,
Kane convened a press conference.  Speaking to reporters, she
stated that the actions of Noonan, Feathers, Sheetz, and Fina had
led to delays in the Sandusky investigation.  As a result, Kane
contended, Sandusky had been afforded the opportunity to molest two
minors who would not have been victimized if the investigation had
proceeded more quickly.  According to plaintiffs, this statement
was false.  Indeed, Kane later acknowledged through a spokesperson
that the statement was untrue.

In response, plaintiffs convened a press conference of
their own.  Fina told reporters that the inquiry into the Sandusky
investigation "was a campaign promise [Kane] made.  It was a trick

-6-

she used to get elected and Moulton didn't deliver for her.  What's she going to do?  She has to come up with something else sensational to detract that she [made] a series of falsehoods to the public during the campaign."

Plaintiffs plead that Kane retaliated against them for criticizing her.  As alleged in the First Amended Complaint, Kane "initiated a conspiracy" in 2014 to release grand jury information related to a 2009 criminal investigation which had been run by Fina.  That investigation involved the late J. Whyatt Mondesire ("Mondesire"), the former head of the Philadelphia Chapter of the N.A.A.C.P.  The OAG suspected that state grant money had improperly been used to make payments to Mondesire.  The investigation stalled, however, when key witnesses who were under indictment refused to testify before a grand jury.  The OAG concluded that Mondesire would not consent to appear before a grand jury and that subpoenaing him would be impracticable.  As a result, the investigation effectively became dormant.

Upon learning of the status of the Mondesire investigation, Kane gathered confidential grand jury documents related to that case and turned them over to her associate Morrow.  She instructed Morrow to forward the materials to defendant Brennan, the reporter, with whom Morrow had a professional relationship.  Morrow redacted from the materials the names of all individuals other than Costanzo and Fina.  Upon receiving the

-7-

materials, Brennan wrote a story which suggested that Costanzo and Fina had impeded and improperly terminated the Mondesire investigation. The story was published by the Philadelphia Daily News in June 2014. Since that time, the Philadelphia Daily News has printed "numerous" articles critical of Fina and Costanzo.

According to plaintiffs, Kane thereafter "conspired with [defendant] Miletto," who was then employed by the OAG, by directing Miletto to state that he had uncovered evidence of Mondesire's wrongdoing and that Costanzo and Fina had removed him from the Mondesire investigation as a result. Plaintiffs allege that this claim was false.

When Costanzo and Fina became aware in May 2014 of the release of the grand jury information, they reported it to the Supervising Judge of the grand jury, who initiated an investigation into the alleged leak. Costanzo and Fina were subpoenaed to testify before the grand jury as part of that investigation. On August 26, 2014, the day they were to appear, they were confronted by defendant Miletto and several other OAG agents at the entrance to the building in which the grand jury convened. Plaintiffs maintain that Miletto "made intimidating, threatening and harassing statements toward Fina and Costanzo." Miletto and the agents then followed Costanzo and Fina into an elevator, where Miletto "attempted to physically intimidate, threaten and harass Fina." Costanzo and Fina reported this incident to the judge supervising

-8-

the grand jury, who later took evidence concerning the alleged intimidation and issued a protective order.

Since that time, Kane has been criminally charged for her role in the release of the grand jury materials and for lying to a grand jury about the disclosure. She has stated publicly and in "numerous . . . verified court filings" that Costanzo and Fina were part of a "conspiracy," "plot," or "scheme" to "corruptly" manufacture the grand jury investigation of her activities.

Meanwhile, the OAG, having concluded its inquiry into the Sandusky investigation, had come into possession of a large volume of emails that had been received and sent by OAG staff while the Sandusky investigation was taking place.[2] Among those emails, plaintiffs assert, were messages received and sent by plaintiffs containing pornographic images. Plaintiffs allege that Kane, embarrassed by the investigation into her role in the Mondesire grand jury leak and by the disclosure that her statements about Sandusky's victims had been untrue, "sought a way to utilize these emails to retaliate" against them. They contend, upon information and belief, that in summer 2014, Kane "instructed members of her staff to contact members of the media and suggest to them that e-mails existed for which they should make a Right to Know Law

---

2. Although plaintiffs repeatedly characterize these messages as their "private emails," they do not appear to dispute defendants' observation that the messages were received and sent using the "Pennsylvania OAG computer systems and email accounts."

request." Members of the press made such requests, and the OAG
challenged them. The OAG contended that release of the emails was
not mandated because they were not part of the public record.

While the debate over the release of the emails was
ongoing, a colleague of Fina met with David Tyler ("Tyler"), the
OAG's Chief Operating Officer. Tyler told Fina's colleague that
many former members of the OAG legal staff would be hurt,
apparently by their involvement in the email scandal, if "Fina does
not back off." At around the same time, another of Fina's
colleagues met with James Barker ("Barker"), Chief Deputy Attorney
General for Appeals and Legal Services. Barker instructed Fina's
colleague to tell Fina that if Fina continued to criticize Kane,
Kane would release emails of former members of the OAG staff.

Ultimately, in September 2014 Kane released some but not
all of the emails sought by the press. Plaintiffs allege that she
did so selectively and in such a way as to paint them in a negative
light. They claim that "[t]hose selected by Kane to have their
emails released had either spoken out against Kane during her
campaign or in connection with the Sandusky investigation, or were
friends or professional associates of" plaintiffs.

The release of the emails garnered significant media
attention. The Philadelphia Daily News published a profusion of
articles and editorials regarding the participation of Costanzo and
Fina in the email scandal. This reporting suggested that Costanzo

-10-

and Fina were the primary distributors of the offending emails and that they had engaged in workplace discrimination.  Plaintiffs insist that this was untrue.  In addition, the articles in the Philadelphia Daily News frequently failed to mention that Costanzo and Fina were only two of more than 100 recipients of the pornographic email chains.  According to plaintiffs, when the Media Defendants learned in June 2015 that this action was forthcoming, Costanzo and Fina were targeted "in articles and editorials with a focus and ferocity."  Plaintiffs claim that the Media Defendants "vastly overstate[d] the roles of Fina and Costanzo as the primary responsible persons."  The First Amended Complaint details multiple examples of the news stories with which plaintiffs take issue.

Kane, meanwhile, was scheduled to testify before a grand jury on November 17, 2014.  Allegedly in anticipation of the negative press coverage that would result, Kane approached CNN about a possible story regarding the email scandal.  The resulting segment was broadcast on November 18, 2014.  It included an interview with Kane in which she allegedly "knowingly, willfully and intentionally made false statements that were defamatory and cast Fina, Feathers and Noonan in a false light."

Plaintiffs contend that Kane stated in the CNN interview that the offending emails had included child pornography.  They also claim that she implied that Noonan, Feathers, Sheetz, and Fina had viewed such material.  They elaborate by including in their

-11-

First Amended Complaint a transcript of the CNN segment.  The transcript reveals that a CNN correspondent declared during the segment that Kane "claims that many of the officials who worked on the Sandusky sex abuse case were at the exact same time breaking the law by using their work computers to share hardcore porn." Another correspondent then asserted that state officials "who worked to bring down the infamous child molester Jerry Sandusky have been caught exchanging crude pornographic emails written on state email accounts, state computers and on state time, according to the state's [A]ttorney [G]eneral . . . the porn being passed around was not for the faint of heart."  Later in the segment, Kane stated:  "When I saw [the images in the emails], they literally took my breath away.  And they are deplorable.  Hardcore, graphic, sometimes violent emails that had a string of videos and pictures depicting sometimes children, old women, some of them involved violent sexual acts against women."  A correspondent then reports that "[t]hose involved in the scandal include some of the biggest names in Pennsylvania's justice system, a state Supreme Court Justice Seamus McCaffery, the State Police Commissioner Frank Noonan and one of the main Sandusky investigators Randy Feathers."

The CNN segment also reported that Kane was unable to investigate the distribution of the emails due to a gag order that had been imposed as an indirect result of the

-12-

> public and very bitter feud between . . . Kane
> and the main prosecutor in the Sandusky case
> Frank Fina. . . . The two have been lobbying
> [sic] allegations against each other about
> whether several cases have been handled
> correctly.  As a result, Kane is now being
> investigated about whether she improperly leaked
> a memo about a case from 2009 that Fina handled.
> . . . [A] gag order in that case is keeping Kane
> from moving forward.

In addition, the commentator mentioned Noonan again, noting that

while many involved in the scandal had lost their jobs, Noonan

"still has his job because . . . the governor says there was no

proof that he opened the emails."  At various points throughout the

segment, photographs of Noonan, Feathers, and Fina were displayed.

　　　　After the CNN segment was aired, a spokesperson for Kane

clarified that there was no child pornography in any of the emails

at issue.

II.

　　　　When ruling on a Rule 12(b)(6) motion to dismiss, the

court must accept as true all factual allegations in the

complaint and draw all inferences in the light most favorable to

the plaintiff.  Phillips v. Cnty. of Allegheny, 515 F.3d 224,

233 (3d Cir. 2008); Umland v. Planco Fin. Servs., Inc., 542 F.3d

59, 64 (3d Cir. 2008).  We must then determine whether the

pleading at issue "contain[s] sufficient factual matter,

accepted as true, to 'state a claim for relief that is plausible

on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

-13-

(citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).
In making our determination, we may also consider matters of
public record as well as any "undisputedly authentic document
that a defendant attaches as an exhibit to a motion to dismiss
if the plaintiff's claims are based on that document." <u>Pension</u>
<u>Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d
1192, 1196 (3d Cir. 1993).

     In order to survive a Rule 12(b)(6) motion to dismiss,
a claim must do more than raise a "mere possibility of
misconduct." <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210
(3d Cir. 2009) (quoting <u>Iqbal</u>, 556 U.S. at 679). Under this
standard, "[t]hreadbare recitals of the elements of a cause of
action, supported by mere conclusory statements, do not
suffice." <u>Iqbal</u>, 556 U.S. at 678. Instead, the complaint must
contain factual matter sufficient to state a claim that is
facially plausible, meaning that "the plaintiff [has] plead[ed]
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556). This
plausibility standard "is not akin to a 'probability
requirement,' but it asks for more than a sheer possibility that
a defendant has acted unlawfully." <u>Id.</u> A complaint which
"pleads facts that are 'merely consistent with' a defendant's

-14-

liability . . . 'stops short of the line between possibility and plausibility.'" Id. (citing Twombly, 550 U.S. at 557).

## III.

Kane has moved to dismiss Count One of the First Amended Complaint for failure to state a claim under § 1983.[3]  In Count One, Fina pleads that Kane's criticism of the OAG's handling of the Ali bribery investigation constituted unlawful retaliation for his exercise of his First Amendment rights.  Specifically, Fina alleges that Kane "fabricat[ed] and publish[ed] claims that the OAG possessed evidence that the [Ali investigation] was motivated by racism" in retaliation against Fina's protected speech. He appears to contend that his act of highlighting the termination of the Ali investigation and Kane's potential conflict of interest with

---

3.  Counts One through Six are all pleaded under 42 U.S.C. § 1983.  That section establishes in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 does not create substantive rights in and of itself, but instead provides a remedy for violations of constitutional or other federally established rights.  Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

-15-

respect to that matter motivated Kane unlawfully to retaliate
against him.

It is well-established that "an individual has a viable
claim against the government when he is able to prove that the
government took action against him in retaliation for his exercise
of First Amendment rights." Anderson v. Davila, 125 F.3d 148, 160
(3d Cir. 1997) (citing Mt. Healthy City Sch. Dist. v. Doyle, 429
U.S. 274 (1977)).  In order properly to plead a First Amendment
retaliation claim pursuant to § 1983, a plaintiff must allege
"(1) that [the plaintiff] engaged in a protected activity, (2) that
defendants' retaliatory action was sufficient to deter a person of
ordinary firmness from exercising his or her rights, and (3) that
there was a causal connection between the protected activity and
the retaliatory action." Lauren W. ex rel. Jean W. v. DeFlaminis,
480 F.3d 259, 267 (3d Cir. 2007); see also Thomas v. Independence
Twp., 463 F.3d 285, 296 (3d Cir. 2006).

Kane concedes that Fina and his fellow plaintiffs
engaged in protected activity, and she does not appear to dispute
the existence of a causal connection between this activity and her
purported retaliation.  See Lauren W., 480 F.3d at 267.  Thus we
must simply determine whether plaintiffs have adequately alleged
that Kane's actions were "sufficient to deter a person of ordinary
firmness from exercising his or her rights." See id.  In making
this determination, we "focus[] on the status of the speaker, the

-16-

status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*." Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2000) (quoting Suarez Corp. Indus. V. McGraw, 202 F.3d 676, 686 (4th Cir. 2000)); see also Koren v. Noonan, 586 F. App'x 885, 888 (3d Cir. 2014). When the alleged retaliator is a public employer, "courts have required the nature of the retaliatory acts . . . to be more than *de minimis* or trivial." Brennan, 350 F.3d at 419 (quoting Suarez, 202 F.3d at 686). "[C]riticism, false accusations, or verbal reprimands" are generally not considered sufficient to establish a claim. Id. (quoting Suarez, 202 F.3d at 686); see also Koren, 586 F. App'x at 888.

In analyzing First Amendment retaliation claims, our Court of Appeals has repeatedly cited with approval the well-reasoned decision of the Fourth Circuit in Suarez, 202 F.3d 676. See, e.g., Brennan, 350 F.3d at 419; Koren, 586 F. App'x at 888; see also McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006); McLaughlin v. Watson, 271 F.3d 566, 573 (3d Cir. 2001). In Suarez, the Court reviewed a district court ruling that a First Amendment retaliation claim raised by a direct mail marketing company against state officials was not barred by the doctrine of qualified immunity. 202 F.3d at 683-84. The Suarez court reversed. It concluded that the claim could not proceed because the alleged retaliatory conduct had not adversely affected the First Amendment

-17-

rights of the plaintiffs.  See id. at 690-91.  In so doing, the
court observed that when a First Amendment retaliation claim arises
in the public employment context, the relationship between the
speaker and the retaliator "creates competing interests between the
interests of the [public employee], as a citizen, in commenting
upon matters of public concern and the interest of the
[government], as an employer, in promoting the efficiency of the
public services it performs through its employees."  Id. at 686
(internal citation omitted).  It is because of these competing
interests that the retaliatory acts must be "more than de minimis
or trivial" to give rise to a viable claim.  Id.  Under this
standard, criticism and false accusations are insufficient.  See
id.

　　　According to the Suarez court, "[t]he nature of the
alleged retaliatory acts has particular significance where the
public official's acts are in the form of speech."  Id. at 687.
Under such circumstances, the "public official's own First
Amendment speech rights are implicated."  Id.  Consequently, "where
a public official's alleged retaliation is in the nature of speech,
in the absence of a threat, coercion, or intimidation intimating
that punishment, sanction, or adverse regulatory action will
immediately follow, such speech does not adversely affect a
citizen's First Amendment rights, even if defamatory."  Id.
(emphasis added) (citations omitted).

-18-

The Court of Appeals for the Third Circuit recently cited Suarez with approval in Koren, 586 F. App'x 885. There, a former Pennsylvania State Trooper brought a First Amendment retaliation action under § 1983 against two Pennsylvania State Police employees.[4] Id. at 886-87. He alleged that while he was running for political office they had implied in statements to the media that he had engaged in workplace misconduct. Id. at 887. The Court of Appeals affirmed the district court's dismissal of the claim. Id. at 890. It observed that "in the political arena, courts have consistently rejected First Amendment retaliation claims based upon assertions of purportedly false reports or criticism." Id. at 888. Because the defendants' allegedly retaliatory speech "involved no 'threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action [would] imminently follow,'" the court concluded that it "would not dissuade a person of ordinary firmness from" engaging in the type of protected activity undertaken by the plaintiff. Id. (quoting Suarez, 202 F.3d at 687).

Like the purported retaliation in Suarez and Koren, the criticism by Kane of the Ali bribery investigation is not actionable under § 1983. See generally 202 F.3d 676; 586 F. App'x 885. In reaching this conclusion, we consider the status

---

4. One of those two employees happened to be the same Frank Noonan who is a plaintiff in this action.

of Fina as the speaker, the status of Kane as the alleged
retaliator, the relationship between them, and the nature of Kane's
acts. See Brennan, 350 F.3d at 419. Fina, a Deputy Attorney
General under Attorney General Corbett, was a high-level official
in the OAG during the time the Ali investigation was ongoing. Kane
at the relevant time was the elected Attorney General. It bears
noting that in this capacity, Kane enjoys her own First Amendment
rights. See Suarez, 202 F.3d at 687. Fina does not allege that
there was an employment relationship between himself and Kane at
the time of the alleged retaliation. Even if there was such a
relationship, the nature of Kane's alleged acts is different from
that of the retaliation that occurred in the employment cases cited
by plaintiffs. Fina was not terminated, demoted, disciplined, or
subjected to any other adverse employment action as a result of his
criticism of Kane. Instead, he merely bore the effects of a
generalized critique of an investigation in which he took part
under a former Attorney General. In sum, the actions of Kane
detailed in Count One would not "deter a person of ordinary
firmness from exercising his constitutional rights." See, e.g.,
Thomas, 463 F.3d at 296.

Plaintiffs urge us to distinguish Koren. In their view,
the retaliation alleged in Koren took place in the political arena,
while this case arises in an employment context. It is true that
in Koren the Third Circuit acknowledged that when a public employer

-20-

takes action against an employee, the threshold for finding that action to be retaliatory is "very low." 586 F. App'x at 888 (quoting O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006)). But even under such circumstances, the court wrote, "a plaintiff must plead more than mere 'criticism, false accusations, or verbal reprimands.'" Id. (quoting Brennan, 350 F.3d at 419. Moreover, in support of their argument that this case takes place in the employment context, plaintiffs rely on cases which involve retaliatory adverse employment action such as demotion or termination. See, e.g., O'Connor, 440 F.3d at 126 n.1. No such adverse employment action was taken here.

Moreover, the retaliation described in Count One "is in the nature of speech," and Fina alleges no "threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow." See Suarez, 202 F.3d at 687. Rather, Kane's purportedly retaliatory acts are no more than "criticism, false accusations, or verbal reprimands." See Brennan, 350 F.3d at 419. Accordingly, even if that speech is defamatory, as Fina claims it is, it does not implicate his First Amendment rights. See Suarez, 202 F.3d at 687; Koren, 586 F. App'x at 888. We will therefore grant the motion of Kane to dismiss Count One.

-21-

IV.

Kane also seeks to dismiss Count Two of the First Amended Complaint. Count Two, brought under § 1983, contains the allegations of Costanzo and Fina that Kane once again retaliated against them in violation of the First Amendment by "fabricating and publishing claims that Fina and Costanzo wrongfully impeded and terminated a valid criminal investigation against J. Whyatt Mondesire for improper and unethical purposes." Costanzo and Fina also allege that Kane retaliated against them by unlawfully releasing grand jury materials related to the Mondesire investigation. They argue that Kane did so in retaliation for their criticism of her handling of the Ali bribery investigation and "in an attempt to make it appear that [they] had abused their prosecutorial discretion by failing to pursue a case against Mondesire."

Once again, Kane does not appear to dispute that Costanzo and Fina engaged in protected activity or that there is a a causal connection between this activity and her purported retaliation. Thus, our inquiry is again limited to whether Kane's actions would "deter a person of ordinary firmness from exercising his constitutional rights." See, e.g., Thomas, 463 F.3d at 296.

To the extent that Count Two is based on speech by Kane, we reiterate that "where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or

-22-

intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory." Suarez, 202 F.3d at 687. As Kane correctly observes, she is entitled to make clear to the public that she, as the current Attorney General, "thinks that the OAG was either corrupt or inept before she took office and that Fina and Costanzo were part of the problem." Any statement made or initiated by Kane to the effect that the Mondesire investigation was improperly terminated was not "sufficient to deter a person of ordinary fitness from exercising" his First Amendment freedoms. See, e.g., Thomas, 463 F.3d at 296.

As to Costanzo and Fina's allegations that Kane retaliated against them through the unlawful release of materials from the Mondesire grand jury investigation, we likewise conclude that they have not made out a First Amendment retaliation claim. It is true that this alleged leak goes beyond mere speech and that Kane has been criminally charged in connection with it. To determine whether it amounts to retaliation, however, we must assess "the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*." Brennan, 350 F.3d at 419 (citation omitted). The First Amended Complaint does not allege that Kane released the grand jury materials selectively in such a

-23-

way as to misrepresent Costanzo and Fina's involvement in the investigation. Indeed, plaintiffs merely aver that Kane gathered grand jury materials and gave them to her associate Morrow, who passed them along to Brennan. It was Morrow, and not Kane, who "consciously redacted from these documents the names of all persons other than Costanzo and Fina so that the reported story would only be about them." Morrow also "told Brennan that he and Kane were looking to air a story critical of Fina and Costanzo." Plaintiffs do not allege that Morrow did so at Kane's direction.

In summary, Fina and Costanzo have failed adequately to allege that Kane unlawfully retaliated against them by criticizing their handling of the Mondesire investigation or by releasing confidential materials related to that investigation. As a result, we will grant the motion of Kane to dismiss Count Two.

V.

In Count Three, which Kane, Miletto, and Brennan seek to dismiss, Costanzo and Fina aver under § 1983 that Kane, Miletto, and Brennan conspired to retaliate against them for exercising their First Amendment freedoms by fabricating assertions that they had improperly "impeded and terminated" the Mondesire investigation. This claim appears to be based on the following allegations: that Kane directed Miletto to state falsely that Costanzo and Fina had removed him from the Mondesire investigation after he uncovered evidence of

-24-

Mondesire's wrongdoing, and that Brennan reported this
fabrication; and that Brennan received confidential grand jury
materials from Morrow and, at Morrow's request, used them as the
basis for a story.

For the reasons stated above, the criticism and
allegedly false accusations levied by Kane, Miletto, Morrow, and
Brennan against Costanzo and Fina are not enough to establish a
First Amendment retaliation claim.  These acts are mere speech
and do not involve any "threat, coercion, or intimidation
intimating that punishment, sanction, or adverse regulatory
action will immediately follow."  See Suarez, 202 F.3d at 687;
Koren, 586 F. App'x at 888.[5]  They are not enough to "deter a
person of ordinary firmness from exercising his constitutional
rights."  See, e.g., Thomas, 463 F.3d at 296.  Since they are not
retaliatory, they cannot serve as the basis for a claim that
defendants conspired to retaliate against them.

The same is true of the allegations that Kane, Miletto,
and Brennan conspired to engage in retaliation by releasing
confidential grand jury materials.  We have already concluded that

_____

5.  Costanzo and Fina do allege that Miletto later threatened
and intimidated them in connection with the grand jury
investigation when he confronted them as they prepared to
testify about the leak.  This allegation does not appear to
serve as the basis for the conspiracy claim in Count Three.
Moreover, even if plaintiffs do base Count Three on this alleged
intimidation, they have not alleged that Miletto conspired with
Kane or Brennan to engage in this course of conduct.

A000071

any such leak does not amount to retaliation, and as such, it cannot support a retaliation conspiracy claim.

We also note that plaintiffs have not adequately alleged the existence of a conspiracy, at least with respect to defendant Brennan. Nowhere in their First Amended Complaint do plaintiffs allege in anything more than conclusory terms that Brennan conspired with Kane or Miletto to engage in unlawful conduct. See Iqbal, 556 U.S. at 678. Plaintiffs aver that Brennan, at Morrow's direction, wrote a news story critical of Costanzo and Fina, but they do not allege any involvement by Kane or Miletto in this purported scheme. As to Miletto, plaintiffs plead his involvement in a conspiracy only by asserting that Kane directed him to "falsely state that Fina and Costanzo had removed him from the Mondesire investigation when Miletto supposedly found evidence of Mondesire's wrongdoing which was ultimately reported by Brennan in the news story." Again, this is not actionable retaliation, and cannot support a claim of a retaliatory conspiracy.

We will thus grant the motions of Kane, Miletto, and Brennan to dismiss Count Three.

VI.

Kane further moves to dismiss Count Four. Again, this count is predicated on § 1983. There Noonan, Feathers, Sheetz, and Fina claim that Kane retaliated against them in violation of the First Amendment by making a statement "to the media that the

-26-

alleged delay in arresting Sandusky resulted in two minors being subjected to sexual abuse that would not have otherwise occurred." That assertion, as Kane's representative later acknowledged, was untrue.  Noonan, Feathers, Sheetz, and Fina aver that when Kane made the statement she was retaliating against them for their criticism of the inquiry she had initiated into the Sandusky investigation.

In Koren, our Court of Appeals opined that when a court is confronted with allegations that a defendant has "smeared [a plaintiff's] unblemished professional record . . . [t]he question . . . is not whether [the] remarks were defamatory – it is whether they would have deterred 'a person of ordinary firmness'" from exercising his constitutional rights. 586 F. App'x at 888 (quoting Thomas, 463 F.3d at 296).  While plaintiffs engaged in protected activity (as Kane concedes they did), and while Kane's contentions about the delays in the Sandusky investigation may have been false and damaging, those contentions "involved no 'threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow.'"  See id. (quoting Suarez, 202 F.3d at 687).  They were merely the remarks of an elected official about persons she considered to be her political opponents pertaining to an issue which had been at the core of her campaign for office.  They would not "dissuade a person of

-27-

ordinary firmness" from engaging in the type of protected speech
at issue here, and as a result, they are not actionable under
§ 1983.  See id.  For this reason, we will grant the motion of
Kane to dismiss Count Four.

VII.

Kane moves to dismiss Count Five.  This count under
§ 1983 consists of the allegations of Noonan, Feathers, Sheetz, and
Fina that Kane retaliated against them for engaging in First-
Amendment-protected speech by "fabricating and publishing claims
that implied that Fina, Sheetz, Feathers, and Noonan possessed
and/or distributed child pornography."  Plaintiffs are referring to
the statements made by Kane to a CNN correspondent, allegedly in
retaliation for plaintiffs' criticism of her.  They were broadcast
in a news segment which aired on November 18, 2014.  Once again,
Kane concedes that plaintiffs' criticism of her was protected by
the First Amendment, and she does not appear to dispute that there
was a causal connection between this criticism and her statements.

We reiterate that under these circumstances, where
Kane's purportedly retaliatory acts are "in the form of speech,"
her First Amendment rights are implicated as well.  See Suarez, 202
F.3d at 687.  The criticisms Kane articulated during the CNN
segment, which appear to serve as the sole basis for Count Five, do
not involve any "threat, coercion, or intimidation intimating that
punishment, sanction, or adverse regulatory action will immediately

-28-

follow." See id. Again, Kane's comments were those of an elected official concerning the improper use of state computers and state email servers. Even if Kane had defamed Noonan, Feathers, Sheetz, and Fina by falsely asserting that they had viewed child pornography, this would not be actionable First Amendment retaliation under § 1983. See id.

In response to Kane's argument that her statements to CNN involved no threats or intimidation, Noonan, Feathers, Sheetz, and Fina contend that they were subjected to threats in connection with their involvement in the email scandal. Specifically, they plead that Tyler, an OAG official, threatened the release of the emails "if Fina does not back off." They further allege that Barker, another OAG official, directed Fina's colleague to instruct Fina that his criticism of Kane would result in the release of the emails. It is unclear which count (if any) in the First Amended Complaint relies on these allegations. Moreover, there is no indication in the First Amended Complaint that any defendant directed or played any role in the issuance of these alleged threats. Thus, they cannot serve as the basis for a claim in this action.

For the foregoing reasons we will grant the motion of Kane for dismissal of Count Five.

-29-

VIII.

This brings us to Count Six, which Kane asks us to dismiss as not stating a claim under § 1983.  In Count Six, all five plaintiffs plead that Kane again retaliated against their engagement in protected speech by "releasing the information about the private emails and/or releasing the emails of all plaintiffs." They take issue with the OAG's "selective" release of certain of their emails to the press following the filing of Right to Know Law requests concerning the communications.

Once again, in assessing whether the alleged retaliatory acts of Kane were "sufficient to determine a person of ordinary firmness from exercising" his constitutional rights, we "focus[] on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*." Thomas, 463 F.3d at 296; Brennan, 350 F.3d at 419.  Here, the speakers – in this case plaintiffs – are former high ranking public officials, and the retaliator Kane is an elected Attorney General who plays a major role in state law enforcement and who is tasked with directing the OAG.  The alleged retaliatory act at issue was the release to the media, pursuant to an official request and after significant litigation, of sexually explicit messages which plaintiffs do not dispute were exchanged on state email systems. In other words, the "nature of the retaliatory acts" was in this

-30-

case the disclosure by the state's Attorney General of official misconduct within her office. See id. It would defy logic to conclude that Kane violated the constitutional rights of plaintiffs by bringing to light their use of state-owned computers and email systems to exchange pornography.

In arguing otherwise, plaintiffs direct our attention to the decision of the District of Delaware in Neuberger v. Gordon, 567 F. Supp. 2d 622 (D. Del. 2008). In that case, a civil rights attorney who had been critical of certain public figures brought a First Amendment retaliation case against them after they disclosed his private medical information to the media. That disclosure, the court concluded, was "sufficient to deter a civil rights plaintiff's attorney of ordinary firmness from exercising constitutional rights." Id. at 638. Plaintiffs contend that Neuberger stands for the proposition that the disclosure of private information about a plaintiff can support a First Amendment retaliation claim.

Neuberger, however, is of no help to plaintiffs. That case involved the widespread dissemination of highly intimate medical information about the plaintiff. Here, in contrast, the materials released were off-color and arguably pornographic messages sent by state officials on state-owned email servers. The facts of Neuberger are easily distinguishable from those before us in this matter.

-31-

In sum, when we consider "the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*," we have no trouble concluding that Kane's release of certain emails implicating plaintiffs was not "sufficient to determine a person of ordinary firmness from exercising" his right to free speech. See Thomas, 463 F.3d at 296; Brennan, 350 F.3d at 419.

To the extent that Count Six relies on allegations that plaintiffs were threatened with the release of their emails, we note once again that the First Amended Complaint contains no allegations that any defendant made or directed these threats. While plaintiffs may believe that Kane arranged for these purported threats to be made, they have not alleged this in their pleading.

Accordingly, we will grant the motion of Kane to dismiss Count Six.

IX.

In essence, the First Amended Complaint details a long-standing political battle between the Attorney General of Pennsylvania and former high-ranking state officials who served in the administrations of her adversaries. The battle has been hard fought and is not pretty. Each party, however, has exercised his or her rights under the First Amendment, and there has been alleged no illegal retaliation giving rise to claims under § 1983.

-32-

X.

As we have concluded that Rule 12(b)(6) requires dismissal of Counts One through Six, there are no remaining claims against Kane and Miletto. We need not reach their arguments that they are entitled to qualified immunity from all of the claims against them, nor must we address the argument of Kane that the First Amended Complaint should be dismissed on the ground that it runs afoul of the pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure.

XI.

Finally, we address Counts Seven and Eight, in which Costanzo and Fina state law claims of defamation and false light against the Media Defendants whose citizenship is not diverse from that of the plaintiffs. Our subject matter jurisdiction over these claims rests on 28 U.S.C. § 1367.[6]

---

6. Section 1367 provides in relevant part:

> (a) . . . in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.
>
> . . .
>
> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if –

-33-

All the federal claims are being dismissed.  Pursuant to 28 U.S.C. § 1367(c)(3), we decline to exercise supplemental jurisdiction over Counts Seven and Eight.  The action is in a very early stage.  Consequently, Counts Seven and Eight will be dismissed without prejudice to the right of plaintiffs to reassert these claims in the appropriate state court.

---

. . .

    (3) the district court has dismissed all
    claims over which it has original
    jurisdiction.

FRANK NOONAN; RANDY FEATHERS;
RICHARD A. SHEETZ, JR.; E. MARC COSTANZO;
FRANK FINA

v.

ATTORNEY GENERAL PENNSYLVANIA; MICHAEL MILETTO;
CHRISTOPHER BRENNAN; PHILADELPHIA DAILY NEWS;
PHILADELPHIA MEDIA NETWORK (DIGITAL) LLC;
PHILADELPHIA MEDIA NETWORK LLC

      E. Marc Costanzo,
        Appellant

**STANDING ORDER REGARDING MOTIONS TO EXCEED THE PAGE
LIMITATIONS OF THE FEDERAL RULES OF APPELLATE PROCEDURE**

**Effective Immediately**

**PRESENT**:  McKEE, **Chief Judge**, and SLOVITER, SCIRICA, RENDELL, AMBRO,
FUENTES, SMITH, FISHER, CHAGARES, JORDAN, HARDIMAN, GREENAWAY,
JR, VANASKIE, ALDISERT, WEIS, GARTH, STAPLETON, GREENBERG,
COWEN, NYGAARD, ROTH, BARRY, and VAN ANTWERPEN, **Circuit Judges**

      **AND NOW**, it being noted that motions to exceed the page/word limitations for
briefs are filed in approximately twenty-five percent of cases on appeal, and that seventy-
one percent of those motions seek to exceed the page/word limitations by more than
twenty percent;

      Notice is hereby given that motions to exceed the page or word limitations for
briefs are strongly disfavored and will be granted only upon demonstration of
extraordinary circumstances.  Such circumstances  may include multi-appellant
consolidated appeals in which the appellee seeks to file a single responsive brief or
complex/consolidated proceedings in which the parties are seeking to file jointly or the
subject matter clearly requires expansion of the page or word limitations.

      Accordingly, it is **ORDERED** that a three-judge Standing Motions Panel is hereby
appointed to rule on all motions to exceed the page/word limitations for briefs since the
page/word limitations, prescribed by Fed. R. App. P. 32(a)(7), should be sufficient to
address all issues in an appeal.

      It is further **ORDERED** that Counsel are advised to seek advance approval of
requests to exceed the page/word limitations whenever possible or run the risk of
rewriting and refiling a compliant brief.  Any request to exceed page/word limitations
submitted in the absence of such an advance request shall include an explanation of why
counsel could not have foreseen any difficulty in complying with the limitations in time
to seek advance approval from the panel.

      This order shall not apply to capital habeas cases.

By the Court,

/s/ Theodore A. McKee
Chief Judge

Date: January 9, 2012
A True Copy:

*Marcia M. Waldron*

Marcia M. Waldron, Clerk

OFFICE OF THE CLERK

**MARCIA M. WALDRON**

**CLERK**



**UNITED STATES COURT OF APPEALS**
21400 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA  19106-1790
Website: www.ca3.uscourts.gov

TELEPHONE
215-597-2995

August 9, 2016

Fortunato N. Perri Jr., Esq.
McMonagle Perri McHugh & Mischak
1845 Walnut Street
19th Floor
Suite 701
Philadelphia, PA 19103

RE: Frank Noonan, et al v. Attorney General Pennsylvania, et al
Case Number: 16-3312
District Case Number: 2-15-cv-06082

**Effective December 15, 2008, the Court implemented the Electronic Case Files System. Accordingly, attorneys are required to file all documents electronically. See 3d Cir. L.A.R. 113 (2008) and the Court's CM/ECF website at www.ca3.uscourts.gov/cmecf-case-managementelectronic-case-files.**

To All Parties:

Enclosed is case opening information regarding the above-captioned appeal filed by **E. Marc Costanzo**, docketed at No. **16-3312**. All inquiries should be directed to your Case Manager in writing or by calling the Clerk's Office at 215-597-2995. This Court's rules, forms, and case information are available on our website at http://www.ca3.uscourts.gov.

**On December 1, 2009, the Federal Rules of Appellate and Civil Procedure were amended modifying deadlines and calculation of time. In particular those motions which will toll the time for filing a notice of appeal under Fed.R.App.P. 4(a)(4), other than a motion for attorney's fees under Fed.R.Civ.P. 54, will be considered timely if filed no later than 28 days after the entry of judgment. <u>Should a party file one of the motions listed in Fed.R.App.P 4(a)(4) after a notice of appeal has been filed, that party must immediately inform the Clerk of the Court of Appeals in writing of the date and type of motion that was filed.</u> The case in the court of appeals will not be stayed absent such notification.**

Payment of fees is required upon filing a Notice of Appeal from a District Court decision unless you are exempt by order of the Court. All fees are to be paid to the District Court. The following fees are currently unpaid:

*$5.00 District Court filing fee*
*$500.00 Court of Appeals docket fee*

**Both fees must be paid within fourteen (14) days of the date of this letter.**

<u>**Counsel for Appellant**</u>

As counsel for Appellant(s), you must file:
1. Application for Admission (if applicable)
2. Appearance Form
3. Civil Information Statement
4. Disclosure Statement (except governmental entities)
5. Concise Summary of the Case
6. Transcript Purchase Order Form.
These forms must be filed within **fourteen (14) days** of the date of this letter.

**Failure of Appellant(s) to comply with any of these requirements by the deadline will result in the DISMISSAL of the case without further notice. 3rd Circuit LAR Misc. 107.2.**

<u>**Counsel for Appellee**</u>

As counsel for Appellee(s), you must file:
1. Application for Admission (if applicable)
2. Appearance Form
3. Disclosure Statement (except governmental entities)
These forms must be filed within **fourteen (14) days** of the date of this letter.

Parties who do not intend to participate in the appeal must notify the Court in writing. This notice must be served on all parties.

Attached is a copy of the full caption in this matter as it is titled in the district court. Please review the caption carefully and promptly advise this office in writing of any discrepancies.

Very truly yours,

*Marcia M. Waldron*
Marcia M. Waldron, Clerk


By: s/James
Case Manager
267-299-4958

sb/cc:  Edward T. Ellis, Esq.
        Amy B. Ginensky, Esq.
        Greg H. Greubel, Esq.
        Richard R. Harris, Esq.
        Rachel F. Satinsky, Esq.
        Michael A. Schwartz, Esq.
        Eli Segal, Esq.
        Mark W. Tanner, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN, et al.            :            CIVIL ACTION
                                :
                                :
            v.                  :
                                :
                                :
KATHLEEN KANE, et al.           :            NO. 15-6082

ORDER

AND NOW, this 19th day of July, 2016, for the reasons
set forth in the accompanying Memorandum, it is hereby ORDERED
that:

(1)   the motion of defendant Kathleen G. Kane to dismiss
Counts I through VI of the First Amended Complaint for failure to
state a claim (Doc. # 29) is GRANTED;

(2)   the motion of defendant Michael Miletto to dismiss
Count III of the First Amended Complaint for failure to state a
claim (Doc. # 30) is GRANTED;

(3)   the motion of defendant Christopher Brennan to
dismiss Count III of the First Amended Complaint for failure to
state a claim (Doc. # 36) is GRANTED;

(4)   pursuant to 28 U.S.C. § 1367(c)(3), Counts VII and
VIII of the First Amended Complaint are DISMISSED without
prejudice; and

**A000086**

(5)   the Clerk shall mark this case closed as no claims remain.

BY THE COURT:


/s/ Harvey Bartle III
J.

A000087

```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

```
FRANK NOONAN, et al.              :              CIVIL ACTION
                                  :
                                  :
            v.                    :
                                  :
                                  :
KATHLEEN KANE, et al.             :              NO. 15-6082
```

                                 MEMORANDUM

Bartle, J.                                          July 19, 2016

        Plaintiff are Frank Noonan ("Noonan"), Randy Feathers

("Feathers"), Richard A. Sheetz, Jr. ("Sheetz"), E. Marc Costanzo

("Costanzo"), and Frank Fina ("Fina"), four of whom are former high

level employees of the Office of the Attorney General of

Pennsylvania ("OAC") and one of whom is a retired Commissioner of

the Pennsylvania State Police.  They have filed this action

against:  Pennsylvania Attorney General Kathleen Kane ("Kane");

Michael Miletto ("Miletto"), an investigator for the Office of the

Attorney General; the Philadelphia Daily News; one of its

reporters, Christopher Brennan ("Brennan"); and Philadelphia Media

Network, LLC and Philadelphia Media Network (Digital) LLC, which

together own the Philadelphia Daily News.

        Noonan is the retired Commissioner of the Pennsylvania

State Police.  Feathers is a retired Regional Director of the

Bureau of Narcotics and Investigation and Control of the OAG.

Sheetz served as a former Executive Deputy Attorney General

Directing the Criminal Law Division of the OAG.  Costanzo is a former Deputy Attorney General for the OAG.  Finally, Fina is a former Chief Deputy Attorney General for the OAG.[1]  All five plaintiffs are citizens of the Commonwealth of Pennsylvania.

Plaintiffs sue Kane under 42 U.S.C. § 1983.  They allege that she retaliated against them for engaging in speech protected by the First Amendment.  Costanzo and Fina also plead that Kane, Miletto, and Brennan conspired to retaliate against them for the same protected speech.  Finally, Costanzo and Fina assert defamation and false light claims under Pennsylvania law against Brennan, Philadelphia Media Network, LLC and Philadelphia Media Network (Digital) LLC.  We have supplemental jurisdiction over these state-law claims pursuant to 28 U.S.C. § 1367.

Before the court are three motions filed by Kane, Miletto, and the Media Defendants (Brennan, the Philadelphia Daily News, Philadelphia Media Network (Digital) LLC, and Philadelphia Media Network LLC) to dismiss plaintiffs' First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. Kane and Miletto also rely on the doctrine of qualified immunity.

---

1.  Although Feathers, Sheetz, Costanzo, and Fina no longer work at the OAG, their pleading does not make clear precisely when their employment with the OAG ended.  What is clear is that each of these four plaintiffs left the OAG either before Kane took office or shortly thereafter.

A000089

Kane further argues that the First Amended Complaint does not meet the pleading requirements under Rule 8(a).

I.

The facts set forth in the First Amended Complaint, taken in the light most favorable to plaintiffs, are as follows.

In early 2012, Kane announced her candidacy to become Attorney General of Pennsylvania.  During her campaign, Kane criticized the OAG for its handling of the high-profile investigation and subsequent prosecution of Jerry Sandusky ("Sandusky"), a Penn State University football coach who was ultimately convicted in June 2012 of sexually abusing minors. Plaintiffs had all been involved in the Sandusky investigation during the time that Thomas Corbett was the Attorney General. While campaigning, Kane declared that the OAG had improperly delayed in charging Sandusky and had devoted inadequate resources to the investigation.  She promised to initiate an investigation into the handling of the Sandusky case by the OAG if elected.  In response, Feathers made public statements refuting Kane's claims and deriding her as uninformed.  Likewise, Costanzo "openly expressed criticism of Kane's campaign tactics regarding the Sandusky prosecution."  Kane won the election in November 2012 and assumed office in January 2013.

Upon taking office, Kane also put a halt to a long-running bribery investigation in which plaintiffs had been

-3-

**A000090**

involved.   In furtherance of that investigation, the OAG had been
relying on an informant named Tyron Ali ("Ali").   Ali had entered
into a cooperation agreement with the OAG pursuant to which he
would identify Philadelphia elected officials who were prepared to
accept bribes.   In exchange, the OAG would not pursue charges
against Ali.

When Kane assumed office in early 2013, Fina informed
her that he believed she could not oversee the Ali investigation
because it had the potential to implicate Joshua Morrow ("Morrow"),
a friend, supporter, and former campaign employee of Kane.   Kane
disagreed and retained control of the investigation.

In September 2013, Kane made clear that she would not
pursue the bribery investigation, nor would she honor Ali's
cooperation agreement.   In response, Ali moved for Kane's recusal
and for enforcement of the agreement.   Fina executed an affidavit
in support of Ali's motion.   In it, Fina attested to his knowledge
of the purported conflict of interest, the investigation, and the
cooperation agreement.

Kane ultimately relented, dismissing all charges against
Ali.   However, beginning in late 2013 and continuing into early
2014, she expressed publicly that the Ali bribery investigation had
been racially motivated, that Ali was not credible, and that the
investigation lacked "quality" and had inadequate resources.   She
reported that federal law enforcement officials had characterized

-4-

the case as "flawed and not prosecutable" and stated that Ali and the lead case agent both believed the investigation to be focused on members of the General Assembly's Black Caucus.  In addition, Kane implied that Fina was to blame for the public disclosure of the investigation.  Plaintiffs allege that these statements were false.  Fina responded to them in what plaintiffs characterize as a "letter of March 22, 2014 to the public."  Meanwhile, Fina, Noonan, and Sheetz made public statements refuting Kane's accusations. Around the same time, Kane emailed a media strategist regarding reports of her role in the Ali investigation.   In the email, Kane justified her accusations that the investigation was racially motived by stating:  "This is war."

     Ultimately, Philadelphia District Attorney Seth Williams ("Williams") took over the Ali bribery investigation.  Williams reviewed the evidence and found no indication that the investigation was racially motivated.  He brought charges against six elected officials, five of whom have pleaded guilty.

     Meanwhile, Kane fulfilled her campaign promise to initiate an inquiry into the Sandusky investigation.  Fina, who was contacted as part of the inquiry, openly questioned the legality of Kane's inquiry and Kane's authority to conduct it.  Fina also directed "a variety [of] letters . . . and motions" to Geoffrey Moulton ("Moulton"), the attorney in the OAG directing the inquiry, and to the grand jury judge supervising it.

-5-

A report of the inquiry into the Sandusky investigation was completed by Moulton in May 2014. Pursuant to the protocol established by the grand jury judge who was supervising the inquiry, Noonan, Feathers, Sheetz, and Fina had the opportunity to respond to the Moulton report. They did so in June 2014. Plaintiffs criticized the inquiry as "ill-advised" and contended that it had been "born of political opportunism and posturing." They also called the claims that had given rise to the report "ill-informed and unfounded." The report, according to plaintiffs, was merely an "exercise in second guessing" undertaken "to sift for criticism." These responses were incorporated into a final version of the report.

On June 23, 2014, the day the final report was released, Kane convened a press conference. Speaking to reporters, she stated that the actions of Noonan, Feathers, Sheetz, and Fina had led to delays in the Sandusky investigation. As a result, Kane contended, Sandusky had been afforded the opportunity to molest two minors who would not have been victimized if the investigation had proceeded more quickly. According to plaintiffs, this statement was false. Indeed, Kane later acknowledged through a spokesperson that the statement was untrue.

In response, plaintiffs convened a press conference of their own. Fina told reporters that the inquiry into the Sandusky investigation "was a campaign promise [Kane] made. It was a trick

-6-

A000093

she used to get elected and Moulton didn't deliver for her.  What's she going to do?  She has to come up with something else sensational to detract that she [made] a series of falsehoods to the public during the campaign."

Plaintiffs plead that Kane retaliated against them for criticizing her.  As alleged in the First Amended Complaint, Kane "initiated a conspiracy" in 2014 to release grand jury information related to a 2009 criminal investigation which had been run by Fina.  That investigation involved the late J. Whyatt Mondesire ("Mondesire"), the former head of the Philadelphia Chapter of the N.A.A.C.P.  The OAG suspected that state grant money had improperly been used to make payments to Mondesire.  The investigation stalled, however, when key witnesses who were under indictment refused to testify before a grand jury.  The OAG concluded that Mondesire would not consent to appear before a grand jury and that subpoenaing him would be impracticable.  As a result, the investigation effectively became dormant.

Upon learning of the status of the Mondesire investigation, Kane gathered confidential grand jury documents related to that case and turned them over to her associate Morrow. She instructed Morrow to forward the materials to defendant Brennan, the reporter, with whom Morrow had a professional relationship.  Morrow redacted from the materials the names of all individuals other than Costanzo and Fina.  Upon receiving the

-7-

**A000094**

materials, Brennan wrote a story which suggested that Costanzo and
Fina had impeded and improperly terminated the Mondesire
investigation.  The story was published by the <u>Philadelphia Daily
News</u> in June 2014.  Since that time, the <u>Philadelphia Daily News</u>
has printed "numerous" articles critical of Fina and Costanzo.

According to plaintiffs, Kane thereafter "conspired with
[defendant] Miletto," who was then employed by the OAG, by
directing Miletto to state that he had uncovered evidence of
Mondesire's wrongdoing and that Costanzo and Fina had removed him
from the Mondesire investigation as a result.  Plaintiffs allege
that this claim was false.

When Costanzo and Fina became aware in May 2014 of the
release of the grand jury information, they reported it to the
Supervising Judge of the grand jury, who initiated an investigation
into the alleged leak.  Costanzo and Fina were subpoenaed to
testify before the grand jury as part of that investigation.  On
August 26, 2014, the day they were to appear, they were confronted
by defendant Miletto and several other OAG agents at the entrance
to the building in which the grand jury convened.  Plaintiffs
maintain that Miletto "made intimidating, threatening and harassing
statements toward Fina and Costanzo."  Miletto and the agents then
followed Costanzo and Fina into an elevator, where Miletto
"attempted to physically intimidate, threaten and harass Fina."
Costanzo and Fina reported this incident to the judge supervising

-8-

the grand jury, who later took evidence concerning the alleged
intimidation and issued a protective order.

Since that time, Kane has been criminally charged for
her role in the release of the grand jury materials and for lying
to a grand jury about the disclosure.  She has stated publicly and
in "numerous . . . verified court filings" that Costanzo and Fina
were part of a "conspiracy," "plot," or "scheme" to "corruptly"
manufacture the grand jury investigation of her activities.

Meanwhile, the OAG, having concluded its inquiry into
the Sandusky investigation, had come into possession of a large
volume of emails that had been received and sent by OAG staff while
the Sandusky investigation was taking place.[2]  Among those emails,
plaintiffs assert, were messages received and sent by plaintiffs
containing pornographic images.  Plaintiffs allege that Kane,
embarrassed by the investigation into her role in the Mondesire
grand jury leak and by the disclosure that her statements about
Sandusky's victims had been untrue, "sought a way to utilize these
emails to retaliate" against them.  They contend, upon information
and belief, that in summer 2014, Kane "instructed members of her
staff to contact members of the media and suggest to them that e-
mails existed for which they should make a Right to Know Law

---

2.  Although plaintiffs repeatedly characterize these messages
as their "private emails," they do not appear to dispute
defendants' observation that the messages were received and sent
using the "Pennsylvania OAG computer systems and email
accounts."

request." Members of the press made such requests, and the OAG challenged them. The OAG contended that release of the emails was not mandated because they were not part of the public record.

While the debate over the release of the emails was ongoing, a colleague of Fina met with David Tyler ("Tyler"), the OAG's Chief Operating Officer. Tyler told Fina's colleague that many former members of the OAG legal staff would be hurt, apparently by their involvement in the email scandal, if "Fina does not back off." At around the same time, another of Fina's colleagues met with James Barker ("Barker"), Chief Deputy Attorney General for Appeals and Legal Services. Barker instructed Fina's colleague to tell Fina that if Fina continued to criticize Kane, Kane would release emails of former members of the OAG staff.

Ultimately, in September 2014 Kane released some but not all of the emails sought by the press. Plaintiffs allege that she did so selectively and in such a way as to paint them in a negative light. They claim that "[t]hose selected by Kane to have their emails released had either spoken out against Kane during her campaign or in connection with the Sandusky investigation, or were friends or professional associates of" plaintiffs.

The release of the emails garnered significant media attention. The Philadelphia Daily News published a profusion of articles and editorials regarding the participation of Costanzo and Fina in the email scandal. This reporting suggested that Costanzo

-10-

and Fina were the primary distributors of the offending emails and
that they had engaged in workplace discrimination.  Plaintiffs
insist that this was untrue.  In addition, the articles in the
Philadelphia Daily News frequently failed to mention that Costanzo
and Fina were only two of more than 100 recipients of the
pornographic email chains.  According to plaintiffs, when the Media
Defendants learned in June 2015 that this action was forthcoming,
Costanzo and Fina were targeted "in articles and editorials with a
focus and ferocity."  Plaintiffs claim that the Media Defendants
"vastly overstate[d] the roles of Fina and Costanzo as the primary
responsible persons."  The First Amended Complaint details multiple
examples of the news stories with which plaintiffs take issue.

     Kane, meanwhile, was scheduled to testify before a grand
jury on November 17, 2014.  Allegedly in anticipation of the
negative press coverage that would result, Kane approached CNN
about a possible story regarding the email scandal.  The resulting
segment was broadcast on November 18, 2014.  It included an
interview with Kane in which she allegedly "knowingly, willfully
and intentionally made false statements that were defamatory and
cast Fina, Feathers and Noonan in a false light."

     Plaintiffs contend that Kane stated in the CNN interview
that the offending emails had included child pornography.  They
also claim that she implied that Noonan, Feathers, Sheetz, and Fina
had viewed such material.  They elaborate by including in their

-11-

First Amended Complaint a transcript of the CNN segment.  The transcript reveals that a CNN correspondent declared during the segment that Kane "claims that many of the officials who worked on the Sandusky sex abuse case were at the exact same time breaking the law by using their work computers to share hardcore porn." Another correspondent then asserted that state officials "who worked to bring down the infamous child molester Jerry Sandusky have been caught exchanging crude pornographic emails written on state email accounts, state computers and on state time, according to the state's [A]ttorney [G]eneral . . . the porn being passed around was not for the faint of heart."  Later in the segment, Kane stated:  "When I saw [the images in the emails], they literally took my breath away.  And they are deplorable.  Hardcore, graphic, sometimes violent emails that had a string of videos and pictures depicting sometimes children, old women, some of them involved violent sexual acts against women."  A correspondent then reports that "[t]hose involved in the scandal include some of the biggest names in Pennsylvania's justice system, a state Supreme Court Justice Seamus McCaffery, the State Police Commissioner Frank Noonan and one of the main Sandusky investigators Randy Feathers."

        The CNN segment also reported that Kane was unable to investigate the distribution of the emails due to a gag order that had been imposed as an indirect result of the

A000099

> public and very bitter feud between . . . Kane
> and the main prosecutor in the Sandusky case
> Frank Fina. . . . The two have been lobbying
> [sic] allegations against each other about
> whether several cases have been handled
> correctly.  As a result, Kane is now being
> investigated about whether she improperly leaked
> a memo about a case from 2009 that Fina handled.
> . . . [A] gag order in that case is keeping Kane
> from moving forward.

In addition, the commentator mentioned Noonan again, noting that
while many involved in the scandal had lost their jobs, Noonan
"still has his job because . . . the governor says there was no
proof that he opened the emails."  At various points throughout the
segment, photographs of Noonan, Feathers, and Fina were displayed.

After the CNN segment was aired, a spokesperson for Kane
clarified that there was no child pornography in any of the emails
at issue.

II.

When ruling on a Rule 12(b)(6) motion to dismiss, the
court must accept as true all factual allegations in the
complaint and draw all inferences in the light most favorable to
the plaintiff.  Phillips v. Cnty. of Allegheny, 515 F.3d 224,
233 (3d Cir. 2008); Umland v. Planco Fin. Servs., Inc., 542 F.3d
59, 64 (3d Cir. 2008).  We must then determine whether the
pleading at issue "contain[s] sufficient factual matter,
accepted as true, to 'state a claim for relief that is plausible
on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

A000100

(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).
In making our determination, we may also consider matters of
public record as well as any "undisputedly authentic document
that a defendant attaches as an exhibit to a motion to dismiss
if the plaintiff's claims are based on that document." Pension
Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d
1192, 1196 (3d Cir. 1993).

         In order to survive a Rule 12(b)(6) motion to dismiss,
a claim must do more than raise a "mere possibility of
misconduct." Fowler v. UPMC Shadyside, 578 F.3d 203, 210
(3d Cir. 2009) (quoting Iqbal, 556 U.S. at 679). Under this
standard, "[t]hreadbare recitals of the elements of a cause of
action, supported by mere conclusory statements, do not
suffice." Iqbal, 556 U.S. at 678. Instead, the complaint must
contain factual matter sufficient to state a claim that is
facially plausible, meaning that "the plaintiff [has] plead[ed]
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." Id. (citing Twombly, 550 U.S. at 556). This
plausibility standard "is not akin to a 'probability
requirement,' but it asks for more than a sheer possibility that
a defendant has acted unlawfully." Id. A complaint which
"pleads facts that are 'merely consistent with' a defendant's

-14-

A000101

liability . . . 'stops short of the line between possibility and plausibility.'"   Id. (citing Twombly, 550 U.S. at 557).

III.

Kane has moved to dismiss Count One of the First Amended Complaint for failure to state a claim under § 1983. [3]  In Count One, Fina pleads that Kane's criticism of the OAG's handling of the Ali bribery investigation constituted unlawful retaliation for his exercise of his First Amendment rights.  Specifically, Fina alleges that Kane "fabricat[ed] and publish[ed] claims that the OAG possessed evidence that the [Ali investigation] was motivated by racism" in retaliation against Fina's protected speech. He appears to contend that his act of highlighting the termination of the Ali investigation and Kane's potential conflict of interest with

_____

3.  Counts One through Six are all pleaded under 42 U.S.C. § 1983.  That section establishes in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 does not create substantive rights in and of itself, but instead provides a remedy for violations of constitutional or other federally established rights.  Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

-15-

respect to that matter motivated Kane unlawfully to retaliate against him.

It is well-established that "an individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment rights." Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist. v. Doyle, 429 U.S. 274 (1977)).  In order properly to plead a First Amendment retaliation claim pursuant to § 1983, a plaintiff must allege "(1) that [the plaintiff] engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007); see also Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006).

Kane concedes that Fina and his fellow plaintiffs engaged in protected activity, and she does not appear to dispute the existence of a causal connection between this activity and her purported retaliation.  See Lauren W., 480 F.3d at 267.  Thus we must simply determine whether plaintiffs have adequately alleged that Kane's actions were "sufficient to deter a person of ordinary firmness from exercising his or her rights." See id.  In making this determination, we "focus[] on the status of the speaker, the

-16-

A000103

status of the retaliator, the relationship between the speaker and
the retaliator, *and the nature of the retaliatory acts*." Brennan
v. Norton, 350 F.3d 399, 419 (3d Cir. 2000) (quoting Suarez Corp.
Indus. V. McGraw, 202 F.3d 676, 686 (4th Cir. 2000)); see also
Koren v. Noonan, 586 F. App'x 885, 888 (3d Cir. 2014).  When the
alleged retaliator is a public employer, "courts have required the
nature of the retaliatory acts . . . to be more than *de minimis* or
trivial." Brennan, 350 F.3d at 419 (quoting Suarez, 202 F.3d at
686).  "[C]riticism, false accusations, or verbal reprimands" are
generally not considered sufficient to establish a claim. Id.
(quoting Suarez, 202 F.3d at 686); see also Koren, 586 F. App'x at
888.

In analyzing First Amendment retaliation claims, our
Court of Appeals has repeatedly cited with approval the
well-reasoned decision of the Fourth Circuit in Suarez, 202 F.3d
676. See, e.g., Brennan, 350 F.3d at 419; Koren, 586 F. App'x at
888; see also McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006);
McLaughlin v. Watson, 271 F.3d 566, 573 (3d Cir. 2001).  In Suarez,
the Court reviewed a district court ruling that a First Amendment
retaliation claim raised by a direct mail marketing company against
state officials was not barred by the doctrine of qualified
immunity.  202 F.3d at 683-84.  The Suarez court reversed.  It
concluded that the claim could not proceed because the alleged
retaliatory conduct had not adversely affected the First Amendment

-17-

rights of the plaintiffs.  See id. at 690-91.  In so doing, the court observed that when a First Amendment retaliation claim arises in the public employment context, the relationship between the speaker and the retaliator "creates competing interests between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 686 (internal citation omitted).  It is because of these competing interests that the retaliatory acts must be "more than de minimis or trivial" to give rise to a viable claim.  Id.  Under this standard, criticism and false accusations are insufficient.  See id.

     According to the Suarez court, "[t]he nature of the alleged retaliatory acts has particular significance where the public official's acts are in the form of speech." Id. at 687. Under such circumstances, the "public official's own First Amendment speech rights are implicated." Id.  Consequently, "where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory." Id. (emphasis added) (citations omitted).

-18-

A000105

The Court of Appeals for the Third Circuit recently
cited Suarez with approval in Koren, 586 F. App'x 885.  There, a
former Pennsylvania State Trooper brought a First Amendment
retaliation action under § 1983 against two Pennsylvania State
Police employees.[4]  Id. at 886-87.  He alleged that while he was
running for political office they had implied in statements to the
media that he had engaged in workplace misconduct.  Id. at 887.
The Court of Appeals affirmed the district court's dismissal of the
claim.  Id. at 890.  It observed that "in the political arena,
courts have consistently rejected First Amendment retaliation
claims based upon assertions of purportedly false reports or
criticism."  Id. at 888.  Because the defendants' allegedly
retaliatory speech "involved no 'threat, coercion, or intimidation
intimating that punishment, sanction, or adverse regulatory action
[would] imminently follow,'" the court concluded that it "would not
dissuade a person of ordinary firmness from" engaging in the type
of protected activity undertaken by the plaintiff.  Id. (quoting
Suarez, 202 F.3d at 687).

Like the purported retaliation in Suarez and Koren,
the criticism by Kane of the Ali bribery investigation is not
actionable under § 1983.  See generally 202 F.3d 676; 586
F. App'x 885.  In reaching this conclusion, we consider the status

---

4.  One of those two employees happened to be the same Frank
Noonan who is a plaintiff in this action.

A000106

of Fina as the speaker, the status of Kane as the alleged
retaliator, the relationship between them, and the nature of Kane's
acts.  See Brennan, 350 F.3d at 419.  Fina, a Deputy Attorney
General under Attorney General Corbett, was a high-level official
in the OAG during the time the Ali investigation was ongoing.  Kane
at the relevant time was the elected Attorney General.  It bears
noting that in this capacity, Kane enjoys her own First Amendment
rights.  See Suarez, 202 F.3d at 687.  Fina does not allege that
there was an employment relationship between himself and Kane at
the time of the alleged retaliation.  Even if there was such a
relationship, the nature of Kane's alleged acts is different from
that of the retaliation that occurred in the employment cases cited
by plaintiffs.  Fina was not terminated, demoted, disciplined, or
subjected to any other adverse employment action as a result of his
criticism of Kane.  Instead, he merely bore the effects of a
generalized critique of an investigation in which he took part
under a former Attorney General.  In sum, the actions of Kane
detailed in Count One would not "deter a person of ordinary
firmness from exercising his constitutional rights."  See, e.g.,
Thomas, 463 F.3d at 296.

Plaintiffs urge us to distinguish Koren.  In their view,
the retaliation alleged in Koren took place in the political arena,
while this case arises in an employment context.  It is true that
in Koren the Third Circuit acknowledged that when a public employer

-20-

takes action against an employee, the threshold for finding that action to be retaliatory is "very low."  586 F. App'x at 888 (quoting O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006)).  But even under such circumstances, the court wrote, "a plaintiff must plead more than mere 'criticism, false accusations, or verbal reprimands.'"  Id. (quoting Brennan, 350 F.3d at 419. Moreover, in support of their argument that this case takes place in the employment context, plaintiffs rely on cases which involve retaliatory adverse employment action such as demotion or termination.  See, e.g., O'Connor, 440 F.3d at 126 n.1.  No such adverse employment action was taken here.

Moreover, the retaliation described in Count One "is in the nature of speech," and Fina alleges no "threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow."  See Suarez, 202 F.3d at 687.  Rather, Kane's purportedly retaliatory acts are no more than "criticism, false accusations, or verbal reprimands."  See Brennan, 350 F.3d at 419.  Accordingly, even if that speech is defamatory, as Fina claims it is, it does not implicate his First Amendment rights.  See Suarez, 202 F.3d at 687; Koren, 586 F. App'x at 888.  We will therefore grant the motion of Kane to dismiss Count One.

A000108

IV.

Kane also seeks to dismiss Count Two of the First Amended Complaint.  Count Two, brought under § 1983, contains the allegations of Costanzo and Fina that Kane once again retaliated against them in violation of the First Amendment by "fabricating and publishing claims that Fina and Costanzo wrongfully impeded and terminated a valid criminal investigation against J. Whyatt Mondesire for improper and unethical purposes."  Costanzo and Fina also allege that Kane retaliated against them by unlawfully releasing grand jury materials related to the Mondesire investigation.  They argue that Kane did so in retaliation for their criticism of her handling of the Ali bribery investigation and "in an attempt to make it appear that [they] had abused their prosecutorial discretion by failing to pursue a case against Mondesire."

Once again, Kane does not appear to dispute that Costanzo and Fina engaged in protected activity or that there is a a causal connection between this activity and her purported retaliation.  Thus, our inquiry is again limited to whether Kane's actions would "deter a person of ordinary firmness from exercising his constitutional rights."  See, e.g., Thomas, 463 F.3d at 296.

To the extent that Count Two is based on speech by Kane, we reiterate that "where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or

-22-

intimidation intimating that punishment, sanction, or adverse
regulatory action will immediately follow, such speech does not
adversely affect a citizen's First Amendment rights, even if
defamatory."  Suarez, 202 F.3d at 687.  As Kane correctly observes,
she is entitled to make clear to the public that she, as the
current Attorney General, "thinks that the OAG was either corrupt
or inept before she took office and that Fina and Costanzo were
part of the problem."  Any statement made or initiated by Kane to
the effect that the Mondesire investigation was improperly
terminated was not "sufficient to deter a person of ordinary
fitness from exercising" his First Amendment freedoms.  See, e.g.,
Thomas, 463 F.3d at 296.

As to Costanzo and Fina's allegations that Kane
retaliated against them through the unlawful release of materials
from the Mondesire grand jury investigation, we likewise conclude
that they have not made out a First Amendment retaliation claim.
It is true that this alleged leak goes beyond mere speech and that
Kane has been criminally charged in connection with it.  To
determine whether it amounts to retaliation, however, we must
assess "the status of the speaker, the status of the retaliator,
the relationship between the speaker and the retaliator, and the
nature of the retaliatory acts."  Brennan, 350 F.3d at 419
(citation omitted).  The First Amended Complaint does not allege
that Kane released the grand jury materials selectively in such a

-23-

A000110

way as to misrepresent Costanzo and Fina's involvement in the investigation.  Indeed, plaintiffs merely aver that Kane gathered grand jury materials and gave them to her associate Morrow, who passed them along to Brennan.  It was Morrow, and not Kane, who "consciously redacted from these documents the names of all persons other than Costanzo and Fina so that the reported story would only be about them."  Morrow also "told Brennan that he and Kane were looking to air a story critical of Fina and Costanzo."  Plaintiffs do not allege that Morrow did so at Kane's direction.

In summary, Fina and Costanzo have failed adequately to allege that Kane unlawfully retaliated against them by criticizing their handling of the Mondesire investigation or by releasing confidential materials related to that investigation.  As a result, we will grant the motion of Kane to dismiss Count Two.

V.

In Count Three, which Kane, Miletto, and Brennan seek to dismiss, Costanzo and Fina aver under § 1983 that Kane, Miletto, and Brennan conspired to retaliate against them for exercising their First Amendment freedoms by fabricating assertions that they had improperly "impeded and terminated" the Mondesire investigation.  This claim appears to be based on the following allegations:  that Kane directed Miletto to state falsely that Costanzo and Fina had removed him from the Mondesire investigation after he uncovered evidence of

-24-

A000111

Mondesire's wrongdoing, and that Brennan reported this fabrication; and that Brennan received confidential grand jury materials from Morrow and, at Morrow's request, used them as the basis for a story.

For the reasons stated above, the criticism and allegedly false accusations levied by Kane, Miletto, Morrow, and Brennan against Costanzo and Fina are not enough to establish a First Amendment retaliation claim.  These acts are mere speech and do not involve any "threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow."  See Suarez, 202 F.3d at 687; Koren, 586 F. App'x at 888.[5]  They are not enough to "deter a person of ordinary firmness from exercising his constitutional rights."  See, e.g., Thomas, 463 F.3d at 296.  Since they are not retaliatory, they cannot serve as the basis for a claim that defendants conspired to retaliate against them.

The same is true of the allegations that Kane, Miletto, and Brennan conspired to engage in retaliation by releasing confidential grand jury materials.  We have already concluded that

---

5.  Costanzo and Fina do allege that Miletto later threatened and intimidated them in connection with the grand jury investigation when he confronted them as they prepared to testify about the leak.  This allegation does not appear to serve as the basis for the conspiracy claim in Count Three. Moreover, even if plaintiffs do base Count Three on this alleged intimidation, they have not alleged that Miletto conspired with Kane or Brennan to engage in this course of conduct.

A000112

any such leak does not amount to retaliation, and as such, it cannot support a retaliation conspiracy claim.

We also note that plaintiffs have not adequately alleged the existence of a conspiracy, at least with respect to defendant Brennan.  Nowhere in their First Amended Complaint do plaintiffs allege in anything more than conclusory terms that Brennan conspired with Kane or Miletto to engage in unlawful conduct.  See Iqbal, 556 U.S. at 678.  Plaintiffs aver that Brennan, at Morrow's direction, wrote a news story critical of Costanzo and Fina, but they do not allege any involvement by Kane or Miletto in this purported scheme.  As to Miletto, plaintiffs plead his involvement in a conspiracy only by asserting that Kane directed him to "falsely state that Fina and Costanzo had removed him from the Mondesire investigation when Miletto supposedly found evidence of Mondesire's wrongdoing which was ultimately reported by Brennan in the news story."  Again, this is not actionable retaliation, and cannot support a claim of a retaliatory conspiracy.

We will thus grant the motions of Kane, Miletto, and Brennan to dismiss Count Three.

VI.

Kane further moves to dismiss Count Four.  Again, this count is predicated on § 1983.  There Noonan, Feathers, Sheetz, and Fina claim that Kane retaliated against them in violation of the First Amendment by making a statement "to the media that the

-26-

A000113

alleged delay in arresting Sandusky resulted in two minors being subjected to sexual abuse that would not have otherwise occurred." That assertion, as Kane's representative later acknowledged, was untrue.  Noonan, Feathers, Sheetz, and Fina aver that when Kane made the statement she was retaliating against them for their criticism of the inquiry she had initiated into the Sandusky investigation.

In Koren, our Court of Appeals opined that when a court is confronted with allegations that a defendant has "smeared [a plaintiff's] unblemished professional record . . . [t]he question . . . is not whether [the] remarks were defamatory – it is whether they would have deterred 'a person of ordinary firmness'" from exercising his constitutional rights. 586 F. App'x at 888 (quoting Thomas, 463 F.3d at 296).  While plaintiffs engaged in protected activity (as Kane concedes they did), and while Kane's contentions about the delays in the Sandusky investigation may have been false and damaging, those contentions "involved no 'threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow.'"  See id. (quoting Suarez, 202 F.3d at 687).  They were merely the remarks of an elected official about persons she considered to be her political opponents pertaining to an issue which had been at the core of her campaign for office.  They would not "dissuade a person of

-27-

ordinary firmness" from engaging in the type of protected speech
at issue here, and as a result, they are not actionable under
§ 1983.  See id.  For this reason, we will grant the motion of
Kane to dismiss Count Four.

VII.

Kane moves to dismiss Count Five.  This count under
§ 1983 consists of the allegations of Noonan, Feathers, Sheetz, and
Fina that Kane retaliated against them for engaging in First-
Amendment-protected speech by "fabricating and publishing claims
that implied that Fina, Sheetz, Feathers, and Noonan possessed
and/or distributed child pornography."  Plaintiffs are referring to
the statements made by Kane to a CNN correspondent, allegedly in
retaliation for plaintiffs' criticism of her.  They were broadcast
in a news segment which aired on November 18, 2014.  Once again,
Kane concedes that plaintiffs' criticism of her was protected by
the First Amendment, and she does not appear to dispute that there
was a causal connection between this criticism and her statements.

We reiterate that under these circumstances, where
Kane's purportedly retaliatory acts are "in the form of speech,"
her First Amendment rights are implicated as well.  See Suarez, 202
F.3d at 687.  The criticisms Kane articulated during the CNN
segment, which appear to serve as the sole basis for Count Five, do
not involve any "threat, coercion, or intimidation intimating that
punishment, sanction, or adverse regulatory action will immediately

-28-

follow." See id.  Again, Kane's comments were those of an elected
official concerning the improper use of state computers and state
email servers.  Even if Kane had defamed Noonan, Feathers, Sheetz,
and Fina by falsely asserting that they had viewed child
pornography, this would not be actionable First Amendment
retaliation under § 1983.  See id.

     In response to Kane's argument that her statements to
CNN involved no threats or intimidation, Noonan, Feathers, Sheetz,
and Fina contend that they were subjected to threats in connection
with their involvement in the email scandal.  Specifically, they
plead that Tyler, an OAG official, threatened the release of the
emails "if Fina does not back off."  They further allege that
Barker, another OAG official, directed Fina's colleague to instruct
Fina that his criticism of Kane would result in the release of the
emails.  It is unclear which count (if any) in the First Amended
Complaint relies on these allegations.  Moreover, there is no
indication in the First Amended Complaint that any defendant
directed or played any role in the issuance of these alleged
threats.  Thus, they cannot serve as the basis for a claim in this
action.

     For the foregoing reasons we will grant the motion of
Kane for dismissal of Count Five.

A000116

VIII.

This brings us to Count Six, which Kane asks us to dismiss as not stating a claim under § 1983.  In Count Six, all five plaintiffs plead that Kane again retaliated against their engagement in protected speech by "releasing the information about the private emails and/or releasing the emails of all plaintiffs." They take issue with the OAG's "selective" release of certain of their emails to the press following the filing of Right to Know Law requests concerning the communications.

Once again, in assessing whether the alleged retaliatory acts of Kane were "sufficient to determine a person of ordinary firmness from exercising" his constitutional rights, we "focus[] on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*." Thomas, 463 F.3d at 296; Brennan, 350 F.3d at 419.  Here, the speakers – in this case plaintiffs – are former high ranking public officials, and the retaliator Kane is an elected Attorney General who plays a major role in state law enforcement and who is tasked with directing the OAG.  The alleged retaliatory act at issue was the release to the media, pursuant to an official request and after significant litigation, of sexually explicit messages which plaintiffs do not dispute were exchanged on state email systems. In other words, the "nature of the retaliatory acts" was in this

-30-

case the disclosure by the state's Attorney General of official misconduct within her office.  See id.  It would defy logic to conclude that Kane violated the constitutional rights of plaintiffs by bringing to light their use of state-owned computers and email systems to exchange pornography.

In arguing otherwise, plaintiffs direct our attention to the decision of the District of Delaware in Neuberger v. Gordon, 567 F. Supp. 2d 622 (D. Del. 2008).  In that case, a civil rights attorney who had been critical of certain public figures brought a First Amendment retaliation case against them after they disclosed his private medical information to the media.  That disclosure, the court concluded, was "sufficient to deter a civil rights plaintiff's attorney of ordinary firmness from exercising constitutional rights."  Id. at 638.  Plaintiffs contend that Neuberger stands for the proposition that the disclosure of private information about a plaintiff can support a First Amendment retaliation claim.

Neuberger, however, is of no help to plaintiffs.  That case involved the widespread dissemination of highly intimate medical information about the plaintiff.  Here, in contrast, the materials released were off-color and arguably pornographic messages sent by state officials on state-owned email servers.  The facts of Neuberger are easily distinguishable from those before us in this matter.

-31-

A000118

In sum, when we consider "the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*," we have no trouble concluding that Kane's release of certain emails implicating plaintiffs was not "sufficient to determine a person of ordinary firmness from exercising" his right to free speech. See Thomas, 463 F.3d at 296; Brennan, 350 F.3d at 419.

To the extent that Count Six relies on allegations that plaintiffs were threatened with the release of their emails, we note once again that the First Amended Complaint contains no allegations that any defendant made or directed these threats. While plaintiffs may believe that Kane arranged for these purported threats to be made, they have not alleged this in their pleading.

Accordingly, we will grant the motion of Kane to dismiss Count Six.

IX.

In essence, the First Amended Complaint details a long-standing political battle between the Attorney General of Pennsylvania and former high-ranking state officials who served in the administrations of her adversaries.  The battle has been hard fought and is not pretty.  Each party, however, has exercised his or her rights under the First Amendment, and there has been alleged no illegal retaliation giving rise to claims under § 1983.

-32-

A000119

X.

As we have concluded that Rule 12(b)(6) requires dismissal of Counts One through Six, there are no remaining claims against Kane and Miletto.  We need not reach their arguments that they are entitled to qualified immunity from all of the claims against them, nor must we address the argument of Kane that the First Amended Complaint should be dismissed on the ground that it runs afoul of the pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure.

XI.

Finally, we address Counts Seven and Eight, in which Costanzo and Fina state law claims of defamation and false light against the Media Defendants whose citizenship is not diverse from that of the plaintiffs.  Our subject matter jurisdiction over these claims rests on 28 U.S.C. § 1367.[6]

---

6.  Section 1367 provides in relevant part:

> (a) . . . in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

> . . .

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if –

All the federal claims are being dismissed.  Pursuant
to 28 U.S.C. § 1367(c)(3), we decline to exercise supplemental
jurisdiction over Counts Seven and Eight.  The action is in a
very early stage.  Consequently, Counts Seven and Eight will be
dismissed without prejudice to the right of plaintiffs to
reassert these claims in the appropriate state court.

---

    . . .

       (3) the district court has dismissed all
       claims over which it has original
       jurisdiction.

A000121

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN, et al.         :          CIVIL ACTION
                             :
                             :
         v.                  :
                             :
                             :
KATHLEEN KANE, et al.        :          NO. 15-6082


ORDER

AND NOW, this 2nd  day of December, 2016, for the
reasons set forth in the accompanying memorandum, it is hereby
ORDERED that the motion of plaintiffs Frank Noonan, Randy Feathers,
Richard A. Sheetz, Jr., E. Marc Constanzo, and Frank Fina "pursuant
to Rule 60(b) to vacate order granting defendant Kane's motion to
dismiss plaintiffs' amended complaint and seeking leave to file a
second amended complaint" (Doc. # 47) is DENIED.

                              BY THE COURT:


                              /s/ Harvey Bartle III
                                                    J.

**A000122**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN, et al.    :    CIVIL ACTION
             :
             :
    v.       :
             :
             :
KATHLEEN KANE, et al.    :    NO. 15-6082

MEMORANDUM

Bartle, J.          December 2, 2016

   Before the court is the motion of plaintiffs "pursuant to Rule 60(b) to vacate order granting defendant Kane's motion to dismiss plaintiffs' amended complaint and seeking leave to file a second amended complaint."

   Plaintiffs are Frank Noonan, Randy Feathers, Richard A. Sheetz, Jr., E. Marc Costanzo, and Frank Fina.  Noonan is the retired Commissioner of the Pennsylvania State Police.  Feathers is a retired Regional Director of the Bureau of Narcotics and Investigation and Control of the Office of the Attorney General of Pennsylvania ("OAG").  Sheetz served as a former Executive Deputy Attorney General Directing the Criminal Law Division of the OAG.  Costanzo is a former Deputy Attorney General for the OAG.  Finally, Fina is a former Chief Deputy Attorney General for the OAG.

   Plaintiffs' first amended complaint contained claims under 42 U.S.C. § 1983 and supplemental state law claims

A000123

involving six defendants:  former Pennsylvania Attorney General Kathleen Kane; Michael Miletto, an investigator for the Office of the Attorney General; the <u>Philadelphia Daily News</u>; one of its reporters, Christopher Brennan; and Philadelphia Media Network, LLC and Philadelphia Media Network (Digital) LLC, which together own the <u>Philadelphia Daily News</u>.

Plaintiffs alleged that Kane, in violation of § 1983, retaliated against them for engaging in speech protected by the First Amendment.  Costanzo and Fina averred that Kane, Miletto, and Brennan engaged in a conspiracy to retaliate against them for the same protected speech.  Costanzo and Fina also raised defamation and false light claims under Pennsylvania law against Brennan, Philadelphia Media Network, LLC, and Philadelphia Media Network (Digital) LLC.

The defendants filed motions to dismiss the respective counts against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.  On July 19, 2016, we granted defendants' motions to dismiss Counts I through VI for failure to state a claim.  We dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3) the supplemental state law claims presented in Counts VII and VIII.  Plaintiffs filed a notice of appeal on August 9, 2016.

A000124

While the appeal is pending, plaintiffs filed on October 26, 2016 a motion with this court pursuant to Rule 60(b) of the Federal Rules of Civil Procedure to vacate the court's order granting the defendants' motions to dismiss on the ground that new evidence has come to their attention.  They seek leave to file a second amended complaint.

Under Venen v. Sweet, while an appeal is pending the district court has the ability to entertain and deny a Rule 60(b) motion.  758 F.2d 117, 123 (3d Cir. 1985).  However if a district court is inclined to grant the Rule 60(b) motion, it must certify this intention to the Court of Appeals.  Id.  It is only if the Court of Appeals remands the case does the district court have the power to grant the motion.  Id.

Plaintiffs urge us to advise the Court of Appeals of our intention to grant relief under Rule 60(b) and to allow them to file a second amended complaint.  They seek to incorporate into their proposed pleading recently released testimony from Kane's recent state court criminal trial, which concluded with a guilty verdict on August 15, 2016.  See Commonwealth v. Kane, No. CR-6239, CR-8423 (Ct. Comm. Pl. Montgomery Cnty. 2016).  The testimony, which they attach to their motion, is that of Joshua Morrow, who testified against Kane at the trial and during a grand jury investigation.  This testimony was not available to plaintiffs at the time the first amended complaint was filed.

-3-

**A000125**

While plaintiffs seek to file a second amended complaint in light of this recent testimony, they have not attached a proposed second amended complaint to the instant motion.  They apparently expect the court to cull through more than 200 pages of testimony and speculate as to what plaintiffs would allege and against whom in the new version of their pleading.  This is not the proper role of this court.[1]

Accordingly, we will deny plaintiffs' motion "pursuant to Rule 60(b) to vacate order granting defendant Kane's motion to dismiss plaintiffs' amended complaint and seeking leave to file a second amended complaint."

---

1. Plaintiffs' entire request for relief is unspecific.  It is unclear whether plaintiffs seek the reversal of the portion of the order that granted Kane's motion to dismiss, or whether they seek the reversal of the court's entire order that granted defendants' motions to dismiss. (See Doc. # 43).  While the caption of plaintiffs' motion only references Kane, the body of plaintiffs' brief suggests the second amended complaint would contain amended claims against all defendants.  (See Doc. # 47).  As noted above, plaintiffs have neither provided a proposed second amended complaint nor identified which counts or defendants would be implicated.

-4-

**A000126**