UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

FRANK NOONAN, RANDY FEATHERS,
RICHARDS A. SHEETZ, JR., E. MARC
COSTANZO and FRANK FINA
          **Appellants**

v.

KATHLEEN KANE and MICHAEL MILETTO

        **Appellees**

---

## APPENDIX VOLUME II

## Pages A000127-A000737

---

## Nos. 16-3311 & 16-3312

---

*Appeal from the Order of the Honorable Harvey J. Bartle, III, Entered on July 19, 2016 in the United States District Court for The Eastern District of Pennsylvania No. 15-cv-06082*

---

MARK W. TANNER, ESQUIRE
Feldman Shepherd Wohlgelernter
Tanner
Weinstock & Dodig, LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
Attorneys for Plaintiffs, Frank Noonan,
Randy Feathers, Richard A. Sheetz, Jr.,
and Frank Fina

FORTUNATO N. PERRI, JR.,
ESQUIRE
McMonagle Perri McHugh & Mischak
145 Walnut Street, 19th Floor
Philadelphia, PA 19103

Attorney for Plaintiff, E. Marc Costanzo

# APPENDIX TABLE OF CONTENTS

## VOLUME I

Notice of Appeal, filed August 8, 2016 ........................................... A000001

Notice of Appeal of E. Marc Costanzo filed August 9, 2016............ A000043

Order of Judge Harvey Bartle, III, dated July 19, 2016 ................... A000086

Memorandum Opinion of Judge Harvey Bartle, III,
dated July 19, 2016 .......................................................................... A000088

Order of Judge Harvey Bartle, III, dated December 2, 2016............. A000122

Memorandum Opinion of Judge Harvey Bartle, III,
dated December 2, 2016..................................................................... A000123

## VOLUME II

Civil Docket for case no. 15-6082 .................................................... A000127

First Amended Complaint ................................................................. A000135

Response of Plaintiffs' to the Motion of Defendant
Kathleen G. Kane to Dismiss Counts I Through VI of the
First Amended Complaint.................................................................. A000218

Plaintiffs Motion Pursuant to Rule 60(b) to Vacate Order
Granting Defendant Kane's Motion to Dismiss Plaintiff's
Amended Complaint and Seeking Leave to File a
Second Amended Complaint ............................................................. A000270

Memorandum Opinion of Judge William R. Carpenter,
dated December 12, 2014................................................................... A000651

Criminal Docket for case no. : CP-46-CR-0006239-2015 ................ A000670

Criminal Docket for case no.:  CP-46-CR-0008423-2015 ................ A000709

Certificate of Service ........................................................................... A000737

CLOSED,APPEAL,STANDARD

# United States District Court
# Eastern District of Pennsylvania (Philadelphia)
# CIVIL DOCKET FOR CASE #: 2:15−cv−06082−HB

NOONAN et al v. KANE et al
Assigned to: HONORABLE HARVEY BARTLE, III
Case in other court:   USCA, 16−03311
                                USCA, 16−03312
Cause: 42:1983 Civil Rights Act

Date Filed: 11/12/2015
Date Terminated: 07/19/2016
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**FRANK NOONAN**

represented by **MARK W. TANNER**
FELDMAN, SHEPHERD,
WOHLGELERNTER, TANNER &
WEINSTOCK
1845 WALNUT ST., 21ST FL
PHILADELPHIA, PA 19103
215−567−8300
Email: mtanner@feldmanshepherd.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RANDY FEATHERS**

represented by **MARK W. TANNER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RICHARD A. SHEETZ, JR.**

represented by **MARK W. TANNER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**E. MARC COSTANZO**

represented by **FORTUNATO N. PERRI , JR.**
MC MONAGLE, PERRI, MC HUGH &
MISCHAK
1845 WALNUT ST 19TH FL
PHILADELPHIA, PA 19103
215−981−0999
Fax: 215−981−0977
Email: fperri@mpmpc.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FRANK FINA**

represented by **MARK W. TANNER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**KATHLEEN KANE**

represented by **EDWARD T. ELLIS**
LITTLER MENDELSON, P.C.
1601 CHERRY STREET
THREE PARKWAY, SUITE 1400

A000127

PHILADELPHIA, PA 19102
267–402–3008
Email: eellis@littler.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RACHEL FENDELL SATINSKY**
LITTLER MENDELSON, P.C.
1601 Cherry Street
Suite 1400
PHILADELPHIA, PA 19102
267–402–3071
Fax: 267–402–3131
Email: rsatinsky@littler.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RICHARD R. HARRIS**
LITTLER MENDELSON
THREE PARKWAY SUITE 1400
1601 CHERRY ST
PHILADELPHIA, PA 19102
267–402–3000
Fax: 267–285–4321
Email: rharris@littler.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**GREG GREUBEL**
LITTLER MENDELSON
1601 CHERRY ST #1400
PHILADELPHIA, PA 19102
267–402–3027
Email: ggreubel@littler.com
*ATTORNEY TO BE NOTICED*

**Defendant**
**MICHAEL MILETTO**                    represented by   **EDWARD T. ELLIS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RACHEL FENDELL SATINSKY**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RICHARD R. HARRIS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**GREG GREUBEL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**
**CHRISTOPHER BRENNAN**               represented by   **MICHAEL A. SCHWARTZ**
PEPPER HAMILTON LLP
3000 TWO LOGAN SQUARE
18TH & ARCH STREETS
PHILADELPHIA, PA 19103–2799
215–981–4000
Email: schwartzma@pepperlaw.com

**A000128**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**AMY B. GINENSKY**
PEPPER HAMILTON LLP
3000 TWO LOGAN SQUARE
18TH AND ARCH STREET
PHILADELPHIA, PA 19103–2793
215–981–4315
Fax: FAX 215–994–2222
Email: ginenskya@pepperlaw.com
*ATTORNEY TO BE NOTICED*

**ELI M. SEGAL**
PEPPER HAMILTON LLP
3000 TWO LOGAN SQUARE
EIGHTEENTH & ARCH STS
PHILADELPHIA, PA 19103–2799
215–981–4239
Email: segale@pepperlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**PHILADELPHIA DAILY NEWS**          represented by   **MICHAEL A. SCHWARTZ**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ELI M. SEGAL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PHILADELPHIA MEDIA**          represented by   **MICHAEL A. SCHWARTZ**
**NETWORK (DIGITAL) LLC**                          (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**AMY B. GINENSKY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ELI M. SEGAL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PHILADELPHIA MEDIA**          represented by   **MICHAEL A. SCHWARTZ**
**NETWORK, LLC**                                   (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**AMY B. GINENSKY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ELI M. SEGAL**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
| --- | --- | --- |

**A000129**

| 11/12/2015 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 130579.), filed by RANDY FEATHERS, E. MARC COSTANZO, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR.(tj, ) (Entered: 11/12/2015) |
|---|---|---|
| 11/12/2015 | | Summons Issued as to CHRISTOPHER BRENNAN, KATHLEEN KANE, MICHAEL MILETTO, PHILADELPHIA DAILY NEWS, PHILADELPHIA MEDIA NETWORK (DIGITAL) LLC, PHILADELPHIA MEDIA NETWORK, LLC. Given To: Counsel on 11/12/15 (tj, ) (Entered: 11/12/2015) |
| 11/12/2015 | | DEMAND for Trial by Jury by E. MARC COSTANZO, RANDY FEATHERS, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR. (tj, ) (Entered: 11/12/2015) |
| 11/19/2015 | 2 | *Stipulation and Proposed Order to Extend Time to Respond to Complaint* by CHRISTOPHER BRENNAN, PHILADELPHIA DAILY NEWS, PHILADELPHIA MEDIA NETWORK (DIGITAL) LLC, PHILADELPHIA MEDIA NETWORK, LLC. (FILED IN ERROR BY ATTORNEY; COPY FORWARDED TO JUDGE FOR APPROVAL). (SCHWARTZ, MICHAEL) Modified on 11/20/2015 (fb). (Entered: 11/19/2015) |
| 11/19/2015 | 3 | NOTICE of Appearance by MICHAEL A. SCHWARTZ on behalf of CHRISTOPHER BRENNAN, PHILADELPHIA DAILY NEWS, PHILADELPHIA MEDIA NETWORK (DIGITAL) LLC, PHILADELPHIA MEDIA NETWORK, LLC with Certificate of Service(SCHWARTZ, MICHAEL) (Entered: 11/19/2015) |
| 11/19/2015 | 4 | NOTICE of Appearance by ELI M. SEGAL on behalf of CHRISTOPHER BRENNAN, PHILADELPHIA MEDIA NETWORK (DIGITAL) LLC, PHILADELPHIA MEDIA NETWORK, LLC with Certificate of Service(SEGAL, ELI) (Entered: 11/19/2015) |
| 11/19/2015 | 5 | NOTICE of Appearance by AMY B. GINENSKY on behalf of CHRISTOPHER BRENNAN, PHILADELPHIA MEDIA NETWORK (DIGITAL) LLC, PHILADELPHIA MEDIA NETWORK, LLC with Certificate of Service(GINENSKY, AMY) (Entered: 11/19/2015) |
| 11/19/2015 | 6 | *Amended Stipulation and Proposed Order to Extend Time to Respond to Complaint* by CHRISTOPHER BRENNAN, PHILADELPHIA DAILY NEWS, PHILADELPHIA MEDIA NETWORK (DIGITAL) LLC, PHILADELPHIA MEDIA NETWORK, LLC.**(FILED IN ERROR BY ATTY, COPY FORWARDED TO JUDGE FOR APPROVAL)** (SEGAL, ELI) Modified on 12/2/2015 (tjd). (Entered: 11/19/2015) |
| 11/19/2015 | 7 | NOTICE of Appearance by RICHARD R. HARRIS on behalf of KATHLEEN KANE, MICHAEL MILETTO (HARRIS, RICHARD) (Entered: 11/19/2015) |
| 11/19/2015 | 8 | NOTICE of Appearance by EDWARD T. ELLIS on behalf of KATHLEEN KANE, MICHAEL MILETTO (ELLIS, EDWARD) (Entered: 11/19/2015) |
| 11/19/2015 | 9 | NOTICE of Appearance by RACHEL FENDELL SATINSKY on behalf of KATHLEEN KANE, MICHAEL MILETTO (SATINSKY, RACHEL) (Entered: 11/19/2015) |
| 11/20/2015 | 10 | AMENDED STIPULATION AND ORDER THAT DEFENDANTS CHRISTOPHER BRENNAN, PHILADELPHIA DAILY NEWS, PHILADELPHIA MEDIA NETWORK (DIGITAL) LLC, AND PHILADELPHIA MEDIA NETWORK, LLC (COLLECTIVELY, "MEDIA DEFENDANTS") SHALL MOVE OR PLEAD IN RESPONSE TO PLAINTIFFS' COMPLAINT BY JANUARY 15, 2016. SIGNED BY HONORABLE HARVEY BARTLE, III ON 11/20/15. 11/20/15 ENTERED AND COPIES E–MAILED. (va, ) (Entered: 11/20/2015) |
| 11/24/2015 | 11 | SUMMONS Returned Executed by RANDY FEATHERS, E. MARC COSTANZO, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR re: Daniel Patterson served Summons and Complaint upon KATHLEEN KANE by Personal. KATHLEEN KANE served on 11/16/2015, answer due 12/7/2015. (TANNER, MARK) (Entered: 11/24/2015) |
| 11/24/2015 | 12 | SUMMONS Returned Executed by RANDY FEATHERS, E. MARC COSTANZO, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR re: Daniel Patterson served Summons and Complaint upon MICHAEL MILETTO by Personal. MICHAEL |

| | | |
|---|---|---|
| | | MILETTO served on 11/16/2015, answer due 12/7/2015. (TANNER, MARK) (Entered: 11/24/2015) |
| 11/24/2015 | 13 | SUMMONS Returned Executed by RANDY FEATHERS, E. MARC COSTANZO, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR re: Karl Thomas served Summons and Complaint upon CHRISTOPHER BRENNAN by Personal. CHRISTOPHER BRENNAN served on 11/13/2015, answer due 1/15/2016. (TANNER, MARK) (Entered: 11/24/2015) |
| 11/24/2015 | 14 | SUMMONS Returned Executed by RANDY FEATHERS, E. MARC COSTANZO, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR re: Karl Thomas served Summons and Complaint upon PHILADELPHIA DAILY NEWS by Personal. PHILADELPHIA DAILY NEWS served on 11/13/2015, answer due 1/15/2016. (TANNER, MARK) (Entered: 11/24/2015) |
| 11/24/2015 | 15 | SUMMONS Returned Executed by RANDY FEATHERS, E. MARC COSTANZO, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR re: Karl Thomas served Summons and Complaint upon PHILADELPHIA MEDIA NETWORK (DIGITAL) LLC by Personal. PHILADELPHIA MEDIA NETWORK (DIGITAL) LLC served on 11/13/2015, answer due 1/15/2016. (TANNER, MARK) (Entered: 11/24/2015) |
| 11/24/2015 | 16 | SUMMONS Returned Executed by RANDY FEATHERS, E. MARC COSTANZO, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR re: Karl Thomas served Summons and Complaint upon PHILADELPHIA MEDIA NETWORK, LLC by Personal. PHILADELPHIA MEDIA NETWORK, LLC served on 11/13/2015, answer due 1/15/2016. (TANNER, MARK) (Entered: 11/24/2015) |
| 12/14/2015 | 17 | STIPULATION AND ORDER THAT DEFENDANTS KATHLEEN KANE AND MICHAEL MILETTO MAY ANSWER COMPLAINT BY 1/15/2016. SIGNED BY HONORABLE HARVEY BARTLE, III ON 12/14/15. 12/14/15 ENTERED AND COPIES E−MAILED. (va, ) (Entered: 12/14/2015) |
| 12/17/2015 | 18 | NOTICE of Appearance by GREG GREUBEL on behalf of KATHLEEN KANE, MICHAEL MILETTO (GREUBEL, GREG) (Entered: 12/17/2015) |
| 01/14/2016 | 19 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by KATHLEEN KANE.Memorandum, Certificate of Service. (Attachments: # 1 Memorandum, # 2 Text of Proposed Order, # 3 Exhibit A)(ELLIS, EDWARD) (Entered: 01/14/2016) |
| 01/14/2016 | 20 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by MICHAEL MILETTO.Memorandum, Certificate of Service. (Attachments: # 1 Memorandum, # 2 Text of Proposed Order, # 3 Exhibit A)(ELLIS, EDWARD) (Entered: 01/14/2016) |
| 01/15/2016 | 21 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by CHRISTOPHER BRENNAN, PHILADELPHIA DAILY NEWS, PHILADELPHIA MEDIA NETWORK (DIGITAL) LLC, PHILADELPHIA MEDIA NETWORK, LLC.Memorandum of Law in Support of Media Defendants' Motion to Dismiss All Claims Against Them, Proposed Order, and Certificate of Service. (Attachments: # 1 Exhibit A (June 6, 2014 Philadelphia Daily News article, titled State A.G. Probed Philly NAACP Leader Mondesires Finances Five Years Ago))(SCHWARTZ, MICHAEL) (Entered: 01/15/2016) |
| 01/26/2016 | 22 | STIPULATION for Extension of Time to Respond to Defendants' Motions to Dismiss filed by E. MARC COSTANZO, RANDY FEATHERS, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR., Certificate of Service.(TANNER, MARK) (FILED IN ERROR BY ATTY; COPY FORWARDED TO JUDGE FOR APPROVAL) Modified on 1/27/2016 (md). (Entered: 01/26/2016) |
| 01/27/2016 | 23 | STIPULATION AND ORDER THAT PLAINTIFFS SHALL RESPOND TO MOTIONS TO DISMISS AND/OR FILE AN AMENDED COMPLAINT BY 2/29/2016. SIGNED BY HONORABLE HARVEY BARTLE, III ON 1/27/16. 1/27/16 ENTERED AND COPIES E−MAILED. (va, ) (Entered: 01/27/2016) |
| 02/25/2016 | 24 | NOTICE of Appearance by FORTUNATO N. PERRI, JR on behalf of E. MARC COSTANZO (PERRI, FORTUNATO) (Entered: 02/25/2016) |

| 02/26/2016 | 25 | NOTICE of Withdrawal of Appearance by MARK W. TANNER on behalf of E. MARC COSTANZO(TANNER, MARK) (Entered: 02/26/2016) |
|---|---|---|
| 02/26/2016 | 26 | AMENDED COMPLAINT against CHRISTOPHER BRENNAN, KATHLEEN KANE, MICHAEL MILETTO, PHILADELPHIA DAILY NEWS, PHILADELPHIA MEDIA NETWORK (DIGITAL) LLC, PHILADELPHIA MEDIA NETWORK, LLC, filed by RANDY FEATHERS, E. MARC COSTANZO, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR. Jury Demand. Exhibits. (va, ) (Entered: 02/26/2016) |
| 03/02/2016 | 27 | ORDER DENYING MOTIONS 19 20 21 TO DISMISS AS MOOT. SIGNED BY HONORABLE HARVEY BARTLE, III ON 3/1/16. 3/3/16 ENTERED AND COPIES E–MAILED. (va, ) Modified on 3/4/2016 (md). (Entered: 03/03/2016) |
| 03/04/2016 | 28 | STIPULATION AND ORDER THAT MEDIA DEFENDANTS ANSWER BY 4/1/2016. SIGNED BY HONORABLE HARVEY BARTLE, III ON 3/4/16. 3/4/16 ENTERED AND COPIES E–MAILED. (va, ) (Entered: 03/04/2016) |
| 03/09/2016 | 29 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by KATHLEEN KANE.. (Attachments: # 1 Memorandum of Law, # 2 Certificate of Service, # 3 Text of Proposed Order)(ELLIS, EDWARD) (Entered: 03/09/2016) |
| 03/11/2016 | 30 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *(Count III of the First Amended Complaint)* filed by MICHAEL MILETTO.Memorandum, Certificate of Service. (Attachments: # 1 Memorandum, # 2 Text of Proposed Order)(ELLIS, EDWARD) (Entered: 03/11/2016) |
| 03/17/2016 | 31 | STIPULATION for Extension of Time to File Response/Reply as to 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (Count III of the First Amended Complaint) filed by RANDY FEATHERS, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR.(TANNER, MARK) (FILED IN ERROR BY ATTY; COPY FORWARDED TO JUDGE FOR APPROVAL) Modified on 3/21/2016 (md). (Entered: 03/17/2016) |
| 03/21/2016 | 32 | STIPULATION AND ORDER THAT PLAINTIFFS MAY HAVE AN ADDITIONAL TEN DAYS WITHIN WHICH TO FILE THEIR RESPONSE TO THE MOTIONS TO DISMISS FILED BY DEFENDANTS KANE AND MILETTO, AND PLAINTIFFS WILL FILE THEIR RESPONSES TO BOTH MOTIONS ON OR BEFORE APRIL 1, 2016. SIGNED BY HONORABLE HARVEY BARTLE, III ON 3/21/16. 3/21/16 ENTERED AND COPIES E–MAILED. (va, ) (Entered: 03/21/2016) |
| 03/21/2016 |  | Set/Reset Deadlines as to 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. RESPONSES DUE BY 4/1/2016. (md) (Entered: 03/29/2016) |
| 03/28/2016 | 33 | STIPULATION AND ORDER THAT THE MEDIA DEFENDANTS MAY FILE A BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS THAT IS UP TO 40 PAGES LONG. PLAINTIFFS WILL FILE A RESPONSE TO THE MEDIA DEFENDANTS ' MOTION ON OR BEFORE 4/29/16, WHICH MAY BE EQUAL IN PAGE LENGTH TO THE MEDIA DEFENDANTS' BRIEF. SIGNED BY HONORABLE HARVEY BARTLE, III ON 3/28/16. 3/28/16 ENTERED AND COPIES E–MAILED. (va, ) (Entered: 03/28/2016) |
| 04/01/2016 | 34 | RESPONSE to Motion re 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by E. MARC COSTANZO, RANDY FEATHERS, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR. (TANNER, MARK) (Entered: 04/01/2016) |
| 04/01/2016 | 35 | RESPONSE to Motion re 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *(Count III of the First Amended Complaint)* filed by E. MARC COSTANZO, RANDY FEATHERS, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR. (TANNER, MARK) (Entered: 04/01/2016) |
| 04/01/2016 | 36 | MOTION to Dismiss *All Claims Against Them in First Amended Complaint* filed by CHRISTOPHER BRENNAN, PHILADELPHIA DAILY NEWS, PHILADELPHIA MEDIA NETWORK (DIGITAL) LLC, PHILADELPHIA MEDIA NETWORK, LLC.Memorandum in Support, Certificate of Service. (Attachments: # 1 Exhibit A–F, # 2 Exhibit G–L, # 3 Exhibit M–R, # 4 Exhibit S–Y)(SEGAL, ELI) (Entered: 04/01/2016) |

| | | |
|---|---|---|
| 04/07/2016 | 37 | STIPULATION AND ORDER TO EXTEND TIME FOR DEFENDANTS KANE AND MILETTO TO FILE THEIR REPLY BRIEFS IN SUPPORT OF THEIR MOTIONS TO DISMISS BY 4/15/2016. SIGNED BY HONORABLE HARVEY BARTLE, III ON 4/7/16. 4/7/16 ENTERED AND COPIES E–MAILED. (va, ) (Entered: 04/07/2016) |
| 04/15/2016 | 38 | REPLY to Response to Motion re 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by KATHLEEN KANE. (ELLIS, EDWARD) (Entered: 04/15/2016) |
| 04/15/2016 | 39 | REPLY to Response to Motion re 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *(Count III of the First Amended Complaint)* filed by MICHAEL MILETTO. (ELLIS, EDWARD) (Entered: 04/15/2016) |
| 04/29/2016 | 40 | RESPONSE in Opposition to the Media Defendants' Motion to Dismiss re 36 MOTION to Dismiss All Claims Against Them in First Amended Complaint, filed by E. MARC COSTANZO, RANDY FEATHERS, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR. (TANNER, MARK) Modified on 5/3/2016 (md). (Entered: 04/29/2016) |
| 05/06/2016 | 41 | REPLY to Response to Motion re 36 MOTION to Dismiss *All Claims Against Them in First Amended Complaint , certificate of service,* filed by CHRISTOPHER BRENNAN, PHILADELPHIA DAILY NEWS, PHILADELPHIA MEDIA NETWORK (DIGITAL) LLC, PHILADELPHIA MEDIA NETWORK, LLC. (SCHWARTZ, MICHAEL) (Entered: 05/06/2016) |
| 07/19/2016 | 42 | MEMORANDUM SIGNED BY HONORABLE HARVEY BARTLE, III ON 7/19/16. 7/19/16 ENTERED AND COPIES E–MAILED. (va, ) (Entered: 07/19/2016) |
| 07/19/2016 | 43 | ORDER THAT THE MOTION OF DEFENDANT KATHLEEN G. KANE TO DISMISS COUNTS I THROUGH VI OF THE FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM (DOC. # 29 ) IS GRANTED; THE MOTION OF DEFENDANT MICHAEL MILETTO TO DISMISS COUNT III OF THE FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM (DOC. # 30 ) IS GRANTED; THE MOTION OF DEFENDANT CHRISTOPHER BRENNAN TO DISMISS COUNT III OF THE FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM (DOC. # 36 ) IS GRANTED; PURSUANT TO 28 U.S.C. § 1367(C)(3), COUNTS VII AND VIII OF THE FIRST AMENDED COMPLAINT ARE DISMISSED WITHOUT PREJUDICE; AND THE CLERK SHALL MARK THIS CASE CLOSED AS NO CLAIMS REMAIN. SIGNED BY HONORABLE HARVEY BARTLE, III ON 7/19/16. 7/19/16 ENTERED AND COPIES E–MAILED. (va, ) (Entered: 07/19/2016) |
| 08/04/2016 | 44 | NOTICE OF APPEAL as to 43 Order (Memorandum and/or Opinion), by RANDY FEATHERS, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR. Filing Fee: Not Paid. Copies to Judge, Clerk USCA, Appeals Clerk, Certificate of Service.(TANNER, MARK) Modified on 8/5/2016 (md). (Entered: 08/04/2016) |
| 08/04/2016 | 45 | NOTICE OF APPEAL as to 43 Order (Memorandum and/or Opinion), by E. MARC COSTANZO. Filing Fee: Not Paid. Copies to Judge, Clerk USCA, Appeals Clerk, Certificate of Service. (PERRI, FORTUNATO) Modified on 8/5/2016 (md). (FILED IN ERROR – TO BE REFILED WITH CORRECTED PDF) (va, ). (Entered: 08/04/2016) |
| 08/05/2016 | 46 | NOTICE OF APPEAL as to 43 Order (Memorandum and/or Opinion), by E. MARC COSTANZO, Certificate of Service. Filing fee: Not Paid. Copies to Judge, Clerk USCA, Appeals Clerk.(PERRI, FORTUNATO) Modified on 8/8/2016 (md). (Entered: 08/05/2016) |
| 08/05/2016 | | USCA Appeal Fees received $ 505 receipt number PPE144761 re 44 Notice of Appeal filed by RANDY FEATHERS, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR. (va, ) Modified on 8/8/2016 (va, ). (Entered: 08/08/2016) |
| 08/09/2016 | | NOTICE of Docketing Record on Appeal from USCA re 44 Notice of Appeal, filed by RANDY FEATHERS, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR.. USCA Case Number 16–3311 (dmc, ) (Entered: 08/09/2016) |

| 08/09/2016 | | NOTICE of Docketing Record on Appeal from USCA re 46 Notice of Appeal filed by E. MARC COSTANZO. USCA Case Number 16–3312 (dmc, ) (Entered: 08/09/2016) |
|---|---|---|
| 09/12/2016 | | USCA Appeal Fees received $ 505 receipt number PPE146631 re 46 Notice of Appeal filed by E. MARC COSTANZO. (va, ) (Entered: 09/13/2016) |
| 10/26/2016 | 47 | MOTION for Relief Under 60B *TO VACATE ORDER GRANTING DEFENDANT KANES MOTION TO DISMISS PLAINTIFFS AMENDED COMPLAINT AND SEEKING LEAVE TO FILE A SECOND AMENDED COMPLAINT* filed by RANDY FEATHERS, FRANK FINA, FRANK NOONAN, RICHARD A. SHEETZ, JR.Memorandum. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D & E)(TANNER, MARK) (Entered: 10/26/2016) |
| 11/10/2016 | 48 | RESPONSE to Motion re 47 MOTION for Relief Under 60B *TO VACATE ORDER GRANTING DEFENDANT KANES MOTION TO DISMISS PLAINTIFFS AMENDED COMPLAINT AND SEEKING LEAVE TO FILE A SECOND AMENDED COMPLAINT* filed by KATHLEEN KANE, MICHAEL MILETTO. (ELLIS, EDWARD) (Entered: 11/10/2016) |
| 11/14/2016 | 49 | Memorandum OF LAW IN OPPOSITION re 47 MOTION for Relief Under 60B *TO VACATE ORDER GRANTING DEFENDANT KANES MOTION TO DISMISS PLAINTIFFS AMENDED COMPLAINT AND SEEKING LEAVE TO FILE A SECOND AMENDED COMPLAINT* filed by CHRISTOPHER BRENNAN. (SEGAL, ELI) (Entered: 11/14/2016) |
| 11/21/2016 | 50 | NOTICE by E. MARC COSTANZO re 47 MOTION for Relief Under 60B *TO VACATE ORDER GRANTING DEFENDANT KANES MOTION TO DISMISS PLAINTIFFS AMENDED COMPLAINT AND SEEKING LEAVE TO FILE A SECOND AMENDED COMPLAINT Joinder* (PERRI, FORTUNATO) (Entered: 11/21/2016) |
| 12/02/2016 | 51 | MEMORANDUM SIGNED BY HONORABLE HARVEY BARTLE, III ON 12/2/16. 12/2/16 ENTERED AND COPIES E–MAILED. (va, ) (Entered: 12/02/2016) |
| 12/02/2016 | 52 | ORDER DENYING 47 MOTION TO VACATE ORDER IS DENIED. SIGNED BY HONORABLE HARVEY BARTLE, III ON 12/2/16. 12/2/16 ENTERED AND COPIES E–MAILED. (va, ) (Entered: 12/02/2016) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FRANK NOONAN
     and
RANDY FEATHERS
     and
RICHARD A. SHEETZ, JR.
     and
E. MARC COSTANZO
     and
FRANK FINA
     Plaintiffs

     v.

KATHLEEN KANE
Office of the Attorney General,
16th Floor Strawberry Square
Harrisburg, PA 17120
     and
MICHAEL MILETTO
Office of the Attorney General,
16th Floor Strawberry Square
Harrisburg, PA 17120
     and
CHRISTOPHER BRENNAN
801 Market Street
Philadelphia, PA 19107
     and
PHILADELPHIA DAILY NEWS
801 Market Street, Suite 300
Philadelphia, PA 19107
     and
PHILADELPHIA MEDIA NETWORK
(DIGITAL) LLC
801 Market Street, Suite 300
Philadelphia, PA 19107
     and
PHILADELPHIA MEDIA NETWORK, LLC
801 Market Street, Suite 300
Philadelphia, PA 19107
     Defendants.

CIVIL ACTION:     2:15-cv-06082

JURY TRIAL DEMANDED

**FIRST AMENDED COMPLAINT**

<u>**PRELIMINARY STATEMENT**</u>

1.      In January of 2013, Defendant Kathleen Kane was sworn in as the Attorney General for the Commonwealth of Pennsylvania.  Upon assuming office, Defendant Kane has misused the power of her office, and its publicly funded resources, for the purpose of silencing her critics through a pattern of intimidation, attempted blackmail, and vindictive retaliation against those persons who have lawfully exposed Defendant Kane's falsehoods, unlawful activities,  and violations of her oath of office.

2.      This is a civil action for compensatory and punitive damages and for injunctive relief against Pennsylvania Attorney General Kathleen Kane ("Kane" or "the Attorney General") and others for retaliatory violations of plaintiffs' right to freedom of speech under the First Amendment of the United States Constitution, conspiracy, defamation, false light and invasion of privacy.  It is fundamental to every American citizen's relationship with government that he or she be free to speak openly about their government and its elected officials without fear of retribution or retaliation by the vast powers of that government.  Kane has continuously abused and misdirected the power of her office for personal and unconstitutional ends against these plaintiffs.

3.      Plaintiffs exercised their First Amendment rights as citizens to speak out and expose the illegal actions of public officials, including Kane, to publicly rebut inaccurate and false statements concerning matters of important public interest made and endorsed by Kane, to expose unethical conduct by Kane and her office, and by the honest provision of sworn statements in support of a legal action that sought the recusal of the Attorney General and the

enforcement of a lawful and appropriate plea agreement that the Attorney General had refused to honor.

4.      Following plaintiff's lawful exercise of free speech, the defendant Kane launched a vendetta against plaintiffs that was fueled by the defendant's criminal actions and abuse of government powers.

5.      In November of 2012, Kane was elected Attorney General after running a hostile campaign that accused the prior Attorney General and his professional staff, including the Plaintiffs, of incompetence and political maneuvering in its investigation and prosecution of Jerry Sandusky, a former Penn State football coach convicted of the sexual abuse of numerous boys.  During the political campaign, Kane's statements that demeaned the work and the motives of the Plaintiffs amounted to little more than campaign rhetoric that, while cynical and inaccurate, were not unlawful.

6.      Upon being elected, however, Kane continued her assault on the plaintiffs, and began to use the estimable power of her office to retaliate and punish the plaintiffs when they publicly defended themselves against Kane's false accusations or provided evidence against her and her office as responsible citizens.  What was simply political grandstanding during the campaign became a program of unconstitutional retaliation when Kane assumed the mantle of office.

7.      As Attorney General, Kane's actions against the plaintiffs violated the United States Constitution, insofar as these actions infringed upon plaintiffs' right to engage in lawful speech free of government retaliation.  Indeed, Kane, while acting under the color of law, took extraordinary and criminally unlawful measures to defame the plaintiffs, using the powers of her

office to release sealed grand jury materials and to construct and publish false and outlandish claims against the plaintiffs that included ugly allegations of racism and child pornography.

8.      Kane's first act of retaliation was directed at plaintiffs Fina and E. Marc Costanzo ("Costanzo"),  career prosecutors who had for several years prior to Kane's election developed a wide-ranging corruption investigation of Philadelphia elected officials who took bribes from Tyron Ali, a former lobbyist who became an agent for the Commonwealth following his arrest for government contractor fraud.

9.      Ali proved to be an unusually effective agent whose unprecedented work on the public corruption investigation ("Ali Bribery Investigation") together with the presentation of substantial exculpatory evidence in the case against Ali, caused Fina to agree to a withdrawal of the criminal case against him in exchange for his ongoing cooperation.

10.     A clear conflict of interest between Kane and the Ali Bribery Investigation should have led Kane to recuse herself from the matter entirely.  She did not.  Instead, in what became pattern for her, Kane took control of the investigation in an effort to both derail it and to advance a personal and political vendetta against the plaintiffs in defiance of her ethical duties of her office.

11.      By way of background, during Kane's transition, Fina informed Kane that she had a conflict of interest with the Ali Bribery Investigation because there was a former political campaign employee, Joshua Morrow ("Morrow"), and a friend of Kane's and significant campaign supporter, now a sitting Judge, who was alleged to have been involved in unlawful campaign fundraising activity involving Ali.  Because of this conflict, Fina sent the investigation to the United States Attorney's office to manage prior to Kane assuming office.

3

12.     Upon assuming office, Kane repudiated this conflict, regained control over the investigation, and then balked at honoring the signed agreement to dismiss the charges against Ali.  In turn, Ali's attorneys sought to compel dismissal of the charges against Ali as originally agreed, and also sought Kane's recusal due to her conflict.  Fina executed an affidavit which attested to the factual accuracy of Ali's motion detailing the conflict of interest, the Ali Bribery Investigation, and the background of the plea agreement.

13.     When Kane's suppression of the Ali Bribery Investigation became public through press reports, Kane retaliated against Fina by fabricating evidence that the Ali Bribery Investigation was driven by racist motives which she then published to the press.  Kane falsely believed that Fina was the source of the public exposure of her termination of this investigation.  In an email to one of her media consultants, Kane sought to justify this action by stating, "This is war."  In so doing, Kane confirmed her retaliatory motive.

14.     When R. Seth Williams, the Philadelphia District Attorney, learned that Kane was refusing to prosecute public officials who were recorded taking bribes, he was publicly critical of that decision and he later accepted a challenge by Kane to prosecute the case himself.   In the course of his own investigation, Williams confirmed there was no evidence of racism, and charged six elected officials who took the bribes, promptly obtaining guilty pleas on five of them.  One other awaits trial.

15.     Kane further retaliated by conspiring with Morrow (over whom she had a conflict of interest due to his role in possible campaign fraud) to unlawfully release grand jury evidence in an attempt to make it appear that plaintiffs Fina and Costanzo had improperly terminated a 2009

4

**A000139**

criminal investigation of J. Whyatt Mondesire who, ironically, was head of the N.A.A.C.P. at the time. As evidence of just how illogical and desperate Kane was in her vendetta to defame Fina and Costanzo at any cost, she told the media that Fina and Costanzo had improperly declined to prosecute a prominent African American leader, while at the same time alleging that these same prosecutors had pursued a racist investigation against African American state representatives in the Ali Bribery Investigation.

16.     The third major act of retaliation arose in the context of Kane's attempts to fulfill her campaign promise that she would conduct an investigation of the Sandusky Investigation. Kane appointed Geoffrey Moulton, Jr., Esquire to direct the investigation. Because the Sandusky Investigation had been conducted by a grand jury, Moulton's investigation had to be monitored and managed by the supervising judge of the grand jury. Kane was originally indifferent to this obligation as it was bound to interfere with the result oriented goals of her politically driven investigation. She relented, however, when the judge intervened.

17.     The judge established ground rules for any public report which required that it include a written response by the plaintiffs if they deemed such a response appropriate. The plaintiffs did submit this court mandated response, and it was reviewed and incorporated by the Attorney General before release of the final report. In that response, plaintiffs were highly critical of the Attorney General. They stated that the "ill advised" Moulton investigation and report were "born of political opportunism and posturing." The response described the criticism of the Sandusky Investigation as false and unwarranted and called the claims that led to the report "ill-informed and unfounded." Plaintiffs further described the report as little more than an "exercise

5

in second guessing" undertaken solely "to sift for criticism."  Plaintiffs' response also characterized the report as wholly rebutting all of the criticism that had been leveled by Kane during her campaign.

18.      In a direct reaction to the plaintiffs' response, Kane convened a press conference where she knowingly voiced completely fabricated allegations that plaintiffs' alleged delays in the Sandusky investigation gave Sandusky the opportunity to sexually abuse two more children who would have otherwise been unharmed.  This false and horrendous allegation, that children were victimized because prosecutors dallied for political purposes, was intentionally designed to place a terrible professional stain on the reputation of career public servants.  Kane later, through her spokesperson, admitted these allegations were not true.

19.      Kane's retaliation did not end there.  Kane searched for and reconstituted numerous deleted emails that contained off-color and, in some cases, adult materials.   While many of the emails were received from individuals outside of the Attorney General's office, they were often forwarded by employees within the office and some were received by the plaintiffs.  While some of these emails were offensive, irreverent and in bad taste, there was nothing illegal in their content.

20.      Kane, who was solely in possession of these emails, worked through her media contacts to arrange a national interview with CNN in which she accused the plaintiffs of viewing child pornography in these emails.  This horrific allegation is entirely false and was, and is, devastating to the reputations of men sworn to investigate and punish such activity.

6

21.     The interview was pre-recorded, and Kane had ample opportunity to correct the record before the interview was aired but intentionally chose not to.  After the piece was aired and the damage done, Kane acknowledged there was no child pornography contained in the emails.

22.     Finally, in a further act of retaliation, Kane maliciously and selectively disclosed to the press many of plaintiffs' private emails simply in an attempt to embarrass them and undermine their professional and personal reputations.  Kane continues to threaten plaintiffs, and others, with these emails in an ongoing attempt to intimidate and retaliate.

23.      On at least two occasions, the *Philadelphia Daily News* abetted Kane's unconstitutional and defamatory actions knowingly, and/or in reckless disregard for the truth.  The *Philadelphia Daily News* published an article that implied that plaintiffs Fina and Costanzo improperly terminated a supposedly viable criminal investigation of the head of the Philadelphia N.A.A.C.P.  That article was based on illegally leaked grand jury documents obviously and selectively redacted by Kane to defame Fina and Costanzo after literally declaring "war" on them.  Kane's intent was to defame and disgrace the plaintiffs and the *Philadelphia Daily News* readily abetted her in this goal.

24.     Kane's pattern of falsehoods, distraction and retaliation has been amply displayed through her arrests, the emergency suspension of her license to practice law and her repeated material falsehoods made to the public, the Pennsylvania Supreme Court, the Supervising Judge of a Grand Jury and the members of a Statewide Investigating Grand Jury.

A000142

## I.    JURISDICTION

25.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and the First and Fourteenth Amendments of the United States Constitution.  The cause of action arises under 42 U.S.C. §§ 1983 and 1985.  The claims arose in this judicial district.  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 which provides for supplemental jurisdiction.

## II.    PARTIES

26.    Plaintiff Frank Noonan ("Noonan") is a retired Commissioner of the Pennsylvania State Police, a citizen of the Commonwealth of Pennsylvania and a resident of Lackawanna County, Pennsylvania.

27.    Plaintiff Randy Feathers ("Feathers") is a retired Regional Director of the Attorney General's Bureau of Narcotics Investigation and Control, a citizen of the Commonwealth of Pennsylvania and a resident of Blair County, Pennsylvania.

28.     Plaintiff Rick Sheetz ("Sheetz") was the Executive Deputy Attorney General Directing the Criminal Law Division, and is a citizen of the Commonwealth of Pennsylvania and a resident of Lancaster County, Pennsylvania.

29.    Plaintiff E. Marc Costanzo ("Costanzo") is a former Deputy Attorney General for the Office of Attorney General, and is currently Chief Assistant District Attorney for Special Investigations for the Office of the District Attorney of Philadelphia County.  He is a citizen of the Commonwealth of Pennsylvania and a resident of Philadelphia County, Pennsylvania.

8

30.     Plaintiff Frank Fina is a public prosecutor employed by the Office of the Philadelphia District Attorney, a citizen of the Commonwealth of Pennsylvania and a resident of Philadelphia County, Pennsylvania.

31.     At all times relevant to this lawsuit and presently, defendant Kathleen Kane has been the attorney general for the Commonwealth of Pennsylvania.  She is sued individually and in her official capacity.

32.     At all times relevant to this lawsuit, Defendant Christopher Brennan ("Brennan") was a reporter for The Philadelphia Daily News.  Brennan is a citizen and resident of the Commonwealth of Pennsylvania with a place of business at 801 Market Street, Philadelphia, Pennsylvania.

33.     At all times relevant to this lawsuit, Defendant Michael Miletto ("Miletto") was an investigator for the Pennsylvania Office of Attorney General ("OAG").   Miletto is a citizen of and resident the Commonwealth of Pennsylvania with a place of business at Office of the Attorney General, 16th Floor Strawberry Square, Harrisburg, Pennsylvania.  He is sued individually and in his official capacity.

34.     Defendant Philadelphia Media Network (Digital) LLC and Philadelphia Media Network, LLC (collectively "PMN") is a Pennsylvania corporation that employed defendant Brennan, and that owns and operates the *Philadelphia Daily News* and Philly.com and is responsible for the content of its publication.  At all relevant times, PMN were corporations and citizens of, or have their principle place of business at 801 Market Street, Suite 300, Philadelphia in the

9

A000144

Commonwealth of Pennsylvania.  The publications described herein were targeted to and sold in the Pennsylvania and/or national marketplace.

> **A.    Plaintiffs' Backgrounds**

> > 1.    **Frank Noonan**

35.    Plaintiff Noonan has had a lengthy and honorable career in government service.  Noonan served as Commissioner of the Pennsylvania State Police, appointed by then Governor Corbett on January 18, 2011.  He retired from that position on January 18, 2015.

36.    Prior to his work as head of the Pennsylvania State Police, Noonan served honorably in the United States Marine Corps from 1968 until 1970 and was awarded the Bronze Star for his service in Vietnam.  Upon his discharge from the Marine Corps, Noonan joined the Federal Bureau of Investigation ("FBI") as a Special Agent where he served for 27 years.  Following his retirement from the FBI, Noonan was appointed as a regional director for the Office of the Pennsylvania Attorney General Narcotics Investigation and Drug Control for the northeast region of Pennsylvania.

37.    In 2009, Noonan was promoted to Chief of Investigations for the Attorney General's Office.

38.    Noonan is a graduate of West Chester State University.

> > 2.    **Randy P. Feathers**

39.     Plaintiff Feathers is a graduate of the Pennsylvania State University and Indiana University of Pennsylvania.  He is also a graduate of the Metropolitan Police Academy in

10

A000145

Washington, D.C., the Pennsylvania State Police Municipal Academy and the Pennsylvania Office of Attorney General Academy.

40.     Feathers began his law enforcement career in 1981 with the Washington, D.C. Police Department.  He joined the Altoona Police department in 1982 and was appointed as a narcotics agent for the OAG in 1988.

41.     As the director of the Blair County Task Drug Task Force from 1997 to 2005, he supervised over 5,000 narcotics investigations.  Pennsylvania attorneys general Mike Fisher, Gerald Pappert, and Tom Corbett all called his Blair County Drug Task Force "a model that we will use throughout the state."

42.     In 2005, Feathers was named as the regional director for the State College Office of the Attorney General's Bureau of Narcotics Investigation and Drug Control.

43.     In September 2012, Governor Corbett appointed Feathers to the Commonwealth Board of Probation and Parole.  His appointment was unanimously approved by the Pennsylvania Senate on October 3, 2012.

44.     Feathers has served on several community boards, such as Blair County Children and Youth, Blair County Drug and Alcohol, and the Booker T. Washington Revitalizing Committee.

### 3.     Richard A. Sheetz, Jr.

45.      Plaintiff Sheetz is a graduate of Rutgers College and Temple University Law School. From 1987 to 2013, Sheetz was employed as an attorney at the OAG.

11

46.     From 2004 to 2014, Sheetz held the post of Executive Deputy Attorney General, where, as the director of the Criminal Law Division, he supervised overall functions and operations of criminal prosecutions statewide.

47.     Prior to that, Sheetz headed the OAG's Criminal Prosecution Section responsible for environmental crimes, insurance fraud and Medicaid fraud from 1996-2004.  Prior to that, he supervised a unit of nine attorneys in the Drug Prosecution and Forfeiture Section.

48.     From 1996 to 2013, Sheetz was a member of the Pennsylvania Municipal Police Officers' Education and Training Commission.

49.     From 2006-2011, Sheetz was a member of the Pennsylvania Supreme Court Criminal Procedural Rules Committee.

50.     From 2005-2011, Sheetz was the OAG representative to the Pennsylvania Commission on Crime and Delinquency.

### 4.     E. Marc Costanzo

51.     Plaintiff Costanzo is a graduate of Temple University and the University of Baltimore Law School.  From 1987-1993, Costanzo served as Assistant District Attorney in Philadelphia. From 1993 to 2012, Costanzo was employed as a deputy attorney general in the Criminal Prosecution Section of the OAG.

52.     From 2012 to the present, Costanzo has been employed as chief of the Special Investigations Division of the Office of District Attorney for Philadelphia County.

53.      Costanzo also served as a Special Assistant United States Attorney in the Eastern District of Pennsylvania.

A000147

54.     From approximately 2005 to the present, Costanzo has served on the Board of Directors of the Northeast Community Center for Behavioral Health.

55.     From 2003 to the present, Costanzo has served on the Advisory Board of St. Hubert's Catholic High School for Girls in Philadelphia.

56.     From 1980 to 1998, Costanzo served on the Board of Directors of the Frankford Boys Club.  From 1998 to the present, Costanzo has served on the Board of Directors of the Crispin Garden Athletic Club.

### 5.     Frank Fina

57.     Frank Fina has practiced law in the Commonwealth of Pennsylvania for more than 20 years.  He graduated from Dickinson College in 1987, and received his law degree from George Washington University in 1992.

58.     From 2002 until 2013, Fina served in the OAG, reaching the rank of Chief Deputy Attorney General where he headed the Criminal Prosecution, Public Corruption, Tax Crimes and Child Predator Sections.  During his tenure with the OAG, Fina worked under five different Attorney Generals as he successfully investigated and prosecuted complex public corruption cases that led to the conviction of 24 state representatives and officials of the Pennsylvania state legislature.

59.     Fina enjoys a statewide reputation as a prosecutor dedicated to the investigation and prosecution of public corruption.

13

60.     Fina enjoys an excellent reputation generally in the Pennsylvania legal community and was awarded the 2012 National District Attorney Association "Home Run Hitter" Award for Outstanding Trial Prosecutor.

61.     Fina was appointed by the Pennsylvania Supreme Court as a member of the Criminal Rules Committee.

B.     **Events Giving Rise to the Action**

1.     **Kathleen Kane's 2013 Campaign for Attorney General Focuses on the Sandusky Investigation**

62.     In June 2009, the OAG, then headed by Thomas Corbett ("Corbett"), convened a grand jury investigation into allegations that Jerry Sandusky ("Sandusky"), a prominent football coach for Penn State University, had engaged in a long-term pattern of predatory sexual abuse of young boys.  The Sandusky Investigation spanned 30 months and resulted in the indictment of Sandusky for 45 counts of child sex abuse.

63.     While the Sandusky Investigation began under the stewardship of Corbett, it was ultimately assumed by Linda Kelly, who was appointed Attorney General to complete Corbett's unexpired term after Corbett was elected governor.  As a practical matter, the investigation had been run by Fina who, in 2009, was the OAG Chief Deputy Attorney General in charge of, amongst other units, the Child Predator Section.  Fina worked closely with Noonan on the Sandusky Investigation, as Noonan was the Commissioner of the Pennsylvania State Police at the time.  Feathers was the Sandusky Investigation's lead investigator for the OAG.

14

64.     Sheetz, who was the OAG Executive Deputy Attorney General Directing the Criminal Law Division, likewise played an active role in the supervision of the Sandusky Investigation.

65.     Fina was the Commonwealth's lead attorney in the investigation, prosecution, and trial of Sandusky.  Costanzo made public statements and addressed the media on behalf of the prosecution team following Sandusky's arrest.

66.     On June 22, 2012, a Centre County jury returned a guilty verdict on 43 counts of the Sandusky indictment, and on October 9, 2012, Sandusky was sentenced to a term of imprisonment of 30-60 years.

67.     In 2012, the position of Attorney General became the subject of an open election since Corbett had resigned to run for governor, and his appointed replacement Linda Kelly had agreed not to run for the office.

68.     In or about February 2012, Kane announced her candidacy for Attorney General.

69.     In June, shortly after the verdict in the Sandusky trial, Kane gave an interview congratulating the OAG on its fine work in procuring a conviction of Sandusky.

70.     It was not long, however, before Kane realized that she could exploit the Sandusky case for political advantage and, with that in mind, she began to level unjustified attacks on the course and manner of the investigation.

71.     Accordingly, less than a month after she congratulated the Sandusky prosecutors, Kane began a mantra of criticism of the Sandusky Investigation which grew into the touchstone of her campaign which she eventually rode to victory.

15

72.     Kane set forth a five-part platform for her Sandusky Investigation campaign attack that included the following assertions: (1) that charges should have been brought against Sandusky within thirty (30) days of the date the first victim came forward; (2) that the case should never have been put in front of a grand jury, and the fact that it was constituted evidence that those who were running the investigation wished to delay it; (3) that inadequate resources were given to the case; (4) that Corbett engaged in a political conspiracy to attack Penn State, but did it in a way that fitted his political ambition to run for governor; and (5) that, if elected, she would initiate an investigation to learn about why these things allegedly occurred in the Sandusky Investigation.

73.     Kane campaigned on this Sandusky Investigation platform notwithstanding the fact that parts of the case remained under active investigation and had yet to go to trial.  Nearly three years later, none of the related cases charged before Kane took office have gone to trial and other open investigations have apparently disappeared.

74.     Although Kane's politically opportunistic platform was without merit, with the exception of Randy Feathers, those involved in the Sandusky investigation and prosecution, including Fina, Noonan, Costanzo and Sheetz, remained silent and did not publicly respond to Kane's criticism.

75.     Feathers, however, refused to sit silently while Kane tried to take political advantage of this emotionally charged case.

76.     Accordingly, Feathers made many public statements to the press which refuted Kane's claims, including an October 2012 pre-election interview on the WABC's national television news magazine 20/20 where he effectively stated that Kane's criticism of the Sandusky investigation was wrong because she was uninformed and lacked knowledge.  He also refuted

16

**A000151**

her allegation that the Sandusky investigation was deliberately slowed down to avoid political fallout with Penn State alumni voters.

77.     In November 2012, Kane won the election and became the Attorney General elect.

78.     Following her taking office, in February of 2013 Kane appointed attorney Moulton to head an inquiry into the Sandusky Investigation.

79.     Upon accepting the task of reviewing the Sandusky Investigation, Moulton contacted Fina to seek his cooperation.

80.     Fina openly questioned the legality of an investigation that inquired into grand jury matters which, by law, were to be kept as confidential.  Fina expressed these concerns to Moulton, and later challenged Kane's authority to conduct the investigation without the direct oversight of the grand jury's supervising judge and the establishment of clear safeguards to limit political grandstanding during the process.

81.     Fina's challenge came in the form of a variety letters to Moulton and motions to the supervising grand jury judge.  One of the reasons Kane ultimately retaliated against Fina was this challenge to her authority and the ultimate effect that the challenge had- the direct involvement of the grand jury supervising judge who established a protocol for how the investigation would proceed.  This protocol included the right of Fina to have his interviews video-recorded and the right of Fina and others involved in the Sandusky Investigation to read an advance copy of the final report and draft a response to be reviewed by the grand jury supervising judge, together with Moulton's final report.  Fina's actions effectively curtailed Kane's ability to conduct the

17

type of one-sided political investigation of the Sandusky Investigation she had originally intended.

82.     Because of the active involvement of the grand jury supervising judge, and the right of Fina and the other Sandusky investigators to issue a public response with the publication of Moulton's report, Kane's ability to control the process of her investigation, and to pre-ordain the outcome to suit her political purposes, was substantially diminished and gave impetus to her desire to retaliate against Fina and others.

> ### 2.     The Ali Bribery Investigation, Kane's Conflict of Interest, and Kane's False Accusation of a Racially Motivated Prosecution.

83.     In 2013, after taking office, Kane acted to secretly stop and destroy the viability of a long term undercover investigation into public corruption involving illegal lobbying and bribery of elected officials and others.  When these actions were later exposed to the public in 2014, Kane pursued a series of separate abuses of power against Fina, Costanzo, Noonan, and Sheetz.

84.     In 2009, the OAG charged Tyron Ali with fraud and other offenses in connection with his alleged malfeasance in the management of a federally-funded state meal program.

85.     Following his arrest, Ali entered into an agreement with the OAG that called for him not only to supply all information concerning the OAG's investigation into the meal program, but also to serve as an agent for the OAG in its investigation of active public corruption in Pennsylvania.

86.     The cooperation agreement was open-ended and Ali's involvement with the OAG's investigation of public corruption ultimately spanned nearly three (3) years.

18

87.     During that time, Ali was employed as an unpaid civilian agent engaged in continuous operations directed by attorneys and agents of the OAG.  Fina, who was Chief Deputy Attorney General and headed the OAG's Public Corruption Unit, was personally responsible for directing Ali's actions.  Sheetz, who was the Executive Deputy Attorney General, supervised Fina throughout this investigation.  Noonan supervised the investigators assigned to this case until his departure from the OAG to become Commissioner of the Pennsylvania State Police in 2011.  Costanzo was one of the prosecutors who assisted in the investigative efforts.

88.     In collaboration with Fina and OAG investigators, Ali identified elected officials in Philadelphia who he believed were prepared to accept money and other consideration in exchange for their votes and influence.   Philadelphia was chosen primarily because Ali was comfortable with the political landscape there; it was where he made his home and conducted most of his lobbying in the past.

89.     Indeed, Ali paid bribes to more than five elected officials who gave assurances that they would vote for recommended legislation or otherwise provide influence in matters that Ali represented to be of concern to him.

90.     Independent of this assistance to the OAG, Ali also provided detailed exculpatory information on his own case.  In particular, he provided details about the manner in which he operated the program for which he had been criminally charged including a credible accounting of program funds that had been entrusted to him by the state.

91.     At the time of Kane's election, the political corruption investigation was ongoing but, because of a conflict of interest that Fina had discerned between Kane, Ali and other individuals

19

involved in the investigation, Fina transferred the file to the F.B.I. and asked that it assume

responsibility for the investigation.  Fina assumed that Kane would acknowledge the obvious

conflict of interest.  She did not.

92.     During the course of the investigation, Fina had discovered that Kane had a professional

relationship with at least two individuals whom Ali had implicated in possible public

wrongdoing.  During his initial proffer sessions with the OAG, Ali advised investigators that he

had made unlawful cash contributions to a political candidate through his campaign official,

Joshua Morrow.  In addition, Ali admitted that he had made a separate ten thousand dollar

($10,000) contribution in the form of four $2,500 certified checks in the names of four people

who served as straw donors. Ali, in fact, had provided the money for those contributions.

93.     After Ali's arrest, Morrow, on behalf of that candidate, returned the checks to Ali.

94.     Morrow later became a paid employee of Kane's campaign staff and the then former

candidate became a political supporter of Kane.  Indeed, as will be discussed later, Morrow was

held by Kane in high confidence and later served as her agent in the criminal delivery of grand

jury materials she wished to have leaked to the media.

95.     Based upon Ali's extraordinary commitment to the Commonwealth through the OAG's

investigation of public corruption, and in consideration of the substantial exculpatory evidence

he supplied, the OAG entered into an agreement with Ali to dismiss all criminal charges against

him.  The agreement was made explicitly in consideration for Ali's assistance and because of the

substantial exculpatory material he provided in response to the investigation against him.  This

agreement was approved by Fina and his supervisors on behalf of the OAG before Kane took office.

96.     Prior to leaving the OAG, Fina briefed Kane on the Ali case, advised her of his discovery of the conflict of interest, and informed her that he had transferred the case to the F.B.I. in light of that conflict.

97.     In deliberate disregard to this obvious conflict of interest, Kane refused to relinquish possession of the Ali Bribery Investigation, demanded the return of the file from the Federal authorities, refused to prosecute the case and then refused to honor the cooperation agreement and refused to dismiss the charges against Ali pursuant to the plea agreement.

98.     In September 2013, nine months after Kane had taken office, Kane made clear to Ali that she would not pursue the Ali Bribery Investigation at all, nor honor the Ali plea agreement.   Ali then filed a motion seeking the recusal of Kane and the enforcement of his plea agreement.   In support of that motion, Ali obtained an affidavit from Fina setting forth the background of the investigation, Ali's extensive cooperation, and Kane's conflict of interest.

99.     Unable to defend her conduct in court concerning this conflict of interest, Kane agreed to fulfill the terms of the cooperation agreement and dismiss the charges against Ali.  Kane dismissed the charges against Ali in November of 2013.

100.    Thereafter, between November 2013 and March 2014, Kane set in motion a plan to avenge herself and retaliate against Fina for his lawful disclosure of her conflict of interest and for supporting Ali's efforts to have Kane honor his plea agreement by way of his affidavit.  As part of this vendetta, Kane contrived an account of the Ali Bribery Investigation in which Kane

21

A000156

asserted that the case against the officials who accepted the bribes simply could not be prosecuted on the following grounds: (1) the prosecution was driven by racist motives; (2) consideration afforded Ali in the form of dismissal of all charges rendered his credibility completely worthless; (3) a lack of "quality" in the investigative methods and reports; (4) an absence of "corroborating evidence" beyond hundreds of hours of recordings; (5) a lack of "adequate resources"; (6) that Federal law enforcement officials stated the case was "flawed and not prosecutable"; (7) that Ali told an un-named person that the investigation was limited to the General Assembly's Black Caucus; and (8) that the lead agent assigned to the case, Claude Thomas, stated that he was instructed to "focus only on members of the General Assembly's Black Caucus."  Kane released these accusations in writing to the press on March 14, 2014 and would reiterate them, and others, in public statements throughout March of 2014.  Kane also falsely implied that Fina was responsible for the public disclosure of the Ali undercover investigation.

101.    Kane's accusation that the investigation was driven by racist motives (all of the elected officials who accepted cash were African-American) was wholly fabricated by Kane and her staff, and was published to the media intentionally in an effort to damage the reputation of Fina, Costanzo and others involved in this investigation.  Likewise, all of Kane's accusations and justifications for shutting down and discrediting the bribery investigation were demonstrably false and have been clearly exposed by subsequent investigations and events.

102.    Kane's retaliatory motive was made manifest by an email she wrote to a media strategist shortly after a news report of her role in the Ali Bribery Investigation surfaced. In that email, Kane wrote, "This is war."

103.    Ali, himself, provided a statement to Kane's representatives that race played no role in how the targets were identified. Kane's claim that the principal investigator responsible for Ali, Claude Thomas, himself an African-American, stated that African Americans were intentionally targeted was also a fabrication as was her claim that an F.B.I. agent with knowledge of the investigation also stated that the investigation was driven by race.

104.    Philadelphia District Attorney Seth Williams, likewise reviewed the evidence involved in the investigation and concluded there was no evidence of racism. A Grand Jury in Philadelphia also found no evidence of racism. To his credit, Williams has, to date, obtained four separate felony convictions in these cases that Kane declined to prosecute. In a fifth case, Williams secured a misdemeanor plea and the defendant's own attorney publicly acknowledged there was no evidence of racism in the prosecution. Fina, Noonan and Sheetz also made public statements correcting numerous falsehoods asserted by Kane in her effort to retaliate and justify her termination of this case.

105.    Nonetheless, Kane repeatedly made and directed public statements impugning the investigation as racist and incompetent, while knowing that her repeated claims were false and defamatory.

23

### 3. Kane's Secret and Illegal Release of Grand Jury Documents to Defame Fina and Costanzo

106.     In March of 2014, immediately following the public exposure of her secret termination of

the legislative bribery investigation, in further retaliation against Fina and Costanzo, Kane

initiated a conspiracy to unlawfully release grand jury information involving an unrelated

criminal investigation run by Fina five years earlier in 2009.

107.     By way of background, in 2009, an investigation of J. Whyatt Mondesire, then head of

the Philadelphia chapter of the N.A.A.C.P., emerged from a separate OAG investigation of

Harriett Garrett and her daughter for the theft of state grant money for a job training program.

108.     Garrett was the treasurer for Next Generation Community Development Corporation, a

non-profit entity operated by Mondesire.  Mondesire had transferred responsibilities for the

operation of Next Generation to Garrett, who operated a separate non-profit called Creative

Urban Educational Systems, for which Mondesire was chairman of the board.  Mondesire served

as a paid consultant for Next Generation.  During the investigation of Garrett and her daughter,

the OAG investigated payments to Mondesire by Next Generation for a variety of expenses.

Garrett and her daughter were charged criminally by the OAG.  Later, OAG investigators asked

Garrett and her daughter to assist them with the investigation of payments to Mondesire, but they

refused to give any statements or testify before the grand jury and they could not be compelled to

do so since they were under indictment.  Since there was no one else at Next Generation with

knowledge concerning the payments, that left only Mondesire to explain them.  Under those

circumstances William Davis, the assigned deputy attorney general sought permission from Fina

24

to subpoena Mondesire to the grand jury.  The decision was reached not to subpoena Mondesire to the grand jury because: 1) there was virtually no chance that Mondesire would appear at the grand jury and incriminate himself; and 2) because he was a public figure, authority to subpoena him had to be approved by the Attorney General himself, who at the time was Tom Corbett, and that approval was never provided.

109.    In point of fact, Costanzo had no decision-making authority whatsoever concerning this process.

110.    Without the assistance of Garrett or her daughter who were the only ones who knew the reasons for the payments to Mondesire, there was no way to develop concrete evidence that the payments to Mondesire were in any fashion unlawful, and the investigation could not advance further.  As a result, the investigation came to a standstill.

111.    As Kane continued to search for ways to retaliate against Fina and others, the long dormant Mondesire investigation came to her attention.

112.     In furtherance of this scheme for revenge, Kane personally gathered key confidential grand jury documents and gave them to Morrow, a political associate, with direct instructions that he pass those documents to Christopher Brennan, a reporter for the *Philadelphia Daily News* with whom Morrow had a professional relationship and who Kane and Morrow knew would be receptive and would further their efforts. According to Morrow's own statement, he consciously redacted from these documents the names of all persons other than Costanzo and Fina so that the reported story would only be about them.  It is believed that Morrow (who invoked his constitutional right against self incrimination before the grand jury at one point)

25

specifically told Brennan that he and Kane were looking to air a story critical of Fina and Costanzowhich was otherwise plainly evident from his redactions. Brennan then knowingly obliged by writing precisely the story that Kane and Morrow sought, which disparaged and defamed Fina and Costanzo by suggesting that they impeded the Mondesire investigation and terminated it improperly.

113.    The story, written by Brennan and published by the *Philadelphia Daily News* on June 6, 2014, implies that Fina and Costanzo impeded, obstructed or otherwise terminated a valid criminal inquiry into the payments to Mondesire. In so doing, Fina and Costanzo were cast in a false light and their professional ethics and reputation were maliciously impugned. To date, the *Philadelphia Daily News* has continued to work in concert with Kane and her agents in directing repeated stories, editorials, and opinion pieces that cast Fina and Costanzo in a false light and that specifically seek to impugn their ethics and reputation.

114.    In furtherance of Kane's goals, and in apparent collusion with her and her agents, the Philadelphia Daily News has printed numerous articles, editorials and opinion pieces about the emails of Fina and Costanzo. These include, but are not limited to, editorials on August 28, 2015 and September 9, 2015, and front page stories on September 9, 2015, October 1, 2015 and October 6, 2015. These pieces have consistently cast these plaintiffs in a false context by asserting that Fina and Costanzo, among other things: were the core distributors of the emails, were key to the email controversy; and, have engaged in discriminatory practices. The Philadelphia Daily News has knowingly and purposefully ignored that Fina and Costanzo were

A000161

but two of in excess of over a hundred similarly situated recipients of email chains that originated outside of the OAG.

115.    On June 2, 2015, the Media Defendants learned of plaintiffs' intention of bringing this suit against it and Christopher Brennan when plaintiffs entered into an agreement tolling the statute of limitations for claims against them.  Thereafter, the Media Defendants began to target Fina in articles and editorials with a focus and ferocity that outstripped its treatment of others who had significantly more email activity or engaged in actionable conduct such as Jonathon Duecker.

116.    By way of example, Mr. Duecker was accused by at least two female employees of the OAG of having inappropriately touched them.  Shortly after being named chief of staff to defendant Kane, the OAG human resources office recommended terminating Mr. Duecker for the alleged conduct.  Defendant Kane has ignored that recommendation.  While PMN continues the attack upon Costanzo and Fina, they have done little to no reporting on Kane's decision to retain and promote Mr. Duecker.

117.    In the months following notice to *The Daily News* of Fina's and Costanzo's intention to bring legal claims against it and Brennan, *The Daily News* undertook what amounted to a "full court press" to unfairly demean and diminish the reputations of Fina and Costanzo by mischaracterizing their involvement in the email issue, to the exclusion of all others (with the exception of Justice Eakin), by continually reciting the contents of the e-mails in article upon article, and engaging in an editorial policy to repeatedly demand their termination while ignoring

27

the status of more than a dozen prosecutors in the state Attorney General's Office, and other public officials, who were similarly situated and recipients of the same emails.

118.    Since June of 2015, *The Daily News* ran no less than 35 articles, editorials and columns discussing Fina and Costanzo in connection with the email issue.  In at least six of these articles, *The Daily News* vastly overstates the roles of Fina and Costanzo as the primary responsible persons.  For example:

- An August 27, 2015 article refers to Fina's "extensive porn e-mails" and that he "received plenty of e-mails."

- An August 28, 2015- article referred to Fina as being "the center of the pornography scandal" which is a subjective characterization that is never qualified, explained or justified by the *The Daily News* at any time.

- A September 9, 2015 article purports to describe the psychological profile of people who view pornography.  Sandra Shay, an editor for the newspaper, writes that e-mails were being exchanged in the "hundreds" by "highly placed officials in the Attorney General's Office" and that "many were sent by… Frank Fina"  naming no one else by name.

- An October 10, 2015 article again refers to Frank Fina as "the guy at the center of 'Porngate'" in the story's headline.  Notwithstanding the fact that there was a significant amount of professional staff members in the Attorney General's Office as well was the courts involved in the receipt and forwarding of the subject e-mails, *The Daily News* focused its coverage entirely upon Frank Fina and Marc

28

Costanzo to the point that the only reasonable impression was that they were the leaders and organizers of the offending conduct.  Indeed, there is virtually no mention of others with the exception of the two supreme court justices, Seamus McCaffery and Michael Eakin.

119.    In its obsessive reporting of the subject, *The Daily News* published numerous editorials and opinion columns calling solely for the termination of Costanzo and Fina's employment without commentary or reference to the fact that there were many others on the Attorney General staff, many of whom are still employed there, for which they have asked for no such similar sanction nor even suggested that it may be warranted.  In particular, Kathleen Kane's twin sister, Ellen Granahan, who was elevated to a management position as head of the Attorney General's Child Predator Unit upon Kane's assumption of office, continues in her position without any outcry from *The Daily News*, notwithstanding her similar involvement in the e-mail conduct.  For example:

- An August 28, 2015 editorial recommends that the public ignore the misdeeds of Kane and focus on the issues raised by e-mails instead with particular reference to Frank Fina and Marc Costanzo.

- A September 6, 2015, column by Ronnie Polaneczky calls for Frank Fina to lose his law license.

- A September 9, 2015 editorial again calls for the termination of Fina and Costanzo, while ignoring others identified in the email issue.

29

- On November 20, 2015, *The Daily News* published another editorial demanding an independent investigation and again condemning Fina and Costanzo.

120.    In article after article, *The Daily News* repeatedly referred to the contents of the emails as though it had become the newspaper's mantra to make Fina and Costanzo synonymous with the offending emails in the minds of its readership.

- On August 27, 2015, *The Daily News* graphically describes five of the emails and refers to the volume of emails without specifying numbers or placing them in the context of others who may be involved.

- The next day, August 28th, *The Daily News* again described the contents of the emails of Fina's and Costanzo's released by Kane.

- On October 2, 2015, *The Daily News* wrote an opinion supposedly about emails related to Justice Eakin, but did not miss an opportunity to again provide graphic depiction of emails connected to Fina and Costanzo.

- On October 8, 2015, *The Daily News* published two pieces, a column by Helen Ubinis and an article wherein both describe the contents of emails related to Fina and Costanzo.

- On November 15, 2015, *The Daily News* published an article about the Commonwealth Court's ruling reinstating the pension of Jerry Sandusky, but did

30

not miss an opportunity to again describe allegations pertaining to Fina and Costanzo's emails.

- On November 19, 2015, *The Daily News* published a story in which the head of the Philadelphia Bar Association called for an independent probe on the entire email issue and, again, takes the opportunity to describe, in detail, emails pertaining to Fina and Costanzo.  The only thing new and different about the story was the declaration by the head of the Philadelphia Bar Association calling for the investigation.

- On November 20, 2015, *The Daily News* published an article concerning the potential political side effects to the Philadelphia District Attorney with respect to the email issue and again takes the opportunity to review the same material about the emails published in prior stories, including the story published the day before.

- On December 14, 2015, *The Daily News* published a story concerning the correspondence exchanged between Kane and the Philadelphia District Attorney concerning the District Attorney's request that Kane release all emails as opposed to targeting individuals.  The newspaper again takes the opportunity to graphically describe plaintiffs' emails.

- On December 17, 2015, the newspaper reports on an article published in The Philadelphia Inquirer about offending emails sent and received by Kane's sister,

31

but does not discuss the contents of these emails, portray images from them, or write even another single story about them.

- On December 22, 2015, in an article purporting to address news about the suspension of Kane's law license, *The Daily News* again discussed the contents of Fina's and Costanzo's emails.

121.    With respect to Marc Costanzo, on several occasions *The Daily News* falsely accused him of being one of the prosecutors responsible for sending the offending emails, as opposed to simply being on the receiving end of others who distributed or forwarded them.  In an article published on August 28, 2015, *The Daily News* states that Costanzo "sent, received and deleted" many of the offending emails.  Costanzo was also often mentioned in other articles as a prosecutor who sent or received offending emails without any attempt to qualify the fact that Costanzo was merely a passive recipient and not a distributor, forwarder or endorser of the emails, a key distinction.  See *The Daily News* attached hereto and marked as Exhibit "A."

122.    *The Daily News* also sought to demean Fina and Costanzo and diminish their reputation during this time frame through continual false and inaccurate reporting on allegations of racism in the Ali Bribery Investigation and through their supposed role in an EEOC complaint filed by a female investigator of the Attorney General's Office that was ultimately settled by Kane for nuisance value without any admission of liability.  Although *The Daily News* has never once sought Fina's or Costanzo's comments in connection with these articles, it then, in an opinion

32

column written by Helen Ubinis, criticized Fina and Costanzo for failing to comment on any of the numerous stories published by *The Daily News* on the subject.

123.    *The Daily News* continued its attempts to disparage Fina and Costanzo and damage their public image in stories pertaining to matters collateral to the email issue.  In an article published on October 1, 2015, *The Daily News* ran a story concerning an EEOC complaint that it incorrectly identifies Fina as a target of the claim.  The article states that "Fina is named in the complaint-just below the allegation- as one of the men [plaintiff] believed to be 'primarily responsible for the discrimination' according to sources familiar with the report."  This statement was not true and *The Daily News* published the information without concern for truth.  In this one-sided article, *The Daily News* significantly failed to report that Fina did not know, work with, supervise, or have any direct involvement with the plaintiff.  The article also failed to note that the matter was settled by the Attorney General's Office after Fina had left the office.  The article also referred to other certain alleged misconduct but failed to note that those claims had been rejected by courts.

124.    In November 2015, *The Daily News* published several articles trying to link the emails in question to claims that the Ali bribery investigation was racially motivated.  This one-sided story again tried to cast Fina and Costanzo as racists, but made no mention of the fact that a Philadelphia grand jury specifically found that there was no racial component to the investigation and that four of the six defendants who had pled guilty at the time failed to make any allegations of racial animus.  The story also failed to mention that members of Kane's staff specifically

33

repudiated the alleged basis for the allegation that the Ali bribery investigation had a racial component.

125.    In a December 2, 2015 story that paints Fina as being obsessed with the "sexual antics" of a witness in the public corruption prosecution of state representative William DeWeese, the article fails to mention that none of the other prosecutors or professional staff at the attorney general's office involved in the investigation were interviewed and would have denied the allegations.  Nor does the article mention that the matter only became an issue in the case because defendant DeWeese himself raised issues of sex involving the witness against him and also raised the allegation that one of the witnesses used state money to pay for the breast enhancement of one of defendant's staffers.  The article also attempts to establish legal equivalence of pornographic emails with DeWeese's theft of services case without noting that no individual has ever been charged criminally for personal use of public emails.  The article also intentionally masked the fact that Fina's prosecution of state legislators involved the theft and misuse of millions of dollars of public funds for campaign purposes.

126.    On December 9, 2015, *The Daily News* again tried to link Fina's emails to suggestions that only African Americans were charged in a notorious Philadelphia building collapse case while the white owner of the building and site supervisor were uncharged.  The article depicts Fina as having responsibility for the district attorney's investigation of the building collapse and plainly implies that he responsible for the decision concerning criminal charges when, in fact, he played no role in those decisions.  Indeed, one of the two individuals charged in the case was

arrested at the site by police before the district attorney's office became involved in the investigation.

127.    Notwithstanding the newspaper's repeated attacks on the professional standing, conduct and reputations of Fina and Costanzo, their reporters, columnists and editors never once contacted them to comment, further reflecting the newspaper's principle goal of character assassination.

### 4.    A Criminal Investigation Establishes Kane's Illegal Leak of Grand Jury Materials

128.    Kane's actions directly violated the Criminal History Record Information Act codified at 18 Pa. C.S. § 9101 *et. seq.*  She also violated the Grand Jury Act codified at 42 Pa. C.S. § 4549. Kane has been charged criminally for these actions and for attempting to cover up her role in them by lying to the grand jury.

129.    Kane further conspired with Miletto, who was at all times relevant hereto, an agent of the OAG, to further the retaliatory attack by having Miletto falsely state that Fina and Costanzo had removed him from the Mondesire investigation when Miletto supposedly found evidence of Mondesire's wrongdoing which was ultimately reported by Brennan in the news story. Miletto's statement is false, and was made to lend credibility to the claim that Fina and Costanzo improperly interfered with a valid criminal investigation.

130.    Kevin Wevodau, a former F.B.I. agent who Kane had hired as a special agent in charge of the OAG's Bureau of Criminal Investigations confirmed that Kane's motive could only have been one of retaliation.  He testified before the grand jury investigating Kane stating that "a

review of the Mondesire investigation would have been solely done so that it may be or could have been used against Mr. Fina."

131.     Fina and Costanzo first learned about the unlawful leak of grand jury material in this matter when they were contacted separately by Brennan with a request for comment.  They advised Brennan that he had unlawfully come into possession of sealed grand jury material in violation of state law.  They knew they could not lawfully comment on a sealed grand jury matter, and explained that to Brennan.

132.     Fina and Costanzo dutifully and lawfully then reported this violation of law to the Supervising Judge of the Grand Jury.  The letter of May 8, 2014 advised the Court of a potential leak but did not request any specific action nor imply any knowledge or information regarding the source of the potential leak.

133.     As a result of Fina and Costanzo's report and a preliminary investigation by the Supervising Judge, a special prosecutor was appointed to investigate the leak and the matter was submitted to a grand jury.

134.     That grand jury concluded its investigation with a presentment against Kane in which it recommended charges, concluding that Kane committed perjury in an attempt to cover up her role in the grand jury leak, that she had unlawfully leaked grand jury information and had attempted to obstruct justice. Those charges have now been filed against Kane by the Montgomery County District Attorney.  A preliminary hearing has been held and a Magisterial District Justice found sufficient evidence for all charges against Kane to proceed to the Court of Common Pleas for trial.

135.    In yet a further attempt to retaliate against Fina and Costanzo for their exercise of First Amendment rights in reporting the unlawful grand jury leak, Miletto engaged in acts of physical harassment and intimidation against Fina and Costanzo.

136.    On August 26th, 2014, the day that Fina and Costanzo were subpoenaed to appear before the grand jury to give testimony concerning their knowledge of the leak, they were met at the entrance of the building where the grand jury sits by Miletto and several other agents of the OAG who had obtained knowledge of Fina and Costanzo's grand jury subpoenas and appearance dates.

137.    Miletto and his fellow agents, who were plainly aware that Fina and Costanzo were to appear before the grand jury that day, met them at the entrance of the building where the grand jury was located and Miletto made intimidating, threatening and harassing statements toward Fina and Costanzo.  Miletto and the other agents followed Fina and Costanzo into the elevator as they were proceeding to the grand jury courtroom.  Miletto then attempted to physically intimidate, threaten and harass Fina while he was in the elevator.

138.    As a result of the OAG and Miletto's conduct, the supervising grand jury judge convened a hearing in which he took evidence concerning the intimidation, and the judge was sufficiently concerned about the OAG and Miletto's conduct that he imposed a protective order on August 27th, 2014 to prevent the OAG from engaging in any further attempts at intimidating Fina and Costanzo.  Despite Kane's many attempts to falsely attack and mischaracterize the basis for the Court's protective order, the order has been repeatedly upheld by the Supervising Judge and the Pennsylvania Supreme Court.

A000172

5.      **Moulton's 2014 Report on the Sandusky Investigation and Kane's Fabrication of New Victims**

139.    In May 2014, Moulton completed the report of his review of the Sandusky Investigation.

140.    Pursuant to the protocol established by the supervising grand jury judge, Fina, Sheetz, Feathers and Noonan were given an advance copy of the draft final report with the right to draft a response.  Responses from the plaintiffs were drafted and submitted on June 11th, 2014, and these responses became incorporated into the report.  All of the responses highlighted the fact that Moulton's Report exposed the falsity of Kane's campaign claims and criticisms of the Sandusky investigation.

141.    Upon information and belief, Kane read that report, was aware that it was going to be released to the press and that it did not support her campaign statement due, in significant part, to the plaintiffs' responses.  Accordingly, Kane planned a retaliatory response.

142.    On June 23, 2014, Kane's report and the responses by Fina, Sheetz, Feathers and Noonan were released to the media.  On that same date, Kane convened a press conference in which she made a statement and took questions from reporters.

143.    In that press conference, Kane made statements in retaliation against Fina, Sheetz, Feathers and Noonan for their written response to the report.  She expressly stated that delays in the Sandusky investigation, which were the result of the actions of Fina, Sheetz, Feathers and Noonan, provided Sandusky with the opportunity to assault others and, in fact, Kane alleged that two minors were victimized while the investigation was ongoing.

144.     The statement, which was premeditated and calculated to defame and embarrass Fina,

Sheetz, Feathers, Noonan and Costanzo, was false, and Kane knew it to be false when she made

it.

145.     Kane's statement concerning two new victims was widely reported in the media.

146.     In response to these scandalous allegations, plaintiffs held a press conference, and Fina

responded to Kane by stating that "[investigating the handling of the Sandusky probe] was a

campaign promise she made.  It was a trick she used to get elected and Moulton didn't deliver

for her [in his report].  What's she going to do?  She has to come up with something else

sensational to detract that she [made] a series of falsehoods to the public during the campaign."

This statement, together with others from this press conference, became further cause for Kane's

war of retaliation.  Fina, Feathers and Noonan all publically denounced Kane's statements about

other victims as fabricated and untruthful.

147.     In fact, through a spokesperson, Kane later acknowledged that her public statements

concerning the two additional victims were simply not true.

148.     Kane's next act of retaliation followed a short time after plaintiffs' written and oral

response to the Moulton report.

#### 6.     Kane's Retaliatory Use of Private E-Mails and Attempt to Silence Plaintiffs

149.     In the course of Moulton's review of the Sandusky investigation, the OAG apparently

reviewed a large volume of e-mails that were received and, in some cases forwarded, by

members of the staff of the OAG at the time, which included all plaintiffs.

A000174

150.    Amongst these e-mails were numerous personal e-mails, some of which contained pornographic images.

151.    By July of 2014, Kane was aware that a Special Prosecutor had been appointed to investigate her for the Mondesire Grand Jury leaks and that Fina and Costanzo would be grand Jury witnesses in that investigation.  She had also been recently embarrassed by her false statements about other Sandusky victims in her bid to retaliate against Fina, Noonan, Sheetz, Costanzo and Feathers.  Following these events, Kane sought a way to utilize these emails to retaliate against Fina, Sheetz, Feathers, Costanzo, Noonan and others by threatening to release these personal e-mails which would embarrass them in the event plaintiffs continued with their lawful exercise of free speech that was critical of her conduct.

152.    Upon information and belief, in July and August of 2014, Kane instructed members of her staff to contact members of the media and suggest to them that e-mails existed for which they should make a Right to Know Law request.   When those requests invariably arrived, Kane obtained no fewer than two legal opinions that confirmed she could not lawfully selectively release employees' or former employees' private emails.  She was advised that any decision regarding the release of emails had to be comprehensive.  That is, she needed to release all private emails or none.  Kane proceeded to act in deliberate disregard of these legal opinions.  A court has already made specific factual findings regarding Kane's selected planting of these emails with the media through Right to Know Law requests.  The Opinion of Supervising Judge William Carpenter of December 12, 2014 at Supreme Court Docket 171 MM 2014 details these efforts.

153.    In fact, the OAG under Kane has vigorously argued in an appellate brief before the Commonwealth Court that these same emails are not public record, should remain private, and should not be subject to public release under the Right to Know Law.  Despite acknowledging and advancing this legal position in pleadings as an officer of the court, Kane's own actions contradict the legal position of her office, as she has nonetheless selectively released key emails for the sole purpose of retaliating against those whom she views as a threat or who have spoken out against her.  While the Commonwealth Court was poised to rule on her legal position filed of record which asserts that these emails should not be released under the Right to Know Law, she has at the same time stated publicly at a press conference that she will seek authority from Judge Carpenter to release other emails, and these ongoing efforts are likewise for the obvious purpose of further retaliating against plaintiffs as they have no lawful basis nor other legitimate purpose. Ultimately, the Commonwealth Court ruled that private emails are not agency records and thus not subject to release pursuant to Right to Know requests.

154.    Kane's decision-making with respect to the so-called pornographic emails has been driven by her decision to retaliate against the plaintiffs rather than by the proper service of her office.  As stated above, she has taken contradictory positions on the release of the emails to suit her retaliatory agenda.  She seeks to release the offending emails of those who have exercised their First Amendment rights to her political detriment while taking the official position that the emails are not public records and should not be released to the media pursuant to Right to Know Law requests.  Further, while using the emails to embarrass and harm plaintiffs, she has protected the emails of her allies, friends, family and, in the case of one trusted confident, OAG

41

A000176

agent Louis C. DiTitto who participated in pornographic email traffic, Kane promoted him to a position in OAG management and gave him a 16% pay raise.

155.    In the summer of 2014, after Kane's agents had been advising members of the media to make Right to Know Act requests for private emails, a colleague of Fina had a meeting with David Tyler, the Chief Operating Officer for the OAG.  At that meeting, Tyler advised Fina's colleague that many of the former OAG legal staff's names were connected to private emails containing pornography.  Tyler then told Fina's colleague that a lot of those people are going to be hurt if "Fina does not back off." That threat was plainly understood to mean that Kane would release the emails of people friendly with Fina if Fina did not stop talking to the press and take steps to end the grand jury that was investigating the Mondesire leak.

156.    Fina was informed of these threats and he, in turn, advised the special prosecutor of the grand jury leak investigation.  Upon information and belief, due to the report of these threats, Tyler was confronted with his statements by the prosecutor and admitted to them.

157.    In August of 2014, another colleague of Fina met with James Barker, then OAG Chief Deputy Attorney General for Appeals and Legal Services, and Barker admonished him that he should tell Fina that if Fina did not stop criticizing Kane, Kane would release the private emails of the former OAG staff.

158.    This threat was also conveyed to Fina who conveyed the information to the special prosecutor.

159.    Kane ignored the legal advice she had received concerning the release of e-mails and, on September 23, 2014, she convened a press conference where she made selections of the e-mails of selective former OAG employees available to media.

160.    Those selected by Kane to have their emails released had either spoken out against Kane during her campaign or in connection with the Sandusky Investigation, or were friends or professional associates of Fina, Sheetz, Feathers, Costanzo and Noonan.

161.    The emails were selectively released to retaliate directly against Fina, Sheetz, Feathers, Costanzo and Noonan, individuals who exercised their right to free speech by speaking publicly against Kane and her inappropriate political manipulation of important cases and facts. The e-mail release was done as a means of retaliation for the exercise of free speech protected by the First Amendment.

162.    These e-mails were the private communications of former employees of the OAG and their release was meant solely to embarrass and denigrate the plaintiffs.

> **7.    Kane's Conspiracy With CNN to Publish False Claims That Plaintiffs Had Allegedly Viewed Child Pornography**

163.    By November of 2014, Kane's lengthy efforts to use her office in retaliation had not prevented the Special Counsel or Grand Jury from continuing the investigation into her criminal acts, nor had they stopped the media from publically exposing her misconduct.  In fact, despite her considerable efforts to avoid it, she had to testify before the Grand Jury on November 17, 2014.  Knowing she would be forced to testify on that date and that it would entail considerable negative press coverage, Kane lobbied CNN to produce a story about the emails and CNN

agreed.  This story was specifically designed to defame Fina, Noonan, Sheetz and Feathers, and to distract from Kane's own legal troubles.

164.    The CNN story was produced in early November and broadcast later on November 18, 2014.  In a pre-recorded interview of Kane that was ultimately used in the broadcast story, Kane knowingly, willfully and intentionally made false statements that were defamatory and cast Fina, Feathers and Noonan in a false light.  Kane falsely stated that amongst the emails that had been exchanged, there was child pornography, and Kane made these statements in such a manner as to suggest that Fina, Feathers, Sheetz and Noonan were implicated in the criminal activity of viewing such images. Kane, in effect, accused Fina, Feathers, Sheetz and Noonan of possessing and/or distributing pornography which is not only grossly immoral, but is a felony under state law and federal law.

165.    Below is a transcript of the CNN segment:

> SCIUTTO (CNN CORRESPONDENT): Tonight, stunning allegations about dozens of Pennsylvania officials, including some who investigated former Penn State assistant football coach Jerry Sandusky. Sandusky as you probably now is now serving a 30-to-60 year sentence for sexually abusing more than a half dozen boys over a decade. It took years before he was charged and brought to trial. A lag that's drawn fire from many people. Now Pennsylvania's attorney general claims that many of the officials who worked on the Sandusky sex abuse case were at the exact same time breaking the law by using their work computers to share hardcore porn. On top of that, she said that a gag order is keeping her from completing her investigation. Here's CNN investigative correspondent Sara Ganim.
>
> SARA GANIM, CNN CORRESPONDENT: Dozens of state officials in Pennsylvania, many who worked to bring down the infamous child molester Jerry Sandusky have been caught exchanging crude pornographic emails written on state email accounts, state computers and on state time, according to the state's attorney general.

44

**A000179**

In all, more than 4,000 sexually explicit emails were circulated between about 50 people, many state employees, over a four-year period starting in 2008. Some of them at the very same time that the very same people were building a child sex abuse case against Sandusky. And the porn being passed around was not for the faint of heart.

KATHLEEN KANE: When I saw them, they literally took my breath away. And they are deplorable. Hardcore, graphic, sometimes violent emails that had a string of videos and **pictures depicting sometimes children**, old women, some of them involved violent sexual acts against women.

Good morning.

GANIM: The emails were discovered by State Attorney General Kathleen Kane, who ran for office on the promise that she would investigate why it took three years to charge Sandusky after his first victim came forward. While looking into that, her office uncovered the pornographic emails. Those involved in the scandal include some of the biggest names in Pennsylvania's justice system, a state Supreme Court justice Seamus McCaffery, the State Police Commissioner Frank Noonan and one of the main Sandusky investigators Randy Feathers. The emails are so graphic, the chief justice of the State Supreme Court wrote that they are clearly obscene and may violate the crimes code section on obscenity." But now incredibly, Kane says she can't do a thing about it, can't investigate further, can't name any names that have not already been made public.

But are you investigating this right now?

KANE: We are not investigating it.

GANIM: Why not?

KANE: I cannot investigate. I am being stopped from performing my duties as attorney general, my office is being stopped from certain investigations, and we are being stopped even from telling why.

GANIM: So, I'm hearing you say that your hands are tied. Why are your hands tied?

KANE: My hands are tied and this will be frustrating for you because it's just as frustrating for me. My hands are tied because there are court orders that don't allow us to say certain things, which I believe the public needs to know.

A000180

GANIM (voice over): To understand why, you have to go back to a public and very bitter feud between Attorney General Kathleen Kane and the main prosecutor in the Sandusky case Frank Fina. It started with her criticism of how Fina handled Sandusky. The two have been lobbying allegations against each other about whether several cases have been handled correctly. As a result, Kane is now being investigated about whether she improperly leaked a memo about a case from 2009 that Fina handled. And according to the "Philadelphia Inquirer," a gag order in that case is keeping Kane from moving forward on the porn emails.

As the state's top prosecutor ...

KANE: Yes.

GANIM: You're saying that there's a court order that's keeping you from investigating a case that you think, and the chief justice on the state's Supreme Court thinks, might be illegal.

KANE: That is correct.

GANIM (voice over): Kane says she believes she did the right thing. Frank Fina would not comment for this story.

Do you feel that the system is being abused to protect certain people?

KANE: I knew that I was walking into public corruption, which again is why I ran. But I will tell you this, even I am shocked at the level of public corruption. I am shocked at how deep it goes and I am shocked at how powerful it is. I have never seen anything like this. It's breathtaking. It has been described by the people familiar with what is happening as shameful.

SCIUTTO: Sara Ganim joins us now. Sara, great reporting. What can you tell us happened to the state employees involved in these emails?

GANIM: Well, Jim, most of the people have been - who have been publicly shamed, they lost their jobs, either resigning or being forced out. But the State Police Commissioner Frank Noonan, you saw him, he still has his job because according to published reports, the governor says there was no proof that he opened the emails. There are also people in the public sector, the private sector, I'm sorry, that still have their jobs, too.

SCIUTTO: And how about for the Pennsylvania attorney general? What's next for her?

46

GANIM: Well, she testified yesterday before the grand jury and now she waits to see if she'll be indicted. Remember, that's a whole another case about a grand jury leak.  She's under investigation for that leak. And sources tell us that the order that she says that is preventing her from investigating these emails, it doesn't actually name any names, it's vague. But she says that she believes she can't take any chances because she could be held in contempt of court, possibly even jailed. Jim.

SCIUTTO: Alarming case, thanks very much to Sara Ganim.

At various points during the narrative, quoted intact above, CNN displayed photos of

Fina, Noonan and Feathers.

166.    Kane plainly arrived at the interview intending to utter that fabrication in an attempt to

smear Fina, Sheetz, Feathers and Noonan, to defame them and to do demonstrable harm to their

reputation.

167.    Because the statement was pre-recorded before it was aired on November 18, 2014, Kane

had an opportunity to recant that statement and ask that it be stricken from the broadcast

interview.  She did not, always intending that these false statements be published and cause the

resultant harm.

168.    In fact, once again, in the days that followed, a Kane spokesperson was forced to

acknowledge that there was no truth to any allegation of images of child pornography in the

emails.

169.    In fact, the email referred to by Kane in the CNN interview had 79 recipients, of which at

least 17 were employed at the Attorney General's office at the time of the CNN broadcast; 14 are

still employed there today.  Kane made no mention of this fact during her interview and it is now

clear that her description of the email's contents was a gross mischaracterization and her moral offense was fabricated to defame Noonan, Feathers, Sheetz and Fina as best evidenced by the fact none of her employees on the email recipient list in her office were terminated for having possessed the material.  See Exhibit "B."

### 8.    Plaintiffs' Protected First Amendment Speech

170.    Plaintiffs engaged in numerous acts of protected First Amendment speech, including the following:

    (a)    statements by Feathers in 2012 to the media commenting and criticizing Kane's politically motivated campaign criticism of the Sandusky Investigation;

    (b)    Fina's assertions to the OAG and the supervising judge of the Sandusky grand jury challenging Kane's authority to conduct an investigation of a grand jury investigation, and various motions to regulate the conduct of that investigation;

    (c)    the September 2013 production of an affidavit by Fina in support of Ali's motion to recuse Kane from his case and compel performance of the cooperation agreement entered into between Ali and the Commonwealth;

    (d)    Fina letter of March 22, 2014 to the public responding to Kane's false allegations about her termination of the Ali undercover bribery case;

    (e)    The public statements in March and April of 2014 by Noonan and Sheetz correcting Kane's allegations about her termination of the Ali undercover bribery case;

    (f)    Fina and Costanzo's May 8, 2014 report to the Supervising Judge of the Grand Jury concerning the leak of grand jury information in the Mondesire investigation;

    (g)    Fina, Sheetz, Feathers and Noonan's written responses to the Moulton Report concerning the review of the Sandusky Investigation, provided on June 11, 2014;

A000183

(h)    June 23rd, 2014 press conference statements of Fina, Feathers, and Noonan in responding to false allegations that Sandusky abused two children while the grand jury investigation was underway in 2009;

(i)    Fina and Costanzo's report on August 26, 2014 to the special prosecutor about Miletto's attempt to engage in physical and oral intimidation of them as grand jury witnesses;

(j)    Fina's and Costanzo's August 26th, 2014 testimony before the grand jury investigating the leak of grand jury material in the Mondesire investigation; and

(k)    Costanzo openly expressed criticism of Kane's campaign tactics regarding the Sandusky prosecution.

171.    Each of these actions taken by Fina, Costanzo, Sheetz, Feathers, and Noonan were done to achieve lawful objectives and sought to assure that agreements of the Commonwealth are being honored and enforced, that citizens of the Commonwealth are receiving an honest, complete and fair assessments of the actions of their government agencies, and each action constitutes a form of political expression and petition of the government for redress of grievances.

172.    The actions of Fina, Costanzo, Sheetz, Feathers, and Noonan, on behalf of agents, witnesses and the citizens of the Commonwealth angered defendants Kane and her agents including Milleto.  Kane was enraged by the fact that these plaintiffs took a stand, challenged them and initiated legal actions to prevent them from engaging in unlawful conduct.

173.    Indeed, the grand jury investigation into the leak of the Mondesire grand jury revealed clear evidence of Kane and her administration's willingness to engage in criminal actions to advance their ill motives and retaliatory scheme against Fina and Costanzo, and display their

49

willingness to engage in retaliatory action, generally.  The findings of the Disciplinary Board of the Supreme Court of Pennsylvania similarly bolster the clear existence of the evidence of Kane's misconduct.   The conduct of defendants Kane, Miletto, and others associated with them include violations of the United States Constitution, and criminal laws.

174.    As a direct and proximate result of the actions listed above defendants sought to inflict injury on and professionally damage or destroy plaintiffs through their retaliatory actions.

175.    By the content, form and context of the speech and conduct of plaintiffs Fina, Costanzo, Sheetz, Feathers, and Noonan, plaintiffs spoke out about matters of public concern.

176.    All of these plaintiffs' First Amendment protected activities were on matters of public concern to the citizens of the Commonwealth of Pennsylvania, the news media, voters, the public at large, the governor of Pennsylvania and the general assembly.

177.    Plaintiffs' First Amendment protected activities related to matters of political, social and other concern to the community.

178.    Plaintiffs were acting in good faith and with honest motives at all times when they exercised their First Amendment protected rights.

**9.      Retaliation by Defendant Kane**

179.    Defendant Kane engaged in a calculated and continual enterprise against the plaintiffs in an effort to harm them and deter them from exercising their First Amendment rights of free speech.

50

**A000185**

180.   In a calculated and directed campaign to retaliate against and injure plaintiffs,  Kane published false statements to the media  and released private e-mails that impugned plaintiffs' professional and personal reputations, including:

(a)   false statements that she possessed evidence that Fina and Costanzo were responsible for a racially motivated investigation of Philadelphia state representatives who accepted cash bribes;

(b)   conspiring with others, including Morrow, Miletto and Brennan - a Philadelphia Daily News reporter - - to unlawfully leak grand jury information connected to the Mondesire investigation that dishonestly represented that Fina and Costanzo had improperly impeded a criminal investigation of Mondesire, then director of the Philadelphia NAACP;

(c)   falsely represented to the media that there existed evidence that delays in the Sandusky Investigation run by Fina, Sheetz, Feathers, Noonan and Costanzo that resulted in additional victims of sexual abuse;

(d)   falsely stated that plaintiffs had possessed and/or distributed images of child pornography;

(e)   released information about and/or plaintiffs actual private and personal e-mails in a manner that was unlawful; .

(f)   falsely stated, in numerous public statements and verified court filings that Fina and Costanzo engaged in a "conspiracy", "plot" or "scheme" to "corruptly" manufacture a grand jury investigation of Kane;

(g)   falsely asserted that Fina and Costanzo have engaged in criminal acts and that "the corrupt machinations of Frank Fina and E. Marc Costanzo have wrongfully caused the judiciary to bar her from discharging the duties of her office;" and

(h)   has repeatedly asserted she is the victim of a male and/or "old boys" network.

181.   At all times, Kane knew that her allegations were false and/or intended to reveal matters of privacy with no legitimate purpose.

182.   Defendant Kane published her false allegations despite knowledge of their actual falsity.

51

183.    Defendant Kane willfully blinded herself to the falsity of her statements.

184.    The retaliatory publications and release of private and personal emails were intended to intimidate, prevent and deter plaintiffs from engaging in First Amendment protected activity discussed above and to punish them for that same activity.  Stories about Kane's false and scandalous allegations and plaintiffs' emails were published by various state and national news and subsequently republished throughout Pennsylvania and the United States.

185.    With respect to Feathers, Kane took her retaliatory action further by falsely alleging that Feathers had viewed and forwarded many of the e-mails containing the pornographic materials. Despite public demands by Feathers that Kane conduct a forensic evaluation of his e-mail account to show just how limited Feathers' involvement was with respect to the emails in question, Kane stood by her misrepresentations in an attempt to embarrass and harm Feathers in the absence of such fundamental evidence.

186.    As a result of Kane's actions, Feathers was compelled to resign from his post as a member of the Pennsylvania State Parole Board.

187.    As a result of Kane's actions, Sheetz was compelled to resign from his position as an assistant district attorney at the Lancaster County District Attorney's office.


**COUNT I- 42 U.S.C. § 1983- FIRST AMENDMENT FREE SPEECH RETALIATION
FINA V. KANE (ALI INVESTIGATION)**

188.    Plaintiffs repeat and reallege paragraphs 1-175 set forth above and incorporates them herein by reference.

A000187

189.    Kane's actions of fabricating and publishing claims that the OAG possessed evidence that the investigation involving the acceptance of bribes by state representatives was motivated by racism was retaliatory action against Fina as a direct and proximate result and in retaliation of his exercise of First Amendment protected freedom of speech as more fully discussed above. Kane's fabrication and publication of these false statements of racism directly related to a matter of important public concern upon which Fina had exercised his First Amendment right of free speech.

190.    Kane cannot identify any non-retaliatory reason for having fabricated and published false allegations of racism against Fina.

191.    Fina's rights to engage in expressive First Amendment activity have been chilled by Kane's actions.

192.    The publication of the false implications of racism resulted in injury to Fina's personal and professional reputation, diminished his public esteem, respect and goodwill, generated derogatory and negative opinions against him, and caused him embarrassment and anxiety.

193.    Plaintiff's constitutional right to freedom of speech has been denied under the first Amendment of the United States Constitution at 42 U.S.C. § 1983.

194.    As a direct and proximate cause of Kane's actions, Fina has suffered emotional distress, humiliation, embarrassment, and injury to his reputation.

WHEREFORE, plaintiff Frank Fina demands judgment in his favor against defendant Kathleen Kane for compensatory damages, punitive damages, attorneys' fees, cost of suit, and injunctive relief that includes a permanent injunction enjoining defendant Kane from retaliating

53

against plaintiff now or in the future and a reparative injunction directing defendant Kane to issue a public statement personally apologizing to plaintiff Fina for the publication of false statements in violation of his constitutional rights.

### COUNT II- 42 U.S.C. § 1983- FIRST AMENDMENT FREE SPEECH RETALIATION FINA AND COSTANZO V. KANE (MONDESIRE GRAND JURY LEAKS)

195.    Plaintiffs repeat and re-allege paragraphs 1-182 set forth above and incorporates them herein by reference.

196.    Kane's actions of fabricating and publishing claims that Fina and Costanzo wrongfully impeded and terminated a valid criminal investigation against J. Whyatt Mondesire for improper and unethical purposes was retaliatory action against Fina and Costanzo as a direct and proximate result of, and in retaliation for, their exercise of First Amendment protected freedom of speech as more fully discussed above.  Kane's fabrication and publication of these false statements directly related to a matter of important public concern upon which Fina and Costanzo had exercised their First Amendment right of free speech.

197.    Kane cannot identify any non-retaliatory reason for having fabricated and published false allegations that Fina and Costanzo wrongfully impeded and terminated a valid criminal investigation against J. Whyatt Mondesire for improper and unethical purposes..

198.    Fina and Costanzo's rights to engage in expressive First Amendment activity have been chilled by Kane's actions.

199.    The publication of the false implications that they wrongfully impeded and terminated a valid criminal investigation resulted in injury to Fina and Costanzo's personal and professional

reputations, diminished their public esteem, respect and goodwill, generated derogatory and negative opinions against them, and caused them embarrassment and anxiety.

200.    Plaintiffs' constitutional right to freedom of speech has been denied under the First Amendment of the United States Constitution at 42 U.S.C. § 1983.

201.    As a direct and proximate cause of Kane's actions, Fina and Costanzo have suffered emotional distress, humiliation, embarrassment, and injury to their reputations.

WHEREFORE, plaintiffs Frank Fina and E. Marc Costanzo demand judgment in their favor against defendant Kathleen Kane for compensatory damages, punitive damages, attorneys' fees, cost of suit, and injunctive relief that includes a permanent injunction enjoining defendant Kane from retaliating against plaintiffs now or in the future and a reparative injunction directing defendant Kane to issue a public statement personally apologizing to plaintiffs Fina and Costanzo for the publication of false statements in violation of their constitutional rights.

## COUNT III- 42 U.S.C. §§ 1983 - FIRST AMENDMENT FREE SPEECH RETALIATION-Conspiracy

## FINA AND COSTANZO V. KANE, MILETTO, AND BRENNAN (MONDESIRE GRAND JURY LEAKS)

202.    Plaintiffs repeat and reallege paragraphs 1-189 set forth above and incorporates them herein by reference.

203.    Kane's actions of fabricating and publishing claims that Fina and Costanzo wrongfully interfered with and terminated a valid criminal investigation against J. Whyatt Mondesire for improper and unethical purposes was retaliatory action against Fina and Costanzo as a direct and proximate result and in retaliation of their exercise of First Amendment protected freedom of

55

**A000190**

speech as more fully discussed above.  Kane's fabrication and publication of these false statements directly related to a matter of important public concern upon which Fina and Costanzo had exercised their First Amendment right of free speech.

204.    Defendants cannot identify any non-retaliatory reason for having fabricated and published false allegations of that Fina and Costanzo wrongfully suppressed and terminated a valid criminal investigation against J. Whyatt Mondesire for improper and unethical purposes.

205.    Through their concerted actions described above, defendants conspired to retaliate against Fina and Costanzo for the exercise of their First Amendment rights of free speech.

206.    The publication of the false implications that they wrongfully interfered with and terminated a valid criminal investigation resulted in injury to Fina and Costanzo's personal and professional reputations, diminished their public esteem, respect and goodwill, generated derogatory and negative opinions against them, and caused them embarrassment and anxiety.

207.    Plaintiffs' constitutional right to freedom of speech has been denied under the First Amendment of the United States Constitution at 18 U.S.C. § 1983.

208.    As a direct and proximate cause of the actions of Kane, Milleto and Brennan, Fina and Costanzo have suffered emotional distress, humiliation, embarrassment, and injury to their reputations.

WHEREFORE, plaintiffs Frank Fina and E. Marc Costanzo demand judgment in their favor against defendants Kathleen Kane, Michael Miletto and Christopher Brennan for compensatory damages, punitive damages, attorneys' fees, cost of suit, and injunctive relief that includes a permanent injunction enjoining defendant Kane from retaliating against plaintiffs now

A000191

or in the future and a reparative injunction directing Defendant Kane to issue a public statement personally apologizing to plaintiffs Fina and Costanzo for the publication of false statements in violation of their constitutional rights.

**COUNT IV- 42 U.S.C. § 1983- FIRST AMENDMENT FREE SPEECH RETALIATION FINA, SHEETZ, FEATHERS AND NOONAN V. KANE (MOULTON REPORT)**

209.    Plaintiffs repeat and reallege paragraphs 1-196 set forth above and incorporates them herein by reference.

210.    Kane's statements to the media that the alleged delay in arresting Sandusky resulted in two minors being subjected to sexual abuse that would not have otherwise occurred was retaliatory action against Fina, Sheetz, Feathers, and Noonan and was retaliatory action as a direct and proximate result and in retaliation of their exercise of First Amendment protected freedom of speech as more fully discussed above.  Kane's fabrication and publication of these false statements directly related to a matter of important public concern upon which Plaintiffs had exercised their first amendment right of free speech.

211.    Fina's, Sheetz's, Feather's, and Noonan's rights to engage in expressive First Amendment activity have been chilled by Kane's actions.

212.    The publication of the false allegations of investigative delays resulting in additional victims resulted in injury to Plaintiffs' personal and professional reputations, diminished their public esteem, respect and goodwill, generated derogatory and negative opinions against them, and caused them embarrassment and anxiety.

213.    Plaintiffs' constitutional right to freedom of speech has been denied under the first Amendment of the United States Constitution at 42 U.S.C. § 1983.

214.    As a direct and proximate cause of Kane's actions, Fina, Sheetz, Feathers, and Noonan have suffered emotional distress, humiliation, embarrassment, and injury to their reputations.

WHEREFORE, plaintiffs Fina, Sheetz, Feathers, and Noonan demand judgment in their favor against defendant Kathleen Kane for compensatory damages, punitive damages, attorneys' fees, cost of suit, and injunctive relief that includes a permanent injunction enjoining defendant Kane from retaliating against plaintiffs now or in the future and a reparative injunction directing defendant Kane to issue a public statement personally apologizing to plaintiffs Fina, Sheetz, Feathers, and Noonan for the publication of false statements in violation of their constitutional rights.

## COUNT V- 42 U.S.C. § 1983- FIRST AMENDMENT FREE SPEECH RETALIATION

### FINA, SHEETZ, FEATHERS AND NOONAN V. KANE
### (KANE'S FALSE CLAIMS ABOUT POSSESSION/DISTRIBUTION OF CHILD PORNOGRAPHY)

215.    Plaintiffs repeat and reallege paragraphs 1-202 set forth above and incorporates them herein by reference.

216.    Kane's actions of fabricating and publishing claims that implied that Fina, Sheetz, Feathers and Noonan possessed and/or distributed child pornography was retaliatory action against Fina, Sheetz, Feathers and Noonan as a direct and proximate result of, and in retaliation for, their exercise of First Amendment protected freedom of speech as more fully discussed above.  Kane's fabrication and publication of statements falsely implicating Fina, Feathers and Noonan in child pornography directly related to a matter of important public concern upon which Plaintiffs had exercised his First Amendment right of free speech.

A000193

217.     Kane cannot identify any non-retaliatory reason for having fabricated and published false allegations relating to child pornography against Fina, Sheetz, Feathers and Noonan.

218.     Fina's, Sheetz's, Feathers' and Noonan's rights to engage in expressive First Amendment activity have been chilled by Kane's actions.

219.     The publication of the false implications that Fina, Sheetz, Feathers and Noonan dealt in child pornography resulted in injury to their personal and professional reputations, diminished their public esteem, respect and goodwill, generated derogatory and negative opinions against them, and caused them embarrassment and anxiety.

220.     Plaintiffs' constitutional rights to freedom of speech have been denied under the First Amendment of the United States Constitution at 42 U.S.C. § 1983.

221.     As a direct and proximate cause of Kane's actions, Fina, Sheetz, Feathers and Noonan have suffered emotional distress, humiliation, embarrassment, and injury to their reputations.

WHEREFORE, plaintiffs Fina, Sheetz, Feathers and Noonan demand judgment in their favor against defendant Kathleen Kane for compensatory damages, punitive damages, attorneys' fees, cost of suit, and injunctive relief that includes a permanent injunction enjoining defendant Kane from retaliating against plaintiffs now or in the future and a reparative injunction directing defendant Kane to issue a public statement personally apologizing to plaintiffs Fina, Sheetz, Feathers and Noonan for the publication of false statements in violation of his constitutional rights.

A000194

**COUNT VI- 42 U.S.C. § 1983- FIRST AMENDMENT FREE SPEECH RETALIATION**

**ALL PLAINTIFFS V. KANE (RELEASE OF PRIVATE E-MAILS)**

222.    Plaintiffs repeat and reallege paragraphs 1-209 set forth above and incorporates them herein by reference.

223.    Kane's actions of releasing the information about the private emails and/or releasing the emails of all plaintiffs was retaliatory action against the plaintiffs as a direct and proximate result of, and in retaliation for, the exercise of First Amendment protected freedom of speech as more fully discussed above.  Kane's release of this information to the media was directly related to a matter of important public concern which was the result of plaintiffs' exercise of their First Amendment right of free speech.

224.    Kane cannot identify any non-retaliatory reason for having released these private emails.

225.    Plaintiffs' rights to engage in expressive First Amendment activity have been chilled by Kane's actions.

226.    The publication of the information concerning the contents of these private emails and the actual emails resulted in injury to plaintiffs' personal and professional reputation, diminished their public esteem, respect and goodwill, generated derogatory and negative opinions against him, and caused him embarrassment and anxiety.

227.    Plaintiffs' constitutional right to freedom of speech has been denied under the first Amendment of the United States Constitution at 42 U.S.C. § 1983.

228.    As a direct and proximate cause of Kane's actions, plaintiffs have suffered emotional distress, humiliation, embarrassment, and injury to their reputations.

60

A000195

WHEREFORE, Plaintiffs demand judgment in their favor against defendant Kathleen Kane for compensatory damages, punitive damages, attorneys' fees, cost of suit, and injunctive relief that includes a permanent injunction enjoining defendant Kane from retaliating against plaintiffs now or in the future and a reparative injunction directing defendant Kane to issue a public statement personally apologizing to plaintiffs for the publication of false statements in violation of their constitutional rights.

## COUNT VII- DEFAMATION

**FINA AND COSTANZO V. BRENNAN AND PHILADELPHIA MEDIA NETWORK (DIGITAL), LLC AND PHILADELPHIA MEDIA NETWORK, LLC**

229.   Plaintiffs repeat and reallege paragraphs 1-216 set forth above and incorporates them herein by reference.

230.   Defendants published the above-mentioned statements, innuendos and implications concerning Fina, Costanzo, including to individuals in Philadelphia County and the Commonwealth of Pennsylvania who understood those statements, innuendos and implications to refer to and defame Fina and Costanzo.  Defendants' publications falsely and maliciously stated, suggested and implied that Fina and Costanzo, as described above, acted unprofessionally, violated attorney ethics, and performed a disservice to the citizens of the Commonwealth by impeding and terminating an allegedly appropriate investigation into the misuse and/or theft of money by Mondesire.  Defendants have also continued to publish false and misleading stories in furtherance of Kane's efforts to retaliate and defame Fina and Costanzo through her selective release and characterization of emails."

61

**A000196**

231.    Defendants knew, or were on notice, that Defendant Kane had a vendetta against Fina and Costanzo and were engaging in the unlawful act of leaking grand jury information against them and were providing only a partial and biased account of the investigation.

232.    Defendants published their statement with knowledge of its falsity and/or reckless disregard for the truth and intentionally and maliciously portrayed Fina and Costanzo as they did to undermine their position and reputation as public ethics prosecutors in the minds of the readers of Defendants' articles.

233.    Defendants' false and defamatory statements, innuendos and implications severely injured Fina and Costanzo in that they tended to blacken and besmirch their reputation; have exposed them to public contempt ridicule or hatred; have conveyed the impression that they engaged in corrupt motives; have subjected them to emotional distress, mental anguish, embarrassment and humiliation; and have damaged them professionally and personally.

234.    Defendants' defamatory publications were so outrageous and malicious as to warrant the imposition of punitive damages.

235.    As a proximate result of defendants' malicious, intentional and reckless conduct as set forth above, Fina and Costanzo are entitled to such damages as will compensate them for the injury to their professional and personal reputation, for their emotional distress, and punitive damages to punish the defendants for their conduct and to deter them and others similarly situated from similar acts in the future.

A000197

WHEREFORE, plaintiffs Frank Fina and E. Marc Costanzo demand judgment in their favor against defendants jointly and severally, for compensatory damages, punitive damages, attorneys' fees, cost of suit, and such other relief as this Court may deem just and proper.

### COUNT VIII - FALSE LIGHT

### FINA AND COSTANZO V. BRENNAN AND PHILADELPHIA MEDIA NETWORK (DIGITAL), LLC AND PHILADELPHIA MEDIA NETWORK, LLC

236.    Plaintiffs repeat and re-allege paragraphs 1-223 set forth above and incorporates them herein by reference.

237.    Defendants, through their coverage and investigation of Kane, her political campaign, her attacks on the professionalism and professional work of Fina, as well as the ongoing hostilities between them throughout her tenure as attorney general, were on notice that Kane would stop at nothing to diminish and disparage Fina and his colleagues and their professional reputation and work for her own political gain.  In the present case, defendants were aware, or should have been aware, that Kane was engaged in a violation of criminal law by leaking selective grand jury materials and having one of their political operatives provide defendants with an inaccurate account of the Mondesire grand jury investigation.  Defendants, nonetheless, willfully chose to report and actively promote a false and misleading story that Fina and Costanzo improperly suppressed and ended an investigation against Mondesire.  Defendants have also continued to publish false and misleading stories in furtherance of Kane's efforts to retaliate and defame Fina and Costanzo through her selective release and characterization of emails.

238.     Due to the above, defendants placed Fina and Costanzo in a false light for the public by representing a false and incorrect account of the investigation and presenting an overall false representation of that investigation.

239.     The aforementioned false light in which Fina and Costanzo were placed would be highly offensive to a reasonable person.

240.     Defendants had knowledge of, or acted in a reckless disregard, as to the falsity of the matter they publicized and the false light in which they placed Fina and Costanzo.

241.     As a proximate result of defendants' malicious, intentional and/or reckless conduct as set forth above, Fina and Costanzo are entitled to such damages as will compensate them for the injury to their professional and personal reputation, their emotional distress, and punitive damages to punish the defendants for their conduct and to deter them and others similarly situated from similar acts in the future.

A000199

WHEREFORE, plaintiffs Frank Fina and E. Marc Costanzo demand judgment in their favor against defendants jointly and severally, for compensatory damages, punitive damages, attorneys' fees, cost of suit, and such other relief as this Court may deem just and proper.

MCMONAGLE, PERRI, MCHUGH & MISCHAK

FELDMAN SHEPHERD WOHLGELERNTER TANNER WEINSTOCK & DODIG, LLP

_____/s/ Fortunato N. Perri, Jr., Esquire_____
FORTUNATO N. PERRI, JR., ESQUIRE
1845 Walnut Street, 19th Floor
Philadelphia, PA 19103
215-981-0999
fperri@mpmpc.com
Attorney for E. Marc Costanzo

_____/s/ Mark W. Tanner, Esquire_____
MARK W. TANNER, ESQUIRE
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
215-567-8300
mtanner@feldmanshepherd.com
Attorney for Frank Noonan, Randy Feathers, Richard A. Sheetz, Jr. and Frank Fina

Date:   February 26, 2016

65

A000200

# EXHIBIT "A"

A000201

# Emails of 'porn peddlers' now public



CLEM MURRAY / STAFF PHOTOGRAPHER Attorney General Kane: Emails are important to the legal story.

**BY DAVID GAMBACORTA & WILLIAM BENDER, Daily News Staff Writers gambacd@phillynews.com, 215-854-5994**

Posted: August 28, 2015

IF YOU EVER find yourself missing the old-school experience of flipping through a porn mag, head up to the fourth floor of City Hall and grab hold of Frank Fina's binder full of nude women.

The state Supreme Court yesterday unsealed hundreds of pages of records connected to the looming criminal trial of state Attorney General Kathleen Kane, including pornographic emails that were sent and received by Fina when he was a state prosecutor.

Kane has long contended that the smutty images - collected in a nearly 400-page binder in the Supreme Court's Prothonotary Office - are crucial to understanding why she's in a legal bind.

We pause here to note that the story of Kane and Fina and the emails is convoluted and depressing, a bit like the plot of the second season of "True Detective" but featuring levels of political dysfunction

Case 2:15-cv-06082-HB    Document 26    Filed 02/26/16    Page 69 of 83

almost too pathetic to be true.

Let's start with the porn, because that's probably why you've read this far.

After being sworn into office in 2013, Kane followed through on a campaign promise to re-examine the state's investigation into convicted pedophile Jerry Sandusky, seeking to determine if the case had lagged under her predecessor, former Gov. Tom Corbett.

Office emails were collected and reviewed, including many sent, received and ultimately deleted by Fina and fellow prosecutor E. Marc Costanzo.

"In accordance with Kane's policy of public disclosure and transparency, those emails would soon be released to the public," Kane's legal team wrote in court filings last fall. "Personally and professionally, Fina would be ruined."

How bad could the emails be? Well . . . pretty bad. "FW: New Office Motivation Policy Posters," read the subject line of an email that Fina sent from his government account on May 21, 2009. Attached were several images. "Take advantage of every opening," read the caption of one photo, which showed a woman having anal sex. "Making your boss happy is your only job," read the caption of another, showing a pants-less woman on her knees, performing oral sex on a man.

A 2011 email from Fina to his colleagues included a collection of fake nude photos of former Alaska Gov. Sarah Palin. "Rainbows: Not as gay as you might think," read the subject line of another photo series, showing a woman in striped underwear and stockings.

Some of the images were racially offensive, like one that showed a white man carrying a bucket of Kentucky Fried Chicken as he appears to struggle with two black men. "Bravery At Its Finest" was the caption on that one.

Fina was on the receiving end of plenty of emails, too, including one in 2009 titled "Men in Training" that showed a little boy looking into a little girl's underwear.

In the court filings, Kane's attorneys describe Fina and Costanzo as "peddlers of pornography and obscenity depositing state paychecks," and accused both of lying to higher-ups about the nature of their emails.

So, what do all of these graphic photos add up to? That remains to be seen.

Both Fina and Costanzo now work for District Attorney Seth Williams. In a statement yesterday, the D.A.'s office pledged to do a "thorough review" of the material. Williams did not respond to emailed questions about any prior knowledge he may have had about Fina's state emails.

A federal grand jury, incidentally, is investigating Williams' use of campaign money. His political-action

committee, Friends of Seth Williams, last week intimated that Kane was to blame for the investigation into the D.A.

Why? Because shortly after Fina went to work for Williams, the *Inquirer* wrote about Kane's decision to not prosecute a handful of local pols caught accepting bribes from a lobbyist as part of a sting operation.

Williams ultimately took on the case and successfully prosecuted it, but not before he and Kane took jabs at one another publicly.

Montgomery County District Attorney Risa Vetri Ferman earlier this month said Kane blamed Fina for the sting case ending up in the *Inquirer*, leading the attorney general to allegedly orchestrate the leak of information about a stagnant 2009 grand jury investigation into former Philadelphia NAACP head J. Whyatt Mondesire - a case that Fina worked on - to the *Daily News* in retaliation.

Kane's legal team argued in documents unsealed yesterday that Fina orchestrated a grand jury investigation that ultimately determined Kane was responsible for the Mondesire leak. During a preliminary hearing Monday in Norristown, a Montgomery County judge ordered Kane held for trial on charges of perjury, criminal conspiracy and obstruction of justice.

Gerald Shargel, Kane's attorney, referenced Fina's extensive porn emails during the hearing, saying afterward that the "entire story" hadn't come out yet.

If Kane was hoping Fina's career would be destroyed when his porn stash saw the light of day, she might be right. But she might have cooked her own goose in the process.

A new *Daily News*/Franklin & Marshall College poll released yesterday found that 46 percent of Pennsylvania voters want her to resign, while 43 percent want her to continue serving. Of those who want her to resign, 52 percent said the Legislature should impeach her if she refuses.

Poll director G. Terry Madonna said the average voter probably doesn't understand the complexities of a scandal involving Kane, Fina, an undercover sting, corrupt lawmakers and Mondesire - and, of course, a lot o' porn.

"How do you talk about the sting? How do voters understand Jerry Mondesire and the grand jury? You're inside so much," Madonna said. "There's no doubt she's in trouble, but at the moment you got to give folks some time to see how it all plays out."

If Kane follows through on her plan - threat? - to run for re-election, it could be a campaign for the ages, Madonna said.

"Politically, there are no commercials, no ads, but you have to think what next year's campaign would be like if she files," Madonna said. "Think about those commercials and all the stuff with the sting and Mondesire and pornographic emails. This stuff has a long way to play out."

**A000204**

**On Twitter:** @dgambacorta

A000205

# EXHIBIT "B"

A000206

| | |
|---|---|
| From: | Gerrard, Lawrence |
| To: | Ansel, Francis; "Andrew F. Schlotter"; Adams, John J.; Bugda, Theodore; Burke, Thomas V.; Blessington, Patrick; "boylesbythesea@comcast.net"; Brennan, Gerard M.; "bresch2@verizon.net"; "butlar@yahoo.com"; Costanzo, E Marc.; "Campolongo6@comcast.net"; "cbw9796@comcast.net"; Carney, Kevin; Davenport, Carol; Cushman, Irene; Chiarella, Paula J.; "CNCNR909303@aol.com"; Crawford, Kevin S.; "Copeso@aol.com"; "Cbentham@aol.com"; "Chuck Lanard"; DeTitto, Louis C.; Murray, Dennis; "Judith Davies-Dunhour"; Walesyn, Dianne; Davis, Michael; Deery, Timothy; "DanRosenstein@aol.com"; "dc26rn@aol.com"; Dee, Doris; "dianewieland@comcast.net"; Flannery, John; Noonan, Francis; Fina, Frank G.; Feathers, Randy; Policare, Gregory; "Gene Dooley"; Shore, Gregg; "GerrardGman@comcast.net"; "Grace, Laureen M"; Helm, William A.; "Harriette Davidson"; "HMBERARDO@aol.com"; Hughes, Edward T.; "JTPedrick@verizon.net"; Pendell, John; Ralston, Joseph; "James Sartori"; "James Sartori"; "John Saleski"; "joenopowicz@comcast.net"; Kelly, Edward; "kencurcio@hotmail.com"; Ansel, Karen; "L.LUBIEJEWSKI@comcast.net"; O"Neill, Leo; "lrlir@frontiernet.net"; Miletto, Michael A.; Montague, Robert; Sabo, Mark G.; McIlmail, Michael W.; "Margate211@aol.com"; "MAFrazier719@comcast.net"; Nutter, Russell W.; "Ncfalcon57@aol.com"; "naplesbs@aol.com"; "PF9029@aol.com"; "polaris500@frontiernet.net"; "Popcartv@aol.com"; Shiver, Robert; Sheetz, Richard A.; "SERGE665@aol.com"; "Sally Morrison"; "siapenta@gmail.com"; Shook, Dennis; "TLS11255@aol.com"; "Thebrod1@aol.com" |
| Subject: | FW: Men in Training |
| Date: | Tuesday, March 03, 2009 3:46:52 PM |
| Attachments: | image009.gif<br>image008.jpg<br>image007.jpg<br>image006.jpg<br>image005.jpg<br>image004.jpg<br>image003.jpg<br>image002.jpg<br>image001.jpg |

---

From: Kenneth Curcio [mailto:kencurcio@hotmail.com]
Sent: Tuesday, March 03, 2009 2:10 PM
To: bjcurcio@comcast.net; boylesbythesea@comcast.net; bud warner; jgallagher126@verizon.net; jnolen@gmail.com; johnnypeppers@hotmail.com; gene dooley; Gerrard, Lawrence
Subject: FW: Men in Training

---

Exhibit A 146

**A000207**

If you don't send this to a few old friends, there will be fewer people laughing in the world.

If you fill your heart with regrets of yesterday and the worries of tomorrow, you have no today to be

Exhibit A 147

A000208



thankful for.

————

Hotmail® is up to 70% faster. Now good news travels really fast. Find out more.

Exhibit A 148



Exhibit A 149

A000210



Exhibit A 150

A000211



Exhibit A 151

A000212



Exhibit A 152

A000213



Exhibit A 153

A000214



Exhibit A 154

A000215



Exhibit A 155

A000216



Exhibit A 156

A000217

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRANK NOONAN, et al., | CIVIL ACTION: 15-cv-06082 |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| KATHLEEN KANE, ET AL., | |
| Defendants. | |

## **ORDER**

AND NOW, this            day of                2016, upon consideration of Defendant Kathleen G. Kane's Motion to Dismiss Counts I through VI of Plaintiffs' First Amended Complaint, and in consideration of Plaintiffs' Response thereto, it is hereby ORDERED that Defendant Kane's Motion is DENIED.

BY THE COURT:

_____
                                                                    J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN, et al.,                          CIVIL ACTION: 15-cv-06082

     Plaintiff,

     v.                                         JURY TRIAL DEMANDED

KATHLEEN KANE, ET AL.,

     Defendants.

## RESPONSE OF PLAINTIFFS' TO THE MOTION OF DEFENDANT KATHLEEN G. KANE TO DISMISS COUNTS I THROUGH VI OF THE FIRST AMENDED COMPLAINT

Plaintiffs, by and through their undersigned counsel, hereby respond in opposition to the Motion of the Defendant, Kathleen G. Kane, to Dismiss Counts I – VI of Plaintiffs' First Amended Complaint for the reasons set forth fully in the Memorandum of Law in Opposition to the Defendant's Motion, which is incorporated herein by reference.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court deny the Defendant's Motion, and enter the Order which is proposed and attached hereto.

FELDMAN SHEPHERD WOHLGELERNTER        MCMONAGLE, PERRI, MCHUGH &
TANNER WEINSTOCK & DODIG, LLP          MISCHAK


/s/ MARK W. TANNER                      /s/ FORTUNATO N. PERRI, JR.
Mark W. Tanner                          Fortunato N. Perri, Jr.
1845 Walnut Street, 21st Floor          1845 Walnut Street, 19th Floor
Philadelphia, PA 19103                  Philadelphia, PA 19103
*Attorneys for Plaintiffs, Frank Noonan, Randy*    *Attorney for Plaintiff, E. Marc Costanzo*
*Feathers, Richard A. Sheetz, Jr. and Frank Fina*

**A000219**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRANK NOONAN, et al., | CIVIL ACTION: 15-cv-06082 |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| KATHLEEN KANE, ET AL., | |
| Defendants. | |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RESPONSE TO THE MOTION OF DEFENDANT KATHLEEN G. KANE TO DISMISS COUNTS I THROUGH VI OF THE FIRST AMENDED COMPLAINT

## I.   INTRODUCTION

Defendant, an embattled Attorney General whose law license is suspended and who is only a few months away from trial on felony charges of perjury and related crimes, seeks to dismiss Plaintiffs' Complaint by suggesting that her unlawful and retaliatory actions should somehow be excused as being "part of an ongoing political battle," or that she was "exercising her own right to speak out, to the detriment of Plaintiffs' reputations, on matters of public concern."  [Kane Memorandum p. 1].  These claims of convenience are directly contradicted by the allegations of the Plaintiffs' Amended Complaint, controlling precedent, and also by the very positions which the Attorney General has simultaneously asserted in other courts in this Commonwealth.[1]  Moreover, Plaintiffs' claims of threats and retaliation by the Attorney General

---

[1]  Specifically, the Office of Attorney General has successfully argued that the emails which the defendant now claims are matters of "public concern," and on which Plaintiffs along with approximately 75 other Commonwealth employees were copied, were private and not matters of public concern and therefore not subject to disclosure. *Pennsylvania Office of Attorney General v. Philadelphia Inquirer*,  127 A.3d 57 (Pa.Cmwlth, No. 2096 C.D. 2014, filed November 19, 2015); *Pennsylvania Office of Attorney General v. Brad Bumsted*, *Capitol Reporter Pittsburg Tribune-Review*, _____ A.3d _____ fn 10 (Pa. Cmwlth. No. 2097 C.D. 2014, filed March 15, 2016) (Holding that the emails at issue are exempt from disclosure, and noting further that "personal emails were permitted under the Attorney General's email policy and they were understood to be personal.").  See also *Easton Area School District*

have already been substantiated by the findings of the Honorable William Carpenter, who determined that ". . . there were attempts, direct and indirect, by agents of the OAG to sway Mr. Fina's and Mr. Costanzo's testimony before the Grand Jury.  It was the substance of the threats combined with the timing of those threats, i.e., when the OAG became aware that both men were subpoenaed to testify, that created an atmosphere of intimidation."   See Opinion of The Honorable William R. Carpenter in *Pennsylvania Office of Attorney General v. Supervising Judge of the Thirty-Fifth Statewide Investigating Grand Jury*, Supreme Court of Pennsylvania, No. 171 MM 2014, (December 12, 2014, Unsealed August 26, 2015) attached hereto as Exhibit "A."

At its core, the defense Motion argues that Plaintiffs' claims must be dismissed because Kane's retaliatory misconduct somehow concerned matters of "public concern" – something directly contradicted by the Commonwealth Court – and that the retaliatory actions (as described by Judge Carpenter) which she displayed would not deter "a person of ordinary firmness" from exercising his or her First Amendment right to speak out on matters which were truly of public concern, including the unethical and illegal activity of the Commonwealth's Attorney General. Essentially, the Defendant Kane is arguing that because her attempts to use embarrassing information to blackmail the Plaintiffs and coerce their silence proved unsuccessful, then it follows that the Plaintiffs' claims must fail because they were undeterred.  The Defendant's arguments misconstrue the allegations of the Plaintiffs' Amended Complaint and ignore decades

---

*v. Baxter*, 35 A.3d 1259 (Pa. Cmwlth.), appeal denied, 54 A.3d 350 (Pa. 2012) ". . .The fact whether the information is sent to, stored on or received by a public or personal computer is irrelevant in determining whether the email is a "public record."); *Meguerian v. Office of the Attorney General*, 86 A.3d 924, 930 (Pa. Cmwlth.)("Emails are not considered records of an agency simply because they are sent or received using an agency email address or by virtue of their location on an agency computer").  See also *Pennsylvania State Education Association Ex Rel. Wilson v. Commonwealth of Pennsylvania, Department of Community and Economic Development*, 50 A.3d 1263 (Pa. 2012) before an agency releases personal emails, employees and third parties who received or sent those emails must receive written notice and a meaningful opportunity to object at the request stage to the disclosure of their emails to establish that their release would be an unwarranted invasion of privacy).

of law within this Circuit concerning actionable claims for retaliatory misconduct in violation of the rights afforded under the First Amendment.

Finally, while the Defendant Kane contends in her motion that "this lawsuit is part of an ongoing political battle," it is undisputed that the only politician involved was the defendant herself. The Plaintiffs have never run for office, engaged in any political debate, nor participated in any campaign. To the contrary, Plaintiffs have spent decades working quietly under multiple Attorney Generals as law enforcement officers and attorneys serving this Commonwealth, and have only recently come under fire for their role in exposing the criminal misconduct of the defendant.

## II. FACTUAL BACKGROUND

### A. THE PARTIES

Each of the Plaintiffs in this case was publicly critical of the Defendant Kathleen Kane and/or provided testimony or information to law enforcement authorities engaged in Kane's prosecution. Each of the Plaintiffs was subject to direct attempts of intimidation and blackmail by the Defendant Kane, as she threatened that if the Plaintiffs continued to be publicly critical of her, she would selectively release damaging and embarrassing information in an attempt to humiliate and impugn them. ¶¶ 155-158.[2] These men refused to be silenced by Kane's threats, and as a consequence have been the subject of her abuse of power and vindictive retaliation giving rise to this action.

#### 1. Frank Noonan

Frank Noonan served as a special agent for the FBI for twenty-seven (27) years and then as a regional director of the Office of the Attorney General Narcotics Investigation and Drug

---

[2] All citations to paragraph numbers refer to Plaintiffs' Amended Complaint.

Control for several years. ¶ 36.  Mr. Noonan's career in government service culminated with his appointment as Commissioner of the Pennsylvania State Police in January of 2011; a position he held until retirement in January of 2015.  ¶ 35.

Noonan spoke publicly and contradicted Kane's outrageous claims that the Sandusky investigation was somehow delayed to the extent that it allowed two other boys to be molested while investigators allegedly dragged their feet.  ¶¶ 18, 69-73, 139-147.  Noonan exposed Kane's claim regarding this delay as a falsehood, and in response the defendant retaliated by using her office to publish false claims that Noonan had allegedly viewed child pornography. ¶¶ 163-167.  These claims were broadcast on a national news program, *Id.*, following which a Kane spokesperson was forced to acknowledge that there was no truth to the allegations and that there were no images of child pornography.  ¶ 168.  In fact, the only email referred to by Kane in this regard was one which was not authored by Plaintiffs, and which was sent to 79 recipients, at least 17 of whom were employed within Kathleen Kane's office, and 14 of whom are still employed there today.  ¶ 169.

### 2.      Randy Feathers

Plaintiff Randy Feathers had an exemplary law enforcement career that spanned from 1981 until 2012 when he was appointed to the Commonwealth Board of Probation and Parole.  ¶ 43.  His career culminated in his appointment as a regional director of the Attorney General's Bureau of Narcotics Investigation and Drug Control in 2005.  ¶ 42.

Feathers likewise spoke publicly in an effort to rebut and contradict Kane's false claims that the Sandusky investigation was somehow delayed, and as a result Feathers was also identified by Kane on the CNN broadcast in which Kane falsely claimed that he had received child pornography.  ¶¶ 163-167.

### 3.  Richard Sheetz

Plaintiff Richard Sheetz was a career prosecutor with the Pennsylvania Attorney General's Office and, from 2004-2014, held the post of executive Deputy Attorney General as the Director of the Criminal Law Division.  ¶ 46.

Mr. Sheetz publicly corrected and contradicted Kane's allegations regarding the termination of the Tyrone Ali undercover bribery case, and also provided written responses which contradicted Kane's allegations concerning the manner in which the Sandusky investigation was handled.  ¶170.  In retaliation, Kane published false statements to the media concerning Sheetz's involvement in the Sandusky investigation and further selectively released private emails which were designed to humiliate and embarrass Sheetz.  ¶ 180.

### 4.  E. Marc Costanzo

Plaintiff E. Marc Costanzo was a career prosecutor who was an Assistant District Attorney in Philadelphia from 1987 until 1993, and a Deputy Attorney General from 1993 until 2012. ¶ 51.  Plaintiff Costanzo is currently employed at the Philadelphia District Attorney's Office.

Mr. Costanzo reported the presence of a leak of grand jury information to the Supervising Judge of the Grand Jury on May 8, 2014, which led to criminal charges against Kane.  He further reported the attempts of Kane's agent, Michael Milletto, to engage in physical and oral intimidation of witnesses before Costanzo was to testify before a grand jury, and Costanzo also gave testimony to the grand jury that ultimately led to criminal charges against the Defendant Kane.  ¶ 170.  In retaliation, Kane issued false statements that Costanzo somehow was responsible for a racially motivated investigation of Philadelphia State Representatives, that he had improperly impeded a criminal investigation of Jerome Mondesire, the then Director of the

5

Philadelphia NAACP, that he had been responsible for delays in the Sandusky investigation resulting in additional victims of sexual abuse, and that he had somehow engaged in other unspecified "corrupt" or criminal actions.  ¶ 180.  Of course, none of these allegations were true and Kane knew it.  ¶ 181.

### 5.   Frank Fina

Frank Fina was a prosecutor at the Pennsylvania Attorney General's Office from 2002 to 2013 where he ultimately came to lead the Public Corruption Unit responsible for the prosecution and conviction of 24 state representatives and elected officials. ¶ 58.

Fina challenged Kane's authority to conduct an investigation of the Sandusky matter, and further challenged Kane's conflict of interest which existed concerning an ongoing public corruption investigation.   ¶ 170.   Fina also publicly responded to Kane's false allegations concerning the Ali undercover bribery case, and Fina was one of the individuals who reported the leak of grand jury materials to the Supervising Judge of the grand jury concerning the Mondesire investigation.  *Id*.  Fina was also the lead prosecutor in the Sandusky investigation and contradicted Kane's false allegations concerning any alleged delays in that investigation.  *Id*. In retaliation, Kane publicly made false statements that Fina was somehow responsible for a racially motivated investigation of corrupt Philadelphia politicians; Kane manufactured a story in the Philadelphia Daily News that Fina somehow impeded an investigation of Jerome Mondesire; she falsely represented to the public that there was evidence that delays in Fina's investigation of Sandusky resulted in additional victims of sexual abuse; she falsely stated that Fina had possessed and/or distributed images of child pornography, and she selectively released private emails in an effort to embarrass, humiliate and impugn him.  ¶ 180.

### B.   THE PLAINTIFFS' PROTECTED SPEECH AND THE DEFENDANT'S ACTS OF RETALIATION

### 1.    The Bribery Investigation of Philadelphia State Representatives

In 2010, the OAG began an investigation of public corruption in Philadelphia.  The OAG had obtained the services of a civilian confidential informant ("CI") who had experience in the political process in Philadelphia and had agreed to act in an undercover capacity to identify politicians willing to sell their influence and votes for money.  ¶ 85.  Over the course of approximately one and a half years, the CI paid cash bribes to six state representatives from Philadelphia and recorded the transactions.  ¶ 89.  During the course of this investigation, Plaintiff Fina learned that the CI also had provided unlawful campaign contributions to a political candidate and a political consultant who had professional and personal ties to defendant Kane.  ¶ 92.  After defendant Kane's election, and prior to his departure from the OAG, Fina advised Kane of this conflict of interest with respect to the primary investigation and suggested that the investigation be transferred to the FBI.  ¶ 96.

Upon taking office, Defendant Kane did not transfer the investigation, but rather terminated the investigation and refused to honor an agreement between the OAG and the CI to dismiss charges against him in an unrelated criminal case.  ¶ 97.  In response, the CI petitioned the court, with the assistance of an affidavit from plaintiff Fina, asking that the court remove defendant Kane due to her conflict of interest and enforce the agreement to dismiss criminal charges against the CI.  ¶ 98.  While those papers were filed under seal, they ultimately found their way to the press which reported all of the details concerning the bribery investigation, Kane's conflict of interest, and the role of the CI. ¶ 13, 83.

Kane, who was politically embarrassed by the report of her actions blamed plaintiff Fina for supplying the affidavit and disclosing the information to the press, and Kane declared in an email to an associate that "this is war."  ¶ 13.

A000226

In retaliation for plaintiff Fina's proper exercise of his First Amendment rights to provide testimony by way of the affidavit filed with the court, and to publicly challenge and disclose unethical conduct of a government official, defendant Kane publicly accused Fina of engineering a selective and racist prosecution against African-American elected officials. ¶ 13.  In ostensible support of that assertion, defendant Kane engineered an investigation that fabricated statements included purported admissions by the CI and investigators that the state representative bribery investigation was designed to target black legislators.  ¶ 100, 101.  The release of these allegations by defendant Kane on numerous occasions to the press was done to defame plaintiff Fina, damage his professional reputation, diminish his professional prospects and deter him from engaging in protected First Amendment conduct as retaliation for the proper and protected disclosures he made about the investigation and her conflict of interest. ¶ 101.

### 2.   Defendant Kane's Retaliation Through the Disclosure of the Mondesire Grand Jury Investigation

Around the same time that defendant Kane made false public statements concerning the basis of the bribery investigation, she also illegally leaked redacted documents of a past grand jury investigation that had been handled by plaintiffs Fina and Costanzo in an attempt to impugn their professional reputations, embarrass them, diminish their professional prospects and deter them from engaging in protected First Amendment speech.  ¶ 106.  In 2010, plaintiffs Fina and Costanzo were involved in a grand jury investigation looking into suspected fraud by a prominent Philadelphia public official, J. Wyatt Mondesire- then head of the Philadelphia chapter of the NAACP.  ¶ 107-108.  While investigators had suspicions that Mondesire had engaged in fraudulent financial transactions, the lack of cooperation by key witnesses led to the end of the investigation without criminal charges being brought.  ¶ 110.  In an attempt to smear both plaintiffs Fina and Costanzo, defendant Kane orchestrated the release of selected documents

8

from the file that were turned over to a Philadelphia news reporter in an attempt to make it appear that plaintiffs Fina and Costanzo had abused their prosecutorial discretion by failing to pursue a case against Mondesire.  ¶ 112.  The story was reported in the Philadelphia Daily News. ¶ 113.  These actions were taken by Kane in retaliation for plaintiff Fina's role in the disclosure of the state representative bribery investigation.  ¶ 112-113.

### C. DEFENDANT KANE'S RETALIATION FOR PLAINTIFF'S DEFENSE OF THE SANDUSKY INVESTIGATION

Several months after the unlawful release of secret grand jury documents related to the Mondesire investigation, the Moulton Report on the Sandusky investigation was published.  ¶ 139.  Pursuant to rules laid down by the Sandusky Investigation Grand Jury judge, plaintiffs, who played key roles in the investigation and prosecution of Sandusky, were entitled to provide written comments that were incorporated into the written report.  ¶ 140.  In the written response that was signed by all five plaintiffs, they stated that the investigation was "ill advised" and was born of "political opportunism and posturing" by defendant Kane.  ¶ 17.  Their response also described the criticism of the Sandusky Investigation as false and unwarranted, and called the claims that led to the Report "ill-informed and unfounded."  ¶ 17.  Plaintiffs further described the report as little more than "an exercise in second guessing" undertaken solely "to sift for criticism."  ¶ 17.  Finally, plaintiffs pointed out that Moulton's own conclusions in the report wholly rebutted the criticisms defendant Kane had made during her campaign. ¶ 17.

In retaliation for these statements, defendant Kane convened a press conference where she knowingly made fabricated allegations that plaintiffs' alleged delays in the Sandusky Investigation gave Sandusky the opportunity to abuse two children who would otherwise have been unharmed.  ¶ 143-144.  This false and horrendous allegation, that children were victimized because prosecutors engaged in delay for political purposes, was intentionally designed to

9

defame the plaintiffs, impugn their professional reputations, impair their professional prospects and deter them from engaging in protected First Amendment speech. Her allegations were widely reported in the media. ¶ 145. Kane later admitted these allegations were ~~true~~ untrue. ¶ 147.

### D.   KANE'S RETALIATION THROUGH DISCLOSURE OF EMAILS RECEIVED BY PLAINTIFFS (AND COUNTLESS OTHERS)

In the course of his review of the Sandusky Investigation, Moulton reviewed the email directory of plaintiffs and many others employed by the OAG. ¶ 149. Moulton found private emails containing pornographic images and off-color cartoons and remarks, some of which were received by plaintiffs among others, and a few were forwarded by some of the plaintiffs. ¶ 149-150. Kane viewed this discovery as political pay dirt, and quickly transformed it into mud she would sling at the Plaintiffs. Notably, Kane first tried to blackmail Plaintiffs into remaining silent, threatening the release of these emails if Plaintiffs would not "cooperate." ¶¶ 155-158. When Plaintiffs refused to be silent, defendant Kane arranged, through her professional contacts, to have CNN report on the existence and content of these emails and she, herself, sat for an interview as part of this televised story. ¶ 163-164. In the interview, defendant Kane, who had not shown the reporters any of the actual emails, insinuated that amongst some of these emails were images of child pornography. ¶ 164-165. These statements led to intense media inquiry and she was forced, through her agents, to later publicly state that there was no child pornography present in any of the emails. ¶ 168.

Kane further retaliated in the same vein by selectively disclosing to the press a number of emails received by Plaintiffs (while at the same time shielding the identities of the actual senders and other recipients) in an attempt to further embarrass Plaintiffs and to undermine their personal and professional reputations. ¶ 153. Kane continued to threaten plaintiffs with additional

disclosures by having her agents report that more materials would be released unless Fina and the other plaintiffs refrained from further contact with the press about her. ¶ 155-157.

In her motion to dismiss plaintiffs' Amended Complaint, defendant Kane characterizes her conflict with the plaintiffs as political activity which would presumably raise the threshold for what would be considered unacceptable public comment. This is not a political matter. Plaintiffs have never sought public office, nor have they participated in any political campaigns on behalf of any of defendant Kane's political opponents. Plaintiffs have exercised their professional responsibility and spoken in defense of their professional reputations. While the exposure of Kane's crimes, falsehoods, and misdeeds may have caused the defendant political harm, the defendant's abuse of power and retaliation against Plaintiffs' constitutionally protected speech remains actionable and Plaintiffs' claims should be permitted to proceed.

## III.    LEGAL ARGUMENT

### A.    STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has failed to state a claim upon which relief can be granted. Fed. R. Civ. P.12(b)(6); *see also Hedges v. United States,* 404 F.3d 744, 750 (3d Cir.2005). In *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555, 127 S.Ct. 1955. Following these basic dictates, the Supreme Court, in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, subsequently defined a two-pronged approach to a court's review of a motion to dismiss.

"First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678, 129 S.Ct. 1937. Thus, although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79, 129 S.Ct. 1937.

Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679, 129 S.Ct. 1937. "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.  Id.; *see also Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 232–34 (3d Cir.2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level.'") quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of review have remained intact. *Spence v. Brownsville Area Sch. Dist.*, No. Civ.A.08–626, 2008 WL 2779079, at *2 (W.D.Pa. July 15, 2008). The general rules of pleading still require only a plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. *Phillips*, 515 F.3d at 233. Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff."

12

A000231

*Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir.2006). Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n. 7 (3d Cir.2002).

Moreover, even if the Court finds any of plaintiff's legal theories to be novel, the defense motion should be denied.  "Courts should be reluctant to grant a motion to dismiss when the claim in question asserts a novel legal theory of recovery. Novel theories of recovery are best tested for legal sufficiency in light of actual, rather than alleged facts." *Buckhead Am. Corp. v. Reliance Capital Group, Inc.*, 178 B.R. 956, 961 (D.Del. 1994); *accord Woodruff v. Hamilton Twp. Pub. Schs.*, 2007 WL 1876491, *5 (D.N.J. June 26, 2007); and *Branch v. Fed. Deposit Ins. Corp.*, 825 F.Supp. 384, 397 (D.Mass. 1993).

## B. RETALIATION BY A GOVERNMENT OFFICIAL AGAINST AN INDIVIDUAL WHO EXERCISES A FIRST AMENDMENT RIGHT VIOLATES THE CONSTITUTION

Plaintiffs' right to be free of retaliation for the exercise of their First Amendment rights is well-recognized.  In the Supreme Court's words, "[o]fficial reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "The Supreme Court has explicitly held that an individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment rights." *Anderson v. Davila*, 125 F.3d 148, 160 (3d Cir. 1997) citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).  It has long been the law that "an otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech."  *Id.* at 161.  This is known as the

A000232

"unconstitutional conditions" doctrine. *Id.* at n.12.  *See, e.g. Perry v. Sinderman*, 408 U.S. 593, 597 (1972).

As far as it relates to the First Amendment, "motives of government officials are indeed relevant, if not dispositive, when an individual's exercise of speech precedes government action affecting that individual."  *Id.* at 161.  For at least forty-five years, the Court has held that "the First Amendment ... protects vigorous advocacy, certainly of lawful ends, against governmental intrusion." *NAACP v. Button*, 371 U.S. 415, 429 (1963) citing *Thomas v. Collins*, 323 U.S. 516, 537 (1945); *Herndon v. Lowry*, 301 U.S. 242 (1937).  As the Supreme Court has explained, ". . . it is clear that the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for speaking out." *Hartman*, 547 U.S. at 256.

First Amendment retaliation claims are analyzed under a three part test. A plaintiff must allege: (1) that he engaged in constitutionally protected activity; (2) that the government responded with retaliation against him; and (3) that the protected activity caused the retaliation.[3] *Eichenlaub v. Twp of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004).

In her motion, defendant Kane acknowledges that plaintiffs engaged in protected activity through their speech, satisfying the first element.  Further she makes no argument contesting the third element: that, if otherwise deemed to be retaliatory, her actions were caused by the protected activity of plaintiffs.  The defendant's focus centers upon her contention that plaintiffs have failed to state a claim upon which a relief can be granted because the retaliatory action was not sufficient to deter a person of "ordinary firmness" from exercising his constitutional rights.

---

[3]  The two part *Mt. Healthy* paradigm for proving causation applies to all types of First Amendment retaliation. *Anderson*, 125 F.3d at 163. Accordingly, following a determination that the speech is protected by the First Amendment, *Mt. Healthy* requires the plaintiff to demonstrate that his speech was a substantial or motivating factor in the adverse action. The burden of proof then shifts to the defendants to prove that they would have made the same decision anyway, even in the absence of the protected activity.  *Mt. Healthy* 429 U.S. at 287; *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 144 (3d Cir. 2000); *Springer v. Henry*, 435 F.3d 268, 275 (3d Cir. 2006).

A000233

With respect to the evaluation of the retaliatory action itself, and whether or not it was sufficient "to deter a person of ordinary firmness from exercising his constitutional rights," the defendant relies heavily on *Koren v. Noonan*, 586 F.App'x 885 (3d Cir. 2014).  This is an unpublished Third Circuit Opinion written by Chief Judge Vanaskie concerning the appeal of Judge Cynthia M. Rufe's dismissal[4] of a claim against Frank Noonan that had been filed by Edward Koren, who was a former state trooper running for political office.

In essence, Koren was running for District Attorney when it came to light that he was denied an honorable discharge by Commissioner Frank Noonan of the Pennsylvania State Police. It was apparently intimated in Koren's Complaint that Noonan was a political appointee of Governor Tom Corbett, who was a fellow Republican and therefore the reader was asked to conclude that he was colluding with Koren's political opponent.

Notably, when it came to an evaluation of whether the Plaintiff's First Amendment rights were in fact adversely affected by retaliatory conduct, the Third Circuit observed that this was a "fact intensive inquiry focusing on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts," which must "be more than *de minimis* or trivial."  *Koren v. Noonan*, 586 F.App'x 885, 888 quoting *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003), quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000).

The Court distinguished the *Koren* case from those that arose in the employment context, as in that context the court noted that when retaliatory action was taken by a public employer against an employee, the evaluation of the protected expression was given a threshold which was "very low."  *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006).  At the same time, the Court observed that employment cases are distinct from those that arise in the political arena,

---

4  Notably, Judge Rufe's Opinion was also an unpublished slip opinion.

A000234

noting that courts "have consistently rejected first amendment retaliation claims based upon assertions of purportedly false reports or criticism" in the political arena. *Id.* at 888, citing *Parks v. City of Horseshoe Bend*, 480 F.3d 837, 840 (8th Cir. 2007) (Affirming grant of summary judgment where retaliation claim was predicated upon "a dispute fueled by the rough and tumble of local politics"); *Colson v. Grohman*, 174 F.3d 498, 514 (5th Cir. 1999) ("[T]he defendants allegedly retaliatory crusade amounted to no more than the sort of steady stream of false accusations and vehement criticism than any politician must expect to endure."); *Ollman v. Evans*, 750 F.2d 970, 1002 (D.C. Cir. 1984) (*en banc*) (Bork, J. concurring) ("Where politics and ideas about politics contend, there is a [F]irst [A]mendment arena.   The individual who deliberately enters that arena must expect that the debate will sometimes be rough and personal.").

Obviously, none of the Plaintiffs have ever campaigned for political office nor were they political candidates at the time of the retaliatory action and false statements.   Accordingly, these cases are easily distinguishable.[5]

Defendant also relies upon the *Suarez* Opinion from the Fourth Circuit.   *Suarez* was an action brought by a direct mail marketer and some of its customers against state officials alleging retaliation for the exercise of the marketer's First Amendment right to free speech.   Interestingly, the *Suarez* decision seems to support Plaintiffs' claims when one considers the allegations in the Amended Complaint; namely, Kane first threatened Plaintiffs and then followed through on her threat.   Specifically, in *Suarez* the Court observed:

---

[5] Interestingly, in another portion of the *Koren* Opinion, the Third Circuit noted that "the Supreme Court has recognized that the Constitution "protects" the individual interests in avoiding disclosure of personal matters." *Koren* at 889.   Citing *Doe v. Deli*, 257 F.3d 309, 315 (3d Cir. 2001) quoting *Whalen v. Roe*, 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977).

A000235

> The nature of the alleged retaliatory acts has particular significance when the public official's acts are in the form of speech.  Not only is there an interest in having public officials fulfill their duties, a public official's own First Amendment speech rights are implicated.  Thus, where a public official's alleged retaliation is in the nature of speech, **in the absence of a threat, coercion or intimidation, intimating that punishment, sanction or adverse regulatory action will imminently follow,** such speech does not adversely affect a citizen's First Amendment rights, even if defamatory.

*Suarez Corp. Ind. v. MaGraw*, 202 F.3d 676, 687 (4th Cir. 2000) (emphasis supplied), citing *Penthouse International Limited v. Meese*, 939 F.2d 1011, 1015 (D.C. Cir. 1991).  See also *X-Men Sec. Inc. v. Pataki*, 196 F.3d 56 (2d Cir. 1999) (holding that, in the absence of threats, intimidation or coercion, legislators' "disparaging accusatory or untrue statements . . . fail to state a claim for violation of . . . constitutional rights.").  There is no question that Plaintiffs' allegations of Kane's attempted threat and intimidation, designed to deter Plaintiffs from revealing information to the media and/or through the Grand Jury process, would and should be sufficient to distinguish their situation from *Suarez*. ¶¶ 155-158.

Along these lines, the *Suarez* case was also distinguished by Judge Kugler of the District Court of New Jersey when he declined to follow that reasoning in *Citizens for a Better Lawnside, Inc. v. Bryant*, 2007 WL 1557479.  In that Opinion, the defendants sought reconsideration of Judge Kugler's Order denying summary judgment on the Plaintiff's First Amendment retaliation claims.  The defendants argued that the conduct constituted a "*de minimis* violation," relying heavily upon *Suarez*.  Judge Kugler observed that "the Third Circuit has little binding precedent on the issue.  However the Third Circuit used language in previous opinions which leads this Court to believe that the threshold to establish a First Amendment retaliation claim is low." *Citizens for a Better Lawnside, Inc.* at *5.  Specifically, Judge Kugler cited to the Third Circuit Opinion of *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) for the observation

17

A000236

that ". . . the threshold to establish a First Amendment retaliation claim is low."  In fact, in the O'Connor Opinion, the Third Circuit stated:

> First Amendment retaliation claims are always individually actionable, even when relatively minor.  Even "an act of retaliation as trivial as failing to hold a birthday party for a public employee" if "intended to punish her for exercising her free speech rights" may be actionable if under the circumstances it would sufficient to "deter a person of ordinary firmness" from exercising his or her First Amendment rights.  A First Amendment retaliation claim will lie for any individual act which meets this "deterrence threshold," and that threshold is very low: . . . a cause of action is supplied by all but truly *de minimis* violations.

*O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) citing *Suppan v. DaDonna*, 203 F.3d 228, 234-35 (3d Cir. 2000).

Judge Kugler further rejected the *Suarez* argument by stating "this Court distinguishes the non-binding authority cited by defendants in support of their *de minimis* argument."  *Id.*

Finally, Judge Kugler observed that the inquiry of whether a defendant's conduct would deter a person of "ordinary firmness from exercising his or her First Amendment rights" is a "question of fact" which "is not an appropriate determination for this Court to make on a summary judgment motion," and obviously therefore would be inappropriate at the 12(b)(6) Motion to Dismiss stage.  *Id.* at *6.

It is also important to note that the deterrence inquiry is an objective one and does not depend upon the actual effect which the retaliatory conduct may have had on the plaintiffs.  *See Smith v. Mosley*, 532 F.3d 1270, 1277-78 (11th Cir. 2008); *Constantine v. Rectors and Victors of George Mason University*, 411 F.3d 474, 500 (4th Cir. 2005); *Harbin-Bey v. Rutter*, 420 F.3d 571, 579 (6th Cir. 2005); and *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2nd Cir. 2004).  Thus, it is immaterial to the analysis as to whether or not the plaintiffs were actually deterred from exercising their constitutional rights.

18

Given that none of the Plaintiffs were political candidates, Plaintiffs' claims are more comparable to those in *Neuberger v. Gordon*, 567 F. Supp., 2d 622 (D. Del. 2008). In *Neuberger*, plaintiff, a civil rights attorney, brought a First Amendment retaliation claim against numerous public figures who sought to discredit and defame him due to his advocacy against public corruption and abuse and because of civil rights lawsuits he brought on behalf of abuse victims against state entities and state actors. While the court dismissed plaintiff Neuberger's claim with respect to his legal representation of individuals, the court found that he had pleaded a sufficient First Amendment retaliation claim for actions taken against him as a result of his public advocacy and attempts to expose corruption and abuse by his government. The retaliation in the *Neuberger* case took two forms: (1) official release of medical information that government offices possessed concerning plaintiff's health; and (2) through the purchase of ads that accused plaintiff of unethical conduct and wrongdoing.

In *Neuberger*, the defendants made the identical arguments presented here: i.e., that the defendant's actions would not have caused a person of reasonable firmness to discontinue speaking out against the objectionable government action. Even though there were no threats of physical coercion, prosecution, or other actions that could cause direct material harm in *Neuberger*, the court had no trouble finding that the plaintiff pleaded retaliatory action sufficient to show the chilling effect based upon the defamatory publications of government officials to overcome a motion to dismiss. In particular, the court rejected the defense suggestion that plaintiff would not likely be chilled by government actions given the fact that he was an outspoken civil rights advocate who would, presumably, be used to dealing with attacks in adversity from the parties against his adversaries.

A000238

In the present case, none of the plaintiffs chose to enter the political arena, but rather, they simply performed their professional duties or otherwise acted as concerned citizens.  All of the Plaintiffs were either career prosecutors or career law enforcement investigators who themselves had never engaged in any political campaign or held elected office.   Accordingly, they should not be held to the heightened standards of those who voluntarily take on the "rough and tumble" of political interaction.  For these reasons, the unpublished *Koren* decision is of no service to the Court's evaluation of the Plaintiffs' claims, and the defendant's argument should be rejected.

1. **Defendant Kane's Defamatory Speech Is Not Separately Protected by the First Amendment When It Is Retaliatory In Nature.**

Defendant Kane also alleges that her retaliatory statements are not actionable because they are the statements of a public official who is entitled to speak out on matters of "public concern" based upon her own First Amendment privilege.  [Defendant's Memorandum, p. 1].  First, many of the retaliatory acts as alleged by plaintiffs contain knowingly false and defamatory information, and cannot be fairly described as serving any legitimate public purpose.

Secondly, through her machinations, Kane committed crimes by disseminating to a reporter secret grand jury information that attempted to depict misconduct on the part of plaintiffs Fina and Costanzo by an alleged failure to pursue a public figure in a criminal investigation.[6]   Third, defendant Kane pursued her vendetta further by falsely alleging that plaintiffs abetted sexual child abuse by allowing a suspected child predator to remain at large during the course of a grand jury investigation.  Finally, defendant Kane also made statements falsely insinuating that the plaintiffs had engaged in the traffic of child pornography during a

---

[6] See Montgomery County Court of Common Pleas Criminal Docket Nos. CP-46-CR-0006239 and CP-46-CR-0008423-2015

A000239

national interview with CNN.  All of these statements were intentionally made to punish the Plaintiffs for their exercise of free speech.

Courts have found that an "act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *DeLoach*, 922 F.2d at 620 (quoting *Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir.1984)); *Bloch v. Ribar*, 156 F.3d 673, 681–82 (6th Cir.1998) (same quotation); *see also Allah v. Seiverling*, 229 F.3d 220, 224–25 (3d Cir.2000)("Government actions which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." quoting *Thaddeus–X v. Blatter*, 175 F.3d 378, 398 (6th Cir.1999)(en banc). Thus, assuming that defendant's motive was retaliatory, it is irrelevant whether or not she may have had a right to respond under the First Amendment. Furthermore, plaintiffs also allege that defendant's statements were false and defamatory. Thus, the statements would not be protected under the First Amendment. See *Mezibov*, 411 F.3d at 722 (considering only those comments that could "reasonably be construed as defamatory, lest we trample on the First Amendment rights" of the government official).

Here, Kane expressly threatened Plaintiffs with this embarrassment in an effort to coerce their silence.  ¶¶ 151-159. When her blackmail attempt fell short, Kane, in an act of retaliation, released information that was highly embarrassing and impugned plaintiffs' professional and personal reputations.  In Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir.1998), the Court found that the retaliatory release of information concerning the criminal investigation of a rape victim could serve as a basis for retaliation suit and that "injury based on embarrassment, humiliation, and emotional distress" is sufficient to be actionable under § 1983. See also Barrett v. Harrington,

21

130 F.3d 246 (6th Cir.1997), cert. denied, 523 U.S. 1075, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998). Thus, while public disclosure of information could have a public purpose, when the release is done strictly for a retaliatory purpose, it turns the conduct into an unconstitutional act of retaliation.

For these reasons, Courts have found that actions taken in retaliation for the exercise of a constitutionally protected right are actionable under §1983 even if the act, when taken for a different reason, would have been proper. *DeLoach*, 922 F.2d at 620 *quoting Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir. 1984); *Bloch v. Ribar*, 156 F.3d 673, 681-82 (6th Cir. 1998); and *see also Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000) ("Government actions which standing alone do not violate the Constitution, may nevertheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.") *quoting Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (*en banc*). Thus, because defendant Kane's action was retaliatory in nature, it is irrelevant whether Kane may have otherwise had a right to respond under the First Amendment.

### 2.      Plaintiffs have sufficiently pled a nexus between their constitutionally protected speech and Kane's retaliation.

The third element of a retaliation claim requires a causal link between the constitutionally protected conduct and retaliatory action which occurred. *See Thomas v. Independence T.P.*, 463 F.3d 285, 296 (3d Cir. 2006). As the defendant claims that her conduct was not retaliatory, she apparently did not see cause to question whether the Amended Complaint sufficiently demonstrated that there was a cause and effect relationship between the retaliatory acts and plaintiffs' constitutional conduct. Plaintiffs have nonetheless provided a detailed timeline in their Amended Complaint which demonstrates that a causal link is easily established by the temporal proximity of the event, a past history of hostility and antagonism, and the evidence as a

whole.  *See Lauren W., ex rel. Jean W. v. Deflaninis*, 480 F.3d 259, 267 (3d Cir. 2007) (holding that a plaintiff can establish the requisite connection by proving a "pattern of antagonism coupled with timing").

Plaintiffs' Amended Complaint satisfies each of the essential elements and plainly states a cognizable claim for retaliation under the First Amendment.

### 3.     Defendant Kane Is Not Protected By Qualified Immunity.

Defendant Kane claims she is entitled to qualified immunity for all of plaintiffs' claims against her.  Defendant Kane is not entitled to qualified immunity as she violated plaintiffs' clearly established constitutional rights arising from plaintiffs' constitutionally protected speech. Qualified immunity is an affirmative defense that must be pleaded by a defendant official. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920 (1980).  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).  It is the burden of the defendant official asserting qualified immunity to establish an entitlement to the same.  *Beers-Capitol v. Wetzel*, 256 F.3d 120, 142 n. 15 (3d Cir. 2001) (citations omitted).  Yet this immunity applies only to "suits for civil damages arising from actions within the scope of an official's duties and in objective good faith."  *Harlow v. Fitzgerald*, 457 U.S. 800, 819 n.34, 102 S.Ct. 2727 (1982).  The purpose of qualified immunity is to protect officials who act when their "duties legitimately require action." *Harlow*, 457 U.S. at 819, 102 S.Ct. 2727.  Thus, the preliminary inquiry is whether the official acts for which qualified immunity is asserted were within the scope of the official's authority. Defendant officials "bear the burden of demonstrating that the conduct for which the plaintiff's

23

complain falls within the scope of the defendant's duties." *In re: Allen*, 106 F.3d 582, 594 (4th Cir. 1997) (citations omitted). Rather than the title of the official's office, it is the "duties with which the particular officer sought to be made to respond in damages is entrusted - - the relation of the act complained of to 'matters committed by law to his control or supervision' - - which must provide the guide in delineating the scope of the rule which clothes the official act with immunity". *Barr v. Matteo*, 360 U.S. 564, 573-74, 79 S.Ct. 1335 (1959). The ultimate question when determining if a public employee is acting under the color of state law is whether the official's actions are fairly attributed to the state. *Rendell-Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764 (1982) (citations omitted). This is a separate inquiry from whether the actions of an official are within the scope of that official's authority, although the two may intersect at times. The Supreme Court has noted the distinction between the two, holding that personal liability under section 1983 for acts taken under color of state law may be imposed on acts both within and outside of an official's authority. *Hafer v. Melo*, 502 U.S. 21, 29, 112 S.Ct. 358 (1991). When determining the scope of an official's authority, the Supreme Court has analyzed the statutes and regulations controlling an official's duties. *See Doe*, 412 U.S. at 321-22, 983 S.Ct. 2018, 2029.

Where defendant asserts qualified immunity, the initial inquiry must be whether, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001) (citations omitted). As stated above, plaintiffs have alleged a violation of the constitutional right to engage in protected First Amendment speech. Under the qualified immunity doctrine, the actions of defendant Kane, as described in Plaintiffs' Amended Complaint, cannot be shielded from liability as her actions violated "clearly established statutory

24

or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. 818, 102 S.Ct. 2727.  For qualified immunity purposes, a right is considered clearly established if "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034 (1987).  A reasonable official may be on notice that her conduct is unlawful even if there is no "previous precedent directly on point." *Acierno v. Cloutier*, 40 F.3d 597, 603 (3d Cir. 2004); *see also, Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508 (2002) (holding that "an official can still be on notice that their conduct violates established law even in novel factual circumstances.")   Here, plaintiffs have alleged that defendant Kane's motivation in her statements concerning the plaintiffs was retaliatory, and the Court must accept all well-pleaded allegations of fact as true at this juncture. *Twombly*, 127 S.Ct. at 1965.

In this case, Kane cannot possibly hide behind the qualified immunity doctrine, which was a doctrine designed to protect those officials who reasonably exercise their duties.   In contrast, no one in Kane's position could reasonably believe that she was engaged in the exercise of the duties of her office when she committed the acts giving rise to Plaintiffs' Complaint. First, when she leaked confidential Grand Jury information as part of her plan to defame the Plaintiffs, she committed crimes for which she is currently being prosecuted.[7]  She has been held for court on these charges, with the Judge finding that the elements of a *prima facie* claim had been met, notwithstanding her efforts to perjure herself in her own defense.   ¶15.  See also ¶ 130.  Secondly, when Kane made the decision to publicly release private emails, which had been redacted to reveal only the identities of Plaintiffs in an effort to embarrass Plaintiffs, she received two legal opinions and advice from her staff, telling her that if she went forward with her plan

---

[7] See Montgomery County Court of Common Pleas Criminal Docket Nos. CP-46-CR-0006239-2015 and CP-46-CR-0008423-2015.

A000244

she would be breaking the law.   ¶ 152.   Kane acted in deliberate disregard of these legal opinions and the advice of those in her office.   ¶ 152.   This deliberate effort to engage in illegal conduct is not the sort of activity that should be protected under the qualified immunity doctrine. The Third Circuit has clearly stated that "it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Montero v. City of Elizabeth,* 436 F.3d 397, 404 (3d Cir. 2006) (citations omitted).   As a result, the "unlawful intent inherent in… retaliatory action places it beyond the scope of… qualified immunity if the right retaliated against was established and clear." *DeLoach*, 922 F.2d at 620.   Thus, the relevant inquiry is whether the right retaliated against was clearly established.   Defendant Kane acknowledges in her motion that the plaintiff engaged in protected First Amendment activity.   Plaintiffs' rights to speak to the media and the public regarding government corruption and illegality are clearly established. *See Mills v. State of Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434 (1966) ("there is practically a universal agreement that a major purpose of the First Amendment was to discuss the free discussion of governmental affairs.")   With respect to the present case, Plaintiffs assert that a reasonable official cannot believe that defamatory actions, which themselves are potentially illegal, taken with the intent of retaliating against another's constitutional rights are protected.

For this reason, the Third Circuit has held that the qualified immunity analysis in the context of a First Amendment retaliation claim turns on a "factual determination as to the official's subjective beliefs and motivations, and thus cannot be properly resolved on the face of the pleadings." *Larsen v. Senate of Cmwlth of PA*, 154 F.3d 82, 95 (3d Cir. 1998).   The only exception to this rule is "if a legitimate basis for [defendant Kane's] actions is 'so apparent that plaintiff's allegations of retaliatory motive could not alter the conclusion' that [Defendant Kane]

A000245

would have acted the same 'even without regard for the protected first amendment activity.'" *Id*. Defendant's claim of qualified immunity falls far short.

### 4.    Defendant Kane Is Entitled To No Relief On Her Claim That Plaintiffs' Complaint Violates The Terms Of Federal Rule of Civil Procedure 8(a).

In drafting their Amended Complaint, Plaintiffs anticipated that this Court could be faced with "a fact intensive inquiry" to determine whether the defendant's actions are sufficient to deter persons of ordinary firmness from exercising their right of free speech. *See Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003). The Court's analysis examines four factors including (1) the status of the speaker; (2) the status of the retaliator; (3) the relationship between the speaker and the retaliator; and (4) the nature of the retaliatory acts which must be shown to be more than de minimus or trivial. *Id*. Recognizing that the defense might file a motion to dismiss this case, obligating the Court to make an in depth factual inquiry, plaintiffs endeavored to provide a factual history that provides the Court with sufficient detail to understand the identities and roles of the various parties, their relationship to one another, as well as the foundation of the protected speech and the nature of the retaliatory action. Some of the retaliatory action was complex and involved defendant's use and engagement with numerous employees, agents, friends and supporters.

Plaintiffs are aware that Rule 8 underscores the emphasis placed on clarity and brevity by federal pleadings rules; however, plaintiffs were also cognizant of the unique fact-based nature of the review the Court is compelled to complete in a First Amendment retaliation case. Typically, courts consider dismissal of a complaint pursuant to Rule 8 when the allegations are illegible or incomprehensible or largely unintelligible. *See Stephanatos v. Cohen*, 236 F.App'x 785, 787 (3d Cir. 2007). Dismissal is also proper when a complaint leaves the defendants having

A000246

to guess what of the many things discussed constitutes cause of action on their part, *Binsack v. Lackawanna City Prison*, 430 F. App'x 158, 160 (3d Cir. 2011), or when the complaint is so rambling and unclear as to defy response, *Tillio v. Spiess*, 441 F. App'x, 109, 110 (3d Cir. 2011) or when the complaint is so confused, ambiguous, vague or unintelligible that its true substance, if any, is well disguised.  *Tillio v. Northland Group, Inc.*, 456 F.App'x 78, 79 (3d Cir. 2012). None of those issues exist here.

While plaintiffs do provide a detailed history of their relationship with defendant Kane, the Amended Complaint paints a coherent, logical and detailed account of the facts making up the basis of plaintiffs' claims.  At worst, plaintiffs provided the defense with notice of considerably more factual evidence than they might typically expect at the point of pleading. Because the pleading provides this Court with the information and detail it needs to make a fair and complete review of defendant's motion to dismiss, and because the Amended Complaint contains no irrelevant, impertinent or scandalous material that would not otherwise be justified in the context of the claims alleged in this case, this Court should deny the defendant's motion to dismiss.

## IV.    CONCLUSION

For all of the foregoing reasons, the Defendant's Motion to Dismiss should be denied, and the defendant should be directed to file an Answer to Plaintiffs' Amended Complaint.

WHEREFORE, for all of the foregoing reasons, it is respectfully requested that this Honorable Court deny the Motion to Dismiss filed by the Defendant, Kathleen G. Kane, and enter the Order which is proposed and attached hereto.


FELDMAN SHEPHERD WOHLGELERNTER         MCMONAGLE, PERRI, MCHUGH &
TANNER WEINSTOCK & DODIG, LLP          MISCHAK


/s/ MARK W. TANNER                     /s/ FORTUNATO N. PERRI, JR.
Mark W. Tanner                         Fortunato N. Perri, Jr.
1845 Walnut Street, 21st Floor         1845 Walnut Street, 19th Floor
Philadelphia, PA 19103                 Philadelphia, PA 19103
*Attorneys for Plaintiffs, Frank Noonan, Randy*   *Attorney for Plaintiff, E. Marc Costanzo*
*Feathers, Richard A. Sheetz, Jr. and Frank Fina*


Date:   April 1, 2016

A000248

## CERTIFICATE OF SERVICE

I, Mark W. Tanner, Esquire, hereby certify that a true and correct of the foregoing Response to Motion to Dismiss is being served via the Court's electronic filing system.

FELDMAN SHEPHERD WOHLGELERNTER
TANNER WEINSTOCK & DODIG, LLP


/s/ MARK W. TANNER
Mark W. Tanner
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
*Attorneys for Plaintiffs, Frank Noonan, Randy Feathers, Richard A. Sheetz, Jr. and Frank Fina*

Date:   April 1, 2016

# EXHIBIT "A"

A000250

**FILED UNDER SEAL**

**IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT**

UNSEALED PER ORDER
OF THE COURT DATED
AUGUST 26, 2015

| | | |
|---|---|---|
| PENNSYLVANIA OFFICE OF<br>ATTORNEY GENERAL, | : | NO. 171 MM 2014 |
| | : | |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| SUPERVISING JUDGE OF THE THIRTY-<br>FIFTH STATEWIDE INVESTIGATING<br>GRAND JURY | : | |
| | : | |
| | : | |
| Respondent | : | |

**OPINION**

CARPENTER  J.                                    **DECEMBER 12, 2014**

I, as the Supervising Judge of the Thirty-Fifth Statewide Investigating Grand Jury, have strived for all of my actions to be consistent with the values of judicial objectivity and independence. Any actions that have been inconsistent with those values, I regret. And now, having been informed  that my actions were inconsistent with those values and that a separate response to the Pennsylvania Office of the Attorney General's Petition for Review of the Protective Orders ("Petition for Review"), is required this Opinion follows and addresses those issues raised in the Per Curiam Order and the Concurring Statements authored by Chief Justice Castille and by Justice Stevens filed on December 4, 2014. I respectfully apologize for not anticipating that this Opinion was expected.

I do note that the only communication received by me from the Pennsylvania Supreme Court's Office of the Prothonotary prior to December 4, 2014, when responses to the

1

A000251

Petition for Review were due, was a letter addressed to "William R. Carpenter, Esq." and reading in part "Dear Attorney Carpenter". <u>See</u>, Exhibit "A", appended to this Opinion.

FACTUAL AND PROCEDURAL HISTORY

The history giving rise to the initial Protective Order dated August 27, 2014, the amended Protective Order dated September 17, 2014 and finally the Order of October 30, 2014 outlining this Court's Findings of Fact and Conclusions of Law (collectively termed "Protective Order"), is detailed as follows. On August 25, 2014, this Court held an *ex parte, in camera* hearing with the Special Prosecutor Thomas E. Carluccio, Frank Fina and A. Marc Costanzo being present. The purpose of the hearing was to put on the record certain concerns brought to this Court's attention by Special Prosecutor Carluccio. I feel that it is necessary to cite to the record of the *ex parte in camera* proceedings in order to properly address the issues here. I request that you not unseal those proceedings for the Attorney General as there is confidential information not made part of this Opinion.

At that hearing, Mr. Fina detailed his unsolicited interaction with a reporter from Pittsburgh. According to Mr. Fina, the reporter contacted him on August 13, 2014. The substance of the conversation was to inform Mr. Fina that he was contacted by someone close to the Attorney General. That person provided details about Mr. Fina's personal emails that were uncovered by Geoffrey Moutlon during the review of the Sandusky case, and that there was a significant effort to release some portion of those emails that would be very embarrassing and destructive to him. (N.T. 8/25/14 pp. 2 – 3).

Mr. Fina also relayed an incident that occurred on August 18, 2014. On that date, Mr. Fina told the Court that someone who had assisted him during the review that Mr. Moulton performed, attorney Chris Carusone, was approached without solicitation, by someone named David Tyler, Chief Operating Officer for the Office of the Attorney General ("OAG"). In that interaction, Mr. Tyler told Mr. Carusone something to the effect that "tell your boy to back down

2

or cool down." Mr. Carusone indicated to Mr. Tyler that he didn't know what he was talking about. Mr. Tyler then made references to Mr. Fina's emails that would be very embarrassing and could be released. Mr. Tyler made further remarks to Mr. Carusone that Mr. Fina should keep his mouth shut. Id. at 4 – 5.

A third incident was relayed by Mr. Fina at the August 25, 2014 hearing. A few days earlier, on August 21, 2014, a reporter from Philadelphia contacted him. The reporter informed Mr. Fina that members of the OAG were aggressively suggesting to everybody in the Capitol Media Room, that the OAG had emails of his, that the media is going to want to see them and that they would discredit Mr. Fina. The reporter told Mr. Fina that it was something like he had never seen before in its aggressiveness and it was unlike past situations experienced by him when the OAG has tried to leak information. It seemed to the reporter that the OAG was trying to send Mr. Fina a message, that they had this information and were willing to use it. Id. at 9 – 11.

Mr. Fina told this Court that he believed that these messages or threats were related to that fact that he had been subpoenaed to testify before the Grand Jury. Id. at 11.

Mr. Costanzo was also present to testify at the August 25, 2014, hearing. He had concerns in regard to his cooperation with this investigation and his subpoena to testify before the Grand Jury. Mr. Costanzo relayed that the Attorney General had solicited Right-to-Know requests from the media and that the media has sent those requests to the Office of the Attorney General. Mr. Costanzo believed that the subject matter of the Right-to-Know requests were his personal and private emails that were received by him of a personal nature. Id. at 17 – 19.

Additionally, Mr. Costanzo testified that over the past several months, in various public ways the Attorney General has made statements about him that were not accurate and meant to convey something negative in an attempt to denigrate his reputation. He gave the Court an example that when the Attorney General was questioned about an undercover

3

operation involving Tyron Ali, her reaction in the press was to accuse the prosecutors, including

Mr. Costanzo, of being racist and incompetent and she went out of her way to name Mr.

Costanzo as one of those prosecutors. Mr. Costanzo told the Court that in reality, despite the

Attorney General's depiction to the media, his involvement was minimal and peripheral at most.

Id. at 19 – 20. Mr. Costanzo provided another example concerning a memorandum involving Mr.

Mondesire's investigation and an article that appeared in the Daily News. The Daily News article

suggested that possible criminal conduct on the part of Mr. Mondesire was brought to Mr.

Costanzo's attention, and neither he nor Mr. Fina appropriately responded to that information. In

reality Mr. Costanzo was not the receiver of the memo; rather, it was he who directed that the

memo be prepared and then it was sent up to his boss. He was the sender of that memo and

was waiting for a response. Id. at 20 – 21.

        After considering the testimony of both Mr. Fina and Mr. Costanzo the August 27,

2014, Protective Order was issued, and the relevant portion reads as follows:

> AND NOW, this 27[th] day of August, 2014, it is hereby ORDERED,
> pursuant to 18 Pa.C.S. §4954 (relating to protective orders), that:
>
> 1.  The Office of the Attorney General, except upon specific
> authorization by this Court or the Special Prosecutor, shall
> refrain from any involvement in, or access to, the investigative
> efforts of the Special Prosecutor.
>
> 2.  Employees of the Office of the Attorney General shall refrain
> from engaging in, or soliciting, any act of obstruction,
> intimidation or retaliation against any witness summoned by
> the Grand Jury in the Special Prosecutor's investigation.
>
> 3.  All transcripts of Grand Jury testimony shall be given only from
> the stenographer or their employer directly to the Supervising
> Judge and the Special Prosecutor, no copy shall be given to
> the Attorney General's Office.
>
> 4.  Employees of the Office of the Attorney General shall not have
> access to transcripts of proceedings before the Grand Jury or
> Supervising Judge, exhibits, or other information pertaining to
> the Special Prosecutor's investigation. All information

A000254

pertaining to the Special Prosecutor's investigation. All
information related to the work of the Special Prosecutor shall
be kept in the custody of the Special Prosecutor and
Supervising Judge.

5. Any person, including employees of the Office of the Attorney
   General, who engage in any act of obstruction, Intimidation or
   retaliation against a witness summoned by the Grand Jury in
   the Special Prosecutor's investigation may be prosecuted as
   set forth in 1 8 Pa.C.S. §4955 (relating to violation of orders)
   and any other applicable provisions of the Crimes Code of
   Pennsylvania.

***

August 27, 2014 Protective Order.

Thereafter, the OAG filed a Motion for Reconsideration. This Court then issued

its first September 17, 2014, Order which directed a reconsideration hearing to be held in regard

to the issuance of the protective order under 18 Pa.C.S.A. §4954. See, September 17, 2014

Order.

Another order was issued on September 17, 2014. This order amended the

original August 27, 2014, Protective Order to only subject the following person to paragraphs 2

and 5 of that Order as follows:

1. Any person who has been sworn to Grand Jury secrecy.
2. Any person who has or had access to Grand Jury information.
3. Any person associated with the J. Whyatt Mondesire
   proceedings and investigation.

See, September 17, 2014 Order.

After this Court ordered a reconsideration hearing be held, but before that

hearing was scheduled, the OAG filed an Application for Special Relief with the Pennsylvania

Supreme Court. That Application was dismissed as moot based on the fact that there would be

a hearing.

Subsequently, on October 17, 2014, an *in camera* reconsideration hearing was

conducted. At the start of the hearing, Attorney Lauran Ditka who appeared on behalf of the

5

OAG, renewed a request to subpoena Mr. Fina and Mr. Costanzo. That request was denied. Attorney Ditka also renewed a request to review the transcript of the August 25, 2014 *ex parte, in camera* hearing. That was denied. Finally, Attorney Ditka motioned for leave to call Special Prosecutor Carluccio, which was also denied.

At the hearing, the OAG only presented evidence of inappropriate and possibly pornographic emails that were recovered during the review of the Sandusky investigation. This was done through the testimony of James Barker, Chief Deputy Attorney General. (N.T. 10/17/14, 1:23 p.m., pp. 21 – 34). However, the OAG did not present any witness to substantiate its claim that the Protective Order as amended on September 17, 2014, impacted the operation of the OAG's functions.

Directly following the reconsideration hearing, an in *ex parte, in camera hearing* was conducted. First, Special Prosecutor Carluccio continued questioning Mr. Barker, who remained under oath. Mr. Barker testified that the Right-to-Know requests originally came in around July 7, 2014. Those requests did not specifically name anyone. They were general requests asking for inappropriate emails from employees. (N.T. 10/17/14, 2:12 p.m. pp. 2 – 3). Then in the beginning of August of 2014, additional the Right-to-Know requests were received by Mr. Barker. These requests were amended to specify certain employees of the Attorney General's office, including Mr. Fina, Mr. Costanzo and Mr. Carusone. Id. at 3. Mr. Barker was also included in a Right-to-Know request toward the end of August, 2014. Id. at 3 – 4.

By way of background, Mr. Barker testified that he became aware of the inappropriate emails in about February or March of 2014. However, it wasn't until after Special Prosecutor Carluccio started issuing subpoenas in July of 2014 to Mr. Fina and Mr. Costanzo that he began to receive Right-to-Know requests regarding the emails, and not much later he started receiving Right-to-Know requests specifically naming Mr. Fina, Mr. Costanzo and Mr. Carusone. Id. at 6 – 9.

A000256

Also to testify at this second October 17, 2014, hearing was George Kadish, special assistant investigator to Special Prosecutor Carluccio. Id. at 19. Mr. Kadish stated that he was present on August 26, 2014, when Mr. Costanzo and Mr. Fina came to testify before the Grand Jury. Id. Mr. Kadish explained that on that morning, he arrived at a quarter to eight, and as he entered the building he noticed some people milling around on the ground floor. Mr. Kadish thought it strange that there were more people than are usually there. Id. In particular, he noticed Agent Mike Miletto of the OAG who had already testified before the Grand Jury on a different date. Id. at 19. Mr. Kadish continued on to the third floor. At some point Mr. Fina and Mr. Costanzo arrived and were very upset. Id. at 20. Both men relayed to Mr. Kadish that when they had come into the ground floor, there were about four agents of the OAG waiting for them, giving them "dirty looks." Id. at 20. These agents followed the two men into the elevator and rode up with them to the third floor. Id. While on the elevator, Agent Miletto got face-to-face with Mr. Fina. Id. at 22. They all exited at the same time. Id. The agents followed Mr. Fina and Mr. Costanzo to where the two men were to meet with Mr. Kadish and Special Prosecutor Carluccio. Id. at 20. Shortly after their arrival, Special Prosecutor Carluccio was being summoned by a sheriff on behalf of an agent, Agent Mackelin. Id. at 21. With Mr. Kadish accompanying Special Prosecutor Carluccio, the agent singled out Mr. Costanzo and started to disparage him. Id.

On October 30, 2014, the OAG's Motion for Reconsideration of the August 27, 2014, Protective Order as amended by the September 17, 2014, Order was denied. Attached to that Order were the Court's Findings of Fact and Conclusions of Law. Those Findings of Facts and Conclusions of Law read as follows:

7

**A000257**

**FINDINGS OF FACT:**

Prior to the issuance of the Protective Order:

1. The identity of anyone subpoenaed by the Special Prosecutor was widely known within the Attorney Generals' Office.
2. The time and location of those witnesses appearing before the Grand Jury was also widely known within the Attorney General's Office.
3. The Attorney General was also acquiring copies of the Notes of Testimony presented by the Special Prosecutor to the Grand Jury, in a situation where the Attorney General's Office was the subject of the investigation.
4. Grand Jury witnesses were confronted as they arrived to testify before the Grand Jury. They were subjected to conduct of an intimidating nature.
5. Subsequent to the issuance of the Protective Order the above conduct has been abated.
6. The Grand Jury operates within one of the office buildings of the Attorney General. Grand Jury scheduling and issuance of subpoenas are necessarily done with the clerical employees of the Attorney General. Accordingly the Attorney General and her employees know when, where and which witnesses are appearing before the Grand Jury.
7. Here the Attorney General and her employees are the subject of the investigation into the leaking of secret Grand Jury information to the newspapers.
8. This Court has been furnished with substantial evidence, information and testimony in camera that fully supports the issuance of an the maintaining of the Protective Order.
9. The Court conducted a hearing on the Attorney General's Request to Vacate the Protective Order on October 17, 2014. At that hearing, the Attorney General called only one witness who in no way provided any reason or just cause to vacate the Protective Order.
10. The timing of the Right-to-Know Request naming Frank Fina and Mark Costanzo among others were submitted to the Attorney General's Office at the time they were subpoenaed and/or scheduled to testify.

A000258

11. In her "Motion to Quash Grand Jury Subpoena" the Attorney General through privately retained counsel submitted that because she was not sworn to secrecy with regard to prior Grand Juries "...she <u>could not</u> as a matter of law be in Contempt of Court with regard to any disclosure related to that Grand Jury proceeding."

12. This Court finds based upon substantial evidence as a fact that:

    A. The Protective Order is necessary to protect the secrecy of the Statewide Grand Jury proceedings;

    B. The Protective Order is necessary to maintain and ensure the integrity of the Grand Jury process and;

    C. The Protective Order is necessary and appropriate to deter Grand Jury witness intimidation and retaliation.

**CONCLUSIONS OF LAW:**

The Protective Order is necessary and appropriate. The Attorney General has shown no cause to vacate the Protective Order or amend it further.

<u>See</u>, October 30, 2014 Order.

Subsequently, the OAG filed the underlying Petition for Review with the Pennsylvania Supreme Court seeking that the Protective Order be vacated. This Opinion serves as the Court's response addressing those issues outlined in the Per Curium Order and the Concurring Statements filed on December 4, 2014.

<u>ISSUES</u>

I.    <u>Whether the Protective Order does not infringe on the OAG's ability to fulfill its constitutional mandate relative to the investigation and prosecution of criminal offenses.</u>

II.    <u>Whether the Protective Order is not intended to restrict or impact "appropriate public discourse" of information connected with the possession and/or distribution of pornographic images by members of the OAG.</u>

9

A000259

III.   Whether the Protective Order was properly issued based upon substantial evidence of intimidation of grand jury witnesses.

## DISCUSSION

I.   The Protective Order does not infringe on the OAG's ability to fulfill its constitutional mandate relative to the investigation and prosecution of criminal offenses.

Per Chief Justice Castille's recommendation in his Concurring Statement filed on December 4, 2014, this Court issued an order on December 5, 2014, directing the OAG to "immediately identify precisely which, if any, of its law enforcement functions, other than a supposed right to investigate witnesses in an ongoing Special Prosecution involving OAG itself, have been impeded by the protective order here... If the OAG is so affected the OAG is directed to suggest the contours of a narrower order that would address the OAG's concerns affecting duties outside the realm of the Special Prosecution." December 5, 2014 Order, quoting Chief Justice Castille's Concurring Statement filed on December 4, 2014.

On December 9, 2014, the OAG complied with this Court's court order. In the OAG's response to the December 5, 2014 Court order, the OAG set forth examples which it believes illustrate how its constitutional mandate relative to the investigation and prosecution of criminal offenses is hampered by the Protective Order. Therein, the OAG's examples rely on an erroneous premise set forth which it would like the Pennsylvania Supreme Court to accept as true, namely that "the Court has made clear that it views **any sort of action on the part of any employee** of the Office of the Attorney General that is adverse in any way to such a witness as intimidation, obstruction and/or retaliation." See, Response of the OAG to the Order of Court Dated December 5, 2014, 12/9/14, pp. 1, 5 (emphasis added). All of the OAG's examples rely in this erroneous premise. This is not what the Protective Order was and is intended to prevent. Its purpose was/is to prevent the intimidation, obstruction and/or retaliation, in the ordinary sense of those words, of any grand jury witness in an effort to inhibit and/or impede that witness from testifying truthfully and fully before the Grand Jury. In fact, the testimony of Mr. Fina, Mr.

10

Costanzo and Mr. Kadish reveals that there were attempts, direct and indirect, by agents of the OAG to sway Mr. Fina's and Mr. Costanzo's testimony before the Grand Jury. It was the substance of the threats combined with the timing of those threats, i.e., when the OAG became aware that both men were subpoenaed to testify, that created an atmosphere of intimidation. The Protective Order strives to maintain the integrity of the Grand Jury system and process. It was never intended to prevent the OAG from carrying out its constitutional duties.

Additionally, the OAG never provided this Court with the curtesy of an opportunity to craft an order directly addressing its concerns, despite this Court's invitation to do so in August and again at the October 17, 2014, reconsideration hearing, in which Attorney Ditka was told that this Court would entertain limiting language regarding the Protective Order. This Court was open to that, but none was provided. The OAG's Response to the December 5, 2014 Order is the very first time it has set forth its concerns by way of presenting concrete illustrations of how their constitutional duties could possibly be affected, and that first time it has suggested contours of a narrower order that would address those concerns. It is essential to underscore that the OAG had the opportunity to present evidence at the October 17, 2014, reconsideration hearing of how its duties were hampered by the Protective Order, in a courtroom, under oath before this Judge. However, there was no proper evidence presented.

In contrast, the Protective Order was based upon testimony given under oath to me that I found to be credible and substantial. Nothing in the OAGs Petition for Review is based upon any evidence given under oath to any Judge.

II. The Protective Order is not intended to restrict or impact "appropriate public discourse" of information connected with the possession and/or distribution of pornographic images by members of the OAG.

The Protective Order is not intended to restrict or impact "appropriate public discourse" of information connected with the possession and/or distribution of possibly pornographic images by members of the OAG. That is not the purpose of the Protective Order.

11

It is the intimidation by the OAG against grand jury witnesses that the Protective Order is meant to put an end to in order to maintain the integrity of the Grand Jury process. In fact, it is my belief that all of the inappropriate images and information related thereto should be appropriately released. The materials should not be selectively released. The materials should not be released unless the Attorney General can prove that the named individual received and opened the emails.

The OAG is insincere at best when in its Petition for Review it stated, "[t]he Attorney General's decision to serve the public interest by identifying egregious prior misconduct within the OAG and the identities of those public servants involved *has absolutely no nexus whatsoever to the Special Prosecutor's investigation*." (emphasis is the original). This is not accurate. There has been a nexus between the threatened release of Mr. Fina's personal emails and his subpoena to testify before the Grand Jury. In addition, the Right-to-Know requests, specifically requesting the personal emails of Mr. Fina and Mr. Costanzo which were made by several news outlets at the urging of the OAG, were made after Special Prosecutor Carluccio subpoenaed them to testify before the Grand Jury. There has been a nexus.

It seems that the problem surrounding the public discussion has occurred because Attorney General Kane has cherry picked which and whose email to selectively release. It all should be released, without which a proper public discourse cannot occur.

Additionally, the release of information relating to such images and the images themselves does not obviate the need for a Protective Order. There was substantial evidence demonstrated in the August 25, 2014 hearing and the October 17, 2014 *ex parte, in camera* hearing that the OAG is willing to intimidate subpoenaed Grand Jury witnesses, either directly or indirectly. This should not be tolerated in any form, whether today it is the release of inappropriate emails and tomorrow it is intimidation in a different fashion. The Protective Order is meant to preserve the integrity of the grand jury system and process.

12

A000262

III.    The Protective Order was properly issued based upon substantial evidence of
        intimidation of grand jury witnesses.

                 *a.    There was substantial evidence that Grand Jury witnesses were being
        intimidated.*

The Protective Order issued on August 27, 2014, as amended by way of the

September 17, 2014 Order, was properly issued pursuant to 18 PA.C.S §4954 based upon a

substantial evidence presented at the August 25, 2014, *ex parte, in camera* hearing that

witnesses who were subpoenaed to testify before the Grand Jury were being intimidated by

agents of the OAG. In addition, evidence that was brought forth to this Court on the October 17,

2014 *ex parte, in camera* hearing further substantiated the necessity in maintaining the

Protective Order. Moreover, the language of the Protective Order does not have the potential to

produce a chilling effect as it relates to unrelated ongoing cases involving the OAG and some of

the potential Grand Jury witnesses.

Section 4954 of the Criminal Code allows for the issuance of protective orders

based upon the following:

> **§ 4954. Protective orders**
>
> Any court with jurisdiction over any criminal matter may, after a
> hearing and in its discretion, upon substantial evidence, which
> may include hearsay or the declaration of the prosecutor that a
> witness or victim has been intimidated or is reasonably likely to be
> intimidated, issue protective orders, including, but not limited to,
> the following:
>
> (1) An order that a defendant not violate any provision of this
> subchapter or section 2709 (relating to harassment ) or 2709.1 (
> relating to stalking).
>
> (2) An order that a person other than the defendant, including, but
> not limited to, a subpoenaed witness, not violate any provision of
> this subchapter.
>
> (3) An order that any person described in paragraph (1) or (2)
> maintain a prescribed geographic distance from any specified
> witness or victim.

13

**A000263**

> (4) An order that any person described in paragraph (1) or (2)
> have no communication whatsoever with any specified witness or
> victim, except through an attorney under such reasonable
> restrictions as the court may impose.

18 Pa.C.S. § 4954.

At the August 25, 2014, *ex parte, in camera* hearing both Mr. Fina and Mr.
Costanzo credibly testified that attempts were made by agents of the OAG, indirectly, to
intimidate them, as detailed in the above cited testimony. For instance, Mr. Fina testified that he
was contacted, unsolicited, by two separate reporters on two separate occasions prior to his
appearance before the Grand Jury, warning him that there was an effort to release emails that
had the potential to embarrass him. Mr. Fina believed that these were attempts to intimidate him
related to the fact that he had been subpoenaed to testify. In addition, Mr. Costanzo testified
that he too had been what he believed to be the target of intimidation by the OAG. He told this
Court that the OAG solicited the media to make Right-to-Know requests, requesting private
emails received by him. In addition, Mr. Costanzo made this Court aware of attempts by the
OAG to publically undercut his credibility, to disparage him and to suggest he was behind
botched OAG investigations. This Court believed that the testimony of Mr. Fina and Mr.
Costanzo as more fully set forth earlier in this Opinion provided substantial evidence in which to
issue the August 27, 2014, Protective Order in an effort to maintain the integrity of the grand jury
process.

Not only was substantial evidence provided at the August 25, 2014, hearing, the
OAG provided no evidence at the October 17, 2014 reconsideration hearing that required this
Court to modify or vacate the Protective Order. At the October 17, 2014 reconsideration
hearing, the OAG made no attempt to properly subpoena any witnesses to testify before the
Court. Instead, the OAG improperly subpoenaed a reporter utilizing the subpoena power only
reserved for the official business of the 35th Statewide Grand Jury containing my electronic
signature. Those subpoenas read in relevant part, "You are ORDERED to appear as a witness

14

A000264

before the PENNSYLVANIA STATEWIDE GRAND JURY...". However the October 17, 2014, reconsideration hearing did not involve testimony before the Grand Jury, but rather, it was before the undersigned as the Supervising Judge. The 35th Statewide Investigating Grand Jury was not even in session that week. The improper use of Statewide Grand Jury Subpoenas was never approved by me.

Additionally, at the October 17, 2014, reconsideration hearing the OAG offered only one witness to testify to inappropriate emails uncovered during the Sandusky investigation. There were no witnesses offered to substantiate claims that the OAG's duties and the responsibilities were or are hampered by the Protective Order, that it was overbroad and too vague. The OAG offered no proposed language to this Court to tailor the Protective Order to alleviate its concerns regarding its constitutional duties, despite an invitation form this Court to do so.

Moreover, the *ex parte, in camera* October 17, 2014, hearing provided additional support for the necessity of the Protective Order. The testimony adduced therein showed that in early July, 2014, the OAG received only general requests under the Right-to-Know Act. However, shortly after the OAG became aware in mid-August that certain witnesses were subpoenaed to testify before the Grand Jury, the OAG received additional Right-to-Know requests which specifically identified both Mr. Fina, Mr. Costanzo. Additionally, at this hearing was evidence presented through the testimony of Mr. Kabash of intimidating conduct by agents of the OAG and specifically those of Agent Miletto and the disparagement by Agent Mackelin of Mr. Costanzo.

> b. The OAG's requests to subpoena Mr. Fina and Mr. Costanzo, to call Special Prosecutor Carluccio to testify and to review the notes of testimony from the August 25, 2014 ex parte, in camera hearing were properly denied.

At the reconsideration hearing, the OAG renewed its request to subpoena Mr. Fina and Mr. Costanzo, for leave to call Special Prosecutor Carluccio to testify and to review the

A000265

transcript from the August 25, 2014, *ex parte, in camera* hearing. This Court denied the request relying on Commonwealth v. Hood, 872 A.2d 175 (Pa.Super. 2005).

In Hood, a protective order was granted after an *ex parte, in camera* hearing pursuant to Pa.R.Crim.P. 573(F), which allows a judge to grant a protective order after a showing of "sufficient showing", and in that context an *ex parte, in camera* hearing was found to be proper. There is even more reason to find such a hearing proper under 18 Pa.C.S. §4954, which requires "substantial evidence" in which to issue a protective order. The higher standard offers more protection to the opposing side, despite the *ex parte* nature of the hearing. The Hood Court explained the necessity of the *ex parte* nature of the *in camera* hearing and stated, "[w]e note at the outset that allowing the presence of defendant and defense counsel at the protective order hearing would have defeated the purpose of providing protection for these witnesses." Id. at 872 A.2d at 180.That is even more true when a protective order has been issued under §4954, which specifically addresses the protection against witness intimidation. This approach is not inconsistent with the argument of Special Prosecutor Carluccio in which he argued that "[t]he Attorney General's Office is not a defendant. They have not been charged. They are a third party in this investigation." (N.T. 10/17/14, 1:23 P.M., p. 7).

In particular, although the OAG and Attorney General Kane are now only considered witnesses to the leak of the prior grand jury information, the allegations of intimidation are directly attributable to the OAG. It seemed that agents of the OAG or Attorney General Kane herself feel threatened by the potentially damaging testimony that Mr. Fina or Mr. Costanzo in their respective Grand Jury testimony might have provided.

It is crucial to note that testimony before the Grand Jury, including that of members of the OAG, has firmly and definitively established that the 29th Statewide Grand Jury information that was inappropriately supplied to the press came from the OAG. In fact, Attorney General Kane has implicitly admitted that she was involved in the 2009 grand jury leak that the 35th Statewide Grand Jury is investigating at the time she filed her Motion to Quash her

16

subpoena to testify before the Grand Jury, in which she argued that she personally could divulge the documents because she was not subject to an oath of secrecy associated with the 2009 Grand Jury. More specifically, in Attorney General Kane's memorandum of law in support of her motion to quash subpoena, which she filed in her individually capacity through privately retained counsel, not through the OAG, she stated that, "Attorney General Kane was not sworn to secrecy with regard to the 2009 grand jury proceedings. By statute, only a limited group of individuals are sworn to secrecy... Because Attorney General Kane had no involvement whatsoever with the 2009 grand jury proceedings, she could not as a matter of law be in contempt of court with regard to any disclosure related to that grand jury proceeding." Memorandum of law in support of motion to quash 9/29/14. This passage seems to suggest that she believed she might be charged with a criminal offense and was already putting forth her defense. Therefore, although not defendants, the OAG and Attorney General Kane feel threatened by potentially damaging testimony, and have attempted to intimidate Grand Jury witnesses. Accordingly, the Protective Order is necessary to protect the integrity of the Grand Jury system.

### c. The Protective Order does not have a chilling effect on the duties and responsibilities of the OAG.

Finally, this Court does not believe the Protective Order to be overbroad or too vague. Although the OAG consistently argues this point is each of its filings, this argument is disingenuous. At all times the OAG has sought to vacate and only vacate the Protective Order. As this Court noted at the October 17, 2014 reconsideration hearing, if the OAG was seeking modification of the Protective Order, then this Court would be receptive to additional revised language to consider. That was conveyed to the OAG in August and again in October of 2014, and was never pursued by the OAG.

The conduct that is covered by the Protective Order can be gleaned from the traditional and dictionary meaning of the word intimidation and retaliation. According to the

17

Merriam Webster dictionary, the term "intimidate" means to "to make timid or

fearful : frighten; *especially* : to compel or deter by or as if by threats". In addition, the term

"retaliate" according to the Merriam Webster dictionary means "to do something bad to

someone who has hurt you or treated you badly : to get revenge against someone". These

definitions are not vague or overbroad. . Clearly, two attorneys, one from the OAG and one as a

potential witness before the Grand Jury, having a disagreement about an unrelated investigation

and getting into a heated discussion, an argument even, in no way falls into the conduct that is

intimidating and retaliatory the same way as threating to expose personal emails that could

embarrass and damage the reputation of a Grand Jury witness just prior to that witness's

appearance before the Grand Jury as in Mr. Fina's case, or publically disparaging a Grand Jury

witness by making false claims to the media as in the case of Mr. Costanzo.

      As for the OAG's illustrations of how its functions are hampered by the Protective

Order contained in the Response to this Court's December 5, 2014, Order, they are addressed

in Issue I as set forth earlier in this Opinion. It should be emphasized that the OAG did not bring

any evidence before this Court at the reconsideration hearing, at a time that evidence could

have been presented under oath, in a courtroom and before this Judge. Not only is there a lack

of evidence to substantiate the OAG's claims of interference with its responsibilities; but also

there has been a lack of concrete examples of such alleged hindrance.

      As for the OAG's suggestions for a narrower order: (1) *A protective*

*order...should comply with the provisions of 18 Pa.C.S. 4954.* For all of the reasons previously

state, I believe that the Protective Order does comply. (2) *A protective order should be directed*

*at those persons who are found to have actually engaged in intimidation or retaliation.* The

Protective Order as amended applies only to :

1. Any person who has been sworn to Grand Jury secrecy.
2. Any person who has or had access to Grand Jury information.
3. Any person associated with the J. Whyatt Mondesire
   proceedings and investigation.

A000268

To wait until after further intimidation and retaliation has occurred to identify those persons who are found to have actually engaged in intimidation or retaliation would defeat the purpose of the Protective Order.  The additional harm sought to be prevented would have already occurred. (3) *Conduct that will be found to be intimidating, retaliatory, or otherwise in violation of the protective order should be delineated.* I believe that the Protective Order clearly sets forth that offensive conduct is conduct which is aimed at intimidating a witness from testifying or from telling the whole truth, or conduct aimed at retaliation against a witness who has testified. (4) *A protective order should have an expiration date.* I request that the Protective Order remain in place until the investigation has concluded.

<u>CONCLUSION</u>

Based upon the foregoing analysis, this Court respectfully requests that the Protective Order be upheld.

**BY THE COURT:**

**WILLIAM R. CARPENTER       J.**
SUPERVISING JUDGE OF THE THIRTY-
FIFTH STATEWIDE INVESTIGATING
GRAND JURY

Copies sent on December 12, 2014
By First Class Mail to:
Attorney General Kathleen M. Kane
Thomas E. Carluccio, Esquire

19

A000269

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRANK NOONAN, et al., | CIVIL ACTION: 15-cv-06082 |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| KATHLEEN KANE, ET AL., | |
| Defendants. | |

## __ORDER__

AND NOW, this            day of                          , 2016, upon consideration of Plaintiffs' Motion Pursuant To Rule 60(b) to Vacate Order Granting Defendant Kane's Motion To Dismiss Plaintiffs' Amended Complaint And Seeking Leave To File A Second Amended Complaint and supporting Memorandum of Law, it is hereby ORDERED and DECREED that the Motion is GRANTED and Plaintiffs' may file a Second Amended Complaint.

BY THE COURT:

_____
                                    J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

---

FRANK NOONAN, et al.,                                CIVIL ACTION: 15-cv-06082

     Plaintiff,

     v.                                                 JURY TRIAL DEMANDED

KATHLEEN KANE, ET AL.,

     Defendants.

---

**PLAINTIFFS' MOTION PURSUANT TO RULE 60(b) TO VACATE ORDER GRANTING DEFENDANT KANE'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT AND  SEEKING LEAVE TO FILE A SECOND AMENDED COMPLAINT**

For the reasons set forth in the accompanying Memorandum of Law, Plaintiffs hereby move, pursuant to Fed. R. Civ. P.60(b)(2) and (6), for leave to file an Amended Complaint setting forth further allegations in support of Plaintiffs claim in light of the newly released testimony made public at the criminal trial of the Defendant Kane, which occurred after this Honorable Court entered the Order of July 19, 2016 dismissing Plaintiffs claims before any discovery could be conducted.

WHEREFORE, it is respectfully requested that this Honorable Court grant Plaintiffs' Motion, and enter the Order which is proposed and attached hereto.

FELDMAN SHEPHERD WOHLGELERNTER
TANNER WEINSTOCK & DODIG, LLP

/s/ MARK W. TANNER
Mark W. Tanner
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
*Attorneys for Plaintiffs, Frank Noonan, Randy Feathers, Richard A. Sheetz, Jr. and Frank Fina*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

FRANK NOONAN, et al.,                                    CIVIL ACTION: 15-cv-06082

      Plaintiff,

      v.                                                         JURY TRIAL DEMANDED

KATHLEEN KANE, ET AL.,

      Defendants.
_____

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION PURSUANT TO RULE 60(b) TO VACATE ORDER GRANTING DEFENDANT KANE'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT AND SEEKING LEAVE TO FILE A SECOND AMENDED COMPLAINT**

A.    Introduction

On July 19, 2016, the Court dismissed plaintiffs §1983 First Amendment retaliation complaint against former Pennsylvania Attorney General Kathleen Kane,  reasoning that plaintiffs had failed to allege facts sufficient to show that Kane played a material role in the retaliatory conduct or conspired with others.  At the time the Court rendered its decision, neither the plaintiffs nor the Court had the benefit of the sealed grand jury testimony of Joshua Morrow, one of Kane's co-conspirators, and this testimony was subsequently revealed at the August criminal trial which resulted in Kane's conviction for unlawfully leaking of grand jury material and perjury.  Morrow's testimony, and the jury's verdict, establishes beyond any doubt that Kane initiated and directed a conspiracy to retaliate against plaintiffs – in fact, that conspiracy formed the core of the prosecution's case that resulted in Kane's criminal conviction.  Morrow's testimony makes clear that Kane orchestrated the publication of a defamatory Philadelphia Daily News story by personally leaking confidential grand jury documents with instructions that

Morrow get them to a "friendly" reporter who would write the desired story designed to defame plaintiffs.  Morrow testified that he and Kane entered into this conspiracy specifically as an act of retaliation against Fina and Costanzo, and then conspired further to cover up this illegal conduct.  This new evidence, unavailable to plaintiffs or the Court before the August trial (but presumably in the possession of the moving Defendant Kane), now makes it abundantly clear that plaintiffs have cognizable claims for First Amendment retaliation.  Under Fed. R. Civ. P. 60(b), this Court should vacate its order of dismissal and permit plaintiffs to amend their complaint to include allegations which detail this newly discovered evidence.

Plaintiffs brought a § 1983 civil rights action against former Pennsylvania Attorney General Kathleen Kane, former Daily News reporter Chris Brennan, and others for taking action in retaliation for appellants' exercise of their First Amendment rights to free speech.[1]  On motion by Kane and her co-defendants, this Court dismissed appellants' complaint under Fed. R. C. P. 12(b)(6).[2]  While appellants maintain that the Court failed to properly credit the allegations and inferences to which Plaintiffs were entitled in the Amended Complaint, and that Plaintiffs should have been given the opportunity to engage in discovery and obtain this additional evidence which supports Plaintiffs claims, Plaintiffs seek the opportunity to Amend so the Court can consider the issues in light of the evidence adduced at the recent criminal trial.  By way of example, in dismissing Plaintiffs claims, the Court reasoned that plaintiffs did not adequately allege conduct by Kane showing that she played a sufficiently material role in causing the news story to be published which Plaintiffs Fina and Constanzo claimed was both defamatory and retaliatory.  Opinion, Exh. "C" at 20-26.  Testimony at Kane's criminal trial now makes it abundantly clear that Kane was driving force and played the principal role in the concerted

---

[1] Plaintiffs' amended complaint is attached hereto as Exhibit "A."
[2] Kane's motion to dismiss plaintiffs' complaint is attached hereto as Exhibit "B" and the trial court's memorandum opinion is attached hereto as Exhibit "C."

A000273

action.[3]  Similarly, in the opinion, the Court reasoned that the appellants did not adequately plead

facts to show that Kane participated in a conspiracy that included her consultant Joshua Morrow,

which led to the publication of this story in the Daily News.   Opinion, Exh. "C" at 24-25.

However, the actual testimony of Morrow at Kane's criminal trial expressly acknowledges that

Kane was the leader and director of the conspiracy. See Exhibit D.  Plaintiffs' bring this motion

pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, asking the Court to vacate its

order dismissing their complaint, and to provide leave to amend in view of this new evidence.

Under these circumstances, the interests of justice can only be served by vacating the

order dismissing the complaint and allowing plaintiffs to file an amended complaint.

A.      Factual Background

In its Opinion dismissing plaintiffs' amended complaint, the Court acknowledged that the

dissemination of grand jury material for a retaliatory purpose can be grounds for a § 1983

retaliation claim depending on "the status of the speaker, the status of the retaliator, the

relationship between speaker and the retaliator, and the nature of the retaliation."  Opinion, Exh.

"C" at 23. (Citations omitted.)  While Plaintiffs maintain their position that the original Amended

Complaint was sufficient, in dismissing this action, the Court found that the Amended

Complaint:

> . . . does not allege that Kane released the grand jury materials selectively
> in such a way as to misrepresent Costanzo and Fina's involvement in the
> investigation.  Indeed, plaintiffs merely aver that Kane gathered grand jury
> materials and gave them to her associate Morrow who passed them along
> to Brennan.  It was Morrow, and not Kane, who "consciously redacted
> from these documents the names of all persons other than Costanzo and
> Fina so that the reported story would only be about them."  Morrow also
> "told Brennan that he and Kane were looking to air a story critical of
> Costanzo and Fina."  Plaintiffs do not allege that Morrow did so at Kane's
> direction.

---

[3] The notes of Joshua Morrow's trial testimony are attached hereto and marked as Exhibit "D."

A000274

Opinion, Exh. "C" at 23-24.

This conclusion drawn by the Court both deprives Plaintiffs of the inferences to which they were entitled and further is directly contradicted by the sworn testimony of Morrow and others at the subsequent criminal trial.

With respect to Count III, plaintiffs claim that Kane conspired with others to retaliate against plaintiffs in violation of their First Amendment rights through the unlawful disclosure of grand jury materials for publication of a news story.  The Court found plaintiffs' pleadings lacking for similar reasons.  In its opinion, the court stated that:

> The same is true of the allegation that Kane, Milletto and Brennan conspired to engage in retaliation by releasing confidential grand jury materials.  …. Nowhere in their first amended complaint do plaintiffs allege anything more than conclusory terms that Brennan conspired with Kane or Milletto to engage in unlawful conduct.  (Citations omitted.)
>
> Plaintiffs aver that Brennan, at Morrow's direction, wrote a news story critical of Costanzo and Fina but they do not allege any involvement by Kane or Milletto in this purported scheme.

Opinion, Exh. "C" at 26.

Once again, the conclusions drawn by the Court deprived plaintiffs of the inferences to which they were entitled at this stage of the pleadings, and further they were subsequently demonstrated to be contradicted by the sworn testimony of the conspirators themselves.  On August 9, 2016, Kane's criminal trial began.  On August 15, 2016, the trial concluded with a guilty verdict on the charge that Kane unlawfully disclosed grand jury materials and committed perjury before the grand jury.  Since the conclusion of the trial, plaintiffs have acquired and reviewed the trial notes of testimony.  Kane's co-conspirator in the leak, Joshua Morrow, testified at length about Kane's motivation behind the leak and how the leak was effectuated to cause plaintiffs Fina and Costanzo maximum harm.  This testimony, were it available to

4

**A000275**

plaintiffs before the district court ruled on the 12(b)(6) motion, would have provided the facts that the district court found lacking.

Specifically, in the criminal trial Morrow testified that he first met Kane in 2011 and began working for her on her campaign in February of 2012 as a media consultant and later as communication director.  TT, 08/11/16 at 107-108.  Following her election, which Morrow considered the crowning achievement of his career, he continued to work for her until her inauguration but then stayed in regular contact with her.  TT, 08/11/16 at 108-109.  He testified that he and Kane communicated on all manner of subjects, personal and professional.  TT, 08/11/16 at 111.

Morrow testified that from the very beginning of Kane's administration in 2013, she had a lot of animosity toward Fina.  TT, 08/11/16 at 129.  Morrow and Kane discussed their mutual negative feelings about Fina a lot during their regular conversations.  TT, 08/11/16 at 135. Morrow stated that Kane initiated the conspiracy to leak the grand jury documents when she called him in April of 2014 and discussed the matter and explained that she had documents that she wanted him to get to a reporter.  TT, 08/11/16 at 134.  They specifically discussed the contents of the documents.  TT, 08/11/16 at 135.  Morrow said this plan did not surprise him because of past conversations concerning Fina.  TT, 08/11/16 at 136.  Morrow knew that Kane had an interest in getting negative information out about Fina,  TT, 08/11/16 at 148, and testified further that Kane was "hell bent at getting back at Frank Fina."  TT, 08/11/16 at 150.

Morrow states that Kane instructed  him to give the documents to "a friendly reporter," plainly referring to someone who would be amenable to writing a piece hostile to Fina and Costanza  TT, 08/11/16 at  10-11.  Morrow chose to offer them to Chris Brennan, a Daily News

reporter, because he had known him for a number of years and is somebody for which Morrow had often served as a source of information.  TT, 08/11/16 at  10-12.

After Morrow received the documents, he redacted all of the names except for Fina and Costanzo because "it was clear that's what [Kane] wanted to get out, a negative story on Marc Costanzo and Frank Fina."  TT, 08/11/16 at 16-17.  The Kane prosecutor asked Morrow "And how did you know that?  Had you discussed, you know, getting back at Frank Fina?"  TT, 08/11/16 at 16-17.  Morrow replied, "Yes."  TT, 08/11/16 at 17.

After Morrow delivered the documents to Brennan, he texted Kane the following statement: "What's the saying about revenge?"   TT, 08/11/16 at 23.  Kane responded, "Best served cold.  Are we eating out soon?"  TT, 08/11/16 at 23.  Brennan then responded "Yes." Morrow testified that he spoke with Brennan a lot about the article before it was published and updated Kane each time.  TT, 08/11/16 at 23-26, 29.  Morrow testified that Brennan was updating him on the status of the story including responses to the people he had reached out to for comment, including Fina.  TT, 08/11/16 at 26-31.  Reflecting her own sense of ownership over the goal of the conspiracy, Kane texted Morrow "Where is **my** story?  I'm dying here while you are drinking."  TT 08/11/16 at 33-34 (emphasis supplied).  At one point, Brennan even previewed the article with Morrow before it was published.  TT, 08/11/16 at 39-41.  Finally, when Morrow found out that the article was about to be published, he sent a text to Kane that stated, "It's time for your friends to fight back."  TT, 08/11/16 at 32.  Kane responded by stating "I agree.  I wish they would."  TT, 08/11/16 at 32.  Morrow then responded "Happy to lead the charge."  TT, 08/11/16 at 32.

If plaintiffs had access to this testimony, they would have included the above summary as further factual support for their retaliation claims under Count II and III of their Amended

Complaint.  This new evidence demonstrates the clear existence of a conspiracy and reveals the intent of Kane to retaliate against the plaintiffs for their exercise of First Amendment right to free speech.  The testimony at Kane's criminal trial was nothing short of shocking and makes clear that plaintiffs should be given leave to file a second amended complaint and conduct discovery which will likely lead to the same type of communications revealing Kane's intent to destroy the professional reputations of all plaintiffs.

<u>Legal Argument</u>

Where a final judgment or order has been entered in a case, Rule 60(b) of the Federal Rules of Civil Procedure provides an avenue of relief based on one or more of the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party,

(4) the judgment is void;

(5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) Any other reason that justifies relief.

Rule 60 has been characterized as "a grand reservoir of equitable power to do justice in a particular case." *Hesling v. CSX Transp., Inc.,* 396 F.3d 632, 642 (5th Cir.2005).

Notwithstanding the pendency of the appeal, this Court may entertain the instant motion

7

**A000278**

for relief brought pursuant to Federal Rule of Civil Procedure 60(b). The Third Circuit has approved of the following, three-step process with respect to Rule 60(b) motions made during the pendency of an appeal:

- First, "the proper procedure is for [the movant] to file" the Rule 60(b) motion in the rendering court;

- Second, if the rendering court "is inclined to grant the motion or intends to grant the motion," then "it should certify its inclination or its intention to the appellate court;" and

- Finally, the appellate court "can then entertain a motion to remand the case," and once remanded, the rendering court will have power to grant the Rule 60(b) motion.

*Venen v. Sweet*, 758 F.2d 117 (3d Cir. 1985) (citations and internal quotations omitted).

Pursuant to Rule 60(b), this Court "may relieve a party or its legal representative from a final judgment, order, or proceeding" on the basis of six enumerated provisions. Rule 60(b)(2) authorizes such relief where there is "newly discovered evidence that, with reasonably diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." To satisfy Rule 60(b)(2) in the Third Circuit, the movant bears the burden of establishing that the new evidence "(1) be material and not merely cumulative, (2) could not have been discovered before trial through the exercise of reasonable diligence and (3) would probably have changed the outcome of the trial." *Compass Technology, Inc. v. Tseng Laboratories, Inc.*, 71 F.3d 1125, 1130 (3d Cir. 1995).  In the alternative, the Court may grant relief under Rule 60(b)(6) , which authorizes a court to grant relief from a judgment or order for "any other reason that

justifies relief." FED. R. CIV. P. 60(b)(6) . Simultaneous with granting relief from judgment under Rule 60(b), this Court may grant leave to amend pursuant to Federal Rule of Civil Procedure 15(a).

The newly discovered evidence is material and not merely cumulative. Morrow's testimony reveals that Kane did not just simply pass grand jury material to Morrow for him to pass along. Kane had detailed conversations with Morrow about their mutual intention of releasing the grand jury material to smear Fina and Costanza. Morrow testified that through his conversations with Kane he understood that she wanted the story about the Mondesire investigation to focus on Fina and Costanza for maximum retaliatory effect. Morrow testified that he spoke to Brennan a lot about the article before its publication – in fact Brennan gave Morrow regular updates on the status on his investigation - and it is apparent that Kane and Morrow's joint goal was conveyed to Brennan. Morrow admitted that everything he did was at Kane's direction. In fact, initially, Morrow, himself, expressed some professional reluctance about this scheme, not because he opposed retaliation against Fina and Costanza, but because it did not seem to be a part of any broader communications strategy.[4] Nonetheless, he ultimately fell in line and executed Kane's plan.

The Court also found plaintiffs conspiracy claim to be flawed because the allegations were conclusory and failed to alleged specific involvement by Kane in the scheme to have Brennan write a defamatory news story about Fina and Costanza. Obviously, at the pleadings stage, Plaintiffs did not have the benefit of discovery, and Morrow's testimony at Kane's criminal trial has since removed any doubt as to Kane's involvement as the person who organized, initiated and directed the conspiracy to publish a news story based upon the materials

---

[4] Morrow expressed his concerns in a telephone call with John Lisko, a friend and colleague, that was recorded by the FBI in an unrelated investigation. The recording was played at Kane's trial and the transcript of that call is attached hereto as Exhibit "E."  TT 08/11/16 at 147-149.

which Kane unlawfully leaked.  Moreover, this testimony definitively demonstrated that Kane's sole motivation for this unlawful conduct was to retaliate against Plaintiffs Fina and Costanzo. Kane brought the idea to Morrow, provided the materials for the story, gave Morrow specific directions about what she wanted and why and then followed the stories progress through regular conversations with Morrow until it was published.  The conspiracy extended to the attempt by Morrow and Kane to cover up their illegal acts through a fabricated account.  Succinctly, Morrow testified that "we (sic) conspired to create the story that wasn't true."  TT 08/11/16 at 117.

The newly discovered evidence could not have been discovered through reasonable diligence.  First, plaintiffs had no access to Joshua Morrow who only testified at Kane's criminal trial under a grant of immunity provided by the Commonwealth.  Even if they were able to resort to compelled civil process to take his sworn testimony, he had refuge in his 5th Amendment rights against testifying.  Only the Commonwealth, through its power to grant immunity, could compel his testimony which they were ultimately required to do.  Plaintiffs did not and could not have had access to Morrow's testimony until the conclusion of Kane's criminal trial.

Faced with Morrow's testimony, the Court would not have dismissed their complaint based on this alleged lack of conspiratorial nexus, and would have allowed discovery to proceed. First, the new evidence makes Kane's retaliatory intent very clear.  The evidence also makes it self-evident that a conspiracy existed and that Kane was its leader and organizer and its goal was retaliation through a public smear campaign that included the illegal leak of select and edited confidential grand jury documents.

Even if the Court does not find that relief is warranted under Rule 60(b)(2), it should grant relief under the 60(b)(6) – "any other reason that justifies relief."  Morrow's testimony laid

bare the complete lack of compunction by Kane in her use and abuse of her official powers.  She misused her office, abused all discretion and committed high crimes against people she perceived to be political enemies.  The very brazen nature of Kane's corrupt conduct separately warrants that plaintiffs be permitted to proceed with discovery in this case.  Plaintiffs submit that what Morrow's testimony revealed is but the tip of the iceberg in a concerted and corrupt attempt by Kane to destroy their professional reputations.  Through discovery, plaintiffs expect that they will be able to flesh out all of their claims.  The interests of justice demand that plaintiffs be permitted to proceed on all of the claims in their complaint.

FELDMAN SHEPHERD WOHLGELERNTER
TANNER WEINSTOCK & DODIG, LLP

/s/ MARK W. TANNER
Mark W. Tanner
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
*Attorneys for Plaintiffs, Frank Noonan, Randy Feathers, Richard A. Sheetz, Jr. and Frank Fina*

11

**A000282**

# EXHIBIT "A"

A000283

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN
    and
RANDY FEATHERS
    and
RICHARD A. SHEETZ, JR.
    and
E. MARC COSTANZO
    and
FRANK FINA
    Plaintiffs

    v.

KATHLEEN KANE
Office of the Attorney General,
16th Floor Strawberry Square
Harrisburg, PA 17120
    and
MICHAEL MILETTO
Office of the Attorney General,
16th Floor Strawberry Square
Harrisburg, PA 17120
    and
CHRISTOPHER BRENNAN
801 Market Street
Philadelphia, PA 19107
    and
PHILADELPHIA DAILY NEWS
801 Market Street, Suite 300
Philadelphia, PA 19107
    and
PHILADELPHIA MEDIA NETWORK
(DIGITAL) LLC
801 Market Street, Suite 300
Philadelphia, PA 19107
    and
PHILADELPHIA MEDIA NETWORK, LLC
801 Market Street, Suite 300
Philadelphia, PA 19107
    Defendants.

CIVIL ACTION:    2:15-cv-06082

JURY TRIAL DEMANDED

## FIRST AMENDED COMPLAINT

## <u>PRELIMINARY STATEMENT</u>

1.      In January of 2013, Defendant Kathleen Kane was sworn in as the Attorney General for the Commonwealth of Pennsylvania.  Upon assuming office, Defendant Kane has misused the power of her office, and its publicly funded resources, for the purpose of silencing her critics through a pattern of intimidation, attempted blackmail, and vindictive retaliation against those persons who have lawfully exposed Defendant Kane's falsehoods, unlawful activities,  and violations of her oath of office.

2.      This is a civil action for compensatory and punitive damages and for injunctive relief against Pennsylvania Attorney General Kathleen Kane ("Kane" or "the Attorney General") and others for retaliatory violations of plaintiffs' right to freedom of speech under the First Amendment of the United States Constitution, conspiracy, defamation, false light and invasion of privacy.  It is fundamental to every American citizen's relationship with government that he or she be free to speak openly about their government and its elected officials without fear of retribution or retaliation by the vast powers of that government.  Kane has continuously abused and misdirected the power of her office for personal and unconstitutional ends against these plaintiffs.

3.      Plaintiffs exercised their First Amendment rights as citizens to speak out and expose the illegal actions of public officials, including Kane, to publicly rebut inaccurate and false statements concerning matters of important public interest made and endorsed by Kane, to expose unethical conduct by Kane and her office, and by the honest provision of sworn statements in support of a legal action that sought the recusal of the Attorney General and the

enforcement of a lawful and appropriate plea agreement that the Attorney General had refused to honor.

4.     Following plaintiff's lawful exercise of free speech, the defendant Kane launched a vendetta against plaintiffs that was fueled by the defendant's criminal actions and abuse of government powers.

5.     In November of 2012, Kane was elected Attorney General after running a hostile campaign that accused the prior Attorney General and his professional staff, including the Plaintiffs, of incompetence and political maneuvering in its investigation and prosecution of Jerry Sandusky, a former Penn State football coach convicted of the sexual abuse of numerous boys.  During the political campaign, Kane's statements that demeaned the work and the motives of the Plaintiffs amounted to little more than campaign rhetoric that, while cynical and inaccurate, were not unlawful.

6.     Upon being elected, however, Kane continued her assault on the plaintiffs, and began to use the estimable power of her office to retaliate and punish the plaintiffs when they publicly defended themselves against Kane's false accusations or provided evidence against her and her office as responsible citizens.  What was simply political grandstanding during the campaign became a program of unconstitutional retaliation when Kane assumed the mantle of office.

7.     As Attorney General, Kane's actions against the plaintiffs violated the United States Constitution, insofar as these actions infringed upon plaintiffs' right to engage in lawful speech free of government retaliation.  Indeed, Kane, while acting under the color of law, took extraordinary and criminally unlawful measures to defame the plaintiffs, using the powers of her

2

office to release sealed grand jury materials and to construct and publish false and outlandish claims against the plaintiffs that included ugly allegations of racism and child pornography.

8.     Kane's first act of retaliation was directed at plaintiffs Fina and E. Marc Costanzo ("Costanzo"), career prosecutors who had for several years prior to Kane's election developed a wide-ranging corruption investigation of Philadelphia elected officials who took bribes from Tyron Ali, a former lobbyist who became an agent for the Commonwealth following his arrest for government contractor fraud.

9.     Ali proved to be an unusually effective agent whose unprecedented work on the public corruption investigation ("Ali Bribery Investigation") together with the presentation of substantial exculpatory evidence in the case against Ali, caused Fina to agree to a withdrawal of the criminal case against him in exchange for his ongoing cooperation.

10.     A clear conflict of interest between Kane and the Ali Bribery Investigation should have led Kane to recuse herself from the matter entirely. She did not. Instead, in what became pattern for her, Kane took control of the investigation in an effort to both derail it and to advance a personal and political vendetta against the plaintiffs in defiance of her ethical duties of her office.

11.      By way of background, during Kane's transition, Fina informed Kane that she had a conflict of interest with the Ali Bribery Investigation because there was a former political campaign employee, Joshua Morrow ("Morrow"), and a friend of Kane's and significant campaign supporter, now a sitting Judge, who was alleged to have been involved in unlawful campaign fundraising activity involving Ali. Because of this conflict, Fina sent the investigation to the United States Attorney's office to manage prior to Kane assuming office.

3

12.    Upon assuming office, Kane repudiated this conflict, regained control over the investigation, and then balked at honoring the signed agreement to dismiss the charges against Ali.  In turn, Ali's attorneys sought to compel dismissal of the charges against Ali as originally agreed, and also sought Kane's recusal due to her conflict.  Fina executed an affidavit which attested to the factual accuracy of Ali's motion detailing the conflict of interest, the Ali Bribery Investigation, and the background of the plea agreement.

13.    When Kane's suppression of the Ali Bribery Investigation became public through press reports, Kane retaliated against Fina by fabricating evidence that the Ali Bribery Investigation was driven by racist motives which she then published to the press.  Kane falsely believed that Fina was the source of the public exposure of her termination of this investigation.  In an email to one of her media consultants, Kane sought to justify this action by stating, "This is war."  In so doing, Kane confirmed her retaliatory motive.

14.    When R. Seth Williams, the Philadelphia District Attorney, learned that Kane was refusing to prosecute public officials who were recorded taking bribes, he was publicly critical of that decision and he later accepted a challenge by Kane to prosecute the case himself.   In the course of his own investigation, Williams confirmed there was no evidence of racism, and charged six elected officials who took the bribes, promptly obtaining guilty pleas on five of them.  One other awaits trial.

15.    Kane further retaliated by conspiring with Morrow (over whom she had a conflict of interest due to his role in possible campaign fraud) to unlawfully release grand jury evidence in an attempt to make it appear that plaintiffs Fina and Costanzo had improperly terminated a 2009

4

criminal investigation of J. Whyatt Mondesire who, ironically, was head of the N.A.A.C.P. at the time.  As evidence of just how illogical and desperate Kane was in her vendetta to defame Fina and Costanzo at any cost, she told the media that Fina and Costanzo had improperly declined to prosecute a prominent African American leader, while at the same time alleging that these same prosecutors had pursued a racist investigation against African American state representatives in the Ali Bribery Investigation.

16.     The third major act of retaliation arose in the context of Kane's attempts to fulfill her campaign promise that she would conduct an investigation of the Sandusky Investigation.  Kane appointed Geoffrey Moulton, Jr., Esquire to direct the investigation.  Because the Sandusky Investigation had been conducted by a grand jury, Moulton's investigation had to be monitored and managed by the supervising judge of the grand jury.  Kane was originally indifferent to this obligation as it was bound to interfere with the result oriented goals of her politically driven investigation.  She relented, however, when the judge intervened.

17.     The judge established ground rules for any public report which required that it include a written response by the plaintiffs if they deemed such a response appropriate.  The plaintiffs did submit this court mandated response, and it was reviewed and incorporated by the Attorney General before release of the final report.  In that response, plaintiffs were highly critical of the Attorney General.  They stated that the "ill advised" Moulton investigation and report were "born of political opportunism and posturing."  The response described the criticism of the Sandusky Investigation as false and unwarranted and called the claims that led to the report "ill-informed and unfounded."  Plaintiffs further described the report as little more than an "exercise

5

in second guessing" undertaken solely "to sift for criticism." Plaintiffs' response also characterized the report as wholly rebutting all of the criticism that had been leveled by Kane during her campaign.

18.     In a direct reaction to the plaintiffs' response, Kane convened a press conference where she knowingly voiced completely fabricated allegations that plaintiffs' alleged delays in the Sandusky investigation gave Sandusky the opportunity to sexually abuse two more children who would have otherwise been unharmed. This false and horrendous allegation, that children were victimized because prosecutors dallied for political purposes, was intentionally designed to place a terrible professional stain on the reputation of career public servants. Kane later, through her spokesperson, admitted these allegations were not true.

19.     Kane's retaliation did not end there. Kane searched for and reconstituted numerous deleted emails that contained off-color and, in some cases, adult materials. While many of the emails were received from individuals outside of the Attorney General's office, they were often forwarded by employees within the office and some were received by the plaintiffs. While some of these emails were offensive, irreverent and in bad taste, there was nothing illegal in their content.

20.     Kane, who was solely in possession of these emails, worked through her media contacts to arrange a national interview with CNN in which she accused the plaintiffs of viewing child pornography in these emails. This horrific allegation is entirely false and was, and is, devastating to the reputations of men sworn to investigate and punish such activity.

A000290

21.    The interview was pre-recorded, and Kane had ample opportunity to correct the record before the interview was aired but intentionally chose not to.  After the piece was aired and the damage done, Kane acknowledged there was no child pornography contained in the emails.

22.    Finally, in a further act of retaliation, Kane maliciously and selectively disclosed to the press many of plaintiffs' private emails simply in an attempt to embarrass them and undermine their professional and personal reputations.  Kane continues to threaten plaintiffs, and others, with these emails in an ongoing attempt to intimidate and retaliate.

23.    On at least two occasions, the *Philadelphia Daily News* abetted Kane's unconstitutional and defamatory actions knowingly, and/or in reckless disregard for the truth.  The *Philadelphia Daily News* published an article that implied that plaintiffs Fina and Costanzo improperly terminated a supposedly viable criminal investigation of the head of the Philadelphia N.A.A.C.P.  That article was based on illegally leaked grand jury documents obviously and selectively redacted by Kane to defame Fina and Costanzo after literally declaring "war" on them.  Kane's intent was to defame and disgrace the plaintiffs and the *Philadelphia Daily News* readily abetted her in this goal.

24.    Kane's pattern of falsehoods, distraction and retaliation has been amply displayed through her arrests, the emergency suspension of her license to practice law and her repeated material falsehoods made to the public, the Pennsylvania Supreme Court, the Supervising Judge of a Grand Jury and the members of a Statewide Investigating Grand Jury.

A000291

# I.    JURISDICTION

25.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and the First and Fourteenth Amendments of the United States Constitution.  The cause of action arises under 42 U.S.C. §§ 1983 and 1985.  The claims arose in this judicial district.  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 which provides for supplemental jurisdiction.

# II.    PARTIES

26.    Plaintiff Frank Noonan ("Noonan") is a retired Commissioner of the Pennsylvania State Police, a citizen of the Commonwealth of Pennsylvania and a resident of Lackawanna County, Pennsylvania.

27.    Plaintiff Randy Feathers ("Feathers") is a retired Regional Director of the Attorney General's Bureau of Narcotics Investigation and Control, a citizen of the Commonwealth of Pennsylvania and a resident of Blair County, Pennsylvania.

28.     Plaintiff Rick Sheetz ("Sheetz") was the Executive Deputy Attorney General Directing the Criminal Law Division, and is a citizen of the Commonwealth of Pennsylvania and a resident of Lancaster County, Pennsylvania.

29.    Plaintiff E. Marc Costanzo ("Costanzo") is a former Deputy Attorney General for the Office of Attorney General, and is currently Chief Assistant District Attorney for Special Investigations for the Office of the District Attorney of Philadelphia County.  He is a citizen of the Commonwealth of Pennsylvania and a resident of Philadelphia County, Pennsylvania.

8

30.     Plaintiff Frank Fina is a public prosecutor employed by the Office of the Philadelphia

District Attorney, a citizen of the Commonwealth of Pennsylvania and a resident of Philadelphia

County, Pennsylvania.

31.     At all times relevant to this lawsuit and presently, defendant Kathleen Kane has been the

attorney general for the Commonwealth of Pennsylvania.  She is sued individually and in her

official capacity.

32.     At all times relevant to this lawsuit, Defendant Christopher Brennan ("Brennan") was a

reporter for The Philadelphia Daily News.  Brennan is a citizen and resident of the

Commonwealth of Pennsylvania with a place of business at 801 Market Street, Philadelphia,

Pennsylvania.

33.     At all times relevant to this lawsuit, Defendant Michael Miletto ("Miletto") was an

investigator for the Pennsylvania Office of Attorney General ("OAG").   Miletto is a citizen of

and resident the Commonwealth of Pennsylvania with a place of business at Office of the

Attorney General, 16th Floor Strawberry Square, Harrisburg, Pennsylvania.  He is sued

individually and in his official capacity.

34.     Defendant Philadelphia Media Network (Digital) LLC and Philadelphia Media Network,

LLC (collectively "PMN") is a Pennsylvania corporation that employed defendant Brennan, and

that owns and operates the *Philadelphia Daily News* and Philly.com and is responsible for the

content of its publication.  At all relevant times, PMN were corporations and citizens of, or have

their principle place of business at 801 Market Street, Suite 300, Philadelphia in the

9

Commonwealth of Pennsylvania. The publications described herein were targeted to and sold in the Pennsylvania and/or national marketplace.

A.    **Plaintiffs' Backgrounds**

1.    **Frank Noonan**

35.    Plaintiff Noonan has had a lengthy and honorable career in government service. Noonan served as Commissioner of the Pennsylvania State Police, appointed by then Governor Corbett on January 18, 2011. He retired from that position on January 18, 2015.

36.    Prior to his work as head of the Pennsylvania State Police, Noonan served honorably in the United States Marine Corps from 1968 until 1970 and was awarded the Bronze Star for his service in Vietnam. Upon his discharge from the Marine Corps, Noonan joined the Federal Bureau of Investigation ("FBI") as a Special Agent where he served for 27 years. Following his retirement from the FBI, Noonan was appointed as a regional director for the Office of the Pennsylvania Attorney General Narcotics Investigation and Drug Control for the northeast region of Pennsylvania.

37.    In 2009, Noonan was promoted to Chief of Investigations for the Attorney General's Office.

38.    Noonan is a graduate of West Chester State University.

2.    **Randy P. Feathers**

39.    Plaintiff Feathers is a graduate of the Pennsylvania State University and Indiana University of Pennsylvania. He is also a graduate of the Metropolitan Police Academy in

10

A000294

Washington, D.C., the Pennsylvania State Police Municipal Academy and the Pennsylvania Office of Attorney General Academy.

40.     Feathers began his law enforcement career in 1981 with the Washington, D.C. Police Department.  He joined the Altoona Police department in 1982 and was appointed as a narcotics agent for the OAG in 1988.

41.     As the director of the Blair County Task Drug Task Force from 1997 to 2005, he supervised over 5,000 narcotics investigations.  Pennsylvania attorneys general Mike Fisher, Gerald Pappert, and Tom Corbett all called his Blair County Drug Task Force "a model that we will use throughout the state."

42.     In 2005, Feathers was named as the regional director for the State College Office of the Attorney General's Bureau of Narcotics Investigation and Drug Control.

43.     In September 2012, Governor Corbett appointed Feathers to the Commonwealth Board of Probation and Parole.  His appointment was unanimously approved by the Pennsylvania Senate on October 3, 2012.

44.     Feathers has served on several community boards, such as Blair County Children and Youth, Blair County Drug and Alcohol, and the Booker T. Washington Revitalizing Committee.

### 3.     Richard A. Sheetz, Jr.

45.      Plaintiff Sheetz is a graduate of Rutgers College and Temple University Law School. From 1987 to 2013, Sheetz was employed as an attorney at the OAG.

11

A000295

46. From 2004 to 2014, Sheetz held the post of Executive Deputy Attorney General, where, as the director of the Criminal Law Division, he supervised overall functions and operations of criminal prosecutions statewide.

47. Prior to that, Sheetz headed the OAG's Criminal Prosecution Section responsible for environmental crimes, insurance fraud and Medicaid fraud from 1996-2004. Prior to that, he supervised a unit of nine attorneys in the Drug Prosecution and Forfeiture Section.

48. From 1996 to 2013, Sheetz was a member of the Pennsylvania Municipal Police Officers' Education and Training Commission.

49. From 2006-2011, Sheetz was a member of the Pennsylvania Supreme Court Criminal Procedural Rules Committee.

50. From 2005-2011, Sheetz was the OAG representative to the Pennsylvania Commission on Crime and Delinquency.

### 4. E. Marc Costanzo

51. Plaintiff Costanzo is a graduate of Temple University and the University of Baltimore Law School. From 1987-1993, Costanzo served as Assistant District Attorney in Philadelphia. From 1993 to 2012, Costanzo was employed as a deputy attorney general in the Criminal Prosecution Section of the OAG.

52. From 2012 to the present, Costanzo has been employed as chief of the Special Investigations Division of the Office of District Attorney for Philadelphia County.

53. Costanzo also served as a Special Assistant United States Attorney in the Eastern District of Pennsylvania.

12

54.     From approximately 2005 to the present, Costanzo has served on the Board of Directors of the Northeast Community Center for Behavioral Health.

55.     From 2003 to the present, Costanzo has served on the Advisory Board of St. Hubert's Catholic High School for Girls in Philadelphia.

56.     From 1980 to 1998, Costanzo served on the Board of Directors of the Frankford Boys Club.  From 1998 to the present, Costanzo has served on the Board of Directors of the Crispin Garden Athletic Club.

### 5.     Frank Fina

57.     Frank Fina has practiced law in the Commonwealth of Pennsylvania for more than 20 years.  He graduated from Dickinson College in 1987, and received his law degree from George Washington University in 1992.

58.     From 2002 until 2013, Fina served in the OAG, reaching the rank of Chief Deputy Attorney General where he headed the Criminal Prosecution, Public Corruption, Tax Crimes and Child Predator Sections.  During his tenure with the OAG, Fina worked under five different Attorney Generals as he successfully investigated and prosecuted complex public corruption cases that led to the conviction of 24 state representatives and officials of the Pennsylvania state legislature.

59.     Fina enjoys a statewide reputation as a prosecutor dedicated to the investigation and prosecution of public corruption.

A000297

60.     Fina enjoys an excellent reputation generally in the Pennsylvania legal community and
was awarded the 2012 National District Attorney Association "Home Run Hitter" Award for
Outstanding Trial Prosecutor.

61.     Fina was appointed by the Pennsylvania Supreme Court as a member of the Criminal
Rules Committee.

       **B.**     **Events Giving Rise to the Action**

        **1.**     **Kathleen Kane's 2013 Campaign for Attorney General Focuses on the
Sandusky Investigation**

62.     In June 2009, the OAG, then headed by Thomas Corbett ("Corbett"), convened a grand
jury investigation into allegations that Jerry Sandusky ("Sandusky"), a prominent football coach
for Penn State University, had engaged in a long-term pattern of predatory sexual abuse of young
boys.  The Sandusky Investigation spanned 30 months and resulted in the indictment of
Sandusky for 45 counts of child sex abuse.

63.     While the Sandusky Investigation began under the stewardship of Corbett, it was
ultimately assumed by Linda Kelly, who was appointed Attorney General to complete Corbett's
unexpired term after Corbett was elected governor.  As a practical matter, the investigation had
been run by Fina who, in 2009, was the OAG Chief Deputy Attorney General in charge of,
amongst other units, the Child Predator Section.  Fina worked closely with Noonan on the
Sandusky Investigation, as Noonan was the Commissioner of the Pennsylvania State Police at
the time.  Feathers was the Sandusky Investigation's lead investigator for the OAG.

A000298

64.     Sheetz, who was the OAG Executive Deputy Attorney General Directing the Criminal Law Division, likewise played an active role in the supervision of the Sandusky Investigation.

65.     Fina was the Commonwealth's lead attorney in the investigation, prosecution, and trial of Sandusky.  Costanzo made public statements and addressed the media on behalf of the prosecution team following Sandusky's arrest.

66.     On June 22, 2012, a Centre County jury returned a guilty verdict on 43 counts of the Sandusky indictment, and on October 9, 2012, Sandusky was sentenced to a term of imprisonment of 30-60 years.

67.     In 2012, the position of Attorney General became the subject of an open election since Corbett had resigned to run for governor, and his appointed replacement Linda Kelly had agreed not to run for the office.

68.     In or about February 2012, Kane announced her candidacy for Attorney General.

69.     In June, shortly after the verdict in the Sandusky trial, Kane gave an interview congratulating the OAG on its fine work in procuring a conviction of Sandusky.

70.     It was not long, however, before Kane realized that she could exploit the Sandusky case for political advantage and, with that in mind, she began to level unjustified attacks on the course and manner of the investigation.

71.     Accordingly, less than a month after she congratulated the Sandusky prosecutors, Kane began a mantra of criticism of the Sandusky Investigation which grew into the touchstone of her campaign which she eventually rode to victory.

A000299

72.     Kane set forth a five-part platform for her Sandusky Investigation campaign attack that included the following assertions: (1) that charges should have been brought against Sandusky within thirty (30) days of the date the first victim came forward; (2) that the case should never have been put in front of a grand jury, and the fact that it was constituted evidence that those who were running the investigation wished to delay it; (3) that inadequate resources were given to the case; (4) that Corbett engaged in a political conspiracy to attack Penn State, but did it in a way that fitted his political ambition to run for governor; and (5) that, if elected, she would initiate an investigation to learn about why these things allegedly occurred in the Sandusky Investigation.

73.     Kane campaigned on this Sandusky Investigation platform notwithstanding the fact that parts of the case remained under active investigation and had yet to go to trial.  Nearly three years later, none of the related cases charged before Kane took office have gone to trial and other open investigations have apparently disappeared.

74.     Although Kane's politically opportunistic platform was without merit, with the exception of Randy Feathers, those involved in the Sandusky investigation and prosecution, including Fina, Noonan, Costanzo and Sheetz, remained silent and did not publicly respond to Kane's criticism.

75.     Feathers, however, refused to sit silently while Kane tried to take political advantage of this emotionally charged case.

76.     Accordingly, Feathers made many public statements to the press which refuted Kane's claims, including an October 2012 pre-election interview on the WABC's national television news magazine 20/20 where he effectively stated that Kane's criticism of the Sandusky investigation was wrong because she was uninformed and lacked knowledge.  He also refuted

16

her allegation that the Sandusky investigation was deliberately slowed down to avoid political fallout with Penn State alumni voters.

77. In November 2012, Kane won the election and became the Attorney General elect.

78. Following her taking office, in February of 2013 Kane appointed attorney Moulton to head an inquiry into the Sandusky Investigation.

79. Upon accepting the task of reviewing the Sandusky Investigation, Moulton contacted Fina to seek his cooperation.

80. Fina openly questioned the legality of an investigation that inquired into grand jury matters which, by law, were to be kept as confidential. Fina expressed these concerns to Moulton, and later challenged Kane's authority to conduct the investigation without the direct oversight of the grand jury's supervising judge and the establishment of clear safeguards to limit political grandstanding during the process.

81. Fina's challenge came in the form of a variety letters to Moulton and motions to the supervising grand jury judge. One of the reasons Kane ultimately retaliated against Fina was this challenge to her authority and the ultimate effect that the challenge had- the direct involvement of the grand jury supervising judge who established a protocol for how the investigation would proceed. This protocol included the right of Fina to have his interviews video-recorded and the right of Fina and others involved in the Sandusky Investigation to read an advance copy of the final report and draft a response to be reviewed by the grand jury supervising judge, together with Moulton's final report. Fina's actions effectively curtailed Kane's ability to conduct the

17

type of one-sided political investigation of the Sandusky Investigation she had originally intended.

82.     Because of the active involvement of the grand jury supervising judge, and the right of Fina and the other Sandusky investigators to issue a public response with the publication of Moulton's report, Kane's ability to control the process of her investigation, and to pre-ordain the outcome to suit her political purposes, was substantially diminished and gave impetus to her desire to retaliate against Fina and others.

> **2.     The Ali Bribery Investigation, Kane's Conflict of Interest, and Kane's False Accusation of a Racially Motivated Prosecution.**

83.     In 2013, after taking office, Kane acted to secretly stop and destroy the viability of a long term undercover investigation into public corruption involving illegal lobbying and bribery of elected officials and others.  When these actions were later exposed to the public in 2014, Kane pursued a series of separate abuses of power against Fina, Costanzo, Noonan, and Sheetz.

84.     In 2009, the OAG charged Tyron Ali with fraud and other offenses in connection with his alleged malfeasance in the management of a federally-funded state meal program.

85.     Following his arrest, Ali entered into an agreement with the OAG that called for him not only to supply all information concerning the OAG's investigation into the meal program, but also to serve as an agent for the OAG in its investigation of active public corruption in Pennsylvania.

86.     The cooperation agreement was open-ended and Ali's involvement with the OAG's investigation of public corruption ultimately spanned nearly three (3) years.

A000302

87.     During that time, Ali was employed as an unpaid civilian agent engaged in continuous operations directed by attorneys and agents of the OAG.  Fina, who was Chief Deputy Attorney General and headed the OAG's Public Corruption Unit, was personally responsible for directing Ali's actions.  Sheetz, who was the Executive Deputy Attorney General, supervised Fina throughout this investigation.  Noonan supervised the investigators assigned to this case until his departure from the OAG to become Commissioner of the Pennsylvania State Police in 2011.  Costanzo was one of the prosecutors who assisted in the investigative efforts.

88.     In collaboration with Fina and OAG investigators, Ali identified elected officials in Philadelphia who he believed were prepared to accept money and other consideration in exchange for their votes and influence.   Philadelphia was chosen primarily because Ali was comfortable with the political landscape there; it was where he made his home and conducted most of his lobbying in the past.

89.     Indeed, Ali paid bribes to more than five elected officials who gave assurances that they would vote for recommended legislation or otherwise provide influence in matters that Ali represented to be of concern to him.

90.     Independent of this assistance to the OAG, Ali also provided detailed exculpatory information on his own case.  In particular, he provided details about the manner in which he operated the program for which he had been criminally charged including a credible accounting of program funds that had been entrusted to him by the state.

91.     At the time of Kane's election, the political corruption investigation was ongoing but, because of a conflict of interest that Fina had discerned between Kane, Ali and other individuals

19

involved in the investigation, Fina transferred the file to the F.B.I. and asked that it assume responsibility for the investigation. Fina assumed that Kane would acknowledge the obvious conflict of interest. She did not.

92. During the course of the investigation, Fina had discovered that Kane had a professional relationship with at least two individuals whom Ali had implicated in possible public wrongdoing. During his initial proffer sessions with the OAG, Ali advised investigators that he had made unlawful cash contributions to a political candidate through his campaign official, Joshua Morrow. In addition, Ali admitted that he had made a separate ten thousand dollar ($10,000) contribution in the form of four $2,500 certified checks in the names of four people who served as straw donors. Ali, in fact, had provided the money for those contributions.

93. After Ali's arrest, Morrow, on behalf of that candidate, returned the checks to Ali.

94. Morrow later became a paid employee of Kane's campaign staff and the then former candidate became a political supporter of Kane. Indeed, as will be discussed later, Morrow was held by Kane in high confidence and later served as her agent in the criminal delivery of grand jury materials she wished to have leaked to the media.

95. Based upon Ali's extraordinary commitment to the Commonwealth through the OAG's investigation of public corruption, and in consideration of the substantial exculpatory evidence he supplied, the OAG entered into an agreement with Ali to dismiss all criminal charges against him. The agreement was made explicitly in consideration for Ali's assistance and because of the substantial exculpatory material he provided in response to the investigation against him. This

agreement was approved by Fina and his supervisors on behalf of the OAG before Kane took office.

96.     Prior to leaving the OAG, Fina briefed Kane on the Ali case, advised her of his discovery of the conflict of interest, and informed her that he had transferred the case to the F.B.I. in light of that conflict.

97.     In deliberate disregard to this obvious conflict of interest, Kane refused to relinquish possession of the Ali Bribery Investigation, demanded the return of the file from the Federal authorities, refused to prosecute the case and then refused to honor the cooperation agreement and refused to dismiss the charges against Ali pursuant to the plea agreement.

98.     In September 2013, nine months after Kane had taken office, Kane made clear to Ali that she would not pursue the Ali Bribery Investigation at all, nor honor the Ali plea agreement.   Ali then filed a motion seeking the recusal of Kane and the enforcement of his plea agreement.  In support of that motion, Ali obtained an affidavit from Fina setting forth the background of the investigation, Ali's extensive cooperation, and Kane's conflict of interest.

99.     Unable to defend her conduct in court concerning this conflict of interest, Kane agreed to fulfill the terms of the cooperation agreement and dismiss the charges against Ali.  Kane dismissed the charges against Ali in November of 2013.

100.     Thereafter, between November 2013 and March 2014, Kane set in motion a plan to avenge herself and retaliate against Fina for his lawful disclosure of her conflict of interest and for supporting Ali's efforts to have Kane honor his plea agreement by way of his affidavit.  As part of this vendetta, Kane contrived an account of the Ali Bribery Investigation in which Kane

A000305

asserted that the case against the officials who accepted the bribes simply could not be prosecuted on the following grounds: (1) the prosecution was driven by racist motives; (2) consideration afforded Ali in the form of dismissal of all charges rendered his credibility completely worthless; (3) a lack of "quality" in the investigative methods and reports; (4) an absence of "corroborating evidence" beyond hundreds of hours of recordings; (5) a lack of "adequate resources"; (6) that Federal law enforcement officials stated the case was "flawed and not prosecutable"; (7) that Ali told an un-named person that the investigation was limited to the General Assembly's Black Caucus; and (8) that the lead agent assigned to the case, Claude Thomas, stated that he was instructed to "focus only on members of the General Assembly's Black Caucus." Kane released these accusations in writing to the press on March 14, 2014 and would reiterate them, and others, in public statements throughout March of 2014. Kane also falsely implied that Fina was responsible for the public disclosure of the Ali undercover investigation.

101. Kane's accusation that the investigation was driven by racist motives (all of the elected officials who accepted cash were African-American) was wholly fabricated by Kane and her staff, and was published to the media intentionally in an effort to damage the reputation of Fina, Costanzo and others involved in this investigation. Likewise, all of Kane's accusations and justifications for shutting down and discrediting the bribery investigation were demonstrably false and have been clearly exposed by subsequent investigations and events.

22

102.     Kane's retaliatory motive was made manifest by an email she wrote to a media strategist shortly after a news report of her role in the Ali Bribery Investigation surfaced.  In that email, Kane wrote, "This is war."

103.     Ali, himself, provided a statement to Kane's representatives that race played no role in how the targets were identified.  Kane's claim that the principal investigator responsible for Ali, Claude Thomas, himself an African-American, stated that African Americans were intentionally targeted was also a fabrication as was her claim that an F.B.I. agent with knowledge of the investigation also stated that the investigation was driven by race.

104.     Philadelphia District Attorney Seth Williams, likewise reviewed the evidence involved in the investigation and concluded there was no evidence of racism.  A Grand Jury in Philadelphia also found no evidence of racism.   To his credit, Williams has, to date, obtained four separate felony convictions in these cases that Kane declined to prosecute.  In a fifth case, Williams secured a misdemeanor plea and the defendant's own attorney publicly acknowledged there was no evidence of racism in the prosecution.  Fina, Noonan and Sheetz also made public statements correcting numerous falsehoods asserted by Kane in her effort to retaliate and justify her termination of this case.

105.     Nonetheless, Kane repeatedly made and directed public statements impugning the investigation as racist and incompetent, while knowing that her repeated claims were false and defamatory.

A000307

### 3. Kane's Secret and Illegal Release of Grand Jury Documents to Defame Fina and Costanzo

106.   In March of 2014, immediately following the public exposure of her secret termination of the legislative bribery investigation, in further retaliation against Fina and Costanzo, Kane initiated a conspiracy to unlawfully release grand jury information involving an unrelated criminal investigation run by Fina five years earlier in 2009.

107.   By way of background, in 2009, an investigation of J. Whyatt Mondesire, then head of the Philadelphia chapter of the N.A.A.C.P., emerged from a separate OAG investigation of Harriett Garrett and her daughter for the theft of state grant money for a job training program.

108.   Garrett was the treasurer for Next Generation Community Development Corporation, a non-profit entity operated by Mondesire.  Mondesire had transferred responsibilities for the operation of Next Generation to Garrett, who operated a separate non-profit called Creative Urban Educational Systems, for which Mondesire was chairman of the board.  Mondesire served as a paid consultant for Next Generation.  During the investigation of Garrett and her daughter, the OAG investigated payments to Mondesire by Next Generation for a variety of expenses. Garrett and her daughter were charged criminally by the OAG.  Later, OAG investigators asked Garrett and her daughter to assist them with the investigation of payments to Mondesire, but they refused to give any statements or testify before the grand jury and they could not be compelled to do so since they were under indictment.  Since there was no one else at Next Generation with knowledge concerning the payments, that left only Mondesire to explain them.  Under those circumstances William Davis, the assigned deputy attorney general sought permission from Fina

24

to subpoena Mondesire to the grand jury. The decision was reached not to subpoena Mondesire to the grand jury because: 1) there was virtually no chance that Mondesire would appear at the grand jury and incriminate himself; and 2) because he was a public figure, authority to subpoena him had to be approved by the Attorney General himself, who at the time was Tom Corbett, and that approval was never provided.

109.    In point of fact, Costanzo had no decision-making authority whatsoever concerning this process.

110.    Without the assistance of Garrett or her daughter who were the only ones who knew the reasons for the payments to Mondesire, there was no way to develop concrete evidence that the payments to Mondesire were in any fashion unlawful, and the investigation could not advance further. As a result, the investigation came to a standstill.

111.    As Kane continued to search for ways to retaliate against Fina and others, the long dormant Mondesire investigation came to her attention.

112.     In furtherance of this scheme for revenge, Kane personally gathered key confidential grand jury documents and gave them to Morrow, a political associate, with direct instructions that he pass those documents to Christopher Brennan, a reporter for the *Philadelphia Daily News* with whom Morrow had a professional relationship and who Kane and Morrow knew would be receptive and would further their efforts. According to Morrow's own statement, he consciously redacted from these documents the names of all persons other than Costanzo and Fina so that the reported story would only be about them. It is believed that Morrow (who invoked his constitutional right against self incrimination before the grand jury at one point)

25

specifically told Brennan that he and Kane were looking to air a story critical of Fina and Costanzo which was otherwise plainly evident from his redactions. Brennan then knowingly obliged by writing precisely the story that Kane and Morrow sought, which disparaged and defamed Fina and Costanzo by suggesting that they impeded the Mondesire investigation and terminated it improperly.

113. The story, written by Brennan and published by the *Philadelphia Daily News* on June 6, 2014, implies that Fina and Costanzo impeded, obstructed or otherwise terminated a valid criminal inquiry into the payments to Mondesire. In so doing, Fina and Costanzo were cast in a false light and their professional ethics and reputation were maliciously impugned. To date, the *Philadelphia Daily News* has continued to work in concert with Kane and her agents in directing repeated stories, editorials, and opinion pieces that cast Fina and Costanzo in a false light and that specifically seek to impugn their ethics and reputation.

114. In furtherance of Kane's goals, and in apparent collusion with her and her agents, the Philadelphia Daily News has printed numerous articles, editorials and opinion pieces about the emails of Fina and Costanzo. These include, but are not limited to, editorials on August 28, 2015 and September 9, 2015, and front page stories on September 9, 2015, October 1, 2015 and October 6, 2015. These pieces have consistently cast these plaintiffs in a false context by asserting that Fina and Costanzo, among other things: were the core distributors of the emails, were key to the email controversy; and, have engaged in discriminatory practices. The Philadelphia Daily News has knowingly and purposefully ignored that Fina and Costanzo were

26

but two of in excess of over a hundred similarly situated recipients of email chains that originated outside of the OAG.

115.    On June 2, 2015, the Media Defendants learned of plaintiffs' intention of bringing this suit against it and Christopher Brennan when plaintiffs entered into an agreement tolling the statute of limitations for claims against them.  Thereafter, the Media Defendants began to target Fina in articles and editorials with a focus and ferocity that outstripped its treatment of others who had significantly more email activity or engaged in actionable conduct such as Jonathon Duecker.

116.    By way of example, Mr. Duecker was accused by at least two female employees of the OAG of having inappropriately touched them.  Shortly after being named chief of staff to defendant Kane, the OAG human resources office recommended terminating Mr. Duecker for the alleged conduct.  Defendant Kane has ignored that recommendation.  While PMN continues the attack upon Costanzo and Fina, they have done little to no reporting on Kane's decision to retain and promote Mr. Duecker.

117.    In the months following notice to *The Daily News* of Fina's and Costanzo's intention to bring legal claims against it and Brennan, *The Daily News* undertook what amounted to a "full court press" to unfairly demean and diminish the reputations of Fina and Costanzo by mischaracterizing their involvement in the email issue, to the exclusion of all others (with the exception of Justice Eakin), by continually reciting the contents of the e-mails in article upon article, and engaging in an editorial policy to repeatedly demand their termination while ignoring

the status of more than a dozen prosecutors in the state Attorney General's Office, and other public officials, who were similarly situated and recipients of the same emails.

118.    Since June of 2015, *The Daily News* ran no less than 35 articles, editorials and columns discussing Fina and Costanzo in connection with the email issue.  In at least six of these articles, *The Daily News* vastly overstates the roles of Fina and Costanzo as the primary responsible persons.  For example:

- An August 27, 2015 article refers to Fina's "extensive porn e-mails" and that he "received plenty of e-mails."

- An August 28, 2015- article referred to Fina as being "the center of the pornography scandal" which is a subjective characterization that is never qualified, explained or justified by the *The Daily News* at any time.

- A September 9, 2015 article purports to describe the psychological profile of people who view pornography.  Sandra Shay, an editor for the newspaper, writes that e-mails were being exchanged in the "hundreds" by "highly placed officials in the Attorney General's Office" and that "many were sent by… Frank Fina"  naming no one else by name.

- An October 10, 2015 article again refers to Frank Fina as "the guy at the center of 'Porngate'" in the story's headline.  Notwithstanding the fact that there was a significant amount of professional staff members in the Attorney General's Office as well was the courts involved in the receipt and forwarding of the subject e-mails, *The Daily News* focused its coverage entirely upon Frank Fina and Marc

28

Costanzo to the point that the only reasonable impression was that they were the leaders and organizers of the offending conduct. Indeed, there is virtually no mention of others with the exception of the two supreme court justices, Seamus McCaffery and Michael Eakin.

119. In its obsessive reporting of the subject, *The Daily News* published numerous editorials and opinion columns calling solely for the termination of Costanzo and Fina's employment without commentary or reference to the fact that there were many others on the Attorney General staff, many of whom are still employed there, for which they have asked for no such similar sanction nor even suggested that it may be warranted. In particular, Kathleen Kane's twin sister, Ellen Granahan, who was elevated to a management position as head of the Attorney General's Child Predator Unit upon Kane's assumption of office, continues in her position without any outcry from *The Daily News*, notwithstanding her similar involvement in the e-mail conduct. For example:

- An August 28, 2015 editorial recommends that the public ignore the misdeeds of Kane and focus on the issues raised by e-mails instead with particular reference to Frank Fina and Marc Costanzo.

- A September 6, 2015, column by Ronnie Polaneczky calls for Frank Fina to lose his law license.

- A September 9, 2015 editorial again calls for the termination of Fina and Costanzo, while ignoring others identified in the email issue.

29

- On November 20, 2015, *The Daily News* published another editorial demanding an independent investigation and again condemning Fina and Costanzo.

120. In article after article, *The Daily News* repeatedly referred to the contents of the emails as though it had become the newspaper's mantra to make Fina and Costanzo synonymous with the offending emails in the minds of its readership.

- On August 27, 2015, *The Daily News* graphically describes five of the emails and refers to the volume of emails without specifying numbers or placing them in the context of others who may be involved.

- The next day, August 28th, *The Daily News* again described the contents of the emails of Fina's and Costanzo's released by Kane.

- On October 2, 2015, *The Daily News* wrote an opinion supposedly about emails related to Justice Eakin, but did not miss an opportunity to again provide graphic depiction of emails connected to Fina and Costanzo.

- On October 8, 2015, *The Daily News* published two pieces, a column by Helen Ubinis and an article wherein both describe the contents of emails related to Fina and Costanzo.

- On November 15, 2015, *The Daily News* published an article about the Commonwealth Court's ruling reinstating the pension of Jerry Sandusky, but did

30

not miss an opportunity to again describe allegations pertaining to Fina and Costanzo's emails.

- On November 19, 2015, *The Daily News* published a story in which the head of the Philadelphia Bar Association called for an independent probe on the entire email issue and, again, takes the opportunity to describe, in detail, emails pertaining to Fina and Costanzo. The only thing new and different about the story was the declaration by the head of the Philadelphia Bar Association calling for the investigation.

- On November 20, 2015, *The Daily News* published an article concerning the potential political side effects to the Philadelphia District Attorney with respect to the email issue and again takes the opportunity to review the same material about the emails published in prior stories, including the story published the day before.

- On December 14, 2015, *The Daily News* published a story concerning the correspondence exchanged between Kane and the Philadelphia District Attorney concerning the District Attorney's request that Kane release all emails as opposed to targeting individuals. The newspaper again takes the opportunity to graphically describe plaintiffs' emails.

- On December 17, 2015, the newspaper reports on an article published in The Philadelphia Inquirer about offending emails sent and received by Kane's sister,

31

but does not discuss the contents of these emails, portray images from them, or write even another single story about them.

- On December 22, 2015, in an article purporting to address news about the suspension of Kane's law license, *The Daily News* again discussed the contents of Fina's and Costanzo's emails.

121.    With respect to Marc Costanzo, on several occasions *The Daily News* falsely accused him of being one of the prosecutors responsible for sending the offending emails, as opposed to simply being on the receiving end of others who distributed or forwarded them.  In an article published on August 28, 2015, *The Daily News* states that Costanzo "sent, received and deleted" many of the offending emails.  Costanzo was also often mentioned in other articles as a prosecutor who sent or received offending emails without any attempt to qualify the fact that Costanzo was merely a passive recipient and not a distributor, forwarder or endorser of the emails, a key distinction.  See *The Daily News* attached hereto and marked as Exhibit "A."

122.    *The Daily News* also sought to demean Fina and Costanzo and diminish their reputation during this time frame through continual false and inaccurate reporting on allegations of racism in the Ali Bribery Investigation and through their supposed role in an EEOC complaint filed by a female investigator of the Attorney General's Office that was ultimately settled by Kane for nuisance value without any admission of liability.  Although *The Daily News* has never once sought Fina's or Costanzo's comments in connection with these articles, it then, in an opinion

column written by Helen Ubinis, criticized Fina and Costanzo for failing to comment on any of the numerous stories published by *The Daily News* on the subject.

123.    *The Daily News* continued its attempts to disparage Fina and Costanzo and damage their public image in stories pertaining to matters collateral to the email issue.  In an article published on October 1, 2015, *The Daily News* ran a story concerning an EEOC complaint that it incorrectly identifies Fina as a target of the claim.  The article states that "Fina is named in the complaint-just below the allegation- as one of the men [plaintiff] believed to be 'primarily responsible for the discrimination' according to sources familiar with the report."  This statement was not true and *The Daily News* published the information without concern for truth.  In this one-sided article, *The Daily News* significantly failed to report that Fina did not know, work with, supervise, or have any direct involvement with the plaintiff.  The article also failed to note that the matter was settled by the Attorney General's Office after Fina had left the office.  The article also referred to other certain alleged misconduct but failed to note that those claims had been rejected by courts.

124.    In November 2015, *The Daily News* published several articles trying to link the emails in question to claims that the Ali bribery investigation was racially motivated.  This one-sided story again tried to cast Fina and Costanzo as racists, but made no mention of the fact that a Philadelphia grand jury specifically found that there was no racial component to the investigation and that four of the six defendants who had pled guilty at the time failed to make any allegations of racial animus.  The story also failed to mention that members of Kane's staff specifically

A000317

repudiated the alleged basis for the allegation that the Ali bribery investigation had a racial component.

125.    In a December 2, 2015 story that paints Fina as being obsessed with the "sexual antics" of a witness in the public corruption prosecution of state representative William DeWeese, the article fails to mention that none of the other prosecutors or professional staff at the attorney general's office involved in the investigation were interviewed and would have denied the allegations.  Nor does the article mention that the matter only became an issue in the case because defendant DeWeese himself raised issues of sex involving the witness against him and also raised the allegation that one of the witnesses used state money to pay for the breast enhancement of one of defendant's staffers.  The article also attempts to establish legal equivalence of pornographic emails with DeWeese's theft of services case without noting that no individual has ever been charged criminally for personal use of public emails.  The article also intentionally masked the fact that Fina's prosecution of state legislators involved the theft and misuse of millions of dollars of public funds for campaign purposes.

126.    On December 9, 2015, *The Daily News* again tried to link Fina's emails to suggestions that only African Americans were charged in a notorious Philadelphia building collapse case while the white owner of the building and site supervisor were uncharged.  The article depicts Fina as having responsibility for the district attorney's investigation of the building collapse and plainly implies that he responsible for the decision concerning criminal charges when, in fact, he played no role in those decisions.  Indeed, one of the two individuals charged in the case was

34

A000318

arrested at the site by police before the district attorney's office became involved in the investigation.

127.    Notwithstanding the newspaper's repeated attacks on the professional standing, conduct and reputations of Fina and Costanzo, their reporters, columnists and editors never once contacted them to comment, further reflecting the newspaper's principle goal of character assassination.

### 4.    A Criminal Investigation Establishes Kane's Illegal Leak of Grand Jury Materials

128.    Kane's actions directly violated the Criminal History Record Information Act codified at 18 Pa. C.S. § 9101 *et. seq*.  She also violated the Grand Jury Act codified at 42 Pa. C.S. § 4549. Kane has been charged criminally for these actions and for attempting to cover up her role in them by lying to the grand jury.

129.    Kane further conspired with Miletto, who was at all times relevant hereto, an agent of the OAG, to further the retaliatory attack by having Miletto falsely state that Fina and Costanzo had removed him from the Mondesire investigation when Miletto supposedly found evidence of Mondesire's wrongdoing which was ultimately reported by Brennan in the news story. Miletto's statement is false, and was made to lend credibility to the claim that Fina and Costanzo improperly interfered with a valid criminal investigation.

130.    Kevin Wevodau, a former F.B.I. agent who Kane had hired as a special agent in charge of the OAG's Bureau of Criminal Investigations confirmed that Kane's motive could only have been one of retaliation.  He testified before the grand jury investigating Kane stating that "a

A000319

review of the Mondesire investigation would have been solely done so that it may be or could have been used against Mr. Fina."

131.    Fina and Costanzo first learned about the unlawful leak of grand jury material in this matter when they were contacted separately by Brennan with a request for comment.  They advised Brennan that he had unlawfully come into possession of sealed grand jury material in violation of state law.  They knew they could not lawfully comment on a sealed grand jury matter, and explained that to Brennan.

132.    Fina and Costanzo dutifully and lawfully then reported this violation of law to the Supervising Judge of the Grand Jury.  The letter of May 8, 2014 advised the Court of a potential leak but did not request any specific action nor imply any knowledge or information regarding the source of the potential leak.

133.    As a result of Fina and Costanzo's report and a preliminary investigation by the Supervising Judge, a special prosecutor was appointed to investigate the leak and the matter was submitted to a grand jury.

134.    That grand jury concluded its investigation with a presentment against Kane in which it recommended charges, concluding that Kane committed perjury in an attempt to cover up her role in the grand jury leak, that she had unlawfully leaked grand jury information and had attempted to obstruct justice. Those charges have now been filed against Kane by the Montgomery County District Attorney.  A preliminary hearing has been held and a Magisterial District Justice found sufficient evidence for all charges against Kane to proceed to the Court of Common Pleas for trial.

135.    In yet a further attempt to retaliate against Fina and Costanzo for their exercise of First Amendment rights in reporting the unlawful grand jury leak, Miletto engaged in acts of physical harassment and intimidation against Fina and Costanzo.

136.    On August 26th, 2014, the day that Fina and Costanzo were subpoenaed to appear before the grand jury to give testimony concerning their knowledge of the leak, they were met at the entrance of the building where the grand jury sits by Miletto and several other agents of the OAG who had obtained knowledge of Fina and Costanzo's grand jury subpoenas and appearance dates.

137.    Miletto and his fellow agents, who were plainly aware that Fina and Costanzo were to appear before the grand jury that day, met them at the entrance of the building where the grand jury was located and Miletto made intimidating, threatening and harassing statements toward Fina and Costanzo.  Miletto and the other agents followed Fina and Costanzo into the elevator as they were proceeding to the grand jury courtroom.  Miletto then attempted to physically intimidate, threaten and harass Fina while he was in the elevator.

138.    As a result of the OAG and Miletto's conduct, the supervising grand jury judge convened a hearing in which he took evidence concerning the intimidation, and the judge was sufficiently concerned about the OAG and Miletto's conduct that he imposed a protective order on August 27th, 2014 to prevent the OAG from engaging in any further attempts at intimidating Fina and Costanzo.  Despite Kane's many attempts to falsely attack and mischaracterize the basis for the Court's protective order, the order has been repeatedly upheld by the Supervising Judge and the Pennsylvania Supreme Court.

37

A000321

### 5. Moulton's 2014 Report on the Sandusky Investigation and Kane's Fabrication of New Victims

139.     In May 2014, Moulton completed the report of his review of the Sandusky Investigation.

140.     Pursuant to the protocol established by the supervising grand jury judge, Fina, Sheetz, Feathers and Noonan were given an advance copy of the draft final report with the right to draft a response.  Responses from the plaintiffs were drafted and submitted on June 11th, 2014, and these responses became incorporated into the report.  All of the responses highlighted the fact that Moulton's Report exposed the falsity of Kane's campaign claims and criticisms of the Sandusky investigation.

141.     Upon information and belief, Kane read that report, was aware that it was going to be released to the press and that it did not support her campaign statement due, in significant part, to the plaintiffs' responses.  Accordingly, Kane planned a retaliatory response.

142.     On June 23, 2014, Kane's report and the responses by Fina, Sheetz, Feathers and Noonan were released to the media.  On that same date, Kane convened a press conference in which she made a statement and took questions from reporters.

143.     In that press conference, Kane made statements in retaliation against Fina, Sheetz, Feathers and Noonan for their written response to the report.  She expressly stated that delays in the Sandusky investigation, which were the result of the actions of Fina, Sheetz, Feathers and Noonan, provided Sandusky with the opportunity to assault others and, in fact, Kane alleged that two minors were victimized while the investigation was ongoing.

A000322

144.     The statement, which was premeditated and calculated to defame and embarrass Fina,

Sheetz, Feathers, Noonan and Costanzo, was false, and Kane knew it to be false when she made

it.

145.     Kane's statement concerning two new victims was widely reported in the media.

146.     In response to these scandalous allegations, plaintiffs held a press conference, and Fina

responded to Kane by stating that "[investigating the handling of the Sandusky probe] was a

campaign promise she made.  It was a trick she used to get elected and Moulton didn't deliver

for her [in his report].  What's she going to do?  She has to come up with something else

sensational to detract that she [made] a series of falsehoods to the public during the campaign."

This statement, together with others from this press conference, became further cause for Kane's

war of retaliation.  Fina, Feathers and Noonan all publically denounced Kane's statements about

other victims as fabricated and untruthful.

147.     In fact, through a spokesperson, Kane later acknowledged that her public statements

concerning the two additional victims were simply not true.

148.     Kane's next act of retaliation followed a short time after plaintiffs' written and oral

response to the Moulton report.

> **6.     Kane's Retaliatory Use of Private E-Mails and Attempt to Silence
>           Plaintiffs**

149.     In the course of Moulton's review of the Sandusky investigation, the OAG apparently

reviewed a large volume of e-mails that were received and, in some cases forwarded, by

members of the staff of the OAG at the time, which included all plaintiffs.

A000323

150.    Amongst these e-mails were numerous personal e-mails, some of which contained pornographic images.

151.    By July of 2014, Kane was aware that a Special Prosecutor had been appointed to investigate her for the Mondesire Grand Jury leaks and that Fina and Costanzo would be grand Jury witnesses in that investigation.  She had also been recently embarrassed by her false statements about other Sandusky victims in her bid to retaliate against Fina, Noonan, Sheetz, Costanzo and Feathers.  Following these events, Kane sought a way to utilize these emails to retaliate against Fina, Sheetz, Feathers, Costanzo, Noonan and others by threatening to release these personal e-mails which would embarrass them in the event plaintiffs continued with their lawful exercise of free speech that was critical of her conduct.

152.    Upon information and belief, in July and August of 2014, Kane instructed members of her staff to contact members of the media and suggest to them that e-mails existed for which they should make a Right to Know Law request.   When those requests invariably arrived, Kane obtained no fewer than two legal opinions that confirmed she could not lawfully selectively release employees' or former employees' private emails.  She was advised that any decision regarding the release of emails had to be comprehensive.  That is, she needed to release all private emails or none.  Kane proceeded to act in deliberate disregard of these legal opinions.  A court has already made specific factual findings regarding Kane's selected planting of these emails with the media through Right to Know Law requests.  The Opinion of Supervising Judge William Carpenter of December 12, 2014 at Supreme Court Docket 171 MM 2014 details these efforts.

153.    In fact, the OAG under Kane has vigorously argued in an appellate brief before the Commonwealth Court that these same emails are not public record, should remain private, and should not be subject to public release under the Right to Know Law.  Despite acknowledging and advancing this legal position in pleadings as an officer of the court, Kane's own actions contradict the legal position of her office, as she has nonetheless selectively released key emails for the sole purpose of retaliating against those whom she views as a threat or who have spoken out against her.  While the Commonwealth Court was poised to rule on her legal position filed of record which asserts that these emails should not be released under the Right to Know Law, she has at the same time stated publicly at a press conference that she will seek authority from Judge Carpenter to release other emails, and these ongoing efforts are likewise for the obvious purpose of further retaliating against plaintiffs as they have no lawful basis nor other legitimate purpose. Ultimately, the Commonwealth Court ruled that private emails are not agency records and thus not subject to release pursuant to Right to Know requests.

154.    Kane's decision-making with respect to the so-called pornographic emails has been driven by her decision to retaliate against the plaintiffs rather than by the proper service of her office.  As stated above, she has taken contradictory positions on the release of the emails to suit her retaliatory agenda.  She seeks to release the offending emails of those who have exercised their First Amendment rights to her political detriment while taking the official position that the emails are not public records and should not be released to the media pursuant to Right to Know Law requests.  Further, while using the emails to embarrass and harm plaintiffs, she has protected the emails of her allies, friends, family and, in the case of one trusted confident, OAG

41

A000325

agent Louis C. DiTitto who participated in pornographic email traffic, Kane promoted him to a position in OAG management and gave him a 16% pay raise.

155.    In the summer of 2014, after Kane's agents had been advising members of the media to make Right to Know Act requests for private emails, a colleague of Fina had a meeting with David Tyler, the Chief Operating Officer for the OAG.  At that meeting, Tyler advised Fina's colleague that many of the former OAG legal staff's names were connected to private emails containing pornography.  Tyler then told Fina's colleague that a lot of those people are going to be hurt if "Fina does not back off." That threat was plainly understood to mean that Kane would release the emails of people friendly with Fina if Fina did not stop talking to the press and take steps to end the grand jury that was investigating the Mondesire leak.

156.    Fina was informed of these threats and he, in turn, advised the special prosecutor of the grand jury leak investigation.  Upon information and belief, due to the report of these threats, Tyler was confronted with his statements by the prosecutor and admitted to them.

157.    In August of 2014, another colleague of Fina met with James Barker, then OAG Chief Deputy Attorney General for Appeals and Legal Services, and Barker admonished him that he should tell Fina that if Fina did not stop criticizing Kane, Kane would release the private emails of the former OAG staff.

158.    This threat was also conveyed to Fina who conveyed the information to the special prosecutor.

159.    Kane ignored the legal advice she had received concerning the release of e-mails and, on

September 23, 2014, she convened a press conference where she made selections of the e-mails

of selective former OAG employees available to media.

160.    Those selected by Kane to have their emails released had either spoken out against Kane

during her campaign or in connection with the Sandusky Investigation, or were friends or

professional associates of Fina, Sheetz, Feathers, Costanzo and Noonan.

161.    The emails were selectively released to retaliate directly against Fina, Sheetz, Feathers,

Costanzo and Noonan, individuals who exercised their right to free speech by speaking publicly

against Kane and her inappropriate political manipulation of important cases and facts. The e-

mail release was done as a means of retaliation for the exercise of free speech protected by the

First Amendment.

162.    These e-mails were the private communications of former employees of the OAG and

their release was meant solely to embarrass and denigrate the plaintiffs.

> **7.    Kane's Conspiracy With CNN to Publish False Claims That Plaintiffs Had Allegedly Viewed Child Pornography**

163.    By November of 2014, Kane's lengthy efforts to use her office in retaliation had not

prevented the Special Counsel or Grand Jury from continuing the investigation into her criminal

acts, nor had they stopped the media from publically exposing her misconduct.  In fact, despite

her considerable efforts to avoid it, she had to testify before the Grand Jury on November 17,

2014.  Knowing she would be forced to testify on that date and that it would entail considerable

negative press coverage, Kane lobbied CNN to produce a story about the emails and CNN

agreed. This story was specifically designed to defame Fina, Noonan, Sheetz and Feathers, and to distract from Kane's own legal troubles.

164.    The CNN story was produced in early November and broadcast later on November 18, 2014. In a pre-recorded interview of Kane that was ultimately used in the broadcast story, Kane knowingly, willfully and intentionally made false statements that were defamatory and cast Fina, Feathers and Noonan in a false light. Kane falsely stated that amongst the emails that had been exchanged, there was child pornography, and Kane made these statements in such a manner as to suggest that Fina, Feathers, Sheetz and Noonan were implicated in the criminal activity of viewing such images. Kane, in effect, accused Fina, Feathers, Sheetz and Noonan of possessing and/or distributing pornography which is not only grossly immoral, but is a felony under state law and federal law.

165.    Below is a transcript of the CNN segment:

> SCIUTTO (CNN CORRESPONDENT): Tonight, stunning allegations about dozens of Pennsylvania officials, including some who investigated former Penn State assistant football coach Jerry Sandusky. Sandusky as you probably now is now serving a 30-to-60 year sentence for sexually abusing more than a half dozen boys over a decade. It took years before he was charged and brought to trial. A lag that's drawn fire from many people. Now Pennsylvania's attorney general claims that many of the officials who worked on the Sandusky sex abuse case were at the exact same time breaking the law by using their work computers to share hardcore porn. On top of that, she said that a gag order is keeping her from completing her investigation. Here's CNN investigative correspondent Sara Ganim.

> SARA GANIM, CNN CORRESPONDENT: Dozens of state officials in Pennsylvania, many who worked to bring down the infamous child molester Jerry Sandusky have been caught exchanging crude pornographic emails written on state email accounts, state computers and on state time, according to the state's attorney general.

A000328

In all, more than 4,000 sexually explicit emails were circulated between about 50 people, many state employees, over a four-year period starting in 2008. Some of them at the very same time that the very same people were building a child sex abuse case against Sandusky. And the porn being passed around was not for the faint of heart.

KATHLEEN KANE: When I saw them, they literally took my breath away. And they are deplorable. Hardcore, graphic, sometimes violent emails that had a string of videos and **pictures depicting sometimes children**, old women, some of them involved violent sexual acts against women.

Good morning.

GANIM: The emails were discovered by State Attorney General Kathleen Kane, who ran for office on the promise that she would investigate why it took three years to charge Sandusky after his first victim came forward. While looking into that, her office uncovered the pornographic emails. Those involved in the scandal include some of the biggest names in Pennsylvania's justice system, a state Supreme Court justice Seamus McCaffery, the State Police Commissioner Frank Noonan and one of the main Sandusky investigators Randy Feathers. The emails are so graphic, the chief justice of the State Supreme Court wrote that they are clearly obscene and may violate the crimes code section on obscenity." But now incredibly, Kane says she can't do a thing about it, can't investigate further, can't name any names that have not already been made public.

But are you investigating this right now?

KANE: We are not investigating it.

GANIM: Why not?

KANE: I cannot investigate. I am being stopped from performing my duties as attorney general, my office is being stopped from certain investigations, and we are being stopped even from telling why.

GANIM: So, I'm hearing you say that your hands are tied. Why are your hands tied?

KANE: My hands are tied and this will be frustrating for you because it's just as frustrating for me. My hands are tied because there are court orders that don't allow us to say certain things, which I believe the public needs to know.

45

A000329

GANIM (voice over): To understand why, you have to go back to a public and very bitter feud between Attorney General Kathleen Kane and the main prosecutor in the Sandusky case Frank Fina. It started with her criticism of how Fina handled Sandusky. The two have been lobbying allegations against each other about whether several cases have been handled correctly. As a result, Kane is now being investigated about whether she improperly leaked a memo about a case from 2009 that Fina handled. And according to the "Philadelphia Inquirer," a gag order in that case is keeping Kane from moving forward on the porn emails.

As the state's top prosecutor ...

KANE: Yes.

GANIM: You're saying that there's a court order that's keeping you from investigating a case that you think, and the chief justice on the state's Supreme Court thinks, might be illegal.

KANE: That is correct.

GANIM (voice over): Kane says she believes she did the right thing. Frank Fina would not comment for this story.

Do you feel that the system is being abused to protect certain people?

KANE: I knew that I was walking into public corruption, which again is why I ran. But I will tell you this, even I am shocked at the level of public corruption. I am shocked at how deep it goes and I am shocked at how powerful it is. I have never seen anything like this. It's breathtaking. It has been described by the people familiar with what is happening as shameful.

SCIUTTO: Sara Ganim joins us now. Sara, great reporting. What can you tell us happened to the state employees involved in these emails?

GANIM: Well, Jim, most of the people have been - who have been publicly shamed, they lost their jobs, either resigning or being forced out. But the State Police Commissioner Frank Noonan, you saw him, he still has his job because according to published reports, the governor says there was no proof that he opened the emails. There are also people in the public sector, the private sector, I'm sorry, that still have their jobs, too.

SCIUTTO: And how about for the Pennsylvania attorney general? What's next for her?

46

GANIM: Well, she testified yesterday before the grand jury and now she waits to see if she'll be indicted. Remember, that's a whole another case about a grand jury leak. She's under investigation for that leak. And sources tell us that the order that she says that is preventing her from investigating these emails, it doesn't actually name any names, it's vague. But she says that she believes she can't take any chances because she could be held in contempt of court, possibly even jailed. Jim.

SCIUTTO: Alarming case, thanks very much to Sara Ganim.

At various points during the narrative, quoted intact above, CNN displayed photos of Fina, Noonan and Feathers.

166.    Kane plainly arrived at the interview intending to utter that fabrication in an attempt to smear Fina, Sheetz, Feathers and Noonan, to defame them and to do demonstrable harm to their reputation.

167.    Because the statement was pre-recorded before it was aired on November 18, 2014, Kane had an opportunity to recant that statement and ask that it be stricken from the broadcast interview. She did not, always intending that these false statements be published and cause the resultant harm.

168.    In fact, once again, in the days that followed, a Kane spokesperson was forced to acknowledge that there was no truth to any allegation of images of child pornography in the emails.

169.    In fact, the email referred to by Kane in the CNN interview had 79 recipients, of which at least 17 were employed at the Attorney General's office at the time of the CNN broadcast; 14 are still employed there today. Kane made no mention of this fact during her interview and it is now

A000331

clear that her description of the email's contents was a gross mischaracterization and her moral

offense was fabricated to defame Noonan, Feathers, Sheetz and Fina as best evidenced by the

fact none of her employees on the email recipient list in her office were terminated for having

possessed the material.  See Exhibit "B."

## 8.     Plaintiffs' Protected First Amendment Speech

170.     Plaintiffs engaged in numerous acts of protected First Amendment speech, including the

following:

(a)     statements by Feathers in 2012 to the media commenting and criticizing Kane's politically motivated campaign criticism of the Sandusky Investigation;

(b)     Fina's assertions to the OAG and the supervising judge of the Sandusky grand jury challenging Kane's authority to conduct an investigation of a grand jury investigation, and various motions to regulate the conduct of that investigation;

(c)     the September 2013 production of an affidavit by Fina in support of Ali's motion to recuse Kane from his case and compel performance of the cooperation agreement entered into between Ali and the Commonwealth;

(d)     Fina letter of March 22, 2014 to the public responding to Kane's false allegations about her termination of the Ali undercover bribery case;

(e)     The public statements in March and April of 2014 by Noonan and Sheetz correcting Kane's allegations about her termination of the Ali undercover bribery case;

(f)     Fina and Costanzo's May 8, 2014 report to the Supervising Judge of the Grand Jury concerning the leak of grand jury information in the Mondesire investigation;

(g)     Fina, Sheetz, Feathers and Noonan's written responses to the Moulton Report concerning the review of the Sandusky Investigation, provided on June 11, 2014;

48

(h)     June 23rd, 2014 press conference statements of Fina, Feathers, and Noonan in responding to false allegations that Sandusky abused two children while the grand jury investigation was underway in 2009;

(i)     Fina and Costanzo's report on August 26, 2014 to the special prosecutor about Miletto's attempt to engage in physical and oral intimidation of them as grand jury witnesses;

(j)     Fina's and Costanzo's August 26th, 2014 testimony before the grand jury investigating the leak of grand jury material in the Mondesire investigation; and

(k)     Costanzo openly expressed criticism of Kane's campaign tactics regarding the Sandusky prosecution.

171.    Each of these actions taken by Fina, Costanzo, Sheetz, Feathers, and Noonan were done to achieve lawful objectives and sought to assure that agreements of the Commonwealth are being honored and enforced, that citizens of the Commonwealth are receiving an honest, complete and fair assessments of the actions of their government agencies, and each action constitutes a form of political expression and petition of the government for redress of grievances.

172.    The actions of Fina, Costanzo, Sheetz, Feathers, and Noonan, on behalf of agents, witnesses and the citizens of the Commonwealth angered defendants Kane and her agents including Milleto.  Kane was enraged by the fact that these plaintiffs took a stand, challenged them and initiated legal actions to prevent them from engaging in unlawful conduct.

173.    Indeed, the grand jury investigation into the leak of the Mondesire grand jury revealed clear evidence of Kane and her administration's willingness to engage in criminal actions to advance their ill motives and retaliatory scheme against Fina and Costanzo, and display their

49

**A000333**

willingness to engage in retaliatory action, generally. The findings of the Disciplinary Board of the Supreme Court of Pennsylvania similarly bolster the clear existence of the evidence of Kane's misconduct. The conduct of defendants Kane, Miletto, and others associated with them include violations of the United States Constitution, and criminal laws.

174. As a direct and proximate result of the actions listed above defendants sought to inflict injury on and professionally damage or destroy plaintiffs through their retaliatory actions.

175. By the content, form and context of the speech and conduct of plaintiffs Fina, Costanzo, Sheetz, Feathers, and Noonan, plaintiffs spoke out about matters of public concern.

176. All of these plaintiffs' First Amendment protected activities were on matters of public concern to the citizens of the Commonwealth of Pennsylvania, the news media, voters, the public at large, the governor of Pennsylvania and the general assembly.

177. Plaintiffs' First Amendment protected activities related to matters of political, social and other concern to the community.

178. Plaintiffs were acting in good faith and with honest motives at all times when they exercised their First Amendment protected rights.

### 9. Retaliation by Defendant Kane

179. Defendant Kane engaged in a calculated and continual enterprise against the plaintiffs in an effort to harm them and deter them from exercising their First Amendment rights of free speech.

A000334

180.    In a calculated and directed campaign to retaliate against and injure plaintiffs,  Kane published false statements to the media  and released private e-mails that impugned plaintiffs' professional and personal reputations, including:

      (a)    false statements that she possessed evidence that Fina and Costanzo were responsible for a racially motivated investigation of Philadelphia state representatives who accepted cash bribes;

      (b)    conspiring with others, including Morrow, Miletto and Brennan - a Philadelphia Daily News reporter - - to unlawfully leak grand jury information connected to the Mondesire investigation that dishonestly represented that Fina and Costanzo had improperly impeded a criminal investigation of Mondesire, then director of the Philadelphia NAACP;

      (c)    falsely represented to the media that there existed evidence that delays in the Sandusky Investigation run by Fina, Sheetz, Feathers, Noonan and Costanzo that resulted in additional victims of sexual abuse;

      (d)    falsely stated that plaintiffs had possessed and/or distributed images of child pornography;

      (e)    released information about and/or plaintiffs actual private and personal e-mails in a manner that was unlawful; .

      (f)    falsely stated, in numerous public statements and verified court filings that Fina and Costanzo engaged in a "conspiracy", "plot" or "scheme" to "corruptly" manufacture a grand jury investigation of Kane;

      (g)    falsely asserted that Fina and Costanzo have engaged in criminal acts and that "the corrupt machinations of Frank Fina and E. Marc Costanzo have wrongfully caused the judiciary to bar her from discharging the duties of her office;" and

      (h)    has repeatedly asserted she is the victim of a male and/or "old boys" network.

181.    At all times, Kane knew that her allegations were false and/or intended to reveal matters of privacy with no legitimate purpose.

182.    Defendant Kane published her false allegations despite knowledge of their actual falsity.

51

183.    Defendant Kane willfully blinded herself to the falsity of her statements.

184.    The retaliatory publications and release of private and personal emails were intended to intimidate, prevent and deter plaintiffs from engaging in First Amendment protected activity discussed above and to punish them for that same activity.  Stories about Kane's false and scandalous allegations and plaintiffs' emails were published by various state and national news and subsequently republished throughout Pennsylvania and the United States.

185.    With respect to Feathers, Kane took her retaliatory action further by falsely alleging that Feathers had viewed and forwarded many of the e-mails containing the pornographic materials. Despite public demands by Feathers that Kane conduct a forensic evaluation of his e-mail account to show just how limited Feathers' involvement was with respect to the emails in question, Kane stood by her misrepresentations in an attempt to embarrass and harm Feathers in the absence of such fundamental evidence.

186.    As a result of Kane's actions, Feathers was compelled to resign from his post as a member of the Pennsylvania State Parole Board.

187.    As a result of Kane's actions, Sheetz was compelled to resign from his position as an assistant district attorney at the Lancaster County District Attorney's office.

### COUNT I- 42 U.S.C. § 1983- FIRST AMENDMENT FREE SPEECH RETALIATION FINA V. KANE (ALI INVESTIGATION)

188.    Plaintiffs repeat and reallege paragraphs 1-175 set forth above and incorporates them herein by reference.

A000336

189.    Kane's actions of fabricating and publishing claims that the OAG possessed evidence that the investigation involving the acceptance of bribes by state representatives was motivated by racism was retaliatory action against Fina as a direct and proximate result and in retaliation of his exercise of First Amendment protected freedom of speech as more fully discussed above. Kane's fabrication and publication of these false statements of racism directly related to a matter of important public concern upon which Fina had exercised his First Amendment right of free speech.

190.    Kane cannot identify any non-retaliatory reason for having fabricated and published false allegations of racism against Fina.

191.    Fina's rights to engage in expressive First Amendment activity have been chilled by Kane's actions.

192.    The publication of the false implications of racism resulted in injury to Fina's personal and professional reputation, diminished his public esteem, respect and goodwill, generated derogatory and negative opinions against him, and caused him embarrassment and anxiety.

193.    Plaintiff's constitutional right to freedom of speech has been denied under the first Amendment of the United States Constitution at 42 U.S.C. § 1983.

194.    As a direct and proximate cause of Kane's actions, Fina has suffered emotional distress, humiliation, embarrassment, and injury to his reputation.

WHEREFORE, plaintiff Frank Fina demands judgment in his favor against defendant Kathleen Kane for compensatory damages, punitive damages, attorneys' fees, cost of suit, and injunctive relief that includes a permanent injunction enjoining defendant Kane from retaliating

A000337

against plaintiff now or in the future and a reparative injunction directing defendant Kane to issue a public statement personally apologizing to plaintiff Fina for the publication of false statements in violation of his constitutional rights.

### COUNT II- 42 U.S.C. § 1983- FIRST AMENDMENT FREE SPEECH RETALIATION FINA AND COSTANZO V. KANE (MONDESIRE GRAND JURY LEAKS)

195.    Plaintiffs repeat and re-allege paragraphs 1-182 set forth above and incorporates them herein by reference.

196.    Kane's actions of fabricating and publishing claims that Fina and Costanzo wrongfully impeded and terminated a valid criminal investigation against J. Whyatt Mondesire for improper and unethical purposes was retaliatory action against Fina and Costanzo as a direct and proximate result of, and in retaliation for, their exercise of First Amendment protected freedom of speech as more fully discussed above.  Kane's fabrication and publication of these false statements directly related to a matter of important public concern upon which Fina and Costanzo had exercised their First Amendment right of free speech.

197.    Kane cannot identify any non-retaliatory reason for having fabricated and published false allegations that Fina and Costanzo wrongfully impeded and terminated a valid criminal investigation against J. Whyatt Mondesire for improper and unethical purposes..

198.    Fina and Costanzo's rights to engage in expressive First Amendment activity have been chilled by Kane's actions.

199.    The publication of the false implications that they wrongfully impeded and terminated a valid criminal investigation resulted in injury to Fina and Costanzo's personal and professional

reputations, diminished their public esteem, respect and goodwill, generated derogatory and negative opinions against them, and caused them embarrassment and anxiety.

200.    Plaintiffs' constitutional right to freedom of speech has been denied under the First Amendment of the United States Constitution at 42 U.S.C. § 1983.

201.    As a direct and proximate cause of Kane's actions, Fina and Costanzo have suffered emotional distress, humiliation, embarrassment, and injury to their reputations.

WHEREFORE, plaintiffs Frank Fina and E. Marc Costanzo demand judgment in their favor against defendant Kathleen Kane for compensatory damages, punitive damages, attorneys' fees, cost of suit, and injunctive relief that includes a permanent injunction enjoining defendant Kane from retaliating against plaintiffs now or in the future and a reparative injunction directing defendant Kane to issue a public statement personally apologizing to plaintiffs Fina and Costanzo for the publication of false statements in violation of their constitutional rights.

## COUNT III- 42 U.S.C. §§ 1983 - FIRST AMENDMENT FREE SPEECH RETALIATION-Conspiracy

### FINA AND COSTANZO V. KANE, MILETTO, AND BRENNAN (MONDESIRE GRAND JURY LEAKS)

202.    Plaintiffs repeat and reallege paragraphs 1-189 set forth above and incorporates them herein by reference.

203.    Kane's actions of fabricating and publishing claims that Fina and Costanzo wrongfully interfered with and terminated a valid criminal investigation against J. Whyatt Mondesire for improper and unethical purposes was retaliatory action against Fina and Costanzo as a direct and proximate result and in retaliation of their exercise of First Amendment protected freedom of

55

speech as more fully discussed above. Kane's fabrication and publication of these false statements directly related to a matter of important public concern upon which Fina and Costanzo had exercised their First Amendment right of free speech.

204. Defendants cannot identify any non-retaliatory reason for having fabricated and published false allegations of that Fina and Costanzo wrongfully suppressed and terminated a valid criminal investigation against J. Whyatt Mondesire for improper and unethical purposes.

205. Through their concerted actions described above, defendants conspired to retaliate against Fina and Costanzo for the exercise of their First Amendment rights of free speech.

206. The publication of the false implications that they wrongfully interfered with and terminated a valid criminal investigation resulted in injury to Fina and Costanzo's personal and professional reputations, diminished their public esteem, respect and goodwill, generated derogatory and negative opinions against them, and caused them embarrassment and anxiety.

207. Plaintiffs' constitutional right to freedom of speech has been denied under the First Amendment of the United States Constitution at 18 U.S.C. § 1983.

208. As a direct and proximate cause of the actions of Kane, Milleto and Brennan, Fina and Costanzo have suffered emotional distress, humiliation, embarrassment, and injury to their reputations.

WHEREFORE, plaintiffs Frank Fina and E. Marc Costanzo demand judgment in their favor against defendants Kathleen Kane, Michael Miletto and Christopher Brennan for compensatory damages, punitive damages, attorneys' fees, cost of suit, and injunctive relief that includes a permanent injunction enjoining defendant Kane from retaliating against plaintiffs now

56

or in the future and a reparative injunction directing Defendant Kane to issue a public statement personally apologizing to plaintiffs Fina and Costanzo for the publication of false statements in violation of their constitutional rights.

### COUNT IV- 42 U.S.C. § 1983- FIRST AMENDMENT FREE SPEECH RETALIATION FINA, SHEETZ, FEATHERS AND NOONAN V. KANE (MOULTON REPORT)

209.   Plaintiffs repeat and reallege paragraphs 1-196 set forth above and incorporates them herein by reference.

210.   Kane's statements to the media that the alleged delay in arresting Sandusky resulted in two minors being subjected to sexual abuse that would not have otherwise occurred was retaliatory action against Fina, Sheetz, Feathers, and Noonan and was retaliatory action as a direct and proximate result and in retaliation of their exercise of First Amendment protected freedom of speech as more fully discussed above.  Kane's fabrication and publication of these false statements directly related to a matter of important public concern upon which Plaintiffs had exercised their first amendment right of free speech.

211.   Fina's, Sheetz's, Feather's, and Noonan's rights to engage in expressive First Amendment activity have been chilled by Kane's actions.

212.   The publication of the false allegations of investigative delays resulting in additional victims resulted in injury to Plaintiffs' personal and professional reputations, diminished their public esteem, respect and goodwill, generated derogatory and negative opinions against them, and caused them embarrassment and anxiety.

213.   Plaintiffs' constitutional right to freedom of speech has been denied under the first Amendment of the United States Constitution at 42 U.S.C. § 1983.

A000341

214.    As a direct and proximate cause of Kane's actions, Fina, Sheetz, Feathers, and Noonan have suffered emotional distress, humiliation, embarrassment, and injury to their reputations.

WHEREFORE, plaintiffs Fina, Sheetz, Feathers, and Noonan demand judgment in their favor against defendant Kathleen Kane for compensatory damages, punitive damages, attorneys' fees, cost of suit, and injunctive relief that includes a permanent injunction enjoining defendant Kane from retaliating against plaintiffs now or in the future and a reparative injunction directing defendant Kane to issue a public statement personally apologizing to plaintiffs Fina, Sheetz, Feathers, and Noonan for the publication of false statements in violation of their constitutional rights.

## COUNT V- 42 U.S.C. § 1983- FIRST AMENDMENT FREE SPEECH RETALIATION

### FINA, SHEETZ, FEATHERS AND NOONAN V. KANE
### (KANE'S FALSE CLAIMS ABOUT POSSESSION/DISTRIBUTION OF CHILD PORNOGRAPHY)

215.    Plaintiffs repeat and reallege paragraphs 1-202 set forth above and incorporates them herein by reference.

216.    Kane's actions of fabricating and publishing claims that implied that Fina, Sheetz, Feathers and Noonan possessed and/or distributed child pornography was retaliatory action against Fina, Sheetz, Feathers and Noonan as a direct and proximate result of, and in retaliation for, their exercise of First Amendment protected freedom of speech as more fully discussed above.  Kane's fabrication and publication of statements falsely implicating Fina, Feathers and Noonan in child pornography directly related to a matter of important public concern upon which Plaintiffs had exercised his First Amendment right of free speech.

58

217.     Kane cannot identify any non-retaliatory reason for having fabricated and published false allegations relating to child pornography against Fina, Sheetz, Feathers and Noonan.

218.     Fina's, Sheetz's, Feathers' and Noonan's rights to engage in expressive First Amendment activity have been chilled by Kane's actions.

219.     The publication of the false implications that Fina, Sheetz, Feathers and Noonan dealt in child pornography resulted in injury to their personal and professional reputations, diminished their public esteem, respect and goodwill, generated derogatory and negative opinions against them, and caused them embarrassment and anxiety.

220.     Plaintiffs' constitutional rights to freedom of speech have been denied under the First Amendment of the United States Constitution at 42 U.S.C. § 1983.

221.     As a direct and proximate cause of Kane's actions, Fina, Sheetz, Feathers and Noonan have suffered emotional distress, humiliation, embarrassment, and injury to their reputations.

     WHEREFORE, plaintiffs Fina, Sheetz, Feathers and Noonan demand judgment in their favor against defendant Kathleen Kane for compensatory damages, punitive damages, attorneys' fees, cost of suit, and injunctive relief that includes a permanent injunction enjoining defendant Kane from retaliating against plaintiffs now or in the future and a reparative injunction directing defendant Kane to issue a public statement personally apologizing to plaintiffs Fina, Sheetz, Feathers and Noonan for the publication of false statements in violation of his constitutional rights.

59

**COUNT VI- 42 U.S.C. § 1983- FIRST AMENDMENT FREE SPEECH RETALIATION**

**ALL PLAINTIFFS V. KANE (RELEASE OF PRIVATE E-MAILS)**

222.    Plaintiffs repeat and reallege paragraphs 1-209 set forth above and incorporates them herein by reference.

223.    Kane's actions of releasing the information about the private emails and/or releasing the emails of all plaintiffs was retaliatory action against the plaintiffs as a direct and proximate result of, and in retaliation for, the exercise of First Amendment protected freedom of speech as more fully discussed above.  Kane's release of this information to the media was directly related to a matter of important public concern which was the result of plaintiffs' exercise of their First Amendment right of free speech.

224.    Kane cannot identify any non-retaliatory reason for having released these private emails.

225.    Plaintiffs' rights to engage in expressive First Amendment activity have been chilled by Kane's actions.

226.    The publication of the information concerning the contents of these private emails and the actual emails resulted in injury to plaintiffs' personal and professional reputation, diminished their public esteem, respect and goodwill, generated derogatory and negative opinions against him, and caused him embarrassment and anxiety.

227.    Plaintiffs' constitutional right to freedom of speech has been denied under the first Amendment of the United States Constitution at 42 U.S.C. § 1983.

228.    As a direct and proximate cause of Kane's actions, plaintiffs have suffered emotional distress, humiliation, embarrassment, and injury to their reputations.

A000344

WHEREFORE, Plaintiffs demand judgment in their favor against defendant Kathleen Kane for compensatory damages, punitive damages, attorneys' fees, cost of suit, and injunctive relief that includes a permanent injunction enjoining defendant Kane from retaliating against plaintiffs now or in the future and a reparative injunction directing defendant Kane to issue a public statement personally apologizing to plaintiffs for the publication of false statements in violation of their constitutional rights.

## COUNT VII- DEFAMATION

### FINA AND COSTANZO V. BRENNAN AND PHILADELPHIA MEDIA NETWORK (DIGITAL), LLC AND PHILADELPHIA MEDIA NETWORK, LLC

229.    Plaintiffs repeat and reallege paragraphs 1-216 set forth above and incorporates them herein by reference.

230.    Defendants published the above-mentioned statements, innuendos and implications concerning Fina, Costanzo, including to individuals in Philadelphia County and the Commonwealth of Pennsylvania who understood those statements, innuendos and implications to refer to and defame Fina and Costanzo. Defendants' publications falsely and maliciously stated, suggested and implied that Fina and Costanzo, as described above, acted unprofessionally, violated attorney ethics, and performed a disservice to the citizens of the Commonwealth by impeding and terminating an allegedly appropriate investigation into the misuse and/or theft of money by Mondesire. Defendants have also continued to publish false and misleading stories in furtherance of Kane's efforts to retaliate and defame Fina and Costanzo through her selective release and characterization of emails."

61

231.    Defendants knew, or were on notice, that Defendant Kane had a vendetta against Fina and Costanzo and were engaging in the unlawful act of leaking grand jury information against them and were providing only a partial and biased account of the investigation.

232.    Defendants published their statement with knowledge of its falsity and/or reckless disregard for the truth and intentionally and maliciously portrayed Fina and Costanzo as they did to undermine their position and reputation as public ethics prosecutors in the minds of the readers of Defendants' articles.

233.    Defendants' false and defamatory statements, innuendos and implications severely injured Fina and Costanzo in that they tended to blacken and besmirch their reputation; have exposed them to public contempt ridicule or hatred; have conveyed the impression that they engaged in corrupt motives; have subjected them to emotional distress, mental anguish, embarrassment and humiliation; and have damaged them professionally and personally.

234.    Defendants' defamatory publications were so outrageous and malicious as to warrant the imposition of punitive damages.

235.    As a proximate result of defendants' malicious, intentional and reckless conduct as set forth above, Fina and Costanzo are entitled to such damages as will compensate them for the injury to their professional and personal reputation, for their emotional distress, and punitive damages to punish the defendants for their conduct and to deter them and others similarly situated from similar acts in the future.

A000346

WHEREFORE, plaintiffs Frank Fina and E. Marc Costanzo demand judgment in their favor against defendants jointly and severally, for compensatory damages, punitive damages, attorneys' fees, cost of suit, and such other relief as this Court may deem just and proper.

### COUNT VIII - FALSE LIGHT

### FINA AND COSTANZO V. BRENNAN AND PHILADELPHIA MEDIA NETWORK (DIGITAL), LLC AND PHILADELPHIA MEDIA NETWORK, LLC

236.   Plaintiffs repeat and re-allege paragraphs 1-223 set forth above and incorporates them herein by reference.

237.   Defendants, through their coverage and investigation of Kane, her political campaign, her attacks on the professionalism and professional work of Fina, as well as the ongoing hostilities between them throughout her tenure as attorney general, were on notice that Kane would stop at nothing to diminish and disparage Fina and his colleagues and their professional reputation and work for her own political gain.  In the present case, defendants were aware, or should have been aware, that Kane was engaged in a violation of criminal law by leaking selective grand jury materials and having one of their political operatives provide defendants with an inaccurate account of the Mondesire grand jury investigation.  Defendants, nonetheless, willfully chose to report and actively promote a false and misleading story that Fina and Costanzo improperly suppressed and ended an investigation against Mondesire.  Defendants have also continued to publish false and misleading stories in furtherance of Kane's efforts to retaliate and defame Fina and Costanzo through her selective release and characterization of emails.

63

238.     Due to the above, defendants placed Fina and Costanzo in a false light for the public by representing a false and incorrect account of the investigation and presenting an overall false representation of that investigation.

239.     The aforementioned false light in which Fina and Costanzo were placed would be highly offensive to a reasonable person.

240.     Defendants had knowledge of, or acted in a reckless disregard, as to the falsity of the matter they publicized and the false light in which they placed Fina and Costanzo.

241.     As a proximate result of defendants' malicious, intentional and/or reckless conduct as set forth above, Fina and Costanzo are entitled to such damages as will compensate them for the injury to their professional and personal reputation, their emotional distress, and punitive damages to punish the defendants for their conduct and to deter them and others similarly situated from similar acts in the future.

A000348

WHEREFORE, plaintiffs Frank Fina and E. Marc Costanzo demand judgment in their

favor against defendants jointly and severally, for compensatory damages, punitive damages,

attorneys' fees, cost of suit, and such other relief as this Court may deem just and proper.

MCMONAGLE, PERRI, MCHUGH &
MISCHAK

_____/s/ Fortunato N. Perri, Jr., Esquire_____
FORTUNATO N. PERRI, JR., ESQUIRE
1845 Walnut Street, 19th Floor
Philadelphia, PA 19103
215-981-0999
fperri@mpmpc.com
Attorney for E. Marc Costanzo

FELDMAN SHEPHERD WOHLGELERNTER
TANNER WEINSTOCK & DODIG, LLP

_____/s/ Mark W. Tanner, Esquire_____
MARK W. TANNER, ESQUIRE
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
215-567-8300
mtanner@feldmanshepherd.com
Attorney for Frank Noonan, Randy Feathers,
Richard A. Sheetz, Jr. and Frank Fina

Date:   February 26, 2016

65

A000349

# EXHIBIT "A"

# Emails of 'porn peddlers' now public



CLEM MURRAY / STAFF PHOTOGRAPHER Attorney General Kane: Emails are important to the legal story.

**BY DAVID GAMBACORTA & WILLIAM BENDER, Daily News Staff Writers gambacd@phillynews.com, 215-854-5994**

Posted: August 28, 2015

IF YOU EVER find yourself missing the old-school experience of flipping through a porn mag, head up to the fourth floor of City Hall and grab hold of Frank Fina's binder full of nude women.

The state Supreme Court yesterday unsealed hundreds of pages of records connected to the looming criminal trial of state Attorney General Kathleen Kane, including pornographic emails that were sent and received by Fina when he was a state prosecutor.

Kane has long contended that the smutty images - collected in a nearly 400-page binder in the Supreme Court's Prothonotary Office - are crucial to understanding why she's in a legal bind.

We pause here to note that the story of Kane and Fina and the emails is convoluted and depressing, a bit like the plot of the second season of "True Detective" but featuring levels of political dysfunction

almost too pathetic to be true.

Let's start with the porn, because that's probably why you've read this far.

After being sworn into office in 2013, Kane followed through on a campaign promise to re-examine the state's investigation into convicted pedophile Jerry Sandusky, seeking to determine if the case had lagged under her predecessor, former Gov. Tom Corbett.

Office emails were collected and reviewed, including many sent, received and ultimately deleted by Fina and fellow prosector E. Marc Costanzo.

"In accordance with Kane's policy of public disclosure and transparency, those emails would soon be released to the public," Kane's legal team wrote in court filings last fall. "Personally and professionally, Fina would be ruined."

How bad could the emails be? Well . . . pretty bad. "FW: New Office Motivation Policy Posters," read the subject line of an email that Fina sent from his government account on May 21, 2009. Attached were several images. "Take advantage of every opening," read the caption of one photo, which showed a woman having anal sex. "Making your boss happy is your only job," read the caption of another, showing a pants-less woman on her knees, performing oral sex on a man.

A 2011 email from Fina to his colleagues included a collection of fake nude photos of former Alaska Gov. Sarah Palin. "Rainbows: Not as gay as you might think," read the subject line of another photo series, showing a woman in striped underwear and stockings.

Some of the images were racially offensive, like one that showed a white man carrying a bucket of Kentucky Fried Chicken as he appears to struggle with two black men. "Bravery At Its Finest" was the caption on that one.

Fina was on the receiving end of plenty of emails, too, including one in 2009 titled "Men in Training" that showed a little boy looking into a little girl's underwear.

In the court filings, Kane's attorneys describe Fina and Costanzo as "peddlers of pornography and obscenity depositing state paychecks," and accused both of lying to higher-ups about the nature of their emails.

So, what do all of these graphic photos add up to? That remains to be seen.

Both Fina and Costanzo now work for District Attorney Seth Williams. In a statement yesterday, the D.A.'s office pledged to do a "thorough review" of the material. Williams did not respond to emailed questions about any prior knowledge he may have had about Fina's state emails.

A federal grand jury, incidentally, is investigating Williams' use of campaign money. His political-action

A000352

committee, Friends of Seth Williams, last week intimated that Kane was to blame for the investigation into the D.A.

Why? Because shortly after Fina went to work for Williams, the *Inquirer* wrote about Kane's decision to not prosecute a handful of local pols caught accepting bribes from a lobbyist as part of a sting operation.

Williams ultimately took on the case and successfully prosecuted it, but not before he and Kane took jabs at one another publicly.

Montgomery County District Attorney Risa Vetri Ferman earlier this month said Kane blamed Fina for the sting case ending up in the *Inquirer*, leading the attorney general to allegedly orchestrate the leak of information about a stagnant 2009 grand jury investigation into former Philadelphia NAACP head J. Whyatt Mondesire - a case that Fina worked on - to the *Daily News* in retaliation.

Kane's legal team argued in documents unsealed yesterday that Fina orchestrated a grand jury investigation that ultimately determined Kane was responsible for the Mondesire leak. During a preliminary hearing Monday in Norristown, a Montgomery County judge ordered Kane held for trial on charges of perjury, criminal conspiracy and obstruction of justice.

Gerald Shargel, Kane's attorney, referenced Fina's extensive porn emails during the hearing, saying afterward that the "entire story" hadn't come out yet.

If Kane was hoping Fina's career would be destroyed when his porn stash saw the light of day, she might be right. But she might have cooked her own goose in the process.

A new *Daily News*/Franklin & Marshall College poll released yesterday found that 46 percent of Pennsylvania voters want her to resign, while 43 percent want her to continue serving. Of those who want her to resign, 52 percent said the Legislature should impeach her if she refuses.

Poll director G. Terry Madonna said the average voter probably doesn't understand the complexities of a scandal involving Kane, Fina, an undercover sting, corrupt lawmakers and Mondesire - and, of course, a lot o' porn.

"How do you talk about the sting? How do voters understand Jerry Mondesire and the grand jury? You're inside so much," Madonna said. "There's no doubt she's in trouble, but at the moment you got to give folks some time to see how it all plays out."

If Kane follows through on her plan - threat? - to run for re-election, it could be a campaign for the ages, Madonna said.

"Politically, there are no commercials, no ads, but you have to think what next year's campaign would be like if she files," Madonna said. "Think about those commercials and all the stuff with the sting and Mondesire and pornographic emails. This stuff has a long way to play out."

A000353

2/24/2016

**On Twitter:** @dgambacorta

# EXHIBIT "B"

A000355

| | |
|---|---|
| From: | Gerrard, Lawrence |
| To: | Ansel, Francis; "Andrew F. Schlotter"; Adams, John J.; Bugda, Theodore; Burke, Thomas V.; Blessington, Patrick; "boylesbythesea@comcast.net"; Brennan, Gerard M.; "bresch2@verizon.net"; "butlar@yahoo.com"; Costanzo, E Marc.; "Campolongo6@comcast.net"; "cbw9796@comcast.net"; Carney, Kevin; Davenport, Carol; Cushman, Irene; Chiarella, Paula J.; "CNCNR909303@aol.com"; Crawford, Kevin S.; "Copeso@aol.com"; "Cbentham@aol.com"; "Chuck Lanard"; DeTitto, Louis C.; Murray, Dennis; "Judith Davies-Dunhour"; Walesyn, Dianne; Davis, Michael; Deery, Timothy; "DanRosenstein@aol.com"; "dc26rn@aol.com"; Dee, Doris; "dianewieland@comcast.net"; Flannery, John; Noonan, Francis; Fina, Frank G.; Feathers, Randy; Policare, Gregory; "Gene Dooley"; Shore, Gregg; "GerrardGman@comcast.net"; "Grace, Laureen M"; Helm, William A.; "Harriette Davidson"; "HMBERARDO@aol.com"; Hughes, Edward T.; "JTPedrick@verizon.net"; Pendell, John; Ralston, Joseph; "James Sartori"; "James Sartori"; "John Saleski"; "joenopowicz@comcast.net"; Kelly, Edward; "kencurcio@hotmail.com"; Ansel, Karen; "L.LUBIEJEWSKI@comcast.net"; O"Neill, Leo; "irlir@frontiernet.net"; Miletto, Michael A.; Montague, Robert; Sabo, Mark G.; McIlmail, Michael W.; "Margate211@aol.com"; "MAFrazier719@comcast.net"; Nutter, Russell W.; "Ncfalcon57@aol.com"; "naplesbs@aol.com"; "PF9029@aol.com"; "polaris500@frontiernet.net"; "Popcarty@aol.com"; Shiver, Robert; Sheetz, Richard A.; "SERGE665@aol.com"; "Sally Morrison"; "slapenta@gmail.com"; Shook, Dennis; "TLS11255@aol.com"; "Thebrod1@aol.com" |
| Subject: | FW: Men in Training |
| Date: | Tuesday, March 03, 2009 3:46:52 PM |
| Attachments: | image009.gif<br>image008.jpg<br>image007.jpg<br>image006.jpg<br>image005.jpg<br>image004.jpg<br>image003.jpg<br>image002.jpg<br>image001.jpg |

---

From: Kenneth Curcio [mailto:kencurcio@hotmail.com]
Sent: Tuesday, March 03, 2009 2:10 PM
To: bjcurcio@comcast.net; boylesbythesea@comcast.net; bud warner; jgallagher126@verizon.net; jnolen@gmail.com; johnnypeppers@hotmail.com; gene dooley; Gerrard, Lawrence
Subject: FW: Men in Training

---

Exhibit A 146

If you don't send this to a few old friends, there will be fewer people laughing in the world.

If you fill your heart with regrets of yesterday and the worries of tomorrow, you have no today to be

Exhibit A 147

A000357



thankful for.

―――――

Hotmail® is up to 70% faster. Now good news travels really fast. Find out more.

Exhibit A 148



Exhibit A 149

A000359



Exhibit A 150



Exhibit A 151

A000361



Exhibit A 152

A000362



Exhibit A 153

A000363



Exhibit A 154

A000364



Exhibit A 155

A000365



Exhibit A 156

A000366

# EXHIBIT "B"

A000367

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN, et al.,                    :
                                         :
       Plaintiff,                    :        Case No. 2:15-cv-6082
                                         :
    v.                                   :
                                         :
KATHLEEN KANE, et al.,                   :
                                         :
       Defendant.                    :
                                         :

## <u>PROPOSED ORDER</u>

AND NOW, this _____ day of _____, 2016, upon consideration of Defendant Kathleen G. Kane's Motion to Dismiss Counts I-VI of Plaintiffs' First Amended Compliant, it is hereby **ORDERED** that Defendant Kane's Motion is **GRANTED**. Plaintiffs' claims against Defendant Kane are dismissed with prejudice.

_____
                                J.

Date: _____, 2016

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN, et al.,

      Plaintiff,

      v.

KATHLEEN KANE, et al.,

      Defendant.

Case No. 2:15-cv-6082

## MOTION OF DEFENDANT KATHLEEN G. KANE TO DISMISS COUNTS I THROUGH VI OF THE FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

Defendant Kathleen G. Kane, by and through her undersigned counsel and pursuant to Federal Rule of Civil Procedure 12(b)(6), hereby moves the Court to dismiss Counts I-VI of Plaintiffs' First Amended Complaint, with prejudice, for the reasons set forth more fully in the Memorandum of Law in Support of Defendant's Motion to Dismiss, which is incorporated herein by reference.

WHEREFORE, Defendant Kane respectfully requests that this Court grant her Motion to Dismiss the Complaint, with prejudice.

/s/ Edward T. Ellis
Richard R. Harris (PA #84897)
Edward T. Ellis (PA #23680)
Rachel Fendell Satinsky (PA #308751)
Greg H. Greubel (PA #321130)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102.1321
Tel.: 267.402.3000
Fax: 267.402.3131

**A000369**

*Attorneys for Defendant*
*Kathleen Kane*

Dated:  March 9, 2016

A000370

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN, et al.,                    :
                                         :
         Plaintiff,                      :    Case No. 2:15-cv-6082
                                         :
    v.                                   :
                                         :
KATHLEEN KANE, et al.,                   :
                                         :
         Defendant.                      :
                                         :

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANT KATHLEEN G. KANE TO DISMISS COUNTS I THROUGH VI OF THE FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

## I.    INTRODUCTION

This lawsuit is part of an ongoing political battle between the sitting Attorney General of the Commonwealth of Pennsylvania and her opposition, primarily state prosecutors who left state employment at or about the time she took office in 2013.  The dispute is about how the Pennsylvania Office of Attorney General ("OAG") should serve the citizens of Pennsylvania. This lawsuit involves three specific issues:  (a) competing views of principles of prosecution for public corruption cases, (b) the efficiency of the OAG in the highly publicized Jerry Sandusky/Penn State child abuse investigation, and (c) the use by prosecutors and state investigators of OAG computer equipment for viewing and transmitting pornographic images. Plaintiffs – all high ranking former law enforcement officials in Pennsylvania – bring this action against Defendants Attorney General Kane, OAG investigator Michael Miletto, the Philadelphia Daily News and one of its reporters.  They sue Kane and Miletto under 42 U.S.C. § 1983, asserting that Kane violated their First Amendment rights by exercising her own right to speak out, to the detriment of the Plaintiffs' reputations, on matters of public concern.  Defendant Attorney General Kane moves to dismiss Counts I through VI of the First Amended Complaint

pursuant to Federal Rule of Civil Procedure 12(b)(6) because, under applicable Third Circuit precedent, plaintiffs may not maintain a § 1983 action against a public official where the acts of retaliation they allege are non-threatening statements made to the public by the defendant on matters of public concern.  Defendant Miletto joins in this motion and files his own motion to dismiss in a separate document.

## II.   PROCEDURAL HISTORY

Plaintiffs filed their Complaint on November 12, 2015.  (Doc. 1.)  Defendant Attorney General Kane filed a motion to dismiss the Complaint on January 14, 2016, pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. 19.)  Defendant Miletto filed his own motion on the same date, as did the news media defendants.  (Docs. 20, 21.)  Plaintiffs filed the First Amended Complaint against the same Defendants on February 26, 2016.  (Doc. 26.)  The Court denied the defense motions to dismiss as moot after Plaintiffs filed the First Amended Complaint.  (Doc. 27.)  This Motion by the Attorney General asserts essentially the same grounds for dismissal as she asserted in her motion to dismiss the Complaint filed in January 2016.

## III.   FACTUAL BACKGROUND

### A.   The parties

Defendant Kathleen G. Kane is the Attorney General of Pennsylvania.  She was elected to a four year term in November 2012 and took office January 15, 2013.  As part of her political campaign, Plaintiffs have noted, Kane criticized the handling by the OAG of the Jerry Sandusky/Penn State child sex abuse investigation and, specifically, the length of time the OAG took between receipt of the reported child abuse in early 2009 and the filing of the first charges against Sandusky in November 2011.  (First Am. Compl. ¶¶ 71-73.)  Kane contended that the OAG should have brought charges against Sandusky sooner, she questioned the use of a grand jury in the investigation rather than simpler and quicker police investigation techniques, and she

A000372

questioned whether the Attorney General at the time, Tom Corbett, had delayed the investigation so its outcome would not impair his campaign for governor in 2010.  (First Am. Compl. ¶ 72.)  She made a campaign promise that, once elected, she would investigate the Sandusky investigation to determine whether any of the concerns she had raised were valid.  (First Am. Compl. ¶ 73.)   Plaintiffs concede that it was not unlawful for Kane to raise these issues in her political campaign.  (First Am. Compl. ¶ 5.)  Actually, far from being unlawful, for a candidate for office to question the motives and competence of the people serving in the office she seeks is the essence of political discourse in a democracy.

Four of the five Plaintiffs here were high ranking officials in the OAG during the 2012 election campaign; the fifth was the head of the Pennsylvania State Police.  (First Am. Compl. ¶¶ 35-61.)   All played at least some role in the Sandusky/Penn State investigation from 2009 through 2012 and were apparently offended when Kane questioned their competence, their decision-making, and their motives.  (First Am. Compl. ¶¶ 62-82.)   Plaintiff Frank Fina was a chief deputy attorney general ("CDAG") in charge of criminal investigations; he alleges that he played a key role in the Sandusky investigation.  (First Am. Compl. ¶ 63.)  Plaintiff Richard Sheetz was a deputy attorney general ("DAG") who worked with Fina on that case.  (First Am. Compl. ¶ 64.)  Plaintiff Noonan was the Commissioner of the Pennsylvania State Police during the Sandusky investigation and, according to the First Amended Complaint, worked with Fina and Sheetz on the investigation.  (First Am. Compl. ¶¶ 63-65.)  Randy Feathers was the "lead" OAG investigator on the case.  (First Am. Compl. ¶¶ 63-65.)  Plaintiff Marc Costanzo is not alleged to have played a significant role in the investigation, but, as a DAG, he "made public statements and addressed the media on behalf of the prosecution team following Sandusky's arrest."  (First Am. Compl. ¶ 65.)  Fina, Sheetz, Costanzo, and Feathers all left their positions

A000373

with the OAG in late 2012 or early 2013.  (First Am. Compl. ¶¶ 43, 45, 51, 58.)  None have alleged in the First Amended Complaint that they were subordinates of the Attorney General when she is alleged to have retaliated against them.  Noonan was a supervisory investigator in the OAG from about 1997 until 2011, when he became head of the state police.  (First Am. Compl. ¶¶ 35-37.)  He retired from the state police in January 2015.  (First Am. Compl. ¶¶ 35-37.)

Defendant Miletto was and is an OAG investigator who is not alleged to have played any role in the Sandusky/Penn State investigation.  (First Am. Compl. ¶ 33).

**B.    Statements allegedly protected by the First Amendment**

Plaintiffs collectively allege that they engaged in protected speech on eleven occasions.  (First Am. Compl. ¶ 70.)   Described in paragraph 170 of the First Amended Complaint, the eleven occasions revolve around five issues that are best summarized as follows:

- Public comments complaining about Kane's political campaign attacks on the OAG's Sandusky investigation (Feathers and Costanzo, First Am. Compl.  ¶¶ 170 (a) and (k));

- Objections to the special investigation by attorney Geoffrey Moulton, directed by Kane in fulfillment of her campaign promise to look into Plaintiffs' conduct of the Sandusky investigation, including Plaintiffs' rebuttal to Moulton's final report (Fina, Sheetz, Feathers and Noonan, First Am. Compl. ¶¶ 170 (b), (g) and (h));

- Efforts to have Kane prosecuted for leaking grand jury materials from a 2009 investigation into Philadelphia political figure Jerome Whyatt Mondesire (Fina and Costanzo, First Am. Compl.  ¶¶ 170 (f) and (j));

- Public comments and a court filing that criticized Kane for refusing to pursue investigations some of the Plaintiffs had initiated into bribery of elected officials in Philadelphia (Noonan, Sheetz and Fina, First Am. Compl. ¶¶ 170 (c), (d) and (e)); and

- A report by Fina and Costanzo that Defendant Miletto tried to intimidate them (First Am. Compl.  ¶¶ 170 (j).)

Plaintiffs allege that they made these statements beginning during the 2012 election campaign and continuing through at least August 2014, when Fina and Costanza say that they testified

A000374

before the grand jury that eventually charged Attorney General Kane with leaking grand jury information and committing perjury during her grand jury testimony. (Feathers, First Am. Compl. ¶¶ 74-76, 136.)

### C. The alleged retaliation

Plaintiffs contend that in response to their statements summarized above, Kane retaliated against them in the form of her own public speech. (First Am. Compl. ¶¶ 179-187.) Much of the alleged retaliation revolves around Kane's discovery of and the eventual release of pornographic, racist, sexist and misogynistic emails from the official OAG email boxes of the Plaintiffs. (First Am. Compl. ¶¶ 149-168.) The First Amended Complaint refers to these emails as "personal" or "private" emails of the Plaintiffs. (First Am. Compl. ¶¶ 150, 157, 162.) As set forth in the First Amended Complaint, all five Plaintiffs have made careers in law enforcement. (First Am. Compl. ¶¶ 35-61.) All five have been in positions where they made investigative and prosecutorial decisions involving minorities or female subjects and victims, sexual conduct or misconduct (including, as set forth in the First Amended Complaint, during the Sandusky investigation), and crimes involving children. (First Am. Compl. ¶ 74.) Plaintiffs' use of the Pennsylvania OAG computer systems and email accounts to enjoy the pornography and related material Kane has described and, in some cases, released is a matter of public concern – just as much as the public criticism the Plaintiffs have directed at the Attorney General's conduct of the business of the OAG since she took office in 2013.

Plaintiffs collectively allege that Defendant Kane made the following additional public comments about them:

- That Fina and Costanzo were responsible for a racially motivated investigation into African-American elected representatives in Philadelphia;

A000375

- That Costanzo and Fina terminated an investigation into Philadelphia political figure Jerome Whyatt Mondesire several years earlier, despite having sufficient evidence to move forward with the investigation;

- That law enforcement delays during the Sandusky/Penn State investigation allowed Sandusky to abuse additional victims;

- That Plaintiffs had possessed or distributed child pornography; [1]

- That Fina and Costanzo were part of a conspiracy to corruptly manufacture a grand jury investigation of Kane; and

- That she (the Attorney General) is a victim of a male or "old boys" network.

(First Am. Compl. ¶ 180.)

## IV. ARGUMENT: THE COURT SHOULD DISMISS THE FIRST AMENDED COMPLAINT BECAUSE IT FAILS TO STATE A CLAIM FOR WHICH RELIEF MAY BE GRANTED AND IT OTHERWISE VIOLATES RULE 8, FED. R. CIV. P.

It is Defendant Kane's position that the facts Plaintiffs allege, even if true, do not make out a case of First Amendment retaliation. In addition, Kane has qualified immunity for any violation because it has never been clearly established that the non-coercive speech of an elected

---

[1] The allegation that Defendant Kane falsely accused the Plaintiffs Fina, Noonan, Sheetz and Feathers of possessing child pornography is patently untrue, as demonstrated by comparing the CNN transcript (paragraphs 165 through 169) of the First Amended Complaint against the documents referenced in paragraph 169 and attached as Exhibit B of the First Amended Complaint. These documents were filed publicly in the Pennsylvania Supreme Court. In the CNN story published in November 2014, Kane stated that the e-mails she reviewed contained "[h]ardcore, graphic, sometimes violent e-mails that had a string of videos and pictures depicting sometimes children, old women, some of them involved violent sexual acts against women." (First Am. Compl. ¶ 165)(emphasis in First Am. Compl.) Kane never accused any of the Plaintiffs of child pornography. Her statements to CNN were accurate because the pornography possessed by the Plaintiffs and now on file with the Pennsylvania Supreme Court does in fact contain images depicting children. Exhibit B to the First Amended Complaint, originally Exhibit A to Kane's motion to dismiss filed against the original complaint, contains nine images of children taken from the material on file with the Supreme Court. For purposes of this Motion, whether Kane's statements are true or false is immaterial, as set forth more fully below.

A000376

public official can be the basis of a First Amendment retaliation claim.  Finally, the Court should dismiss the First Amended Complaint for violation of Rule 8(a), Fed. R. Civ. P.

**A.     Plaintiffs cannot maintain a First Amendment retaliation case against a government official based on non-threatening statements the government official made about them, even if those statements were false or defamatory.**

To establish a First Amendment retaliation claim against Defendant Attorney General Kane, Plaintiffs must prove three elements: "'(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action.'" *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006), quoted in *Koren v. Noonan*, 586 F. App'x 885, 887-88 (3d Cir. 2014).  Defendant Kane does not dispute, for purposes of this Motion, that the occasions when Plaintiffs engaged in speech, as alleged in paragraph 170 of the First Amended Complaint, are protected under the First Amendment.  The Court should dismiss the First Amended Complaint because Plaintiffs have not, in their 65-page Complaint containing 241 separate factual allegations, alleged facts from which a court could discern that Kane engaged in retaliatory action sufficient to deter "a person of ordinary firmness" from exercising his First Amendment right to speak out on matters of public concern.

**1.     The Court must determine whether statements by the Attorney General are sufficient to deter persons "of ordinary firmness" from exercising their Free Speech rights.**

Under applicable Third Circuit case law, a court must undertake "a fact intensive inquiry" to determine if a defendant's actions are sufficient to deter persons "of ordinary firmness" from exercising their Free Speech rights. *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000)).  This factual inquiry focuses of the following four factors established in *Suarez*: "[1] the status of the speaker, [2] the status of the retaliator, [3] the relationship between the speaker and the retaliator, and [4]

the nature of the retaliatory acts[,]" which must "be more than de minimis or trivial." *Id.*
(quoting *Suarez*, 202 F.3d at 686). When the speaker is a public official and the retaliation
alleged is solely in the form of public speech without threats of prosecution, regulatory action or
other adverse official acts, the public official has not engaged in retaliatory acts sufficient to
deter "a person of ordinary firmness" from exercising his constitutional rights, and the court
should dismiss the complaint. *Suarez*, 202 F.3d at 686; *X-Men Security v. Pataki*, 196 F.3d 56,
70-71 (2d Cir. 1999).

The Third Circuit confronted the question of public official speech in *Koren*, in which it
quoted with approval *Suarez*, the Fourth Circuit case cited above. *Koren,* 586 F. App'x at 888;
*Suarez*, 202 F.2d at 686. In *Koren*, the plaintiff was a candidate for district attorney in Lehigh
County, Pennsylvania. *Id.* at 886. He alleged that, in order to derail his candidacy in favor of
that of a political ally, the Commissioner of the Pennsylvania State Police smeared his
"unblemished professional record," leading the electorate to believe that he was not worthy of
public office. *Id.* The district court dismissed the complaint and the Third Circuit affirmed on
the ground that the alleged retaliatory speech by the government official, although alleged to be
defamatory and injurious to the plaintiff's political ambitions, was not sufficient to deter a person
of ordinary firmness from exercising his right to speak or to run for public office. *Id.* at 887-88.
Just as the Court of Appeals dismissed the claim in *Koren,* this Court should also dismiss this
claim because an analysis of the *Suarez* factors leads to the conclusion that the Attorney

A000378

General's statements and actions do not amount to an infringement on the Free Speech rights of the five Plaintiffs in this case. [2]

> ### 2. Analysis of the four factors from *Suarez* leads to the conclusion that Defendant Kane has not retaliated against the Plaintiffs for the exercise of their First Amendment rights
>
> #### a. Status of the speakers

As noted above and as set forth at some length in the First Amended Complaint, Plaintiffs were once senior Pennsylvania law enforcement officials, all of whom held supervisory positions in the OAG during the administration of former Attorney General Tom Corbett. (First Am. Compl. ¶¶ 35-61.) Corbett ran successfully for governor of Pennsylvania in 2010, assuming office in January 2011. Within a few days of his inauguration, Governor Corbett appointed Noonan his state police commissioner. (First Am. Compl. ¶ 35.) The following year, Corbett appointed Feathers to the Commonwealth Board of Probation and Parole. (First Am. Compl. ¶ 43.)

Either shortly before or shortly after Kane's election in November 2012, the Plaintiffs who remained at the OAG (Fina, Costanzo and Sheetz) departed. (First Am. Compl. ¶¶ 51, 50, 58.) None have been employed by the OAG since their respective departures. Noonan is now retired. (First Am. Compl. ¶ 35.) All five Plaintiffs participated in the Sandusky/Penn State investigation and prosecution, and all vigorously criticized either Defendant Kane's announced plan to investigate the conduct of that investigation, the outcome of the investigation, or both. (First Am. Compl. ¶¶ 74-76, 80-81, 146.) None of the Plaintiffs alleges that Kane has prosecuted

---

[2] Ironically, the state police commissioner and principal defendant in the *Koren* case, who was alleged to have smeared the candidate for Lehigh County political office, is the same Frank Noonan who is suing the Attorney General in the case presently before the Court, claiming that he has himself been smeared by the Attorney General's statements about the Sandusky/Penn State investigation and his receipt of pornography on his state OAG email account.

A000379

him or threatened to prosecute him.  None alleges that Kane took an adverse employment action against him.

### b.  Status of the retaliator

Defendant Kathleen Kane is the elected Attorney General of Pennsylvania.  It is a principle of long-standing under the United States Constitution that acceptance of public employment does not require a citizen to forfeit his right to speak out on matters of public concern.  *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968).  That principle applies to the Attorney General herself, just as it applies to former OAG employees who left the agency voluntarily shortly before or shortly after the Attorney General's inauguration.  The First Amendment requires that Attorney General Kane must be free to speak out about matters of public concern, including the conduct of employees in the agency she was elected to run.[3]

### c.  Relationship between speakers and the retaliator

There is, at present, no employment relationship between Plaintiffs and Defendant Kane. Further, Plaintiffs allege no adverse employment action, prosecution, threat of prosecution or other official act on Kane's part.

### d.  Nature of the retaliatory acts

The First Amended Complaint describes Kane's alleged retaliatory actions in great detail. Paragraphs 149 through 169 are devoted to her release of Plaintiffs' pornographic, racist, sexist, and misogynistic emails and to statements she made to the media about the emails.  The First Amended Complaint quotes Defendant Kane as stating she was "shocked at the level of public corruption . . . shocked at how deep it goes and shocked at how powerful it is," referring to

---

[3] *See Suarez*, 202 F.3d at 686; *Hutchins v. Clarke*, 661 F.3d 947, 956 (7th Cir. 2011); *Penthouse Int'l Ltd. v. Meese*, 939 F.2d 1011, 1015 (D.C.Cir.1991)

Plaintiffs' emails.[4]  It cannot seriously be argued that Kane's speech (including the release of pornographic emails) concerning the manner in which the Plaintiffs conducted the public's business before her election is not a matter of public concern that merits protection under the First Amendment.  *Feldman v. Philadelphia Housing Authority*, 43 F.3d 823, 829 (3rd Cir. 1994) (noting that "(d)iscussing corruption, fraud and illegality is always a matter of public concern.")

The First Amended Complaint seems to make a conclusory allegation that Defendant Kane threatened to release the emails before she actually released them.  (First Am. Compl. ¶ 151.)  However, the First Amended Complaint does not allege that the Attorney General herself actually threatened anyone with release of the emails.  It is alleged in paragraph 155 that an unidentified "colleague" of Fina had a meeting with David Tyler, the chief operating officer of the OAG at the time, who told the "colleague" that a number of current and former OAG lawyers were likely to be embarrassed by the emails Defendant Kane would release if "Fina does not back off."  This, of course, is not a threat by Defendant Kane; it is simply a prediction by another OAG employee who may or may not be well informed.  There is no allegation that Tyler acted on Kane's behalf.

It is similar to the second threat, a statement made to yet another unidentified Fina "colleague" by OAG attorney James Barker to the effect that Kane would release the emails if Fina did not back off.  (First Am. Compl. ¶ 157.)  Again, this is not the statement of the Attorney

---

[4] Defendant Kane did not actually release most of the emails of which the Plaintiffs complain. Kane filed about 400 pages of emails and attachments under seal in the Pennsylvania Supreme Court in 2014 in an effort to get the Supreme Court to block a grand jury investigation.  The Supreme Court released the previously sealed documents in August 2015.

A000381

General; it is the statement of an OAG attorney, who did not purport to speak for Kane and who made the same prediction as Tyler.[5]

Regardless of the content and regardless of the source of the statements whispered down the lane to Fina by his two colleagues, the statements did not dissuade Fina or any other Plaintiff (who received no "threats," apparently) from continuing to speak out against how Kane has been conducting herself as Attorney General. Fina says in the First Amended Complaint that he took the "threats" to the special prosecutor and continued to pursue Kane through the device of the grand jury. (First Am. Compl. ¶¶ 156, 158.)

In any event, these "threats" are not the type of "threat, coercion or adverse regulatory action" described in *Koren*, 586 F. App'x at 888, *Suarez*, 202 F.2d at 686, or other First Amendment decisions. They are threats by an elected official to speak out against abuse of office by the Plaintiffs, not threats of official action. The latter can be actionable under § 1983; the former are not.

Other alleged retaliation pleaded in the First Amended Complaint include leaking "grand jury information connected to the Mondesire investigation that dishonestly represented that Fina and Costanzo had improperly impeded a criminal investigation" and stating that Fina and Costanzo were responsible for a racially motivated investigation into Philadelphia state representatives. (First Am. Compl. ¶¶ 180(a-b).) These are statements about how Fina and Costanzo conducted themselves when they held the power of the grand jury and the power of indictment over private citizens of the Commonwealth. (First Am. Compl. ¶¶ 180(a-b).) The public is entitled to know that the current Attorney General of Pennsylvania thinks that the OAG

---

[5] Defendant Kane terminated Barker in April 2015 and Barker has filed suit against the Attorney General in the Middle District of Pennsylvania, *Barker v. Kane*, Civ. No. 15-1924.

A000382

was either corrupt or inept before she took office and that Fina and Costanzo were part of the problem.

The same is true of Defendant Kane's allegation that delays in the Sandusky/Penn State investigation allowed the perpetrator to molest additional children.  (First Am. Compl. ¶ 180(c).)  This is an important political issue in Pennsylvania that merits further debate.

The remainder of the alleged retaliatory acts are statements Defendant Kane or her attorneys have made in defending against criminal charges that Fina and Costanzo apparently initiated after the leak from the Mondesire investigation file.  (First Am. Compl. ¶¶ 180(d-h).)  Defendant Kane's contention that the former OAG attorneys, stung by her criticism of the Sandusky investigation, have conspired to manufacture a grand jury investigation and criminal charges is a matter of public concern that merits public debate.[6]

In summary, the Court must consider the "nature of the retaliatory acts" in evaluating the First Amended Complaint, and all the alleged retaliatory acts are speech by a public official on matters of public concern.

> **3.**    **The Court should dismiss the First Amended Complaint because the political nature of the dispute, the Attorney General's own Free Speech rights, and the complete absence of deterrent effect mean that the Attorney General has committed no actionable retaliation in violation of the First Amendment.**

After analysis of the four factors set forth in *Suarez* and approved by the Third Circuit in *Koren* and *Brennan*, the Court should dismiss the First Amended Complaint because it fails to establish retaliatory action on the part of Attorney General Kane.  As the Fourth Circuit stated in

---

[6] The First Amended Complaint claims relief on the basis of statements made by Defendant Kane in court filings.  (*See*, *e.g.*, ¶¶ 180(f) and (g).)  The quotation in subparagraph (g) is lifted verbatim from the Petition for Extraordinary Relief filed in the Supreme Court on November 14, 2014.  The notion that a statement in a court pleading filed by a defendant in a criminal case could be actionable retaliation is novel in First Amendment jurisprudence.  Surely, it is not sufficiently weighty to deter a person of ordinary firmness from exercising his First Amendment rights.

A000383

*Suarez*, "where a public official's retaliation is in the nature of speech, in the absence of a threat, coercion or intimidation intimating that punishment, sanction or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory." 202 F.3d at 687. This is in part because there is an interest in having public officials fulfill their duties. More important, however, is that the public official has her own right to Free Speech that should not be chilled by lawsuits alleging that the particular speech is defamatory.[7] Since Defendant Kane neither took nor threatened official action against any of the Plaintiffs, they cannot establish actionable retaliation, and the Court should dismiss the First Amended Complaint.

### B. The Court should dismiss the First Amended Complaint because it is barred by the doctrine of qualified immunity.

Qualified immunity protects a public official from a lawsuit under § 1983 except where the public official violated a constitutional right that was "clearly established" under the law at the time of the public official's action. *Dougherty v. School District of Philadelphia*, 772 F.3d 979, 986 (3rd Cir. 2014). The qualified immunity doctrine requires that the court first determine whether the acts alleged by the Plaintiffs, if true, would violate their constitutional rights. *Id.* Next, the court must determine whether the rights recognized at step one were "clearly established" at the time of the public official's action. *Id.*

Section IV A of this memorandum, *supra*, argues that the retaliatory actions Plaintiffs have alleged in this case are not sufficient to deter a person of ordinary firmness from exercising their First Amendment rights. If the Court accepts Kane's argument on that point, then a judicial determination on qualified immunity is unnecessary. If the Court finds that Kane's actions are or

---

[7] *Suarez* collects cases supporting the principle that a public official's non-threatening speech is not actionable as First Amendment retaliation under § 1983. 202 F.3d at 687-88. The Third Circuit cited some of these cases with approval in affirming the dismissal of the action against state police commissioner Noonan in *Koren*, 586 F. App'x at 888.

A000384

could be actionable under the First Amendment and § 1983, then the Court must determine whether, at the time Kane took those actions, the First Amendment rights that she violated or may have violated were clearly established.  It is Attorney General Kane's position that it was not in 2014, and it is not today "clearly established" that her public statements about Plaintiffs' performance of their official state functions while in office and her release of Plaintiffs' emails were actionable under the First Amendment.

The doctrine of qualified immunity requires that the court review federal case law as of the date of the defendant's actions.  The Court should note that, unlike the great majority of First Amendment retaliation cases, this case does not arise in the public employment context.[8]  Thus, when Kane made public statements about the Plaintiffs, she had no authority to fire them or punish them by virtue of being their boss.  It is also important that she is not alleged to have used any of her significant law enforcement powers to harass or punish the Plaintiffs.  In short, she did not fire them, demote them, investigate them, subpoena them, charge them with crimes or threaten any of those actions.[9]  Rather, according to the First Amended Complaint, she questioned their handling of a major investigation and prosecution that brought them significant public attention, she criticized at least some of them for dropping a promising investigation into political corruption (even as they were accusing her of doing the same thing), and she exposed immorality and corruption in statewide law enforcement prior to her election.  (First Am. Compl. ¶ 180.)  While it has been settled law since *Pickering v. Board of Education*, that a public official violates the First Amendment by taking an adverse employment action against an employee who

---

[8] *See*, *e.g., Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Connick v. Myers*, 461 U.S. 138 (1983); *Foraker v. Chaffinch*, 501 F.3d 231 (3rd Cir. 2007); *McGreary v. Stroup*, 413 F.3d 359 (3rd Cir. 2005), and many others.
[9] To the contrary, Fina and Costanzo claim credit for the charges filed against Kane by the district attorney for Montgomery County.

A000385

has spoken out in opposition to the public official, there is no "settled law" to the effect that a public official may not publicly criticize a former government employee of engaging in misconduct during his tenure in office.  391 U.S. at 568.

The closest Third Circuit analogy to the present situation is *Koren*, in which the court held that a public official (State Police Commissioner Frank Noonan) could not be held liable under § 1983 for slandering a candidate for public office by smearing "his unblemished professional record" as a state trooper.  586 F. App'x at 887.  In *Koren*, the court made a clear distinction between employment cases, where the threshold for retaliatory action is "very low," and the "political arena," where "courts have consistently rejected First Amendment retaliation cases based upon assertions of purportedly false reports or criticisms."  *Id*. at 888.  *Suarez* and related cases fully support this view.  *Suarez*, 202 F.2d at 686; *Parks v. City of Horseshoe Bend*, 480 F.3d 837, 840 (8th Cir. 2007); *X-Men,* 196 F.3d at 56; *Colson v. Grohman*, 174 F.3d 498, 512 (5th Cir. 1999); *see also Hutchins*, 661 F.3d at 956 (employment case in which a Deputy Sheriff and a Sheriff criticized each other on a radio talk show and Deputy Sheriff sued; the court dismissed the case holding: "The court must take into consideration Sheriff Clarke's own right to free speech. . . . We cannot afford one party his right to free speech while discounting the rights of the other party . . . ." (citing *Suarez*; 202 F.2d at 686)).

Accordingly, since there is no settled law to the effect that the conduct alleged by the Plaintiffs in their First Amended Complaint violates the First Amendment, the Court should dismiss the Complaint against Kane on the ground of qualified immunity.

**C.**   **The Court should dismiss the First Amended Complaint because it violates the requirements of Fed. R. Civ. P.  Rule 8 that complaints contain a "short and plain statement of the claim."**

Rule 8(a) of the Federal Rules of Civil Procedure requires that complaints contain "a *short* and *plain* statement of the claim showing that the pleader is entitled to relief." (emphasis

added).  Rule 8 further provides that "*[e]ach allegation must be simple, concise, and direct.*"
Fed. R. Civ. P. 8(d) (emphasis added).  "Taken together, [these rules] underscore the emphasis
placed on *clarity* and *brevity* by the federal pleadings rules."  *In re: Westinghouse Secs. Litig.*, 90
F.3d 696, 702 (3d Cir. 1996) (quoting 5 Wright & Miller, Federal Practice and Procedure § 1217
(2d Ed. 1990)) (emphasis added).

A court may dismiss a complaint when it fails to comply with the clarity and brevity
requirements of Rule 8.  For example, in *Adams v. Coppola*, 53 F. App'x 661 (3rd Cir. 2002), the
Third Circuit held that the district court did not err in dismissing a complaint that the district
court described as "rambling" and "replete with 'typographical and grammatical errors.'"  *Id.* at
661-62.  Similarly, in *Stephanatos v. Cohen*, 236 F. App'x 785 (3rd Cir. 2007), the Third Circuit
upheld the district court's dismissal of a complaint for failure to comply with Rule 8, describing
the approximately 550-page amended Complaint as "of an unwieldy length" and "largely
unintelligible."  *See Id.* at 786-87; *see also In re: Westinghouse*, 90 F.3d at 703; *Barnes v.
Madison*, 79 Fed. App'x 691, 696 (5th Cir. 2003).

Plaintiffs have filed an amended Complaint that covers 65 pages and contains 241
separate numbered allegations.  Many of those allegations are extraneous, placed in the First
Amended Complaint apparently to attract media attention.  For example, Plaintiffs devote 27
paragraphs to a lengthy description of two law enforcement investigations into criminal activity
in the City of Philadelphia.  (First Am. Compl. ¶¶ 83-110.)  They then describe, in eleven
paragraphs, the investigation into a possible leak of grand jury material from the OAG and the
resulting criminal charges against Kane.  (First Am. Compl. ¶¶ 128-138.)  Whether Kane is
guilty of leaking grand jury information has no bearing on whether she retaliated against the
Plaintiffs in violation of the First Amendment.  Furthermore, the lengthy explications on

A000387

irrelevant material are repetitious – all these facts and much more are covered in detail in the first 24 paragraphs of the First Amended Complaint, which consumes 8 pages but turns out to be merely the "PRELIMINARY STATEMENT" for the First Amended Complaint.

Another issue that has no bearing on any violation of First Amendment rights is the gratuitous allegation that Defendant Kane's current Chief of Staff was accused by two female OAG staff members of "inappropriately touching them," yet that allegation can be found in paragraph 116 of the First Amended Complaint.  Clearly, this allegation has no relevance in this matter.

The obvious purpose of this style of pleading is to attract publicity, to distract from the real issues in the case, and to put the defense to the time and expense of responding to a bloated pleading full of titillating irrelevancies.

The Court should advance the cause of civil justice and dismiss the First Amended Complaint, without prejudice but with an instruction that any future Complaint comply with Federal Rule of Civil Procedure 8.

## V.   CONCLUSION

For the reasons set forth above, Defendant Kathleen Kane asks the Court to dismiss the First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

A000388

/s/ Edward T. Ellis

Richard R. Harris (PA #84897)
Edward T. Ellis (PA #23680)
Rachel Fendell Satinsky (PA #308751)
Greg H. Greubel (PA #321130)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
Tel.:  267.402.3000
Fax:  267.402.3131

*Attorneys for Defendant*
*Kathleen Kane*

Dated: March 9, 2016

A000389

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of March 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Edward T. Ellis*
Edward T. Ellis

# Exhibit "C"

A000391

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN, et al.    :    CIVIL ACTION
             :
             :
    v.        :
             :
             :
KATHLEEN KANE, et al.    :    NO. 15-6082

MEMORANDUM

Bartle, J.             July 19, 2016

    Plaintiff are Frank Noonan ("Noonan"), Randy Feathers
("Feathers"), Richard A. Sheetz, Jr. ("Sheetz"), E. Marc Costanzo
("Costanzo"), and Frank Fina ("Fina"), four of whom are former high
level employees of the Office of the Attorney General of
Pennsylvania ("OAC") and one of whom is a retired Commissioner of
the Pennsylvania State Police.  They have filed this action
against:  Pennsylvania Attorney General Kathleen Kane ("Kane");
Michael Miletto ("Miletto"), an investigator for the Office of the
Attorney General; the Philadelphia Daily News; one of its
reporters, Christopher Brennan ("Brennan"); and Philadelphia Media
Network, LLC and Philadelphia Media Network (Digital) LLC, which
together own the Philadelphia Daily News.

    Noonan is the retired Commissioner of the Pennsylvania
State Police.  Feathers is a retired Regional Director of the
Bureau of Narcotics and Investigation and Control of the OAG.
Sheetz served as a former Executive Deputy Attorney General

Directing the Criminal Law Division of the OAG.  Costanzo is a former Deputy Attorney General for the OAG.  Finally, Fina is a former Chief Deputy Attorney General for the OAG.[1]  All five plaintiffs are citizens of the Commonwealth of Pennsylvania.

Plaintiffs sue Kane under 42 U.S.C. § 1983.  They allege that she retaliated against them for engaging in speech protected by the First Amendment.  Costanzo and Fina also plead that Kane, Miletto, and Brennan conspired to retaliate against them for the same protected speech.  Finally, Costanzo and Fina assert defamation and false light claims under Pennsylvania law against Brennan, Philadelphia Media Network, LLC and Philadelphia Media Network (Digital) LLC.  We have supplemental jurisdiction over these state-law claims pursuant to 28 U.S.C. § 1367.

Before the court are three motions filed by Kane, Miletto, and the Media Defendants (Brennan, the Philadelphia Daily News, Philadelphia Media Network (Digital) LLC, and Philadelphia Media Network LLC) to dismiss plaintiffs' First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.  Kane and Miletto also rely on the doctrine of qualified immunity.

---

1.  Although Feathers, Sheetz, Costanzo, and Fina no longer work at the OAG, their pleading does not make clear precisely when their employment with the OAG ended.  What is clear is that each of these four plaintiffs left the OAG either before Kane took office or shortly thereafter.

-2-

A000393

Kane further argues that the First Amended Complaint does not meet the pleading requirements under Rule 8(a).

## I.

The facts set forth in the First Amended Complaint, taken in the light most favorable to plaintiffs, are as follows.

In early 2012, Kane announced her candidacy to become Attorney General of Pennsylvania. During her campaign, Kane criticized the OAG for its handling of the high-profile investigation and subsequent prosecution of Jerry Sandusky ("Sandusky"), a Penn State University football coach who was ultimately convicted in June 2012 of sexually abusing minors. Plaintiffs had all been involved in the Sandusky investigation during the time that Thomas Corbett was the Attorney General. While campaigning, Kane declared that the OAG had improperly delayed in charging Sandusky and had devoted inadequate resources to the investigation. She promised to initiate an investigation into the handling of the Sandusky case by the OAG if elected. In response, Feathers made public statements refuting Kane's claims and deriding her as uninformed. Likewise, Costanzo "openly expressed criticism of Kane's campaign tactics regarding the Sandusky prosecution." Kane won the election in November 2012 and assumed office in January 2013.

Upon taking office, Kane also put a halt to a long-running bribery investigation in which plaintiffs had been

-3-

A000394

involved.  In furtherance of that investigation, the OAG had been relying on an informant named Tyron Ali ("Ali").  Ali had entered into a cooperation agreement with the OAG pursuant to which he would identify Philadelphia elected officials who were prepared to accept bribes.  In exchange, the OAG would not pursue charges against Ali.

When Kane assumed office in early 2013, Fina informed her that he believed she could not oversee the Ali investigation because it had the potential to implicate Joshua Morrow ("Morrow"), a friend, supporter, and former campaign employee of Kane.  Kane disagreed and retained control of the investigation.

In September 2013, Kane made clear that she would not pursue the bribery investigation, nor would she honor Ali's cooperation agreement.  In response, Ali moved for Kane's recusal and for enforcement of the agreement.  Fina executed an affidavit in support of Ali's motion.  In it, Fina attested to his knowledge of the purported conflict of interest, the investigation, and the cooperation agreement.

Kane ultimately relented, dismissing all charges against Ali.  However, beginning in late 2013 and continuing into early 2014, she expressed publicly that the Ali bribery investigation had been racially motivated, that Ali was not credible, and that the investigation lacked "quality" and had inadequate resources.  She reported that federal law enforcement officials had characterized

-4-

A000395

the case as "flawed and not prosecutable" and stated that Ali and
the lead case agent both believed the investigation to be focused
on members of the General Assembly's Black Caucus.  In addition,
Kane implied that Fina was to blame for the public disclosure of
the investigation.  Plaintiffs allege that these statements were
false.  Fina responded to them in what plaintiffs characterize as a
"letter of March 22, 2014 to the public."  Meanwhile, Fina, Noonan,
and Sheetz made public statements refuting Kane's accusations.
Around the same time, Kane emailed a media strategist regarding
reports of her role in the Ali investigation.  In the email, Kane
justified her accusations that the investigation was racially
motived by stating:  "This is war."

Ultimately, Philadelphia District Attorney Seth Williams
("Williams") took over the Ali bribery investigation.  Williams
reviewed the evidence and found no indication that the
investigation was racially motivated.  He brought charges against
six elected officials, five of whom have pleaded guilty.

Meanwhile, Kane fulfilled her campaign promise to
initiate an inquiry into the Sandusky investigation.  Fina, who was
contacted as part of the inquiry, openly questioned the legality of
Kane's inquiry and Kane's authority to conduct it.  Fina also
directed "a variety [of] letters . . . and motions" to Geoffrey
Moulton ("Moulton"), the attorney in the OAG directing the inquiry,
and to the grand jury judge supervising it.

-5-

A000396

A report of the inquiry into the Sandusky investigation
was completed by Moulton in May 2014. Pursuant to the protocol
established by the grand jury judge who was supervising the
inquiry, Noonan, Feathers, Sheetz, and Fina had the opportunity to
respond to the Moulton report. They did so in June 2014.
Plaintiffs criticized the inquiry as "ill-advised" and contended
that it had been "born of political opportunism and posturing."
They also called the claims that had given rise to the report
"ill-informed and unfounded." The report, according to plaintiffs,
was merely an "exercise in second guessing" undertaken "to sift for
criticism." These responses were incorporated into a final version
of the report.

On June 23, 2014, the day the final report was released,
Kane convened a press conference. Speaking to reporters, she
stated that the actions of Noonan, Feathers, Sheetz, and Fina had
led to delays in the Sandusky investigation. As a result, Kane
contended, Sandusky had been afforded the opportunity to molest two
minors who would not have been victimized if the investigation had
proceeded more quickly. According to plaintiffs, this statement
was false. Indeed, Kane later acknowledged through a spokesperson
that the statement was untrue.

In response, plaintiffs convened a press conference of
their own. Fina told reporters that the inquiry into the Sandusky
investigation "was a campaign promise [Kane] made. It was a trick

-6-

she used to get elected and Moulton didn't deliver for her. What's she going to do? She has to come up with something else sensational to detract that she [made] a series of falsehoods to the public during the campaign."

Plaintiffs plead that Kane retaliated against them for criticizing her. As alleged in the First Amended Complaint, Kane "initiated a conspiracy" in 2014 to release grand jury information related to a 2009 criminal investigation which had been run by Fina. That investigation involved the late J. Whyatt Mondesire ("Mondesire"), the former head of the Philadelphia Chapter of the N.A.A.C.P. The OAG suspected that state grant money had improperly been used to make payments to Mondesire. The investigation stalled, however, when key witnesses who were under indictment refused to testify before a grand jury. The OAG concluded that Mondesire would not consent to appear before a grand jury and that subpoenaing him would be impracticable. As a result, the investigation effectively became dormant.

Upon learning of the status of the Mondesire investigation, Kane gathered confidential grand jury documents related to that case and turned them over to her associate Morrow. She instructed Morrow to forward the materials to defendant Brennan, the reporter, with whom Morrow had a professional relationship. Morrow redacted from the materials the names of all individuals other than Costanzo and Fina. Upon receiving the

–7–

materials, Brennan wrote a story which suggested that Costanzo and Fina had impeded and improperly terminated the Mondesire investigation.  The story was published by the Philadelphia Daily News in June 2014.  Since that time, the Philadelphia Daily News has printed "numerous" articles critical of Fina and Costanzo.

According to plaintiffs, Kane thereafter "conspired with [defendant] Miletto," who was then employed by the OAG, by directing Miletto to state that he had uncovered evidence of Mondesire's wrongdoing and that Costanzo and Fina had removed him from the Mondesire investigation as a result.  Plaintiffs allege that this claim was false.

When Costanzo and Fina became aware in May 2014 of the release of the grand jury information, they reported it to the Supervising Judge of the grand jury, who initiated an investigation into the alleged leak.  Costanzo and Fina were subpoenaed to testify before the grand jury as part of that investigation.  On August 26, 2014, the day they were to appear, they were confronted by defendant Miletto and several other OAG agents at the entrance to the building in which the grand jury convened.  Plaintiffs maintain that Miletto "made intimidating, threatening and harassing statements toward Fina and Costanzo."  Miletto and the agents then followed Costanzo and Fina into an elevator, where Miletto "attempted to physically intimidate, threaten and harass Fina."  Costanzo and Fina reported this incident to the judge supervising

-8-

the grand jury, who later took evidence concerning the alleged intimidation and issued a protective order.

Since that time, Kane has been criminally charged for her role in the release of the grand jury materials and for lying to a grand jury about the disclosure. She has stated publicly and in "numerous . . . verified court filings" that Costanzo and Fina were part of a "conspiracy," "plot," or "scheme" to "corruptly" manufacture the grand jury investigation of her activities.

Meanwhile, the OAG, having concluded its inquiry into the Sandusky investigation, had come into possession of a large volume of emails that had been received and sent by OAG staff while the Sandusky investigation was taking place.[2] Among those emails, plaintiffs assert, were messages received and sent by plaintiffs containing pornographic images. Plaintiffs allege that Kane, embarrassed by the investigation into her role in the Mondesire grand jury leak and by the disclosure that her statements about Sandusky's victims had been untrue, "sought a way to utilize these emails to retaliate" against them. They contend, upon information and belief, that in summer 2014, Kane "instructed members of her staff to contact members of the media and suggest to them that e-mails existed for which they should make a Right to Know Law

---

2. Although plaintiffs repeatedly characterize these messages as their "private emails," they do not appear to dispute defendants' observation that the messages were received and sent using the "Pennsylvania OAG computer systems and email accounts."

A000400

request."  Members of the press made such requests, and the OAG
challenged them.  The OAG contended that release of the emails was
not mandated because they were not part of the public record.

While the debate over the release of the emails was
ongoing, a colleague of Fina met with David Tyler ("Tyler"), the
OAG's Chief Operating Officer.  Tyler told Fina's colleague that
many former members of the OAG legal staff would be hurt,
apparently by their involvement in the email scandal, if "Fina does
not back off."  At around the same time, another of Fina's
colleagues met with James Barker ("Barker"), Chief Deputy Attorney
General for Appeals and Legal Services.  Barker instructed Fina's
colleague to tell Fina that if Fina continued to criticize Kane,
Kane would release emails of former members of the OAG staff.

Ultimately, in September 2014 Kane released some but not
all of the emails sought by the press.  Plaintiffs allege that she
did so selectively and in such a way as to paint them in a negative
light.  They claim that "[t]hose selected by Kane to have their
emails released had either spoken out against Kane during her
campaign or in connection with the Sandusky investigation, or were
friends or professional associates of" plaintiffs.

The release of the emails garnered significant media
attention.  The Philadelphia Daily News published a profusion of
articles and editorials regarding the participation of Costanzo and
Fina in the email scandal.  This reporting suggested that Costanzo

-10-

and Fina were the primary distributors of the offending emails and
that they had engaged in workplace discrimination.  Plaintiffs
insist that this was untrue.  In addition, the articles in the
Philadelphia Daily News frequently failed to mention that Costanzo
and Fina were only two of more than 100 recipients of the
pornographic email chains.  According to plaintiffs, when the Media
Defendants learned in June 2015 that this action was forthcoming,
Costanzo and Fina were targeted "in articles and editorials with a
focus and ferocity."  Plaintiffs claim that the Media Defendants
"vastly overstate[d] the roles of Fina and Costanzo as the primary
responsible persons."  The First Amended Complaint details multiple
examples of the news stories with which plaintiffs take issue.

        Kane, meanwhile, was scheduled to testify before a grand
jury on November 17, 2014.  Allegedly in anticipation of the
negative press coverage that would result, Kane approached CNN
about a possible story regarding the email scandal.  The resulting
segment was broadcast on November 18, 2014.  It included an
interview with Kane in which she allegedly "knowingly, willfully
and intentionally made false statements that were defamatory and
cast Fina, Feathers and Noonan in a false light."

        Plaintiffs contend that Kane stated in the CNN interview
that the offending emails had included child pornography.  They
also claim that she implied that Noonan, Feathers, Sheetz, and Fina
had viewed such material.  They elaborate by including in their

-11-

**A000402**

First Amended Complaint a transcript of the CNN segment.  The
transcript reveals that a CNN correspondent declared during the
segment that Kane "claims that many of the officials who worked on
the Sandusky sex abuse case were at the exact same time breaking
the law by using their work computers to share hardcore porn."
Another correspondent then asserted that state officials "who
worked to bring down the infamous child molester Jerry Sandusky
have been caught exchanging crude pornographic emails written on
state email accounts, state computers and on state time, according
to the state's [A]ttorney [G]eneral . . . the porn being passed
around was not for the faint of heart."  Later in the segment, Kane
stated:  "When I saw [the images in the emails], they literally
took my breath away.  And they are deplorable.  Hardcore, graphic,
sometimes violent emails that had a string of videos and pictures
depicting sometimes children, old women, some of them involved
violent sexual acts against women."  A correspondent then reports
that "[t]hose involved in the scandal include some of the biggest
names in Pennsylvania's justice system, a state Supreme Court
Justice Seamus McCaffery, the State Police Commissioner Frank
Noonan and one of the main Sandusky investigators Randy Feathers."

        The CNN segment also reported that Kane was unable to
investigate the distribution of the emails due to a gag order that
had been imposed as an indirect result of the

-12-

>public and very bitter feud between . . . Kane
>and the main prosecutor in the Sandusky case
>Frank Fina. . . . The two have been lobbying
>[sic] allegations against each other about
>whether several cases have been handled
>correctly.  As a result, Kane is now being
>investigated about whether she improperly leaked
>a memo about a case from 2009 that Fina handled.
>. . . [A] gag order in that case is keeping Kane
>from moving forward.

In addition, the commentator mentioned Noonan again, noting that
while many involved in the scandal had lost their jobs, Noonan
"still has his job because . . . the governor says there was no
proof that he opened the emails."  At various points throughout the
segment, photographs of Noonan, Feathers, and Fina were displayed.

After the CNN segment was aired, a spokesperson for Kane
clarified that there was no child pornography in any of the emails
at issue.

II.

When ruling on a Rule 12(b)(6) motion to dismiss, the
court must accept as true all factual allegations in the
complaint and draw all inferences in the light most favorable to
the plaintiff.  Phillips v. Cnty. of Allegheny, 515 F.3d 224,
233 (3d Cir. 2008); Umland v. Planco Fin. Servs., Inc., 542 F.3d
59, 64 (3d Cir. 2008).  We must then determine whether the
pleading at issue "contain[s] sufficient factual matter,
accepted as true, to 'state a claim for relief that is plausible
on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

-13-

A000404

(citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).
In making our determination, we may also consider matters of
public record as well as any "undisputedly authentic document
that a defendant attaches as an exhibit to a motion to dismiss
if the plaintiff's claims are based on that document." <u>Pension</u>
<u>Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d
1192, 1196 (3d Cir. 1993).

        In order to survive a Rule 12(b)(6) motion to dismiss,
a claim must do more than raise a "mere possibility of
misconduct." <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210
(3d Cir. 2009) (quoting <u>Iqbal</u>, 556 U.S. at 679). Under this
standard, "[t]hreadbare recitals of the elements of a cause of
action, supported by mere conclusory statements, do not
suffice." <u>Iqbal</u>, 556 U.S. at 678. Instead, the complaint must
contain factual matter sufficient to state a claim that is
facially plausible, meaning that "the plaintiff [has] plead[ed]
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556). This
plausibility standard "is not akin to a 'probability
requirement,' but it asks for more than a sheer possibility that
a defendant has acted unlawfully." <u>Id.</u> A complaint which
"pleads facts that are 'merely consistent with' a defendant's

-14-

**A000405**

liability . . . 'stops short of the line between possibility and plausibility.'"  Id. (citing Twombly, 550 U.S. at 557).

III.

Kane has moved to dismiss Count One of the First Amended Complaint for failure to state a claim under § 1983. [3]  In Count One, Fina pleads that Kane's criticism of the OAG's handling of the Ali bribery investigation constituted unlawful retaliation for his exercise of his First Amendment rights.  Specifically, Fina alleges that Kane "fabricat[ed] and publish[ed] claims that the OAG possessed evidence that the [Ali investigation] was motivated by racism" in retaliation against Fina's protected speech. He appears to contend that his act of highlighting the termination of the Ali investigation and Kane's potential conflict of interest with

---

3.  Counts One through Six are all pleaded under 42 U.S.C. § 1983.  That section establishes in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 does not create substantive rights in and of itself, but instead provides a remedy for violations of constitutional or other federally established rights.  Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

-15-

**A000406**

respect to that matter motivated Kane unlawfully to retaliate against him.

It is well-established that "an individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment rights." Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist. v. Doyle, 429 U.S. 274 (1977)). In order properly to plead a First Amendment retaliation claim pursuant to § 1983, a plaintiff must allege "(1) that [the plaintiff] engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007); see also Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006).

Kane concedes that Fina and his fellow plaintiffs engaged in protected activity, and she does not appear to dispute the existence of a causal connection between this activity and her purported retaliation. See Lauren W., 480 F.3d at 267. Thus we must simply determine whether plaintiffs have adequately alleged that Kane's actions were "sufficient to deter a person of ordinary firmness from exercising his or her rights." See id. In making this determination, we "focus[] on the status of the speaker, the

-16-

**A000407**

status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*." Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2000) (quoting Suarez Corp. Indus. V. McGraw, 202 F.3d 676, 686 (4th Cir. 2000)); see also Koren v. Noonan, 586 F. App'x 885, 888 (3d Cir. 2014).  When the alleged retaliator is a public employer, "courts have required the nature of the retaliatory acts . . . to be more than *de minimis* or trivial." Brennan, 350 F.3d at 419 (quoting Suarez, 202 F.3d at 686).  "[C]riticism, false accusations, or verbal reprimands" are generally not considered sufficient to establish a claim. Id. (quoting Suarez, 202 F.3d at 686); see also Koren, 586 F. App'x at 888.

In analyzing First Amendment retaliation claims, our Court of Appeals has repeatedly cited with approval the well-reasoned decision of the Fourth Circuit in Suarez, 202 F.3d 676.  See, e.g., Brennan, 350 F.3d at 419; Koren, 586 F. App'x at 888; see also McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006); McLaughlin v. Watson, 271 F.3d 566, 573 (3d Cir. 2001).  In Suarez, the Court reviewed a district court ruling that a First Amendment retaliation claim raised by a direct mail marketing company against state officials was not barred by the doctrine of qualified immunity.  202 F.3d at 683-84.  The Suarez court reversed.  It concluded that the claim could not proceed because the alleged retaliatory conduct had not adversely affected the First Amendment

-17-

**A000408**

rights of the plaintiffs.  See id. at 690-91.  In so doing, the
court observed that when a First Amendment retaliation claim arises
in the public employment context, the relationship between the
speaker and the retaliator "creates competing interests between the
interests of the [public employee], as a citizen, in commenting
upon matters of public concern and the interest of the
[government], as an employer, in promoting the efficiency of the
public services it performs through its employees."  Id. at 686
(internal citation omitted).  It is because of these competing
interests that the retaliatory acts must be "more than *de minimis*
or trivial" to give rise to a viable claim.  Id.  Under this
standard, criticism and false accusations are insufficient.  See
id.

        According to the Suarez court, "[t]he nature of the
alleged retaliatory acts has particular significance where the
public official's acts are in the form of speech."  Id. at 687.
Under such circumstances, the "public official's own First
Amendment speech rights are implicated."  Id.  Consequently, "where
a public official's alleged retaliation is in the nature of speech,
in the absence of a threat, coercion, or intimidation intimating
that punishment, sanction, or adverse regulatory action will
immediately follow, such speech does not adversely affect a
citizen's First Amendment rights, even if defamatory."  Id.
(emphasis added) (citations omitted).

-18-

**A000409**

The Court of Appeals for the Third Circuit recently cited Suarez with approval in Koren, 586 F. App'x 885. There, a former Pennsylvania State Trooper brought a First Amendment retaliation action under § 1983 against two Pennsylvania State Police employees.[4] Id. at 886-87. He alleged that while he was running for political office they had implied in statements to the media that he had engaged in workplace misconduct. Id. at 887. The Court of Appeals affirmed the district court's dismissal of the claim. Id. at 890. It observed that "in the political arena, courts have consistently rejected First Amendment retaliation claims based upon assertions of purportedly false reports or criticism." Id. at 888. Because the defendants' allegedly retaliatory speech "involved no 'threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action [would] imminently follow,'" the court concluded that it "would not dissuade a person of ordinary firmness from" engaging in the type of protected activity undertaken by the plaintiff. Id. (quoting Suarez, 202 F.3d at 687).

Like the purported retaliation in Suarez and Koren, the criticism by Kane of the Ali bribery investigation is not actionable under § 1983. See generally 202 F.3d 676; 586 F. App'x 885. In reaching this conclusion, we consider the status

_____

4. One of those two employees happened to be the same Frank Noonan who is a plaintiff in this action.

-19-

of Fina as the speaker, the status of Kane as the alleged
retaliator, the relationship between them, and the nature of Kane's
acts.  See Brennan, 350 F.3d at 419.  Fina, a Deputy Attorney
General under Attorney General Corbett, was a high-level official
in the OAG during the time the Ali investigation was ongoing.  Kane
at the relevant time was the elected Attorney General.  It bears
noting that in this capacity, Kane enjoys her own First Amendment
rights.  See Suarez, 202 F.3d at 687.  Fina does not allege that
there was an employment relationship between himself and Kane at
the time of the alleged retaliation.  Even if there was such a
relationship, the nature of Kane's alleged acts is different from
that of the retaliation that occurred in the employment cases cited
by plaintiffs.  Fina was not terminated, demoted, disciplined, or
subjected to any other adverse employment action as a result of his
criticism of Kane.  Instead, he merely bore the effects of a
generalized critique of an investigation in which he took part
under a former Attorney General.  In sum, the actions of Kane
detailed in Count One would not "deter a person of ordinary
firmness from exercising his constitutional rights."  See, e.g.,
Thomas, 463 F.3d at 296.

Plaintiffs urge us to distinguish Koren.  In their view,
the retaliation alleged in Koren took place in the political arena,
while this case arises in an employment context.  It is true that
in Koren the Third Circuit acknowledged that when a public employer

-20-

**A000411**

takes action against an employee, the threshold for finding that action to be retaliatory is "very low." 586 F. App'x at 888 (quoting O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006)). But even under such circumstances, the court wrote, "a plaintiff must plead more than mere 'criticism, false accusations, or verbal reprimands.'" Id. (quoting Brennan, 350 F.3d at 419. Moreover, in support of their argument that this case takes place in the employment context, plaintiffs rely on cases which involve retaliatory adverse employment action such as demotion or termination. See, e.g., O'Connor, 440 F.3d at 126 n.1. No such adverse employment action was taken here.

Moreover, the retaliation described in Count One "is in the nature of speech," and Fina alleges no "threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow." See Suarez, 202 F.3d at 687. Rather, Kane's purportedly retaliatory acts are no more than "criticism, false accusations, or verbal reprimands." See Brennan, 350 F.3d at 419. Accordingly, even if that speech is defamatory, as Fina claims it is, it does not implicate his First Amendment rights. See Suarez, 202 F.3d at 687; Koren, 586 F. App'x at 888. We will therefore grant the motion of Kane to dismiss Count One.

A000412

IV.

Kane also seeks to dismiss Count Two of the First Amended Complaint. Count Two, brought under § 1983, contains the allegations of Costanzo and Fina that Kane once again retaliated against them in violation of the First Amendment by "fabricating and publishing claims that Fina and Costanzo wrongfully impeded and terminated a valid criminal investigation against J. Whyatt Mondesire for improper and unethical purposes." Costanzo and Fina also allege that Kane retaliated against them by unlawfully releasing grand jury materials related to the Mondesire investigation. They argue that Kane did so in retaliation for their criticism of her handling of the Ali bribery investigation and "in an attempt to make it appear that [they] had abused their prosecutorial discretion by failing to pursue a case against Mondesire."

Once again, Kane does not appear to dispute that Costanzo and Fina engaged in protected activity or that there is a a causal connection between this activity and her purported retaliation. Thus, our inquiry is again limited to whether Kane's actions would "deter a person of ordinary firmness from exercising his constitutional rights." See, e.g., Thomas, 463 F.3d at 296.

To the extent that Count Two is based on speech by Kane, we reiterate that "where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or

A000413

intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory." Suarez, 202 F.3d at 687. As Kane correctly observes, she is entitled to make clear to the public that she, as the current Attorney General, "thinks that the OAG was either corrupt or inept before she took office and that Fina and Costanzo were part of the problem." Any statement made or initiated by Kane to the effect that the Mondesire investigation was improperly terminated was not "sufficient to deter a person of ordinary fitness from exercising" his First Amendment freedoms. See, e.g., Thomas, 463 F.3d at 296.

As to Costanzo and Fina's allegations that Kane retaliated against them through the unlawful release of materials from the Mondesire grand jury investigation, we likewise conclude that they have not made out a First Amendment retaliation claim. It is true that this alleged leak goes beyond mere speech and that Kane has been criminally charged in connection with it. To determine whether it amounts to retaliation, however, we must assess "the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." Brennan, 350 F.3d at 419 (citation omitted). The First Amended Complaint does not allege that Kane released the grand jury materials selectively in such a

-23-

A000414

way as to misrepresent Costanzo and Fina's involvement in the investigation. Indeed, plaintiffs merely aver that Kane gathered grand jury materials and gave them to her associate Morrow, who passed them along to Brennan. It was Morrow, and not Kane, who "consciously redacted from these documents the names of all persons other than Costanzo and Fina so that the reported story would only be about them." Morrow also "told Brennan that he and Kane were looking to air a story critical of Fina and Costanzo." Plaintiffs do not allege that Morrow did so at Kane's direction.

In summary, Fina and Costanzo have failed adequately to allege that Kane unlawfully retaliated against them by criticizing their handling of the Mondesire investigation or by releasing confidential materials related to that investigation. As a result, we will grant the motion of Kane to dismiss Count Two.

V.

In Count Three, which Kane, Miletto, and Brennan seek to dismiss, Costanzo and Fina aver under § 1983 that Kane, Miletto, and Brennan conspired to retaliate against them for exercising their First Amendment freedoms by fabricating assertions that they had improperly "impeded and terminated" the Mondesire investigation. This claim appears to be based on the following allegations: that Kane directed Miletto to state falsely that Costanzo and Fina had removed him from the Mondesire investigation after he uncovered evidence of

-24-

Mondesire's wrongdoing, and that Brennan reported this fabrication; and that Brennan received confidential grand jury materials from Morrow and, at Morrow's request, used them as the basis for a story.

For the reasons stated above, the criticism and allegedly false accusations levied by Kane, Miletto, Morrow, and Brennan against Costanzo and Fina are not enough to establish a First Amendment retaliation claim. These acts are mere speech and do not involve any "threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow." See Suarez, 202 F.3d at 687; Koren, 586 F. App'x at 888.[5] They are not enough to "deter a person of ordinary firmness from exercising his constitutional rights." See, e.g., Thomas, 463 F.3d at 296. Since they are not retaliatory, they cannot serve as the basis for a claim that defendants conspired to retaliate against them.

The same is true of the allegations that Kane, Miletto, and Brennan conspired to engage in retaliation by releasing confidential grand jury materials. We have already concluded that

---

5. Costanzo and Fina do allege that Miletto later threatened and intimidated them in connection with the grand jury investigation when he confronted them as they prepared to testify about the leak. This allegation does not appear to serve as the basis for the conspiracy claim in Count Three. Moreover, even if plaintiffs do base Count Three on this alleged intimidation, they have not alleged that Miletto conspired with Kane or Brennan to engage in this course of conduct.

-25-

any such leak does not amount to retaliation, and as such, it cannot support a retaliation conspiracy claim.

We also note that plaintiffs have not adequately alleged the existence of a conspiracy, at least with respect to defendant Brennan.  Nowhere in their First Amended Complaint do plaintiffs allege in anything more than conclusory terms that Brennan conspired with Kane or Miletto to engage in unlawful conduct.  <u>See</u> <u>Iqbal</u>, 556 U.S. at 678.  Plaintiffs aver that Brennan, at Morrow's direction, wrote a news story critical of Costanzo and Fina, but they do not allege any involvement by Kane or Miletto in this purported scheme.  As to Miletto, plaintiffs plead his involvement in a conspiracy only by asserting that Kane directed him to "falsely state that Fina and Costanzo had removed him from the Mondesire investigation when Miletto supposedly found evidence of Mondesire's wrongdoing which was ultimately reported by Brennan in the news story."  Again, this is not actionable retaliation, and cannot support a claim of a retaliatory conspiracy.

We will thus grant the motions of Kane, Miletto, and Brennan to dismiss Count Three.

VI.

Kane further moves to dismiss Count Four.  Again, this count is predicated on § 1983.  There Noonan, Feathers, Sheetz, and Fina claim that Kane retaliated against them in violation of the First Amendment by making a statement "to the media that the

-26-

alleged delay in arresting Sandusky resulted in two minors being subjected to sexual abuse that would not have otherwise occurred." That assertion, as Kane's representative later acknowledged, was untrue. Noonan, Feathers, Sheetz, and Fina aver that when Kane made the statement she was retaliating against them for their criticism of the inquiry she had initiated into the Sandusky investigation.

In Koren, our Court of Appeals opined that when a court is confronted with allegations that a defendant has "smeared [a plaintiff's] unblemished professional record . . . [t]he question . . . is not whether [the] remarks were defamatory – it is whether they would have deterred 'a person of ordinary firmness'" from exercising his constitutional rights. 586 F. App'x at 888 (quoting Thomas, 463 F.3d at 296). While plaintiffs engaged in protected activity (as Kane concedes they did), and while Kane's contentions about the delays in the Sandusky investigation may have been false and damaging, those contentions "involved no 'threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow.'" See id. (quoting Suarez, 202 F.3d at 687). They were merely the remarks of an elected official about persons she considered to be her political opponents pertaining to an issue which had been at the core of her campaign for office. They would not "dissuade a person of

-27-

ordinary firmness" from engaging in the type of protected speech
at issue here, and as a result, they are not actionable under
§ 1983.  See id.  For this reason, we will grant the motion of
Kane to dismiss Count Four.

VII.

Kane moves to dismiss Count Five.  This count under
§ 1983 consists of the allegations of Noonan, Feathers, Sheetz, and
Fina that Kane retaliated against them for engaging in First-
Amendment-protected speech by "fabricating and publishing claims
that implied that Fina, Sheetz, Feathers, and Noonan possessed
and/or distributed child pornography."  Plaintiffs are referring to
the statements made by Kane to a CNN correspondent, allegedly in
retaliation for plaintiffs' criticism of her.  They were broadcast
in a news segment which aired on November 18, 2014.  Once again,
Kane concedes that plaintiffs' criticism of her was protected by
the First Amendment, and she does not appear to dispute that there
was a causal connection between this criticism and her statements.

We reiterate that under these circumstances, where
Kane's purportedly retaliatory acts are "in the form of speech,"
her First Amendment rights are implicated as well.  See Suarez, 202
F.3d at 687.  The criticisms Kane articulated during the CNN
segment, which appear to serve as the sole basis for Count Five, do
not involve any "threat, coercion, or intimidation intimating that
punishment, sanction, or adverse regulatory action will immediately

-28-

A000419

follow." See id. Again, Kane's comments were those of an elected official concerning the improper use of state computers and state email servers. Even if Kane had defamed Noonan, Feathers, Sheetz, and Fina by falsely asserting that they had viewed child pornography, this would not be actionable First Amendment retaliation under § 1983. See id.

In response to Kane's argument that her statements to CNN involved no threats or intimidation, Noonan, Feathers, Sheetz, and Fina contend that they were subjected to threats in connection with their involvement in the email scandal. Specifically, they plead that Tyler, an OAG official, threatened the release of the emails "if Fina does not back off." They further allege that Barker, another OAG official, directed Fina's colleague to instruct Fina that his criticism of Kane would result in the release of the emails. It is unclear which count (if any) in the First Amended Complaint relies on these allegations. Moreover, there is no indication in the First Amended Complaint that any defendant directed or played any role in the issuance of these alleged threats. Thus, they cannot serve as the basis for a claim in this action.

For the foregoing reasons we will grant the motion of Kane for dismissal of Count Five.

-29-

VIII.

    This brings us to Count Six, which Kane asks us to
dismiss as not stating a claim under § 1983.  In Count Six, all
five plaintiffs plead that Kane again retaliated against their
engagement in protected speech by "releasing the information about
the private emails and/or releasing the emails of all plaintiffs."
They take issue with the OAG's "selective" release of certain of
their emails to the press following the filing of Right to Know
Law requests concerning the communications.

    Once again, in assessing whether the alleged
retaliatory acts of Kane were "sufficient to determine a person
of ordinary firmness from exercising" his constitutional rights,
we "focus[] on the status of the speaker, the status of the
retaliator, the relationship between the speaker and the
retaliator, *and the nature of the retaliatory acts*."  Thomas, 463
F.3d at 296; Brennan, 350 F.3d at 419.  Here, the speakers – in
this case plaintiffs – are former high ranking public officials,
and the retaliator Kane is an elected Attorney General who plays a
major role in state law enforcement and who is tasked with
directing the OAG.  The alleged retaliatory act at issue was the
release to the media, pursuant to an official request and after
significant litigation, of sexually explicit messages which
plaintiffs do not dispute were exchanged on state email systems.
In other words, the "nature of the retaliatory acts" was in this

-30-

**A000421**

case the disclosure by the state's Attorney General of official misconduct within her office.  See id.  It would defy logic to conclude that Kane violated the constitutional rights of plaintiffs by bringing to light their use of state-owned computers and email systems to exchange pornography.

In arguing otherwise, plaintiffs direct our attention to the decision of the District of Delaware in Neuberger v. Gordon, 567 F. Supp. 2d 622 (D. Del. 2008).  In that case, a civil rights attorney who had been critical of certain public figures brought a First Amendment retaliation case against them after they disclosed his private medical information to the media.  That disclosure, the court concluded, was "sufficient to deter a civil rights plaintiff's attorney of ordinary firmness from exercising constitutional rights."  Id. at 638.  Plaintiffs contend that Neuberger stands for the proposition that the disclosure of private information about a plaintiff can support a First Amendment retaliation claim.

Neuberger, however, is of no help to plaintiffs.  That case involved the widespread dissemination of highly intimate medical information about the plaintiff.  Here, in contrast, the materials released were off-color and arguably pornographic messages sent by state officials on state-owned email servers.  The facts of Neuberger are easily distinguishable from those before us in this matter.

-31-

A000422

In sum, when we consider "the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*," we have no trouble concluding that Kane's release of certain emails implicating plaintiffs was not "sufficient to determine a person of ordinary firmness from exercising" his right to free speech. See Thomas, 463 F.3d at 296; Brennan, 350 F.3d at 419.

To the extent that Count Six relies on allegations that plaintiffs were threatened with the release of their emails, we note once again that the First Amended Complaint contains no allegations that any defendant made or directed these threats. While plaintiffs may believe that Kane arranged for these purported threats to be made, they have not alleged this in their pleading.

Accordingly, we will grant the motion of Kane to dismiss Count Six.

IX.

In essence, the First Amended Complaint details a long-standing political battle between the Attorney General of Pennsylvania and former high-ranking state officials who served in the administrations of her adversaries. The battle has been hard fought and is not pretty. Each party, however, has exercised his or her rights under the First Amendment, and there has been alleged no illegal retaliation giving rise to claims under § 1983.

-32-

X.

As we have concluded that Rule 12(b)(6) requires dismissal of Counts One through Six, there are no remaining claims against Kane and Miletto. We need not reach their arguments that they are entitled to qualified immunity from all of the claims against them, nor must we address the argument of Kane that the First Amended Complaint should be dismissed on the ground that it runs afoul of the pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure.

XI.

Finally, we address Counts Seven and Eight, in which Costanzo and Fina state law claims of defamation and false light against the Media Defendants whose citizenship is not diverse from that of the plaintiffs. Our subject matter jurisdiction over these claims rests on 28 U.S.C. § 1367.[6]

---

6. Section 1367 provides in relevant part:

> (a) . . . in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.
>
> . . .
>
> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if –

-33-

A000424

All the federal claims are being dismissed.  Pursuant to 28 U.S.C. § 1367(c)(3), we decline to exercise supplemental jurisdiction over Counts Seven and Eight.  The action is in a very early stage.  Consequently, Counts Seven and Eight will be dismissed without prejudice to the right of plaintiffs to reassert these claims in the appropriate state court.

---

. . .

    (3) the district court has dismissed all claims over which it has original jurisdiction.

-34-

A000425

# EXHIBIT "D"

A000426

IN THE COURT OF COMMON PLEAS IN AND FOR

THE COUNTY OF MONTGOMERY, PENNSYLVANIA

CRIMINAL DIVISION

- - -

COMMONWEALTH OF          :   NO. 6239-2015
PENNSYLVANIA                 NO. 8423-2015

    vs.                :

KATHLEEN GRANAHAN KANE    :

- - -

Trial by Jury/A.M. Session

- - -

Courtroom A
Thursday, August 11, 2016
Commencing at 8:56 a.m.

- - -

Edward T. McKenna
Official Court Reporter
Montgomery County Courthouse
Norristown, Pennsylvania

- - -

BEFORE:  THE HONORABLE WENDY DEMCHICK-ALLOY, JUDGE
         AND A JURY

- - -

```
 1                  JOSHUA MORROW - DIRECT
 2                    THE COURT:  All right.
 3                    (The proceedings held at side
 4   bar were concluded.)
 5                       - - -
 6                    THE COURT:  All right.
 7   Commonwealth, ready to proceed?  Call your next
 8   witness.
 9                    MS. HENRY:  Your Honor, the
10   Commonwealth calls Joshua Morrow.
11                    THE COURT:  Joshua Morrow.
12                       - - -
13                    JOSHUA MORROW, having been duly
14   sworn, was examined and testified as follows:
15                    THE COURT:  Mr. Morrow, before
16   you is a microphone.
17                    THE WITNESS:  Okay.
18                    THE COURT:  It doesn't look like
19   one, but it's right here.
20                    THE WITNESS:  Okay.
21                    THE COURT:  So in order for the
22   jurors to hear you, all 16 of them, the lawyers as
23   well and me, you have to keep your voice up --
24                    THE WITNESS:  Okay.
25                    THE COURT:  -- and utilize that
```

```
 1                  JOSHUA MORROW - DIRECT

 2   microphone to the best of your ability, okay?

 3                        THE WITNESS:  Yes, ma'am.

 4                        THE COURT:  Because, otherwise,

 5   I'll be prodding you to continue to keep your voice up

 6   and use the microphone.

 7                        All right.  Miss Henry.

 8                        MS. HENRY:  Thank you, Your

 9   Honor.

10                        THE COURT:  The time is yours.

11                        MS. HENRY:  Thank you.

12                     DIRECT EXAMINATION

13   BY MS. HENRY

14   Q.   Good morning, Mr. Morrow.

15   A.   Good morning.

16   Q.   Sir, what do you do for a living?

17   A.   I'm a political consultant.

18   Q.   And how long have you been a political

19   consultant?

20   A.   Probably 18 years, 16 years.

21   Q.   And when you say political consultant, can you

22   tell us what that means?

23   A.   It's -- I do a lot of things.  I do -- I run

24   campaigns, I do paid media, earned media.  I get

25   people elected to office.
```

JOSHUA MORROW – DIRECT

1

2   **Q.**   Okay.   And when you say you get people elected to

3   office, where have you worked on campaigns?

4   **A.**   All over the country, New York, Florida,

5   Pennsylvania, Hawaii, Nevada and California.

6   **Q.**   And you've also worked on campaigns here, in

7   Pennsylvania; is that right?

8   **A.**   That is correct.

9   **Q.**   Now, do you know the defendant in this case?

10   **A.**   I do.

11   **Q.**   And when did you first meet her?

12   **A.**   I believe I met Kathleen in October of 2011.

13   **Q.**   Okay.   And how did you meet her?

14   **A.**   It was at a political event.

15   **Q.**   And were you working for her at that time?

16   **A.**   I was not.

17   **Q.**   And after you met her, did you maintain a

18   relationship with her?

19   **A.**   Not really, not until I started working with her,

20   but, you know, when you do these campaigns, and

21   there's primaries, everyone is going to the same

22   events.   So I would see her from time to time at other

23   events.

24   **Q.**   Okay.   Now, you mentioned that you started to

25   work for her.   When did that happen?

<pre>
 1                   JOSHUA MORROW - DIRECT
 2  A.   I believe it was February of 2012.
 3  Q.   And how did that come to be?
 4  A.   Her media consultant reached out to me, and I
 5  guess they had just -- either their communications
 6  direction had left or was fired, I don't remember, and
 7  they hired me on as the communication director.
 8  Q.   Okay.  I'm sorry.  That was when?
 9  A.   February of 2012.
10  Q.   And what were you doing for her?  What does that
11  mean, what you just --
12  A.   So I was the communication director, and what
13  that role is in the campaign is you write press
14  releases, you draft speeches in some cases, you do
15  questionnaires, you talk to the media.
16  Q.   And so how long did you remain in that role?
17  A.   Until November of 2012.
18  Q.   Okay.  What happened in November of 2012?
19  A.   She got elected.
20  Q.   Okay.  And while you were working for her in that
21  capacity, were you in close contact with her?
22  A.   Yes.
23  Q.   And what do you mean by that?
24  A.   Well, a lot of times, reporters would call for
25  comment, and I would write what the quote would be,
</pre>

```
 1                   JOSHUA MORROW - DIRECT
 2   and then I'd reach out to her and ask her if she
 3   approved the quote, and I traveled with her from time
 4   to time.
 5   Q.    Would you say during that time that you were in
 6   communication with her almost every day?
 7   A.    Pretty regularly, yes.
 8   Q.    And in addition to speaking with her on the
 9   phone, would you sometimes see her face-to-face?
10   A.    Yes.
11   Q.    Okay.  And when she got elected, how did you
12   feel?
13   A.    It was great, one of the crowning achievements of
14   my career.
15   Q.    You felt very proud of that?
16   A.    Very proud.
17   Q.    Did you remain, by the way, in the role that you
18   were hired?
19   A.    Initially?
20   Q.    Well, throughout her campaign.
21   A.    Yes.
22   Q.    For the time you worked with her?
23   A.    Yes.
24   Q.    So you always had that job?
25   A.    Yeah.  There was a brief period when the campaign
```

A000432

```
 1                    JOSHUA MORROW - DIRECT
 2   manager left, and a new person came on, and I sort of
 3   assumed the role of, like, everybody, and then they
 4   brought somebody in, in like July, I think it was.
 5   Q.    How long of a period were you everybody?
 6   A.    A month and a half.
 7   Q.    Okay.  And you indicated that she got elected in
 8   November of 2012; is that right?
 9   A.    That's correct.
10   Q.    Did you continue to work for her?
11   A.    I did not.  I was brought in at the beginning of
12   January, before she was sworn in, to handle some of
13   the press stuff that week before she was sworn in.
14   Q.    And so you worked with her the week before she
15   was sworn in, then did you continue after that?
16   A.    I did not.
17   Q.    After she was sworn in, did you remain in contact
18   with her?
19   A.    I did.
20   Q.    How would you describe your relationship with her
21   after she was sworn in as the Attorney General?
22   A.    More on a friendly term.
23   Q.    Okay.  Did you continue to communicate with her?
24   A.    I did.
25   Q.    And what would you communicate about?
```

JOSHUA MORROW - DIRECT

1

2  **A.**   Everything.  I mean, if there was a news story

3  that was relevant, we'd joke around, a lot of personal

4  stuff.

5  **Q.**   You shared personal stuff with her?

6  **A.**   Did I share personal stuff?  Not really.  Like

7  what I'm doing or what she was doing, nothing like

8  intimate details or anything like that.

9  **Q.**   Did you -- did she know what was going on in your

10  personal life, in other words, that you were engaged

11  and things like that?

12  **A.**   Yes.

13  **Q.**   Okay.  And how would you communicate with her?

14  **A.**   I would say usually text messaging, occasionally

15  phones, but usually text messaging.

16  **Q.**   Okay.  And this is while she's the Attorney

17  General?

18  **A.**   That is correct.

19  **Q.**   Okay.  In addition to communicating with her by

20  phone, did you see her?

21  **A.**   Occasionally, yes.  Like, if she would come to

22  Philadelphia, we would either have lunch or have a

23  beer.

24  **Q.**   So you continued to be friends with her after she

25  was elected?

1                    JOSHUA MORROW - DIRECT

2    **A.**    That is correct.

3    **Q.**    Now, you're here today to testify; is that right?

4    **A.**    That is correct.

5    **Q.**    You have testified about this before; is that

6    right?

7    **A.**    That is correct.

8    **Q.**    How many times?

9    **A.**    Well, three times before the grand jury, and one

10   time before the detectives.

11   **Q.**    Okay.  In court, three times?

12   **A.**    Yes.

13   **Q.**    Okay.  And you appeared before the grand jury,

14   when was the first time, do you remember?

15   **A.**    Yes, it was November 14th.

16   **Q.**    And prior to testifying before the grand jury on

17   November 14, did you speak with anybody?

18   **A.**    Yes.

19   **Q.**    Okay.  Did you have any discussions with anybody

20   regarding what the content of your testimony would be?

21   **A.**    Yes.

22   **Q.**    And who was that?

23   **A.**    Kathleen.

24   **Q.**    Okay.  And after you testified that first time --

25   first of all, when you testified that first time, did

1                    JOSHUA MORROW - DIRECT

2    you do so in person or did you appear before the grand

3    jury.

4    **A.**    I did not.  I was in South America, and so it was

5    done via phone.

6    **Q.**    So it was done over the phone?

7    **A.**    That's correct.

8    **Q.**    And when you talked about testifying with

9    Kathleen, did you discuss -- was it that you were

10   talking about truthful testimony that you were going

11   to give?

12   **A.**    No.

13   **Q.**    And what do you mean by that?

14   **A.**    I had met with Kathleen on -- in August of 2014,

15   we would have a conversation about -- she had told me

16   that there was a grand jury investigation into what

17   we're here today to talk about, the documents that

18   were leaked, and at that conversation, Kathleen and I

19   came up with a story that we were going to -- what I

20   was going to testify to and what she was going to

21   testify to.

22   **Q.**    And was it fair to say that that story that you

23   came up with was not true?

24   **A.**    That is correct.

25   **Q.**    And did you go in, when you first testified on

**A000436**

                      JOSHUA MORROW – DIRECT

1

2    November 14th of 2014 by phone, did you go in and tell

3    that story to the grand jury?

4    **A.**   I did.

5    **Q.**   Okay.  And then do you recall when you appeared

6    again before the grand jury?

7    **A.**   I did.  I do.  It was November 21st.

8    **Q.**   And, Mr. Morrow, was that in person?

9    **A.**   That was in person.

10   **Q.**   Okay.  Again, prior to that testimony, did you

11   communicate with the defendant?

12   **A.**   I did.

13   **Q.**   And did you communicate with the defendant after

14   that testimony?

15   **A.**   I believe I did.

16   **Q.**   And did you continue to tell that story to the

17   grand jurors?

18   **A.**   Yes.

19   **Q.**   And you then testified again in January of 2014;

20   is that right?  I'm sorry.  January of 2015?

21   **A.**   That is correct.

22   **Q.**   Okay.  And you said that the two of you came up

23   with a story about the testimony.  Did you continue to

24   tell that story in January of 2015?

25   **A.**   Yes.

1                    JOSHUA MORROW - DIRECT

2   **Q.**   And what, generally, was the gist of the story

3   that the two of you came up with?

4   **A.**   That Kathleen never saw the document, and that

5   Adrian is the one that told me about the documents.

6   **Q.**   I'm sorry.  I didn't hear the last part?

7   **A.**   I'm sorry.  Adrian King told me about the

8   documents.

9   **Q.**   And you had discussed that with her?

10  **A.**   Yes.

11  **Q.**   And, Mr. Morrow, at some point -- well, let's

12  talk about January of 2015.

13                    Again, you appeared before the

14  grand jury.  Was that in person?

15  **A.**   Yes.

16  **Q.**   Okay.  And did you continue with the story that

17  you just shared with the jurors during your testimony

18  in January of 2015?

19  **A.**   Not entirely.  Not in its entirety.

20  **Q.**   And what do you mean by that?

21  **A.**   Well, in my original grand jury statement, I said

22  that I had a lengthy conversation with Adrian King,

23  and that he walked me through the documents.

24  **Q.**   Was that true?

25  **A.**   That was not true.

1                    JOSHUA MORROW - DIRECT

2    **Q.**   And when you appeared before the grand jurors in

3    January of 2015, did you say that again?

4    **A.**   I did not.

5    **Q.**   And why was that?

6    **A.**   Because when they -- when the -- when I got the

7    next subpoena to testify on the 14th, the prosecutor

8    had my phone records, and he was culling through all

9    of -- like, friends to figure out who everyone was on

10   the list.

11                        I then got my own phone records,

12   and I looked, and I realized that my call with Adrian

13   King on the day of April 22nd was far less than what

14   it could have been, what I said it was.

15   **Q.**   In addition to looking at your phone records and

16   realizing that the records didn't support the story

17   that you two had come up with, did you also see that

18   there was a lot of communication in those records

19   between you and the defendant?

20   **A.**   I did.

21   **Q.**   And did that concern you?

22   **A.**   Yes.

23   **Q.**   Okay.  So in January of 2015, going before the

24   grand jurors, and you don't say the same thing about

25   Adrian King; is that right?

```
 1                    JOSHUA MORROW - DIRECT
 2   A.    That is correct.
 3   Q.    Do you continue to say the part that the
 4   defendant didn't know anything about it?
 5   A.    I plead the 5th.  I took my Constitutional right
 6   to the 5th Amendment.
 7   Q.    And why did you do that?
 8   A.    Because I was still trying to protect Kathleen,
 9   and I recognized that the lie was starting to unravel.
10   Q.    I'm sorry?
11   A.    The lie was starting to unravel.
12   Q.    So you took the 5th Amendment.  Were you held in
13   contempt?
14   A.    I was.
15   Q.    And you say that you were trying to protect
16   Kathleen.  Were you also trying to protect yourself?
17   A.    Yes.
18   Q.    What was your concern about what you had done?
19   You said the lie was starting to unravel?
20   A.    Well, that he had conspired to create the story
21   that wasn't true.
22   Q.    And so you realized that your phone records don't
23   support this; is that right?
24   A.    That is correct.
25   Q.    Okay.  And you take the 5th Amendment and you're
```

```
 1                  JOSHUA MORROW - DIRECT
 2   held in contempt?
 3   A.    That is correct.
 4   Q.    Okay.  You then -- I think you had indicated on
 5   direct examination, at some point, you met with the
 6   detectives?
 7   A.    That is correct.
 8   Q.    Prior to -- first of all, did you have an
 9   attorney?
10   A.    I did.
11   Q.    And prior to meeting with the detectives, did you
12   receive immunity?
13   A.    I did.
14   Q.    And in terms of the immunity, I think you had
15   said you were concerned because you two had concocted
16   this story that wasn't true?
17   A.    That is correct.
18   Q.    Were you concerned about being prosecuted for
19   that?
20   A.    Absolutely.
21                       THE COURT:  I see C-54 is
22   coming?
23                       MS. HENRY:  Yes, Your Honor.
24                       (Order of immunity marked
25   Commonwealth's Exhibit C-54, for identification.)
```

```
 1              JOSHUA MORROW - DIRECT
 2                   THE COURT:  All right.  C-54.
 3                   Showing it to counsel.
 4                   MS. HENRY:  Yes, Your Honor.
 5   I'm handing it to counsel.  Giving a copy to counsel.
 6                   May I approach, Your Honor?
 7                   THE COURT:  Yes.
 8   BY MS. HENRY
 9   Q.    Mr. Morrow, I'm showing you what has been marked
10   for identification as C-54.  Could you take a look at
11   that?  What is that, Mr. Morrow?
12   A.    The order of immunity.
13   Q.    Okay.  And who does it pertain to?
14   A.    Me.
15   Q.    And what's the date on it?
16   A.    January 10th, 2015.
17   Q.    Okay.  Now, Mr. Morrow, you got immunity on
18   January 10th of 2015, before you spoke with the
19   detectives; is that right?
20   A.    That is correct.
21   Q.    And then you met with them, and did you again say
22   the same story that you had told previously to the
23   grand jurors?
24   A.    No.
25   Q.    Were you completely forthcoming with them
```

                        JOSHUA MORROW - DIRECT

1

2   regarding all that you knew about this?

3   **A.**   No.

4   **Q.**   And when you say no, what do you mean by that?

5   **A.**   I did not -- I didn't tell them that we -- that

6   Kathleen and I met in August and came up with the

7   story.

8   **Q.**   And did you share with them all of the

9   communication that the two of you had had prior to

10  each time you testified?

11  **A.**   I don't believe so.

12  **Q.**   Okay.  Why was that?

13  **A.**   I guess I was still trying to protect Kathleen.

14  **Q.**   Is it hard for you to be here today, Mr. Morrow?

15  **A.**   Yes, it is.

16  **Q.**   Why?

17  **A.**   Because I said it was -- first of all, she was a

18  friend, and, second of all, you know, getting her

19  elected was very important, very proud of it.

20  **Q.**   You said that you continued to protect her, even

21  though you had immunity in June; is that right?

22  **A.**   That is correct.

23  **Q.**   And were you still trying to protect yourself?

24  **A.**   To some degree, yes.

25                          (Order of immunity marked

```
 1                  JOSHUA MORROW - DIRECT
 2   Commonwealth's Exhibit C-55, for identification.)
 3                       MS. HENRY:  Your Honor, I'm
 4   marking C-55, showing it to defense counsel and asking
 5   to approach?
 6                       THE COURT:  All right.
 7   Miss Henry, thank you.
 8                       MS. HENRY:  You're welcome.
 9                       May I approach, Your Honor?
10                       THE COURT:  Yes.
11   BY MS. HENRY
12   Q.    Now, Mr. Morrow, I'm showing you C-55.  Could you
13   take a look at that exhibit or what has been marked
14   for identification as an exhibit?  Do you recognize
15   that?
16   A.    I do.
17   Q.    And what is that?
18   A.    That is an immunity, order of immunity.
19   Q.    For who?
20   A.    For me.
21   Q.    And what's the date on that?
22   A.    November, November 10 -- August 10th.
23   Q.    August 10th, yesterday?
24   A.    That is correct.
25   Q.    And is that when you got that immunity order from
```

```
 1                    JOSHUA MORROW - DIRECT
 2   a judge?
 3   A.    Yes.
 4   Q.    Okay.  And you had indicated that you had
 5   immunity, you met with the detectives, and you were
 6   still trying to protect her; is that right?
 7   A.    That is correct.
 8   Q.    And you had an additional immunity order signed
 9   yesterday; is that right?
10   A.    Yes.
11   Q.    Okay.  And do you know why that was or was it on
12   the recommendation of counsel?
13                        MR. FARBER:  Objection.
14                        THE COURT:  Nature of the
15   objection?
16                        MR. FARBER:  Well, I don't have
17   an objection if it calls for firsthand knowledge, Your
18   Honor, but, otherwise, it's hearsay.
19                        THE COURT:  I think she asked,
20   did you know.
21                        MS. HENRY:  Yes, Your Honor.  I
22   can that rephrase.
23   BY MS. HENRY
24   Q.    Do you know why you got that second order?
25   A.    Yes.
```

```
 1                    JOSHUA MORROW - DIRECT
 2   Q.   Why was that?
 3   A.   Because to protect from prosecution for coming up
 4   with a cover story with Kathleen.
 5   Q.   And --
 6                        THE COURT:  Objection overruled.
 7                        MR. FARBER:  I didn't have an
 8   objection to that question.
 9                        MS. HENRY:  I apologize.
10                        THE COURT:  All right.  Go
11   ahead.
12   BY MS. HENRY
13   Q.   Now, Mr. Morrow, you met with the detectives in
14   preparation for your testimony; is that right?
15   A.   Yes.
16   Q.   Okay.  And it was only until fairly recently,
17   wasn't it, that you turned over some items to them?
18   A.   That is correct.
19   Q.   And do you know approximately when that occurred?
20   A.   I want to say it was maybe July 29th.
21   Q.   Of this year?
22   A.   I'm sorry.  Yes, of 2015 -- 2016.
23   Q.   And so that was done fairly recently; is that
24   right?
25   A.   Yes.
```

```
 1                    JOSHUA MORROW - DIRECT
 2   Q.   Okay.  And, Mr. Morrow, would it be fair to say
 3   that it was only recently that you shared with the
 4   detectives all that you knew about this?
 5   A.   Yes.  I mean, the burden of keeping this lie was
 6   becoming -- it was affecting me personally,
 7   relationships and professionally.  So I felt like now
 8   I have to be honest.
 9   Q.   And are you prepared to do that for this jury
10   today, Mr. Morrow?
11   A.   I am.
12   Q.   Mr. Morrow, let's start -- you indicated that you
13   communicated with the defendant after she had become
14   elected; is that right?
15   A.   That is correct.
16   Q.   And were you aware of an article that had come
17   out in the Philadelphia Inquirer on March 16th?
18   A.   Yes.
19   Q.   And did you read that?
20   A.   Yes.
21   Q.   And what was your reaction to that?
22   A.   Shocked.
23   Q.   And just for the members the jury, we have heard
24   a lot of testimony about it, but would you say it
25   was -- well, you describe it.  Was it favorable or
```

A000447

1                   JOSHUA MORROW - DIRECT

2    negative to the defendant?

3    **A.**    It was negative, very negative.

4    **Q.**    And what, generally, was the article about?

5    **A.**    The article was about a lobbyist, who -- let me

6    step back.  In 2009, Tyron Ali was arrested for

7    defrauding the state of $500,000.  He was then made or

8    was cooperating with the Attorney General's Office and

9    became a confidential informant.

10                             And the article was about how he

11   had given all of these state representatives money,

12   and caught them on tape, and this -- it was called a

13   sting, and Kathleen decided not to prosecute them.

14                             So the article was written about

15   why she didn't do this, when there was all of this

16   evidence against the state representatives.

17   **Q.**    And I think you had described it as negative.

18   Did you talk with the defendant about it?

19   **A.**    I don't know if I spoke with her that day, but

20   definitely talked to her about that story.

21   **Q.**    Now, you indicated that you had continued to

22   communicate with her after she had become Attorney

23   General.  Did your communication increase at all after

24   this article had come out?

25   **A.**    Yes.

1                    JOSHUA MORROW - DIRECT

2    **Q.**    And why was that?

3    **A.**    Well, for one, there was a section in the article

4    where, in 2009, I was working for DA Kennedy, and this

5    Tyron Ali came into our office, and also gave us

6    campaign contributions, for campaign contributions,

7    and he was then arrested for fraud, and as part of the

8    process, we looked to see if those contributions were

9    his or if he had what we call a straw donor, which is

10   where he gives someone money, and you write the check

11   in their name.

12                         It turned out that three of the

13   checks were straw contributions.  So then I -- through

14   my client at the time, we contacted the Attorney

15   General's Office, and I went with them.  I went to the

16   Norristown office, and we -- I was able to get two of

17   the guys on the phone to confess that the money was

18   not theirs.

19   **Q.**    Mr. Morrow, let me interrupt.

20   **A.**    Sure.

21   **Q.**    Just for clarity, when you got on the phone, and

22   you were able to get that, was that some kind of

23   recorded phone call with law enforcement?

24   **A.**    Yes, it was a recorded phone call with law

25   enforcement, and then throughout -- with Ali,

                    JOSHUA MORROW – DIRECT

1

2   throughout this whole process, at the last minute, he

3   made this accusation that he gave me $8,000 in cash at

4   the time, which was not true and --

5   **Q.**   Gave it to you?

6   **A.**   Well, I think what he said was a senior member of

7   the McCaffery campaign.

8   **Q.**   So it was to a campaign?

9   **A.**   Yes.

10  **Q.**   Okay.  And were you mentioned in the March 16th,

11  2014, article?

12  **A.**   I was.

13  **Q.**   And so was that concerning to you?

14  **A.**   Yes.

15  **Q.**   And was that part of this story that had come

16  out -- when you say the primary focus -- what would

17  you say the primary focus of that March 16th story

18  was?

19  **A.**   The primary focus was Kathleen, but the

20  prosecutor who got Ali to be an informant, a guy by

21  the name of Frank Fina, had -- I lost my train of

22  thought.

23  **Q.**   Well, let's talk about that.

24  **A.**   Sure.

25  **Q.**   So the person that had worked on that

**A000450**

1          JOSHUA MORROW – DIRECT

2    investigation was a prosecutor by the name of Frank

3    Fina; is that right?

4    **A.**   Yes, that's correct.

5    **Q.**   And he, obviously, was not in the Attorney

6    General's Office in March of 2014, when the article

7    came out?

8    **A.**   That's correct.

9    **Q.**   And so after the article came out, I think you

10   said that you had communication with the defendant.

11   What was her reaction regarding the article?

12   **A.**   It was she was pretty upset, and just to step

13   back, like, the reason that the article -- the sting

14   file was taken out of the Attorney General's Office

15   was because Frank Fina said that Kathleen had a

16   conflict, because I was mentioned in the story, and

17   because I worked for Kathleen.

18   **Q.**   And so that was also part of the story?

19   **A.**   Yes, they said that I was a conflict of interest

20   for her.

21   **Q.**   And in terms of that story coming out, and her

22   reaction, you said she was very upset about it?

23   **A.**   Yes.

24   **Q.**   Were you upset about it?

25   **A.**   Very much so.

**A000451**

1                    JOSHUA MORROW - DIRECT

2   **Q.**   And who did she hold responsible for that

3   article?

4   **A.**   Frank Fina.

5   **Q.**   And how did she feel about Frank Fina in terms of

6   after that article came out?

7   **A.**   I would say from the very beginning, back in

8   2013, I would say there was a lot of animosity.

9   **Q.**   And in terms of after the article came out, with

10  regard to Fina, had that increased?

11  **A.**   Yes.

12  **Q.**   And did she share that with you directly?

13  **A.**   Yes.  We both were very unhappy with Frank Fina.

14  **Q.**   So you also were?

15  **A.**   Yes.

16  **Q.**   All right.  And now you indicate -- were you

17  aware of a trip that the defendant took to Haiti?

18  **A.**   Yes.

19  **Q.**   Okay.  Prior to her going on that trip, did you

20  speak with her?

21  **A.**   Yes.

22  **Q.**   Okay.  When was that?

23  **A.**   It was the middle of April.  I don't remember the

24  exact date.  Maybe the 14th or 15th, but I had spoken

25  to her a lot.  There was a lot of communication before

A000452

```
 1                    JOSHUA MORROW - DIRECT

 2   that trip, but I remember she called me when she was

 3   at the airport.

 4                        MS. HENRY:  Okay.  Your Honor,

 5   if I may have a moment?

 6                        THE COURT:  All right.

 7   BY MS. HENRY

 8   Q.   And, Mr. Morrow, if you could state, for the

 9   record, your telephone number?

10   A.   215-531-1377.

11   Q.   And I hope that that was your number back -- I

12   should have been more clear -- back in April of 2014?

13   A.   Yes.

14   Q.   Okay.  So I'm going to show you an exhibit that's

15   been shared with the defense counsel, and it is a

16   information from C-14, which has already been

17   admitted.

18                        THE COURT:  All right.  C-14.

19                        It's being published to the jury

20   right now?

21                        MS. HENRY:  That's correct.

22                        THE COURT:  All right.

23   BY MS. HENRY

24   Q.   Now, again, looking at this exhibit, do you

25   indicate the number 215-531-1377; is that right?
```

```
 1                   JOSHUA MORROW - DIRECT
 2   A.   That is correct.
 3   Q.   Again, these are call detail records from your
 4   telephone; is that right?
 5   A.   Yes.
 6   Q.   Okay.  So I'm going to direct your attention to
 7   Sunday, April 13th, and, again, this is 2014, the
 8   5:15 p.m.; do you see that?
 9   A.   Yes.
10   Q.   Can you see this --
11   A.   Yes.
12   Q.   -- Mr. Morrow?
13                           Okay.  And, again, it notes that
14   there was a call placed at 5:15 p.m., and the number
15   that was called, can you see that number?
16   A.   Yes.
17   Q.   Do you recognize that number?
18   A.   That's Kathleen's number.
19   Q.   I'm sorry?
20   A.   That's Kathleen Kane's number.
21   Q.   Okay.  And the length of time for that phone
22   call?
23   A.   Fourteen minutes.
24   Q.   Okay.  And is that the call that you discussed
25   that she was at the airport, and you talked to her
```

**A000454**

```
 1                    JOSHUA MORROW - DIRECT

 2   while she was heading to Haiti?

 3   A.    I believe that's -- yes.

 4   Q.    Okay.  And so do you recall what you talked about

 5   at that time, on that particular day?

 6   A.    I don't.  I just remember her saying that because

 7   of the stuff that was going on in Harrisburg, that was

 8   probably the best place to be.

 9   Q.    Okay.  After that, when she returned from Haiti,

10   do you recall talking to her again in April?

11   A.    Yes.

12   Q.    Okay.  And do you recall when that would have

13   been?

14   A.    I mean, I'm sure there's text messages in between

15   that time, but, I mean, April 22nd I think is the next

16   time.

17                    MS. HENRY:  Your Honor, at this

18   time again, I'll called up an exhibit.

19                    THE COURT:  The exhibit --

20                    MS. HENRY:  Your Honor, this is

21   demonstrative exhibit from C-13, C-14, and I believe

22   it's C-50.

23                    THE COURT:  Okay.

24                    MS. HENRY:  And it's been shared

25   with defense counsel.
```

```
 1              JOSHUA MORROW - DIRECT
 2                   THE COURT:  Yes, it has.
 3    BY MS. HENRY
 4    Q.    Now, on April 22nd of 2014, which was a
 5    Tuesday -- let's just start.  Mr. Morrow, you
 6    indicated that you had communication with the
 7    defendant; is that right?
 8    A.    That is correct.
 9    Q.    And were there some other individuals that you
10    had communication with?
11    A.    On that day?
12    Q.    Yes.
13    A.    Yes.
14    Q.    So do you recall the time -- if we're looking at
15    an exhibit here, what time did you receive the first
16    call from the defendant?
17    A.    4:54.
18    Q.    Okay.  And is that p.m.?
19    A.    Yes.
20    Q.    Okay.  How long of a call was that?
21    A.    Eighteen seconds.
22    Q.    Do you recall, Mr. Morrow, if you spoke to the
23    defendant during that phone call?
24    A.    I don't think I did.
25    Q.    Okay.  Do you know if a message was left or --
```

                    JOSHUA MORROW - DIRECT

1

2   **A.**   I don't think so.   I think I was on another call,

3   and I saw it come in, and then I texted her saying,

4   give me minute.

5   **Q.**   Okay.   So we see that 4:58 p.m., there looks like

6   a text from you to the defendant that says "give me a

7   minute?"

8   **A.**   Uh-huh.

9   **Q.**   And that's from your actual phone?

10  **A.**   That is correct.

11  **Q.**   Okay.   And then did you call her back?

12  **A.**   I did.

13  **Q.**   And what time was that?

14  **A.**   5:03 p.m.

15  **Q.**   All right.   And how long of a call was that?

16  **A.**   A minute and 35 seconds.

17  **Q.**   Okay.   Now, Mr. Morrow, when you called her back

18  on that day, what did she say?

19  **A.**   She said that she wanted me to do her a favor, to

20  give Adrian King a call, he had some documents that

21  they wanted to get to a reporter.

22  **Q.**   Did she say anything else --

23  **A.**   Yes.

24  **Q.**   -- during that call?

25  **A.**   Yes, and then I asked her what it was that I was

1                    JOSHUA MORROW - DIRECT

2  getting, and she described a transcript from one of

3  agents to -- from one of her agents to another agent

4  about an investigation into Jerry Mondesire and into

5  his finances, and that Frank Fina was the -- did the

6  investigation, and that he then shut it down.

7  **Q.**   And what did you say in response to this request?

8  **A.**   I said, sure.

9  **Q.**   And had you, prior to this request where she's

10  asking you to get some documents regarding a case

11  Frank Fina had to a reporter, had you two commiserated

12  over the March 16th article?

13  **A.**   Yes.

14  **Q.**   Okay.  Had you discussed your negative feelings

15  about Frank Fina with each other?

16  **A.**   Yes, a lot.

17  **Q.**   I'm sorry?

18  **A.**   A lot.

19  **Q.**   So had this come as a surprise when she requested

20  this?

21  **A.**   Not at all.

22  **Q.**   And did you do what she asked?

23  **A.**   I did.

24  **Q.**   And what time did you call Mr. King?

25  **A.**   So I called -- I called Adrian, and he said he

**A000458**

1          JOSHUA MORROW - DIRECT

2   couldn't talk right now, then he called me back

3   7:46 p.m.

4   **Q.**   Okay.  So we see that 5:31 p.m., there's a one

5   second call.  Did you speak with him at 5:31, do you

6   know?

7   **A.**   I thought I did.  I thought he said, I can't

8   talk.

9   **Q.**   Okay.  And then you indicated he called you back

10  at 7:46; is that right?

11  **A.**   That is correct.

12  **Q.**   Okay.  Before we move into that, did you know

13  Adrian King?

14  **A.**   Not really.  I mean, I met him in, like,

15  September of 2012.

16  **Q.**   How did you meet him?

17  **A.**   On the campaign.

18  **Q.**   And so was it -- when you say the campaign, are

19  you talking about the defendant's campaign?

20  **A.**   Yes.

21  **Q.**   And was that the first time you had ever met him?

22  **A.**   I mean, our paths may have crossed earlier, but

23  that's the first time I remember actually meeting him

24  and talking with him.

25  **Q.**   And were you friends with him?

A000459

                    JOSHUA MORROW - DIRECT

1

2  **A.**   No.

3  **Q.**   And were you friends with him on April 22nd of

4  2014?

5  **A.**   No.

6  **Q.**   Have you ever been friends with him?

7  **A.**   No.

8  **Q.**   Okay.  But you knew at this time -- well, let me

9  ask you, what was Adrian King's position in the

10  Attorney General's Office at this time?

11  **A.**   He was the first deputy.

12  **Q.**   Okay.  And would it be fair to say that you were

13  much closer to the defendant than you were with Adrian

14  King?

15  **A.**   Yes.

16  **Q.**   And so you indicate that Adrian King did call you

17  back at 7:46 p.m.  Tell us about that conversation.

18  **A.**   So I -- when I talked to Adrian, I said that

19  Kathleen said that I should call because you have

20  some -- I said, Kathleen said I should call you

21  because you have documents you want to get to a

22  reporter, and then I described what she described to

23  me, that they involved documents involving Jerry

24  Mondesire and Frank Fina.

25  **Q.**   Okay.  You told him that?

```
 1                    JOSHUA MORROW - DIRECT
 2   A.   Yes.  And he acknowledged that that's what I was
 3   picking up.
 4   Q.   Okay.  And in terms of that, Mr. Morrow, what
 5   else did you discuss about these documents?
 6   A.   He said that he wanted me to pick it up this
 7   evening -- that evening, excuse me, because he was
 8   going out of town.
 9                    And I said that I couldn't pick
10   them up that evening, and I suggested, why don't you
11   just leave them between the screen door and the -- the
12   storm door and the front door, and I'd pick them up in
13   the morning, and then he was going to give me his
14   address, but I was driving, so I just asked him to
15   text me his address.
16   Q.   Mr. Morrow, did he indicate why he wasn't going
17   to be home, if you recall?
18   A.   Yes, he was traveling the next day.  He was
19   flying -- he was leaving early in the morning.
20   Q.   Okay.  Now, Mr. Morrow, you get this request from
21   the defendant, and then you call Mr. King.  How are
22   you feeling about -- you said that, you know, you
23   would, and you did call Mr. King.  How were you
24   feeling about this request?
25   A.   I mean, I didn't think one way or the other.
```

                    JOSHUA MORROW - DIRECT

1

2  **Q.**   Okay.  In terms of picking up these documents and

3  getting them to a reporter, did you have another

4  conversation with anybody else?

5  **A.**   I did.

6  **Q.**   And who was that?

7  **A.**   John Lisko.

8  **Q.**   And who is John Lisko?

9  **A.**   He's a friend.

10  **Q.**   And how long have you known him?

11  **A.**   Since 2007.

12  **Q.**   And when you say he's a friend, can you describe

13  that for us?

14  **A.**   He works in politics, like I do.  So we worked on

15  campaigns together.  We're just friends.

16  **Q.**   And would you talk often with him?

17  **A.**   Yes.

18  **Q.**   And when you called him on this particular --

19  particular day, at 9 o'clock, what was the purpose of

20  the call?

21  **A.**   One is I told him about the conversation I had

22  with Kathleen and Adrian.

23  **Q.**   And why were you calling to share that?

24  **A.**   I just called him just to talk about it.

25  **Q.**   Okay.  And the length of that call was 18 minutes

```
 1                    JOSHUA MORROW - DIRECT

 2   and 54 seconds; is that right?

 3   A.    Yes.

 4   Q.    Okay.  And you talked about a variety of topics?

 5   A.    We did.

 6   Q.    Okay.  And you have since actually listened to

 7   that phone call, have you not?

 8   A.    I have.

 9                         (Audio recording marked

10   Commonwealth's Exhibit C-56, for identification.)

11                         THE COURT:  Anticipating an

12   exhibit coming, it would be C-56?

13                         MS. HENRY:  It is C-56, and

14   defense counsel has been provided this prior to today,

15   but I'll hand it to them again.

16                         THE COURT:  All right.

17                         MS. HENRY:  You're welcome.

18                         THE COURT:  Thank you.

19   BY MS. HENRY

20   Q.    Now, Mr. Morrow, you've indicated that you've

21   listened to that phone call; is that right?

22   A.    That is correct.

23   Q.    Okay.  It's been played to you, and do you

24   recognize the voices that are contained on that phone

25   call?
```

```
 1                    JOSHUA MORROW – DIRECT
 2   A.    I do.
 3   Q.    And who are they?
 4   A.    Mine and John Lisko's.
 5   Q.    It is fair to say that you've talked to Mr. Lisko
 6   many times, and that's how you were able to recognize
 7   his voice?
 8   A.    Yes.
 9   Q.    Now, when this phone call was made on April 22nd,
10   did you have any idea that it was being recorded?
11   A.    I did not.
12   Q.    And do you know who recorded it?
13   A.    Yes.
14   Q.    Who is that?
15   A.    The FBI.
16   Q.    Was that regarding, you've come to learn, about
17   an unrelated matter?
18   A.    Yes.
19                    MS. HENRY:  Your Honor, at this
20   time, there's a stipulation, and I apologize.  I don't
21   know what number it is.
22                    THE COURT:  Okay.
23                    MR. STEELE:  Six.
24                    THE COURT:  Let me see if I can
25   help you with that.
```

```
 1                  JOSHUA MORROW - DIRECT
 2                  MS. HENRY:  I think it's six,
 3   Your Honor, I've been advised.
 4                  THE COURT:  It looks like six.
 5                  MR. ROSENBLUM:  Six.
 6                  THE COURT:  Six.
 7                  MS. HENRY:  Your Honor, if I may
 8   read it into the record?
 9                  THE COURT:  Yes.  Let me just
10   remind the members of the jury about a stipulation.
11                  A stipulation is something
12   basically that the lawyers agree to, that a stipulated
13   fact is not contested at this point.
14                  All right.  That's a stipulation
15   that's being offered for your consideration.
16   BY MS. HENRY
17   Q.   And just to be clear, before I read the
18   stipulation, I'd ask you, Mr. Morrow, I said it was
19   regarding an unrelated matter, that was an unrelated
20   matter for Mr. Lisko; is that right?
21   A.   That's correct.
22   Q.   And you just happened to --
23   A.   Yeah.
24   Q.   -- be on the phone with him?
25   A.   That's correct.
```

```
 1                    JOSHUA MORROW - DIRECT

 2                    MS. HENRY:  Your Honor, at this

 3    time, the stipulation is as follows:  If the called to

 4    testify, Christopher M. Bean, a special agent with the

 5    Federal Bureau of Investigation, FBI, would testify

 6    that the FBI intercepted and recorded a telephone call

 7    on April 22nd, 2014, from telephone

 8    number 215-858-0030.

 9                            This telephone number belonged

10    to John D. Lisko.  The original recording was properly

11    sealed, pursuant to 18 USC, Section 25188(a), and is

12    still maintained and possessed by the FBI at their

13    field office in Philadelphia, Pennsylvania.

14                            A copy of the original

15    recording, which is marked as Exhibit C-56, is

16    accurate and authentic.  The transcript of this

17    recording, which is to be marked as C-57, is a fair

18    and accurate transcription of the recording.

19                            At this time, Your Honor, I will

20    mark those transcripts.  They have been shared with

21    defense counsel.

22                    THE COURT:  All right.  With the

23    Court's permission, you may mark those exhibits.

24                    MS. HENRY:  Thank you.

25                            (Transcript of audio recording
```

```
 1                 JOSHUA MORROW - DIRECT

 2    marked Commonwealth's Exhibit C-57, for

 3    identification.)

 4                        MS. HENRY:  Your Honor, at this

 5    time I move for the admission of C-56 and C-57, and

 6    request permission to share the transcripts with the

 7    members the jury?

 8                        MR. FARBER:  Your Honor, could I

 9    just consult with Miss Henry for one moment?

10                        THE COURT:  Yes.

11                            - - -

12                        (Discussion off the record.)

13                            - - -

14                        MR. FARBER:  Your Honor, with

15    respect to the tape, I just have a previous objection.

16                        THE COURT:  Understood.

17                        MR. FARBER:  Okay.

18                        THE COURT:  And you've noted

19    that on the record.

20                        MR. FARBER:  Thank you.

21                        With respect to the transcript,

22    I have no objection to it being shown to the jury and

23    used as an aide, but I'd request an instruction on the

24    proper use of it, that itself not be admitted into

25    evidence.
```

```
 1                    JOSHUA MORROW - DIRECT
 2                    THE COURT:  All right.  Do you
 3   want me to do that before they hear the tape?
 4                    MR. FARBER:  Yes, Your Honor.
 5                    THE COURT:  All right.  So,
 6   members of the jury, first of all, I'm going to allow
 7   the admission of 56 and 57, which is the CD, the
 8   actual audio, and 57 which is the transcription, which
 9   I'm going to permit the DA to give to you as an aide
10   in your listening to the audio.
11                    What is in the transcript is
12   a -- that's exactly what it is, a transcription by
13   a -- what appears to be a detective or detectives.
14                    Ultimately, it is your
15   assessment and your decision of what's being said.
16   The transcription should be used by you only as an
17   aide.  If there's something inconsistent that any one
18   of you believe, and, ultimately, you will be able to
19   deliberate about this, if it becomes an issue, that if
20   you believe is different than the transcription, then
21   it's, again, your assessment of what you hear that
22   controls, and it's your recollection of what is said
23   that controls.  This is simply, again, to be used by
24   you as an aide.
25                    All right.
```

```
 1                    JOSHUA MORROW - DIRECT

 2                         (Commonwealth's Exhibit C-56 and

 3   C-57, received in evidence.)

 4                         MR. FARBER:  Thank you, Your

 5   Honor.

 6                         MS. HENRY:  Your Honor, I ask

 7   permission to have them distributed to the jury.

 8                         THE COURT:  All right.  I'll

 9   allow you to do that.

10                         MS. HENRY:  Thank you.

11                         THE COURT:  Crier Saville is

12   distributing the transcripts.

13                         MS. HENRY:  Thank you, Your

14   Honor.

15                         THE COURT:  Hold on, members of

16   the jury.  Please don't read it yet.  Keep it in your

17   laps.  Wait for the audio.

18                         Okay.  Thank you.

19                         MR. STEELE:  I think there's a

20   question.

21                         MS. HENRY:  Your Honor, I

22   believe there's a question.

23                         THE COURT:  I think so.

24                         JUROR:  Are we allowed to write

25   on them?
```

```
 1                    JOSHUA MORROW - DIRECT
 2                    THE COURT:  No, do not write on
 3   the transcription.  If you want to make notes, just
 4   write in your notebooks.  Okay.  You got your books
 5   there.  I see you all are able to access them, if you
 6   want.  So just utilize your notebooks to document
 7   whatever notations you want to make, but not on the
 8   transcription.
 9                    MS. HENRY:  Your Honor, I
10   believe we have provided the Court with a copy.  Would
11   you like an additional one?
12                    THE COURT:  No, thank you.
13                    MS. HENRY:  Your Honor, at this
14   time, I'd request permission to play the audiotape.
15                    THE COURT:  You may.
16                    MS. HENRY:  Thank you.
17                    (Audio recording of
18   Commonwealth's Exhibit C-56 played in open court.)
19   BY MS. HENRY
20   Q.   Mr. Morrow, let's talk a little bit about what we
21   just heard.
22                    First of all, you indicated you
23   called Mr. Lisko.  Were you seeking some advice from
24   him?
25   A.   Yes.
```

```
 1                JOSHUA MORROW - DIRECT
 2   Q.   And what was that?
 3   A.   Whether or not I should do this.
 4   Q.   Okay.  And you seem to express some reservations
 5   in this phone call about this plan.  Can you describe
 6   what was going on and what you were thinking?
 7   A.   Well, like, I just felt that, like, like I said
 8   in the call, there needed to be some overall strategy
 9   to why we're doing this.  I mean, I understood why
10   we're doing it, but, like, if we're going to do it, we
11   should do it right, and this clearly backfired.
12   Q.   And what was the -- when you say I understood why
13   we're doing it, what do you mean by that?
14   A.   Because I knew that they had an interest in
15   making sure -- in getting negative information out
16   about Frank Fina.
17   Q.   And you reference in here, just to be clear,
18   something about the fact that I'm like a mere
19   acquaintance.  What were you talking about there?
20   A.   Well, in that March of 2014 article, when they
21   said I was a conflict for Kathleen, she referred to me
22   as a mere acquaintance versus just owning the fact
23   that we were friends, and it kind of pissed me off.
24   Q.   Okay.  And did you think that -- in addition to
25   upsetting you, did you think that you then having
```

```
 1                 JOSHUA MORROW - DIRECT
 2   these documents and giving them to a reporter could be
 3   a problem?
 4   A.    Yes.
 5   Q.    Why was that?
 6   A.    Well, because it would beg the question, like, if
 7   I'm actually doing this, we're talking, when she made
 8   it clear we are just mere acquaintances.
 9   Q.    Had you ever, since she had become Attorney
10   General, delivered documents in this fashion before
11   for her?
12   A.    No.
13   Q.    Had you ever -- were you acting at all as her
14   press officer or press secretary, once she became
15   Attorney General?
16   A.    No.
17   Q.    Were you issuing media statements, getting things
18   out in the press for her?
19   A.    Not in an official capacity.
20   Q.    Okay.  Was this the first time ever she asked
21   you, since she had become the Attorney General, to do
22   something like this?
23   A.    To give documents to a reporter?  Yes.
24   Q.    Okay.  And you had indicated that, again, there
25   was no cohesive strategy and she was unhinged.  What
```

A000472

```
1                JOSHUA MORROW - DIRECT
2   did you mean by that?
3   A.    I think she was just hell bent on getting back at
4   Frank Fina, and so there was just a lot of, like,
5   scatter shot versus trying to -- you know, like the
6   way you do a communications strategy is, like, you
7   have a plan, and I felt like there was not a plan.
8   This was just, let's find this, let's get this out,
9   let's find this, let's get that out.
10  Q.    And I think you used the phrase, throw everything
11  up against the wall?
12  A.    That is correct.
13  Q.    Is that how it felt to you?
14  A.    Yes.
15  Q.    So if I -- it seems to me, Mr. Morrow, what
16  you're saying is you were not concerned with the
17  leaking of documents, but more that it wasn't put
18  together tight enough?
19  A.    Yes.
20  Q.    Now, this phone call -- first of all, is it fair
21  to say that this call occurred before you picked up
22  any documents?
23  A.    I'm sorry?
24  Q.    This call, this call that we just listened to,
25  that occurred before you picked up any of these
```

<pre>
 1                    JOSHUA MORROW - DIRECT

 2   documents; is that fair to say?

 3   A.    That is correct.

 4   Q.    And you had not seen the documents the defendant

 5   had asked you to get; is that right?

 6   A.    That is correct.

 7   Q.    And you reference them in this conversation, in

 8   the beginning, when you tell your friend, Mr. Lisko,

 9   what's going on, you note that Kathleen called you

10   today, right?

11   A.    That is correct.

12   Q.    All right.  And she -- about, like, Frank Fina

13   killing a Jerry Mondesire investigation, how did you

14   get that information?

15   A.    Because Kathleen referenced it in the transcript

16   that she told me was in the package.

17   Q.    Okay.  So she told you that on the phone call; is

18   that right?

19   A.    That is correct.

20   Q.    Okay.  And you had no idea whatsoever that your

21   call was being recorded; is that right?

22   A.    None.

23   Q.    That was just you seeking advice from your

24   friend?

25   A.    That's correct.
</pre>

```
 1                    JOSHUA MORROW - DIRECT
 2   Q.   Did you follow that advice?
 3   A.   I did not.
 4   Q.   So now let's move -- first of all, I think you
 5   had indicated, when we were talking about the
 6   different phone calls, communications you had that
 7   day, that you indicated that you spoke with Mr. King;
 8   is that right?
 9   A.   Yes.
10   Q.   And he had said that he was going to leave these
11   documents at his front door; is that right?
12   A.   Yes.
13   Q.   Now, did he, in fact, reach out to you and let
14   you know -- had you ever been to his house?
15   A.   I had not.
16   Q.   Did he then reach out to you again?
17   A.   Yeah, he sent me a text message, his address,
18   like 12:30 the next morning.
19                    MS. HENRY:  Your Honor, I'd ask
20   permission again -- it's been shared with defense --
21   to publish the exhibit from C-13.
22                    THE COURT:  All right.  C-13,
23   let's publish that for the jury.
24                    MS. HENRY:  Thank you.
25
```

```
 1                    JOSHUA MORROW - DIRECT
 2   BY MS. HENRY
 3   Q.    Again, I'm going to direct your attention.  Once
 4   again, this exhibit we're looking at is from your cell
 5   phone records.  Directing your attention to Wednesday,
 6   April 23rd, at 12:39 a.m., you received a text from --
 7   do you recognize the number?
 8   A.    I do.
 9   Q.    And whose number is that?
10   A.    That's Adrian King's.
11   Q.    Okay.  It comes as a text message; is that right?
12   A.    That is correct.
13   Q.    Do you recall what the content of that text
14   message was?
15   A.    It was just his address.
16   Q.    Okay.  And so, really, you talked to him on
17   April 22nd, but he gets it to you sort of in the -- I
18   would call it the night or early morning of
19   April 23rd?
20   A.    That's correct.
21   Q.    So now let's move to that next day -- well, let's
22   stay on Wednesday, April 23rd.  In the morning, what
23   do you do?
24   A.    I go -- about 10 o'clock in the morning, I went
25   to Adrian's house to pick up the documents.
```

```
 1                    JOSHUA MORROW - DIRECT

 2   Q.   And where does Mr. King live?

 3   A.   Chestnut Hill.

 4   Q.   And when you went there, what did you do?

 5   A.   He left them between the screen door and the

 6   front door.  I picked them up, got in my car and drove

 7   back.

 8   Q.   Did you see anybody?

 9   A.   I did not.

10   Q.   Did you talk to anybody?

11   A.   I did not.  I didn't knock on the door.  I just

12   saw the envelope, picked it up and opened it, and it

13   had name on it inside and then kept going.

14                         THE COURT:  Keep your voice up.

15                         THE WITNESS:  I'm sorry.  Yes,

16   ma'am.

17   BY MS. HENRY

18   Q.   Now, you indicated that you picked up an

19   envelope.  Did you look at it right there, Mr. Morrow?

20   A.   I did not.

21   Q.   Okay.  What did you do?

22   A.   I mean, I just looked inside to see if it was for

23   me, and it was, and I just got in my car, and I read

24   it back in my office.

25   Q.   And what type of envelope was it?
```

A000477

```
 1                  JOSHUA MORROW - DIRECT
 2   A.   It was like a yellow envelope, about that big
 3   with, like, a metal clasp on the back.
 4                    MS. HENRY:  Your Honor, may I
 5   approach to show C-45 to the witness?
 6                    THE COURT:  Yes.
 7   BY MS. HENRY
 8   Q.   Mr. Morrow, you just described an envelope.  Does
 9   C-45 -- is that what you were describing, essentially?
10   A.   Yes.
11   Q.   Was it that size of an envelope?
12   A.   Probably, yes.
13   Q.   Okay.  And was anything written on the outside?
14   A.   No.
15   Q.   Okay.  And I think you had testified that you
16   opened it up to see what was in it; is that right?
17   A.   Yes.
18   Q.   Okay.  And describe for us what was there.
19   A.   So inside of the envelope was, like, a file
20   folder that my name printed on it, like, in
21   handwriting, and then inside was a blue -- like a blue
22   back binder with a clear front that had the
23   transcript, and then behind that were the other
24   documents.  There was -- I think there was two e-mails
25   and one memorandum.
```

```
1                      JOSHUA MORROW - DIRECT
2                      MS. HENRY:  Your Honor, may I
3    approach?  I'm showing the witness what has been
4    marked for identification as C-46, and also what has
5    been admitted, C-39.
6                      THE COURT:  Yes.
7    BY MS. HENRY
8    Q.   If you could look at C-46, Mr. Morrow, that,
9    obviously, is not the envelope -- that is not the file
10   folder.  Is that similar to it?
11   A.   Yes.
12   Q.   Okay.
13   A.   Then my name printed across here.
14   Q.   And then I think you have C-39.  If you could
15   look at the number the back?  I'm sorry?
16   A.   Yes, 39.
17   Q.   Okay.  Is that similar to what the transcript was
18   in?
19   A.   Yes.
20                     MS. HENRY:  Your Honor, at this
21   point, I'd move for the admission of C-56.
22                     THE COURT:  C-56 is the CD.
23   C-57 is the transcription.
24                     MS. HENRY:  C-58.  Sorry.
25                     THE COURT:  That's all right.
```

```
 1                JOSHUA MORROW - DIRECT

 2   Just to clarify, C-58 is what?

 3                    MS. HENRY:  C-58 is an

 4   envelope -- a file folder.

 5                    THE COURT:  All right.  Any

 6   objection?

 7                    MR. FARBER:  Can I consult with

 8   Miss Henry?

 9                    THE COURT:  Yes.

10                    MR. FARBER:  I'm having trouble

11   keeping track.

12                    MS. HENRY:  Probably because of

13   me.

14                         -  -  -

15                    (Discussion off the record.)

16                         -  -  -

17                    THE COURT:  So are you moving

18   for its admission?

19                    MS. HENRY:  Yes, Your Honor, and

20   it may be mis-numbered, but it would be C-58.

21                    THE COURT:  Any objection?

22                    MR. FARBER:  I have no objection

23   to the file folder, Your Honor.

24                    THE COURT:  C-58 is admitted.

25                    (File folder marked
```

```
 1                  JOSHUA MORROW - DIRECT
 2   Commonwealth's Exhibit C-58, for identification, and
 3   received in evidence.)
 4                  MS. HENRY:  Thank you.
 5   BY MS. HENRY
 6   Q.   Now, you indicated that when you first picked it
 7   up, you just checked to make sure it was for you, and
 8   you saw your name; is that right?
 9   A.   That's correct.
10   Q.   Okay.  And did you take the documents out at that
11   time or what did you do?
12   A.   I did not.
13   Q.   Okay.  When did you or when did you look at them?
14   A.   Later that day.
15   Q.   Where did you look at them?
16   A.   At my office.
17   Q.   Okay.  Do you know how long that was?
18   A.   A couple of hours.
19   Q.   Okay.  A couple of hours?
20   A.   Uh-huh.
21   Q.   Okay.  When you were in your office, and you
22   looked at them, did you read them?
23   A.   I did.
24   Q.   In their entirety?
25   A.   Yes.
```

```
 1                 JOSHUA MORROW - DIRECT

 2   Q.   Now, you indicated that you had -- it contained

 3   two e-mails, a transcript and a memo; is that right?

 4   A.   That's correct.

 5                   MS. HENRY:  Your Honor, I'd ask

 6   to approach with C-4 and C-6.

 7                   THE COURT:  All right.

 8   BY MS. HENRY

 9   Q.   Okay.  If you could look at these two documents,

10   Mr. Morrow, I'll ask you if you recognize those?

11   A.   Yes.

12   Q.   And can you tell the members of the jury what

13   they are?

14   A.   One is the transcript between two agents in the

15   Attorney General's Office, and the other is a memo

16   from Bill Davis in the Attorney General's Office to

17   Frank Fina.

18   Q.   And were those the documents that were in that

19   envelope?

20   A.   Along with the e-mails, yes.

21                   MS. HENRY:  Your Honor, I'd ask

22   to approach with C-7 and C-9.

23                   THE COURT:  All right.

24   BY MS. HENRY

25   Q.   Mr. Morrow, I'll ask if you will look at those
```

```
 1                    JOSHUA MORROW - DIRECT
 2   two e-mails?  Do you recognize those?
 3   A.    Yes.
 4   Q.    Okay.  And what are those?
 5   A.    They are the e-mails that were in the package.
 6   Q.    And were -- did they appear that way?
 7   A.    They did not.
 8   Q.    And I'm going to show you now C-8 and C-10, if
 9   you could just a take a look at these two documents?
10   Again, handing you two e-mails, do you recognize
11   those?
12   A.    Yes.
13   Q.    And what are those?
14   A.    The same e-mails, un-redacted.
15   Q.    When you say un-redacted, are those the ones I
16   just handed you, the un-redacted ones, the way they
17   appeared when you opened the envelope?
18   A.    Yes.
19   Q.    Okay.  And we'll talk about how they became
20   redacted, but is it fair to say that everything that
21   you received was not redacted?
22   A.    That's correct.
23   Q.    Okay.  And just to go back, in terms of picking
24   up these documents, you got them on April 23rd; is
25   that right?
```

```
 1                  JOSHUA MORROW – DIRECT

 2   A.    Yes.

 3   Q.    Okay.  And you read them on April 23rd?

 4   A.    Yes.

 5   Q.    Okay.  After you got them and read them, did you

 6   communicate with anybody?

 7   A.    I did.

 8   Q.    And who was that?

 9   A.    Kathleen.

10   Q.    How did you do that?

11   A.    I sent her a text message, later in the evening.

12                      THE COURT:  Keep your voice up

13   sir.

14                      THE WITNESS:  I'm sorry.

15                      Later in the evening, I sent her

16   a text message.

17                      MS. HENRY:  Your Honor, at this

18   time, I'd request permission to show an exhibit again,

19   exhibits that have already been admitted.

20                      THE COURT:  All right.  Before

21   you do, let me just see counsel briefly at side bar.

22                           -  -  -

23                      (A conference was held at side

24   bar, not reported.)

25                           -  -  -
```

```
 1              JOSHUA MORROW - DIRECT

 2                   THE COURT:  All right.  So,

 3   clearly, you're seeing how this works, I go to talk to

 4   the lawyers.  It's just the natural progression of

 5   events.

 6                   What we're going to do is stop

 7   right now.  I know it's in the middle of direct

 8   examination of this witness.  It wouldn't be my

 9   preference, but the witness, I anticipate from

10   speaking to the lawyers, may be up here for quite some

11   time.

12                   So we're going to break for

13   lunch until 1:15, and we'll come back and proceed with

14   the witness on direct, and then open it up for

15   cross-examination.

16                   So here we are again at this

17   point.  I'm going to release you for lunch.  I'm going

18   to warn you again not to have any conversation with

19   each other about the matters involved in this case and

20   in this trial, not to receive any information from any

21   outside sources, whether it's written, spoken,

22   electronic, video, audio, any kind of information at

23   all in terms of outside influences, to which I've

24   referenced earlier in the trial from the very get-go,

25   I am ordering you to ignore completely.
```

```
 1                    JOSHUA MORROW - DIRECT
 2                         Your only information should
 3   come from this courtroom, from this witness stand and
 4   arguments of counsel and, ultimately, instructions
 5   from me, which will come at the conclusion of the
 6   case.
 7                         So with that as your admonition,
 8   I wish you a pleasant lunch.  If you want to go
 9   outside, good luck with that.  It is stifling out
10   there.  Otherwise, we are going to keep it cool in the
11   courthouse, hopefully, and we'll see you back here at
12   1:15.
13                         All right.  Everybody remain
14   seated until the jury leaves the room.
15                         (The jury left the courtroom.)
16                              - - -
17                    THE COURT:  Court staff, I'm
18   going to request to collect the transcriptions, if
19   there are any left in the jury box.  Some of the
20   jurors handed them in, some of them left them at their
21   seats.  So I'm going to order they be collected and
22   returned to the DA.  They were just copies that were
23   given to the jurors.
24                         Any objection to that?
25                    MR. SHARGEL:  No.
```

```
 1                   JOSHUA MORROW - DIRECT

 2                        MS. HENRY:  No, Your Honor.

 3                        THE COURT:  With that, anything

 4   the lawyers want to say?

 5                        MS. HENRY:  May Mr. Morrow step

 6   down?

 7                        THE COURT:  I'll talk to him in

 8   a second.

 9                        Anything the lawyers want to say

10   right now before our lunch?

11                        MR. FARBER:  Not from us, Your

12   Honor.

13                        MS. HENRY:  No, Your Honor.

14                        THE COURT:  So, Mr. Morrow, you

15   are currently under oath.  You are not to talk to

16   anybody about your testimony.  You are under a

17   sequestration order, and that goes for the time that

18   you're testifying, in the middle of testimony and

19   after.

20                        Do you understand, sir?

21                        THE WITNESS:  Yes.

22                        THE COURT:  All right.  We'll

23   see everybody back here at 1:15.

24                        MR. FARBER:  Thank you, Your

25   Honor.
```

1                    JOSHUA MORROW - DIRECT

2                         (At 12:25 p.m., proceedings were

3    adjourned.)

4                              - - -

5                         (The remaining proceedings are

6    herein omitted.)

7                              - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A000488

IN THE COURT OF COMMON PLEAS

IN AND FOR THE COUNTY OF MONTGOMERY, PENNSYLVANIA

CRIMINAL DIVISION

−  −  −

```
COMMONWEALTH OF PENNSYLVANIA:
                                :
          vs.             :  NO.  6239−2015
                          :  NO.  8423−2015
                                :
KATHLEEN GRANAHAN KANE         :
```

−  −  −

Trial by Jury

−  −  −

Tuesday, August 11, 2016
Commencing at 1:24 p.m.

−  −  −

Odalys Cummins, CSR
Official Court Reporter

−  −  −

Courtroom A
Montgomery County Courthouse
Norristown, PA 19401

−  −  −

BEFORE:  THE HONORABLE WENDY DEMCHICK−ALLOY, JUDGE

−  −  −

A000489

JOSHUA MORROW – DIRECT

1  mike a little bit.

2                      THE WITNESS:  Okay.

3  BY MS. HENRY:

4  Q    So you got the documents on April 23rd and you

5  didn't immediately contact the reporter; is that fair

6  to say?

7  A    Yeah, I did not contact the reporter.

8  Q    Do you recall when you reached out to the

9  reporter?

10 A    I believe it was early May or it could have been

11 like the end of April early May.

12 Q    And who did you contact?

13 A    Chris Brennan.

14 Q    And who is Chris Brennan?

15 A    He's a reporter.  At the time he was with the

16 Daily News.  He's now with the Inquirer.

17 Q    And why did you pick Chris Brennan?

18 A    He's a reporter that I have known for a number of

19 years and someone I have often been a source for.

20 Q    And you had indicated, I think, that the defendant

21 had asked you to get a friendly reporter.  Would you

22 consider Chris Brennan a friendly reporter?

23 A    Yes, considering Kathleen was at war with the

24 Inquirer.  It was sort of a Philadelphia-centric story.

25 There wasn't a whole lot of other outlets.

JOSHUA MORROW – DIRECT

1   Q    So you picked the Philadelphia Daily News over the

2   Philadelphia Inquirer; is that right?

3   A    That's correct.

4   Q    And then specifically Chris Brennan?

5   A    Correct.

6                    MS. HENRY:  Your Honor, at this

7   time I move for the admission of C-63, which is an

8   exhibit.  Again, it's containing information that has

9   already been admitted.  It's been shared with the

10  defense.  I request permission to publish it and move

11  it into admission.

12                   THE COURT:  Any objection?

13                   MR. FARBER:  No objection.

14                   THE COURT:  It's admitted.  And

15  I will allow you to publish it to the jury.

16                   MS. HENRY:  Thank you, Your

17  Honor.

18                   (Commonwealth's Exhibit C-63

19  received in evidence.)

20  BY MS. HENRY:

21  Q    So again, Mr. Morrow, you indicated that you had

22  reached out to Chris Brennan.  Had you, prior -- well,

23  how did you reach him?

24  A    I probably called him the week before to tell him

25  what I had and if he was interested in the documents.

**A000491**

JOSHUA MORROW – DIRECT

1   Q    And we see –– we're looking at telephone records

2   of yours from Sunday, April –– sorry, May 4th, and in

3   particular I will direct your attention to where the

4   giant red arrows are, 3:48 p.m.  There is a telephone

5   number there, 215-854-5973.  Whose number is that?

6   A    That's Chris Brennan's office number.

7   Q    And is that where you contacted him?

8   A    I did not.

9   Q    Do you recall calling him?

10  A    Yes.

11  Q    And did you reach him?

12  A    I did.

13  Q    Okay.  After you made contact with him, do you

14  recall what you shared with him?

15  A    I gave him the documents.

16  Q    And how did that happen?

17  A    I met him at his house in South Philly.

18  Q    And was that on May 4th?

19  A    Yes.

20  Q    And that was a Sunday?

21  A    Yes.

22  Q    And had you made arrangements for you to go there?

23  A    Yes.

24  Q    And do you recall approximately what time you

25  went?

JOSHUA MORROW – DIRECT

1  A    Around 4:30.  I remember he was watching the

2  Phillies game, so it was probably a 1:00 game so it was

3  probably like 4:30.

4                         THE COURT:  Mr. Brennan was

5  watching the Phillies game?

6                         THE WITNESS:  Yes.

7                         THE COURT:  All right.  Go

8  ahead.

9                         MS. HENRY:  Thank you, Your

10  Honor.

11  BY MS. HENRY:

12  Q    Mr. Morrow, I am going to hand you some exhibits.

13                         MS. HENRY:  If I may approach,

14  Your Honor?

15                         THE COURT:  Yes.

16  BY MS. HENRY:

17  Q    C-5, C-3, C-9, and C-7.  And I will ask you to

18  start with C-7 and C-9.  Do you recognize those

19  documents?

20  A    I do.

21  Q    And what are those?

22  A    They are two e-mails from --

23  Q    I'm sorry.

24  A    I was going to say one of them appears to be Frank

25  Fina.

JOSHUA MORROW – DIRECT

1   Q    Could you keep your voice up.  I'm sorry.  The

2   first e-mail, who is it to?

3   A    The first e-mail is to Frank Fina and Marc

4   Costanzo.

5   Q    And what is the date on that?

6   A    June 19th, 2009.

7                    THE COURT:  What is the exhibit

8   on that, sir?

9                    THE WITNESS:  Seven.

10                   THE COURT:  Okay.

11                   Go ahead, Ms. Henry.

12  BY MS. HENRY:

13  Q    What is the content -- what's written in that

14  e-mail?

15  A    "Frank, per your instructions, here is the memo

16  regarding Jerome Mondesire.  Let me know if you have

17  any questions.  Thanks."

18  Q    And the next e-mail if you could identify it by

19  number.

20  A    Nine.

21  Q    And what is the date on that?

22  A    June 22nd, 2009.

23  Q    And what is written in that e-mail?

24  A    So it's a response to the first e-mail.  It's from

25  Frank Fina and Cc'd Marc Costanzo.  It says:  "I like

**A000494**

JOSHUA MORROW – DIRECT

1  it.  Thanks."

2  Q   And were those two of the e-mails that you had --

3  that were in the envelope that you picked up at

4  Mr. King's house?

5  A   They were.

6  Q   Now, additionally, up there you have another

7  document, the transcript.  Could you look at that?

8  A   Yes.

9  Q   Could you identify by -- I'm sorry, C...

10  A   Exhibit 3.

11  Q   Exhibit C-3, okay.  And do you recognize that?

12  A   I do.

13  Q   And was that the transcript that was also

14  contained in the envelope?

15  A   It is.

16  Q   And to be clear, Mr. Morrow, was that the

17  transcript that was in that -- I think you had

18  described it as a white plastic with the blue on the

19  back.

20  A   Yes.

21  Q   And then there is one other additional document up

22  there, it is C...

23  A   Five.

24  Q   C-5, okay.  Do you recognize that?

25  A   I do.

JOSHUA MORROW - DIRECT

1  Q    And what is that?

2  A    It is a memo to Frank Fina, re: Jerome Mondesire,

3  June 19th, 2009.

4  Q    And again, do you recognize that document?

5  A    I do.

6  Q    And was that also in the envelope?

7  A    Yes, it was.

8  Q    Now, is it fair to say the four documents that you

9  have in front of you have been redacted?

10  A    Yes.

11  Q    Prior to meeting with Chris Brennan on May 4th,

12  did you do anything to the documents that you had

13  picked up at Mr. King's house?

14  A    I did.

15  Q    What did you do?

16  A    I redacted names.

17  Q    Okay.  Well, what names did you redact?

18  A    Anyone other than Frank Fina or Marc Costanzo.

19  Q    And why did you do that?

20  A    Because, I mean, it was clear that's what they

21  wanted to get out, a negative story on Marc Costanzo

22  and Frank Fina.

23  Q    Well, was it just them?

24  A    No.  I had a vested interest in it as well because

25  he had that story printed about me taking money.

JOSHUA MORROW - DIRECT

1   Q    And you say they wanted that out, was that the
2   defendant?
3   A    Yes.
4   Q    And how did you know that?  Had you discussed, you
5   know, getting back at Frank Fina?
6   A    Yes.
7   Q    And was that a frequent topic that you discussed?
8   A    I mean, not necessarily getting back at Frank
9   Fina, but we definitely talked a lot about Frank Fina.
10  Q    And was it talk?  What was the discussion about
11  it?
12  A    It was not pleasant.
13  Q    What do you mean by that?
14  A    I mean, I think -- I was upset that he falsely
15  accused me of something.  And I think Kathleen was
16  upset because this Sting story got leaked out and she
17  blamed him for it.
18  Q    In terms of these documents, what you are saying
19  is you took out everybody's name but Frank Fina and
20  Marc Costanzo?
21  A    That's correct.
22  Q    And how did you do that?
23  A    With a Sharpie.
24  Q    And those items that you have in front of you, if
25  we could call up --

JOSHUA MORROW - DIRECT

1                    THE COURT:  Did he say with a

2    Sharpie?

3                    THE WITNESS:  Yes.

4                    THE COURT:  You mean like a

5    magic marker, Sharpie?

6                    THE WITNESS:  Yes.

7                    MS. HENRY:  -- C-3.

8                    Request permission to publish.

9                    THE COURT:  All right.

10   BY MS. HENRY:

11   Q    So, we're looking at C-3.  I think you have that

12   in front of you.  And you indicated that you had

13   redacted with a Sharpie some names.  Is this what it

14   looked like when you did it?

15   A    No.

16   Q    And can you tell us what the difference is?

17   A    The big block redactions I did not do.  I redacted

18   where it says attendees, both of them, P and M.  And

19   then, also where it says "with Agent Mike."

20   Q    So you did redact -- if I understand what you are

21   saying, for instance, you did redact that area,

22   attendees; is that right?

23   A    That's correct.

24   Q    Let me just point it out.  There(indicating); is

25   that right?

JOSHUA MORROW - DIRECT

1  A    Yes.

2  Q    And did you do it like that, with like a big

3  block?  Is that what it looked like when you used your

4  Sharpie?

5  A    It is not.

6  Q    How is it different?

7  A    I mean, I just did a Sharpie across it.  This

8  looks like there's a piece of tape put over it.

9  Q    So it wasn't in that condition?

10 A    It was not in this condition, no.

11 Q    So after you do the redactions and you take them

12 to Chris Brennan, do you have a discussion with him

13 about the story?

14 A    Not at that time.  It was very brief.  I just

15 handed them to him.

16                    My fiancée was in the car, we

17 were trying to get home for the night, so I just handed

18 them off to him.

19 Q    Again, Mr. Morrow, had you talked to him

20 previously before you dropped the documents off about

21 the story?

22 A    Yes.

23 Q    And what did you tell him?

24 A    I told him that I had -- I told him what I had and

25 it was an investigation into Jerry Mondesire.  At the

**A000499**

JOSHUA MORROW - DIRECT

1   time there were a couple of stories already out about

2   Jerry Mondesire and what he was doing with NAACP, so it

3   was of a timely nature.

4   Q    And was the purpose of you giving these documents

5   to Chris Brennan to raise the issue of Jerry Mondesire?

6   A    No.

7   Q    And was that the defendant's purpose?

8   A    No.

9   Q    But you are saying that it's something that was in

10  the news anyway?

11  A    Right.  It was clear that the intent here was to

12  show that Frank Fina shut down this investigation, the

13  same way Kathleen shut down the investigation with the

14  Sting.

15  Q    And you said Mr. Mondesire was in the news, it

16  wasn't regarding what is contained in these documents;

17  is that right?

18  A    No.

19  Q    So once you dropped the documents off to the

20  reporter -- and by the way, these redactions that you

21  made, did anybody tell you to make them or did you just

22  do that on your own?

23  A    I mean, I don't recall anyone telling me.

24  Q    Had you done that before?

25  A    No.

A000500

JOSHUA MORROW - DIRECT

1    Q    So this is on Sunday, May 4th.

2                        MS. HENRY:  At this time, Your

3    Honor, I'd ask to move for the admission of what's been

4    marked as C-64, again, it's an exhibit.  It's been

5    shared with the defense.  And it's a summary of

6    exhibits.

7                        THE COURT:  Any objection?

8                        MR. FARBER:  No, Your Honor.

9                        THE COURT:  Admitted.

10                        (Commonwealth's Exhibit C-64

11   received in evidence.)

12                        MS. HENRY:  Request permission

13   to publish?

14                        THE COURT:  Permission granted.

15                        MS. HENRY:  Thank you.

16   BY MS. HENRY:

17   Q    So now, Mr. Morrow, the following day, Monday

18   May 5th, did you have some communication?  Let's start

19   with Mr. Brennan.

20   A    I did.

21   Q    And again, we're looking at an exhibit for your

22   communication on Monday, May 5th of 2014.  And we see a

23   call at 3:09 p.m.; is that right?

24   A    Yes.

25   Q    And who did you call?

JOSHUA MORROW - DIRECT

1    A    Chris Brennan.

2    Q    And what is the length of that call?

3    A    Ten minutes and 58 seconds.

4    Q    And do you recall what you discussed with

5    Mr. Brennan?

6    A    We talked about these documents.

7    Q    And do you recall what was said?

8    A    I don't.

9    Q    It's a 10-minute call, did he indicate that he was

10   interested in writing a story?

11   A    Yes.

12   Q    And do you remember anything else he said about

13   that?

14   A    I don't.  I don't.

15   Q    Did you discuss in this conversation after he had

16   received the documents anything about Mr. Fina in that

17   conversation?

18   A    I don't believe -- I don't remember.  But I know

19   that I told him where I got the documents.  I didn't

20   say I got them from Kathleen or Adrian, I said I got

21   them from the Attorney General's Office.

22   Q    You didn't name who specifically?

23   A    No.

24   Q    And then at 6:58 p.m. you send a text.  Who do you

25   send that to?

JOSHUA MORROW - DIRECT

1   A    Kathleen.

2   Q    And what does that text say?

3   A    "What's the saying about revenge?"

4   Q    Why do you write that?

5   A    Well, because it sounded like Chris was going to

6   write the story about Frank Fina and both of us had a

7   vested interest in making sure that, like, Frank got a

8   little of his own medicine.

9   Q    And you were conveying that to her?

10  A    Yes.

11  Q    And so, does she respond?

12  A    Yes does.

13  Q    At what time?

14  A    7:02.

15  Q    And what does she respond?

16  A    "Best served cold.  Are we eating out soon?"

17  Q    And then at 7:02 p.m. do you respond?

18  A    I do.

19  Q    And what do you write?

20  A    "Yes.  I hope you enjoy the read in a few days."

21  Q    And what were you referencing with that text?

22  A    The story that Chris was going to write.

23  Q    And at that point, Mr. Morrow, did you think that

24  the story was coming out soon?

25  A    I did.

JOSHUA MORROW - DIRECT

1    Q    And at 7:04 p.m. did she respond?

2    A    She did.

3    Q    And what did she say?

4    A    "I think I will.  Can you give me a hint?"

5    Q    And then you responded almost immediately, right

6    at 7:04 p.m.; is that right?

7    A    "Best be able to deny.  But the Daily News has

8    four reporters on it.  Time for Frank to feel the" --

9    it should say heat not hear.

10   Q    Okay.

11   A    Auto correct.

12   Q    So that is your response to her; is that right?

13   A    Yes.

14   Q    So let's start at the beginning.  "Best be able to

15   deny," what do you mean by that?

16   A    Just so that, like, if it ever got -- if it ever

17   came back to her she would be able to say I know

18   nothing about this.

19   Q    And so is that in response to her request for a

20   hint?

21   A    Yes.

22   Q    And you note that the Daily News had four

23   reporters on it, did you know that?

24   A    I think Chris told me that there were several

25   people who were looking into several angles on the

JOSHUA MORROW - DIRECT

1   story.

2   Q    Okay.

3   A    But I think it ended up being just specifically

4   him writing the story.

5   Q    And then you write, "time for Frank to feel

6   the" -- and it says hear, did you mean heat?

7   A    Yes.

8   Q    And again, what is that in reference to?

9   A    The fact that the story was going to be written

10  about him shutting this investigation down.

11  Q    And what is the defendant's response at 7:07?

12  A    "Josh, you really get things done."

13  Q    And then 7:08 you respond.  And what do you write?

14  A    "Just please keep this between us.  Very small

15  circle."

16  Q    Very, very small circle?

17  A    "Very, very small circle."

18  Q    And why did you write that?

19  A    Just because I didn't want it out there that I

20  released these documents.

21  Q    And then what does she say at 7:50 p.m.?

22  A    She says, "I won't tell anyone."

23  Q    After that communication with the defendant on

24  May 5th, Monday, did you again -- well, first of all,

25  did you talk with Chris Brennan again?

JOSHUA MORROW - DIRECT

1    A    Yes.

2    Q    And did you again talk to the defendant about the

3    article?

4    A    Every time I talked to Chris about the story I

5    relayed what was said back to Kathleen.

6                          THE COURT:  You relayed what

7    was said, what sir?

8                          THE WITNESS:  Whatever

9    conversation I had with Chris about the article I

10   relayed back to the Kathleen.

11                         THE COURT:  Okay.

12                         MS. HENRY:  Your Honor, again,

13   at this time I have an exhibit marked C-65.  It's been

14   shown to defense.  Again, it contains information that

15   has already been admitted.  I would move for the

16   admission of C-65 and request permission to publish.

17                         THE COURT:  Any objection?

18                         MR. FARBER:  No, Your Honor.

19                         THE COURT:  Admitted.  And I

20   will give you permission to publish to the jury.

21                         MS. HENRY:  Thank you, Your

22   Honor.

23                         THE COURT:  All right.

24                         (Commonwealth's Exhibit C-65

25   received in evidence.)

JOSHUA MORROW - DIRECT

1  BY MS. HENRY:

2  Q    Now, Mr. Morrow, this is now -- we were discussing

3  Monday, May 5th.  Now we're looking at Wednesday, May 7

4  of 2014.  Can you see that?

5  A    It's a little hard to read, but I can see it.

6  Q    Perhaps we could make it a little bigger.  Better?

7  A    Yeah, I think --

8                      THE COURT:  Most importantly,

9  can the jurors see it?  All right.  We have a collected

10 head nod yes.

11                      Go ahead, Ms. Henry.

12                      MS. HENRY:  Thank you, Your

13 Honor.

14 BY MS. HENRY:

15 Q    So we're going to start at 8:24 p.m.  Do you call

16 anybody?

17 A    I do.  I call Chris Brennan.

18 Q    And how long is that conversation?

19 A    It looks -- is that 16 minutes and 30 seconds?

20 Q    Yes.

21                      THE COURT:  Sir, if you want to

22 step down and take a look at the exhibit, I will let

23 you do that.  Just watch your step.  Just make sure

24 when you answer -- you can either stay there and

25 testify, but the jury and the lawyers have to hear you

JOSHUA MORROW - DIRECT

1  and so do I.

2                          THE WITNESS:  So it looks like

3  it's 16 minutes and 30 seconds.

4  BY MS. HENRY:

5  Q    And that's at 8:24 p.m.  And that's you talking

6  again to Chris Brennan, the reporter that's writing

7  this story; is that right?

8  A    That is correct.

9  Q    And would it be fair to say the story hadn't come

10 out yet; right?

11 A    It had not not come out yet.

12 Q    And do you recall what you talked about with

13 Mr. Brennan on that particular phone call?

14 A    I mean, I guess I can see from the messages that

15 we talked.  He must have reached out to Marc Costanzo

16 and Frank Fina for comment.

17                          MR. FARBER:  Objection, Your

18 Honor.

19                          THE COURT:  Sustained.

20                          MR. FARBER:  And I move to

21 strike.

22                          THE COURT:  Stricken.

23                          MR. FARBER:  Can you give the

24 jury an instruction on that.

25                          THE COURT:  Yes.  So a motion

**A000508**

JOSHUA MORROW – DIRECT

1  has been made to strike the testimony.  As you may

2  recall, ladies and gentlemen of the jury in the

3  beginning when I first instructed you about striking

4  testimony from your minds, that means you should

5  disregard it entirely.  So I am ordering you to do

6  that, all right.  Disregard the answer the witness gave

7  to that question and the question.

8                      MR. FARBER:  Thank you, Your

9  Honor.

10                     THE COURT:  All right.

11                     Go ahead, Ms. Henry.

12                     MS. HENRY:  Thank you, Your

13  Honor.

14  BY MS. HENRY:

15  Q    So you had a conversation with Mr. Brennan for 60

16  minutes and 30 seconds on May 7th; is that right?

17  A    That is correct.

18  Q    As you sit here today -- first of all, let me ask

19  you:  You said you talked to Chris Brennan a lot about

20  the article; is that right?

21  A    That's correct.

22  Q    At some point do you recall him advising you if he

23  reached out to people for comments?

24  A    Yes.

25  Q    And do you recall who specifically he said he had

A000509

JOSHUA MORROW – DIRECT

 1  reached out for comments about the story?

 2  A    Frank Fina.

 3  Q    And did he tell you what Frank Fina said?

 4  A    Yes.

 5  Q    And what did he say?

 6  A    He claimed that the documents that he had were

 7  Grand Jury.

 8  Q    And did he indicate anything else?

 9  A    Not that I remember.

10  Q    So let's look at the next text that you -- well,

11  let's look at a text you sent at 8:40.  So if -- and

12  I'm bad at math -- but 8:24 and then you talked for 16

13  minutes, so soon thereafter would it be fair to say?

14  A    Yeah.

15  Q    At 8:40 you send a text; is that right?

16  A    I was probably still on the phone with Chris at

17  the time as I sent that.

18  Q    And if you could keep your voice up, Mr. Morrow.

19  A    Sorry.

20  Q    And who do you send the text to?

21  A    To Kathleen.

22  Q    And what do you say to her?

23  A    I say, "oh man, Frank's response was priceless."

24  Q    And again, what is that in reference to?

25  A    His response to the article -- or his response to

JOSHUA MORROW - DIRECT

1   Chris's question about a comment.

2   Q    And then at 9:04 p.m. you send another text,

3   what's that?

4   A    "Call me."

5   Q    I'm sorry.  9:04.  The one above.

6   A    I'm sorry.  "Can you talk?"

7   Q    And then at 9:06?

8   A    "Call me."

9   Q    And does the defendant respond at 9:06?

10  A    Yes.

11  Q    And what does she say?

12  A    "In about a half hour."

13  Q    And did she call you?

14  A    She did.

15  Q    And that's at 9:04 p.m.  And what's the length of

16  that call?  Is that 5 minutes and 54 seconds?

17  A    Yes.

18  Q    And, Mr. Morrow, do you recall on this particular

19  time what you talked about?

20  A    I mean, every time that I talked with Chris I

21  relayed back to Kathleen what Chris and I talked about.

22  Q    And what did the defendant have to say when you

23  advised her of Frank Fina's response about this?

24  A    I don't remember.

25  Q    Was she -- was she upset?  Was she happy?

JOSHUA MORROW - DIRECT

1   A     No, she was not upset.

2   Q     What do you mean by that?

3   A     I mean, like she wasn't, like, frantic about it.

4   Q     And did she -- and so let's move on.  You indicate

5   that there's this phone call, 5 minutes 54 seconds, and

6   then at 9:04 p.m. -- I'm assuming when you were done

7   communicating on the phone you send her a text.  What

8   does that text say?

9   A     It's time for your friends to start fighting

10  back -- or "it's time for your friends to fight back."

11  Q     And what did you mean by that when you sent that

12  to her?

13  A     Well, she was getting beaten up in the press and

14  it was for people -- like people who supported her to

15  stand up and start fighting back with her.

16  Q     And did you think that this article, this

17  information that you had provided to a reporter about

18  Frank Fina was fighting back?

19  A     Yes.

20  Q     And then there is a text at 9:55 p.m. from her to

21  you.  And can you see that?

22  A     It says, "I agree.  I wish they would."

23  Q     And at 9:56 you text back?

24  A     "Happy to lead the charge."

25  Q     And it's fair to say, is it not, Mr. Morrow, that

JOSHUA MORROW - DIRECT

1  when you are sending these texts you just communicated

2  with Mr. Brennan but the article had not yet come out;

3  is that right?

4  A    That's correct.

5                         MS. HENRY:  Your Honor, at this

6  time I have an exhibit marked C-66.  I move for the

7  admission of C-66.  It's been shared with the defense.

8  And request permission to publish.

9                         MR. FARBER:  No objection.

10                         THE COURT:  Admitted.  And

11  permission to publish.

12                         MS. HENRY:  Thank you.

13                         (Commonwealth's Exhibit C-66

14  received in evidence.)

15  BY MS. HENRY:

16  Q    So you communicate with the defendant again; is

17  that right?

18  A    That is correct.

19  Q    And directing your attention to Monday, May 12 of

20  2014.  Do you get a text from the defendant?

21  A    I do.

22  Q    And what did she text you?

23  A    "Where is my story?  I'm dying here while you are

24  drinking."

25  Q    And again, what is she referencing, if you know,

JOSHUA MORROW - DIRECT

1  in that text?

2  A     The Chris Brennan story on Frank Fina.

3  Q     And so that comes at 8:14 p.m.  Do you then do

4  something the following day?

5  A     I do.

6  Q     And again, we're looking now at May 13, 2014.  Who

7  do you call at 10:15 a.m.?

8  A     Chris Brennan.

9  Q     And how long of a call is that?

10 A     Three minutes and 33 seconds.

11 Q     And, if you remember -- you get this text from the

12 defendant, it's fair to say you did not respond to that

13 text; is that right?

14 A     That is correct.

15 Q     And why was that?

16 A     Because I didn't have an update.

17 Q     Okay.  Were you out...

18 A     No.

19 Q     And so you don't respond.

20                        But when you make this call to

21 Chris Brennan at 10:15 a.m., what is the purpose of

22 that call?

23 A     I think that's actually an unrelated call.  It had

24 to do with -- I believe it had to do with a press

25 conference we were holding for my fiancées campaign.

JOSHUA MORROW - DIRECT

1   Q    And do you know -- there is another call at 5:04

2   p.m. -- actually -- I apologize.  Chris Brennan called

3   you in the morning; is that right?

4   A    Yes.

5   Q    And you do call him at 5:04 p.m.; is that right?

6   A    That's correct.

7   Q    And that's a very brief 45-second call.  Do you

8   know if you got him?

9   A    I don't remember.

10  Q    And now looking at May 29, of 2014, at 9:30 p.m.,

11  again there is a call from Chris Brennan to you.  Do

12  you recall what you were discussing on that call?

13  A    We were discussing the story because it was about

14  to be published.

15  Q    And when you say "the story," just to be clear are

16  you talking about the Frank Fina and Mondesire story?

17  A    Yes.

18  Q    And how did you know it was about to be published?

19  A    Because he told me.

20  Q    And this is a 6 minute and 24 second call.  Do you

21  recall what you discussed?

22  A    I don't.

23  Q    And did he indicate to you -- so this is Thursday,

24  May 29, did he indicate to you when it would be

25  published?

JOSHUA MORROW - DIRECT

1    A    He thought it was going to be soon.  In the next

2    day or so.

3    Q    Did you communicate that at some point to the

4    defendant?

5    A    I don't recall if I did.

6                        MS. HENRY:  Your Honor, at this

7    time I request permission -- I have C-67 exhibit.  I

8    request admission and permission to publish.  I've

9    shared it with the defense.  And I believe there is no

10   objection.

11                       MR. FARBER:  That is all

12   correct.

13                       THE COURT:  So C-67 is

14   admitted.  You may publish it to the jury.

15                       MS. HENRY:  Thank you.

16                       (Commonwealth's Exhibit C-67

17   received in evidence.)

18   BY MS. HENRY:

19   Q    So, Mr. Morrow, we're looking at June 3rd of 2014,

20   a Tuesday.  And again -- let me just ask you:  On June

21   3rd of 2014, Tuesday, had the article come out yet?

22   A    It had not.

23   Q    And did you have any information about that?

24   A    I think what Chris told me was the article got

25   pushed because of Lewis Katz's death, so everyone was

JOSHUA MORROW – DIRECT

1  sort of covering that.

2  Q    Okay.  And who is Lewis Katz, if you know?

3  A    He was a business man, philanthropist, part owner

4  of the Inquirer.

5  Q    And what happened to him?

6  A    He was on a plane coming back from Doris Kearns

7  Goodwin's house and it crashed in New Jersey.

8  Q    If you can just keep your voice up.

9  A    I'm sorry.  Crashed in New Jersey.

10  Q    So he was killed in a plane crash?

11  A    Yes.

12  Q    And there was publicity about that, articles?

13  A    Yes.  He was a big deal in the area and I think

14  all the reporters -- a lot of reporters were covering

15  some aspect of that story.

16  Q    And you said he was part owner of what?

17  A    The Inquirer and I believe the Daily News.

18  Q    Are they owned together?

19  A    Yes.

20  Q    So then on June 3rd, 2014 the article is not out.

21  And at 7:51 p.m. you text the defendant.  What do you

22  say?

23  A    "Hey."

24  Q    And at 8:18 p.m. she responds what?

25  A    "Hey.  How are you guys?"

JOSHUA MORROW - DIRECT

1   Q    And at 8:23 p.m.?

2   A    "Fine.  Saw Adrian is leaving.  Assuming it's a

3   good thing."

4   Q    And what are you referencing there?

5   A    I guess Adrian King gave his two-week notice or

6   had left the office by that time.

7   Q    And you say, "assume it's a good thing."  What do

8   you mean by that?

9   A    Well, I know that Kathleen and Adrian had a pretty

10  strained relationship.

11  Q    How did you know that?

12  A    She told me.

13  Q    Do you recall when she told you that?

14  A    I don't.  I mean, it's probably in April -- I know

15  they had some problems early on like in 2013.  But I

16  think around April is when she told me there was a lot

17  more problems.

18  Q    And so now directing your attention to

19  8:25 p.m. -- I'm sorry, 8:23 p.m.  The defendant

20  responds with a text, and what does she say?

21  A    "He was only staying a year from the beginning.

22  But between you and I, I'm happy."

23  Q    And again, that is in reference, obviously, to

24  Adrian leaving?

25  A    Correct.

JOSHUA MORROW - DIRECT

1  Q    And then looking at 8:25 p.m. you text her back
2  what?
3  A    "I assume so.  Our story was slated for Monday and
4  the Lewis Katz stuff happened and now they are holding
5  it a week.  I was read the first version.  Brutal on
6  our friends."
7  Q    And what are you referencing when you say "our
8  story?"
9  A    The Frank Fina/Jerry Mondesire story.
10 Q    And you say that the "Lewis Katz stuff happened,"
11 that's what you have already testified about?
12 A    Yes.
13 Q    And "brutal on our friends" is in reference to
14 what?
15 A    Frank Fina.
16 Q    And when you say, "I was read the first version,"
17 what do you mean by that?
18 A    Chris read me part of the story.
19 Q    And did it -- the part that he read you, did it
20 pertain to Frank Fina and this investigation?
21 A    Yeah.  But the story definitely was not what we
22 had hoped for.
23 Q    We'll get to that.
24                    Now we'll look at 8:25 p.m.,
25 does the defendant text you?

**A000519**

JOSHUA MORROW – DIRECT

1  A    Yes.

2  Q    And what does she say?

3  A    "Anything about me?  Please tell me no.  How's S?

4  You both did a great job.  This is not the end."

5  Q    "Anything about me" is a reference to anything in

6  the article about her?

7  A    Yes.

8  Q    And "how's S," what's that in reference to?

9  A    That's my fiancée.

10 Q    And "you both did a great job.  This is not the

11 end," what's that about?

12 A    Also about my fiancée.  She had run and lost and

13 did a good job.

14 Q    And that was the campaign I think you had

15 referenced earlier that you were helping her with?

16 A    That's correct.

17 Q    And when was that primary?

18 A    May 20, 2014.

19 Q    Is that when she lost?

20 A    Yes.

21 Q    Now, directing your attention to 8:44 p.m.  You

22 text back to her, and what do you say?

23 A    I said, "you are fine with this.  Do you think I'd

24 do that to you?"

25 Q    And at 8:44 p.m., what did she say?

JOSHUA MORROW - DIRECT

1    A    "Of course not, but they would."

2    Q    Did you know, Mr. Morrow, at that time when the

3    story was coming out?

4    A    I did not.

5                      MS. HENRY:  Your Honor, at this

6    time I would again move for the admission of what I

7    have marked C-68.  And request permission to publish.

8    I believe there is no objection.

9                      MR. FARBER:  No objection.

10                     THE COURT:  C-68 is admitted.

11   And you may publish it to the jury.

12                     MS. HENRY:  Thank you, Your

13   Honor.

14                     (Commonwealth's Exhibit C-68

15   received in evidence.)

16   BY MS. HENRY:

17   Q    Now, moving to Wednesday, June 4th of 2014.  Did

18   you again have communications with Chris Brennan?

19   A    I did.

20   Q    You called him; is that right?

21   A    I did.

22   Q    And what time was that?

23   A    6:50.

24   Q    And how long is that call?

25   A    Nine minutes and 55 seconds.

JOSHUA MORROW – DIRECT

1   Q    Do you remember what you talked about on June 4th?

2   A    I don't.

3   Q    Would it have been this article?

4   A    Most likely.

5                          MR. FARBER:  Objection, Your

6   Honor.

7                          THE COURT:  Sustained.

8   BY MS. HENRY:

9   Q    On June 4th, again it's Wednesday now, had the

10  article come out?

11  A    It had not.

12  Q    Were you communicating with Chris Brennan at that

13  time regarding anything but the article?

14  A    I mean, there was nothing politically going on so

15  I would have no reason to call him except to find out

16  where the article was.

17  Q    Okay.  Moving to Thursday, June 5th of 2014, again

18  you contact the reporter again; is that right?

19  A    That's correct, yes.

20  Q    And that's at 7:28 p.m.?

21  A    That's correct.

22  Q    And that's a 21-second call?

23  A    Yes.

24  Q    Do you know if you got him?

25  A    Probably not.

JOSHUA MORROW - DIRECT

1   Q    And then it looks like he reaches back to you, and

2   maybe that call doesn't go through at 7:32 p.m.; is

3   that right?

4   A    That looks -- yes.

5   Q    And then at 7:37 p.m. he calls you and there is a

6   9 minute and 12 second call; is that right?

7   A    Yes.

8   Q    And what do you discuss during that phone call?

9   A    The article.

10  Q    And when is the article, if you know -- it's

11  Thursday, June 5th and you're talking to the reporter

12  that is writing it.  Do you know when the article is

13  coming out?

14  A    Yes.

15  Q    When is it?

16  A    The next day.

17  Q    And do you convey that to the defendant?

18  A    Yes.

19  Q    And we look at a text now of 8:24 p.m. from you to

20  the defendant.  And you text her and what do you say?

21  A    "Going to be a bad day for Corbett and company."

22  Q    And when you say, "going to be a bad day for

23  Corbett and company," what do you mean?

24  A    Well, because Tom Corbett was the AG at the time

25  and Frank Fina worked for him.  And during his time at

JOSHUA MORROW - DIRECT

1   the AG is when the investigation of Mondesire happened.

2   Q    So you are referencing a 2009 Mondesire

3   investigation; Corbett the AG and Fina was the

4   prosecutor on it?

5   A    Correct.

6   Q    Is that what you mean by that?

7   A    Yes.

8   Q    And you don't get a response?

9   A    That's correct.

10                      MS. HENRY:  Your Honor, may I

11   approach?

12                      THE COURT:  Yes.

13   BY MS. HENRY:

14   Q    Mr. Morrow, I am going to hand you C-26.  If you

15   could take a look at that.  Do you recognize that?

16   A    I do.

17   Q    And what's depicted on that piece of paper?

18   A    It's the news story from the Daily News.

19   Q    And who is it written by?

20   A    Chris Brennan.

21   Q    And generally what does it pertain to?

22   A    The probe.

23   Q    And that's from June 6th?

24   A    June 6, 2014.

25   Q    And you see the article.  Do you have any

JOSHUA MORROW - DIRECT

1   communication with the defendant on that day?

2   A    I believe I did not.

3   Q    And had you -- did you talk to her -- do you

4   recall talking to her in the weeks after the article

5   came out?

6   A    I did not talk to her.

7   Q    And why is that?

8   A    I don't know.  I just had other stuff going on.

9   Q    And you said the article wasn't what you had hoped

10  or we had hoped, what did you mean by that?

11  A    It wasn't that great of a written article.  Like

12  it didn't do the job.  It was not the equivalent of the

13  Sting investigation being shut down.

14  Q    But it did discuss Frank Fina; is that fair to

15  say?

16  A    It did.

17  Q    So that article comes out on June 6 of 2014 and

18  you indicated that you don't have communications with

19  her during the weeks after that.  Were you disappointed

20  in the article?

21  A    Yes.

22  Q    Did you meet with her some time after that article

23  was published?

24  A    Did I meet with her?

25  Q    Yes.

JOSHUA MORROW — DIRECT

1  A    Yes.

2  Q    And when was the first time you saw her after the

3  article came out?

4  A    I believe it was in August.

5  Q    August of 2014?

6  A    August of 2014, yes.

7  Q    How did that come about, if you recall?

8  A    The meeting?

9  Q    Yes.

10 A    I typically had a standing anytime you're in

11 Philadelphia let's have lunch or a beer.  And so she

12 was in Philadelphia on the 14th of August.

13 Q    And do you recall how it got set up?

14 A    I don't recall how it got set up.

15 Q    And so was there arrangements made to meet her for

16 lunch?

17 A    Yes.

18 Q    And where were you to meet her?

19 A    So Pat Reese called me and asked me to meet him at

20 the corner of I think it was 16th and Locust.

21 Q    Who is Pat Reese?

22 A    Her -- Kathleen's security detail.

23 Q    And he reached out to you and told you to meet him

24 where?

25 A    At the corner of 16th and Locust.

JOSHUA MORROW – DIRECT

1   Q    And did he give you a time?

2   A    Yes.

3   Q    What time?

4   A    I believe it was noon.

5   Q    Noon.  Okay.  And did he indicate why you were

6   meeting him there?

7   A    He was going to pick me up and take me to

8   Kathleen.

9   Q    Okay.  Did you know -- when he indicated to you

10  that he was -- that he was picking up, did you know

11  where you were going for lunch?

12  A    I did not.

13  Q    Did you go to the corner of 16th and Locust?

14  A    I did.

15  Q    Was that unusual when you met the defendant for

16  lunch that she would send her security detail to pick

17  you up?

18  A    It was a little odd, yes.

19  Q    In the past when you had met her for lunch, how

20  would that go down?

21  A    We would meet at the restaurant or the bar.

22  Q    So this was unusual.  Does he pick you up?

23  A    He does.

24  Q    And who's there?

25  A    I believe it was him and there was another driver.

JOSHUA MORROW - DIRECT

1   I can't remember the driver's name.

2   Q    Okay.  And what happens after you get picked up?

3   Where do you go?

4   A    They take me to a parking garage.

5   Q    And is the defendant in the vehicle when you get

6   picked up?

7   A    She is not.

8   Q    So they take you to a parking garage.  And tell us

9   what happens.

10  A    They took my cell phone, my keys and my wallet,

11  and then they wanded me down to see if I was wearing a

12  recording device.

13  Q    I'm sorry.

14  A    They wanded me down to see if I was wearing a

15  recording device.

16  Q    And where did that happen?

17  A    In the parking garage.

18  Q    Were you in the car?

19  A    No.  I was outside of the car.  I handed them my

20  stuff inside the car, and then they asked me to step

21  out and then they wanded me.

22  Q    And, Mr. Morrow, did you just give them the stuff

23  or did they ask for it?

24  A    They asked for it.

25  Q    And tell us again what you gave them.

JOSHUA MORROW — DIRECT

1  A    My wallet, my house keys and my cell phone.

2  Q    And then they got out a wand and they did what

3  with it?

4  A    I'm not sure if it was a wand, but he had some

5  device that he was checking to see if I was wearing

6  something.

7  Q    How do you know that's what they were checking

8  for?

9  A    I just assumed.  They took my phone and

10  everything, they didn't want me recording anything.

11  Q    How did you get to lunch?

12  A    Then they put me back in the car and drove me over

13  to the lunch.

14  Q    And where was that?

15  A    It was at the Bellevue in Philadelphia.

16  Q    And was this conduct unusual?

17  A    Yes.

18  Q    Had that ever happened before?

19  A    No.

20  Q    And so they took you over to the Bellevue to have

21  lunch; is that right?

22  A    That's correct, yes.

23  Q    And did you meet the defendant there?

24  A    I did.

25  Q    And was she by herself?

JOSHUA MORROW - DIRECT

1   A    She was.

2   Q    And did you have lunch with her?

3   A    We did have lunch, yes.

4   Q    And was it just the two of you?

5   A    It was.  And then Pat Reese was at another table

6   like, I don't know, at the other side of the

7   restaurant.

8   Q    So he was there, but not seated at the table?

9   A    That's correct.

10  Q    And when you get to lunch, do you -- tell us what

11  happens.

12  A    She apologizes to me for the security detail, she

13  said it's a new office protocol.

14  Q    And then what?

15  A    We sit down and we place an order for lunch and

16  she tells me that -- Kathleen told me there was a Grand

17  Jury investigation into the Mondesire leak.

18  Q    How did she seem to you at that point?

19  A    Not phased by it.

20  Q    And what else does she say about that?

21  A    So we talked about it for -- you know, we talked

22  about it.  And I was concerned that maybe I was going

23  to get subpoenaed.  And she was like, no, you're not

24  going to.  They're after me.  And then we sort of

25  talked about what actually happened on the 22nd.

A000530

JOSHUA MORROW - DIRECT

1   Q    And what did you discuss?

2   A    And we came up with this -- that Adrian is the one

3   who walked me to the documents and she never saw them.

4   All she said was I called Josh to tell him to give

5   Adrian a call.

6   Q    And she said that at the lunch?

7   A    Yes.

8   Q    And when she's saying "All I did was call Josh and

9   tell him to give Adrian a call," I mean, you knew that

10  wasn't true; is that right?

11  A    That is correct.

12  Q    And did you go along with that?

13  A    I did.

14  Q    And what did you say when she said that?

15  A    I said I don't know why they're subpoenaing you

16  when Adrian is the one that gave me the documents.

17  Q    And why did you say that?

18  A    Because I was trying to protect Kathleen.

19  Q    And did you convey -- in saying that to her, was

20  that to convey that you were going to protect her?

21  A    Yes.

22  Q    And was that your intent?

23  A    Yes.

24  Q    And so did you discuss this further?

25  A    I'm sure.  It was an hour lunch, I'm sure we

JOSHUA MORROW - DIRECT

1    talked about it more.  I don't remember much more.  I

2    mean, I was kind of a little bit shell shocked to find

3    out there was a Grand Jury investigation.

4    Q    Were you concerned?

5    A    Very concerned.

6    Q    Why?

7    A    Because I didn't want to be dragged before a Grand

8    Jury.

9    Q    After that lunch, did you see the defendant again

10   in October?

11   A    I did.

12   Q    Was that the next time you saw her after the lunch

13   in August of 2014?

14   A    Yes.

15   Q    And do you recall where was the next time that you

16   saw her?

17   A    It was at a park in Dunmore.

18   Q    A park in where?

19   A    Dunmore.

20   Q    Where is Dunmore?

21   A    Scranton area.

22   Q    And who set that up?

23   A    I think I was back from being in South America.

24   And I am not sure how it got set up.  But she asked me

25   to come up and see her in Dunmore.

JOSHUA MORROW – DIRECT

1   Q    And is that where she resides or lives or near

2   there?

3   A    In the area, yes.

4   Q    And did you agree to do that?

5   A    I did.

6   Q    And, Mr. Morrow, at the time -- now we're in

7   October 2014, where were you living?

8   A    I was in -- we have a house in Philadelphia, but I

9   was back and forth to South America.

10  Q    And were you working in South America?

11  A    I was.

12  Q    And was that on another campaign?

13  A    Yes.

14  Q    So you are back in Philadelphia and you meet her

15  in Dunmore; is that right?

16  A    That is correct.

17  Q    And so how far from Philadelphia is Dunmore?

18  A    Probably an hour and 45 minutes, maybe two hours.

19  Q    How did you get there?

20  A    I drove.

21  Q    Did you go by yourself?

22  A    I did.

23  Q    What were you going for?

24  A    She asked me to come up and meet her.

25  Q    Okay.  And did you have a time set or a place?

JOSHUA MORROW – DIRECT

1   A    I think I got up there around 10:00 in the

2   morning.  I remember I left early.

3   Q    You left early?

4   A    Yeah.

5   Q    And what happened when you got there?

6   A    I pulled into the park and nobody was there.  And

7   then Pat Reese showed up and had me hop in his car and

8   drove me to his house where he again took my phone, my

9   wallet and my keys, and then wanded me down again.

10  Q    He wanded you down?

11  A    Yes.

12  Q    And again, after that happened, where did you go?

13  A    Then he drove me back to the park and Kathleen was

14  there with the other driver.  The driver got out and I

15  got in.

16  Q    Why did you go to the park, was that the place you

17  were to meet her?

18  A    That's where she told me to meet her.

19  Q    And so you said you got in the car with the

20  defendant, what happened?

21  A    She was just -- she was definitely a lot more

22  frantic than she was the last time.

23  Q    What do you mean by that?

24  A    Well, because she was just like, I need help, I

25  need help.  I need someone to help me.

JOSHUA MORROW – DIRECT

1   Q    What did she need help with?

2   A    I think it was dealing with the press and dealing

3   with the media.

4   Q    Mr. Morrow, at that time did the Grand Jury

5   investigation come up?

6   A    It did not.

7   Q    And how long of a conversation was that?

8   A    It was like 10 minutes.

9   Q    And what did you say when she said, "I need help,

10  I need help?"

11  A    I said I will do whatever you need me to do.  Tell

12  me what you want me to do.

13  Q    And what did she say?

14  A    There was no answer.  I mean, there was no, like,

15  this is what I want you to do, like do this, this, and

16  this.  It was just, I need people to start helping me.

17  Q    And did she give any specifics?

18  A    She did not.

19  Q    You said she seemed frantic at that point?

20  A    Yes.

21  Q    And so you said this was a 10-minute meeting?

22  A    It was very brief.  It was not worth the four-hour

23  drive.

24  Q    And how did it end?

25  A    I just got out of the car.

JOSHUA MORROW – DIRECT

1  Q    Did you see her again in October of 2014?

2  A    I did.

3  Q    And where was that?

4  A    I set up a meeting with her and another attorney

5  in Philadelphia, Dion Rassias.

6  Q    I'm sorry.

7  A    I set her up –– she had a meeting with Dion

8  Rassias, and I set the meeting up.

9  Q    At whose request?

10  A    I think it was hers.

11  Q    She wanted to meet that attorney?

12  A    I believe so, yes.

13  Q    Did you know him?

14  A    I do know him.

15  Q    And so where did you set up the meeting for the

16  two of them?

17  A    At his office.

18  Q    Do you recall when that was, Mr. Morrow?

19  A    It was around the same time because I did it –– I

20  did both those meetings in the time that I was back in

21  the United States and I was only ever back for, like,

22  10 days at a time.  So it would have been in that same

23  time frame.

24  Q    And that was in October of 2014?

25  A    Yes.

JOSHUA MORROW – DIRECT

1    Q    And what happened when you had this meeting?

2    A    So it was a similar thing.  Pat Reese came in, he

3    didn't take any cell phones this time but he, sort of,

4    like wanded over everything in the office to make sure

5    there was no recording device.

6    Q    And what office?

7    A    In Dion's office.

8    Q    And where was that?

9    A    The Beasley Law Firm, it's on 12th and Walnut

10   maybe, in Philadelphia.

11   Q    And did you stay for the meeting?

12   A    You know, I was pretty sick from being in South

13   America and so I kept leaving and coming back in the

14   meeting, so I don't remember what the meeting was

15   about.

16   Q    How long of a meeting was it?

17   A    Maybe 20, 30 minutes.  It didn't seem very long.

18   And then they subsequently had follow-up meetings after

19   that that I was not a part of.

20   Q    You were not there?

21   A    No.  But I helped set them up.

22   Q    Now, you said that you were only home for a little

23   bit and then you had to go back to South America; is

24   that right?

25   A    That's correct.

JOSHUA MORROW – DIRECT

1   Q    And where were you in South America?

2   A    Guyana.

3   Q    While you were there, did you have communications

4   with the defendant?

5   A    I did.

6   Q    And how frequently was that?

7   A    Pretty frequent.

8   Q    And when you were communicating with her, what

9   were you talking about?

10  A    Well, once I got back down there I got called by

11  someone who was trying to serve me with a subpoena for

12  the Grand Jury.

13                    MS. HENRY:  Your Honor, at this

14  time I would request permission to admit C-69 and

15  publish it.  I believe there is no objection.

16                    THE COURT:  Accurate?

17                    MR. FARBER:  Can I confer with

18  Ms. Henry to make sure I have the numbers right.

19                    THE COURT:  Yes, certainly.

20                    MR. FARBER:  No objection.

21                    THE COURT:  All right.  There

22  is no objection, so C-69 is admitted.  And you may

23  publish it to the jury.

24                    MS. HENRY:  Thank you, Your

25  Honor.

JOSHUA MORROW - DIRECT

```
 1                       (Commonwealth's Exhibit C-69
 2    received in evidence.)
 3    BY MS. HENRY:
 4    Q    So, Mr. Morrow, again phone records that are
 5    yours.  I am going to direct your attention to Block
 6    Number 11.  So it's at the bottom, do you see it down
 7    there?
 8    A    Yes.
 9    Q    And again there is a phone number.  It says, "to."
10    Do you recognize that number?
11    A    Yes.
12    Q    And is that the defendant's?
13    A    It is.
14    Q    And then we see a time there or a date, what date
15    is that, if you can see?
16    A    11/4/2014.
17    Q    And again it's a text message and it's sent by you
18    to the defendant.  What do you say?
19    A    "Good evening.  I hope you're enjoying this
20    Election Day.  FYI, I had visitors this morning at 7:00
21    a.m."
22    Q    And now this is November 4th.  Can you explain
23    that text?
24    A    That was the day I was served with a subpoena.
25    Q    And where were you?
```

JOSHUA MORROW — DIRECT

1  A    At my house in Philadelphia.

2  Q    Was it at 7:00 a.m. that they served you with the

3  subpoena?

4  A    I think something like that, yeah.  I mean, I

5  wasn't home.  I think I was out running, but eventually

6  I got served.

7  Q    And then looking at the response from the

8  defendant, again it's a text, and what does she say?

9  A    "Tenacity."  Are you referring to 10?

10  Q    Yes.

11  A    I'm sorry.  "I'm enjoying being on this side of

12  it.  Welcome home.  All good.  Okay."

13  Q    And then you respond?

14  A    "They waited two hours and finally got me when I

15  was leaving my house."

16  Q    And what are you referencing when you say, "they

17  waited two hours and finally got me when I was leaving

18  my house?"

19  A    They finally served me.

20  Q    Were those -- those were the individuals that were

21  outside your house?

22  A    Yes.

23  Q    And then the response on Line Number 8 from the

24  defendant?

25  A    "Tenacity."

JOSHUA MORROW - DIRECT

1  Q    And then you respond in Line Number 7 back to her?

2  A    "The dates they want me are not going to work for

3  me, I'm going to be out of the country."

4  Q    What did you mean by that?

5  A    Because I was headed back to Guyana.

6  Q    And you were headed back.  Did you know what date

7  you had been subpoenaed for?

8  A    I don't remember if the subpoena had a date or

9  not.

10  Q    But you knew you weren't going to be there?

11  A    Well, I was leaving at the end of the week.

12  Q    Okay.

13                        And then a response back on

14  Line 6.

15  A    "That stinks.  Are you coming up to Scranton?

16  Maybe Thursday?"

17  Q    And then Line 5 you respond to her invite saying

18  what?

19  A    "I can.  You tell me when."

20  Q    And Line 4 she says?

21  A    "You don't have to.  It's like visiting our old

22  aunt in the home."

23  Q    And then Line 3?

24  A    "Oh please.  I'd like to catch up."

25  Q    And then Line 2.

A000541

JOSHUA MORROW − DIRECT

1  A    "Okay.  You let me know a time.  Cool."

2  Q    And so would it be fair to say that you had not

3  seen her again -- you described the meeting in the

4  attorney's office -- well, let me just be clear,

5  Mr. Morrow:  You said you met her two times in October,

6  once in the park and once at the attorney's office.  Do

7  you remember which one was first?

8  A    You know, I mean, now looking at this, the park

9  meeting may have been that Thursday.

10  Q    And had you already been to the attorney's office?

11  A    Yes.

12  Q    So that had occurred?

13  A    Yes.

14  Q    But this may have been, now that you look at this,

15  setting up the meeting in the park?

16  A    Yes.

17  Q    And you indicated that you were only home for a

18  little bit?

19  A    Yeah.  Like seven to ten days.

20                      MS. HENRY:  If I may just have

21  a moment, Your Honor.

22                      THE COURT:  All right.

23  BY MS. HENRY:

24  Q    Now, you indicated in these text messages that you

25  were not going to be in the country for when you had to

**A000542**

JOSHUA MORROW - DIRECT

1  appear before the Grand Jury; is that right?

2  A    Yes.

3  Q    Did you eventually testify in November of 2014?

4  A    I did.

5  Q    And when that occurred, were you here in the

6  country?

7  A    I was not.  I did it through a phone call.

8  Q    Okay.  So you called in.  Were you sworn under

9  oath through the phone?

10 A    I was.

11 Q    And were those arrangements made through your

12 attorney, that you could testify by phone?

13 A    Yes.

14 Q    And prior to testifying -- now, Mr. Morrow, you've

15 told us that in September you met the defendant for

16 lunch and it was there that there was talk about saying

17 that Adrian told you about the documents.

18 A    That was August.

19 Q    I'm sorry.  August, you're right.  Thank you.

20 A    Yes.

21 Q    After that, did you have conversations about what

22 you would say before the Grand Jury?

23 A    Yes.

24 Q    And when did you have this?

25 A    We always just reiterated the lie.

A000543

JOSHUA MORROW – DIRECT

1    Q    I'm sorry.

2    A    We reiterated the lie.

3    Q    What do you mean?

4    A    That she never saw the documents; that her phone

5    call was, hey, Josh give Adrian a call.

6    Q    And what do you mean by, "we always reiterated the

7    lie?"

8    A    Any time we talked about it was like we just, sort

9    of, like laid the groundwork for it.

10   Q    And that was the understanding between the two of

11   you?

12   A    Yes.

13   Q    And so on November 14 -- first of the all, did you

14   tell her that you were going to testify before the

15   Grand Jury by phone on November 14?

16   A    I don't believe I did.

17   Q    And I think we've already covered this, but you

18   testified on November 14th; right?

19   A    That's correct.

20   Q    And did you stick with the story the two of you

21   had come up with?

22   A    Yes.

23   Q    And what did you say?

24   A    In relation to -- you want the whole...

25   Q    Well, generally what was the story?

**A000544**

JOSHUA MORROW - DIRECT

1   A    The story was is that all she did was call me and

2   say, hey, do me a favor and give Adrian a call.

3   Q    And then --

4   A    And then I said I called Adrian.  He called me

5   back, told me about the documents.  He walked me

6   through them.  And I picked them up in the morning from

7   him.

8   Q    And was your understanding of the story that if

9   that was what you said, she could claim that she didn't

10  know what was in the envelope?

11  A    Yes.

12  Q    I never saw them; right?

13  A    Right.

14  Q    And was there a concern -- was this a concern

15  because these were Grand Jury materials?

16  A    Well, I guess at this point it was out that there

17  was a Grand Jury.  So, yes, I guess the concern for her

18  seeing these is that they were Grand Jury and that

19  she --

20                    MR. FARBER:  Objection, Your

21  Honor.  I guess.

22                    THE COURT:  All right.

23  Sustained.

24                    Sir, you can't guess.

25                    THE WITNESS:  Okay.

JOSHUA MORROW – DIRECT

1            MR. FARBER:  And move to strike

2   the last part of the answer.

3            THE COURT:  That's stricken.

4            The jury has the same

5   instruction about disregarding anything that I have

6   stricken, from your minds.

7   BY MS. HENRY:

8   Q    And so you weren't sure -- I think that you had

9   testified, too, that you weren't sure if you had told

10  her that you were testifying on November 14th.  But

11  after you testified, did you communicate with her?

12  A    Yes.

13  Q    And how did you communicate with her?

14  A    First it was via text and then it was a phone

15  call, several phone calls.

16            THE COURT:  Mr. Morrow, don't

17  forget to keep your voice up.  You tend to drop your

18  voice.

19            THE WITNESS:  Sorry.

20            THE COURT:  Okay.  It's just

21  audio challenging in this room.  So the acoustics are

22  very difficult.  We all have to hear you, okay.  Try to

23  remember to keep your voice up through your entire

24  response.  And use that microphone that is in front of

25  you.

**A000546**

JOSHUA MORROW - DIRECT

1            All right, Ms. Henry.

2            MS. HENRY:  Your Honor, at this

3  time I would request permission to admit C-70 and

4  publish it to the jury.  I have shared it with defense

5  counsel.  And I believe there is no objection.

6            MR. FARBER:  No objection.

7            THE COURT:  All right.  So C-70

8  is admitted.  You may publish it to the jury.

9            (Commonwealth's Exhibit C-70

10  received in evidence.)

11            THE COURT:  Not to comment on

12  the jurors eyesight, but that's pretty small font if I

13  may say so from my perspective.  And I would bet it's

14  challenging for them.

15            MS. HENRY:  Your Honor, I

16  intend to blow it up.

17            THE COURT:  Just making sure.

18  All right.  I don't want to read the jurors mind or try

19  and guess that that's what they think.  But it looks to

20  me like they're straining a bit.

21            MS. HENRY:  I agree.  I

22  couldn't read it.  I will have them blow it up.

23            THE COURT:  Nor could I.

24            Thank you.

25  BY MS. HENRY:

**A000547**

JOSHUA MORROW – DIRECT

1    Q    Sir, I am going to hand you what has been marked

2    as C-70.  So you can perhaps look at this, but we will

3    look at it a little more closely.

4                       So looking at the first --

5    where the first red arrow is on this document -- and

6    again, it's fair to say that these are from your phone

7    records, your cell phone records; is that right?

8    A    Yes, they are.

9    Q    So if you could look at the first red arrow, we're

10   looking at what date?

11   A    The 11/14/2014.

12   Q    And we'll go down to the next arrow.

13   A    11/15/2014 -- oh wait.  Right.

14   Q    I'm sorry.  The next block.  I apologize.

15   A    I'm sorry.

16   Q    Next block.  If you just wait one moment.

17                       So now on November 14 there is

18   a call at 10:41 p.m.; is that right?

19   A    Yes.

20   Q    Again, that's you.  And the phone call is to the

21   defendant; is that right?

22   A    Yes.

23   Q    And how long of a phone conversation is that?

24   A    It looks like it's less than a minute.

25   Q    And so that would have been on Friday,

JOSHUA MORROW - DIRECT

1    November 14.  That would have been after you testified;

2    is that right?

3    A     That's correct.

4    Q     And now we're going to move down to the next red

5    arrow.

6                         If you can blow that up for me,

7    please.

8                         We're looking at now Saturday,

9    November 15th.  Do you see that, Mr. Morrow?

10   A     I do.

11   Q     And we're going to go down to the next red block

12   and we see three times here.  First of all, there's

13   12:17 a.m.  And again, how long is that call?

14   A     It's a minute.

15   Q     And then at 12:23 a.m. there is another call with

16   the defendant.  How long is that?

17   A     A minute.

18   Q     And then at 12:23 a.m. -- again, now this is

19   technically November 15th, but it's early morning or I

20   would say late, late night -- and 12:23 a.m., how long

21   is that phone call?

22   A     Six minutes.

23   Q     And so it's midnight and you are talking with the

24   defendant the day after you testified in front of the

25   Grand Jury or the day of, what are you discussing?

JOSHUA MORROW - DIRECT

1    A    Well, she had heard that I testified.

2    Q    What do you mean by she had heard that you had

3    testified?  How do you know that?

4    A    Because she told me.

5    Q    What did she say?

6    A    She said word on the street is that you testified

7    today.  And she had some of the facts right and some of

8    the facts wrong.

9    Q    And when you say she had some of the facts right

10   and some of the facts wrong, what do you mean?

11   A    She said that I testified by video.

12   Q    By video.

13   A    When, in fact, I did it by phone.

14   Q    Okay.  And this is a six-minute phone

15   conversation, what do you discuss?

16   A    My testimony.

17   Q    And do you tell her what you said?

18   A    Yes.

19   Q    Did she seem like she had information about that?

20   A    Yes.

21   Q    And what makes you say that?

22   A    Because there was just stuff that she knew.

23   Q    And what did she know?

24   A    Like I think she knew what time I did it, like she

25   knew -- I mean, I don't remember all the facts, but she

1   definitely had -- she knew that I testified.  And I was

2   upset, but I was less upset that Kathleen knew and more

3   upset that I thought it was leaked by a reporter.

4   Because "word on the street" to me means, like,

5   reporters are calling asking for comment.

6   Q    And that upset you?

7   A    Yes.

8   Q    You indicated she talked with you.  Did you convey

9   to her that you had testified and stuck with the story?

10  A    I didn't say I stuck with the story, but I told

11  her what I testified to.

12  Q    If we could move down to the next block, red

13  block.

14              Again this is still now

15  Saturday, November 15th.  What is the time there?

16  A    1:01 a.m.

17  Q    And how long of a conversation is this one?

18  A    Twenty-three minutes.

19  Q    And again, what are you discussing at one in the

20  morning with the defendant the day after you testified

21  before the Grand Jury?

22  A    I was trying to figure out how she heard that I

23  testified.

24  Q    And what was she saying to you?

25  A    She just said she heard it.  I was trying to

JOSHUA MORROW – DIRECT

1   figure out how my testimony could have possibly leaked

2   out of that Grand Jury.

3   Q    And were you concerned?

4   A    Yes.

5   Q    Did she seem concerned about what you had said?

6   A    You mean what I testified to?

7   Q    Yes.

8   A    No.

9   Q    Did you tell her what you had said?

10  A    Yes.

11  Q    And did she say anything in response about her

12  testifying or about what she was going to say?

13  A    She did not.  I didn't know when she was

14  testifying and she didn't tell me when she was

15  testifying.

16              MS. HENRY:  Your Honor, at this

17  time I would request to admit C-71 and publish it to

18  the jury.  It's been shared with Defense Counsel.  And

19  I believe there is no objection.

20              MR. FARBER:  No objection.

21              THE COURT:  C-71 may be

22  admitted.  And it may be published to the jury.

23              MS. HENRY:  Thank you.

24              (Commonwealth's Exhibit C-71

25  received in evidence.)

**A000552**

JOSHUA MORROW – DIRECT

 1  BY MS. HENRY:

 2  Q    Mr. Morrow --

 3                         MS. HENRY:  If I may approach,

 4  Your Honor?

 5  BY MS. HENRY:

 6  Q    I'm going to hand you C-71 so you can look at

 7  that.

 8  A    Great.

 9  Q    Now, you had indicated, I think, when you first

10  started to testify about your communication with the

11  defendant on November 14th and had said, I think, that

12  it started with text messages; is that right?

13  A    That's right.

14  Q    Now, again we're looking at your phone records and

15  it indicates at the red arrow November 14th, again,

16  Friday; is that right?

17  A    That's right.

18  Q    And these pertain to text messages, so we're going

19  to go -- if we could maybe blow up the first three

20  blocks, if that's possible.

21                         And now we're looking -- could

22  you just indicate the times that you see in these three

23  red blocks?

24  A    6:26 p.m. and then 6:27 to 6:35 and then 8:58 to

25  9:09.

JOSHUA MORROW - DIRECT

1   Q    And it's fair to say these are sent text messages

2   to the defendant?  That's her number?

3   A    Yes.

4   Q    Okay.  Can we go down to the next set of blocks.

5                          And again, if you could just

6   indicate -- it indicates there's text messages sent

7   from 9:23 to 10:14 p.m.; is that right?

8   A    That's correct.

9   Q    And, Mr. Morrow, it's fair to say that these text

10  messages you are sending, that was before you spoke

11  with her?

12  A    I believe, yes.

13  Q    And do you know -- do you recall what the text

14  messages were?

15  A    Yeah.  These were all when she was telling me that

16  she heard that I testified.

17  Q    Well, you're sending them.

18  A    I mean, where are the received ones?

19  Q    Well, we'll get to that, Mr. Morrow.

20  A    Okay.

21  Q    But do you recall from your side of it what was

22  the communication between the two of you?

23  A    I think there was a lot of banter back and forth.

24  Q    And what was it about generally?

25  A    It wasn't all about my testifying before the Grand

**A000554**

JOSHUA MORROW — DIRECT

1    Jury.

2    Q    Was some of it?

3    A    Some of it was, yes.

4                    MS. HENRY:  Your Honor, at this

5    time I would request permission to admit C-72, publish

6    it.  It's been shared with defense counsel.  And I

7    don't believe there is an objection.

8                    MR. FARBER:  No objection.

9                    MS. HENRY:  May I approach?

10                    THE COURT:  C-72 is admitted.

11   And you may publish it to the jury.

12                    (Commonwealth's Exhibit C-72

13   received in evidence.)

14                    MS. HENRY:  And approach.

15                    THE COURT:  You may.

16                    MS. HENRY:  Thanks.

17   BY MS. HENRY:

18   Q    Mr. Morrow, I am handing you what has been marked

19   as C-72.  If you can take a look at that.

20   A    Yes.

21   Q    Now, if we could look at the date, again at the

22   arrow.  Looking at Friday, November 14th.

23   A    Yes.

24   Q    If we can blow up that first block.

25                    And again, on November 14th now

JOSHUA MORROW – DIRECT

1  these are received text messages from the defendant.

2  And just the time stamp, when do the text messages

3  start and when do they end?

4  A    Well, there's some on 7/26.

5  Q    Well, I'm looking at the ones in the block.

6  A    Oh, I'm sorry.  Okay.  10:49.

7  Q    And they go to?

8  A    11:20.

9  Q    And again, is this the back and forth that you are

10  seeing?

11  A    Yes.

12              MS. HENRY:  If I may just have

13  a moment, Your Honor.

14              THE COURT:  All right.

15  BY MS. HENRY:

16  Q    Now, we had indicated on November 14 there was

17  this communication back and forth; is that right?

18  A    That is correct.

19  Q    And you had indicated, I think, that you had to

20  testify again.

21  A    That is correct.

22  Q    And when was that?

23  A    11/21.

24  Q    And do you know if between November 14 and

25  November 21st if the defendant testified?

JOSHUA MORROW - DIRECT

1   A    Yes.

2   Q    And how do you know that?

3   A    I think there was a news story about it.

4   Q    Did you -- did she tell you that she was going to

5   testify?

6   A    She did not.

7   Q    Did she tell you after she had testified?

8   A    I think I sent her a text message.

9                      Because I think she had a press

10  conference before she testified and that's how I knew

11  that she was testifying that day.

12  Q    Okay.  And did she communicate with you at all

13  after she testified?

14  A    I think I sent her a picture saying -- I sent her

15  a text, I heard you did a great job.  And she sent me

16  back a picture of a beer that she was having.

17  Q    And that was after she had testified; is that

18  right?

19  A    Yes.

20                     MS. HENRY:  Your Honor, at this

21  time I would request permission to admit C-74.

22                     THE COURT:  Seventy-three.

23                     MS. HENRY:  C-73, and publish

24  it.

25                     THE COURT:  It's been shown to

JOSHUA MORROW — DIRECT

1   defense counsel?

2                              MS. HENRY:  I have, Your Honor.

3   I apologize.

4                              THE COURT:  Any objection?

5                              MR. FARBER:  May I confer with

6   Ms. Henry.

7                              THE COURT:  Yes.

8                              All right.

9                              MR. FARBER:  No objection, Your

10  Honor.  Thank you.

11                             THE COURT:  So C-73 is admitted

12  without objection.  And I will allow you to publish it

13  to the jury.

14                             (Commonwealth's Exhibit C-73

15  received in evidence.)

16  BY MS. HENRY:

17  Q    Now, again we're looking at Monday, November 17th,

18  from your phone records, a picture that you were sent

19  from the defendant.  What is the time that is reflected

20  there?

21  A    6:55.

22  Q    And is that what you were indicating where she

23  sent you a picture of a beer she was drinking?

24  A    Yes.

25                             MS. HENRY:  Your Honor, at this

JOSHUA MORROW - DIRECT

1  time I would request permission to admit C-74, publish

2  it.  I believe there is no objection.

3                        MR. FARBER:  No objection.

4                        THE COURT:  C-74 is admitted.

5  I will allow you to publish it to the jury.

6                        (Commonwealth's Exhibit C-74

7  received in evidence.)

8  BY MS. HENRY:

9  Q    Now, we're looking at your phone records for

10  Tuesday, November 18th.  Again, did you have some

11  communication with the defendant on that day?

12  A    I did.

13  Q    And was that communication -- this indicates text

14  messages.

15  A    This looks like it's phone calls.

16  Q    Okay.  On that day you spoke with her not just

17  communicated by text; is that right?

18  A    On the 18th?

19  Q    Yes.

20  A    I only have phone calls here.

21  Q    Okay.  You did talk to her on the 18th?

22  A    Yes.

23  Q    And again, what time is that?

24  A    6:34.

25  Q    And how long of a conversation was that?

JOSHUA MORROW - DIRECT

1  A     Twenty minutes.

2  Q     And now, this would have been after she testified

3  but before you testified for the second time; is that

4  right?

5  A     Yes.  But I was not told I was testifying until

6  Wednesday.

7  Q     So you wouldn't have known that at this point?

8  A     No.

9  Q     Do you recall where you were on November 18th?

10  A     Yes, South America.

11  Q     You were in South America?

12  A     Yes.

13  Q     And do you recall what you discussed during this

14  phone call?

15  A     I do not.

16  Q     Had you discussed after she testified -- I know

17  you said that she sent you the picture, but did you

18  discuss her testimony at all?

19  A     I don't believe we did.

20  Q     Did you know whether or not she had testified in

21  accordance with the story?

22  A     I did not.

23  Q     Had you heard her press conference?

24  A     I did not.  I mean, I read the news stories, but I

25  was -- I read the news stories on her, but I didn't see

JOSHUA MORROW - DIRECT

1    the press conference.

2    Q    You read the news stories about what her press

3    conference was on the date she testified?

4    A    Yes.

5    Q    And was that consistent with the story?

6    A    Yes.

7    Q    Now, Mr. Morrow, we've covered a lot of

8    communications back and forth by records and is it fair

9    to say -- I think we had covered this a little bit in

10   the beginning of your testimony -- is it fair to say it

11   wasn't until very recently that you shared your phones

12   with the detectives; is that right?

13   A    That's correct.

14   Q    Or the information contained on your phones.

15   A    That's correct.

16   Q    And when you did that, did you do that by consent?

17   A    Yes.

18   Q    What did you agree to?

19   A    I said that they could take text messages between

20   Kathleen and myself off of my phones.

21   Q    And anybody else?

22   A    And devices.

23   Q    Anybody else?

24   A    I don't believe so.

25   Q    And do you know whether or not you agreed to

JOSHUA MORROW – DIRECT

1  communication between yourself and Adrian King?

2  A    Oh yes, yes.  I agreed to that as well.

3  Q    And in terms of any other individuals, ultimately

4  did you provide information regarding communications

5  between some other individuals?

6  A    Yes.

7  Q    And again, what was your reluctance to share the

8  information contained on your cell phone?

9  A    Privacy.

10 Q    And what do you mean by that?

11 A    I mean I have a lot of personal text messages and

12 e-mails from my fiancée and myself, my parents,

13 business clients.  It's very invasive to turn over your

14 phone and have someone else have access to all the

15 information that's in there.

16 Q    And that was your concern?

17 A    That was my concern.

18                     MS. HENRY:  If I may have one

19 moment, Your Honor.

20                     THE COURT:  Yes.

21                     MR. FARBER:  If there is

22 something being shown to the jury, Your Honor, may I

23 move so that I can see it?

24                     THE COURT:  Certainly.

25                     MR. FARBER:  Thank you.

JOSHUA MORROW — DIRECT

1  BY MS. HENRY:

2  Q    Mr. Morrow, I apologize.  But I think you are

3  going to have to step down from the witness stand.

4                          THE COURT:  That's fine.

5                          Watch your step, sir.

6                          MS. HENRY:  Your Honor, just

7  for the record it's C-51, that has already been

8  admitted, that's on display.

9                          THE COURT:  Okay.

10                         MS. HENRY:  Thank you.

11  BY MS. HENRY:

12  Q    Now, Mr. Morrow, we covered a lot, but we're going

13  to look at this all together now.

14                          Looking at Tuesday, April 22nd,

15  which is the day that you got the documents, if you

16  could just take a look at this in terms of starting at

17  4:54 p.m. with the defendant calling you and then

18  ending with your 9:00 p.m. call to Lisko.  Do you see

19  that for April 22nd?

20  A    Yes.

21  Q    Does that accurately display the communication

22  that you had on that day with not only the defendant

23  but Mr. King and then your friend Mr. Lisko?

24  A    Yes.

25  Q    And we move, then, to April 23rd, Wednesday, and

JOSHUA MORROW - DIRECT

1  we see the text message from you to the defendant; is

2  that right?

3  A    That's right.

4                      THE COURT:  Okay.  So,

5  Mr. Morrow, when you answer all of us --

6                      THE WITNESS:  Okay.

7                      THE COURT:  -- the crowd behind

8  you has to hear you.

9                      THE WITNESS:  Okay.

10                      THE COURT:  But especially the

11  jurors and the court reporter.  So that's the challenge

12  we have here.  So I would recommend perhaps you stand

13  with Ms. Henry or closer to her and then turn yourself

14  so that your answer can be heard by all of us

15  especially the last two in the box here and also the

16  court reporter to my left.  Also the lawyers need to

17  hear, although one of them is behind me, for the

18  defense and another for the DA.  Most importantly the

19  jurors have to hear you.

20                      THE WITNESS:  Okay.

21                      THE COURT:  It's a little bit

22  reversed, typically the alternates might be

23  rubbernecking here right, but it's the first two in the

24  box.

25                      Keep your voice up, please,

**A000564**

JOSHUA MORROW — DIRECT

1  sir.

2                           THE WITNESS:  I will.

3  BY MS. HENRY:

4  Q    So looking at April 23rd, 2014, we see the text

5  exchange between you and the defendant; is that right?

6  A    Correct.

7  Q    Now, moving -- because we've discussed a lot of

8  different dates -- to Monday, May 5th, 2014.  That's

9  when you have telephone contact after you dropped the

10  documents off with Mr. Brennan; is that right?

11  A    That is correct.

12  Q    And that first text message that you send the

13  defendant is this one.  What is it?

14  A    "What is the saying about revenge?"

15  Q    And at 7:02 she replies?

16  A    "Best served cold.  Are we eating out soon."

17  Q    And again, those text messages on that particular

18  day, May 5th, the last one we see here is the defendant

19  saying what?

20  A    "I won't tell anyone."

21  Q    If we can move to C-52, please.  So now we're

22  looking at C-52.  Again, it's Wednesday, May 7, at 8:24

23  p.m., there is a phone conversation; is that right?

24  A    That's correct.

25  Q    And again, that's for 16 minutes and 30 seconds?

JOSHUA MORROW – DIRECT

1  A    Correct.

2  Q    And what is your text to the defendant after you

3  talk to the reporter who is writing the Fina/Mondesire

4  article?

5  A    "Oh man.  Frank's response was priceless."

6  Q    And again, that was in reference to the comment of

7  what had conveyed to you; is that right?

8  A    That's correct.

9  Q    And you ultimately then talked to the defendant on

10  that particular day; is that right?

11  A    Correct.

12  Q    And it ended with a 9:54 p.m. text where you tell

13  her what?

14  A    "It's time for your friends to fight back."

15  Q    And then we move then to May 12, 2014.  Do you see

16  that date there?

17  A    Yes.

18  Q    And you get a text from the defendant at 8:14 p.m.

19  What is she asking?

20  A    "Where is my story?  I'm dying here while you are

21  drinking."

22  Q    And then we see on here on May 13 and May 29 there

23  are some phone communications between you and the

24  reporter; is that right?

25  A    Correct.

A000566

JOSHUA MORROW – DIRECT

1   Q     And if we could now move to C-53.

2                          Now, this is Tuesday, June 3rd.

3   Again, this is before the article comes out; is that

4   right?

5   A     Correct.

6   Q     And these are texts between you and the defendant?

7   A     Correct.

8   Q     And looking at the one at 8:25 p.m., do you see

9   that one?

10  A     Yes.

11  Q     Again, what does that one say?

12  A     "I assume so.  Our story was slated for Monday and

13  the Lewis Katz stuff happened and now they are holding

14  it a week.  I was read the first version.  Brutal on

15  our friends."

16  Q     In reference to?

17  A     Frank Fina.

18  Q     And then June 3rd at 2014, this is the -- I'm

19  sorry.  June 3rd you see a text from you to her; is

20  that right?

21  A     Right.

22  Q     And what do you say there?

23  A     "You are fine in this.  Do you think I would do

24  that to you?"

25  Q     And then looking at June 4th, which again is the

JOSHUA MORROW — DIRECT

1    day before or two days before this article comes out on

2    June 5th, there is some communication with you and

3    Chris Brennan; is that right?

4    A    That is correct.

5    Q    And then you text after all that communication

6    with the reporter on June 5th, which is the day before

7    the article comes back at 8:24 p.m.  What do you tell

8    the defendant?

9    A    Going to be a bad day for Corbett and company.

10   Q    And then we see here Friday, June 6th.  What

11   happens on that day?

12   A    The story is published.

13   Q    Thank you, Mr. Morrow.

14                    THE COURT:  Let me see counsel

15   for a minute at side bar.

16                    - - -

17                    (A conference was held at

18   sidebar, not reported.)

19                    - - -

20                    THE COURT:  All right.  Ladies

21   and gentlemen, I'm trying to read you, as I have.  I

22   think it would be best for us to take a quick break.  I

23   know some of you have indicated you're thirsty you'd

24   like some water, we'll certainly do that.  We'll take a

25   bathroom break.  Leg stretch.  Replenish fluids.

JOSHUA MORROW − DIRECT

1      We're going to come back in

2  five minutes.

3      So this is my anticipation for

4  today:  I did promise you we're going to go a little

5  bit earlier day, because I did push you to the break

6  yesterday.  So I don't want you to end up wilted by the

7  end of the day and not being fresh all the way to the

8  end of testimony.  We need you to stay fresh and

9  attentive.  You are right now.  As I said, I think

10 today we'll probably conclude somewhere around 4:30,

11 quarter of 5.  So each day is different.

12      I can't tell you where we are

13 in terms of the math of the case or where it's going to

14 go and how long it's going to take.  That's something

15 that proceeds with testimony and questioning.  The

16 lawyers do their job in their robust advocacy of asking

17 questions, and that's the way it goes with each

18 witness.  That's a wait and see.  So no promises here

19 about where it will go from today.  I don't know.

20      But what I can tell you each

21 day is kind of where breaks go and how engaged you are

22 in the testimony.

23      Right now I think a quick break

24 will do.  Hopefully you're okay with that.  A

25 five−minute break, is that acceptable to you?  And to

JOSHUA MORROW - DIRECT

 1  jump right back in the box in five minutes.  And we'll

 2  go today until about 4:35, quarter of 5.

 3                      With that, let's excuse the

 4  jury for five minutes.

 5                      Everybody remain seated until

 6  the jury leaves the room.

 7               (The jury was excused.)

 8                      THE COURT:  All right.  Let me

 9  just say the jury has left the room.  And I heard a

10  cell phone going off or a semblance of a cell phone.

11  And if I hear that again we're going to have to search

12  whose cell phone it is and it's going to be

13  confiscated.  So everybody be on notice.  Cell phones

14  and any other devices are to be silenced or they'll be

15  taken from you.

16                      We're going to take five

17  minutes.

18                      - - -

19                  (Recess.)

20                      - - -

21                      THE COURT:  All right.  Ms.

22  Henry.

23                      MS. HENRY:  Thank you, Your

24  Honor.

25  BY MS. HENRY:

JOSHUA MORROW - DIRECT

1    Q    Mr. Morrow, I think when we left off we were

2    discussing communication you had with the defendant

3    around the time that you had testified back in November

4    of 2014; is that right?

5    A    Correct.

6    Q    And it's fair to say that you testified a third

7    time in January of 2015; is that right?

8    A    That is correct.

9    Q    Do you recall the date?

10   A    I believe it was the 12th, January 12th.

11   Q    And was that in person?

12   A    Yes.

13   Q    And did you have any contact or communication when

14   you were going to testify on January 12th?

15   A    Yes.

16   Q    Had you communicated to the defendant that you

17   were going to be called or going to testify for a third

18   time?

19   A    I don't remember.

20   Q    You don't recall if you did or didn't?

21   A    I think I told her that I was testifying on the

22   12th.

23   Q    And had you discussed anything about that?

24   A    No.

25   Q    You had indicated when you would talk about it

JOSHUA MORROW - DIRECT

1   that you would reiterate the lie, had that continued?

2   A    No.

3   Q    That was after you testified the first two times;

4   is that right?

5   A    That's right.

6   Q    I think you had said that you -- when you

7   testified on that day you did have communication with

8   her; is that right?

9   A    I got a text message from her on my way to the

10  Grand Jury.

11  Q    And what did the text message say?

12  A    I believe it said, don't worry.  The calvary is

13  coming.

14  Q    And what did you -- did you know what that meant?

15  A    I had no idea.

16  Q    Did you respond?

17  A    I don't believe I did.

18  Q    After that, in January of 2015, did you have

19  contact with anybody associated with the defendant

20  regarding this Grand Jury investigation?

21  A    I am not sure.

22  Q    In October of 2015 were you contacted by anybody?

23  A    Yes.

24  Q    And who contacted you, if you recall?

25  A    Dion Rassias.

JOSHUA MORROW - DIRECT

1   Q    And who is that?

2   A    A lawyer.

3   Q    And how did you know him?

4   A    Well, he represented me on several other issues,

5   and I introduced him and Kathleen.

6   Q    Is that the individual that you had testified

7   earlier that you introduced her at her request and met

8   in his office in Philadelphia?

9   A    Yes.

10  Q    And when he contacted you, what did he say?

11  A    He said, if I heard what is true about the tape,

12  tape meaning the recorded conversation, that you have

13  to come out on it because it's going to exonerate

14  Kathleen.  And then he said that if I felt I was

15  getting pressure from Carluccio, the Special

16  Prosecutor, to change my story, that I should hold a

17  press conference and say that.

18  Q    And what did you think about that phone call?

19  A    I said I have to talk to my attorney.

20  Q    And in terms of that phone call, did you talk to

21  your attorney about that?

22  A    I did.

23  Q    Did you receive another communication in October?

24  A    I did.  I got a text message from Colleen,

25  Kathleen's cousin.

**A000573**

JOSHUA MORROW – DIRECT

1                    MS. HENRY:  Your Honor, I have

2    what has been marked for identification as C-75.  I

3    have shared it with defense counsel.

4                         (Text Message, dated 10/23,

5    marked Commonwealth's Exhibit C-75 for identification.)

6                    MS. HENRY:  May I approach the

7    witness?

8                    THE COURT:  You may.

9                    C-75.

10   BY MS. HENRY:

11   Q    Mr. Morrow, if you can take a look at C-75.  Do

12   you recognize what is depicted in that photograph?

13   A    Yes.

14   Q    What is that?

15   A    It's the text message from Colleen.

16                    MS. HENRY:  Your Honor, at this

17   time I would request permission to admit and publish

18   C-75.

19                    MR. FARBER:  No objection.

20                    THE COURT:  C-75 is admitted.

21   And I will allow you to publish it to the jury.

22                    MS. HENRY:  Thank you, Your

23   Honor.

24                         (Commonwealth's Exhibit C-75

25   received in evidence.)

JOSHUA MORROW – DIRECT

1   BY MS. HENRY:

2   Q    And again, can you note the date on this?

3   A    It's Friday, October 23rd at 12:20 p.m.

4   Q    And what does the text say?

5   A    "Can we talk when you have a second.  Please."

6   Q    And did you -- again, who is this that is texting

7   you?

8   A    This is Kathleen's cousin.

9   Q    Does she work in the Attorney General's Office?

10  A    As far as I know, yes.

11  Q    Had you met her before?

12  A    Yes.

13  Q    And did you then call her?

14  A    I did.

15  Q    And what happened during that phone conversation?

16  A    She said, you have to do the right thing here or

17  people are going to lose their jobs.

18  Q    And how did you take that?

19  A    I took that as like she wanted me to stick to the

20  story.

21  Q    And when you say "stick to the story" you are

22  talking about the first story?

23  A    Yes.

24  Q    So you received these contacts, Mr. Morrow, from

25  an attorney and the defendant's cousin interpreting

**A000575**

JOSHUA MORROW – DIRECT

1  them as sticking to the story?

2  A    Yes.

3  Q    And you came in here today, did you tell us the

4  truth?

5  A    Yes.

6  Q    Did you stick to the story?

7  A    I did not.

8                       MS. HENRY:  No further

9  questions.

10                      THE COURT:  Cross-examine.

11                      MR. FARBER:  Thank you.  May I

12  have a moment to gather my things?

13                      THE COURT:  You may.

14                      Ms. Henry, do you want to

15  retrieve the exhibits from the stand so that the

16  witness doesn't have them up here, we don't lose track

17  of them, and also if Mr. Farber wants to refer to them

18  he can get them when he would like to use them.

19                      MS. HENRY:  I will, Your Honor.

20                      MR. FARBER:  Your Honor, may I

21  move the podium?

22                      THE COURT:  You may.

23                      MR. FARBER:  Thank you.

24                    **CROSS-EXAMINATION**

25  BY MR. FARBER:

JOSHUA MORROW - CROSS

1  Q    Good afternoon, Mr. Morrow.

2  A    Good afternoon.

3  Q    My name is Seth Farber, a lawyer for Ms. Kane.

4              I'd like to start just briefly

5  by where you ended up on direct examination.  You

6  testified just a couple of minutes ago that you

7  received a text message from Ms. Kane's cousin;

8  correct?

9  A    Correct.

10 Q    And you said you called her and you had a

11 conversation with her and she said to you you have to

12 do the right thing; correct?

13 A    Yes.

14 Q    And then Ms. Henry asked you what you understood

15 that to mean.  And you said you understood that to mean

16 stick to the story; correct?

17 A    Correct.

18 Q    Ms. Kane's cousin didn't say those words to you,

19 did she?

20 A    No.

21 Q    She told you you have to do the right thing;

22 right?

23 A    Or people are going to lose their jobs.

24 Q    And right before that you were asked about a

25 conversation you had with a lawyer named Dion Rassias;

JOSHUA MORROW – CROSS

1  correct?

2  A    Correct.

3  Q    And Mr. Rassias, you have a good relationship with

4  him; correct?

5  A    Not anymore.

6  Q    You did at the time; correct?

7  A    I hadn't spoken to him in a while, a month or two.

8  Q    He is someone who represented you personally;

9  correct?

10  A    He's never represented me, but he's been of

11  counsel to me, yes.

12  Q    What is the difference between being of counsel to

13  you and representing you?

14  A    I guess in my mind he's never gone to court for

15  me, but he's given me legal counsel.

16  Q    He's given you legal advice; correct?

17  A    Yes.

18  Q    And isn't it correct, sir, that you have taken the

19  position that your communications with him are

20  privileged and no one can inquire of him because you

21  had an attorney/client relationship; isn't that

22  correct?

23  A    It's my understanding I turned over communications

24  that were not privileged.

25  Q    You turned over some, correct, from a later period

JOSHUA MORROW - CROSS

1  of time; isn't that right?

2  A     I turned over all the text messages that I had

3  that were not privileged, yes.

4  Q     I want to be very specific, Mr. Morrow.  You have

5  taken the position that for a period of time relevant

6  to this investigation Mr. Rassias was your lawyer, you

7  consulted him for legal advice and as a result the

8  defense team would be precluded from finding out what

9  you said to him; isn't that right?

10 A     That's correct.

11 Q     So your testimony is that this individual who was

12 your lawyer -- and Mr. Rassias is a lawyer of the

13 Beasley Group, which is a significant law firm in

14 Philadelphia; correct?

15 A     Correct.

16 Q     He has a fairly good reputation; correct?

17 A     Correct.

18 Q     Well-respected in the community?

19 A     I suppose so.

20 Q     So correct me if I'm wrong, your testimony on

21 direct was that if you have a tape that can exonerate

22 Kathleen Kane you should go and release that to the

23 public; is that correct?

24 A     Correct.

25 Q     And he said you need to have a press conference to

**A000579**

JOSHUA MORROW - CROSS

1  do that; is that correct?

2  A    Correct.

3  Q    And your testimony is you said to him I need to

4  talk to my attorney?

5  A    Yes.

6  Q    Now, you testified also that you arranged a

7  meeting with Ms. Kane and Mr. Rassias; correct?

8  A    Correct.

9  Q    And the purpose of that meeting had nothing to do

10  with the events that are the subject of this trial;

11  isn't that right?

12  A    I believe that to be true, yes.

13  Q    That was -- if I'm correct, you had testified that

14  Ms. Kane said that she was having difficulty dealing

15  with the press, was looking for some assistance with

16  that, and you thought Mr. Rassias would be somebody who

17  could help her with that; isn't that right?

18  A    No, two different meetings.

19  Q    Wasn't that the point of you introducing her to

20  Mr. Rassias as someone who might be able to provide

21  advice to her and help her in handling issues she was

22  confronting in her office?

23  A    I suppose that's true.  But I wasn't in the

24  meeting, I was in and out of the meet.

25  Q    For the parts that you attended and from your

**A000580**

JOSHUA MORROW – CROSS

1    conversations, wasn't that your understanding?

2    A    I believe that's true.  But I was really sick, so

3    I was not really focused on what they were talking

4    about.

5    Q    I want to come back to the various text messages

6    that you were shown and go through them in some detail.

7    Just to start, generally you were shown a selection of

8    text messages that you sent; correct?

9    A    How do you mean a selection?

10   Q    Well, you recall there were some charts that Ms.

11   Henry went through with you in your direct examination;

12   correct?

13   A    Correct.

14   Q    And they had certain text messages?

15   A    Correct.

16   Q    You are a person who texts a lot; is that fair to

17   say?

18   A    Yes.

19   Q    How many text messages would you say you send on

20   an average day?

21   A    I have no idea.

22   Q    Dozens?

23   A    Probably.

24   Q    And most of those are essentially the electronic

25   equivalent of chatting with people; correct?

JOSHUA MORROW - CROSS

1   A    Correct.

2   Q    And that includes text messages with Ms. Kane;

3   correct?

4   A    Correct.

5   Q    You two would text and chat about your personal

6   lives; correct?

7   A    Correct.

8   Q    Politics; correct?

9   A    Correct.

10  Q    Your fiancées campaign; correct?

11  A    Correct.

12  Q    And that was true throughout this whole period

13  that was depicted in direct examination; correct?

14  A    Correct.

15  Q    And when I say there is a selection that you were

16  shown, the prosecutor went through and picked out a few

17  and put them up for you and went through them, but they

18  didn't show you the whole context; isn't that correct?

19  A    I guess that's true, yes.

20  Q    And let's just take a look at a few of those, if

21  we can.  And I guess to start with -- before we do

22  that.  Did Ms. Kane ever say to you, revenge is a dish

23  best served cold?

24  A    No.  I said, "What did they say about revenge?"

25  And she says, "It's a dish best served cold.  When are

A000582

JOSHUA MORROW - CROSS

1  we eating out?"

2  Q    You brought that up; right?

3  A    Yes.

4  Q    And the words she said after that, "Are we eating

5  out soon"; right?

6  A    Okay.

7                      MR. FARBER:  If I could

8  approach the witness, Your Honor, with C-64.

9                      THE COURT:  You may.

10                     MR. FARBER:  May I consult with

11  Ms. Henry for a moment.

12                     THE COURT:  You may.

13  BY MR. FARBER:

14  Q    I'm showing you what's previously been marked and

15  entered into evidence as C-64.

16                     Can I ask that be published to

17  the jury?

18                     THE COURT:  Yes.  I give you

19  permission to do that.

20                     MR. FARBER:  Thank you.

21  BY MR. FARBER:

22  Q    Okay.  And so if we look at 6:58 p.m., Mr. Morrow,

23  you text Ms. Kane without prompting, "What is saying

24  about revenge"; correct?

25  A    Correct.

JOSHUA MORROW - CROSS

1  Q    And that being a familiar phrase, she responds
2  "Best served cold"; correct?
3  A    Yes.
4  Q    And then moves on and says, "Are we eating out
5  soon"; right?
6  A    Well, it's the same text message.  Okay.  Yes.
7  Q    Then you text her, "Yes.  I hope you enjoy the
8  read in a few days"; correct?
9  A    Correct.
10 Q    And a couple of days after that there was an
11 article published about your fiancée; correct?
12                    THE COURT:  Can I just stop for
13 a moment.  Is C-64 what is right now published to the
14 jury?  Just take a look, Mr. Farber, and check on that
15 to make sure we're all following along with where you
16 want us to be.
17                    MR. FARBER:  My eyesight is
18 failing.
19                    THE COURT:  No worries.  Just
20 take a minute and maybe consult with Mr. Perrone and
21 Ms. Henry to make sure that C-64 is where you want and
22 where the exhibit is where you want it to be before
23 this jury.
24                    MR. FARBER:  We now have it.
25 Thank you, Your Honor.

**A000584**

JOSHUA MORROW — CROSS

1           THE COURT:  Is that the exhibit

2   that you wish the jury to see.

3           MR. FARBER:  Yes.  According to

4   my notes that's C-64.

5           THE COURT:  All right.

6           MR. FARBER:  Mr. Morrow, is

7   that what you have in front of you?

8           THE WITNESS:  Yes.

9           THE COURT:  All right.

10  BY MR. FARBER:

11  Q    So my question to you is:  At 7:02 p.m. you text

12  Ms. Kane saying, "Yes, I hope you enjoy the read in a

13  few days."  And a few days after that there was an

14  article published about your fiancée and her campaign;

15  correct?

16  A    Was that the article that refers to the

17  endorsement?

18  Q    Was there such an article?

19  A    There was.  But I don't know the date of that

20  article.

21  Q    Around that time?

22  A    If you can be more specific.

23  Q    Was there an article published about the

24  endorsement of Shaughnessy Naughton in May of 2014?

25  A    Yes.

JOSHUA MORROW - CROSS

1   Q    And her response to you is, "I think I will.  Can

2   you give me a hint?"

3                        When she's responding she

4   doesn't know what you are talking about; is that

5   correct?

6   A    She knows exactly what I'm talking about.

7   Q    Did she indicate that in this text?

8   A    First of all, when editorials make endorsements

9   they don't tell the campaigns in advance, so I would

10  not have known that we were getting the editorial

11  endorsement.  It doesn't happen like that.  So I would

12  not have known we were getting the endorsement.  I knew

13  the morning I got it.

14  Q    My question to you is:  When she responds, "I

15  think I will.  Can you give me a hint," she's

16  indicating there that she doesn't know what article you

17  are talking about; isn't that correct?

18  A    She knew exactly which article I was talking

19  about.

20  Q    Does that say that on here?

21  A    It does not.  But I will point out the following

22  text is about the Daily News, which is who I gave the

23  story to.

24  Q    That's what you write; correct?

25  A    Yes.  But she knows which article it is.

JOSHUA MORROW - CROSS

1    Q    Where are those words written here?

2    A    They're not.

3    Q    Thank you.

4                        We'll come back and look at

5    some more of these texts later.  But I want to talk for

6    a few minutes about your Grand Jury testimony.

7    A    Okay.

8    Q    You testified at length about them, and you

9    testified for the first time back on November 14 of

10   2014; correct?

11   A    That's correct.

12   Q    Now, you testified a number of times after that;

13   isn't that correct?

14   A    That is correct.

15   Q    And at some point in time you were presented with

16   an immunity order; correct?

17   A    Correct.

18   Q    And the first time that you got an immunity order

19   was back in June of 2015; correct?

20   A    Correct.

21   Q    And you got a second one right before you

22   testified here today; correct?

23   A    Yesterday.

24   Q    Yesterday.  And you recall that the first time you

25   testified, November 14th, 2014, you were testifying

JOSHUA MORROW - CROSS

1  under oath; isn't that right?

2  A    That is correct.

3  Q    And you were represented by a lawyer at that time;

4  isn't that right?

5  A    Correct.

6  Q    A woman named Katie Recker?

7  A    Correct.

8  Q    And Ms. Recker is someone who you retained; is

9  that right?

10 A    That is correct.

11 Q    Not someone who Ms. Kane retained for you;

12 correct?

13 A    That is correct.

14 Q    And she has no connection at all to the Office of

15 the Attorney General; correct?

16 A    None.  Correct.

17 Q    And you understand what the attorney/client

18 privilege is?

19 A    Yes.

20 Q    Which means you can talk to your lawyer, disclose

21 to her fully what you've done and no one can find out

22 what you said; correct?

23 A    That's correct.

24 Q    So you were free to tell Ms. Recker everything

25 about what had happened; correct?

JOSHUA MORROW - CROSS

1   A    That's correct.

2   Q    Before you get legal advice from her; correct?

3   A    Correct.

4   Q    And Ms. Recker was on the phone when you did that

5   first Grand Jury testimony; isn't that correct?

6   A    That is correct.

7   Q    And had you had a chance to speak with her

8   privately beforehand?

9   A    Yes.

10  Q    And I'd like to go over with you some of your

11  prior testimony.

12                      MR. FARBER:  If I may approach

13  Ms. Henry for a moment.

14                      If I may approach, Your Honor?

15  I would like to show the witness an exhibit that I am

16  going to mark as Defense Exhibit 8.

17                      (Sworn Testimony of Joshua

18  Morrow, dated 11/14/14, marked Respondent's Exhibit D-8

19  for identification.)

20                      THE COURT:  All right.  You may

21  approach the witness.

22                      MR. FARBER:  Thank you, Your

23  Honor.  And I am providing a copy to Ms. Henry.

24                      THE COURT:  All right.

25  BY MR. FARBER:

JOSHUA MORROW - CROSS

1    Q    Mr. Morrow, I've just handed you what I have just

2    marked as Defense Exhibit 8.  That's a transcript of

3    your testimony via teleconference on Friday,

4    November 14th, 2014.  Do you recognize that?

5    A    Yes.

6                        MR. FARBER:  And, Your Honor, I

7    would offer Defense Exhibit 8.

8                        THE COURT:  Any objection?

9                        MS. HENRY:  No objection.

10                       THE COURT:  D-8 is admitted.

11                       (Defendant's Exhibit D-8

12   received in evidence.)

13   BY MR. FARBER:

14   Q    Mr. Morrow, if you would turn, please, to Page 4.

15   And do you recall -- excuse me, Page 5.  You recall you

16   were sworn in to this Grand Jury; correct?

17   A    Yes.

18   Q    Sworn to tell the truth?

19   A    Yes.

20   Q    And before you testified you appeared in front of

21   a judge by telephone; correct?

22   A    Yes.

23   Q    And on Page 5, Line 16 -- excuse me, Line 17, tell

24   me if I am reading this correctly and if you remember

25   it happening:

JOSHUA MORROW - CROSS

1              "THE COURT:  Mr. Morrow, you

2    said you understood your rights so far.

3                   "Then I was explaining that a

4    witness before the Grand Jury has the duty to give

5    full, truthful, complete and honest answers to all

6    questions asked, except where the witness appropriately

7    refuses to answer on a proper legal ground.  And I am

8    directing you to observe and obey this duty.  And I

9    caution you that if you lie before the Grand Jury that

10   could be considered the crime of perjury, which is a

11   felony, which is punishable in Pennsylvania under the

12   Crimes Code and people do go to prison for lying to the

13   Grand Jury.

14                   You do understand that, sir, do

15   you not?

16                   "THE WITNESS:  I do

17   understand."

18                   Do you recall that exchange,

19   sir?

20   A    I do.

21   Q    And then further down you're asked:

22                   "You do solemnly swear or

23   affirm that the testimony you will give before the

24   Statewide Investigating Grand Jury in the matters being

25   inquired into it will be the truth, the whole truth and

JOSHUA MORROW – CROSS

1    nothing but the truth, so help you God."

2                            And your answer was, "yes";

3    correct?

4    A    Correct.

5    Q    And that is the same oath that you just took

6    today; correct?

7    A    Correct.

8    Q    And then you were asked a series of questions.

9    And if you could turn to Page 10, Line 14.  You were

10   asked:

11                           "QUESTION:  Do you know an

12   Adrian King?

13                           "ANSWER:  I do.

14                           "QUESTION:  In what capacity

15   and how do you know him?

16                           "ANSWER:  I met Adrian on the

17   last couple of months on the Attorney General's

18   campaign.  And I have not spoken to Adrian in a while.

19   But I have spoken to him two times between the end of

20   the campaign and over the course of the last, you know,

21   year.

22                           "QUESTION:  Did you have

23   contact with Adrian King in April or early May of this

24   year?

25                           "ANSWER:  I did.  I did.

JOSHUA MORROW – CROSS

1          "QUESTION:  What was that

2    about?

3          "ANSWER:  He asked me if I

4    could get some documents to a friendly reporter."

5          And the court reporter

6    interjects:  "I'm sorry.  I didn't hear that.

7    Documents to?"

8          "QUESTION:  If you can repeat

9    that?  Yes.

10         "He asked me if I could pick up

11   documents from him and give them to a friendly

12   reporter.

13         "QUESTION:  Okay.  Did someone

14   talk to you before about calling Adrian King?

15         "ANSWER:  Yes.

16         "QUESTION:  How did that

17   happen?  Who did that?

18         "ANSWER:  I spoke with

19   Kathleen.

20         "And that's Kathleen Kane?

21         "ANSWER:  That's correct.

22         "QUESTION:  What did she talk

23   to you about?

24         "She merely said give Adrian a

25   call.

JOSHUA MORROW – CROSS

1              "Do you know when that was
2   about?
3              "ANSWER:  I think it was
4   April 22nd.
5              "QUESTION:  Did she give you
6   any other formation?
7              "She said to give him a call.
8              "Anything else?
9              "ANSWER:  No.  She just said
10  give Adrian a call.
11             "QUESTION:  Did you discuss any
12  other matters?
13             "ANSWER:  No.
14             "QUESTION:  So based upon what
15  she told you, what did you do?
16             "ANSWER:  I called Adrian.
17  Adrian asked if he could call me back.  He called me
18  back a couple of hours later, told me that he had these
19  documents.  He asked me if I could pick them up from
20  him that night.  I could not pick them up that night.
21  He then left them for me in his front door between the
22  storm door and the main door, and I went the next
23  morning around 10:00 to pick them up.
24             "QUESTION:  What did he tell
25  you on the phone when he called you back?

JOSHUA MORROW – CROSS

1              "ANSWER: --

2              MS. HENRY:  Objection, Your

3    Honor.  At this point defense counsel is just reading a

4    transcript into the record.

5              THE COURT:  Well, he is.

6              Is there going to be a question

7    at some point at the end of this?  How much of the

8    transcript do you intend to read, Mr. Farber?

9              MR. FARBER:  To Page 13, Line

10   11.

11             MS. HENRY:  Your Honor, I agree

12   that defense counsel is allowed to impeach the witness.

13   But the way -- it's improper the way he's doing it.

14             THE COURT:  I will allow him to

15   do it.

16             MR. FARBER:  Thank you, Your

17   Honor.

18             THE COURT:  Overruled.

19             MR. FARBER:  Forgive me if I

20   lost exactly where I was.

21   BY MR. FARBER:

22   Q    I think this is it.

23             "QUESTION:  What did he tell

24   you on the phone when he called you back?

25             "ANSWER:  He told me that they

A000595

JOSHUA MORROW - CROSS

1  were documents related to -- one was a transcript

2  between, I think an investigator and a Deputy Attorney

3  General.  And one was an internal memo that talked

4  about an investigation into Jerry Mondesire's running

5  of a nonprofit."

6                      Let me just pause there.  Did I

7  read that testimony accurately, Mr. Morrow?

8  A    Yes.

9  Q    And I understand you've given, would it be fair to

10  say, different versions of events as time has

11  progressed?

12  A    Yes.

13  Q    And your testimony here today you discussed your

14  current version of what Mr. King said to you.  Do you

15  recall that earlier testimony?

16  A    Yes.

17  Q    And even today under this most recent immunity

18  order, which you received just yesterday, your version

19  of events is that you spoke to Mr. King and you talked

20  to him about the fact that he had documents for you

21  that you were supposed to get to a reporter; correct?

22  A    Correct.

23  Q    And he acknowledged to you what they were;

24  correct?

25  A    Correct.

JOSHUA MORROW - CROSS

1   Q    And did you talk with him about the fact that

2   these were campaign-related documents?

3   A    No.

4   Q    Did that ever come up?

5   A    No.

6   Q    Did he ever indicate to you that that's what he

7   thought these were?

8   A    No.

9   Q    He knew exactly what they were; correct?

10  A    Yes.

11  Q    Now, continuing on the transcript, Page 12, Line

12  18.

13                      "QUESTION:  Okay.  Did you see

14  those documents?

15                      "ANSWER:  I did.

16                      "QUESTION:  So did you review

17  them yourself?

18                      "ANSWER:  I cursorily read

19  them.  I didn't read them in great detail, but I did

20  read them.

21                      "QUESTION:  And they were what

22  they were purported to be by Mr. King?

23                      "ANSWER:  They were.

24                      "QUESTION:  After reviewing the

25  documents, did he say anything else?  What did he want

JOSHUA MORROW – CROSS

1   you to do with those documents?

2                           "He asked me if I could get

3   those documents to a friendly reporter.

4                           "QUESTION:  Did you do that?  I

5   did.

6                           "QUESTION:  What reporter did

7   you give it to and what newspaper?

8                           "ANSWER:  I gave it to Chris

9   Brennan at the Daily News."

10                          Do you recall that testimony?

11  A    Yes.

12  Q    Now, you testified a second time approximately a

13  week later; correct?

14  A    Correct.

15  Q    And this time you testified in person; is that

16  right?

17  A    Yes.

18  Q    Before an actual Grand Jury, live human beings;

19  correct?

20  A    Yes.

21                          MR. FARBER:  Your Honor, I

22  would like to mark the next exhibit, I believe it's

23  Defense 9.

24                          THE COURT:  D-9.

25                          (Master Transcript of

JOSHUA MORROW - CROSS

1  Proceedings of Grand Jury, dated 11/21/14 marked

2  Defendant's Exhibit D-9 for identification.)

3                       MR. FARBER:  And I am handing a

4  copy to Ms. Henry.

5                       MS. HENRY:  I have a copy.

6  Thank you.

7                       THE COURT:  All right.

8                       MR. FARBER:  May I approach the

9  witness?

10                      THE COURT:  Yes.

11  BY MR. FARBER:

12  Q    And Mr. Morrow, I am handing you what's been

13  marked for identification as Defense Exhibit 9.  And

14  you recall before you actually testified in the Grand

15  Jury you met again -- excuse me, you met in chambers

16  for the first time in person with the Grand Jury Judge

17  and Mr. Carluccio, the Special Prosecutor.

18  A    Correct.

19  Q    You need to answer audibly.

20  A    I said correct.

21  Q    I'm sorry.  I didn't hear you.  I apologize.

22                      And this time your lawyer was

23  with you in person; is that right?

24  A    Correct.

25  Q    Again, Ms. Recker?

JOSHUA MORROW - CROSS

1   A     Yes.

2   Q     And during that session in chambers the judge

3   ensured that you understood your rights again; correct?

4   A     Correct.

5   Q     And you recall that judge -- it was Judge

6   Carpenter, do you recall that?

7   A     Yes.

8   Q     And Judge Carpenter said to you -- Page 3, Line 3

9   -- "Kindly place your hand on the Bible.

10                          "You do solemnly swear or

11  affirm the testimony you will give before the Grand

12  Jury on the matters being inquired into by it will be

13  the truth, the whole truth and nothing but the truth,

14  so help you God."

15                          And you answered "yes";

16  correct?

17  A     Correct.

18  Q     And Judge Carpenter said to you:  "You further

19  understand lying to the Grand Jury is perjury, that

20  people go to prison for lying to the Grand Jury.  Do

21  you understand that?"

22                          And you answered "yes";

23  correct?

24  A     Correct.

25  Q     And then after you were sworn in you testified and

A000600

JOSHUA MORROW - CROSS

1   answered questions from Mr. Carluccio; correct?

2   A    Correct.

3                       MR. FARBER:  And, Your Honor, I

4   am now going to mark Defense 10.

5                       THE COURT:  All right.  D-10.

6                       (Transcript of Proceedings of

7   Grand Jury, dated 11/21/14, marked Defendant's Exhibit

8   D-10 for identification.)

9                       MR. FARBER:  And I am providing

10  a copy to Ms. Henry.

11                      MS. HENRY:  Thank you.

12                      MR. FARBER:  May I approach?

13                      THE COURT:  Yes.

14                      MR. FARBER:  If I can just have

15  a moment, Your Honor.

16                      THE COURT:  All right.

17  BY MR. FARBER:

18  Q    Page 6, Line 15.

19                      You were asked a question --

20  turn to Page 6, Line 15, Mr. Morrow.

21  A    Yes.

22  Q    You were asked a question:  "Did you have a

23  conversation her at the end of April, a phone call?

24  Did she call you"?  Does that mean with her, is that

25  how you understood that?

JOSHUA MORROW — CROSS

1  A     You mean with Kathleen?

2  Q     Yes.

3  A     Yes.

4  Q     Okay.

5                          "ANSWER:  She did.

6                          "QUESTION:  What did she tell

7  you?

8                          "ANSWER:  She asked me to call

9  Adrian King.

10                          "QUESTION:  And did she tell

11 you what it was about or anything of that nature?

12                          "ANSWER:  No.

13                          "QUESTION:  So the phone call

14 was what, basically?

15                          "ANSWER:  It was, hey, can you

16 give Adrian King a call.

17                          "QUESTION:  What did you do?

18 Did you respond to her?

19                          "ANSWER:  I told her I will.

20                          "QUESTION:  Did you talk about

21 the campaign or anything else on that phone call?  Did

22 you talk about anything else or that was just call

23 Adrian King?

24                          "ANSWER:  It was that brief.

25                          "Did you have an idea of what

JOSHUA MORROW - CROSS

1    she was calling you about?

2                         "ANSWER:  I did not.

3                         "QUESTION:  What did you do

4    after that?

5                         "ANSWER:  I called Adrian King.

6                         "QUESTION:  What did you tell

7    him?

8                         "I said, Adrian, Kathleen asked

9    me to call you.  He said, can I call you back.  We had

10   a very brief conversation.  He said, can I call you

11   back.

12                        "QUESTION:  When was that

13   conversation?

14                        "ANSWER:  He said he had some

15   documents he wanted me to give do a reporter."

16                        Did I read that accurately,

17   Mr. Morrow?

18   A    Yes.

19                        MR. FARBER:  If I can have a

20   moment, Your Honor.

21                        THE COURT:  All right.

22                        MR. FARBER:  And could I ask

23   that C-51 be put back up.

24                        THE COURT:  C-51 you want

25   published to the jury?

JOSHUA MORROW - CROSS

1              MR. FARBER:  Yes, Your Honor.

2              THE COURT:  All right.

3              Mr. Perrone, if you could

4    oblige us with that.  C-51, please.

5              MR. FARBER:  Could I ask that

6    we have C-51 set up.

7              THE COURT:  Okay.

8              Thank you detectives for

9    accommodating Mr. Farber with the exhibits.  Just make

10   sure that the glare from the lights are not bothering

11   the jurors.

12              Can the jurors see the exhibit

13   without the glare?  All right.  We have head nods from

14   all the jurors yes it looks good.  Go ahead.

15   BY MR. FARBER:

16   Q    Mr. Morrow, can you see?

17   A    I will come down there.

18              THE COURT:  Watch your step,

19   sir.

20   BY MR. FARBER:

21   Q    Okay.  And, in fact, this sequence of calls as

22   depicted on this timeline the Commonwealth went

23   through; isn't that right?

24   A    Correct.

25   Q    Ms. Kane calls you, a brief 18-second call;

**A000604**

JOSHUA MORROW – CROSS

1   correct?

2   A    Yes.

3   Q    You text her, "give me a minute"; correct?

4   A    Correct.

5   Q    You were on the phone with someone else then;

6   right?

7   A    I was.

8   Q    Do you recall who that was?

9   A    I don't.

10  Q    Could it have been Judge Dan McCaffery?

11  A    Possibly.

12  Q    Who is he?

13  A    He's a friend.

14  Q    You then call Ms. Kane back.  Talk to her for only

15  a minute 35 seconds; right?

16  A    Correct.

17  Q    Then you briefly call Mr. King, one-second call;

18  correct?

19  A    Correct.

20  Q    And then Mr. King calls you for a minute and 26

21  seconds, about the same time as you talked to Ms. Kane;

22  correct?

23  A    Correct.

24  Q    So you did speak to Ms. Kane, "call Adrian King";

25  correct?

JOSHUA MORROW – CROSS

1   A    Yes.

2                         MR. FARBER:  If I may have a

3   moment to take this down, Your Honor.

4                         THE COURT:  All right.

5   BY MR. FARBER:

6   Q    And my recollection is you said that eventually

7   you received a text from Mr. King --

8   A    Yes.

9   Q    -- later that night, actually, very early in the

10  morning?

11  A    Yes.

12  Q    Something like 12:30 a.m.?

13  A    Correct.

14  Q    And Mr. King had indicated to you he was flying

15  out of town early the next morning, which is why you

16  had this arrangement to pick up the documents between

17  the screen and his door; is that right?

18  A    Yes.

19  Q    So he was really going out of his way to deliver

20  these to you; correct?

21                        MS. HENRY:  Objection.  Calls

22  for speculation.

23                        THE COURT:  Sustained.

24  BY MR. FARBER:

25  Q    It was a late night text you received; correct?

JOSHUA MORROW — CROSS

1   A     Yes.

2   Q     From someone you knew had to get up very early the

3   next morning; correct?

4   A     Yes.

5   Q     And he told you he was driving two hours from

6   Harrisburg the night before; correct?

7   A     Yes.

8   Q     Now, am I correct that after your Grand Jury

9   testimony you felt under a tremendous amount of

10  pressure?

11  A     To tell the truth, yes.

12  Q     Your testimony is that you felt under tremendous

13  pressure to tell the truth after you testified twice

14  before the Grand Jury?

15  A     Yes.

16  Q     Well, sir, isn't it correct that you were

17  concerned because you were afraid that you were going

18  to be charged with perjury for your prior Grand Jury

19  testimony?

20  A     Yes.  I lied in the Grand Jury to protect

21  Kathleen.

22  Q     You were concerned that you were going to be

23  charged with perjury; correct?

24  A     Yes.

25  Q     And the office that would have prosecuted you for

**A000607**

JOSHUA MORROW - CROSS

1  perjury is the Montgomery County District Attorney's
2  Office; correct?
3  A    I guess so, yes.
4  Q    You gave that testimony here in Norristown; is
5  that right?
6  A    That's correct, yes.
7  Q    Which is part of Montgomery County?
8  A    Yes.
9  Q    So that would be Mr. Steele's officer; correct?
10  A    Yes.
11  Q    And the thought of being charged with perjury was
12  quite distressing to you; correct?
13  A    Yes.
14  Q    Because that would have had some pretty severe
15  consequences for you; correct?
16  A    Correct.
17  Q    And not just for you personally but for your
18  fiancée?
19  A    For a lot of people, yes.
20  Q    Well, you were at the time engaged to Shaughnessy
21  Naughton; correct?
22  A    I still am.
23  Q    And she was in the middle of a congressional
24  campaign?
25  A    I guess when I interviewed with the DAs office it

JOSHUA MORROW — CROSS

1   was June of last year.  Yes.

2   Q    And my recollection is she ran once for congress

3   unsuccessfully.  Her plan was to run again; right?

4   A    She did run again.

5   Q    And that was always the plan that she had in mind,

6   correct, that after she lost she was going to try and

7   run again?

8   A    Yes.

9   Q    And I take it you were very concerned about the

10  impact that it would have on her, on your relationship

11  if you were charged with perjury; correct?

12  A    The reality is I lied in a Grand Jury and I was

13  given an opportunity to come in and tell the truth, and

14  that's what I did.  It's very embarrassing to admit to

15  lying.  It's very —— it was hurtful to my career, it's

16  been hurtful to my relationships.  But the truth is I

17  was given an opportunity to come back in and tell the

18  truth, and that's what I did.

19  Q    When were you given that opportunity first?

20  A    June 10th.

21  Q    June 10th of 2015?

22  A    Yes.

23  Q    And when you came in on June 10th of 2015, did you

24  testify in front of a Grand Jury?

25  A    I did not.

JOSHUA MORROW - CROSS

1   Q    In fact, what you did on June 10th of 2015 --

2   actually, you didn't just come in, you did so because

3   there was an immunity order that compelled you to come

4   in; correct?

5   A    Correct.

6   Q    Let's take a look at that for a moment.

7                        MR. FARBER:  May I approach the

8   witness, Your Honor?

9                        THE COURT:  Yes.

10  BY MR. FARBER:

11  Q    Mr. Morrow, I'm showing you what has been marked

12  as Exhibit C-54.

13                       And could I ask that that be

14  published to the jury, Your Honor?

15                       THE COURT:  Any objection?

16                       MS. HENRY:  No, Your Honor.

17                       THE COURT:  All right.  I will

18  allow you to publish it.

19  BY MR. FARBER:

20  Q    So, Mr. Morrow, what this order says is:  "And

21  now, this 10th day of June, 2015, it is hereby ordered

22  and decreed that the Commonwealth's immunity petition

23  is granted and that, pursuant to 42 Pa.C.S.A 5947,

24  immunity is conferred upon Joshua Morrow for his

25  interview with detectives of the Montgomery County

JOSHUA MORROW - CROSS

1   Detective Bureau scheduled for today, June 10th, 2015.

2   It is further ordered that Josh Morrow may not refuse

3   to answer questions during his interview based on his

4   privilege against self-incrimination and that none of

5   the answers that Joshua Morrow gives to detectives

6   during his interview may be used against Joshua Morrow

7   except as provided by 42 Pa.C.S.A. 5947."

8                        Did I read that correctly?

9   A    Yes.

10  Q    You recall seeing this order at the time?

11  A    Yes.

12  Q    You had been refusing to speak to the detective

13  until you received this order; correct?

14  A    Correct.

15  Q    In fact, you had been held in contempt by a judge

16  for your refusal to answer questions in a prior Grand

17  Jury?

18  A    Correct.  I pled my 5th Amendment right.

19  Q    So it wasn't that you had some decision that you

20  wanted to come clean.  You were compelled to sit with

21  the detectives and answer questions.

22  A    And tell the truth.

23  Q    But, in fact, you didn't really tell the truth on

24  June 10th, 2015, did you?

25  A    No, I was still ready to continue to try to

**A000611**

JOSHUA MORROW - CROSS

1   protect Kathleen.

2   Q    You were still trying to protect Kathleen Kane on

3   June 10th?

4   A    Yes.  I was not ready to publicly admit that I

5   lied.

6   Q    Do you recall while you were there that detectives

7   were typing up a statement?

8   A    Yes.

9   Q    And you signed that statement?

10  A    Yes.

11                  MR. FARBER:  If I could make an

12  exhibit as 12, Your Honor, Defendant's Exhibit 12.

13                  THE COURT:  I have it as 11.

14                  (Investigative Interview

15  Record, dated 6/10/15, marked Defendant's Exhibit D-11

16  for identification.)

17                  THE COURT:  So marked.

18                  MR. FARBER:  And I am providing

19  a copy to Ms. Henry.

20                  MS. HENRY:  Thank you.

21                  MR. FARBER:  May I approach the

22  witness?

23                  THE COURT:  You may.

24  BY MR. FARBER:

25  Q    Mr. Morrow, I am showing you what I just marked as

JOSHUA MORROW - CROSS

1    Defense Exhibit 11.  And this is a five-page Interview

2    Record that you signed; correct?

3    A    Yes.

4                        MR. FARBER:  Your Honor, I'd

5    offer Defense Exhibit 11.

6                        THE COURT:  You are asking for

7    it's admission?

8                        MR. FARBER:  Yes.

9                        THE COURT:  Any objection?

10                       MS. HENRY:  No, Your Honor.

11                       THE COURT:  It's admitted.

12                       (Defendant's Exhibit D-11

13   received in evidence.)

14   BY MR. FARBER:

15   Q    And if you look at the bottom of each page,

16   Mr. Morrow, there is a signature.  Whose signature is

17   there?

18   A    Mine and the detective's.

19   Q    And it's dated; correct?

20   A    Yes.

21   Q    Now, at Page 4 at the bottom of this statement

22   there is a question.  Can you read the question and

23   answer for the jury, please?

24   A    "Do you know that it is against the law to provide

25   false information in this statement," that question?

JOSHUA MORROW – CROSS

1  Q    Yes.  You were ask the question:

2                        "Do you understand that it is

3  against the law to provide false information in this

4  statement and that if it is discovered that you have

5  provided false information that you could be arrested

6  and subject to the penalties of Section 4904 of the

7  Pennsylvania Crimes Code, 18 Pa.C.S.A. 4904, related to

8  unsworn falsification to authorities.

9                        "ANSWER:  Yes."

10                       Do you recall that from the

11  interview?

12  A    Yes.

13  Q    And do you recall that was in the statement when

14  you signed it?

15  A    Yes.

16  Q    And you had immunity for this interview; correct?

17  A    Yes.

18  Q    And your testimony is when you had the opportunity

19  to come clean you did.  You had that opportunity here;

20  correct?

21  A    Yes.

22  Q    And what you are telling us now is that you didn't

23  because you were still protecting Kathleen Kane; is

24  that correct?

25  A    Yes.

JOSHUA MORROW – CROSS

1   Q     And where it says that you could be arrested if

2   it's discovered that you provided false information, is

3   it your testimony that you did provide false

4   information in this statement?

5   A     I didn't tell the whole truth.

6   Q     When you say you didn't tell the whole truth, does

7   that mean you provided false information?

8   A     I didn't tell the whole truth.  I lied then to

9   part of my testimony.

10  Q     So would it be fair to say that if you lied you

11  provided false information?

12  A     I'm sorry.

13  Q     Would it be fair to say that if you lied then that

14  you provided false information?

15  A     Yes.

16  Q     Have you been arrested?

17  A     No.

18  Q     And what is your understanding about who decides

19  whether to arrest you for having provided false

20  information to Montgomery County Detectives?

21  A     I assume it's the Montgomery County Detectives.

22  Q     And the Montgomery County District Attorney's

23  Office?

24  A     Yes.

25  Q     Mr. Steele?

JOSHUA MORROW – CROSS

1   A    I'm not sure if he was the DA at the time, but

2   yes.

3   Q    He is now; right?

4   A    Yes, he is.

5   Q    And this was from June 10th of 2015; correct?

6   A    Correct.

7   Q    Now, if you turn to the first page of this the

8   first is:

9                           "Were you advised of the

10  disclosure order that was issued on April 30, 2015 by

11  the Honorable William R. Carpenter?

12                          "ANSWER:  Yes.

13                          "QUESTION:  Do you have any

14  questions regarding the disclosure order?

15                          "ANSWER:  I do not."

16                          And then you were asked a

17  question:

18                          "Has anyone within the Office

19  of Attorney General instructed you to provide specific

20  information or to be dishonest in this statement?"

21                          What was your answer?

22  A    "No."

23  Q    The next question:

24                          "Have you been afforded enough

25  time with your attorney to review your prior testimony?

**A000616**

JOSHUA MORROW – CROSS

1           "ANSWER:  Yes."

2                  Correct?

3     A     Correct.

4     Q     And here, too, your attorney was Ms. Recker;

5     correct?

6     A     Correct.

7     Q     And once again she was sitting right there next to

8     you; correct?

9     A     Correct.

10    Q     And then you're asked:

11                   "When did you provide testimony

12    in front of the Grand Jury?

13                   "ANSWER:  November 14, 2014,

14    November 21, 2014, January 12, 2015."

15                  Correct?

16    A     Correct.

17    Q     Okay.  Then you're asked:

18                   "After refreshing your memory

19    would you like to clarify any portion of your prior

20    testimony?"

21                  You see that?

22    A     Yes.

23    Q     And then you provide some references to lines of

24    your testimony.  Do you recall doing that?

25    A     Yes.

**A000617**

JOSHUA MORROW - CROSS

1  Q    And how did you come up with those particular

2  lines of testimony to respond to?

3  A    Because they were some of the testimony that I

4  lied about.

5  Q    So did you need to refresh your memory to

6  determine that you had lied?

7  A    Well, I hadn't seen the transcript, so yes.

8  Q    Well, you said those were lies.  Were you

9  clarifying your prior testimony or were you changing it

10 completely?

11 A    I was clarifying it.

12 Q    So the story that you told twice under oath you

13 thought was unclear; is that correct?

14 A    Yes.

15 Q    Just a mistake you made honestly?

16 A    No.

17 Q    Who decided to use the world clarify.

18 A    Well, that was the question that they presented,

19 I'm assuming the DA did or the detectives.

20 Q    If you read further down the page you were asked:

21                    "QUESTION:  Is there other

22 clarifications in your November 21, 2014 testimony?"

23                    And you give an answer.  Is

24 that one of the transcripts I put in front of you,

25 Mr. Morrow?

**A000618**

JOSHUA MORROW - CROSS

1   A    I'm sorry.  Which one?

2   Q    November 21, 2014.

3   A    I believe so, yes.  Okay.

4   Q    And can you just remind us what exhibit number you

5   have, please?

6   A    Well, I have two November 21s.  There's 9 and 10.

7   Q    Look at 10, please.  And if you could look at Page

8   6.

9                          Now, in your statement on

10  June 10, 2015 -- if you could keep both of those

11  documents handy -- in response to the question in your

12  statement:

13                          "Is there other clarifications

14  in your November 21, 2014 testimony?"

15                          Your answer is -- Page 6, Line

16  22, okay -- "My answer is yes."

17                          This is referenced to the

18  telephone call on April 22, 2014.

19                          Now, going back, sir, to the

20  November 21, 2014 testimony.

21  A    I'm sorry. I'm losing you here.  So Page 6, Line

22  22.

23  Q    If you look at Page 6, Line 22 of your

24  November 21, 2014 testimony.

25  A    Okay.

JOSHUA MORROW - CROSS

1  Q    Do you have that, sir?

2  A    Yes.

3  Q    And you see you're asked a question -- excuse me.

4  You're asked a question on Line 20:  "And did she tell

5  you what it is about or anything of that nature?"

6                              And that's in reference when

7  she asked you to call Adrian King; correct?

8  A    Correct.

9  Q    So in response to the question and did she tell

10  you what it is about or anything of that nature, you

11  answered no; correct?

12  A    Correct.

13  Q    And that was your testimony in the Grand Jury;

14  correct?

15  A    Yes.

16  Q    And then when you are sitting down with Mr.

17  Steele's detectives typing out this statement they ask:

18  "Is there any other clarifications in your November 21,

19  2014 testimony?"  And the first thing you say is --

20  Page 6, Line 22 -- "My answer is yes"; correct?

21  A    Yes.

22  Q    You change no to yes; correct?

23  A    Correct.

24  Q    That is not a clarification, that is just

25  completely changing your testimony; isn't that correct?

**A000620**

JOSHUA MORROW — CROSS

1    A    That's correct.

2    Q    This is just a euphemism that you're using to

3    avoid --

4                          MS. HENRY:  Objection.  The

5    witness testified it wasn't his word.

6                          MR. FARBER:  Excuse me.  I will

7    ask him another question.

8                          THE COURT:  All right.

9    BY MR. FARBER:

10   Q    You signed this statement, didn't you?

11   A    I did.

12   Q    And you understood that in signing it you were

13   indicating that everything in it was accurate; correct?

14   A    Correct.

15   Q    So turn to the very last page of the statement,

16   Page 5.  It says:

17                          "QUESTION:  I am now going to

18   print this statement, please read it over and make any

19   corrections, we want to make sure that it is accurate.

20   Do you understand?

21                          "ANSWER:  Yes."

22                          Did I read that correctly?

23   A    Yes.

24   Q    Did you, in fact, read over the statement?

25   A    I did.

JOSHUA MORROW — CROSS

1   Q    To make sure that it was accurate and correct?

2   A    I did.

3   Q    And then you signed it?

4   A    Yes.

5   Q    Understanding that having false statements in here

6   would subject you to potential arrest?

7   A    Yes.

8   Q    Which arrest has never happened; correct?

9   A    Yes.

10  Q    Now, you were also in that statement asked a

11  question on Page 4 towards the bottom:

12                      "QUESTION:  Is there anything

13  that we didn't discuss today that you feel would be

14  important to our investigation?"

15                      And your answer was, "I don't

16  think so."

17                      Is that correct?

18  A    Correct.

19  Q    And Ms. Henry on direct examination asked you

20  about a number of things that you told detectives in

21  Montgomery County for the first time in recent weeks;

22  correct?

23  A    Correct.

24  Q    And that includes this story about meeting with

25  Mr. Rassias; correct?

JOSHUA MORROW − CROSS

1   A    Correct.

2   Q    This story about being wanded; correct?

3   A    Correct.

4   Q    And all of that is information you've related to

5   them within the past month; correct?

6   A    Correct.

7   Q    Maybe even less than that; right?

8   A    Correct.

9   Q    So after you did that, did you face any

10  consequences for the fact that you had not divulged

11  this information previously?

12  A    I did not.

13  Q    And you'd agree with me that those facts, if true,

14  are ones that would be of considerable interest to the

15  District Attorney's Office; correct?

16  A    I have no idea.

17  Q    You have no idea?

18  A    I mean, I don't know if a meeting with Dion

19  Rassias is important to an investigation.  I mean, it

20  was a meeting between two lawyers.

21  Q    How about the allegations that you were wanded by

22  Mr. Reese?

23  A    They were not allegations.

24  Q    The information which you have now provided, you

25  have some doubt about whether that is something that

JOSHUA MORROW - CROSS

1   would have been of interest to Mr. Steele here earlier?

2   A    I didn't think that it was important to the

3   investigation.

4   Q    So that just dawned on you recently and then you

5   immediately came forward?

6   A    Well, once I released the burden of lying, yes.

7   Q    When did you relieve that burden?

8   A    When I had an opportunity to come back in here to

9   tell the truth.

10  Q    You said when you had an opportunity to come back

11  in here and tell the truth.  You've had that

12  opportunity a number of times, haven't you?

13  A    Yes.

14  Q    So when is it that you are saying you had that

15  opportunity?

16  A    Because when they brought me back in to do my

17  trial prep.

18  Q    Trial prep, what do you mean by that?

19  A    Well, I'm a witness, so they prep me for the case

20  or for my testimony.

21  Q    Who prepped you?

22  A    The DA's Office.

23  Q    And when you say the DA's Office prepped you, tell

24  us exactly what they did.

25  A    They asked me questions about the trial.

JOSHUA MORROW - CROSS

1   Q    How many times did you meet with representatives

2   of the District Attorney's Office in preparation for

3   your trial?

4   A    Twice.

5   Q    Did you hear my question, sir?

6   A    I said twice.

7   Q    I'm sorry.  I didn't hear your answer.

8                        THE COURT:  He did answer, he

9   said twice.

10                       MR. FARBER:  I apologize.

11  BY MR. FARBER:

12  Q    And who from the District Attorney's Office

13  attended those sessions?

14  A    The two attorneys in front of me, the DA, the

15  detectives and those two attorneys over there.

16  Q    And so in total how many attorneys would you say?

17  A    Six, I think.

18  Q    How long did each of those sessions last?

19  A    A couple of hours.

20  Q    And at which of those sessions did you first have

21  the opportunity to come clean, as you put it?

22  A    The first one.

23  Q    So that was late July of this year; correct?

24  A    Yes.

25  Q    And you had by then testified in the Grand Jury a

JOSHUA MORROW - CROSS

 1   number of times and been interviewed by the Montgomery

 2   County Detective's Office, all the time represented by

 3   Katie Recker; correct?

 4   A    Correct.

 5   Q    Did it not occur to you that if you wanted to

 6   provide additional information to the District

 7   Attorney's Office to come clean about something that

 8   you could have asked Ms. Recker to pick up the phone

 9   and call Mr. Steele or call Ms. Henry and say there's

10   some things I want to come clean about, did that cross

11   your mind, sir?

12   A    No.

13   Q    So your testimony is that when you sat in the

14   District Attorney's Office with all these lawyers

15   preparing for your testimony you admitted to them that

16   even after testifying once under oath, testifying a

17   second time under oath, testifying a third time under

18   oath, three times before the Grand Jury, after having

19   gotten immunity and come in and sat in that same office

20   and given a written statement with the penalties that

21   we attached that after all that you still had not come

22   clean; correct?

23   A    That's correct.

24   Q    For the last of those times you'd been given

25   immunity, and you admitted to them that you had,

JOSHUA MORROW - CROSS

1  according to you, made false statements; correct?

2  A    Correct.

3  Q    And their response to that was let's continue with

4  our trial preparation; correct?

5  A    Correct.

6  Q    Because you were going to be a witness for the

7  prosecution; correct?

8  A    Correct.

9  Q    And were they happy that you were now, as you put

10  it, coming clean with them?

11                          MS. HENRY:  Objection.

12                          THE COURT:  Sustained.

13  BY MR. FARBER:

14  Q    Was it your perception that they were pleased, as

15  you put it, you were now coming clean with them?

16                          MS. HENRY:  Objection.

17                          THE COURT:  Sustained.

18  BY MR. FARBER:

19  Q    When you had -- as you put it, came clean with the

20  prosecutors, did anyone in the room suggest to you that

21  you would be charged of any crime?

22                          MS. HENRY:  Objection.

23                          THE COURT:  Overruled.

24                          THE WITNESS:  No.

25  BY MR. FARBER:

JOSHUA MORROW - CROSS

1   Q    And, in fact, what happened is you got a second

2   immunity order; correct?

3   A    Correct.

4   Q    And that's what's already been marked and admitted

5   into evidence as C-55; correct.

6                        MR. FARBER:  May I approach,

7   Your Honor?

8                        THE COURT:  Yes, you may.

9                        MR. FARBER:  And may I have

10  this published to the jury, Your Honor?

11                       THE COURT:  Yes, you may.

12                       MR. FARBER:  Thank you, Your

13  Honor.

14                       THE COURT:  So C-55.

15                       Mr. Perrone, if you can indulge

16  us with publishing C-55.  Thank you.

17  BY MR. FARBER:

18  Q    So this order of immunity, it's just like the last

19  one you got; correct, Mr. Morrow?

20  A    Correct.

21  Q    It says:  "And now, this 10th day of August, 2016,

22  it is hereby ordered and decreed that the

23  Commonwealth's immunity petition is granted and that,

24  pursuant to 42 Pa.C.S.A. Section 5947, immunity is

25  conferred upon Joshua Morrow for his testimony at the

JOSHUA MORROW - CROSS

1  trial in the above-captioned case."

2                          And the above-captioned case is

3  Commonwealth of Pennsylvania vs. Kathleen G. Kane, this

4  trial.

5  A    Correct.

6  Q    So you got immunity for what you are saying here

7  today.

8  A    Correct.

9  Q    So would it be fair to say, Mr. Morrow, that no

10  matter what you've said, no matter how much you've

11  changed your testimony you don't get charged with a

12  crime.

13  A    Correct.

14                          MR. FARBER:  If I can have one

15  moment, Your Honor.

16                          THE COURT:  You may.

17  BY MR. FARBER:

18  Q    I would like to spend a minute now, Mr. Morrow,

19  and talk to you about the tape recording that was

20  played in the Commonwealth's case.  Do you recall that

21  recording?

22  A    I do.

23  Q    That was your conversation with Mr. Lisko?

24  A    Correct.

25  Q    That was recorded by the FBI unbeknownst to you;

**A000629**

JOSHUA MORROW – CROSS

1  right?

2  A     That's correct.

3                        MR. FARBER:  Your Honor, I

4  would like to refer to the transcripts, if I may.

5                        THE COURT:  All right.

6                        MR. FARBER:  I think they were

7  previously distributed to the jury, and I ask if they

8  have been collected if they may be redistributed.

9                        THE COURT:  Do we have the

10  transcript to be redistributed to the jurors, please.

11  We do.  If the court staff can distribute them, please.

12  Thank you.  Thank you crier Saville.

13                        MR. FARBER:  If I may have a

14  moment, Your Honor.

15                        THE COURT:  All right.  The

16  jurors all have a copy.

17                        MR. FARBER:  If I can just have

18  a moment to get the exhibit.  Just one second, Your

19  Honor, so I can get the original.

20                        May I approach the witness,

21  Your Honor?

22                        THE COURT:  You may.

23  BY MR. FARBER:

24  Q     So, Mr. Morrow, I have handed you what was

25  previously marked as C-57.  And this is a conversation

A000630

JOSHUA MORROW - CROSS

1  you have at night, at 9:00 at night with Mr. Lisko?

2  A    Yes.

3  Q    And I take it -- and I think you testified on

4  direct examination that you and Mr. Lisko talk a lot?

5  A    Yes.

6  Q    And chat about politics, families, things going on

7  in your lives; correct?

8  A    Yes.

9  Q    And, in fact, this transcript and the tape that

10  was played for the jury was just an excerpt of a larger

11  conversation you had with him; correct?

12  A    Yes.

13  Q    And it's not a formal setting like you are

14  testifying here under oath; correct?

15  A    Correct.

16  Q    And so I take it you don't always speak with him

17  the same precision that you might or hopefully you do

18  when you are testifying under oath; correct?

19  A    Correct.

20  Q    Now, going back to April of 2014, that was a time

21  period when Adrian King was still First Deputy Attorney

22  General for the Commonwealth of Pennsylvania; correct?

23  A    Correct.

24  Q    And I believe you testified on direct examination

25  you didn't have a relationship with him nearly as close

JOSHUA MORROW – CROSS

1  as your relationship with Ms. Kane; correct?

2  A    It was almost non-existent.

3  Q    So he was essentially someone who worked for her;

4  correct?

5  A    Yes.

6  Q    So when he spoke he was speaking for the Attorney

7  General; is that correct?

8                         MS. HENRY:  Objection.  Calls

9  for speculation.

10  BY MR. FARBER:

11  Q    In your mind.

12                         THE COURT:  Overruled.  If you

13  know.

14                         THE WITNESS:  I have no idea.

15  BY MR. FARBER:

16  Q    Well, when you heard something from Mr. King as

17  the Deputy Attorney General about what he wanted done,

18  the office wanted done, you understood that to be what

19  Kathleen Kane wanted; correct?

20                         MS. HENRY:  Objection.  Asked

21  and answered.  He said he didn't know.

22                         THE COURT:  If you know.

23                         THE WITNESS:  I have only

24  spoken to Adrian one time during this time period, so I

25  have no idea, like, you know.

JOSHUA MORROW - CROSS

1  BY MR. FARBER:

2  Q    When you spoke to Mr. King during this time

3  period, did you believe he was speaking to you on

4  behalf of Ms. Kane?

5  A    Kathleen asked me to call him because he had

6  documents, so.

7  Q    I understand your recitation of what you are

8  saying happened.  I am asking a different question,

9  sir.  I'm asking whether you understood that when

10 Mr. King spoke to you he was speaking to you on behalf

11 of Ms. Kane.

12                    MS. HENRY:  Objection.  Asked

13 and answered three times now.

14                    THE COURT:  Sustained.

15 BY MR. FARBER:

16 Q    Mr. Morrow, let me direct you to Page 3 of this

17 transcript.  If you look in the middle, Mr. Lisko,

18 that's JL; correct?

19 A    Yes, right.

20 Q    He says:  "Right.  If anything, if anything it's

21 like proving that point."

22                    And you say to him:  "Right,

23 right.  You know, when she, like, well, go talk to

24 Adrian, Adrian is like, well, I'll leave these between

25 my screen door and my front door and you can pick them

**A000633**

JOSHUA MORROW – CROSS

1  up and, like, redact names.  And like, I'm like oh

2  God."

3                    Did I read that correctly?

4  A    Yes.

5  Q    And you recall saying that to Mr. Lisko?

6  A    I do not recall saying that.  I mean, I do know

7  that I've seen it, but I did not recall it prior to

8  seeing or hearing it today.

9  Q    Is that consistent with your recollection of your

10  conversation?

11  A    I do not recall who told me to redact names.

12  Q    What you said at 9:00 p.m. to Mr. Lisko was that

13  it was Adrian, correct, Adrian King?

14  A    It certainly appears that way, but I do not recall

15  who told me to redact names.

16  Q    Do you have any reason to doubt that's what

17  happened?

18  A    No.  But like I said, I have no recollection who

19  told me or if anyone even told me to redact names.

20                    MR. FARBER:  I'm done with that

21  exhibit, Your Honor.  Would you like me to have the

22  jurors...

23                    THE COURT:  Make sure you won't

24  need to refer to it again because the jurors have it,

25  so.

JOSHUA MORROW – CROSS

1                    MR. FARBER:  No, I'm done with

2    that, Your Honor.

3                    THE COURT:  All right.  Can we

4    collect it from the jurors, please, and the witness.

5                    All right.  The transcription

6    has been collected from the jurors and the witness.

7                    Thank you, Mr. Saville.

8                    Mr. Farber.

9                    MR. FARBER:  Thank you, Your

10   Honor.

11   BY MR. FARBER:

12   Q    Now, I believe you testified that you were upset

13   because Ms. Kane had referred to you as a mere

14   acquaintance.  Do you recall that?

15   A    Yes.

16   Q    In fact, she didn't refer to you as a mere

17   acquaintance, the story said that her office described

18   you in that way; isn't that correct?

19   A    Okay.  I don't remember the exact quote, so I

20   don't know if it was attributed to Kathleen directly or

21   attributed to a spokesperson or the office.

22                    MR. FARBER:  If I can have a

23   moment, Your Honor.  If I can get an exhibit, Your

24   Honor.

25   BY MR. FARBER:

JOSHUA MORROW – CROSS

1  Q    Mr. Morrow, I am showing you what has been

2  previously entered into evidence as Exhibit C–25.

3  That's the article; correct?

4  A    Yes.

5                    MR. FARBER:  If I can have a

6  moment.

7                    THE COURT:  Yes.

8                    MR. FARBER:  And if I can

9  approach the witness just to direct his attention to

10 particular parts of 25, Your Honor?

11                   THE COURT:  C–25.

12 BY MR. FARBER:

13 Q    And, Mr. Morrow, if you could turn to the final

14 page.  And let me direct your attention to the forth

15 column, and ask you to read that and see if that

16 refreshes your recollection about what the article

17 actually said.

18                   MS. HENRY:  Objection.  The

19 witness didn't say that he didn't recall.

20                   MR. FARBER:  Your Honor, my

21 recollection is that he did.

22                   MS. HENRY:  I will withdraw it.

23                   THE COURT:  All right.

24 Objection withdrawn.

25                   THE WITNESS:  Okay.

A000636

JOSHUA MORROW – CROSS

1  BY MR. FARBER:

2  Q    And am I not correct that it says in the statement

3  released Friday at Kane's office, it says, McCaffery

4  and Morrow, quote, are and always have been mere

5  acquaintances of her; correct?

6  A    Correct.

7  Q    That's attributed to her office.

8  A    Right.

9  Q    Not to her personally.

10  A    Well, I mean, if she runs her office like she ran

11  her campaign, quotes and statements didn't go out

12  without her approval.

13  Q    Mr. Morrow, is that just your assumption?

14  A    Well, as the person who handled her communication

15  I can say it's a fact.

16  Q    You were handling it at the time?

17  A    No.  For the campaign.

18  Q    I want to go back to your testimony about your

19  meeting on June 10th -- excuse me, your interview on

20  June 10th of 2015.  You testified at that time that you

21  were still trying to protect Kathleen Kane; right?

22  A    Yes.

23  Q    That's what you said.  Now, you testified in the

24  Grand Jury for the third time in January of 2015;

25  correct?

JOSHUA MORROW — CROSS

1   A     Correct.

2   Q     Several months go by you get an immunity order and

3   you're compelled to testify, compelled to answer

4   questions in June of 2015; correct?

5   A     Correct.

6   Q     And in between there, in March of 2015, you

7   communicate with Judge Dan McCaffery.  In fact, you

8   communicate with Judge McCaffery all the time; isn't

9   that right?

10  A     Yes.

11  Q     And one of the things that you tell him on

12  March 30, 2015, you text him, I hope she goes down;

13  isn't that correct?

14  A     I have no idea.

15  Q     Let me ask a different question.  You texted him,

16  I hope she goes away.

17  A     Yes.

18  Q     You recall that?

19  A     Yes.

20  Q     That's when you were still trying to protect her?

21  A     Yes.

22                    MR. FARBER:  May I have one

23  moment, Your Honor.

24                    THE COURT:  Yes.  Let me see

25  the lawyers at sidebar for one moment.

**A000638**

JOSHUA MORROW - CROSS

1                        - - -

2                              (A conference was held at

3   sidebar, not reported.)

4                        - - -

5                              THE COURT:  Well, I'm going to

6   keep you guessing, ladies and gentlemen of the jury

7   just because.

8                              Mr. Farber, do you have any

9   other questions?

10                              MR. FARBER:  No further

11  questions.

12                              THE COURT:  All right.

13                              Redirect, Ms. Henry.

14                              MS. HENRY:  Very briefly, Your

15  Honor.

16                              THE COURT:  Thank you.

17                              MR. FARBER:  If I may have a

18  moment to gather my things.

19                              THE COURT:  You may.

20                              MS. HENRY:  Thank you, Your

21  Honor.

22                   **REDIRECT EXAMINATION**

23  BY MS. HENRY:

24  Q    Mr. Morrow, you were asked a lot of questions

25  about your testimony on prior occasions.  It's fair to

JOSHUA MORROW – REDIRECT

1    say that you lied in the past about this?

2    A    Yes.

3    Q    And, in fact, you have indicated that you lied to

4    protect, in part, the defendant; is that right?

5    A    And myself, yes.

6    Q    Okay.  And, in fact, when you met with the

7    detectives in June of 2015 you did have immunity; is

8    that right?

9    A    I did.

10   Q    And you still weren't honest about her

11   involvement; is that right?

12   A    That's correct.

13   Q    And in particular the coverup; is that right?

14   A    That's right.

15   Q    And was that to protect her still?

16   A    Yes.

17   Q    Has this been hard?

18   A    Very hard.

19   Q    Did you come in here today and tell us the truth?

20   A    I did.

21                           MS. HENRY:  No further

22   questions.

23                           MR. FARBER:  Briefly.

24                           THE COURT:  I will hold you to

25   that.

**A000640**

JOSHUA MORROW – RECROSS

1          **RECROSS-EXAMINATION**

2   BY MR. FARBER:

3   Q    And you said that you lied in part to protect

4   yourself; correct, Mr. Morrow?

5   A    Yes.

6   Q    And that's who you are protecting now; isn't that

7   right?

8   A    No.

9                    MR. FARBER:  No further

10  questions.

11                   MS. HENRY:  Nothing, Your

12  Honor.

13                   THE COURT:  So I am going to

14  excuse the witness, if that is all right with the

15  lawyers.

16                   MS. HENRY:  Yes, Your Honor.

17                   MR. FARBER:  Yes, Your Honor.

18                   THE COURT:  Mr. Morrow, you are

19  presently sequestered as a witness.  You may not speak

20  to anybody about your testimony or this trial.  Do you

21  understand, sir?

22                   THE WITNESS:  Yes.

23                   THE COURT:  You are excused.

24                   (Witness excused.)

25                       - - -

# EXHIBIT "E"

A000642

IN THE COURT OF COMMON PLEAS IN AND FOR

THE COUNTY OF MONTGOMERY, PENNSYLVANIA

CRIMINAL DIVISION

- - -

COMMONWEALTH OF                :    NO. 6239-2015
PENNSYLVANIA                        NO. 8423-2015

vs.                            :

KATHLEEN GRANAHAN KANE        :

- - -

Trial by Jury

- - -

Courtroom A
Monday, August 15, 2016
Commencing at 9:17 a.m.

- - -

Edward T. McKenna
Official Court Reporter
Montgomery County Courthouse
Norristown, Pennsylvania

- - -

BEFORE:  THE HONORABLE WENDY DEMCHICK-ALLOY, JUDGE
         AND A JURY

- - -

Exhibits



**MONTGOMERY COUNTY DETECTIVE BUREAU**
**TELEPHONE CONVERSATION BETWEEN**
**JOSH MORROW AND JOHN LISKO**
**TUESDAY, APRIL 22, 2014**
**9:00 PM**
**CASE# 2015-1173**

Transcribed by: Detective Michael Begley
Proofed by: Investigator Charles Craig

**Legend:**
**Cut 1837**
**PERTINENT TELEPHONE CONVERSATION**

**VERBATIM TRANSLATION**

Participants
**JM:** Josh Morrow
**JL:** John Lisko

Abbreviation
**(U/I):** Unintelligible

(00:01)

(Phone Ringing)

**JL:**   Yo.

**JM:**   Yo, How's it going?

**JL:**   Good, what's happening with you?

1

A000644

**JM:** Not much. Two things. One is, so Kathleen called me today and I want to get your advice on this, Kathleen called me today and she's like Adrian has documents for you to leak out.

**JL:** (Laughing)

**JM:** You know and it's all bullshit about like Frank Fina killing a Jerry Mondesire investigation and that you know Seth Williams wants this case because all those folks who were targeted are Seth Williams supporters and contributors.

**JL:** Huh.

**JM:** And sort of feel like, like I'm gonna, I'm not like first of all you said I'm like a mere acquaintance.

**JL:** Right

**JM:** The fact that I had these documents sort of like challenges that and two, it's like why the fuck do I want to get in the middle of this.

**JL:** Yeah, yeah.

**JM:** Right, Don't you agree?

**JL:** That's my biggest one it's like, there is, there's not going to be anything good that comes of that but.

**JM:** Yeah like even if I'm like the source it's just like it

2

just doesn't work it for, in my advantage, no?

**JL:** I don't think so, I mean I don't know, I really don't get why they want to do it.

**JM:** No, because Kathleen is like unhinged like she's talking instead of having a strategy to do this, it's like let me just throw everything on the wall and see what sticks.

**JL:** Yeah.

**JM:** You know like, I mean like, I was talking to Charlie Lyons this evening, he was like this doesn't make any, like why you, like your like you're a conflict on interest you have actual or fictional but you're her conflict of interest and like now you're the one like giving inside documents.

**JL:** Right, if anything, if anything it's like proving that point.

**JM:** Right, Right you know when she like well go talk to Adrian, Adrian's like well I'll leave these between my screen door and my front door and you can pick them up and like redact names and like, I'm like oh God.

**JL:** Fuck that.

**JM:** Yeah I don't really feel like that, she threw me under the bus.

3

A000646

**JL:**   Well yeah.

**JM:**   I mean she **(U/I)** protected me but, like...

**JL:**   I just don't see like it doesn't ever make sense from a craft standpoint you know?

**JM:**   Right if you got documents, you fucking leak them.

**JL:**   Right right.

**JM:**   Giving them to me isn't asking the question like how you got the documents like the just beg the question like.

**JL:**   So you are talking to her? (Laughing)

**JM:**   **(U/I).** She called me tonight and she was like.

**JL:**   No, no that's what a reporter.

**JM:**   Of course If I like, you're a mere acquaintance like right it like if you really wanted me to do this you would have said you know you wouldn't have said **(U/I)** (Static noise) she's but just like she's spreading shit everywhere.

**JL:**   Well.

**JM:**   And like and for me it's like look let's have a concise strategy before we do this stuff like, I'm fine like it's like if the strategy is to leak these documents to a

4

reporter and you want me to do it and this is like what the general strategy is fine like I'll figure a way to do it that protects everybody. But like I don't want to do this and then someone else is doing something else and like there is no like general strategy.

**JL:**   Right.

**JM:**   It makes no sense.

**JL:**   They're a little bit late on a figuring out what to do. (Laughing)

**JM:**   Nah, she's unhinged is what it is, she's unhinged, like she is like, whoever she can talk...I'm surprised that Sadie Sterner isn't getting calls.

**JL:**   (Laughing)

**JM:**   I'm sure Liz Randolph is getting calls

**JL:**   (Laughing). She fucked that one up.

**JM:**   Yeah.

**JL:**   Yeah I just don't see anything positive in it, I can perhaps get there like your saying, like a cohesive strategy with a goal of what their looking to do but.

**JM:**   Right, Right, Right. Why like you can't throw a bunch of shit on the wall and see what sticks.

**JL:**   Right.

5

**JM**: I mean I'm not willing to that for in terms of like I don't want to be the source for like junk that then comes back you know on my ass.

**JL**: Right, right.

**JM**: You know like I, but.

**JL**: Yeah, Yeah that's what I would do do at least. I just don't see any even a remotely the positive for you.

**JM**: Yeah.

**JL**: Mostly again, mostly in parts to how she handled it to date.

**JM**: Well yeah.

**JL**: I mean this is the type of shit that makes me think like you know I mean like there I've yeah. (Static noise)....yeah.

**JM**: Like we as a collective team immediately you know like came together and figured out a strategy and like beat it back and then with this stuff it's like Kathleen just not here's been no cohesive strategy.

**JL**: Yeah, yeah.

**JM**: You know.
(Transcript Ends)
(05:32)

6



A000650

**FILED UNDER SEAL**

**IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT**

UNSEALED PER ORDER
OF THE COURT DATED
AUGUST 26, 2015

| | | |
|---|---|---|
| PENNSYLVANIA OFFICE OF<br>ATTORNEY GENERAL, | : | NO. 171 MM 2014 |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| SUPERVISING JUDGE OF THE THIRTY-<br>FIFTH STATEWIDE INVESTIGATING<br>GRAND JURY | : | |
| | : | |
| Respondent | : | |

**OPINION**

CARPENTER   J.                                        **DECEMBER 12, 2014**

I, as the Supervising Judge of the Thirty-Fifth Statewide Investigating Grand Jury,

have strived for all of my actions to be consistent with the values of judicial objectivity and

independence. Any actions that have been inconsistent with those values, I regret. And now,

having been informed  that my actions were inconsistent with those values and that a separate

response to the Pennsylvania Office of the Attorney General's Petition for Review of the

Protective Orders ("Petition for Review"), is required this Opinion follows and addresses those

issues raised in the Per Curiam Order and the Concurring Statements authored by Chief Justice

Castille and by Justice Stevens filed on December 4, 2014. I respectfully apologize for not

anticipating that this Opinion was expected.

I do note that the only communication received by me from the Pennsylvania

Supreme Court's Office of the Prothonotary prior to December 4, 2014, when responses to the

1

**A000651**

Petition for Review were due, was a letter addressed to "William R. Carpenter, Esq." and reading in part "Dear Attorney Carpenter". <u>See</u>, Exhibit "A", appended to this Opinion.

FACTUAL AND PROCEDURAL HISTORY

The history giving rise to the initial Protective Order dated August 27, 2014, the amended Protective Order dated September 17, 2014 and finally the Order of October 30, 2014 outlining this Court's Findings of Fact and Conclusions of Law (collectively termed "Protective Order"), is detailed as follows. On August 25, 2014, this Court held an *ex parte, in camera* hearing with the Special Prosecutor Thomas E. Carluccio, Frank Fina and A. Marc Costanzo being present. The purpose of the hearing was to put on the record certain concerns brought to this Court's attention by Special Prosecutor Carluccio. I feel that it is necessary to cite to the record of the *ex parte in camera* proceedings in order to properly address the issues here. I request that you not unseal those proceedings for the Attorney General as there is confidential information not made part of this Opinion.

At that hearing, Mr. Fina detailed his unsolicited interaction with a reporter from Pittsburgh. According to Mr. Fina, the reporter contacted him on August 13, 2014. The substance of the conversation was to inform Mr. Fina that he was contacted by someone close to the Attorney General. That person provided details about Mr. Fina's personal emails that were uncovered by Geoffrey Moutlon during the review of the Sandusky case, and that there was a significant effort to release some portion of those emails that would be very embarrassing and destructive to him. (N.T. 8/25/14 pp. 2 – 3).

Mr. Fina also relayed an incident that occurred on August 18, 2014. On that date, Mr. Fina told the Court that someone who had assisted him during the review that Mr. Moulton performed, attorney Chris Carusone, was approached without solicitation, by someone named David Tyler, Chief Operating Officer for the Office of the Attorney General ("OAG"). In that interaction, Mr. Tyler told Mr. Carusone something to the effect that "tell your boy to back down

2

or cool down." Mr. Carusone indicated to Mr. Tyler that he didn't know what he was talking about. Mr. Tyler then made references to Mr. Fina's emails that would be very embarrassing and could be released. Mr. Tyler made further remarks to Mr. Carusone that Mr. Fina should keep his mouth shut. Id. at 4 – 5.

A third incident was relayed by Mr. Fina at the August 25, 2014 hearing. A few days earlier, on August 21, 2014, a reporter from Philadelphia contacted him. The reporter informed Mr. Fina that members of the OAG were aggressively suggesting to everybody in the Capitol Media Room, that the OAG had emails of his, that the media is going to want to see them and that they would discredit Mr. Fina. The reporter told Mr. Fina that it was something like he had never seen before in its aggressiveness and it was unlike past situations experienced by him when the OAG has tried to leak information. It seemed to the reporter that the OAG was trying to send Mr. Fina a message, that they had this information and were willing to use it. Id. at 9 – 11.

Mr. Fina told this Court that he believed that these messages or threats were related to that fact that he had been subpoenaed to testify before the Grand Jury. Id. at 11.

Mr. Costanzo was also present to testify at the August 25, 2014, hearing. He had concerns in regard to his cooperation with this investigation and his subpoena to testify before the Grand Jury. Mr. Costanzo relayed that the Attorney General had solicited Right-to-Know requests from the media and that the media has sent those requests to the Office of the Attorney General. Mr. Costanzo believed that the subject matter of the Right-to-Know requests were his personal and private emails that were received by him of a personal nature. Id. at 17 – 19.

Additionally, Mr. Costanzo testified that over the past several months, in various public ways the Attorney General has made statements about him that were not accurate and meant to convey something negative in an attempt to denigrate his reputation. He gave the Court an example that when the Attorney General was questioned about an undercover

3

operation involving Tyron Ali, her reaction in the press was to accuse the prosecutors, including

Mr. Costanzo, of being racist and incompetent and she went out of her way to name Mr.

Costanzo as one of those prosecutors. Mr. Costanzo told the Court that in reality, despite the

Attorney General's depiction to the media, his involvement was minimal and peripheral at most.

Id. at 19 – 20. Mr. Costanzo provided another example concerning a memorandum involving Mr.

Mondesire's investigation and an article that appeared in the Daily News. The Daily News article

suggested that possible criminal conduct on the part of Mr. Mondesire was brought to Mr.

Costanzo's attention, and neither he nor Mr. Fina appropriately responded to that information. In

reality Mr. Costanzo was not the receiver of the memo; rather, it was he who directed that the

memo be prepared and then it was sent up to his boss. He was the sender of that memo and

was waiting for a response. Id. at 20 – 21.

      After considering the testimony of both Mr. Fina and Mr. Costanzo the August 27,

2014, Protective Order was issued, and the relevant portion reads as follows:

> AND NOW, this 27th day of August, 2014, it is hereby ORDERED,
> pursuant to 18 Pa.C.S. §4954 (relating to protective orders), that:
>
> 1. The Office of the Attorney General, except upon specific
>    authorization by this Court or the Special Prosecutor, shall
>    refrain from any involvement in, or access to, the investigative
>    efforts of the Special Prosecutor.
>
> 2. Employees of the Office of the Attorney General shall refrain
>    from engaging in, or soliciting, any act of obstruction,
>    intimidation or retaliation against any witness summoned by
>    the Grand Jury in the Special Prosecutor's investigation.
>
> 3. All transcripts of Grand Jury testimony shall be given only from
>    the stenographer or their employer directly to the Supervising
>    Judge and the Special Prosecutor, no copy shall be given to
>    the Attorney General's Office.
>
> 4. Employees of the Office of the Attorney General shall not have
>    access to transcripts of proceedings before the Grand Jury or
>    Supervising Judge, exhibits, or other information pertaining to
>    the Special Prosecutor's investigation. All information

A000654

pertaining to the Special Prosecutor's investigation. All information related to the work of the Special Prosecutor shall be kept in the custody of the Special Prosecutor and Supervising Judge.

5. Any person, including employees of the Office of the Attorney General, who engage in any act of obstruction, Intimidation or retaliation against a witness summoned by the Grand Jury in the Special Prosecutor's investigation may be prosecuted as set forth in 1 8 Pa.C.S. §4955 (relating to violation of orders) and any other applicable provisions of the Crimes Code of Pennsylvania.

\*\*\*

August 27, 2014 Protective Order.

Thereafter, the OAG filed a Motion for Reconsideration. This Court then issued its first September 17, 2014, Order which directed a reconsideration hearing to be held in regard to the issuance of the protective order under 18 Pa.C.S.A. §4954. <u>See</u>, September 17, 2014 Order.

Another order was issued on September 17, 2014. This order amended the original August 27, 2014, Protective Order to only subject the following person to paragraphs 2 and 5 of that Order as follows:

1. Any person who has been sworn to Grand Jury secrecy.
2. Any person who has or had access to Grand Jury information.
3. Any person associated with the J. Whyatt Mondesire proceedings and investigation.

<u>See</u>, September 17, 2014 Order.

After this Court ordered a reconsideration hearing be held, but before that hearing was scheduled, the OAG filed an Application for Special Relief with the Pennsylvania Supreme Court. That Application was dismissed as moot based on the fact that there would be a hearing.

Subsequently, on October 17, 2014, an *in camera* reconsideration hearing was conducted. At the start of the hearing, Attorney Lauran Ditka who appeared on behalf of the

5

A000655

OAG, renewed a request to subpoena Mr. Fina and Mr. Costanzo. That request was denied. Attorney Ditka also renewed a request to review the transcript of the August 25, 2014 *ex parte, in camera* hearing. That was denied. Finally, Attorney Ditka motioned for leave to call Special Prosecutor Carluccio, which was also denied.

At the hearing, the OAG only presented evidence of inappropriate and possibly pornographic emails that were recovered during the review of the Sandusky investigation. This was done through the testimony of James Barker, Chief Deputy Attorney General. (N.T. 10/17/14, 1:23 p.m., pp. 21 – 34). However, the OAG did not present any witness to substantiate its claim that the Protective Order as amended on September 17, 2014, impacted the operation of the OAG's functions.

Directly following the reconsideration hearing, an in *ex parte, in camera hearing* was conducted. First, Special Prosecutor Carluccio continued questioning Mr. Barker, who remained under oath. Mr. Barker testified that the Right-to-Know requests originally came in around July 7, 2014. Those requests did not specifically name anyone. They were general requests asking for inappropriate emails from employees. (N.T. 10/17/14, 2:12 p.m. pp. 2 – 3). Then in the beginning of August of 2014, additional the Right-to-Know requests were received by Mr. Barker. These requests were amended to specify certain employees of the Attorney General's office, including Mr. Fina, Mr. Costanzo and Mr. Carusone. Id. at 3. Mr. Barker was also included in a Right-to-Know request toward the end of August, 2014. Id. at 3 – 4.

By way of background, Mr. Barker testified that he became aware of the inappropriate emails in about February or March of 2014. However, it wasn't until after Special Prosecutor Carluccio started issuing subpoenas in July of 2014 to Mr. Fina and Mr. Costanzo that he began to receive Right-to-Know requests regarding the emails, and not much later he started receiving Right-to-Know requests specifically naming Mr. Fina, Mr. Costanzo and Mr. Carusone. Id. at 6 – 9.

A000656

Also to testify at this second October 17, 2014, hearing was George Kadish, special assistant investigator to Special Prosecutor Carluccio. Id. at 19. Mr. Kadish stated that he was present on August 26, 2014, when Mr. Costanzo and Mr. Fina came to testify before the Grand Jury. Id. Mr. Kadish explained that on that morning, he arrived at a quarter to eight, and as he entered the building he noticed some people milling around on the ground floor. Mr. Kadish thought it strange that there were more people than are usually there. Id. In particular, he noticed Agent Mike Miletto of the OAG who had already testified before the Grand Jury on a different date. Id. at 19. Mr. Kadish continued on to the third floor. At some point Mr. Fina and Mr. Costanzo arrived and were very upset. Id. at 20. Both men relayed to Mr. Kadish that when they had come into the ground floor, there were about four agents of the OAG waiting for them, giving them "dirty looks." Id. at 20. These agents followed the two men into the elevator and rode up with them to the third floor. Id. While on the elevator, Agent Miletto got face-to-face with Mr. Fina. Id. at 22. They all exited at the same time. Id. The agents followed Mr. Fina and Mr. Costanzo to where the two men were to meet with Mr. Kadish and Special Prosecutor Carluccio. Id. at 20. Shortly after their arrival, Special Prosecutor Carluccio was being summoned by a sheriff on behalf of an agent, Agent Mackelin. Id. at 21. With Mr. Kadish accompanying Special Prosecutor Carluccio, the agent singled out Mr. Costanzo and started to disparage him. Id.

On October 30, 2014, the OAG's Motion for Reconsideration of the August 27, 2014, Protective Order as amended by the September 17, 2014, Order was denied. Attached to that Order were the Court's Findings of Fact and Conclusions of Law. Those Findings of Facts and Conclusions of Law read as follows:

A000657

**FINDINGS OF FACT:**

Prior to the issuance of the Protective Order:

1. The identity of anyone subpoenaed by the Special Prosecutor was widely known within the Attorney Generals' Office.
2. The time and location of those witnesses appearing before the Grand Jury was also widely known within the Attorney General's Office.
3. The Attorney General was also acquiring copies of the Notes of Testimony presented by the Special Prosecutor to the Grand Jury, in a situation where the Attorney General's Office was the subject of the investigation.
4. Grand Jury witnesses were confronted as they arrived to testify before the Grand Jury. They were subjected to conduct of an intimidating nature.
5. Subsequent to the issuance of the Protective Order the above conduct has been abated.
6. The Grand Jury operates within one of the office buildings of the Attorney General. Grand Jury scheduling and issuance of subpoenas are necessarily done with the clerical employees of the Attorney General. Accordingly the Attorney General and her employees know when, where and which witnesses are appearing before the Grand Jury.
7. Here the Attorney General and her employees are the subject of the investigation into the leaking of secret Grand Jury information to the newspapers.
8. This Court has been furnished with substantial evidence, information and testimony in camera that fully supports the issuance of an the maintaining of the Protective Order.
9. The Court conducted a hearing on the Attorney General's Request to Vacate the Protective Order on October 17, 2014. At that hearing, the Attorney General called only one witness who in no way provided any reason or just cause to vacate the Protective Order.
10. The timing of the Right-to-Know Request naming Frank Fina and Mark Costanzo among others were submitted to the Attorney General's Office at the time they were subpoenaed and/or scheduled to testify.

8

A000658

11. In her "Motion to Quash Grand Jury Subpoena" the Attorney General through privately retained counsel submitted that because she was not sworn to secrecy with regard to prior Grand Juries "...she <u>could not</u> as a matter of law be in Contempt of Court with regard to any disclosure related to that Grand Jury proceeding."

12. This Court finds based upon substantial evidence as a fact that:

    A. The Protective Order is necessary to protect the secrecy of the Statewide Grand Jury proceedings;

    B. The Protective Order is necessary to maintain and ensure the integrity of the Grand Jury process and;

    C. The Protective Order is necessary and appropriate to deter Grand Jury witness intimidation and retaliation.

**CONCLUSIONS OF LAW:**

The Protective Order is necessary and appropriate. The Attorney General has shown no cause to vacate the Protective Order or amend it further.

<u>See</u>, October 30, 2014 Order.

Subsequently, the OAG filed the underlying Petition for Review with the Pennsylvania Supreme Court seeking that the Protective Order be vacated. This Opinion serves as the Court's response addressing those issues outlined in the Per Curium Order and the Concurring Statements filed on December 4, 2014.

<u>ISSUES</u>

I.    <u>Whether the Protective Order does not infringe on the OAG's ability to fulfill its constitutional mandate relative to the investigation and prosecution of criminal offenses.</u>

II.    <u>Whether the Protective Order is not intended to restrict or impact "appropriate public discourse" of information connected with the possession and/or distribution of pornographic images by members of the OAG.</u>

9

**A000659**

III.   Whether the Protective Order was properly issued based upon substantial evidence of intimidation of grand jury witnesses.

## DISCUSSION

I.   The Protective Order does not infringe on the OAG's ability to fulfill its constitutional mandate relative to the investigation and prosecution of criminal offenses.

Per Chief Justice Castille's recommendation in his Concurring Statement filed on December 4, 2014, this Court issued an order on December 5, 2014, directing the OAG to "immediately identify precisely which, if any, of its law enforcement functions, other than a supposed right to investigate witnesses in an ongoing Special Prosecution involving OAG itself, have been impeded by the protective order here...If the OAG is so affected the OAG is directed to suggest the contours of a narrower order that would address the OAG's concerns affecting duties outside the realm of the Special Prosecution." December 5, 2014 Order, quoting Chief Justice Castille's Concurring Statement filed on December 4, 2014.

On December 9, 2014, the OAG complied with this Court's court order. In the OAG's response to the December 5, 2014 Court order, the OAG set forth examples which it believes illustrate how its constitutional mandate relative to the investigation and prosecution of criminal offenses is hampered by the Protective Order. Therein, the OAG's examples rely on an erroneous premise set forth which it would like the Pennsylvania Supreme Court to accept as true, namely that "the Court has made clear that it views **any sort of action on the part of any employee** of the Office of the Attorney General that is adverse in any way to such a witness as intimidation, obstruction and/or retaliation." See, Response of the OAG to the Order of Court Dated December 5, 2014, 12/9/14, pp. 1, 5 (emphasis added). All of the OAG's examples rely in this erroneous premise. This is not what the Protective Order was and is intended to prevent. Its purpose was/is to prevent the intimidation, obstruction and/or retaliation, in the ordinary sense of those words, of any grand jury witness in an effort to inhibit and/or impede that witness from testifying truthfully and fully before the Grand Jury. In fact, the testimony of Mr. Fina, Mr.

10

Costanzo and Mr. Kadish reveals that there were attempts, direct and indirect, by agents of the OAG to sway Mr. Fina's and Mr. Costanzo's testimony before the Grand Jury. It was the substance of the threats combined with the timing of those threats, i.e., when the OAG became aware that both men were subpoenaed to testify, that created an atmosphere of intimidation. The Protective Order strives to maintain the integrity of the Grand Jury system and process. It was never intended to prevent the OAG from carrying out its constitutional duties.

Additionally, the OAG never provided this Court with the curtesy of an opportunity to craft an order directly addressing its concerns, despite this Court's invitation to do so in August and again at the October 17, 2014, reconsideration hearing, in which Attorney Ditka was told that this Court would entertain limiting language regarding the Protective Order. This Court was open to that, but none was provided. The OAG's Response to the December 5, 2014 Order is the very first time it has set forth its concerns by way of presenting concrete illustrations of how their constitutional duties could possibly be affected, and that first time it has suggested contours of a narrower order that would address those concerns. It is essential to underscore that the OAG had the opportunity to present evidence at the October 17, 2014, reconsideration hearing of how its duties were hampered by the Protective Order, in a courtroom, under oath before this Judge. However, there was no proper evidence presented.

In contrast, the Protective Order was based upon testimony given under oath to me that I found to be credible and substantial. Nothing in the OAGs  Petition for Review is based upon any evidence given under oath to any Judge.

II.     The Protective Order is not intended to restrict or impact "appropriate public discourse" of information connected with the possession and/or distribution of pornographic images by members of the OAG.

The Protective Order is not intended to restrict or impact "appropriate public discourse" of information connected with the possession and/or distribution of possibly pornographic images by members of the OAG. That is not the purpose of the Protective Order.

11

**A000661**

It is the intimidation by the OAG against grand jury witnesses that the Protective Order is meant to put an end to in order to maintain the integrity of the Grand Jury process. In fact, it is my belief that all of the inappropriate images and information related thereto should be appropriately released. The materials should not be selectively released. The materials should not be released unless the Attorney General can prove that the named individual received and opened the emails.

The OAG is insincere at best when in its Petition for Review it stated, "[t]he Attorney General's decision to serve the public interest by identifying egregious prior misconduct within the OAG and the identities of those public servants involved *has absolutely no nexus whatsoever to the Special Prosecutor's investigation*." (emphasis is the original). This is not accurate. There has been a nexus between the threatened release of Mr. Fina's personal emails and his subpoena to testify before the Grand Jury. In addition, the Right-to-Know requests, specifically requesting the personal emails of Mr. Fina and Mr. Costanzo which were made by several news outlets at the urging of the OAG, were made *after* Special Prosecutor Carluccio subpoenaed them to testify before the Grand Jury. There has been a nexus.

It seems that the problem surrounding the public discussion has occurred because Attorney General Kane has cherry picked which and whose email to selectively release. It all should be released, without which a proper public discourse cannot occur.

Additionally, the release of information relating to such images and the images themselves does not obviate the need for a Protective Order. There was substantial evidence demonstrated in the August 25, 2014 hearing and the October 17, 2014 *ex parte, in camera* hearing that the OAG is willing to intimidate subpoenaed Grand Jury witnesses, either directly or indirectly. This should not be tolerated in any form, whether today it is the release of inappropriate emails and tomorrow it is intimidation in a different fashion. The Protective Order is meant to preserve the integrity of the grand jury system and process.

12

A000662

III.    The Protective Order was properly issued based upon substantial evidence of intimidation of grand jury witnesses.

> a.  There was substantial evidence that Grand Jury witnesses were being intimidated.

The Protective Order issued on August 27, 2014, as amended by way of the September 17, 2014 Order, was properly issued pursuant to 18 PA.C.S §4954 based upon a substantial evidence presented at the August 25, 2014, *ex parte, in camera* hearing that witnesses who were subpoenaed to testify before the Grand Jury were being intimidated by agents of the OAG. In addition, evidence that was brought forth to this Court on the October 17, 2014 *ex parte, in camera* hearing further substantiated the necessity in maintaining the Protective Order. Moreover, the language of the Protective Order does not have the potential to produce a chilling effect as it relates to unrelated ongoing cases involving the OAG and some of the potential Grand Jury witnesses.

Section 4954 of the Criminal Code allows for the issuance of protective orders based upon the following:

### § 4954. Protective orders

Any court with jurisdiction over any criminal matter may, after a hearing and in its discretion, upon substantial evidence, which may include hearsay or the declaration of the prosecutor that a witness or victim has been intimidated or is reasonably likely to be intimidated, issue protective orders, including, but not limited to, the following:

(1) An order that a defendant not violate any provision of this subchapter or section 2709 (relating to harassment ) or 2709.1 ( relating to stalking).

(2) An order that a person other than the defendant, including, but not limited to, a subpoenaed witness, not violate any provision of this subchapter.

(3) An order that any person described in paragraph (1) or (2) maintain a prescribed geographic distance from any specified witness or victim.

13

> (4) An order that any person described in paragraph (1) or (2)
> have no communication whatsoever with any specified witness or
> victim, except through an attorney under such reasonable
> restrictions as the court may impose.

18 Pa.C.S. § 4954.

At the August 25, 2014, *ex parte, in camera* hearing both Mr. Fina and Mr. Costanzo credibly testified that attempts were made by agents of the OAG, indirectly, to intimidate them, as detailed in the above cited testimony. For instance, Mr. Fina testified that he was contacted, unsolicited, by two separate reporters on two separate occasions prior to his appearance before the Grand Jury, warning him that there was an effort to release emails that had the potential to embarrass him. Mr. Fina believed that these were attempts to intimidate him related to the fact that he had been subpoenaed to testify. In addition, Mr. Costanzo testified that he too had been what he believed to be the target of intimidation by the OAG. He told this Court that the OAG solicited the media to make Right-to-Know requests, requesting private emails received by him. In addition, Mr. Costanzo made this Court aware of attempts by the OAG to publically undercut his credibility, to disparage him and to suggest he was behind botched OAG investigations. This Court believed that the testimony of Mr. Fina and Mr. Costanzo as more fully set forth earlier in this Opinion provided substantial evidence in which to issue the August 27, 2014, Protective Order in an effort to maintain the integrity of the grand jury process.

Not only was substantial evidence provided at the August 25, 2014, hearing, the OAG provided no evidence at the October 17, 2014 reconsideration hearing that required this Court to modify or vacate the Protective Order. At the October 17, 2014 reconsideration hearing, the OAG made no attempt to properly subpoena any witnesses to testify before the Court. Instead, the OAG improperly subpoenaed a reporter utilizing the subpoena power only reserved for the official business of the 35th Statewide Grand Jury containing my electronic signature. Those subpoenas read in relevant part, "You are ORDERED to appear as a witness

14

A000664

before the PENNSYLVANIA STATEWIDE GRAND JURY..." . However the October 17, 2014, reconsideration hearing did not involve testimony before the Grand Jury, but rather, it was before the undersigned as the Supervising Judge. The 35[th] Statewide Investigating Grand Jury was not even in session that week. The improper use of Statewide Grand Jury Subpoenas was never approved by me.

Additionally, at the October 17, 2014, reconsideration hearing the OAG offered only one witness to testify to inappropriate emails uncovered during the Sandusky investigation. There were no witnesses offered to substantiate claims that the OAG's duties and the responsibilities were or are hampered by the Protective Order, that it was overbroad and too vague. The OAG offered no proposed language to this Court to tailor the Protective Order to alleviate its concerns regarding its constitutional duties, despite an invitation form this Court to do so.

Moreover, the *ex parte, in camera* October 17, 2014, hearing provided additional support for the necessity of the Protective Order. The testimony adduced therein showed that in early July, 2014, the OAG received only general requests under the Right-to-Know Act. However, shortly after the OAG became aware in mid-August that certain witnesses were subpoenaed to testify before the Grand Jury, the OAG received additional Right-to-Know requests which specifically identified both Mr. Fina, Mr. Costanzo. Additionally, at this hearing was evidence presented through the testimony of Mr. Kabash of intimidating conduct by agents of the OAG and specifically those of Agent Miletto and the disparagement by Agent Mackelin of Mr. Costanzo.

> b.  *The OAG's requests to subpoena Mr. Fina and Mr. Costanzo, to call Special Prosecutor Carluccio to testify and to review the notes of testimony from the August 25, 2014 ex parte, in camera hearing were properly denied.*

At the reconsideration hearing, the OAG renewed its request to subpoena Mr. Fina and Mr. Costanzo, for leave to call Special Prosecutor Carluccio to testify and to review the

15

transcript from the August 25, 2014, *ex parte, in camera* hearing. This Court denied the request relying on Commonwealth v. Hood, 872 A.2d 175 (Pa.Super. 2005).

In Hood, a protective order was granted after an *ex parte, in camera* hearing pursuant to Pa.R.Crim.P. 573(F), which allows a judge to grant a protective order after a showing of "sufficient showing", and in that context an *ex parte, in camera* hearing was found to be proper. There is even more reason to find such a hearing proper under 18 Pa.C.S. §4954, which requires "substantial evidence" in which to issue a protective order. The higher standard offers more protection to the opposing side, despite the *ex parte* nature of the hearing. The Hood Court explained the necessity of the *ex parte* nature of the *in camera* hearing and stated, "[w]e note at the outset that allowing the presence of defendant and defense counsel at the protective order hearing would have defeated the purpose of providing protection for these witnesses." Id. at 872 A.2d at 180.That is even more true when a protective order has been issued under §4954, which specifically addresses the protection against witness intimidation. This approach is not inconsistent with the argument of Special Prosecutor Carluccio in which he argued that "[t]he Attorney General's Office is not a defendant. They have not been charged. They are a third party in this investigation." (N.T. 10/17/14, 1:23 P.M., p. 7).

In particular, although the OAG and Attorney General Kane are now only considered witnesses to the leak of the prior grand jury information, the allegations of intimidation are directly attributable to the OAG. It seemed that agents of the OAG or Attorney General Kane herself feel threatened by the potentially damaging testimony that Mr. Fina or Mr. Costanzo in their respective Grand Jury testimony might have provided.

It is crucial to note that testimony before the Grand Jury, including that of members of the OAG, has firmly and definitively established that the 29th Statewide Grand Jury information that was inappropriately supplied to the press came from the OAG. In fact, Attorney General Kane has implicitly admitted that she was involved in the 2009 grand jury leak that the 35th Statewide Grand Jury is investigating at the time she filed her Motion to Quash her

16

subpoena to testify before the Grand Jury, in which she argued that she personally could divulge the documents because she was not subject to an oath of secrecy associated with the 2009 Grand Jury. More specifically, in Attorney General Kane's memorandum of law in support of her motion to quash subpoena, which she filed in her individually capacity through privately retained counsel, not through the OAG, she stated that, "Attorney General Kane was not sworn to secrecy with regard to the 2009 grand jury proceedings. By statute, only a limited group of individuals are sworn to secrecy... Because Attorney General Kane had no involvement whatsoever with the 2009 grand jury proceedings, she could not as a matter of law be in contempt of court with regard to any disclosure related to that grand jury proceeding." Memorandum of law in support of motion to quash 9/29/14. This passage seems to suggest that she believed she might be charged with a criminal offense and was already putting forth her defense. Therefore, although not defendants, the OAG and Attorney General Kane feel threatened by potentially damaging testimony, and have attempted to intimidate Grand Jury witnesses. Accordingly, the Protective Order is necessary to protect the integrity of the Grand Jury system.

> c. *The Protective Order does not have a chilling effect on the duties and responsibilities of the OAG.*

Finally, this Court does not believe the Protective Order to be overbroad or too vague. Although the OAG consistently argues this point is each of its filings, this argument is disingenuous. At all times the OAG has sought to vacate and only vacate the Protective Order. As this Court noted at the October 17, 2014 reconsideration hearing, if the OAG was seeking modification of the Protective Order, then this Court would be receptive to additional revised language to consider. That was conveyed to the OAG in August and again in October of 2014, and was never pursued by the OAG.

The conduct that is covered by the Protective Order can be gleaned from the traditional and dictionary meaning of the word intimidation and retaliation. According to the

17

Merriam Webster dictionary, the term "intimidate" means to "to make timid or fearful : frighten; *especially* : to compel or deter by or as if by threats". In addition, the term "retaliate" according to the Merriam Webster dictionary means "to do something bad to someone who has hurt you or treated you badly : to get revenge against someone". These definitions are not vague or overbroad. . Clearly, two attorneys, one from the OAG and one as a potential witness before the Grand Jury, having a disagreement about an unrelated investigation and getting into a heated discussion, an argument even, in no way falls into the conduct that is intimidating and retaliatory the same way as threating to expose personal emails that could embarrass and damage the reputation of a Grand Jury witness just prior to that witness's appearance before the Grand Jury as in Mr. Fina's case, or publically disparaging a Grand Jury witness by making false claims to the media as in the case of Mr. Costanzo.

As for the OAG's illustrations of how its functions are hampered by the Protective Order contained in the Response to this Court's December 5, 2014, Order, they are addressed in Issue I as set forth earlier in this Opinion. It should be emphasized that the OAG did not bring any evidence before this Court at the reconsideration hearing, at a time that evidence could have been presented under oath, in a courtroom and before this Judge. Not only is there a lack of evidence to substantiate the OAG's claims of interference with its responsibilities; but also there has been a lack of concrete examples of such alleged hindrance.

As for the OAG's suggestions for a narrower order: (1) *A protective order...should comply with the provisions of 18 Pa.C.S. 4954.* For all of the reasons previously state, I believe that the Protective Order does comply. (2) *A protective order should be directed at those persons who are found to have actually engaged in intimidation or retaliation.* The Protective Order as amended applies only to :

1. Any person who has been sworn to Grand Jury secrecy.
2. Any person who has or had access to Grand Jury information.
3. Any person associated with the J. Whyatt Mondesire proceedings and investigation.

18

A000668

To wait until after further intimidation and retaliation has occurred to identify those persons who are found to have actually engaged in intimidation or retaliation would defeat the purpose of the Protective Order.  The additional harm sought to be prevented would have already occurred. (3) *Conduct that will be found to be intimidating, retaliatory, or otherwise in violation of the protective order should be delineated.* I believe that the Protective Order clearly sets forth that offensive conduct is conduct which is aimed at intimidating a witness from testifying or from telling the whole truth, or conduct aimed at retaliation against a witness who has testified. (4) *A protective order should have an expiration date.* I request that the Protective Order remain in place until the investigation has concluded.

CONCLUSION

Based upon the foregoing analysis, this Court respectfully requests that the Protective Order be upheld.

**BY THE COURT:**

**WILLIAM R. CARPENTER    J.**
SUPERVISING JUDGE OF THE THIRTY-
FIFTH STATEWIDE INVESTIGATING
GRAND JURY

Copies sent on December 12, 2014
By First Class Mail to:
Attorney General Kathleen M. Kane
Thomas E. Carluccio, Esquire

19

A000669

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## CASE INFORMATION

Cross Court Docket Nos: 1164 EDA 2016, 134 ET 2016, 440 MT 2016, 108 MM 2016, 3576 EDA 2016, 3575 EDA 2016

| | |
|---|---|
| Judge Assigned: Demchick-Alloy, Wendy | Date Filed: 08/27/2015     Initiation Date: 08/08/2015 |
| OTN: T 686380-2     LOTN: | Originating Docket No: MJ-38120-CR-0000298-2015 |
| Initial Issuing Authority: Cathleen Kelly Rebar | Final Issuing Authority: Cathleen Kelly Rebar |
| Arresting Agency: Montgomery County Detective | Arresting Officer: Bradbury, Paul M. |
| Complaint/Incident #: 20151173 | |
| Case Local Number Type(s) | Case Local Number(s) |

## RELATED CASES

| Related Docket No | Related Case Caption | Related Court | Association Reason |
|---|---|---|---|
| **Related** | | | |
| CP-46-MD-0000055-2015 | Restricted Case Caption | CP-38-46-Crim | Sealed Search Warrant Case Transferred CR 6239-2015 |
| CP-46-MD-0001685-2015 | Restricted Case Caption | CP-38-46-Crim | Sealed Search Warrant Case Transferred CR 6239-2015 |
| CP-46-MD-0001079-2015 | Restricted Case Caption | CP-38-46-Crim | Sealed Search Warrant Case Transferred CR 6239-2015 |
| CP-46-MD-0001057-2015 | Restricted Case Caption | CP-38-46-Crim | Sealed Search Warrant Case Transferred CR 6239-2015 |
| CP-46-MD-0001053-2015 | Restricted Case Caption | CP-38-46-Crim | Sealed Search Warrant Case Transferred CR 6239-2015 |
| CP-46-MD-0001077-2015 | Restricted Case Caption | CP-38-46-Crim | Sealed Search Warrant Case Transferred CR 6239-2015 |
| CP-46-MD-0001078-2015 | Restricted Case Caption | CP-38-46-Crim | Sealed Search Warrant Case Transferred CR 6239-2015 |
| CP-46-MD-0000053-2015 | Restricted Case Caption | CP-38-46-Crim | Sealed Search Warrant Case Transferred CR 6239-2015 |
| CP-46-MD-0000054-2015 | Restricted Case Caption | CP-38-46-Crim | Sealed Search Warrant Case Transferred CR 6239-2015 |
| CP-46-MD-0001693-2015 | Restricted Case Caption | CP-38-46-Crim | Unsealed Search Warrant |

## STATUS INFORMATION

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000670

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

| Case Status: | Closed | | | Arrest Date: | 08/08/2015 |
|---|---|---|---|---|---|
| | | Status Date | Processing Status | | |
| | | 11/22/2016 | Awaiting Appellate Court Decision | | |
| | | 10/24/2016 | Sentenced/Penalty Imposed | | |
| | | 08/22/2016 | Awaiting PSI Completion | | |
| | | 08/16/2016 | Awaiting PSI | | |
| | | 08/16/2016 | Awaiting Sentencing | | |
| | | 08/08/2016 | Awaiting PSI Completion | | |
| | | 08/08/2016 | Awaiting Sentencing | | |
| | | 07/11/2016 | Awaiting Trial | | |
| | | 04/20/2016 | Awaiting Appellate Court Decision | | |
| | | 10/14/2015 | Awaiting Pre-Trial Conference | | |
| | | 08/27/2015 | Awaiting Formal Arraignment | | |
| | | 08/27/2015 | Awaiting Formal Arraignment | | |
| | | 08/27/2015 | Awaiting Filing of Information | | |

Complaint Date: 08/06/2015

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Formal Arraignment | 10/14/2015 | 9:30 am | Video Room #1 | Judge William T. Nicholas | Scheduled |
| Miscellaneous Hearing | 01/29/2016 | 1:00 pm | | | Scheduled |
| Miscellaneous Hearing | 02/05/2016 | 1:00 pm | | | Scheduled |
| Miscellaneous Hearing | 03/22/2016 | 1:00 pm | | | Scheduled |
| Miscellaneous Hearing | 04/20/2016 | 9:00 am | | | Scheduled |
| Miscellaneous Hearing | 07/26/2016 | 10:00 am | | | Scheduled |
| Jury Trial | 08/08/2016 | 9:00 am | | | Scheduled |
| Jury Trial | 08/09/2016 | 9:00 am | | | Scheduled |
| Jury Trial | 08/10/2016 | 9:00 am | | | Scheduled |
| Jury Trial | 08/11/2016 | 9:00 am | | | Scheduled |
| Jury Trial | 08/12/2016 | 9:00 am | | | Scheduled |
| Sentencing | 10/24/2016 | 10:00 am | | | Scheduled |

## DEFENDANT INFORMATION

| Date Of Birth: | 06/14/1966 | City/State/Zip: | Clarks Summit, PA 18411 |
|---|---|---|---|

CPCMS 9082

Printed: 02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000671

| DOCKET |
|---|



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

| CASE PARTICIPANTS |
|---|

| Participant Type | Name |
|---|---|
| Defendant | Kane, Kathleen Granahan |

| BAIL INFORMATION |
|---|

**Kane, Kathleen Granahan**                                                                 **Nebbia Status:  None**

| Bail Action | Date | Bail Type | Percentage | Amount | | |
|---|---|---|---|---|---|---|
| | | | | | Bail Posting Status | Posting Date |
| Set | 08/08/2015 | Unsecured | | $10,000.00 | | |
| | | | | | Posted | 08/08/2015 |
| Set | 10/24/2016 | Monetary | | $75,000.00 | | |
| Set | 10/24/2016 | Monetary | | $37,500.00 | | |
| | | | | | Posted | 10/24/2016 |

| CHARGES |
|---|

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | F3 | 18 § 4902 §§A | Perjury | 03/16/2014 | T 686380-2 |
| 2 | 2 | M2 | 18 § 4903 §§A1 | False Swearing - Offic Proceed | 03/16/2014 | T 686380-2 |
| 3 | 3 | M2 | 18 § 5101 | Obstruct Admin Law/Other Govt Func | 03/16/2014 | T 686380-2 |
| 4 | 4 | M2 | 18 § 5101 | Obstruct Admin Law/Other Govt Func | 03/16/2014 | T 686380-2 |
| 5 | 5 | M2 | 18 § 903 | Conspiracy - Obstruct Admin Law/Other Govt Func | 03/16/2014 | T 686380-2 |
| 6 | 7 | M2 | 18 § 5301 §§1 | Offl Oppression-Arrest Search Etc | 03/16/2014 | T 686380-2 |
| 7 | 8 | M2 | 18 § 903 | Conspiracy - Offl Oppression-Deny Rights/Prv | 03/16/2014 | T 686380-2 |
| 8 | 9 | M2 | 18 § 5301 §§2 | Offl Oppression-Deny Rights/Prv | 03/16/2014 | T 686380-2 |
| 9 | 9 | M2 | 18 § 903 | Conspiracy - Offl Oppression-Deny Rights/Prv | 03/16/2014 | T 686380-2 |

| DISPOSITION SENTENCING/PENALTIES |
|---|

Disposition

| Case Event | Disposition Date | Final Disposition | |
|---|---|---|---|
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | Credit For Time Served | |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date | |
| Sentence Conditions | | | |

| **Held for Court (Lower Court)** | **Defendant Was Present** | | |
|---|---|---|---|
| Lower Court Disposition | 08/24/2015 | Not Final | |
| 1 / Perjury | Held for Court (Lower Court) | F3 | 18 § 4902 §§ A |
| 2 / False Swearing - Offic Proceed | Held for Court (Lower Court) | M2 | 18 § 4903 §§ A1 |
| 3 / Obstruct Admin Law/Other Govt Func | Held for Court (Lower Court) | M2 | 18 § 5101 |

CPCMS 9082                                                                                   Printed:  02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000672

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | | |
|---|---|---|---|---|
| Sequence/Description | Offense Disposition | Grade | Section | |
| Sentencing Judge | Sentence Date | | Credit For Time Served | |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | | Start Date | |
| Sentence Conditions | | | | |
| 4 / Obstruct Admin Law/Other Govt Func | Held for Court (Lower Court) | M2 | 18 § 5101 | |
| 5 / Conspiracy - Obstruct Admin Law/Other Govt Func | Held for Court (Lower Court) | M2 | 18 § 903 | |
| 6 / Off'l Oppression-Arrest Search Etc | Held for Court (Lower Court) | M2 | 18 § 5301 §§ 1 | |
| 7 / Conspiracy - Off'l Oppression-Deny Rights/Prv | Held for Court (Lower Court) | M2 | 18 § 903 | |
| 8 / Off'l Oppression-Deny Rights/Prv | Held for Court (Lower Court) | M2 | 18 § 5301 §§ 2 | |
| 9 / Conspiracy - Off'l Oppression-Deny Rights/Prv | Held for Court (Lower Court) | M2 | 18 § 903 | |

**Proceed to Court**       Defendant Was Not Present

| Information Filed | 08/08/2016 | Not Final | | |
|---|---|---|---|---|
| 1 / Perjury | Held for Court | F3 | 18 § 4902 §§ A | |
| 2 / False Swearing - Offic Proceed | Held for Court | M2 | 18 § 4903 §§ A1 | |
| 3 / Obstruct Admin Law/Other Govt Func | Held for Court | M2 | 18 § 5101 | |
| 4 / Obstruct Admin Law/Other Govt Func | Held for Court | M2 | 18 § 5101 | |
| 5 / Conspiracy - Obstruct Admin Law/Other Govt Func | Held for Court | M2 | 18 § 903 | |
| 6 / Off'l Oppression-Arrest Search Etc | Held for Court | M2 | 18 § 5301 §§ 1 | |
| 7 / Conspiracy - Off'l Oppression-Deny Rights/Prv | Held for Court | M2 | 18 § 903 | |
| 9 / Conspiracy - Off'l Oppression-Deny Rights/Prv | Held for Court | M2 | 18 § 903 | |

**Guilty**

| Jury Trial | 08/08/2016 | Final Disposition | | |
|---|---|---|---|---|
| 1 / Perjury | Guilty | F3 | 18 § 4902 §§ A | |
| Demchick-Alloy, Wendy | 10/24/2016 | | | |
| Confinement | Min of 5.00 Months | | 10/24/2016 | |
| | Max of 12.00 Months | | | |
| | Other | | | |
| Count 2 merges with Count 1 for sentencing purposes | | | | |
| Probation | Min of 5.00 Years | | | |
| | Max of 5.00 Years | | | |
| | Other | | | |
| 2 / False Swearing - Offic Proceed | Guilty | M2 | 18 § 4903 §§ A1 | |
| Demchick-Alloy, Wendy | 10/24/2016 | | | |
| Merged | | | | |
| 3 / Obstruct Admin Law/Other Govt Func | Guilty | M2 | 18 § 5101 | |
| Demchick-Alloy, Wendy | 10/24/2016 | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000673

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | | Disposition Date | Final Disposition | |
|---|---|---|---|---|
| Sequence/Description | | Offense Disposition | Grade | Section |
| Sentencing Judge | | Sentence Date | | Credit For Time Served |
| Sentence/Diversion Program Type | | Incarceration/Diversionary Period | | Start Date |
| Sentence Conditions | | | | |
| Probation | | Min of 2.00 Years | | 10/24/2016 |
| | | Max of 2.00 Years | | |
| | | Other | | |
| 4 / Obstruct Admin Law/Other Govt Func | | Nolle Prossed | M2 | 18 § 5101 |
| Demchick-Alloy, Wendy | | 10/24/2016 | | |
| 5 / Conspiracy - Obstruct Admin Law/Other Govt Func | | Guilty | M2 | 18 § 903 |
| Demchick-Alloy, Wendy | | 10/24/2016 | | |
| Probation | | Min of 2.00 Years | | 10/24/2016 |
| | | Max of 2.00 Years | | |
| | | Other | | |
| 6 / Off'l Oppression-Arrest Search Etc | | Guilty | M2 | 18 § 5301 §§ 1 |
| Demchick-Alloy, Wendy | | 10/24/2016 | | |
| Probation | | Min of 1.00 Years | | 10/24/2016 |
| | | Max of 1.00 Years | | |
| | | Other | | |
| 7 / Conspiracy - Off'l Oppression-Deny Rights/Prv | | Guilty | M2 | 18 § 903 |
| Demchick-Alloy, Wendy | | 10/24/2016 | | |
| Probation | | Min of 1.00 Years | | 10/24/2016 |
| | | Max of 1.00 Years | | |
| | | Other | | |
| 8 / Off'l Oppression-Deny Rights/Prv | | Nolle Prossed | M2 | 18 § 5301 §§ 2 |
| Demchick-Alloy, Wendy | | 10/24/2016 | | |
| 9 / Conspiracy - Off'l Oppression-Deny Rights/Prv | | Nolle Prossed | M2 | 18 § 903 |
| Demchick-Alloy, Wendy | | 10/24/2016 | | |

Printed:  02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial
System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed
data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can
only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record
Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000674



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## LINKED SENTENCES:

**Link 2**
CP-46-CR-0006239-2015 - Seq. No. 3 (18§ 5101 §§) - Probation is Concurrent with

**Link 3**
CP-46-CR-0006239-2015 - Seq. No. 5 (18§ 5301 §§ 1) - Probation is Concurrent with

**Link 4**
CP-46-CR-0006239-2015 - Seq. No. 7 (18§ 5301 §§ 2) - Probation is Concurrent with

**Link 5**
CP-46-CR-0006239-2015 - Seq. No. 6 (18§ 5301 §§ 1) - Probation is Concurrent with

**Link 1**
CP-46-CR-0006239-2015 - Seq. No. 1 (18§ 4902 §§ A) - Probation is Consecutive to
CP-46-CR-0006239-2015 - Seq. No. 1 (18§ 4902 §§ A) - Confinement

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| <u>Name:</u>   Kevin R. Steele | <u>Name:</u>   Joshua D. Lock |
| District Attorney | Private |
| <u>Supreme Court No:</u>   066335 | <u>Supreme Court No:</u>   017092 |
| <u>Phone Number(s):</u> | <u>Rep. Status:</u>   Active |
|    610-278-3098   (Phone) | <u>Phone Number(s):</u> |
|    610-278-3095   (Other) |    717-234-4161   (Phone) |
|    610-278-3126   (Other) | <u>Address:</u> |
| <u>Address:</u> |    Goldberg Katzman PC |
|    Montgomery CO Da's Office |    4250 Crums Mill Rd Ste 301 |
|    PO Box 311 |    Harrisburg, PA 17112-2889 |
|    Norristown, PA 19404-0311 | |
| | Representing: Kane, Kathleen Granahan |
| <u>Name:</u>   Risa Vetri Ferman | |
| District Attorney | |
| <u>Supreme Court No:</u>   065228 | |
| <u>Phone Number(s):</u> | |
|    610-278-3100   (Phone) | |
|    610-278-3099   (Phone) | |
|    610-292-4950   (Fax) | |
|    610-278-3090   (Other) | |
|    610-278-3099   (Other) | |
| <u>Address:</u> | |
|    Montgomery Cty Da's Office | |
|    PO Box 311 | |
|    Norristown, PA 19404-0311 | |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| | | | |

CPCMS 9082

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000675

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1/1 | 04/15/2015 | | Superior Court of Pennsylvania - Eastern District |

Search Warrant Issued
    Filed by Superior Court President Judge Susan Gantman

    MD 54-2015

| 2/2 | 04/15/2015 | | Superior Court of Pennsylvania - Eastern District |

Search Warrant Issued
    Filed by Superior Court President Judge Susan Gantman

    MD 55-2015

| 3/1 | 05/12/2015 | | Superior Court of Pennsylvania - Eastern District |

Search Warrant Issued
    Filed by Superior Court President Judge Susan Gantman

    MD 1053-2015

| 4/1 | 05/29/2015 | | Superior Court of Pennsylvania - Eastern District |

Search Warrant Issued
    Filed by Superior Court President Judge Susan Gantman

    MD 1057-2015

| 5/1 | 06/10/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
    Filed by Superior Court President Judge Susan Gantman

| 6/2 | 06/10/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
    Filed by Superior Court President Judge Susan Gantman

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000676



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 7/1 | 06/22/2015 | | Superior Court of Pennsylvania - Eastern District |

Search Warrant Issued

Filed by Superior Court President Judge Susan Gantman

MD 1078-2015

| 8/2 | 06/22/2015 | | Superior Court of Pennsylvania - Eastern District |

Search Warrant Issued

Filed by Superior Court President Judge Susan Gantman

MD 1077-2015

| 9/3 | 06/22/2015 | | Superior Court of Pennsylvania - Eastern District |

Search Warrant Issued

Filed by Superior Court President Judge Susan Gantman

MD 1079-2015

| 10/1 | 06/29/2015 | | Superior Court of Pennsylvania - Eastern District |

Search Warrant Issued

Filed by Superior Court President Judge Susan Gantman

MD 1685-2015

| 11/2 | 06/29/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant

Filed by Superior Court President Judge Susan Gantman

| 12/3 | 06/29/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant

Filed by Superior Court President Judge Susan Gantman

Printed: 02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000677



**Docket Number: CP-46-CR-0006239-2015**
# CRIMINAL DOCKET
**Court Case**

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 13/4 | 06/29/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
Filed by Superior Court President Judge Susan Gantman

| 14/5 | 06/29/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
Filed by Superior Court President Judge Susan Gantman

| 15/6 | 06/29/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
Filed by Superior Court President Judge Susan Gantman

| 16/7 | 06/29/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
Filed by Superior Court President Judge Susan Gantman

| 17/1 | 07/28/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
Filed by Superior Court President Judge Susan Gantman

| 18/2 | 07/28/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
Filed by Superior Court President Judge Susan Gantman

| 19/3 | 07/28/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
Filed by Superior Court President Judge Susan Gantman

| 20/4 | 07/28/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
Filed by Superior Court President Judge Susan Gantman

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000678



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 21/5 | 07/28/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
    Filed by Superior Court President Judge Susan Gantman

| 22/6 | 07/28/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
    Filed by Superior Court President Judge Susan Gantman

| 23/7 | 07/28/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
    Filed by Superior Court President Judge Susan Gantman

| 24/8 | 07/28/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
    Filed by Superior Court President Judge Susan Gantman

| 1 | 08/08/2015 | | Rebar, Cathleen Kelly |

Bail Set - Kane, Kathleen Granahan

| 2 | 08/08/2015 | | Kane, Kathleen Granahan |

Bail Posted - Kane, Kathleen Granahan

| 25/1 | 08/27/2015 | | Court of Common Pleas - Montgomery County |

Original Papers Received from Lower Court

| 2 | 08/27/2015 | | MDJ-38-1-20 |

Formal Arraignment Scheduled 10/14/2015  9:30AM
    Oct 14, 2015, service on 8/24/15

Kane, Kathleen Granahan
    08/24/2015          Hand Delivered

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000679



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 26/1 | 08/28/2015 | | Superior Court of Pennsylvania - Eastern District |

Search Warrant Issued

Filed by Superior Court President Judge Susan Gantman

MD 53-2015

| | | | |
|---|---|---|---|
| 27/2 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant

Filed by DDA Thomas McGoldrick

| | | | |
|---|---|---|---|
| 28/3 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant

Filed by DDA Thomas McGoldrick

| | | | |
|---|---|---|---|
| 29/4 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant

Filed by DDA Thomas McGoldrick

| | | | |
|---|---|---|---|
| 30/5 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant

Filed by DDA Thomas McGoldrick

| | | | |
|---|---|---|---|
| 31/6 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant

Filed by DDA Thomas McGoldrick

| | | | |
|---|---|---|---|
| 32/7 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant

Filed by DDA Thomas McGoldrick

| | | | |
|---|---|---|---|
| 33/8 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant

Filed by DDA Thomas McGoldrick

| | | | |
|---|---|---|---|
| 34/9 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant

Filed by DDA Thomas McGoldrick

Printed: 02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000680



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 35/10 | 08/28/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
    Filed by Superior Court President Judge Susan Gantman

| 36/11 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant
    Filed by DDA Thomas McGoldrick

| 37/12 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant
    Filed by DDA Thomas McGoldrick

| 38/13 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant
    Filed by DDA Thomas McGoldrick

| 39/14 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant
    Filed by DDA Thomas McGoldrick

| 15 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant
    Filed by M. ADA M. Stewart Ryan

| 16 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant
    Filed by DDA Thomas McGoldrick

| 40/17 | 08/28/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
    Filed by Superior Court President Judge Susan Gantman

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000681



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 41/18 | 08/28/2015 | | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant
    Filed by Superior Court President Judge Susan Gantman

| 42/19 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant
    Filed by ADA M. Stewart Ryan

| 43/20 | 08/28/2015 | | Ferman, Risa Vetri |

Application for the Sealing of Search Warrant
    Filed by ADA M. Stewart Ryan

| 44/21 | 08/28/2015 | 06/29/2015 | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant

| 45/22 | 08/28/2015 | 07/27/2015 | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant

| 46/23 | 08/28/2015 | 06/29/2015 | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant

| 47/24 | 08/28/2015 | 06/29/2015 | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant

| 48/25 | 08/28/2015 | 07/27/2015 | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant

| 49/26 | 08/28/2015 | 07/27/2015 | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant

| 50/27 | 08/28/2015 | 07/27/2015 | Superior Court of Pennsylvania - Eastern District |

Order Granting Motion for Sealing of Search Warrant

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000682

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 51/28 | 08/28/2015 | 07/27/2015 | Superior Court of Pennsylvania - Eastern District |
| Order Granting Motion for Sealing of Search Warrant | | | |
| 52/29 | 08/28/2015 | 06/29/2015 | Superior Court of Pennsylvania - Eastern District |
| Order Granting Motion for Sealing of Search Warrant | | | |
| 53/30 | 08/28/2015 | 07/27/2015 | Superior Court of Pennsylvania - Eastern District |
| Order Granting Motion for Sealing of Search Warrant | | | |
| 54/31 | 08/28/2015 | 07/27/2015 | Superior Court of Pennsylvania - Eastern District |
| Order Granting Motion for Sealing of Search Warrant | | | |
| 55/32 | 08/28/2015 | 06/29/2015 | Superior Court of Pennsylvania - Eastern District |
| Order Granting Motion for Sealing of Search Warrant | | | |
| 56/33 | 08/28/2015 | | Ferman, Risa Vetri |
| Application for the Sealing of Search Warrant<br>Filed by ADA M. Stewart Ryan | | | |
| 57/1 | 08/31/2015 | | Ferman, Risa Vetri |
| Application for the Sealing of Search Warrant<br>Filed by DDA Thomas McGoldrick | | | |
| 58/2 | 08/31/2015 | | Ferman, Risa Vetri |
| Application for the Sealing of Search Warrant<br>Filed by DDA Thomas McGoldrick | | | |
| 59/1 | 09/08/2015 | | MDJ-38-1-20 |
| Notes of Testimony<br>Preliminary Hearing, Ctrm B<br>Monday August 24, 2015. 1:21 pm<br>Judge Rebard | | | |

CPCMS 9082

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000683

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 60/1 | 09/29/2015 | | Minora, Amil Michael |
| Motion for Admission Pro Hac Vice | | | |
| 61/1 | 10/02/2015 | | Minora, Amil Michael |
| Entry of Appearance | | | |
| 62/1 | 10/07/2015 | 10/06/2015 | Furber, William J. Jr. |
| Order Granting Motion to Admit Pro Hac Vice | | | |
| Seth Farber Esq. | | | |
| Minora, Amil Michael | | | |
| 11/07/2015 | First Class | | |
| Steele, Kevin R. | | | |
| 11/07/2015 | Interoffice | | |
| 63/1 | 10/09/2015 | | Steele, Kevin R. |
| Notice of Joinder of Cases | | | |
| CR 6239-15 | | | |
| MD 2457-15 | | | |
| 64/1 | 10/14/2015 | | Ferman, Risa Vetri |
| Information Filed | | | |
| 65/2 | 10/14/2015 | | Farber, Seth |
| Entry of Appearance/Arraignment Waived | | | |
| 66/1 | 10/23/2015 | 10/22/2015 | Furber, William J. Jr. |
| Order Scheduling Conference | | | |
| October 29, 2015 at 10:00 a.m. in Chambers | | | |
| Minora, Amil Michael | | | |
| 10/22/2015 | First Class | | |
| Steele, Kevin R. | | | |
| 10/22/2015 | Interoffice | | |
| 67/1 | 10/29/2015 | | Minora, Amil Michael |
| Motion for Admission Pro Hac Vice | | | |
| 68/1 | 10/30/2015 | 10/29/2015 | Furber, William J. Jr. |
| Order Granting Motion to Admit Pro Hac Vice | | | |
| Gerald Shargel, Esq. for Defense | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000684



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

**ENTRIES**

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |
| Minora, Amil Michael | | | |
| 10/06/2015 | First Class | | |
| Steele, Kevin R. | | | |
| 10/06/2015 | Interoffice | | |

| | | | |
|---|---|---|---|
| 69/2 | 10/30/2015 | 10/29/2015 | Furber, William J. Jr. |

Order Granting Motion to Admit Pro Hac Vice
  Ross Kramer Esq  for Defense

| Minora, Amil Michael | | | |
|---|---|---|---|
| 10/29/2015 | First Class | | |
| Steele, Kevin R. | | | |
| 10/29/2015 | Interoffice | | |

| | | | |
|---|---|---|---|
| 70/2 | 12/21/2015 | | Demchick-Alloy, Wendy |

Order Scheduling Case Management Conference
   1/29/16 at  1:00,  1st  Floor  Chambers  of  the  undersigned,  Montgomery  County  Courthouse,  Norristown, Pennsylvania

| Minora, Amil Michael | | | |
|---|---|---|---|
| 12/21/2015 | First Class | | |
| Steele, Kevin R. | | | |
| 12/21/2015 | Interoffice | | |

| | | | |
|---|---|---|---|
| 71/1 | 02/02/2016 | 02/01/2016 | Demchick-Alloy, Wendy |

Order Scheduling Pre-Trial Conference
   February 5, 2016 at 1:00 p.m. Courtroom "B"

| | | | |
|---|---|---|---|
| 71a/2 | 02/02/2016 | 02/01/2016 | Demchick-Alloy, Wendy |

Scheduling Order
   Deadline for Informal Discovery - 02/29/16
   Deadline for Filing Pre-Trial Motions - 03/04/16
   Deadline for Answers/Replies to Pre-Trial Motions - 03/11/16
   Deadline for Briefs - 03/18/16

| | | | |
|---|---|---|---|
| 71b/3 | 02/02/2016 | 02/01/2016 | Demchick-Alloy, Wendy |

Order Scheduling Pre-Trial Motions Hearing
   March 22, 2016 at 1:00 p.m. Courtroom "B"

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000685

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



**Docket Number: CP-46-CR-0006239-2015**
# CRIMINAL DOCKET
### Court Case

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 71c/4 | 02/02/2016 | 02/01/2016 | Demchick-Alloy, Wendy |

Order Scheduling Trial
    August 8, 2016 at 9:00 a.m. Courtroom "B"

| 72/1 | 02/12/2016 | | Kane, Kathleen Granahan |

Motion to Quash Subpoena Directed to Michael A. Schwartz, Counsel to Reporter Christopher Brennan
and Philadelphia Media Network, PBC

    Filed by Michael A. Schwartz

| 73/1 | 02/16/2016 | | Kane, Kathleen Granahan |

Memorandum of Law in Support of Motion to Quash Subpoena Directed to Micahael A. Schwartz, Counsel
to Reporter Christopher Brennan and Philadelphia Media Network, PBC

    Filed by Michael A. Schwartz, Esq.

| 74/1 | 02/17/2016 | | Commonwealth of Pennsylvania |

Response to Motion to Quash Subpoena Direccted to Michael A. Schwartz, Counsel to
Reporter Christopher Brennan and Philadelphia Media Network, PBC

    Filed by Thomas W. McGoldrick, DDA

| 75/2 | 02/17/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony
    Pretrial Conference Errata Sheet, Ctrm B
    Friday February 5, 2016. 1:35 pm
    Judge Demchick-Alloy

| 76/1 | 02/26/2016 | | Kane, Kathleen Granahan |

Memorandum of Law in Support of its Response to Motion to Quash Subpoena Directed to
Michael A. Schwartz, Counsel to Reporter Christopher Brennan and Philadelphia Media Network, PBC

    Filed by M. Stewart Ryan, ADA

| 77/1 | 03/02/2016 | | Kane, Kathleen Granahan |

Reply in Support of Motion to Quash Subpoena Directed to Michael A. Schwartz, Counsel to Reporter
Christopher Brennan and Philadelphia Media Network, PBC

    Filed by Michael A. Schwartz, Esq.

Printed: 02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000686

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 78/1 | 03/04/2016 | | Minora, Amil Michael |

Omnibus Pre-Trial Motion
    Filed by Gerald L. Shargel, Esq.

| 79/2 | 03/04/2016 | | Minora, Amil Michael |
|---|---|---|---|

Memorandum of Law in Support of Attorney General Kathleen G. Kane's Omnibus Pretrial Motions
    Filed by Gerald L. Shargel, Esq.

| 80/3 | 03/04/2016 | | Commonwealth of Pennsylvania |
|---|---|---|---|

Motion for Pretrial Discovery and Inspection
    Filed by Thomas W. McGoldrick, DDA

| 81/1 | 03/11/2016 | 03/08/2016 | Demchick-Alloy, Wendy |
|---|---|---|---|

Order Granting Motion to Subpoena Witness
    Michael Schwartz
Minora, Amil Michael
    03/08/2016     First Class
Steele, Kevin R.
    03/08/2016     Interoffice

| 82/2 | 03/11/2016 | | Kane, Kathleen Granahan |
|---|---|---|---|

Attorney General Kathleen G. Kane's Answer to the Commonwealth's Motion for Pretrial Discovey and
    Filed by Gerald L. Shargel, Esq.

| 83/3 | 03/11/2016 | | Commonwealth of Pennsylvania |
|---|---|---|---|

Response to Defendant's Omnibus Pretrial Motion
    CR 6239-15
    8423-15
    Filed by Kevin R. Steele, DA

| 84/1 | 03/16/2016 | 03/16/2016 | Demchick-Alloy, Wendy |
|---|---|---|---|

Decorum Order Governing Pre-Trial Motions Hearing
Farber, Seth
    03/16/2016     First Class
Minora, Amil Michael
    03/16/2016     First Class
Steele, Kevin R.
    03/16/2016     Interoffice

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000687



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 85/1 | 03/18/2016 | | Kane, Kathleen Granahan |

Supplemental Pretrial Motions of Attorney General Kathleen G. Kane
    Filed by Gerald L. Shargel, Esq.

| | | | |
|---|---|---|---|
| 86/2 | 03/18/2016 | | Kane, Kathleen Granahan |

Reply Memorandum of Law in Support of Attorney General Kathleen G. Kane's Omnibus Pretrial Motions
    Filed by Gerald L. Shargel, Esq.

| | | | |
|---|---|---|---|
| 87/3 | 03/18/2016 | | Kane, Kathleen Granahan |

Affidavit of Ross M. Kramer
    Filed by Ross M. Kramer, Esq.

| | | | |
|---|---|---|---|
| 88/2 | 03/23/2016 | 03/22/2016 | Demchick-Alloy, Wendy |

Order Scheduling Pre-Trial Motion Hearing
    April 20, 2016 at 9:00 a.m. Courtroom "B"

Minora, Amil Michael
    03/22/2016    First Class
Steele, Kevin R.
    03/22/2016    Interoffice

| | | | |
|---|---|---|---|
| 89/3 | 03/23/2016 | 03/22/2016 | Demchick-Alloy, Wendy |

Order Granting Motion for Pre-Trial Discovery and Inspection
    Deft to Prepare Report of Examination or Tests by Any Expert Witness Defense Plans to Call to Testify
    Deft Must Also Observe Continuing Duty to Disclose All Notices Within the Scope of Discovery

Minora, Amil Michael
    03/22/2016    First Class
Steele, Kevin R.
    03/22/2016    Interoffice

| | | | |
|---|---|---|---|
| 90/1 | 03/25/2016 | | Gurney, Kaitlin M. |

Motion of Philadelphia Media Network, The Morning Call, Alm Media, Block Communications, and
    PA Media Group to Intervene for the Limited Purpose of Seeking Access to Judicial Records and Proceedings

| | | | |
|---|---|---|---|
| 91/1 | 03/29/2016 | 03/28/2016 | Demchick-Alloy, Wendy |

Omnibus Pre-Trial Motions Order
    1. A Decision on Point 3 is Deferred Until After Argument on Point 2 of the Supplemental Pre-Trial Motions of AG
    2. The Relief Requested by Deft in the Remaining Points is Denied

Minora, Amil Michael
    03/28/2016    First Class

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000688

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

Steele, Kevin R.
03/28/2016      Interoffice

| 92/1 | 03/30/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony
     Pretrial Motions, Ctrm B
     Tuesday March 22, 2016, 1:40 pm
     Judge Demchick-Alloy

| 93/1 | 04/01/2016 | 04/01/2016 | Demchick-Alloy, Wendy |

Answer By
     Deft & Commonwealth Response - Motion to Intervene - on or before 04/08/16

Minora, Amil Michael
04/01/2016      First Class
Steele, Kevin R.
04/01/2016      Interoffice

| 94/1 | 04/06/2016 | | Commonwealth of Pennsylvania |

Response to Defendant's Omniubs Pretrial Motion
     Filed by Kevin R. Steele, District Attorney

| 95/1 | 04/08/2016 | | Commonwealth of Pennsylvania |

Response to the Motion of Philadelphia Media Network, The Morning Call, ALM Media, Block
Communications, and PA Media Group to Intervene for the Limitd Purpose of Seeking Access to Judicial
Records and Proceedings

     Filed by M. Stewart Ryan, ADA

---

CPCMS 9082

Printed: 02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000689



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

### Court Case

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

| | | | |
|---|---|---|---|
| 96/1 | 04/12/2016 | 04/12/2016 | Demchick-Alloy, Wendy |

Motion Of Philadelphia Media Network Order

    1. Moving Parties Granted Leave to Intervene for the Purpose of Seeking Access to Judicial Records and Proceedings

    2. Intervenors are Granted Leave to File, on or before 04/15/16, their Proposed Response in Opposition to Motion to Permission to     File Under Seal, Attached Exhibit A

    3. AG Kane and the Commonwealth are Granted Leave to File, on or before 04/16/16, a Sur-Response to the Interveneor's     Response in Opposition to Motion to Permission to File Motion Under Seal

    4. The Intervenors are Granted Leave to Participate in Oral Argument on Point Two of the Supplemental PreTrial Motions of AG     Kane at the Hearing on 04/20/16

| Minora, Amil Michael | | | |
|---|---|---|---|
| 04/12/2016 | First Class | | |
| Steele, Kevin R. | | | |
| 04/12/2016 | Interoffice | | |

| | | | |
|---|---|---|---|
| 97/1 | 04/13/2016 | 04/12/2016 | Demchick-Alloy, Wendy |

Decorum Order Governing The Pre-Trial Motions Hearing

| Minora, Amil Michael | | | |
|---|---|---|---|
| 04/13/2016 | First Class | | |
| Steele, Kevin R. | | | |
| 04/13/2016 | Interoffice | | |

| | | | |
|---|---|---|---|
| 98/1 | 04/14/2016 | 04/13/2016 | Demchick-Alloy, Wendy |

Amended Scheduling Order

    Time Change ONLY for the 04/20/16 Pre-Trial Motions Hearing: Changed to 10:00 a.m.

| Minora, Amil Michael | | | |
|---|---|---|---|
| 04/25/2016 | Hand Delivered | | |
| Steele, Kevin R. | | | |
| 04/25/2016 | Interoffice | | |

| | | | |
|---|---|---|---|
| 99/1 | 04/15/2016 | | Gurney, Kaitlin M. |

Response of Philadelphia Media Network, The Morning Call, Alm Media, Block Communications, and

    PA Media Group in Opposition to Attorney General Kathleen Kane's Motion for Permission to File Motion Under Seal

| | | | |
|---|---|---|---|
| 100/1 | 04/20/2016 | 04/20/2016 | Minora, Amil Michael |

Notice of Appeal to the Superior Court

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000690

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

Page 22 of 39

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 100a/2 | 04/20/2016 | 04/20/2016 | Minora, Amil Michael |
| Certificate of Service | | | |
| | | | |
| 101/1 | 04/25/2016 | | Commonwealth of Pennsylvania |
| Response to Defendant's Notice of Appeal | | | |
| Filed by Kevin R. Steele, District Attorney | | | |
| | | | |
| 102/1 | 04/27/2016 | | Kane, Kathleen Granahan |
| Motion of Attorney General Kathleen G. Kane to Quash Based on Selective and Vindictive Prosecution | | | |
| Filed by Gerald L. Shargel, Esq. | | | |
| | | | |
| 103/1 | 04/29/2016 | | Court of Common Pleas - Montgomery County |
| Notes of Testimony | | | |
| Pretrial Motions, Ctrm B | | | |
| Wednesday April 20, 2016. 10:04 am | | | |
| Judge Demchick-Alloy | | | |
| | | | |
| 104/1 | 05/02/2016 | | Commonwealth of Pennsylvania |
| Response to Defendant's Motion to Quash Based on Selective and Vindictive Prosecution | | | |
| Filed by Kevin R. Steele, District Attorney | | | |
| | | | |
| 105/1 | 05/09/2016 | | Kane, Kathleen Granahan |
| Reply Memorandum of Law in Support of Attorney General Kathleen G. Kane's Motion to Quash Based on | | | |
| Selective and Vindictive Prosecution | | | |
| | | | |
| Filed by Amil M. Minora, Esq. | | | |
| | | | |
| 106/1 | 05/13/2016 | 05/12/2016 | Demchick-Alloy, Wendy |
| Opinion | | | |
| | | | |
| 1 | 05/16/2016 | 05/16/2016 | Demchick-Alloy, Wendy |
| Order Striking Motion to Quash Based on Selective and Vindictive Prosecution | | | |

Deft Granted 10 Days to File an Amended Motion - with a Support Brief within 10 Days if Commonwealth Files a Response

Commonwealth is Ordered to File a Response (if Defense Files Amended Motion) within 10 Days

| Minora, Amil Michael | | | |
|---|---|---|---|
| 05/16/2016 | First Class | | |
| Steele, Kevin R. | | | |
| 05/16/2016 | Interoffice | | |

CPCMS 9082

Printed: 02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000691

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY



**Docket Number: CP-46-CR-0006239-2015**
# CRIMINAL DOCKET
**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

| | | | |
|---|---|---|---|
| 1 | 05/17/2016 | | Weiss, Ann Thornburg |

List of Documents sent to Superior Court, DA and Attorney

| 2 | 05/17/2016 | | Weiss, Ann Thornburg |
|---|---|---|---|

Certificate and Transmittal of Record to Appellate Court

| 1 | 05/26/2016 | | Minora, Amil Michael |
|---|---|---|---|

Motion of Attorney General Kathleen G. Kane to Quash Based on Selevtive and Vindictive Prosecution

| 2 | 05/26/2016 | | Minora, Amil Michael |
|---|---|---|---|

Memorandum of law in Support of Attorney General Kathleen Kane's Motion to Quash
   Filed by Gerald L. Shargel, Esq.

| 1 | 06/06/2016 | | Commonwealth of Pennsylvania |
|---|---|---|---|

Response to Defendant's Motion to Quash Based on Selective and Vindictive Prosecution
   Filed by Kevin R. Steele, DA

| 1 | 06/13/2016 | | Kane, Kathleen Granahan |
|---|---|---|---|

Reply Memorandum of Law in Support of Attorney General Kathleen G. Kane's Motion to Quash Based on

Selective and Vindictive Prosecution

   Filed by Gerald L. Shargel, Esq.

| 1 | 06/20/2016 | 06/20/2016 | Demchick-Alloy, Wendy |
|---|---|---|---|

Order Denying Motion to Quash Based on Selective and Vindictive Prosecution
Minora, Amil Michael

| 06/20/2016 | First Class | | |
|---|---|---|---|

Steele, Kevin R.

| 06/20/2016 | Interoffice | | |
|---|---|---|---|

| 1 | 06/30/2016 | 06/28/2016 | Demchick-Alloy, Wendy |
|---|---|---|---|

Order Scheduling Trial Management Conference
   July 11, 2016 at 1:00 p.m. 1st Floor Chambers
Minora, Amil Michael

| 06/28/2016 | First Class | | |
|---|---|---|---|

Steele, Kevin R.

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000692



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |
| 06/28/2016 | Interoffice | | |

| | | | |
|---|---|---|---|
| 1 | 07/11/2016 | | Rosenblum, Douglas Keith |

Entry of Appearance

| | | | |
|---|---|---|---|
| 8 | 07/11/2016 | 07/11/2016 | Demchick-Alloy, Wendy |

Scheduling Order

    Filing of Motions in Limine - 07/20/16
    Responses to Motions in Limine - 07/22/16
    Hearing on Motions in Limine - 07/26/16 at 10:00 a.m. Courtroom "A"
    Voir Dire and/or Points of Charge - 08/03/16
    Jury Trial Scheduled for 08/08/16 at 9:00 a.m. Courtroom "A"

Kane, Kathleen Granahan
    07/29/2016     First Class
Steele, Kevin R.
    07/29/2016     Interoffice

| | | | |
|---|---|---|---|
| 9 | 07/11/2016 | 07/11/2016 | Demchick-Alloy, Wendy |

Order Scheduling Jury Trial

    August 8, 2016 at 09:00 a.m. Courtroom "A"

Minora, Amil Michael
    07/11/2016     First Class
Steele, Kevin R.
    07/11/2016     Interoffice

| | | | |
|---|---|---|---|
| 1 | 07/20/2016 | | Kane, Kathleen Granahan |

Memorandum of Law in Support of Her Motion to Compel Production of Handwritten Notes of Interviews

    Filed by Douglas K. Rosenblum, Esq.

| | | | |
|---|---|---|---|
| 2 | 07/20/2016 | | Kane, Kathleen Granahan |

Memorandum of Law in Support of Her Motion in Limine to Preclude Certain Testimony Regarding

    Philadelphia District Attorney R. Seth Williams

    Filed by Douglas K. Rosenblum, Esq.

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000693

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 3 | 07/20/2016 | | Kane, Kathleen Granahan |

Motion to Compel Production of Handwritten Notes of Interviews
    Filed by Douglas K. Rosenblum, Esq.

| 4 | 07/20/2016 | | Kane, Kathleen Granahan |

Motion in Limine to Preclude Certain Testimony Regarding Philadelphia District
Attorney R. Seth Williams

    Filed by Douglas K. Rosenblum

| 1 | 07/21/2016 | | Commonwealth of Pennsylvania |

Motion in Limine to Admit Evidence of Prior Conversations by Joshua Morrow
    Filed by Kevin R. Steele, DA

| 2 | 07/21/2016 | | Commonwealth of Pennsylvania |

Motion in Limine to Exclude Evidence of Selective and Vindictive Prosecution
    Filed by Kevin R. Steele, DA

| 3 | 07/21/2016 | 07/21/2016 | Demchick-Alloy, Wendy |

Order Granting Request for Extention of Deadline for Filing Responses to Motions In Limine
Minora, Amil Michael

| 07/21/2016 | First Class |
| Steele, Kevin R. | |
| 07/21/2016 | Interoffice |

| 1 | 07/25/2016 | | Commonwealth of Pennsylvania |

Reply in Opposition to Commonwealth's Motion in Limine to Exclude Evidence of Selective and
Vindictive Prosecution

    Filed by Douglas K. Rosenblum, Esq.

| 2 | 07/25/2016 | | Kane, Kathleen Granahan |

Reply in Opposition to Commonwealth's Motion in Limine to Admit Evidence of Prior Conversations by
Joshua Morrow

    Filed by Douglas K. Rosenblum, Esq.

CPCMS 9082

Printed: 02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000694

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Docket Number: CP-46-CR-0006239-2015
# CRIMINAL DOCKET
#### Court Case

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 3 | 07/25/2016 | | Commonwealth of Pennsylvania |

Response to Defendant's Motion to Compel Production of Handwritten Notes of Interviews
  Filed by M. Stewart Ryan, ADA

| | | | |
|---|---|---|---|
| 1 | 07/27/2016 | 07/27/2016 | Furber, William J. Jr. |

Decorum Order Governing Voir Dire and Jury Trial

Minora, Amil Michael
  07/27/2016      First Class
Steele, Kevin R.
  07/27/2016      Interoffice

| | | | |
|---|---|---|---|
| 1 | 07/29/2016 | 07/28/2016 | Demchick-Alloy, Wendy |

Motions in Limine Order

Commonwealth's Motion in Limine to Exclude Evidence of Selective and Vindictive Prosecution is Granted
Commonwealth is Granted Leave to Produce Evidence of Prior Conversations by Joshua Morrow after his credibility is at issue
Deft's Motion in Limine to Preclude Certain Testimony Regarding DA R. Seth Williams is Denied - Right to Object Retaines
Deft's Motion to Compel Production of Handwritten Notes of Interviews is Denied in light of Commonwealth's Statement on Record that investigators made no handwritten notes

Rosenblum, Douglas Keith
  07/28/2016      First Class
Steele, Kevin R.
  07/28/2016      Interoffice

| | | | |
|---|---|---|---|
| 1 | 08/01/2016 | | Superior Court of Pennsylvania - Eastern District |

Superior Court Order
  Order Granting Motion to Quash.

| | | | |
|---|---|---|---|
| 2 | 08/01/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony
  Motions in Limine, Ctrm A
  Tuesday July 26, 2016, 10:30 am
  Judge Demchick-Alloy

| | | | |
|---|---|---|---|
| 1 | 08/02/2016 | | Minora, Amil Michael |

Praecipe to Withdraw Affidavit in Part
  Filed by Gerald L. Shargel, Esq

CPCMS 9082

Printed: 02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000695



**Docket Number: CP-46-CR-0006239-2015**
# CRIMINAL DOCKET
**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 2 | 08/02/2016 | | Minora, Amil Michael |

Defendant's Applicaiton to Seal
    Filed by Douglas K. Rosenblum, Esq.

| 3 | 08/02/2016 | | Minora, Amil Michael |
|---|---|---|---|

Defendant's Emergency Application for Extraordinary Relief
    Filed by D. Peter Johnson, Esq.

| 1 | 08/03/2016 | | Steele, Kevin R. |
|---|---|---|---|

Proposed Jury Instructions
    Filed by Kevin Steele, DA

| 2 | 08/03/2016 | | Minora, Amil Michael |
|---|---|---|---|

Defendant's Proposed Supplemental Voire Dire
    Filed by Douglas K. Rosenblum, Esq.

Demchick-Alloy, Wendy
08/04/2016      Hand Delivered

| 3 | 08/03/2016 | | Minora, Amil Michael |
|---|---|---|---|

Defendant's Proposed Jury Instructions
    Filed by Douglas K. Rosenblum, Esq.

Demchick-Alloy, Wendy
08/04/2016      Hand Delivered

| 4 | 08/03/2016 | | Steele, Kevin R. |
|---|---|---|---|

Commonwealth's Proposed Voir Dire Questions
    Filed by Kevin Steele, DA

| 1 | 08/08/2016 | | Commonwealth of Pennsylvania |
|---|---|---|---|

Information Filed

| 2 | 08/08/2016 | | Demchick-Alloy, Wendy |
|---|---|---|---|

Guilty

| 3 | 08/08/2016 | | Demchick-Alloy, Wendy |
|---|---|---|---|

Sentence Deferred

Printed: 02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000696



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 4 | 08/08/2016 | | Demchick-Alloy, Wendy |

Pre-Sentence Investigation Ordered

| 1 | 08/10/2016 | 08/10/2016 | Furber, William J. Jr. |

Amended Decorum Order Governing Voir Dire and Jury Trial

Minora, Amil Michael
| | 08/10/2016 | First Class | |

Steele, Kevin R.
| | 08/10/2016 | Interoffice | |

| 1 | 08/11/2016 | 08/10/2016 | Demchick-Alloy, Wendy |

Order Granting Immunity Petition
   Joshua Morrow

Minora, Amil Michael
| | 08/15/2016 | First Class | |

Steele, Kevin R.
| | 08/15/2016 | Interoffice | |

| 2 | 08/11/2016 | | Steele, Kevin R. |

Immunity Petition
   Filed by Thomas W. McGoldrick, ADA

| 1 | 08/12/2016 | | Gurney, Kaitlin M. |

Intervenor Phialdelphis Media Network's Motion Seeking Access to Trial Exhibits

Intervenor Phialdelphis Media Network's Motion Seeking Access to Trial Exhibits Into Evidence and Material Presented to the Jury

Filed by Amy B. Ginensky, Esq.

| 2 | 08/12/2016 | | Gurney, Kaitlin M. |

Memorandum of Law in Support of Intervenor Philadelphia Media Network's Motion Seeking Trial Exhibit

Memorandum of Law in Support of Intervenor Philadelphia Media Network's Motion Seeking Access to Trial Exhibits Entered Into Evidence and Materials Presented to the Jury

Filed by Amy B. Ginensky, Esq.

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000697

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 08/15/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony

Trial by Jury, Ctrm A
Tuesday August 11, 2016. 1:24 pm
Judge Demchick-Alloy

| 2 | 08/15/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony

Trial by Jury/ A.M. Session, Ctrm A
Wednesday August 10, 2016. 8:49 am
Judge Demchick-Alloy

| 3 | 08/15/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony

Trial by Jury, Ctrm A
Tuesday August 10, 2016. 1:37 pm
Judge Demchick-Alloy

| 4 | 08/15/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony

Trial by Jury, Ctrm A
Monday August 8, 2016. 9:27 am
Judge Demchick-Alloy

| 5 | 08/15/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony

Trial by Jury/A.M. Session, Ctrm A
Tuesday August 9, 2016. 8:52 am
Judge Demchick-Alloy

| 6 | 08/15/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony

Trial by Jury, Ctrm A
Tuesday August 9, 2016. 1:43 pm
Judge Demchick-Alloy

Printed: 02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000698



**Docket Number: CP-46-CR-0006239-2015**
# CRIMINAL DOCKET
**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 7 | 08/15/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony
    Trial by Jury/A.M. Session, Ctrm A
    Thursday August 11, 2016. 8:56 am
    Judge Demchick-Alloy

| | | | |
|---|---|---|---|
| 1 | 08/16/2016 | | Montgomery County Court Administration |

Sentencing Scheduled 10/24/2016 10:00AM

| | | | |
|---|---|---|---|
| 2 | 08/16/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony
    Trial by Jury, Ctrm A
    Friday August 12, 2016. 8:50 am
    Judge Demchick-Alloy and a jury

| | | | |
|---|---|---|---|
| 3 | 08/16/2016 | 08/16/2016 | Demchick-Alloy, Wendy |

Order Scheduling Hearing
    Sentencing Hearing October 24, 2016 at 10:00 a.m. Courtroom "A"

Minora, Amil Michael
    09/03/2016    First Class
Steele, Kevin R.
    09/03/2016    Interoffice

| | | | |
|---|---|---|---|
| 1 | 08/23/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony
    Trial by Jury, Ctrm A
    Monday August 15, 2016. 9:17 am
    Judge Demchick-Alloy

| | | | |
|---|---|---|---|
| 2 | 08/23/2016 | | Minora, Amil Michael |

Exhibits Location Filed

| | | | |
|---|---|---|---|
| 1 | 08/25/2016 | | Minora, Amil Michael |

Exhibits Location Filed

| | | | |
|---|---|---|---|
| 2 | 08/25/2016 | | Steele, Kevin R. |

Exhibits Location Filed

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000699



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 10/13/2016 | | Kane, Kathleen Granahan |

Motion to Perform House Arrest Suitability Assessment

    Filed by Marc Robert Steinberg, Attorney for Defendant

Demchick-Alloy, Wendy

    10/14/2016    Hand Delivered

| | | | |
|---|---|---|---|
| 2 | 10/13/2016 | 10/13/2016 | Furber, William J. Jr. |

Decorum Order Governing Sentencing

    Thomas McGoldrick ADA/ Stew Ryan ADA served via order scanned and sent interoffice mail on 10/12/2016

    Michelle Herny ADA, Gerald L. Shargel, Esq., Ross M. Kramer, Esq., Marc R. Steinberg, Esq. served via order
    scanned and sent via first class mail on 10/12/2016

Farber, Seth

    10/12/2016    First Class

Minora, Amil Michael

    10/12/2016    First Class

Rosenblum, Douglas Keith

    10/12/2016    First Class

Steele, Kevin R.

    10/12/2016    Interoffice

| | | | |
|---|---|---|---|
| 1 | 10/14/2016 | 10/13/2016 | Demchick-Alloy, Wendy |

Answer By

    Commonwealth - Application for House Arrest Suitabilty Assessment - no later than 4:15 p.m. on 10/14/16

    BUCKS ADA MICHELLE HENRY, GERALD SHARGEL ESQ, ROSS M KRAMER ESQ, MARC R STEINBERG ESQ
    SERVED VIA FIRST CLASS MAIL ON 10/13/2016

Farber, Seth

    10/13/2016    First Class

Minora, Amil Michael

    10/13/2016    First Class

Rosenblum, Douglas Keith

    10/13/2016    First Class

Steele, Kevin R.

    10/13/2016    Interoffice

| | | | |
|---|---|---|---|
| 2 | 10/14/2016 | | Commonwealth of Pennsylvania |

Response to Defendant's Motion to Perform House Arrest Suitability Assessment

    Filed by Kevin R. Steele, DA

Demchick-Alloy, Wendy

Printed: 02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial
System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed
data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can
only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record
Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000700



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET
### Court Case

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |
| 10/18/2016 | Hand Delivered | | |

| 1 | 10/17/2016 | 10/14/2016 | Demchick-Alloy, Wendy |
|---|---|---|---|

Order Granting Motion to Perform House Arrest Suitability Assessment

Report due on or before 10/21/16

    MICHELLE HENRY ADA, GERALD L SHARGEL ESQ, ROSS M KRAMER ESQ SERVED VIA FIRST CLASS MAIL 10/14/2016

    M RYAN STEWART ADA, THOMAS W MCGOLDRICK ESQ SERVED VIA INTEROFFICE MAIL 10/14/2016

| Farber, Seth | | | |
|---|---|---|---|
| 10/14/2016 | First Class | | |
| Minora, Amil Michael | | | |
| 10/14/2016 | First Class | | |
| Rosenblum, Douglas Keith | | | |
| 10/14/2016 | First Class | | |
| Steele, Kevin R. | | | |
| 10/14/2016 | Interoffice | | |

| 2 | 10/17/2016 | | Commonwealth of Pennsylvania |
|---|---|---|---|

Sentencing Memorandum

    CR 6239-15

    8423-15

    Filed by Kevin R. Steele, District Attorney

    Thomas W. McGoldrick Deputy District Attorney

| Demchick-Alloy, Wendy | | | |
|---|---|---|---|
| 10/18/2016 | Hand Delivered | | |

| 1 | 10/18/2016 | | Kane, Kathleen Granahan |
|---|---|---|---|

Sentnecing Memorandum

    Filed by Marc Robert Steinberg, Esq.

| Demchick-Alloy, Wendy | | | |
|---|---|---|---|
| 10/18/2016 | Hand Delivered | | |

| 1 | 10/24/2016 | | Demchick-Alloy, Wendy |
|---|---|---|---|

Bail Set - Kane, Kathleen Granahan

     Printed: 02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000701



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 2 | 10/24/2016 | | Regensburg, Mary P. |
| Bail Posted - Kane, Kathleen Granahan | | | |
| 3 | 10/24/2016 | | Demchick-Alloy, Wendy |
| Order - Sentence/Penalty Imposed | | | |
| 4 | 10/24/2016 | | Demchick-Alloy, Wendy |
| Order Modifying Bail | | | |
| 5 | 10/24/2016 | | Demchick-Alloy, Wendy |
| Bail Set - Kane, Kathleen Granahan | | | |
| 1 | 10/25/2016 | | Demchick-Alloy, Wendy |
| Order Modifying Bail | | | |
| 1 | 10/26/2016 | | Kane, Kathleen Granahan |
| Motion to Withdraw as Counsel | | | |
|     Fiiled by Douglas K. Rosenblum, Esq. | | | |
| Demchick-Alloy, Wendy | | | |
|     10/27/2016 | Hand Delivered | | |
| 1 | 10/27/2016 | 10/27/2016 | Demchick-Alloy, Wendy |
| Order Granting Motion to Withdraw as Counsel | | | |
|     Douglas Rosenblum Esq. | | | |
| Minora, Amil Michael | | | |
|     11/16/2016 | First Class | | |
| Steele, Kevin R. | | | |
|     11/16/2016 | Interoffice | | |
| 1 | 10/31/2016 | | Kane, Kathleen Granahan |
| Motion to Withdraw as Counsel | | | |
|     Filed by Seth C. Farber, Esq. | | | |
| 2 | 10/31/2016 | | Kane, Kathleen Granahan |
| Motion to Withdraw as Counsel | | | |
|     Filed by Gerald L. Shargel, Esq. | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000702

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 3 | 10/31/2016 | | Kane, Kathleen Granahan |
| Motion to Withdraw as Counsel | | | |
| Filed by Ross M. Kramer, Esq. | | | |
| | | | |
| 1 | 11/01/2016 | | Demchick-Alloy, Wendy |
| Stipulation re: Waiver under Pa.R.Crim.P. 704(C)(3) | | | |
| | | | |
| 2 | 11/01/2016 | 11/01/2016 | Demchick-Alloy, Wendy |
| Order Granting Motion to Withdraw as Counsel | | | |
| Seth Farber Esq. | | | |
| Minora, Amil Michael | | | |
| 11/16/2016 | First Class | | |
| Steele, Kevin R. | | | |
| 11/16/2016 | Interoffice | | |
| | | | |
| 3 | 11/01/2016 | 11/01/2016 | Demchick-Alloy, Wendy |
| Order Granting Motion to Withdraw as Counsel | | | |
| Gerald Shargel Esq. | | | |
| Minora, Amil Michael | | | |
| 11/16/2016 | First Class | | |
| Steele, Kevin R. | | | |
| 11/16/2016 | Interoffice | | |
| | | | |
| 4 | 11/01/2016 | 11/01/2016 | Demchick-Alloy, Wendy |
| Order Granting Motion to Withdraw as Counsel | | | |
| Ross Kramer Esq. | | | |
| Minora, Amil Michael | | | |
| 11/16/2016 | First Class | | |
| Steele, Kevin R. | | | |
| 11/16/2016 | Interoffice | | |
| | | | |
| 1 | 11/02/2016 | | Kane, Kathleen Granahan |
| Motion to Withdraw as Counsel | | | |
| Filed by Marc Robert Steinberg, Esq. | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000703



## DOCKET

**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|

| Service To | | Service By | |
|---|---|---|---|

| Issue Date | Service Type | Status Date | Service Status |
|---|---|---|---|

| 1 | 11/03/2016 | 11/02/2016 | Demchick-Alloy, Wendy |

Order Granting Motion to Withdraw as Counsel

Marc Robert Steinberg Esq.

    MARC STEINBERG ESQ, GERALD SHARGEL ESQ, SERVED VIA FIRST CLASS MAIL 11/02/2016

Commonwealth of Pennsylvania
11/02/2016

Minora, Amil Michael
11/02/2016    First Class

Rosenblum, Douglas Keith
11/02/2016    First Class

Steele, Kevin R.
11/02/2016

| 1 | 11/07/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony

    Sentencing, Ctrm A
    Monday October 24, 2016, 10:03 am
    Judge Demchick-Alloy

| 1 | 11/21/2016 | | Minora, Amil Michael |

Motion to Withdraw as Counsel

| 1 | 11/22/2016 | | Court of Common Pleas - Montgomery County |

Entry of Civil Judgment

| 2 | 11/22/2016 | | Lock, Joshua D. |

Entry of Appearance

| 3 | 11/22/2016 | | Kane, Kathleen Granahan |

Notice of Appeal to the Superior Court

    Filed by Joshua D. Lock, Esq.

| 4 | 11/22/2016 | | Kane, Kathleen Granahan |

Certificate of Service

CPCMS 9082

Printed: 02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000704



**Docket Number: CP-46-CR-0006239-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

| | | | |
|---|---|---|---|
| 5 | 11/22/2016 | 11/22/2016 | Demchick-Alloy, Wendy |

Order Granting Motion to Withdraw as Counsel
    Amil M. Minora Esq.

Commonwealth of Pennsylvania
11/22/2016

Minora, Amil Michael
11/22/2016

| | | | |
|---|---|---|---|
| 1 | 11/23/2016 | 11/22/2016 | Demchick-Alloy, Wendy |

1925(b) Concise Statement Order

| | | | |
|---|---|---|---|
| 1 | 11/28/2016 | | Kane, Kathleen Granahan |

Motion to Withdraw as Counsel
    Filed by Amil M. Minora, Esq.

Demchick-Alloy, Wendy
11/14/2016        Hand Delivered

| | | | |
|---|---|---|---|
| 1 | 12/09/2016 | | Lock, Joshua D. |

Motion to Enlarge Time to File Concise Statement of Matters Complained of on Appeal Pursuant to Pa.

    Motion to Enlarge Time to File Concise Statement of Matters Complained of on Appeal Pursuant to Pa.R.A.P.
    1925(b)(2).

| | | | |
|---|---|---|---|
| 2 | 12/09/2016 | | Lock, Joshua D. |

Certificate of Service

| | | | |
|---|---|---|---|
| 3 | 12/09/2016 | | Demchick-Alloy, Wendy |

Order Granting Extension to File Statement of Matters Complained on Appeal

| | | | |
|---|---|---|---|
| 1 | 01/03/2017 | | Lock, Joshua D. |

Concise Statement of the Matters Complained on Appeal

| | | | |
|---|---|---|---|
| 2 | 01/03/2017 | | Lock, Joshua D. |

Certificate of Service

| | | | |
|---|---|---|---|
| 1 | 01/04/2017 | | Lock, Joshua D. |

Revised Statement of Matters Complained of on Appeal Pursuant to PA.R.AP. 1925(b)

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000705

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



**Docket Number: CP-46-CR-0006239-2015**
# CRIMINAL DOCKET
**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 2 | 01/04/2017 | | Lock, Joshua D. |
| Certificate of Service | | | |
| 1 | 01/10/2017 | | Commonwealth of Pennsylvania |
| Search Warrant Unsealed | | | |
| DA 180 - 2015 | | | |

## PAYMENT PLAN SUMMARY

| Payment Plan No | Payment Plan Freq. | Next Due Date | Active | Overdue Amt |
|---|---|---|---|---|
| Responsible Participant | | | Suspended | Next Due Amt |
| 46-2016-P000016642 | Monthly | 01/09/2017 | Yes | $89.09 |
| Kane, Kathleen Granahan | | | No | $89.09 |

| Payment Plan History: | Receipt Date | Payor Name | Participant Role | Amount |
|---|---|---|---|---|

Printed: 02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000706



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## CASE FINANCIAL INFORMATION

Last Payment Date: 11/22/2016    Total of Last Payment: -$76.25

| Kane, Kathleen Granahan<br>Defendant | Assessment | Payments | Adjustments | Non Monetary<br>Payments | Total |
|---|---|---|---|---|---|
| **Costs/Fees** | | | | | |
| Appeal to Superior Court (Montgomery) | $71.25 | -$71.25 | $0.00 | $0.00 | $0.00 |
| Automation Filing Fee (Montgomery) | $5.00 | -$5.00 | $0.00 | $0.00 | $0.00 |
| ATJ | $4.00 | $0.00 | $0.00 | $0.00 | $4.00 |
| Automation Fee (Act 36 of 2000)<br>(Montgomery) | $5.00 | $0.00 | $0.00 | $0.00 | $5.00 |
| CJES | $2.25 | $0.00 | $0.00 | $0.00 | $2.25 |
| COC Processing Fee Misd/Fel<br>(Montgomery) | $355.25 | $0.00 | $0.00 | $0.00 | $355.25 |
| Commonwealth Cost - HB627 (Act 167<br>of 1992) | $20.30 | $0.00 | $0.00 | $0.00 | $20.30 |
| Costs of Prosecution - CJEA | $50.00 | $0.00 | $0.00 | $0.00 | $50.00 |
| County Court Cost (Act 204 of 1976) | $29.65 | $0.00 | $0.00 | $0.00 | $29.65 |
| Court Child Care (Act 105 of 2000)<br>(Montgomery) | $5.00 | $0.00 | $0.00 | $0.00 | $5.00 |
| Crime Victims Compensation (Act 96 of<br>1984) | $35.00 | $0.00 | $0.00 | $0.00 | $35.00 |
| DNA Detection Fund (Act 185-2004) | $250.00 | $0.00 | $0.00 | $0.00 | $250.00 |
| Domestic Violence Compensation (Act<br>44 of 1988) | $10.00 | $0.00 | $0.00 | $0.00 | $10.00 |
| Firearm Education and Training Fund | $5.00 | $0.00 | $0.00 | $0.00 | $5.00 |
| JCPS | $21.25 | $0.00 | $0.00 | $0.00 | $21.25 |
| Judicial Computer Project | $8.00 | $0.00 | $0.00 | $0.00 | $8.00 |
| State Court Costs (Act 204 of 1976) | $13.55 | $0.00 | $0.00 | $0.00 | $13.55 |
| Variable Amount to be Distributed<br>CVC/VWS (Act 96) | $12.00 | $0.00 | $0.00 | $0.00 | $12.00 |
| Variable Amount to be Distributed<br>CVC/VWS (Act 96) | $28.00 | $0.00 | $0.00 | $0.00 | $28.00 |
| Victim Witness Service (Act 111 of 1998) | $25.00 | $0.00 | $0.00 | $0.00 | $25.00 |
| OSP (Montgomery/State) (Act 35 of 1991) | $1,340.00 | $0.00 | $0.00 | $0.00 | $1,340.00 |
| OSP (Montgomery/State) (Act 35 of 1991) | $1,340.00 | $0.00 | $0.00 | $0.00 | $1,340.00 |
| ATJ | $4.00 | $0.00 | $0.00 | $0.00 | $4.00 |
| ATJ | $4.00 | $0.00 | $0.00 | $0.00 | $4.00 |
| ATJ | $4.00 | $0.00 | $0.00 | $0.00 | $4.00 |
| CJES | $2.25 | $0.00 | $0.00 | $0.00 | $2.25 |
| CJES | $2.25 | $0.00 | $0.00 | $0.00 | $2.25 |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000707

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## CASE FINANCIAL INFORMATION

**Kane, Kathleen Granahan**
  Defendant

| | Assessment | Payments | Adjustments | Non Monetary Payments | Total |
|---|---|---|---|---|---|
| CJES | $2.25 | $0.00 | $0.00 | $0.00 | $2.25 |
| Commonwealth Cost - HB627 (Act 167 of 1992) | $10.15 | $0.00 | $0.00 | $0.00 | $10.15 |
| Commonwealth Cost - HB627 (Act 167 of 1992) | $10.15 | $0.00 | $0.00 | $0.00 | $10.15 |
| Commonwealth Cost - HB627 (Act 167 of 1992) | $10.15 | $0.00 | $0.00 | $0.00 | $10.15 |
| Judicial Computer Project | $8.00 | $0.00 | $0.00 | $0.00 | $8.00 |
| County Court Cost (Act 204 of 1976) | $33.00 | $0.00 | $0.00 | $0.00 | $33.00 |
| County Court Cost (Act 204 of 1976) | $33.00 | $0.00 | $0.00 | $0.00 | $33.00 |
| County Court Cost (Act 204 of 1976) | $33.00 | $0.00 | $0.00 | $0.00 | $33.00 |
| Judicial Computer Project | $8.00 | $0.00 | $0.00 | $0.00 | $8.00 |
| JCPS | $21.25 | $0.00 | $0.00 | $0.00 | $21.25 |
| JCPS | $21.25 | $0.00 | $0.00 | $0.00 | $21.25 |
| JCPS | $21.25 | $0.00 | $0.00 | $0.00 | $21.25 |
| Judicial Computer Project | $8.00 | $0.00 | $0.00 | $0.00 | $8.00 |
| State Court Costs (Act 204 of 1976) | $11.85 | $0.00 | $0.00 | $0.00 | $11.85 |
| State Court Costs (Act 204 of 1976) | $11.85 | $0.00 | $0.00 | $0.00 | $11.85 |
| State Court Costs (Act 204 of 1976) | $11.85 | $0.00 | $0.00 | $0.00 | $11.85 |
| Appeal to Superior Court (Montgomery) | $71.25 | -$71.25 | $0.00 | $0.00 | $0.00 |
| Automation Filing Fee (Montgomery) | $5.00 | -$5.00 | $0.00 | $0.00 | $0.00 |
| Costs/Fees Totals: | $3,983.25 | -$152.50 | $0.00 | $0.00 | $3,830.75 |
| Grand Totals: | $3,983.25 | -$152.50 | $0.00 | $0.00 | $3,830.75 |

** - Indicates assessment is subrogated

CPCMS 9082

Printed: 02/02/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000708

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## CASE INFORMATION

Cross Court Docket Nos: 1166 EDA 2016, 440 MT 2016, 108 MM 2016, 3575 EDA 2016, 3576 EDA 2016

| | | |
|---|---|---|
| Judge Assigned: Demchick-Alloy, Wendy | Date Filed: 11/23/2015 | Initiation Date: 10/01/2015 |
| OTN: T 709032-2    LOTN: | Originating Docket No: MJ-38120-CR-0000381-2015 | |
| Initial Issuing Authority: Cathleen Kelly Rebar | Final Issuing Authority: Cathleen Kelly Rebar | |
| Arresting Agency: Montgomery County Detective | Arresting Officer: Bradbury, Paul M. | |
| Complaint/Incident #: 1 | | |
| Case Local Number Type(s) | Case Local Number(s) | |

## RELATED CASES

| Related Docket No | Related Case Caption | Related Court | Association Reason |
|---|---|---|---|
| **Related**<br>CP-46-MD-0002457-2015 | Comm v Kane, Kathleen Granahan | CP-38-46-Crim | Case Transferred to Criminal Case CR 8423-2015 |

## STATUS INFORMATION

Case Status:    Closed

Arrest Date:    10/01/2015

| Status Date | Processing Status |
|---|---|
| 11/22/2016 | Awaiting Appellate Court Decision |
| 10/24/2016 | Sentenced/Penalty Imposed |
| 08/22/2016 | Awaiting PSI Completion |
| 08/16/2016 | Awaiting PSI |
| 08/16/2016 | Awaiting Sentencing |
| 08/08/2016 | Awaiting PSI Completion |
| 08/08/2016 | Awaiting Sentencing |
| 07/11/2016 | Awaiting Trial |
| 04/20/2016 | Awaiting Appellate Court Decision |
| 11/27/2015 | Awaiting Formal Arraignment |
| 11/27/2015 | Awaiting Filing of Information |
| 11/23/2015 | Awaiting Formal Arraignment |
| 11/23/2015 | Awaiting Filing of Information |
| 11/19/2015 | Awaiting Pre-Trial Conference |

Complaint Date:    10/01/2015

CPCMS 9082

Printed: 02/06/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000709

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET

# CRIMINAL DOCKET

**Court Case**



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Formal Arraignment | 01/06/2016 | 9:30 am | Video Room #1 | Judge William T. Nicholas | Scheduled |
| Miscellaneous Hearing | 01/29/2016 | 1:00 pm | | | Scheduled |
| Miscellaneous Hearing | 02/05/2016 | 1:00 pm | | | Scheduled |
| Miscellaneous Hearing | 03/22/2016 | 1:00 pm | | | Scheduled |
| Miscellaneous Hearing | 04/20/2016 | 9:00 am | | | Scheduled |
| Miscellaneous Hearing | 07/26/2016 | 10:00 am | | | Scheduled |
| Jury Trial | 08/08/2016 | 9:00 am | | | Scheduled |
| Jury Trial | 08/09/2016 | 9:00 am | | | Scheduled |
| Jury Trial | 08/10/2016 | 9:00 am | | | Scheduled |
| Jury Trial | 08/11/2016 | 9:00 am | | | Scheduled |
| Jury Trial | 08/12/2016 | 9:00 am | | | Scheduled |
| Sentencing | 10/24/2016 | 10:00 am | | | Scheduled |

## DEFENDANT INFORMATION

| Date Of Birth: | 06/14/1966 | City/State/Zip: Clarks Summit, PA 18411 |
|---|---|---|

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Kane, Kathleen Granahan |

## BAIL INFORMATION

**Kane, Kathleen Granahan**                                                                 **Nebbia Status:** None

| Bail Action | Date | Bail Type | Percentage | Amount | | |
|---|---|---|---|---|---|---|
| | | | | | Bail Posting Status | Posting Date |
| Set | 10/01/2015 | Unsecured | | $10,000.00 | | |
| | | | | | Posted | 10/01/2015 |
| Set | 10/24/2016 | Monetary | | $75,000.00 | | |
| Set | 10/24/2016 | Monetary | | $37,500.00 | | |
| | | | | | Posted | 10/24/2016 |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | F3 | **18 § 4902 §§A** | Perjury | 03/16/2014 | T 709032-2 |
| 2 | 2 | M2 | **18 § 4903 §§A1** | False Swearing - Offic Proceed | 03/16/2014 | T 709032-2 |

Printed: 02/06/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000710

## DOCKET



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|------|-----------|-------|---------|---------------------|-------------|-----|
| 3 | 3 | M2 | **18 § 5101** | Obstruct Admin Law/Other Govt Func | 03/16/2014 | T 709032-2 |

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | | Disposition Date | | Final Disposition | |
|---|---|---|---|---|---|
| Sequence/Description | | Offense Disposition | | Grade | Section |
| Sentencing Judge | | Sentence Date | | | Credit For Time Served |
| Sentence/Diversion Program Type | | Incarceration/Diversionary Period | | | Start Date |
| Sentence Conditions | | | | | |

**Held for Court (Lower Court)**     Defendant Was Present

| Lower Court Disposition | 11/10/2015 | Not Final | |
|---|---|---|---|
| 1 / Perjury | Held for Court (Lower Court) | F3 | 18 § 4902 §§ A |
| 2 / False Swearing - Offic Proceed | Held for Court (Lower Court) | M2 | 18 § 4903 §§ A1 |
| 3 / Obstruct Admin Law/Other Govt Func | Held for Court (Lower Court) | M2 | 18 § 5101 |

**Proceed to Court**     Defendant Was Not Present

| Information Filed | 08/08/2016 | Not Final | |
|---|---|---|---|
| 1 / Perjury | Held for Court | F3 | 18 § 4902 §§ A |
| 2 / False Swearing - Offic Proceed | Held for Court | M2 | 18 § 4903 §§ A1 |
| 3 / Obstruct Admin Law/Other Govt Func | Held for Court | M2 | 18 § 5101 |

**Guilty**

| Jury Trial | 08/08/2016 | Final Disposition | |
|---|---|---|---|
| 1 / Perjury | Guilty | F3 | 18 § 4902 §§ A |
| Demchick-Alloy, Wendy | 10/24/2016 | | |
| Confinement | Min of 5.00 Months | | |
| | Max of 11.00 Months | | |
| | Other | | |
| Ct.2 merges with Count 1 for Sentencing purposes | | | |
| Consecutive to 6239-15 | | | |
| Probation | Min of 3.00 Years | | |
| | Max of 3.00 Years | | |
| | Other | | |

| 2 / False Swearing - Offic Proceed | Guilty | M2 | 18 § 4903 §§ A1 |
|---|---|---|---|
| Demchick-Alloy, Wendy | 10/24/2016 | | |
| Merged | | | |

| 3 / Obstruct Admin Law/Other Govt Func | Guilty | M2 | 18 § 5101 |
|---|---|---|---|
| Demchick-Alloy, Wendy | 10/24/2016 | | |
| Probation | Min of 2.00 Years | | |
| | Max of 2.00 Years | | |
| | Other | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000711



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

**LINKED SENTENCES:**

**Link 4**
CP-46-CR-0006239-2015 - Seq. No. 3 (18§ 5101 §§ ) - Probation

**Link 5**
CP-46-CR-0006239-2015 - Seq. No. 5 (18§ 5301 §§ 1) - Probation

**Link 6**
CP-46-CR-0006239-2015 - Seq. No. 6 (18§ 5301 §§ 1) - Probation

**Link 7**
CP-46-CR-0006239-2015 - Seq. No. 7 (18§ 5301 §§ 2) - Probation

**Link 8**
CP-46-CR-0008423-2015 - Seq. No. 3 (18§ 5101 §§) - Probation is Concurrent with

**Link 1**
CP-46-CR-0008423-2015 - Seq. No. 1 (18§ 4902 §§ A) - Probation is Consecutive to
CP-46-CR-0008423-2015 - Seq. No. 1 (18§ 4902 §§ A) - Confinement

**Link 2**
CP-46-CR-0006239-2015 - Seq. No. 1 (18§ 4902 §§ A) - Probation is Consecutive to
CP-46-CR-0006239-2015 - Seq. No. 1 (18§ 4902 §§ A) - Confinement

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000712

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| <u>Name:</u>    Thomas W. McGoldrick | <u>Name:</u>    Joshua D. Lock |
|      District Attorney |      Private |
| <u>Supreme Court No:</u>    078192 | <u>Supreme Court No:</u>    017092 |
| <u>Phone Number(s):</u> | <u>Rep. Status:</u>    Active |
|      610-278-3126     (Phone) | <u>Phone Number(s):</u> |
|      610-278-3090     (Other) |      717-234-4161     (Phone) |
|      610-278-3095     (Other) | <u>Address:</u> |
| <u>Address:</u> |      Goldberg Katzman PC |
|      Montgomery CO Da's Office |      4250 Crums Mill Rd Ste 301 |
|      PO Box 311 |      Harrisburg, PA 17112-2889 |
|      Norristown, PA 19404-0311 | Representing: Kane, Kathleen Granahan |

**COMMONWEALTH INFORMATION** (continued)

<u>Name:</u>    Risa Vetri Ferman
     District Attorney
<u>Supreme Court No:</u>    065228
<u>Phone Number(s):</u>
     610-278-3100     (Phone)
     610-278-3099     (Phone)
     610-292-4950     (Fax)
     610-278-3090     (Other)
     610-278-3099     (Other)
<u>Address:</u>
     Montgomery Cty Da's Office
     PO Box 311
     Norristown, PA 19404-0311

<u>Name:</u>    Kevin R. Steele
     Assistant District Attorney
<u>Supreme Court No:</u>    066335
<u>Phone Number(s):</u>
     610-278-3098     (Phone)
     610-278-3095     (Other)
     610-278-3126     (Other)
<u>Address:</u>
     Montgomery CO Da's Office
     PO Box 311
     Norristown, PA 19404-0311

<u>Name:</u>    Michelle Ann Henry
     Assistant District Attorney
<u>Supreme Court No:</u>    074839
<u>Phone Number(s):</u>
     215-348-6344     (Phone)

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000713

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

Address:

Bucks CO Da's Office
55 E Court St
Doylestown, PA  18901-4318

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 10/01/2015 | | Rebar, Cathleen Kelly |
| Bail Set - Kane, Kathleen Granahan | | | |
| 2 | 10/01/2015 | | Kane, Kathleen Granahan |
| Bail Posted - Kane, Kathleen Granahan | | | |
| 1/1 | 11/19/2015 | | Kramer, Ross M. |
| Entry of Appearance/Arraignment Waived | | | |
| 2/1 | 11/23/2015 | | Court of Common Pleas - Montgomery County |
| Original Papers Received from Lower Court | | | |
| 2 | 11/23/2015 | | MDJ-38-1-20 |
| Formal Arraignment Scheduled 01/06/2016  9:30AM | | | |
| Jan 6, 2016, service on 11/10/15 | | | |
| Kane, Kathleen Granahan | | | |
| 11/10/2015 | Hand Delivered | | |
| 3/1 | 11/24/2015 | | MDJ-38-1-20 |
| Notes of Testimony | | | |
| Preliminary Hearing, Ctrm B | | | |
| Tuesday November 10, 2015. 1:00 pm | | | |
| Judge Rebar | | | |
| 4/1 | 11/27/2015 | | MDJ-38-1-20 |
| Original Papers Received from Lower Court | | | |
| 5/1 | 12/02/2015 | | MDJ-38-1-20 |
| Amended Docket Transcript 12/2/15 | | | |
| 6/2 | 12/21/2015 | | Demchick-Alloy, Wendy |
| Order Scheduling Case Management Conference | | | |
| 1/29/16 at 1:00, 1st Floor Chambers of the undersigned, Montgomery County Courthouse, Norristown, Pennsylvania | | | |
| Kramer, Ross M. | | | |

Printed: 02/06/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000714

## DOCKET



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
| --- | --- | --- | --- |
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |
| 12/21/2015 | First Class | | |
| McGoldrick, Thomas W. | | | |
| 12/21/2015 | Interoffice | | |

---

| | | | |
| --- | --- | --- | --- |
| 7/1 | 01/29/2016 | | McGoldrick, Thomas W. |
| Information Filed | | | |

---

| | | | |
| --- | --- | --- | --- |
| 8/1 | 02/02/2016 | 02/01/2016 | Demchick-Alloy, Wendy |
| Order Scheduling Pre-Trial Conference | | | |
| February 5, 2016 at 1:00 p.m. Courtroom "B" | | | |

---

| | | | |
| --- | --- | --- | --- |
| 8a/2 | 02/02/2016 | 02/01/2016 | Demchick-Alloy, Wendy |
| Scheduling Order | | | |
| Deadline for Informal Discovery - 02/29/16 | | | |
| Deadline for Filing Pre-Trial Motions - 03/04/16 | | | |
| Deadline for Answers/Replies to Pre-Trial Motions - 03/11/16 | | | |
| Deadline for Briefs - 03/18/16 | | | |

---

| | | | |
| --- | --- | --- | --- |
| 8b/3 | 02/02/2016 | 02/01/2016 | Demchick-Alloy, Wendy |
| Order Scheduling Pre-Trial Motions Hearing | | | |
| March 22, 2016 at 1:00 p.m. Courtroom "B" | | | |

---

| | | | |
| --- | --- | --- | --- |
| 8c/4 | 02/02/2016 | 02/01/2016 | Demchick-Alloy, Wendy |
| Order Scheduling Trial | | | |
| August 8, 2016 at 9:00 a.m. Courtroom "B" | | | |

---

| | | | |
| --- | --- | --- | --- |
| 9/1 | 02/09/2016 | | Court of Common Pleas - Montgomery County |
| Notes of Testimony | | | |
| Pretrial Conference, Ctrm B | | | |
| Friday February 5, 2016. 1:35 pm | | | |
| Judge Demchick-Alloy | | | |

---

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000715

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 10/1 | 02/17/2016 | | Commonwealth of Pennsylvania |

Response to Motion to Quash Subpoena Direccted to Michael A. Schwartz, Counsel to
Reporter Christopher Brennan and Philadelphia Media Network, PBC

Filed by Thomas W. McGoldrick, DDA

| 11/2 | 02/17/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony
Pretrial Conference Errata Sheet, Ctrm B
Friday February 5, 2016. 1:35 pm
Judge Demchick-Alloy

| 12/1 | 02/26/2016 | | Kane, Kathleen Granahan |

Memorandum of Law in Support of its Response to Motion to Quash Subpoena Directed to
Michael A. Schwartz, Counsel to Reporter Christopher Brennan and Philadelphia Media Network, PBC

Filed by M. Stewart Ryan, ADA

| 13/1 | 03/04/2016 | | Kramer, Ross M. |

Memorandum of Law

| 14/2 | 03/04/2016 | | Kramer, Ross M. |

Omnibus Pre-Trial Motion
Filed by Gerald L. Shargel, Esq.

| 15/3 | 03/04/2016 | | Kramer, Ross M. |

Memorandum of Law in Support of Attorney General Kathleen G. Kane's Omnibus Pretrial Motions
Filed by Gerald L. Shargel, Esq.

| 16/4 | 03/04/2016 | | Commonwealth of Pennsylvania |

Motion for Pretrial Discovery and Inspection
Filed by Thomas W. McGoldrick, DDA

| 17/1 | 03/11/2016 | | Kane, Kathleen Granahan |

Attorney General Kathleen G. Kane's Answer to the Commonwealth's Motion for Pretrial Discovey and
Filed by Gerald L. Shargel, Esq.

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000716

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 18/2 | 03/11/2016 | | Commonwealth of Pennsylvania |

Response to Defendant's Omnibus Pretrial Motion

    CR 6239-15
    8423-15
    Filed by Kevin R. Steele, DA

---

| | | | |
|---|---|---|---|
| 19/1 | 03/16/2016 | 03/16/2016 | Demchick-Alloy, Wendy |

Decorum Order Governing Pre-Trial Motions Hearing

Henry, Michelle Ann
    03/16/2016      First Class
Kramer, Ross M.
    03/16/2016      First Class
McGoldrick, Thomas W.
    03/16/2016      Interoffice
Steele, Kevin R.
    03/16/2016      Interoffice

---

| | | | |
|---|---|---|---|
| 20/1 | 03/18/2016 | | Kane, Kathleen Granahan |

Supplemental Pretrial Motions of Attorney General Kathleen G. Kane

    Filed by Gerald L. Shargel, Esq.

---

| | | | |
|---|---|---|---|
| 21/2 | 03/18/2016 | | Kane, Kathleen Granahan |

Reply Memorandum of Law in Support of Attorney General Kathleen G. Kane's Omnibus Pretrial Motions

    Filed by Gerald L. Shargel, Esq.

---

| | | | |
|---|---|---|---|
| 22/3 | 03/18/2016 | | Kane, Kathleen Granahan |

Affidavit of Ross M. Kramer

    Filed by Ross M. Kramer, Esq.

---

| | | | |
|---|---|---|---|
| 23/2 | 03/23/2016 | 03/22/2016 | Demchick-Alloy, Wendy |

Order Scheduling Pre-Trial Motion Hearing

    April 20, 2016 at 9:00 a.m. Courtroom "B"

Kramer, Ross M.
    03/22/2016      First Class
McGoldrick, Thomas W.
    03/22/2016      Interoffice

---

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000717

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

| | | | |
|---|---|---|---|
| 24/3 | 03/23/2016 | 03/22/2016 | Demchick-Alloy, Wendy |

Order Granting Motion for Pre-Trial Discovery and Inspection

    Deft to Prepare Report of Examination or Tests by Any Expert Witness Defense Plans to Call to Testify

    Deft Must Also Observe Continuing Duty to Disclose All Notices Within the Scope of Discovery

| | | | |
|---|---|---|---|
| McGoldrick, Thomas W. | | | |
| 03/22/2016 | Interoffice | | |
| Minora, Amil Michael | | | |
| 03/22/2016 | First Class | | |

———————————————————————————————————————————————

| | | | |
|---|---|---|---|
| 25/1 | 03/25/2016 | | Gurney, Kaitlin M. |

Motion of Philadelphia Media Network, The Morning Call, Alm Media, Block Communications, and

    PA Media Group to Intervene for the Limited Purpose of Seeking Access to Judicial Records and Proceedings

———————————————————————————————————————————————

| | | | |
|---|---|---|---|
| 26/1 | 03/29/2016 | 03/28/2016 | Demchick-Alloy, Wendy |

Omnibus Pre-Trial Motions Order

    1. A Decision on Point 3 is Deferred Until After Argument on Point 2 of the Supplemental Pre-Trial Motions of AG

    2. The Relief Requested by Deft in the Remaining Points is Denied

| | | | |
|---|---|---|---|
| Kramer, Ross M. | | | |
| 03/28/2016 | First Class | | |
| McGoldrick, Thomas W. | | | |
| 03/28/2016 | Interoffice | | |

———————————————————————————————————————————————

| | | | |
|---|---|---|---|
| 27/1 | 03/30/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony

    Pretrial Motions, Ctrm B

    Tuesday March 22, 2016. 1:40 pm

    Judge Demchick-Alloy

———————————————————————————————————————————————

| | | | |
|---|---|---|---|
| 28/1 | 04/06/2016 | | Commonwealth of Pennsylvania |

Response to Defendant's Omniubs Pretrial Motion

    Filed by Kevin R. Steele, District Attorney

———————————————————————————————————————————————

Printed: 02/06/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000718



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

Page 11 of 28

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 29/1 | 04/08/2016 | | Commonwealth of Pennsylvania |

Response to the Motion of Philadelphia Media Network, The Morning Call, ALM Media, Block

Communications, and PA Media Group to Intervene for the Limitd Purpose of Seeking Access to Judicial Records and Proceedings

Filed by M. Stewart Ryan, ADA

---

| 30/1 | 04/12/2016 | 04/12/2016 | Demchick-Alloy, Wendy |
|---|---|---|---|

Motion Of Philadelphia Media Network Order

1. Moving Parties Granted Leave to Intervene for the Purpose of Seeking Access to Judicial Records and Proceedings
2. Intervenors are Granted Leave to File, on or before 04/15/16, their Proposed Response in Opposition to Motion to Permission to    File Under Seal, Attached Exhibit A
3. AG Kane and the Commonwealth are Granted Leave to File, on or before 04/15/16, a Sur-Response to the Interveneor's   Response in Opposition to Motion to Permission to File Motion Under Seal
4. The Intervenors are Granted Leave to Participate in Oral Argument on Point Two of the Supplemental PreTrial Motions of AG    Kane at the Hearing on 04/20/16

Kramer, Ross M.
| 04/12/2016 | First Class |
McGoldrick, Thomas W.
| 04/12/2016 | Interoffice |

---

| 31/1 | 04/13/2016 | 04/12/2016 | Demchick-Alloy, Wendy |
|---|---|---|---|

Decorum Order Governing The Pre-Trial Motions Hearing
Kramer, Ross M.
| 04/13/2016 | First Class |
McGoldrick, Thomas W.
| 04/13/2016 | Interoffice |

---

| 32/1 | 04/14/2016 | 04/13/2016 | Demchick-Alloy, Wendy |
|---|---|---|---|

Amended Scheduling Order
Time Change ONLY for the 04/20/16 Pre-Trial Motions Hearing: Changed to 10:00 a.m.
Kramer, Ross M.
| 04/25/2016 | First Class |
McGoldrick, Thomas W.
| 04/25/2016 | Interoffice |

---

| 33/1 | 04/15/2016 | | Gurney, Kaitlin M. |
|---|---|---|---|

Response of Philadelphia Media Network, The Morning Call, Alm Media, Block Communications, and

PA Media Group in Opposition to Attorney General Kathleen Kane's Motion for Permission to File Motion Under Seal

CPCMS 9082

Printed: 02/06/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000719



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 34/1 | 04/20/2016 | 04/20/2016 | Kramer, Ross M. |
| Notice of Appeal to the Superior Court | | | |
| 34a/2 | 04/20/2016 | 04/20/2016 | Kramer, Ross M. |
| Certificate of Service | | | |
| 35/1 | 04/25/2016 | | Commonwealth of Pennsylvania |
| Response to Defendant's Notice of Appeal | | | |
| Filed by Kevin R. Steele, District Attorney | | | |
| 36/1 | 04/27/2016 | | Kane, Kathleen Granahan |
| Motion of Attorney General Kathleen G. Kane to Quash Based on Selective and Vindictive Prosecution | | | |
| FIled by Gerald L. Shargel, Esq. | | | |
| 37/1 | 04/29/2016 | | Court of Common Pleas - Montgomery County |
| Notes of Testimony | | | |
| Pretrial Motions, Ctrm B | | | |
| Wednesday April 20, 2016. 10:04 am | | | |
| Judge Demchick-Alloy | | | |
| 38/1 | 05/02/2016 | | Commonwealth of Pennsylvania |
| Response to Defendant's Motion to Quash Based on Selective and Vindictive Prosecution | | | |
| Filed by Kevin R. Steele, District Attorney | | | |
| 39/1 | 05/09/2016 | | Kane, Kathleen Granahan |
| Reply Memorandum of Law in Support of Attorney General Kathleen G. Kane's Motion to Quash Based on Selective and Vindictive Prosecution | | | |
| Filed by Amil M. Minora, Esq. | | | |
| 40/1 | 05/13/2016 | 05/12/2016 | Demchick-Alloy, Wendy |
| Opinion | | | |
| 1 | 05/16/2016 | 05/16/2016 | Demchick-Alloy, Wendy |
| Order Striking Motion to Quash Based on Selective and Vindictive Prosecution | | | |
| Deft Granted 10 Days to File an Amended Motion - with a Support Brief within 10 Days if Commonwealth Files a Response | | | |
| Commonwealth is Ordered to File a Response (if Defense Files Amended Motion) within 10 Days | | | |

Printed: 02/06/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000720



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

Kramer, Ross M.
05/16/2016     First Class
McGoldrick, Thomas W.
05/16/2016     Interoffice

---

| 1 | 05/17/2016 | | Weiss, Ann Thornburg |

List of Documents sent to Superior Court, DA and Attorney

---

| 2 | 05/17/2016 | | Weiss, Ann Thornburg |

Certificate and Transmittal of Record to Appellate Court

---

| 1 | 05/26/2016 | | Kramer, Ross M. |

Motion of Attorney General Kathleen G. Kane to Quash Based on Selevtive and Vindictive Prosecution

---

| 2 | 05/26/2016 | | Kramer, Ross M. |

Memorandum of law in Support of Attorney General Kathleen Kane's Motion to Quash
    Filed by Gerald L. Shargel, Esq.

---

| 1 | 06/06/2016 | | Commonwealth of Pennsylvania |

Response to Defendant's Motion to Quash Based on Selective and Vindictive Prosecution
    Filed by Kevin R. Steele, DA

---

| 1 | 06/13/2016 | | Kane, Kathleen Granahan |

Reply Memorandum of Law in Support of Attorney General Kathleen G. Kane's Motion to Quash Based on

Selective and Vindictive Prosecution

    Filed by Gerald L. Shargel, Esq.

---

| 1 | 06/20/2016 | 06/20/2016 | Demchick-Alloy, Wendy |

Order Denying Motion to Quash Based on Selective and Vindictive Prosecution
McGoldrick, Thomas W.
06/20/2016     Interoffice
Minora, Amil Michael
06/20/2016     First Class

---

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000721

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

| | | | |
|---|---|---|---|
| 1 | 06/30/2016 | 06/28/2016 | Demchick-Alloy, Wendy |

Order Scheduling Trial Management Conference
   July 11, 2016 at 1:00 p.m. 1st Floor Chambers

Minora, Amil Michael
06/28/2016     First Class
Steele, Kevin R.
06/28/2016     Interoffice

---

| 1 | 07/11/2016 | | Rosenblum, Douglas Keith |
|---|---|---|---|

Entry of Appearance

---

| 8 | 07/11/2016 | 07/11/2016 | Demchick-Alloy, Wendy |
|---|---|---|---|

Scheduling Order
   Filing of Motions in Limine - 07/20/16
   Responses to Motions in Limine - 07/22/16
   Hearing on Motions in Limine - 07/26/16 at 10:00 a.m. Courtroom "A"
   Voir Dire and/or Points of Charge - 08/03/16
   Jury Trial Scheduled for 08/08/16 at 9:00 a.m. Courtroom "A"
Kramer, Ross M.
07/29/2016     First Class
McGoldrick, Thomas W.
07/29/2016     Interoffice

---

| 9 | 07/11/2016 | 07/11/2016 | Demchick-Alloy, Wendy |
|---|---|---|---|

Order Scheduling Jury Trial
   August 8, 2016 at 09:00 a.m. Courtroom "A"

McGoldrick, Thomas W.
07/11/2016     Interoffice
Minora, Amil Michael
07/11/2016     First Class

---

| 1 | 07/20/2016 | | Kane, Kathleen Granahan |
|---|---|---|---|

Memorandum of Law in Support of Her Motion to Compel Production of Handwritten Notes of Interviews
   Filed by Douglas K. Rosenblum, Esq.

---

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000722

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 2 | 07/20/2016 | | Kane, Kathleen Granahan |

Memorandum of Law in Support of Her Motion in Limine to Preclude Certain Testimony Regarding
Philadelphia District Attorney R. Seth Williams

Filed by Douglas K. Rosenblum, Esq.

---

| 3 | 07/20/2016 | | Kane, Kathleen Granahan |

Motion to Compel Production of Handwritten Notes of Interviews
Filed by Douglas K. Rosenblum, Esq.

---

| 4 | 07/20/2016 | | Kane, Kathleen Granahan |

Motion in Limine to Preclude Certain Testimony Regarding Philadelphia District
Attorney R. Seth Williams

Filed by Douglas K. Rosenblum

---

| 1 | 07/21/2016 | | Commonwealth of Pennsylvania |

Motion in Limine to Admit Evidence of Prior Conversations by Joshua Morrow
Filed by Kevin R. Steele, DA

---

| 2 | 07/21/2016 | | Commonwealth of Pennsylvania |

Motion in Limine to Exclude Evidence of Selective and Vindictive Prosecution
Filed by Kevin R. Steele, DA

---

| 3 | 07/21/2016 | 07/21/2016 | Demchick-Alloy, Wendy |

Order Granting Request for Extention of Deadline for Filing Responses to Motions In Limine
Kramer, Ross M.

| 07/21/2016 | First Class |
| McGoldrick, Thomas W. | |
| 07/21/2016 | Interoffice |

---

| 1 | 07/25/2016 | | Commonwealth of Pennsylvania |

Reply in Opposition to Commonwealth's Motion in Limine to Exclude Evidence of Selective and
Vindictive Prosecution

Filed by Douglas K. Rosenblum, Esq.

---

CPCMS 9082

Printed: 02/06/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000723

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|

**2**     07/25/2016                         Kane, Kathleen Granahan

Reply in Opposition to Commonwealth's Motion in Limine to Admit Evidence of Prior Conversations by
    Joshua Morrow

    Filed by Douglas K. Rosenblum, Esq.

---

**3**     07/25/2016                         Commonwealth of Pennsylvania

Response to Defendant's Motion to Compel Production of Handwritten Notes of Interviews
    Filed by M. Stewart Ryan, ADA

---

**1**     07/27/2016     07/27/2016     Furber, William J. Jr.

    Decorum Order Governing Voir Dire and Jury Trial

McGoldrick, Thomas W.
    07/27/2016     Interoffice

Minora, Amil Michael
    07/27/2016     First Class

---

**1**     07/29/2016     07/28/2016     Demchick-Alloy, Wendy

    Motions in Limine Order

    Commonwealth's Motion in Limine to Exclude Evidence of Selective and Vindictive Prosecution is Granted
    Commonwealth is Granted Leave to Produce Evidence of Prior Conversations by Joshua Morrow after his
    credibility is at issue
    Deft's Motion in Limine to Preclude Certain Testimony Regarding DA R. Seth Williams is Denied - Right to Object
    Retaines
    Deft's Motion to Compel Production of Handwritten Notes of Interviews is Denied in light of Commonwealth's
    Statement on Record that investigators made no handwritten notes

McGoldrick, Thomas W.
    07/28/2016     Interoffice

Rosenblum, Douglas Keith
    07/28/2016     First Class

---

**1**     08/01/2016                      Superior Court of Pennsylvania - Eastern District

    Superior Court Order
    Order Granting Motion to Quash.

---

CPCMS 9082                                          Printed: 02/06/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000724

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 2 | 08/01/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony
 Motions in Limine, Ctrm A
 Tuesday July 26, 2016. 10:30 am
 Judge Demchick-Alloy

| | | | |
|---|---|---|---|
| 1 | 08/02/2016 | | Kramer, Ross M. |

Praecipe to Withdraw Affidavit in Part
 Filed by Gerald L. Shargel, Esq

| | | | |
|---|---|---|---|
| 2 | 08/02/2016 | | Kramer, Ross M. |

Defendant's Applicaiton to Seal
 Filed by Douglas K. Rosenblum, Esq.

| | | | |
|---|---|---|---|
| 3 | 08/02/2016 | | Kramer, Ross M. |

Defendant's Emergency Application for Extraordinary Relief
 Filed by D. Peter Johnson, Esq.

| | | | |
|---|---|---|---|
| 1 | 08/03/2016 | | McGoldrick, Thomas W. |

Proposed Jury Instructions
 Filed by Kevin Steele, DA

| | | | |
|---|---|---|---|
| 2 | 08/03/2016 | | Kramer, Ross M. |

Defendant's Proposed Supplemental Voire Dire
 Filed by Douglas K. Rosenblum, Esq.
Demchick-Alloy, Wendy
08/04/2016    Hand Delivered

| | | | |
|---|---|---|---|
| 3 | 08/03/2016 | | Kramer, Ross M. |

Defendant's Proposed Jury Instructions
 Filed by Douglas K. Rosenblum, Esq.
Demchick-Alloy, Wendy
08/04/2016    Hand Delivered

| | | | |
|---|---|---|---|
| 4 | 08/03/2016 | | McGoldrick, Thomas W. |

Commonwealth's Proposed Voir Dire Questions
 Filed by Kevin Steele, DA

CPCMS 9082

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000725

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 08/08/2016 | | Commonwealth of Pennsylvania |
| Information Filed | | | |
| 2 | 08/08/2016 | | Demchick-Alloy, Wendy |
| Guilty | | | |
| 3 | 08/08/2016 | | Demchick-Alloy, Wendy |
| Sentence Deferred | | | |
| 4 | 08/08/2016 | | Demchick-Alloy, Wendy |
| Pre-Sentence Investigation Ordered | | | |
| 1 | 08/10/2016 | 08/10/2016 | Furber, William J. Jr. |
| Amended Decorum Order Governing Voir Dire and Jury Trial | | | |

Kramer, Ross M.
  08/10/2016        First Class
McGoldrick, Thomas W.
  08/10/2016        Interoffice

| 1 | 08/11/2016 | 08/10/2016 | Demchick-Alloy, Wendy |
|---|---|---|---|
| Order Granting Immunity Petition | | | |
|   Joshua Morrow | | | |

Kramer, Ross M.
  08/15/2016        First Class
McGoldrick, Thomas W.
  08/15/2016        Interoffice

| 2 | 08/11/2016 | | McGoldrick, Thomas W. |
|---|---|---|---|
| Immunity Petition | | | |
|   Filed by Thomas W. McGoldrick, ADA | | | |
| 1 | 08/12/2016 | | Gurney, Kaitlin M. |
| Intervenor Phialdelphis Media Network's Motion Seeking Access to Trial Exhibits Into Evidence | | | |

  Intervenor Phialdelphis Media Network's Motion Seeking Access to Trial Exhibits Into Evidence and Material Presented to the Jury

  Filed by Amy B. Ginensky, Esq.

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000726

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 2 | 08/12/2016 | | Gurney, Kaitlin M. |

Memorandum of Law in Support of Intervenor Philadelphia Media Network's Motion Seeking Trial Exhibit

Memorandum of Law in Support of Intervenor Philadelphia Media Network's Motion Seeking Access to Trial Exhibits Entered Into Evidence and Materials Presented to the Jury

Filed by Amy B. Ginensky, Esq.

---

| 1 | 08/15/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony

Trial by Jury, Ctrm A
Tuesday August 11, 2016. 1:24 pm
Judge Demchick-Alloy

---

| 2 | 08/15/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony

Trial by Jury/ A.M. Session, Ctrm A
Wednesday August 10, 2016. 8:49 am
Judge Demchick-Alloy

---

| 3 | 08/15/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony

Trial by Jury, Ctrm A
Tuesday August 10, 2016. 1:37 pm
Judge Demchick-Alloy

---

| 4 | 08/15/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony

Trial by Jury, Ctrm A
Monday August 8, 2016. 9:27 am
Judge Demchick-Alloy

---

| 5 | 08/15/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony

Trial by Jury/A.M. Session, Ctrm A
Tuesday August 9, 2016. 8:52 am
Judge Demchick-Alloy

---

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000727

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 6 | 08/15/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony
   Trial by Jury, Ctrm A
   Tuesday August 9, 2016. 1:43 pm
   Judge Demchick-Alloy

| 7 | 08/15/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony
   Trial by Jury/A.M. Session, Ctrm A
   Thursday August 11, 2016. 8:56 am
   Judge Demchick-Alloy

| 1 | 08/16/2016 | | Montgomery County Court Administration |

Sentencing Scheduled 10/24/2016 10:00AM

| 2 | 08/16/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony
   Trial by Jury, Ctrm A
   Friday August 12, 2016. 8:50 am
   Judge Demchick-Alloy and a jury

| 3 | 08/16/2016 | 08/16/2016 | Demchick-Alloy, Wendy |

Order Scheduling Hearing
   Sentencing Hearing October 24, 2016 at 10:00 a.m. Courtroom "A"
Kramer, Ross M.
   09/03/2016          First Class
McGoldrick, Thomas W.
   09/03/2016          Interoffice

| 1 | 08/23/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony
   Trial by Jury, Ctrm A
   Monday August 15, 2016. 9:17 am
   Judge Demchick-Alloy

---

CPCMS 9082

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000728

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 2 | 08/23/2016 | | Kramer, Ross M. |
| Exhibits Location Filed | | | |
| 1 | 08/25/2016 | | Kramer, Ross M. |
| Exhibits Location Filed | | | |
| 2 | 08/25/2016 | | McGoldrick, Thomas W. |
| Exhibits Location Filed | | | |
| 1 | 09/13/2016 | | Steinberg, Marc Robert |
| Entry of Appearance | | | |
| 1 | 10/13/2016 | | Kane, Kathleen Granahan |

Motion to Perform House Arrest Suitability Assessment
   Filed by Marc Robert Steinberg, Attorney for Defendant

| Demchick-Alloy, Wendy | | | |
|---|---|---|---|
| 10/14/2016 | Hand Delivered | | |

| 2 | 10/13/2016 | 10/13/2016 | Furber, William J. Jr. |
|---|---|---|---|

Decorum Order Governing Sentencing
   Stew Ryan ADA served via order scanned and sent interoffice mail on 10/12/2016

   Gerald L. Shargel, Esq., Seth C. Farber, Esq. served via order scanned and sent via first class mail on 10/12/2016

| Henry, Michelle Ann | | |
|---|---|---|
| 10/12/2016 | First Class | |
| Kramer, Ross M. | | |
| 10/12/2016 | First Class | |
| McGoldrick, Thomas W. | | |
| 10/12/2016 | Interoffice | |
| Minora, Amil Michael | | |
| 10/12/2016 | First Class | |
| Rosenblum, Douglas Keith | | |
| 10/12/2016 | First Class | |
| Steele, Kevin R. | | |
| 10/12/2016 | Interoffice | |
| Steinberg, Marc Robert | | |
| 10/12/2016 | First Class | |

CPCMS 9082

Printed: 02/06/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

**A000729**



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

| 1 | 10/14/2016 | 10/13/2016 | Demchick-Alloy, Wendy |
|---|---|---|---|

Answer By

Commonwealth - Application for House Arrest Suitabilty Assessment - no later than 4:15 p.m. on 10/14/16

GERALD L SHARGEL ESQ AND SETH C FARBER ESQ SERVED VIA FIRST CLASS MAIL ON 10/13/2016

| Henry, Michelle Ann | | | |
|---|---|---|---|
| 10/13/2016 | First Class | | |
| Kramer, Ross M. | | | |
| 10/13/2016 | First Class | | |
| McGoldrick, Thomas W. | | | |
| 10/13/2016 | Interoffice | | |
| Minora, Amil Michael | | | |
| 10/13/2016 | First Class | | |
| Rosenblum, Douglas Keith | | | |
| 10/13/2016 | First Class | | |
| Steele, Kevin R. | | | |
| 10/13/2016 | Interoffice | | |
| Steinberg, Marc Robert | | | |
| 10/13/2016 | First Class | | |

---

| 2 | 10/14/2016 | | Commonwealth of Pennsylvania |
|---|---|---|---|

Response to Defendant's Motion to Perform House Arrest Suitability Assessment

Filed by Kevin R. Steele, DA

| Demchick-Alloy, Wendy | | | |
|---|---|---|---|
| 10/18/2016 | Hand Delivered | | |

---

| 1 | 10/17/2016 | 10/14/2016 | Demchick-Alloy, Wendy |
|---|---|---|---|

Order Granting Motion to Perform House Arrest Suitability Assessment

Report due on or before 10/21/16

GERALD L SHARGEL ESQ, SETH C FARBER ESQ SERVED VIA FIRST CLASS MAIL 10/14/2016

M RYAN STEWART ADA SERVED VIA INTEROFFICE MAIL 10/14/2016

| Henry, Michelle Ann | | | |
|---|---|---|---|
| 10/14/2016 | First Class | | |
| Kramer, Ross M. | | | |
| 10/14/2016 | First Class | | |
| McGoldrick, Thomas W. | | | |
| 10/14/2016 | Interoffice | | |

CPCMS 9082

Printed: 02/06/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000730

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

Page 23 of 28

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

| | | | |
|---|---|---|---|
| Minora, Amil Michael | | | |
| 10/14/2016 | First Class | | |
| Rosenblum, Douglas Keith | | | |
| 10/14/2016 | First Class | | |
| Steele, Kevin R. | | | |
| 10/14/2016 | Interoffice | | |

---

| 2 | 10/17/2016 | | Commonwealth of Pennsylvania |
|---|---|---|---|

Sentencing Memorandum

CR 6239-15
8423-15

Filed by Kevin R. Steele, District Attorney
Thomas W. McGoldrick Deputy District Attorney

| Demchick-Alloy, Wendy | | | |
|---|---|---|---|
| 10/18/2016 | Hand Delivered | | |

---

| 1 | 10/18/2016 | | Kane, Kathleen Granahan |
|---|---|---|---|

Sentnecing Memorandum

Filed by Marc Robert Steinberg, Esq.

| Demchick-Alloy, Wendy | | | |
|---|---|---|---|
| 10/18/2016 | Hand Delivered | | |

---

| 1 | 10/24/2016 | | Demchick-Alloy, Wendy |
|---|---|---|---|

Bail Set - Kane, Kathleen Granahan

---

| 2 | 10/24/2016 | | REGENSBURG, MARY P. |
|---|---|---|---|

Bail Posted - Kane, Kathleen Granahan

---

| 3 | 10/24/2016 | | Demchick-Alloy, Wendy |
|---|---|---|---|

Order - Sentence/Penalty Imposed

---

| 4 | 10/24/2016 | | Demchick-Alloy, Wendy |
|---|---|---|---|

Order Modifying Bail

---

| 5 | 10/24/2016 | | Demchick-Alloy, Wendy |
|---|---|---|---|

Bail Set - Kane, Kathleen Granahan

---

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000731

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

Page 24 of 28

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 10/25/2016 | | Demchick-Alloy, Wendy |
| Order Modifying Bail | | | |

| 1 | 10/26/2016 | | Kane, Kathleen Granahan |
|---|---|---|---|
| Motion to Withdraw as Counsel | | | |
| Filed by Douglas K. Rosenblum, Esq. | | | |

Demchick-Alloy, Wendy
10/27/2016      Hand Delivered

| 1 | 10/27/2016 | 10/27/2016 | Demchick-Alloy, Wendy |
|---|---|---|---|
| Order Granting Motion to Withdraw as Counsel | | | |
| Douglas Rosenblum Esq. | | | |

Kane, Kathleen Granahan
11/16/2016      First Class
McGoldrick, Thomas W.
11/16/2016      Interoffice

| 1 | 10/31/2016 | | Kane, Kathleen Granahan |
|---|---|---|---|
| Motion to Withdraw as Counsel | | | |
| Filed by Seth C. Farber, Esq. | | | |

| 2 | 10/31/2016 | | Kane, Kathleen Granahan |
|---|---|---|---|
| Motion to Withdraw as Counsel | | | |
| Filed by Gerald L. Shargel, Esq. | | | |

| 3 | 10/31/2016 | | Kane, Kathleen Granahan |
|---|---|---|---|
| Motion to Withdraw as Counsel | | | |
| Filed by Ross M. Kramer, Esq. | | | |

| 1 | 11/01/2016 | | Demchick-Alloy, Wendy |
|---|---|---|---|
| Stipulation re: Waiver under Pa.R.Crim.P. 704(C)(3) | | | |

| 2 | 11/01/2016 | 11/01/2016 | Demchick-Alloy, Wendy |
|---|---|---|---|
| Order Granting Motion to Withdraw as Counsel | | | |
| Seth Farber Esq. | | | |

Kane, Kathleen Granahan
11/16/2016      First Class
McGoldrick, Thomas W.

Printed: 02/06/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000732

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |
| 11/16/2016 | Interoffice | | |

| | | | |
|---|---|---|---|
| 3 | 11/01/2016 | 11/01/2016 | Demchick-Alloy, Wendy |

Order Granting Motion to Withdraw as Counsel
  Gerald Shargel Esq.

| | | | |
|---|---|---|---|
| Kane, Kathleen Granahan | | | |
| 11/16/2016 | First Class | | |
| McGoldrick, Thomas W. | | | |
| 11/16/2016 | Interoffice | | |

| | | | |
|---|---|---|---|
| 4 | 11/01/2016 | 11/01/2016 | Demchick-Alloy, Wendy |

Order Granting Motion to Withdraw as Counsel
  Ross Kramer Esq.

| | | | |
|---|---|---|---|
| Kane, Kathleen Granahan | | | |
| 11/16/2016 | First Class | | |
| McGoldrick, Thomas W. | | | |
| 11/16/2016 | Interoffice | | |

| | | | |
|---|---|---|---|
| 1 | 11/02/2016 | | Kane, Kathleen Granahan |

Motion to Withdraw as Counsel
  Filed by Marc Robert Steinberg, Esq.

| | | | |
|---|---|---|---|
| 1 | 11/03/2016 | 11/02/2016 | Demchick-Alloy, Wendy |

Order Granting Motion to Withdraw as Counsel
  Marc Robert Steinberg Esq.
    GERALD SHARGEL ESQ, SERVED VIA FIRST CLASS MAIL 11/02/2016

| | | | |
|---|---|---|---|
| Commonwealth of Pennsylvania | | | |
| 11/02/2016 | | | |
| Henry, Michelle Ann | | | |
| 11/02/2016 | | | |
| McGoldrick, Thomas W. | | | |
| 11/02/2016 | | | |
| Minora, Amil Michael | | | |
| 11/02/2016 | First Class | | |
| Rosenblum, Douglas Keith | | | |
| 11/02/2016 | First Class | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000733

## DOCKET



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

Page 26 of 28

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

Steele, Kevin R.
11/02/2016
Steinberg, Marc Robert
11/02/2016     First Class

---

| 1 | 11/07/2016 | | Court of Common Pleas - Montgomery County |

Notes of Testimony
    Sentencing, Ctrm A
    Monday October 24, 2016. 10:03 am
    Judge Demchick-Alloy

---

| 1 | 11/21/2016 | | Minora, Amil Michael |

Motion to Withdraw as Counsel

---

| 1 | 11/22/2016 | | Lock, Joshua D. |

Entry of Appearance

---

| 2 | 11/22/2016 | | Kane, Kathleen Granahan |

Notice of Appeal to the Superior Court
    Filed by Joshua D. Lock, Esq.

---

| 3 | 11/22/2016 | | Kane, Kathleen Granahan |

Certificate of Service
    Filed by Joshua D. Lock, Esq.

---

| 4 | 11/22/2016 | 11/22/2016 | Demchick-Alloy, Wendy |

Order Granting Motion to Withdraw as Counsel
    Amil M. Minora Esq.
Minora, Amil Michael
11/22/2016
Montgomery County District Attorney's
Office
11/22/2016

---

| 1 | 11/23/2016 | 11/22/2016 | Demchick-Alloy, Wendy |

1925(b) Concise Statement Order

---

CPCMS 9082

Printed: 02/06/2017

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000734

# COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

## DOCKET



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 11/28/2016 | | Kane, Kathleen Granahan |

Motion to Withdraw as Counsel

    Filed by Amil M. Minora, Esq.

Demchick-Alloy, Wendy

| | | | |
|---|---|---|---|
| 11/14/2016 | | Hand Delivered | |
| 1 | 12/09/2016 | | Lock, Joshua D. |

Motion to Enlarge Time to File Concise Statement of Matters Complained of on Appeal Pursuant to Pa.

    Motion to Enlarge Time to File Concise Statement of Matters Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b)(2).

| 2 | 12/09/2016 | | Kane, Kathleen Granahan |
|---|---|---|---|

Certificate of Service

| 3 | 12/09/2016 | | Demchick-Alloy, Wendy |
|---|---|---|---|

Order Granting Extension to File Statement of Matters Complained on Appeal

| 1 | 01/03/2017 | | Lock, Joshua D. |
|---|---|---|---|

Concise Statement of the Matters Complained on Appeal

| 2 | 01/03/2017 | | Lock, Joshua D. |
|---|---|---|---|

Certificate of Service

| 1 | 01/04/2017 | | Lock, Joshua D. |
|---|---|---|---|

Revised Statement of Matters Complained of on Appeal Pursuant to PA.R.A.P. 1925(b)

| 2 | 01/04/2017 | | Lock, Joshua D. |
|---|---|---|---|

Certificate of Service

## PAYMENT PLAN SUMMARY

| Payment Plan No | Payment Plan Freq. | Next Due Date | Active | Overdue Amt |
|---|---|---|---|---|
| Responsible Participant | | | Suspended | Next Due Amt |
| 46-2016-P000016645 | Monthly | 09/18/2017 | Yes | $0.00 |
| Kane, Kathleen Granahan | | | No | $15.01 |

| | Payment Plan History: | Receipt Date | | Payor Name | Participant Role | Amount |
|---|---|---|---|---|---|---|
| | | 11/30/2015 | Payment | Kane, Kathleen Granahan | Defendant | $9.00 |

CPCMS 9082

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000735



**Docket Number: CP-46-CR-0008423-2015**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kathleen Granahan Kane

## CASE FINANCIAL INFORMATION

Last Payment Date: 11/22/2016          Total of Last Payment: -$9.00

**Kane, Kathleen Granahan**
Defendant

| | Assessment | Payments | Adjustments | Non Monetary Payments | Total |
|---|---|---|---|---|---|
| **Costs/Fees** | | | | | |
| Copies (Montgomery) | $9.00 | $0.00 | $0.00 | $0.00 | $9.00 |
| Costs of Prosecution - CJEA | $50.00 | $0.00 | $0.00 | $0.00 | $50.00 |
| Judicial Computer Project | $8.00 | $0.00 | $0.00 | $0.00 | $8.00 |
| State Court Costs (Act 204 of 1976) | $13.55 | $0.00 | $0.00 | $0.00 | $13.55 |
| Appeal to Superior Court (Montgomery) | $71.25 | -$71.25 | $0.00 | $0.00 | $0.00 |
| Automation Filing Fee (Montgomery) | $5.00 | -$5.00 | $0.00 | $0.00 | $0.00 |
| ATJ | $4.00 | $0.00 | $0.00 | $0.00 | $4.00 |
| Automation Fee (Act 36 of 2000) (Montgomery) | $5.00 | $0.00 | $0.00 | $0.00 | $5.00 |
| CJES | $2.25 | $0.00 | $0.00 | $0.00 | $2.25 |
| COC Processing Fee Misd/Fel (Montgomery) | $355.25 | $0.00 | $0.00 | $0.00 | $355.25 |
| Commonwealth Cost - HB627 (Act 167 of 1992) | $20.30 | $0.00 | $0.00 | $0.00 | $20.30 |
| County Court Cost (Act 204 of 1976) | $29.65 | $0.00 | $0.00 | $0.00 | $29.65 |
| Court Child Care (Act 105 of 2000) (Montgomery) | $5.00 | $0.00 | $0.00 | $0.00 | $5.00 |
| Crime Victims Compensation (Act 96 of 1984) | $35.00 | -$9.00 | $0.00 | $0.00 | $26.00 |
| DNA Detection Fund (Act 185-2004) | $250.00 | $0.00 | $0.00 | $0.00 | $250.00 |
| Domestic Violence Compensation (Act 44 of 1988) | $10.00 | $0.00 | $0.00 | $0.00 | $10.00 |
| Firearm Education and Training Fund | $5.00 | $0.00 | $0.00 | $0.00 | $5.00 |
| JCPS | $21.25 | $0.00 | $0.00 | $0.00 | $21.25 |
| Variable Amount to be Distributed CVC/VWS (Act 96) | $12.00 | $0.00 | $0.00 | $0.00 | $12.00 |
| Variable Amount to be Distributed CVC/VWS (Act 96) | $28.00 | $0.00 | $0.00 | $0.00 | $28.00 |
| Victim Witness Service (Act 111 of 1998) | $25.00 | $0.00 | $0.00 | $0.00 | $25.00 |
| Costs/Fees Totals: | $964.50 | -$85.25 | $0.00 | $0.00 | $879.25 |
| Grand Totals: | $964.50 | -$85.25 | $0.00 | $0.00 | $879.25 |

** - Indicates assessment is subrogated

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

A000736

## CERTIFICATE OF SERVICE

This is to certify that in this case two (2) complete copies of all papers contained in the foregoing Brief of Appellants have been served via electronically by the Court and hand delivery upon the following:

Richard R. Harris, Esquire
Littler Mendelson, PC
1601 Cherry Street
Suite 1400
Philadelphia, PA 19102

/s/ Mark W. Tanner
MARK W. TANNER, ESQUIRE
Feldman Shepherd Wohlgelernter Tanner
Weinstock & Dodig, LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
Attorneys for Appellants, Frank Noonan,
Randy Feathers, Richard A. Sheetz, Jr., and
Frank Fina

Fortunato N. Perri, Jr.
FORTUNATO N. PERRI, JR., ESQUIRE
McMonagle Perri McHugh & Mischak
145 Walnut Street, 19th Floor
Philadelphia, PA 19103

Attorney for Appellant, E. Marc Costanzo

Date: February 13, 2017

**A000737**